ORIGINAL

19 MAG 10987

Approved: KIMBERLY RAVENER / MICHAEL KROUSE / KYLE A. WIRSHBA
Assistant United States Attorneys

Before: HONORABLE SARAH NETBURN
United States Magistrate Judge
Southern District of New York

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>- v. -<br><br>VIRGIL GRIFFITH,<br><br>Defendant. | **SEALED COMPLAINT**<br><br>Violation of<br>50 U.S.C. § 1705<br><br>COUNTY OF OFFENSE:<br>NEW YORK |

SOUTHERN DISTRICT OF NEW YORK, ss.:

BRANDON M. CAVANAUGH, being duly sworn, deposes and says that he is a Special Agent with the Federal Bureau of Investigation (the "FBI"), and charges as follows:

COUNT ONE
(Conspiracy to Violate the
International Emergency Economic Powers Act)

1. From at least in or about August 2018, up to and including in or about November 2019, in the Southern District of New York, North Korea, and elsewhere outside of the jurisdiction of any particular State or district of the United States, VIRGIL GRIFFITH, the defendant, and others known and unknown, at least one of whom is expected to be first brought to and arrested in the Southern District of New York, knowingly and willfully did combine, conspire, confederate, and agree together and with each other to violate licenses, orders, regulations, and prohibitions in and issued under the International Emergency Economic Powers Act ("IEEPA"), codified at Title 50, United States Code, Sections 1701-1706.

2. It was a part and an object of the conspiracy that VIRGIL GRIFFITH, the defendant, and others known and unknown, would and did provide and cause others to provide

services to the Democratic People's Republic of Korea ("DPRK" or "North Korea"), without first obtaining the required approval of the U.S. Treasury Department's Office of Foreign Asset Control ("OFAC"), in violation of 50 U.S.C. § 1705(a), 31 C.F.R. §§ 510.206(a), 510.212(b), and Executive Orders 13466 and 13722.

3. It was further a part and an object of the conspiracy that VIRGIL GRIFFITH, the defendant, and others known and unknown, would and did evade and avoid, and attempt to evade and avoid, the requirements of U.S. law with respect to the provision of services to the DPRK, in violation of 50 U.S.C. § 1705(a), 31 C.F.R. §§ 510.212(a)-(b), and Executive Orders 13466 and 13722.

(Title 50, United States Code, Section 1705;
Executive Orders 13466 and 13722;
Title 18, United States Code, Section 3238.)

The bases for my knowledge and the foregoing charge are, in part, as follows:

4. I am a Special Agent with the FBI, currently assigned to the FBI's Counterintelligence Division. This Affidavit is based upon my personal participation in the investigation, my examination of reports and records, and my conversations with other law enforcement agents and other individuals. Because this Affidavit is being submitted for the limited purpose of demonstrating probable cause, it does not include all the facts that I have learned during the course of my investigation. Where the contents of documents and the actions, statements, and conversations of others are reported herein, they are reported in substance and in part, except where otherwise indicated.

**Overview**

5. In or about April 2019, VIRGIL GRIFFITH, the defendant, traveled to the DPRK to attend and present at the "Pyongyang Blockchain and Cryptocurrency Conference" (the "DPRK Cryptocurrency Conference"). The U.S. State Department denied GRIFFITH permission to go to the DPRK to attend the DPRK Cryptocurrency Conference due to the DPRK Sanctions, but GRIFFITH nonetheless traveled to the DPRK, via China, in order to participate. At the DPRK Cryptocurrency Conference, in violation of the DPRK Sanctions, GRIFFITH gave a presentation on topics that were pre-approved by DPRK officials, provided the DPRK with valuable information on blockchain and cryptocurrency technologies, and participated in discussions regarding using

cryptocurrency technologies to evade sanctions and launder money. After the DPRK Cryptocurrency Conference, GRIFFITH also encouraged other U.S. citizens to travel to the DPRK.

**The DPRK Sanctions**

6. The IEEPA, codified at Title 50, United States Code, Sections 1701-1706, confers upon the President authority to deal with unusual and extraordinary threats to the national security and foreign policy of the United States. Section 1705 provides, in part, that "[i]t shall be unlawful for a person to violate, attempt to violate, conspire to violate, or cause a violation of any license, order, regulation, or prohibition issued under this title." 50 U.S.C. § 1705(a).

7. Beginning with Executive Order 13466, issued on June 26, 2008, the President found that the situation "on the Korean Peninsula constitute[s] an unusual and extraordinary threat to the national security and foreign policy of the United States and . . . declare[d] a national emergency to deal with that threat."

8. Following the issuance of Executive Order 13466, OFAC promulgated the North Korea Sanctions Regulations ("NKSR") to further implement the DPRK Sanctions. *See* 31 C.F.R. Part 510.

9. On March 18, 2016, the President issued Executive Order 13722, which prohibited both "the exportation or reexportation, direct or indirect, from the United States, or by a United States person, wherever located, of any goods, services, or technology to North Korea" and "any approval, financing, facilitation, or guarantee by a United States person, wherever located, of a transaction by a foreign person where the transaction by that foreign person would be prohibited by this section if performed by a United States person or within the United States."

10. Executive Order 13722 also prohibits transactions that evade or avoid, have the purpose of evading or avoiding, cause a violation of, or attempt to violate the terms of the Order.

11. Pursuant to Executive Order 13722, and to incorporate certain other legislation, OFAC amended and reissued the NKSR in their entirety on March 5, 2018. Since that time, the NKSR specifically prohibit, among other things, the "exportation or reexportation, directly or indirectly, from the United States, or by a U.S. person, wherever located, of any

goods, services, or technology to North Korea," "[a]ny transaction . . . that evades or avoids, has the purpose of evading or avoiding, causes a violation of, or attempts to violate any of the prohibitions set forth in this part," and "[a]ny conspiracy formed to violate the prohibitions set forth in this part." 31 C.F.R. §§ 510.206(a), 510.212(a)-(b). Thus, under OFAC's regulations, "U.S. persons may not, except as authorized by or pursuant to this part, provide legal, accounting, financial, brokering, freight forwarding, transportation, public relations, or other services to any person in North Korea or to the Government of North Korea." *Id.* § 510.405(d)(1).

**Griffith's Cryptocurrency Expertise**

12. Cryptocurrency is a decentralized, peer-to-peer form of electronic currency that can be digitally traded and functions as (1) a medium of exchange; (2) a unit of account; and/or (3) a store of value, but does not have legal tender status. Unlike "fiat currency," such as the U.S. dollar and the Euro, cryptocurrency is not issued by any jurisdiction and functions only by agreement within the community of users of that particular currency.

13. A blockchain is a public, distributed electronic ledger that, among other things, records cryptocurrency transfers. The blockchain only records the movement of cryptocurrency; it does not by itself identify the parties to the transfer. As a result, the users can remain anonymous.

14. Based on my review of publicly available sources, I know, among other things, that:

a. VIRGIL GRIFFITH, the defendant, possesses a doctorate from the California Institute of Technology in computational and neural systems, and a bachelors of science in computer and cognitive science from the University of Alabama.

b. GRIFFITH is employed by an entity that functions as an open-source platform for the development of blockchain and cryptocurrency technologies, including, among other things, a particular type of the cryptocurrency ("Cryptocurrency-1"). Cryptocurrency-1, like other cryptocurrencies, is not issued by any government or bank, but is instead generated and controlled through computer software operating on a decentralized peer-to-peer network.

**Griffith's May 22, 2019 Admissions**

15. On or about May 22, 2019, I participated in a consensual interview of VIRGIL GRIFFITH, the defendant, in Manhattan, New York (the "May 22 Interview"). Based on my participation in that May 22 Interview, I know that GRIFFITH stated, among other things, the following in substance and in part:

a. GRIFFITH is a United States citizen living in Singapore.

b. In or about April 2019, GRIFFITH traveled to the DPRK to attend and make a presentation at the DPRK Cryptocurrency Conference.

c. GRIFFITH knew that it was illegal to travel to the DPRK and so sought permission from the U.S. Department of State to travel to the DPRK. Although GRIFFITH's request was denied by the State Department, GRIFFITH attended the DPRK Cryptocurrency Conference nonetheless.

d. To facilitate his travel to the DPRK Cryptocurrency Conference, GRIFFITH worked with a particular individual ("CC-1"), who assisted GRIFFITH in arranging travel to the DPRK. As part of that process, GRIFFITH communicated by email with, among others, CC-1 and a DPRK diplomatic mission facility in Manhattan, New York (the "DPRK Mission").

e. GRIFFITH secured a visa to travel to the DPRK through the DPRK Mission. GRIFFITH paid one hundred Euro for his visa and elected to receive his visa on a separate paper instead of affixing the document to his U.S. passport. GRIFFITH chose the separate paper for the visa in an effort to avoid creating physical proof of his travel to the DPRK in his U.S. passport.

f. On or about April 18, 2019, GRIFFITH traveled to the DPRK through China.

g. On or about April 26 and April 27, GRIFFITH attended the DPRK Cryptocurrency Conference in Pyonyang along with approximately 100 other attendees.

h. During the DPRK Cryptocurrency Conference, an organizer of the DPRK Cryptocurrency conference ("CC-2") told GRIFFITH that, during his presentation, GRIFFITH should stress the potential money laundering and sanction evasion applications

of cryptocurrency and blockchain technology as such topics were most likely to resonate with the DPRK audience.

i. At the DPRK Cryptocurrency Conference, GRIFFITH and other attendees discussed how blockchain and cryptocurrency technology could be used by the DPRK to launder money and evade sanctions, and how the DPRK could use these technologies to achieve independence from the global banking system. GRIFFITH's presentation at the DPRK Cryptocurrency Conference was titled "Blockchain and Peace," and he discussed, among other things, how a blockchain technology, including a "smart contract," could be used to benefit the DPRK. GRIFFITH identified several DPRK Cryptocurrency Conference attendees who, during his presentation, asked more specific questions of GRIFFITH and prompted discussions on technical issues such as "proof of work" versus "proof of stake." I know from my training, experience, discussions with other law enforcement officers and open source reporting, that these concepts relate to the creation of new cryptocurrency through a process called "mining."

j. After the DPRK Cryptocurrency Conference, GRIFFITH began formulating plans to facilitate the exchange of Cryptocurrency-1 between the DPRK and South Korea. GRIFFITH acknowledged that assisting with such an exchange would violate sanctions against the DPRK, but stated that he wished to return to the DPRK and attend the same DPRK Cryptocurrency Conference the following year.

k. GRIFFITH showed FBI agents photographs of himself in the DPRK and provided to FBI propaganda from the DPRK, including newspapers and other literature.

**Griffith's Electronic Communications**

16. Based on my participation in this investigation, I know that on or about November 12, 2019, VIRGIL GRIFFITH, the defendant, consented in writing to a search of his cellphone (the "Cellphone"). Based on my review of an extraction of the Cellphone, I know, among other things, the following:

a. On or about November 26, 2018, GRIFFITH discussed his presentation with another individual ("Individual-1") through electronic phone messages. Individual-1 asked, in sum and substance, what interest North Koreans had in cryptocurrency. GRIFFITH replied, in sum and substance, "probably avoiding sanctions . . . who knows."

b. Following the May 22 Interview, on or about August 6, 2019, GRIFFITH sent an electronic message to a particular individual ("Individual-2") that stated, in sum and substance, "I need to send 1 [unit of Cryptocurrency-1] between North and South Korea." In response, Individual-2 asked, in sum and substance, "Isn't that violating sanctions?" GRIFFITH replied, "it is."

c. Electronic messages from the Cellphone also reflect that GRIFFITH contacted at least two other United States citizens to encourage them, in sum and substance, to travel to the DPRK.

**Griffith's November 12, 2019 Admissions**

17. I know from my participation in this investigation that on or about November 12, 2019, myself and another FBI agent conducted a consensual interview of GRIFFITH in San Francisco, California (the "November 12 Interview"). Based on my participation in that November 12 Interview, I know that GRIFFITH stated, among other things, the following in substance and in part:

a. GRIFFITH discussed in more detail his presentation in the DPRK. He stated, in sum and substance, that the DPRK government approved the topics within his presentation in advance and that, in his estimation, attendees left the DPRK Cryptocurrency Conference with a better understanding of cryptocurrency and blockchain than when they arrived. GRIFFITH claimed that this information included basic concepts accessible on the internet.

b. GRIFFITH acknowledged that his presentation at the DPRK Cryptocurrency Conference amounted to a "non-zero tech transfer," that is, a transfer of technical knowledge from GRIFFITH to other attendees.

c. GRIFFITH expressed a desire to obtain citizenship in another jurisdiction.

18. Based on my review of law enforcement records and discussions with other United States Government employees, I know that VIRGIL GRIFFITH, the defendant, did not seek or receive approval from OFAC to travel to or provide services to the DPRK.

WHEREFORE, the deponent respectfully requests that a warrant issue for the arrest of VIRGIL GRIFFITH, the defendant, and that he be arrested and imprisoned or bailed, as the case may be.

BRANDON M. CAVANAUGH
Special Agent, FBI

Sworn to before me this
21 th day of November, 2019

HONORABLE SARAH NETBURN
United States Magistrate Judge
Southern District of New York