

U.S. Department of Justice

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

July 23, 2020

**BY ECF**

Honorable P. Kevin Castel
United States District Judge
Southern District of New York
500 Pearl Street
New York, New York 10007

Re:   *United States v. Virgil Griffith*, 20 Cr. 15 (PKC)

Dear Judge Castel:

On July 20, 2020, the defendant moved to modify his pretrial release conditions to: (1) remove the condition of home confinement with electronic monitoring; and (2) remove the restrictions on his access to the Internet. (Dkt. 48 ("Def. Letter")). The Government respectfully opposes both requests.

**Factual Background**

Griffith is a cryptocurrency expert who possesses a doctorate from the California Institute of Technology in computational and neural systems, and a B.S. in computer and cognitive science from the University of Alabama. For the past several years, the defendant has lived full-time in Singapore, where he worked for Ethereum Foundation, a company that functions as an open-source platform for the development of blockchain[1] and cryptocurrency[2] technologies, including a cryptocurrency named Ethereum.

In or about April 2019, Griffith traveled to the DPRK to attend and present at the "Pyongyang Blockchain and Cryptocurrency Conference" (the "DPRK Cryptocurrency Conference"). Prior to traveling to the DPRK, Griffith requested permission from the U.S. State

---

[1] A blockchain is a public, distributed electronic ledger that, among other things, records cryptocurrency transfers. The blockchain only records the movement of cryptocurrency; it does not by itself identify the parties to the transfer. As a result, the users can remain anonymous. *See* Compl. ¶ 13.

[2] Cryptocurrency is a decentralized, peer-to-peer form of electronic currency that can be digitally traded and functions as (1) a medium of exchange; (2) a unit of account; and/or (3) a store of value, but does not have legal tender status. Unlike "fiat currency," such as the U.S. dollar and the Euro, cryptocurrency is not issued by any jurisdiction and functions only by agreement within the community of users of that particular currency. *See* Compl. ¶ 12.

Department to attend the DPRK Cryptocurrency Conference, but because of the North Korea Sanctions Regulations, the U.S. State Department denied the request. Ignoring this denial, Griffith unlawfully obtained a DPRK visa and traveled to the DPRK via China. *See* Compl. ¶ 5.

The evidence will show that Griffith's participation in the DPRK Cryptocurrency Conference was rooted in his intent to evade DPRK sanctions and assist the North Koreans in doing the same. Griffith began developing plans to evade sanctions more than a year before he traveled to the DPRK Cryptocurrency Conference. For example, as early as on or about February 17, 2018, Griffith attempted to enlist another individual in a scheme to set up unlawful cryptocurrency equipment in the DPRK. He proposed, over an encrypted application, "[i]f you find someone [in North Korea], we'd love to make an Ethereum trip to DPRK and setup an Ethereum node."[3] When the individual questioned whether the plan made "economic sense," Griffith responded, "It does actually[.] It'll help them circumvent the current sanctions on them."

Griffith knew that facilitating sanctions evasion, and supplying his own services to help the DPRK do so, was a critical objective of the DPRK Cryptocurrency Conference. For example, on or about August 31, 2018, an individual asked Griffith, via an encrypted application, why he was willing to risk his safety to go to a conference in the DPRK. Griffith expressed that he was unafraid of the DPRK authorities, because "DPRK wouldn't want to scare away Blockchain talent that'll let them get around sanctions." In response, the individual asked, "What if they're funding their drug trade and nuclear program with crypto?" To this question, Griffith replied, "Unlikely. But they'd probably like to start doing such." In another conversation discussing the DPRK Crypto Currency Conference, on or about November 26, 2018, Griffith wrote that the DPRK's interest in cryptocurrency was "probably avoiding sanctions . . . who knows." Compl. ¶ 16(a).

Despite his understanding that the DPRK sought to utilize his expertise for sanctions evasion, and potentially to aid drug trafficking and nuclear proliferation, Griffith unlawfully obtained a DPRK visa and traveled to the DPRK via China in April 2019. Griffith admitted to law enforcement that he kept his visa separate from his passport in order to hide his travel to the DPRK from U.S. authorities. At the DPRK Cryptocurrency Conference, in violation of the North Korean Sanctions Regulations, Griffith provided services to the DPRK attendees by: giving a presentation on topics that had been pre-approved by DPRK officials, including using cryptocurrency and blockchain technologies; supplying the conference attendees and participants—and, therefore, the DPRK—with valuable information on blockchain and cryptocurrency technologies; and relying on his expertise in discussions regarding using cryptocurrency technologies to evade sanctions and launder money. Griffith was assigned a DPRK-government handler throughout his trip to North Korea, and at times, wore a North Korean military-style uniform.

During the course of the Government's investigation, the Government has obtained, and produced to the defense in discovery in February 2020, audio recordings from the Conference.

---

[3] A "node" is a computer that connects to a cryptocurrency network that is responsible for validating and relaying cryptocurrency transactions. Depending on the cryptocurrency and type of node, a computer acting as a node is often rewarded for the validation it undertakes with additional cryptocurrency, in a process called mining. An individual running a node, therefore, might also receive cryptocurrency as part of the process.

One of the recordings captured what the Government understands to be Griffith's presentation at the conference, during which he made the following statements, in substance and in part:

> Hello everyone, I know it's late in the day so I'll try to make this fun. So the most important feature of blockchain is that they are open. *And the DPRK can't be kept out no matter what the US or the UN says*.
>
> . . .
>
> One of the more interesting things is that blockchain allow greater self-reliance in both banking and contracts. So you can have contracts without an authority. . . . *So you heard about with blockchain the USA can't stop your payments. That's like, that is step 1, and step 2 is the UN can't stop agreements.* So if the DPRK makes agreements with someone, or if an individual does, it's um, you can um you don't have to go to a court.

Later, after Griffith's presentation, Griffith and another individual ("Individual-1") answered questions from North Korean Conference attendees, which focused on the technical aspects of blockchain and cryptocurrencies, and the way in which those technologies could be used to evade sanctions. For instance, one questioner asked, in Korean, whether the regulation of blockchain and cryptocurrencies would be expected to increase over time. Individual-1 responded:

> The issue with Blockchain technology let's say, a regulator does regulate against something or a government, let's say the US tomorrow says all transactions of cryptocurrency between the DPRK and the rest of the world are banned, the question becomes, how can they ban it? The answer is they can't, because they would need to gather every single computer on the entire planet, and program each and every single one of these computers that they would not be able to accept cryptocurrency transactions from DPRK, which is impossible, no one could ever do that, then it will always work. As long as there is an internet connection that the DPRK has, and someone on the other side has, then the transaction can happen. So it is more or less impossible, even if they were to create a law, or to create a sanction, that that sanction would be enforced. They couldn't enforce that sanction. Not like the current system where they just send a letter or a swift and write don't process the transaction. You can't do that with a Blockchain because it's hundreds of thousands of millions of individual computers owned by individual people that would be making that transaction happen.

The same questioner then appeared to have asked a follow-up question about whether the DPRK could access the exchanges where cryptocurrencies are traded, or whether they had to use "OTC service providers." The following statements were then made in response to this question by Individual-1 and Griffith.

> **Individual-1:** That's a really good question.

**Griffith:**  I like him, he's very smart.

**Individual-2:**  So let me explain to you, so in essence not much difference. The difference between an OTC provider and an exchange is an OTC means that the purchasing is happening off the market.  What that means is that, the rest of the market can't see that you bought that bitcoin.  So it's as if, with Dr. Virgil, he decided to privately sell me his bitcoin, or his USDT, but we do it agreed between ourselves, we don't agree it and then everyone in the room knows we did it.  We go outside and we have a conversation and we sent it between ourselves.  So that tends to be a way in which governments and large entities prefer to do the transaction because don't want the whole world knowing that they just moved a significant amount of money between each other.

In terms of your question on sanctions, the largest OTC desks in the cryptocurrency space, most of them operate out of China.  So most of them, the DPRK obviously has more friendly relations with China than probably any of the other large powers at this current stage, and I personally don't think that finding an OTC provider in China would be very difficult for DPRK.

. . .

**Griffith:**  And if China doesn't work, Singapore will probably be able to do it.

Finally, during another part of the Conference, a Conference attendee asked, in Korean, for a "more clear idea of what is blockchain."  Griffith responded:

So I was asked what a blockchain is, and so there are several ways of looking at it. The most abstract one is that it is a database where no single person has back end access where they connect.  So before, when there were different databases, it lives on one server somewhere.  And the government, where that server is, could edit . . . and control it. Blockchain is interesting in that the database is split among servers all over the world.  So this makes the database slower but it makes it where no single person can control it.  That's fundamentally the new idea.  The new idea is having a database that we can all read from and we can all pay a very small amount of money in order to write to it.  And anyone can do this.

So the term blockchain . . . basically it is a list of updates.  You might say A sends money to B or something like that so this block is a list of a hundred transactions and the chain tells you which order that the transaction go through.  So if you have two transactions. Say A sends money to B, or A sends money to C, you have to know which one came first.  So the block says what are the transactions and the chain says what order they go in.

Probably the coolest thing about blockchain is that it lets you treat digital data in a new way.  So before, let's say you have a movie, you can always copy the movie and give it to your friends.  This is not very good for money, you can't copy money,

that doesn't work anymore. So Blockchain is the ability that when you give a final to someone, you can no longer give it to someone else.

After the Conference, FBI agents interviewed Griffith in the United States on May 22, 2019, and November 12, 2019. *See* Compl. ¶¶ 15(a)-(k). During those interviews, Griffith acknowledged that the State Department denied his request to travel to the DPRK and admitted that he traveled anyway. In particular, Griffith told FBI agents, in sum and substance, that he had corresponded with officials at the DPRK Mission in Manhattan to facilitate his travel.

After his interviews with the FBI, the defendant encouraged other U.S. citizens to travel to North Korea and continued to pursue unlawful DPRK projects relating to cryptocurrency. For example, on or about August 6, 2019, Griffith wrote to a contact, "I need to send 1 [unit of Ethereum] between North and South Korea." In response, the contact asked, "Isn't that violating sanctions?" to which Griffith confirmed: "It is. That's why I'm going to get a South Korean to do it."

Finally, after his first interview with the FBI, the defendant also explored the possibility of renouncing his United States citizenship with at least three individuals, including his father. For example, Griffith communicated with others about his plan to purchase citizenship from St. Kitts for $50,000, telling one person he was "working on it." And on October 2, 2019, the defendant, in a text exchange with family members, noted that he might be fired from his cryptocurrency company and stated that, if he was, he might instead "setup a money laundering company in North Korea."

## **Procedural Background**

On November 21, 2019, Griffith was charged in a complaint (the "Complaint") signed by Magistrate Judge Sarah Netburn, with conspiring to violate the International Emergency Economic Powers Act ("IEEPA"), Title 50, United States Code, Section 1705. On November 28, 2019, Griffith was arrested in the Los Angeles International Airport before boarding a flight to Baltimore, Maryland. On December 2, 2019, Griffith was presented in the Central District of California ("CDCA"). Although a magistrate judge in CDCA initially ordered the defendant bailed on certain conditions, District Judge Denise Cote, sitting in Part I, stayed the CDCA release order pending the defendant's arrival in this District.

On December 26, 2019, Virgil Griffith arrived in the Southern District of New York and appeared before the Magistrate Judge Barbara Moses. At the presentment, Judge Moses found that Griffith posed a risk of flight and ordered him detained. Griffith appealed that order and, on December 30, 2019, the parties had oral argument before Judge Broderick, who was sitting in Part I (*see* Transcript ("Ex. A"). Judge Broderick ordered the defendant released on bail under strict conditions (*see* Order ("Ex. B")). Those conditions included: (1) a $1,000,000 bond co-signed by the defendant's sister, father, and mother; (2) securing the bond with two homes owned to the sister and parents; and (3) home detention in his parents' home in Alabama with electronic and GPS monitoring. Judge Broderick also prohibited the defendant from using "any computer or other internet-capable device that does not contain" monitoring software, and stated

that the defendant could not "possess or use any smartphone or any cellular telephone with internet access capability." (Ex. B at 5).

## Legal Standards

A determination of bail conditions "may be reopened . . . at any time before trial if the judicial officer finds that information exists that was not known to the movant at the time of the hearing and that has a material bearing on the issue whether there are conditions of release that will reasonably assure the appearance of such person as required and the safety of any other person and the community." 18 U.S.C. § 3142(f)(2)(B); *see also United States v. Rodriguez*, 2015 WL 6503861, at *1 (S.D.N.Y. Oct. 26, 2015) ("[T]he hearing can be reopened if the court finds that information exists that was not known to the defendant at the time of the hearing and that has a material bearing on the issue that was decided."). However, "[a] bail hearing should not be reopened on the basis of information that was available to the defendant at the time of the hearing." *United States v. Lewis*, No. 16 Cr. 212, 2016 WL 6902198, at *2 (S.D.N.Y. Nov. 16, 2016) (citing *United States v. Hare*, 873 F.2d 796, 799 (5th Cir. 1989). As Judge Marrero recently observed, "new and material information for Section 3142(f)(2)(B) purposes consists of something other than a defendant's own evaluation of his character or the strength of the case against him: truly changed circumstances, something unexpected, or a significant event." *United States v. Esposito*, 354 F.Supp.3d 354, 358-59 (S.D.N.Y. 2019) (quoting *United States v. Quinones*, No. 13 Cr. 83S, 2016 WL 1694998, at *1 (W.D.N.Y. Apr. 28, 2016)).

## Discussion

The defendant has not identified any new and material information justifying his request to modify his bail conditions. Rather, the defendant simply asserts that his conditions should be modified because the defendant has thus far complied with his bail conditions. (Def. Letter at 2 ("Since his release, Mr. Griffith repeatedly has demonstrated to the New York and Alabama Pretrial Services Officers that he is a compliant supervisee.")).

But compliance with bail conditions is *not* "information that was not known to the movant at the time of the bail hearing." *Esposito*, 354 F. Supp. 3d at 360-61 (citing 18 U.S.C. § 3142(f)(2)(B)). As Judge Marrero explained in *Esposito*, "new and material information for Section 3142(f)(2)(B) purposes consists of *something other than a defendant's own evaluation of his character*." *Id.* at 361 (internal quotation marks and alterations omitted) (emphasis in original). Judge Marrero concluded that the defendant's "conclusion that his record of compliance constitutes evidence of his intent not to flee is his 'own evaluation of his character' and thus not a basis for reconsideration." *Id.* Compliance with bail conditions is to be expected, and is not grounds for reconsideration of those conditions. Accordingly, Judge Marrero refused the defendant's request to reconsider the 24-hour armed guard requirement on the grounds that the defendant had up to that point complied with the conditions of his pretrial release.

The same outcome is appropriate here. The bail conditions ordered by Judge Broderick should remain in place, as the defendant still poses a substantial risk of flight. Griffith has significant ties to foreign jurisdictions. For the past several years, Griffith has worked for a European organization and lived in Singapore. Griffith does not reside in the United States and, before his arrest, he was actively exploring renouncing his United States citizenship, including

by paying thousands of dollars to purchase citizenship elsewhere. Moreover, the evidence against Griffith has only grown stronger since the bail hearing. The Government now has audio recordings of parts of Griffith's presentation and his answers to questions during the Conference, which, as shown above, included highly technical information about blockchain and cryptocurrency technologies. This is devastating proof of the defendant's guilt. Moreover, the Government has obtained additional communications between Griffith and several other people, which establish that Griffith intended to help North Korea evade sanctions through the use of blockchain and cryptocurrency. Griffith also faces significant sentencing exposure if he is convicted—the Government's preliminary calculation of the Sentencing Guidelines Range is 57 to 71 months' imprisonment. The fact that the defendant is likely to be convicted and sentenced to significant time in prison provides him with a strong incentive to flee.

Similarly, the defendant's access to the means to flee has not measurably changed since Judge Broderick's bail conditions were set. In compliance with those conditions, the defendant provided his purported cold-storage cryptocurrency devices to counsel based in Singapore. Steps to secure those devices and any assets therein were contemplated by Judge Broderick, and do not provide a basis for a change in bail conditions. Furthermore, the defendant provides no basis for this Court to rely upon his own minimal, self-serving claims regarding his own assets, which remain largely unknown to the Government. The defendant also maintains access to potential financial support through other contacts, including foreign co-conspirators based in multiple countries, and of course, his dealings with the North Korean government.

Judge Broderick imposed strict bail conditions to account for the risk that the defendant would flee. The defendant now claims that there is no basis for continued home confinement, but Judge Broderick previously determined, based on filings from both sides and oral argument, that such a condition was required to reasonably assure the defendant's appearance in Court, and the defendant has not provided any new and material information that would justify removing this condition. Nor does the defendant identify any specific need to remove this condition, particularly in the wake of the COVID-19 pandemic, where unnecessary departure from the home has been discouraged for much of the population for public health reasons. The Government respectfully submits that the defendant remains a substantial risk of flight for the reasons expressed above, and that, therefore, the condition of home confinement should remain in place.

The restrictions on the defendant's use of the Internet should also remain in place. Judge Broderick prohibited the defendant from using computers or other internet-capable devices that are not equipped with monitoring software. The defendant is highly technologically adept, and he has substantial knowledge of and experience with the darkweb, which can be used to obtain, among other things, false identifications. The defendant seeks unmonitored access to the Internet, but he has provided no new and material information to justify such a modification. He has also failed to explain *why* such a modification is necessary. The defendant claims that the lack of Internet access somehow complicates his ability to work and contribute to his defense, but the Court expressly permitted the defendant to email with defense counsel. (Ex. A at 42-43). Moreover, defense counsel does not explain how the monitoring requirement affects the defendant's ability to work and, even if it does, the Defendant's inability to pursue a particular job opportunity while on pre-trial release is not a basis to ignore the risks associated with

unfettered Internet access for such a technologically sophisticated defendant. Lacking any particularized reason to permit unmonitored access to the Internet, the Court should deny the defendant's requested modification to his bail conditions.

## Conclusion

For the foregoing reasons, the defendant's requests to modify his bail conditions should be denied.

Respectfully submitted,

AUDREY STRAUSS
Acting United States Attorney for the
Southern District of New York

By: _____/s/_____
Michael Krouse / Kimberly Ravener /
Kyle A. Wirshba
Assistant United States Attorneys
(212) 637-2279 / 2358 / 2493


Cc:  Brian Klein, Esq.
     Sean Buckley, Esq.
     Attorneys for Virgil Griffith (By Email)