UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------x

UNITED STATES OF AMERICA           :

                Plaintiff,          :
        v.                                        20 Cr. 015 (PKC)
                                    :
VIRGIL GRIFFITH,
                                    :
                Defendant.
------------------------------------------------------

**DEFENDANT VIRGIL GRIFFITH'S
MOTION TO DISMISS THE INDICTMENT**

BRIAN E. KLEIN
KERI CURTIS AXEL
BAKER MARQUART LLP
777 S. Figueroa Street, Suite 2850
Los Angeles, California 90017
(424) 652-7800

SEAN S. BUCKLEY
KOBRE & KIM LLP
800 Third Avenue
New York, New York 10022
(212) 488-1200

*Attorneys for Virgil Griffith*

## <u>TABLE OF CONTENTS</u>

PRELIMINARY STATEMENT ................................................................................... 1

STATEMENT OF FACTS ....................................................................................... 2

LEGAL STANDARDS .......................................................................................... 7

ARGUMENT ..................................................................................................... 9

I.  The Indictment Fails to Provide Adequate Notice as Required by the Fifth and Sixth
Amendedments ........................................................................................... 9

II.  The Government's Allegations, as Advanced in the Charging Instruments and Other
Filings, Fail to State a Criminal Offense ........................................................ 10

    a.  The Charged Offense – Conspiracy to Violate the IEEPA .................................. 10

    b.  Attending a Conference and Giving Remarks Concerning General Information in
the Public Domain Is Not the Provision of "Services" ....................................... 11

    c.   Attending a Conference Where One States General Information in the Public
Domain Is Not the Provision of "Services" ....................................................... 13

    d.  The Charged Conduct Falls Within the Informational Exemption of the Berman
Amendment and the FITA ........................................................................... 17

    d.   The First and Fifth Amendments Bar Prosecution of Mr. Griffith's Speech ....... 20

    1. Mr. Griffith's Speech Is Constitutionally Protected ..................................... 20

    2. The Government Did Not Provide Fair Notice Of Its Novel Construction Of
"Service" ................................................................................................. 24

CONCLUSION .................................................................................................. 25

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Agency for International Development v. Alliance for Open Society International,*
*Inc.*,
570 U.S. 205 (2013).............................................................................................23, 24, 25

*Al Haramain Islamic Foundation, Inc. v. United States Department of Treasury*,
686 F.3d 965 (9th Cir. 2012) .........................................................................................22, 23

*Apprendi v. New Jersey*,
530 U.S. 466 (2000)......................................................................................................7

*Bouie v. City of Columbia*,
378 U.S.347 (1964)......................................................................................................24

*Chevron U.S.A. v. Natural Resources Defense Council, Inc.*,
467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984)......................................................19

*Chicago Police Department v. Mosley*,
408 U.S. 92 (1972)........................................................................................................21

*Cohen v. California*,
403 U.S. 15 (1971).......................................................................................................21

*DKT Memorial Fund Ltd. v. Agency for International Development*,
887 F. 2d 275 (D.C. Cir. 1989) ......................................................................................20

*Forbes v. Napolitano*,
236 F.3d 1009 (9th Cir. 2000) .......................................................................................24

*Haig v. Agee*,
453 U.S. 280 (1981).....................................................................................................20

*Holder v. Humanitarian Law Project*,
561 U.S. 1 (2010).................................................................................................21, 22, 23

*Iannelli v. United States*,
420 U.S. 770 (1975) ....................................................................................................16

*Lanzetta v. New Jersey*,
306 U.S. 451 (1939)......................................................................................................24

*Lewis v. Grinker*,
965 F.2d 1206 (1992)....................................................................................................20

*Marks v. United States*,
    430 U.S. 188 (1977).................................................................................24

*New York City Health and Hospital Corp. v. Perales*,
    954 F.2d 854 (2d Cir. 1992), *cert. denied*, 506 U.S. 972 (1992)......................................19

*Reid v. Covert*,
    354 U.S. 1 (1957)...................................................................................20

*Russell v. United Statest*,
    369 U.S. 749 (1962).............................................................................8, 10

*Securities and Exchange Commission v. Telegram, Inc.*,
    448 F.Supp.3d 352 (S.D.N.Y. 2020)..................................................................3

*United States v. Aleynikov*,
    676 F.3d 71 (2d Cir. 2012)......................................................................7, 8

*United States v. Amirnazmi*,
    645 F.3d 564 (3d Cir. 2011)...................................................................18, 19

*United States v. All Funds on Deposit in United Bank of Switzerland*,
    No. 01 Civ. 2091 (JSR),
    2003 WL 56999 (S.D.N.Y. Jan. 7, 2003) .......................................................14

*United States v. Banki*,
    685 F.3d 99 (2d Cir. 2012)....................................................................14, 15

*United States v. Cruikshank*,
    92 U.S. 542, 23 L.Ed. 588 (1875)................................................................8

*United States v. Flores*,
    945 F.3d 687, 712 (2d Cir. 2019)................................................................ 16

*United States v. Hess*,
    124 U.S. 483 (1888)...............................................................................8

*United States v. Homa International Trading Corp.*,
    387 F.3d 144 (2d Cir.2004) (per curiam)..............................................13, 14, 24

*United States v. Lanier*,
    520 U.S. 259 (1997)..............................................................................25

*United States v. Miller*,
    413 U.S. 15 (1973)................................................................................21

*United States v. Pirro*,
    212 F3d 86 (2d Cxir. 2000).....................................................................7, 9

*United States v. Santos*,
    553 U.S. 507, 128 S.Ct. 2020 (2008)............................................................18

*United States v. Todd*,
    446 F.3d 1062 (10th Cir. 2006) .................................................................8

*United States v. Weaver*,
    659 F.3d 353 (4th Cir. 2011) ....................................................................8

*Ward v. Rock Against Racism*,
    491 U.S. 781 (1988)..................................................................................22

**Statutes**

12 U.S.C. § 95a .....................................................................................11, 19

50 U.S.C. app. § 5(b)(4) (2000) ................................................................11

50 U.S.C. § 1701 ...................................................................................1, 10

50 U.S.C. § 1702 ...................................................................10, 11, 17, 19

50 U.S.C. § 1705 .........................................................................................11

**Other Authorities**

31 C.F.R. § 510...........................................................................................12

31 C.F.R. § 510.206 ...............................................................................11, 13

31 C.F.R. § 510.213 ...................................................................................19

31 C.F.R. § 510.312(a)(1) ...........................................................................17

31 C.F.R. § 560.204 ...................................................................................13

31 C.F.R. § 560.210 ...............................................................................18, 19

31 C.F.R. § 560.538 ...................................................................................16

Black's Law Dictionary (11th ed. 2019)..............................................13, 14, 15

Fed. R. Crim. P. 18 .......................................................................................7

H.R. Conf. Rep. No. 103–482, at 239 (1994) ..........................................21

https://blockgeeks.com/guides/smart-
    contracts/#:~:text=Ethereum%3A%20ethereum%20is%20a%20public,coding
    %20and%20processing%20smart%20contracts ....................................................3

Priyanka Boghani, *The U.S. and North Korea On The Brink: A Timeline,* (Feb. 28,
    2019) https://www.pbs.org/wgbh/frontline/article/the-u-s-and-north-korea-on-
    the-brink-a-timeline/ .....................................................................................................4

Quint Forgey, *Trump, Kim tease third North Korea summit*, (April 13, 2019),
    https://www.politico.com/story/2019/04/13/trump-north-korea-summit-
    1273711.........................................................................................................................6

Antonio Madeira, *Ehereum 'Flippens' Bitcoin to Become the Most Used
    Blockchain* (July 21, 2020), https://cointelegraph.com/news/ethereum-
    flippens-stablecoins-to-become-the-most-used-blockchain ...................................3

Lucas Mearian, *What is  blockshain? The complete guide*, (Jan. 29, 2009),
    https://www.computerworld.com/article/3191077/what-is-blockchain-the-
    complete-guide.html ...................................................................................................3

Official USA Delegate, *2019 Pyongyang Blockchain and Cryptocurrency
    Conference,*(Nov. 20, 2018) https://www.kfausa.org/2019-pyongyang-
    blockchain-cryptocurrency-conference/ ..................................................................4

## **PRELIMINARY STATEMENT**

The defendant Virgil Griffith is charged in a one-count indictment with a conspiracy to violate the International Emergency Economic Powers Act ("IEEPA"), 50 U.S.C. §§ 1701-1706. Mr. Griffith respectfully brings this motion to dismiss that indictment pursuant to Rule 12(b)(3) of the Federal Rules of Criminal Procedure. On many levels, this is a case of first impression with the government advancing through the indictment untested theories of prosecution that are fatally flawed and merit the dismissal of the case against Mr. Griffith.

As a threshold matter, the indictment lacks the specificity required by the Fifth and Sixth Amendments and fails to provide constitutionally adequate notice to Mr. Griffith of the crimes with which he is charged.  The indictment is short and vague, merely intoning the statutory language without providing any facts to demonstrate the conduct that the government believes violates the law.  This is a material defect because the offense charged is in an area where the legal landscape is far from settled and more details are necessary.

The prosecution of Mr. Griffith is also defective because, even accepting the government's allegations as true, the indictment fails to state an offense.  Put simply, the government's complaint, filings, and discovery fail to set forth facts that would amount to a criminal offense.  Knowing full well that Mr. Griffith at most attended a conference on his own dime, and gave a highly general speech based on publicly available information – like he does almost monthly at conferences throughout the world – the government has nonetheless chosen to charge him with providing "services" to the Democratic People's Republic of Korea ("DPRK").

Mr. Griffith's charged conduct, however, does not amount to services under any definition of the word.  Mr. Griffith was not paid to attend a conference and go on a tour of the DPRK.  Mr. Griffith was not contracted or procured by anyone, provided no technical advice,

and did not act as a consultant.  Mr. Griffith's alleged conduct was neither as specific nor as tailored to a client's need as to constitute "services."  In short, a general conference speech is simply not the type of conduct that falls within the definition of "services" under the relevant regulations of the Department of Treasury's Office of Foreign Asset Controls ("OFAC").  Mr. Griffith has also not been provided adequate notice of any claim to the contrary, as the Fifth Amendment requires.

Mr. Griffith's purported speech is also exempted from the IEEPA pursuant to statute and is protected by the First Amendment.  It falls within an exception to IEEPA by amounting to "information" and "informational materials."  Even according to what the government alleges was said at the conference, Mr. Griffith confined his alleged remarks to highly general facts in the public domain.  If the speech Mr. Griffith purportedly gave is not "information," then nothing is.  For that reason, even if the alleged speech did not fit within the contours of the informational exemption to IEEPA, it would be protected by the First Amendment.  Congress has recognized that OFAC's definition of "information" and "informational materials" is narrower than the First Amendment.  Mr. Griffith submits that giving a broad and general speech is exactly the kind of conduct that the First Amendment is meant to protect, and any regulation to the contrary cannot satisfy strict scrutiny.

Because of all of these serious and fatal defects, Mr. Griffith respectfully asks this Court to dismiss the indictment with prejudice.

## STATEMENT OF FACTS

Mr. Griffith is an American citizen from Tuscaloosa, Alabama.  He obtained an undergraduate degree in Computer and Cognitive Science from the University of Alabama (with some coursework from Indiana University), and a PhD in Computation and Neural Systems from the California Institute of Technology in California.  From October 2016 to September 2020, Mr.

Griffith resided in Singapore pursuant to a work visa, and was employed at the Ethereum

Foundation as a Senior Researcher, a role that was akin to a business development manager.

Ethereum is one of the world's most successful "blockchain[1] platform[s] and the most

advanced for coding and processing smart contracts."[2]  A smart contract is a:

> computer protocol intended to digitally facilitate, verify, or enforce the
> negotiation or performance of a contract.  Smart contracts allow the
> performance of credible transactions without third parties.

*Id.*  On a blockchain, such as Ethereum, digital assets are used to conduct transactions including

those involving smart contracts.[3]  Accordingly, conducting a smart contract on the Ethereum

blockchain requires the use of Ether or "ETH."  It has been reported that, as of July 2020,

Ethereum was the world's most-used blockchain, because many projects were building

applications and smart contracts on it.[4]

As part of his work for the Ethereum Foundation, Mr. Griffith has regularly given

presentations and spoken on panels at conferences throughout the world, including large forums

such as Consensus, Devcon, and Edcon.  Given that the Ethereum blockchain is one of the

world's most successful for applications and smart contracts, Mr. Griffith (and his colleagues)

frequently speak on these topics.  Consistent with the *mores* of the industry, many of these

---

[1] A blockchain is a decentralized public ledger that allows data to be stored globally on
thousands of servers, while allowing network participants to see everyone else's entries in near
real-time.  https://www.computerworld.com/article/3191077/what-is-blockchain-the-complete-
guide.html

[2] https://blockgeeks.com/guides/smart-contracts/#:~:text=Ethereum%3A%20ethereum
%20is%20a%20public,coding%20and%20processing%20smart%20contracts.

[3] Such assets can also be a store of value or a medium of exchange in of themselves, which is
why they are also referred to as "cryptocurrency."  *See SEC v. Telegram, Inc.*, 448 F.Supp.3d
352, 358 (S.D.N.Y.2020) (Castel, J.) ("Cryptocurrencies (sometimes called tokens or digital
assets) are a lawful means of storing or transferring value and may fluctuate in value as any
commodity would.")

[4] https://cointelegraph.com/news/ethereum-flippens-stablecoins-to-become-the-most-used-
blockchain

discussions are widely disseminated on the Internet; accordingly, many of Mr. Griffith's talks can readily be found on YouTube and other similar platforms.

In approximately August 2018, Mr. Griffith learned about a possible blockchain conference in North Korea called the DPRK Pyongyang blockchain and Cryptocurrency Conference. Relationships with North Korea and the United States appeared to be warming up during this period. For example, in June 2018, President Donald Trump met DPRK leader Kim John Un in Singapore. After the conference, President Trump stated, "I think our whole relationship with North Korea and the Korean Peninsula is going to be a very much different situation than it has in the past."[5]

Like other conferences Mr. Griffith has attended, the DPRK conference was advertised as an opportunity for experts to gather and "share their knowledge and vision, establish connections and discuss business opportunities."[6] The materials indicated that, for foreign visitors, the trip included four days of touring on a set itinerary. It was sponsored by the "Korean Friendship Association" ("KFA"), itself not an arm of the DPRK, a group that "[strove] for peace and reunification in the Korean peninsula." The conference organizers were Alejandro Cao de Benos, a "Special Delegate for the Committee for Cultural Relations" and President of the KFA, and, on the technical side, Christopher Emms, a purported blockchain and crypto expert.

Mr. Griffith sent an email requesting information regarding whether Americans could attend; the KFA responded that it was possible.[7] In November 2018, he received an email stating that the trip would cost him 3300 Euros, which included all fees, transportation (including flight)

---

[5] https://www.pbs.org/wgbh/frontline/article/the-u-s-and-north-korea-on-the-brink-a-timeline/
[6] https://www.kfausa.org/2019-pyongyang-blockchain-cryptocurrency-conference/
[7] CNTRL_VG000005366

and hotel, and four days of guided touring around the country.[8]  He was asked to send a deposit of 800 Euros, which he did from his Singaporean bank account – his primary bank account at the time given that he worked and lived in Singapore.

On January 25, 2019, Mr. Griffith applied to the U.S. State Department for permission to travel to the DPRK.  He informed the State Department that he had been accepted to speak and, mindful of the sanctions regulations, would talk about "the applications of blockchain technology to business and anti-corruption."  He noted that blockchain technology in the DPRK would "enable[] less corrupt services within the country," and therefore was of "humanitarian interest."  He also stated that, "[i]f during the conference, DPRK representatives express interest in using blockchain technology to circumvent international sanctions," he would "dutifully report back to the US Embassy in Singapore with any and all details."[9]

On February 25, 2019, he received a letter from the Office of Legal Affairs at the U.S. Department of State denying his request.  The letter did not advise that a decision to travel to the DPRK – or, for that matter, to participate in the conference – would violate U.S. criminal law, or that any license from OFAC or any other U.S. agency was required.

On April 13 2019, President Trump tweeted that his relationship with Kim Jong Un "remain[ed] very good, perhaps the term excellent would be even more accurate, and that a third Summit would be good" because they "fully underst[ood] where we each [stood.]"[10]
On April 18, 2019, Mr. Griffith traveled to Beijing to obtain his visa and to assemble for the tour. He obtained his visa in Beijing, and later posted a copy to Twitter.

---

[8]  CNTRL_VG0000014674
[9]  CNTRL_VG000004590
[10] https://www.politico.com/story/2019/04/13/trump-north-korea-summit-1273711

The conference took place on April 22 and 23, 2018.  There were at least ten foreign individuals who attended the conference, in addition to North Korean attendees.  Mr. Griffith's speech topic was "Blockchain and Peace," and the content was very general, publicly available material on the uses of blockchain technology for smart contracts, and how smart contracts may someday be used for agreements that do not require a third-party validator, such as an escrow company, to make sure that mutual conditions precedent have been met.  Mr. Griffith had spoken on this topic many times before, and the information was co-extensive with what was spoken about at other public conferences.  As he later described it, his discussion was consistent with information that one could readily learn from a Google search of this topic.

Immediately upon returning from North Korea in April 2019, Mr. Griffith, on his own accord, went to the U.S. Embassy in Singapore to report about his trip.  He was interviewed by a Special Agent of the State Department for several hours, and voluntarily answered all questions that were posed to the best of his knowledge and ability.

Later, on May 22, 2019, at the request of the FBI, he traveled to New York from Puerto Rico, where he was visiting, and again voluntarily was interviewed for several hours without counsel present.  Then, on November 12, 2019, he appeared upon request of the FBI for an interview in San Francisco, California, and he did so again without counsel.  Following this interview, he provided the FBI with his phone.

Despite his known willingness to cooperate further with the FBI, Mr. Griffith was arrested on a criminal complaint on November 28, 2020 at Los Angeles International Airport as he was traveling to visit his family in Maryland for Thanksgiving.  (*See* Dkt. No. 1 ("Compl.").)  On January 7, 2020, an indictment was filed against Mr. Griffith, which, like the complaint, alleged one count of conspiring to violate the IEEPA.  (Dkt. No. 9 ("Ind.").)

## LEGAL STANDARDS

"[T]he indictment must contain an allegation of every fact which is legally essential [for] the punishment to be inflicted." *Apprendi v. New Jersey*, 530 U.S. 466, 512 (2000) (internal quotation marks omitted). This right is rooted in the U.S. Constitution. The Fifth Amendment provides that: "No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury." As the Second Circuit has explained, "If the indictment does not state the essential elements of the crime, the defendant cannot be assured that he is being tried on the evidence presented to the grand jury." *United States v. Pirro*, 212 F.3d 86, 92 (2d Cir. 2000). Similarly, the Sixth Amendment guarantee that a defendant "be informed of the nature and cause of the accusation" is also offended by an indictment that does not state the essential elements of the crime. *Id.* (citations omitted).

Accordingly, a defect in the indictment, including a failure to state an offense, can be raised and determined without a trial on the merits if the basis for the motion is reasonably available. *See* Fed. R. Crim. P. 12(b)(3)(B)(iv). As the Second Circuit has instructed:

> Since federal crimes are "solely creatures of statute," *Dowling v. United States,* 473 U.S. 207, 213, 105 S.Ct. 3127, 87 L. Ed.2d 152 (1985), a federal indictment can be challenged on the ground that it fails to allege a crime within the terms of the applicable statute.

*United States v. Aleynikov*, 676 F.3d 71, 75–76 (2d Cir. 2012) (citing *Pirro,* 212 F.3d at 91-92). The indictment must be considered by the district court "as it was actually drawn, not as it might have been drawn. *See Pirro, 212 F.3d.* at 92 (citing *Sanabria v. United States,* 437 U.S. 54, 65–66, 98 S.Ct. 2170, 57 L .Ed.2d 43 (1978) ("The precise manner in which an indictment is drawn cannot be ignored . . . .")). A defendant who objects to the indictment before trial is entitled to an exacting review of the indictment. *Id.*

The Supreme Court has made clear that it is insufficient for an indictment merely to intone the general statutory language of the offense. In *Russell v. United States*, the Supreme Court instructed that "where the definition of an offence, whether it be at common law or by statute, includes generic terms, it is not sufficient that the indictment shall charge the offence in the same generic terms as in the definition; but it must state the species—it must descend to particulars." 369 U.S. 749, 765 (1962) (citing *United States v. Cruikshank,* 92 U.S. 542, 23 L. Ed. 588 (1875)). As the Supreme Court explained:

> Undoubtedly, the language of the statute may be used in the general description of an offense, but it must be accompanied with such a statement of the facts and circumstances as will inform the accused of the specific offense . . . with which he is charged.

369 U.S. at 765. (quotation omitted); *United States v. Hess*, 124 U.S. 483 (1888)). Similarly, in *Cruikshank*, the Supreme Court held:

> The object of the indictment is, first, to furnish the accused with such a description of the charge against him as will enable him to make his defense . . . ; and, second, to inform the court of the facts alleged, so that it may decide whether they are sufficient in law to support a conviction, if one should be had. For this, facts are to be stated, not conclusions of law alone. A crime is made up of acts and intent; and these must be set forth in the indictment, with reasonable particularity of time, place, and circumstances.

92 U.S. at 558. An indictment must be dismissed if "it fails to allege a crime within the terms of the applicable statute." *Aleynikov*, 676 F.3d at 75-76.

A further basis to dismiss the indictment is where undisputed evidence shows that the facts alleged do not constitute a crime. District courts may properly rule on a motion to dismiss an indictment when the undisputed evidence shows that, "as a matter of law, the Defendant could not have committed the offense for which he was indicted." *United States v. Todd*, 446 F.3d 1062, 1067-69 (10th Cir. 2006); *United States v. Weaver*, 659 F.3d 353, 355 (4th Cir. 2011)

(motion to dismiss appropriate where "the government does not dispute the ability of the court to reach the motion and proffers, stipulates, or otherwise does not dispute the pertinent facts).

## **ARGUMENT**

### I.      **The Indictment Fails to Provide Adequate Notice as Required by the Fifth and Sixth Amendments**

The one-count indictment against Mr. Griffith is a brief four pages and sets forth a single alleged offense: conspiracy to violate IEEPA.  There are scant other details provided and those are: the conspiracy is alleged to have lasted from approximately August 2018 until November 2019, and allegedly had two objects:

- to "provide services" to the DPRK, in violation of the IEEPA (Ind. ¶ 2); and

- to "evade and avoid, and attempt to evade and avoid" U.S. law requirements "with respect to the provision of services to the DPRK."  (Ind. ¶ 3).

It therefore is not a "speaking indictment."  It does not enumerate any co-conspirators, or specify any alleged overt acts.  Indeed, there is not one single allegation of fact in the indictment. Two of the four pages of the indictment set forth forfeiture and substitute assets allegations that are wholly baseless under the facts.[11]  Further, the indictment fails to set out the acts of Mr. Griffith that the government believes are within the scope of the conspiracy and which the government contends constituted "services," even though, as set forth below, the term is not well defined by regulation or case law.

Because the offense charged in this case includes "generic terms," the government was bound to "descend to the particulars," *Pirro*, 212 F.3d at 93, by alleging specific agreements, acts, and attempted acts purportedly undertaken by Mr. Griffith and his alleged co-conspirators.

---

[11] As the government well knew at the time of the indictment, and as further discussed below, Mr. Griffith was not paid to speak at the conference; thus, there are no "proceeds" that he received as a result of his attendance.

And because the government must allege these "essential facts," the indictment is subject to challenge "as it was actually drawn, not as it might have been drawn." *Id.* at 92. Under these circumstances, the indictment offends the *Russell* standard that it "be accompanied with such a statement of the facts and circumstances as will inform the accused of the specific offense, coming under the general description, with which he is charged."

Although Mr. Griffith is simultaneously moving this Court to order the government to provide a bill of particulars – which he has requested and it has refused to provide – he submits that the proper remedy at this juncture is dismissal of the indictment.

## II.   The Government's Allegations, As Advanced in the Charging Instruments and Other Filings, Fail to State a Criminal Offense

### a.   The Charged Offense – Conspiracy to Violate the IEEPA

The IEEPA grants the President the authority to deal with "unusual and extraordinary" threats to national security, after declaring a national emergency. *See* 50 U.S.C. §§ 1701, *et seq*. Section 1702 of Title 50 empowers the President to issue regulations pursuant to such authority, among other things to regulate or prohibit transactions in foreign exchange, transfers of credit, and importing or exporting of currency or securities by anyone subject to U.S. jurisdiction, and to block transactions with foreign countries. It is a criminal offense to "violate, attempt to violate, conspire to violate, or cause a violation of any license, order, regulation, or prohibition issued under [that] chapter." 50 § U.S.C. 1705.

There are several statutory limits to the President's authority under Section 1702. Relevant to this case, the President does not have authority to regulate or prohibit, directly or indirectly, the importation from any country, or the exportation to any country, whether commercial or otherwise, regardless of format or medium of transmission, of any information or informational materials, including but not limited to, publications, films, posters, phonograph

records, photographs, microfilms, microfiche, tapes, compact disks, CD ROMs, artworks, and news wire feeds.  50 U.S.C. § 1702(b)(3).[12]  This is called the informational materials exemption.  *See* 50 U.S.C. app. § 5(b)(4) (2000) (the "Berman Amendment"); 12 U.S.C. § 95a, 50 U.S.C. § 1702 (2000) (the "Free Trade in Ideas Act" or "FTIA") (collectively with the Berman Amendment, the "informational exemption").

In 2016, President Obama issued Executive Order 13722, which provides that goods, services, and technology may not be exported to the DPRK by a U.S. person "except to the extent provided in regulations, orders, directives, or licenses that may be issued pursuant to this part or pursuant to the export control authorities implemented by the U.S. Department of Commerce."  31 C.F.R. § 510.206(a).  It is this Executive Order that the government has alleged Mr. Griffith violated; specifically, the portion of the Order prohibiting the export of services to North Korea, and the implementing regulations, found at 31 C.F.R. §§ 510, *et seq*. ("NKSR").

OFAC has issued <u>no</u> regulations and published <u>no</u> guidance to clarify the definition of "services" as used in this context.[13]

### b.   Attending a Conference and Giving Remarks Concerning General Information in the Public Domain Is Not the Provision of "Services"

While the indictment lists not a single allegation of fact, based on the government's complaint, its filings in this case, and the discovery it has produced to date, it appears that the government's theory is that, by attending and speaking at a blockchain conference in Pyongyang,

---

[12] The other two statutory limits on the President's authority are: (1) any postal, telegraphic, telephonic, or other personal communication, which does not involve a transfer of anything of value (50 U.S.C. § 1702(b)(1)); and (2) any transactions ordinarily incident to travel to or from any country, including importation of accompanied baggage for personal use, maintenance within any country including payment of living expenses and acquisition of goods or services for personal use, and arrangement or facilitation of such travel including nonscheduled air, sea, or land voyages (50 U.S.C. § 1702(b)(4)).

[13] Even if OFAC published guidance, it would not be binding on the Court.

Mr. Griffith provided "services" because he "provided the DPRK with valuable information on blockchain and cryptocurrency technologies, and participated in discussions regarding using cryptocurrency technologies to evade sanctions and launder money."  (Compl. ¶ 5 (Dkt. No. 1)); *see also id.* ¶ 15(i)).[14]

The complaint further sets forth two alleged co-conspirators: (1) CC-1, "who assisted Griffith in arranging travel to the DPRK" (*id.* ¶15(d)), and (2) CC-2, a conference organizer who allegedly told Griffith that "during his presentation, he should stress the money laundering and sanction evasion applications of crypto-currency and blockchain technology" (*id.* at ¶15(h)).

Setting aside the inaccuracy of these allegations, which Mr. Griffith disputes, the facts alleged in the charging instruments do not amount to the provision of services under the applicable regulations, and the conduct is exempt from OFAC regulation in any event.  The critical exculpatory facts include that:

- Mr. Griffith was not paid to attend and speak at the conference;

- The presentation materials to which the government refers were general articles in the public domain;

- Mr. Griffith's alleged conference remarks – even according to the government's evidence[15] – consisted of very general information, and on which he and others have repeatedly spoken in open, public fora available on the Internet.

---

[14]  Similarly, the government has argued that Mr. Griffith "provided services to the DPRK attendees by giving a presentation on topics that had been pre-approved by DPKR officials, including using cryptocurrency and blockchain technologies; supplying the conference attendees and participants – and therefore the DPRK – with valuable information on blockchain and cryptocurrency technologies." (Opp. at 5 (Dkt. No. 46).)

[15]  For purposes of the arguments in this motion and under the legal standard, Mr. Griffith is required to accept as authentic a recording of the conference that the government allegedly obtained from an unknown source.  Mr. Griffith does not, however, accept the recording or the transcript as authentic or accurate under the Federal Rules of Evidence, and reserves all rights to challenge the admission of the recording and transcript on evidentiary, constitutional, or other grounds.

As Mr. Griffith allegedly told the FBI in a voluntary meeting afterward, he based his discussion on "what information would be readily available in Google search."[16]

This conduct as a matter of law does not amount to services and is protected under the informational exemption created by the Berman Amendment and, as discussed further below, the First Amendment of the U.S. Constitution.

### c. Attending a Conference Where One States General Information in the Public Domain Is Not the Provision of "Services"

As summarized above, OFAC has issued no regulations regarding the definition of the term "services" and the scope of conduct that it believes falls within it. Consequently, the Second Circuit has relied on general principles of statutory construction to interpret the term. The two principal criminal cases are *United States v. Homa International Trading Corp.*, 387 F.3d 144, 146 (2d Cir.2004) (per curiam), and *United States v. Banki*, 685 F.3d 99 (2d Cir. 2012). While the two appellate panels in these cases disagreed with one another as to the definition of the term "services;" under either analysis, Mr. Griffith's alleged conduct does not amount to "services."

In *Homa Int'l Trading*, the defendant was charged with structuring, wiring hundreds of thousands of dollars in narcotics proceeds to foreign bank accounts, and indirectly transferring money into bank accounts in Iran via Dubai, U.A.E., in violation of the Iranian Transaction Regulations ("ITR") promulgated under the IEEPA. Like the NKSR, the ITR prohibits the "exportation . . . directly or indirectly, from the United States . . . of any goods, technology or services to Iran." 31 C.F.R. § 560.204; *cf.* 31 C.F.R. § 510.206(a) (parallel NKSR provision).

Upon conviction, the defendant appealed and challenged whether his indirect transfer of funds to Iran on behalf of others constituted "services" under the ITR. The Second Circuit held

---

[16] USAO_001417

that it did.  Citing with approval the opinion of Judge Rakoff in *United States v. All Funds on Deposit in United Bank of Switzerland*, No. 01 Civ. 2091 (JSR), 2003 WL 56999, at *1 (S.D.N.Y. Jan. 7, 2003) ("*All Funds* "), the Second Circuit concluded that "[t]he term 'services' is unambiguous and refers to the performance of something useful for a fee."  *Id.* at 146.

In the later case of *Banki*, the defendant was alleged to have facilitated the transfer of more than $3.4 million from Iran to the United States in violation of the ITR using informal hawala networks.  *Banki*, 685 F.3d at 103.  The evidence demonstrated that brokers within the hawala networks had received fees for their role in the network, and that false information had accompanied the transfers (such as references on wires to pistachios and tomato paste), but there was no evidence that defendant received a fee.  *Id*. at 104.

Relying on *Homa Int'l* and *All Funds*, the defendant appealed the district court's denial of a jury instruction stating that executing money transfers on behalf of others does not violate the ITR unless performed for a fee.  *Id*. at 106.  Reducing the conclusion of *Homa Int'l* – that the definition of services refers to the performance of something useful for a fee – to *dicta*, the *Banki* court found to the contrary, holding that the "receipt of a fee was not a necessary element of a 'service.'"  *Id.* at 107.  It did not adopt an alternative definition, noting only that certain definitions did not turn on the fact of a fee.  *See id.* at 108 (citing Merriam-Webster's Collegiate Dictionary 1067 (10th ed. 2000) (defining service as "useful labor that does not produce a tangible commodity"); Webster's Third New International Dictionary 2075 (Unabridged ed. 1993) (defining "service" as "the performance of work commanded *or* paid for by another" (emphasis added)). . . . Black's Law Dictionary 1372 (7th ed. 1999) (defining service as "[a]n intangible commodity in the form of human effort, such as labor, skill, or advice")).  The Second

Circuit explained that requiring the payment of a fee could lead to anomalous conclusions such as permitting "the exportation of consulting services to an Iranian corporation *gratis*."  *Id.*

Although the *Banki* court did not adopt a definition of "services," under any of the definitions it cited, Mr. Griffith's alleged conduct would not count.  Even if a fee is not a dispositive requirement, it nevertheless is a critical factor in determining whether conduct constitutes a "service" under the applicable regulations.  Here, the defense believes there is no dispute that Mr. Griffith was not paid to attend the conference.  Mr. Griffith's conduct therefore would fail to meet both the first Webster's Dictionary definition and the first definition of Black's Law Dictionary cited by the *Banki* court.[17]  *See id.*, 685 at 107.

As to the remaining possible definitions, Mr. Griffith's conduct does not satisfy them either.  The common ground among all these definitions is the idea that a service is procured or commanded by a party, for that procuring party's economic benefit.  There is a specific nexus between what the procuring party requests and what the service provider produces, and in all cases the service provides an underlying economic utility.  This is demonstrated by the use of the word "commodity" in Black's Law Dictionary and in Merriam-Webster's Collegiate Dictionary as an economic term referring to something that is traded or sold – as well as by the *Banki* Court's example of a "consulting service."  *Id.* at 107-8.  Indeed, OFAC itself has suggested that the type of services about which it is concerned are "individualized and customized," with

---

[17] Mr. Griffith also submits the second definition of services in Black's Law Dictionary-- that defines service as "[a]n intangible commodity"– also presupposes payment of a fee, as the definition of "commodities" refers to things that are tradeable or bought and sold.  Black's Law Dictionary (11th ed. 2019).

economic value.  *See, e.g.*, 31 C.F.R. § 560.538 (b)(1) (Authorized transactions necessary and ordinarily incident to publishing under the ITR).[18]

Mr. Griffith's alleged conduct of giving a general speech at a conference was indisputably not procured or commanded by the DPRK, nor was there the required specific nexus between a procuring party's direction and his activities, as there would be in consulting or legal services.   Mr. Griffith's speech – even according to the government's transcript – was high-level and general, just as in other presentations Mr. Griffith has given elsewhere in the world – which he does customarily.  The information covered by Mr. Griffith's alleged comments was well within the public domain prior to his attendance at this conference.  This was simply not services under any definition of the word.[19]

The government appears to be asking this Court to countenance a definition of "services" that is neither supported by OFAC guidance nor caselaw.  The Court should reject the

---

[18] Although it has no direct counterpart in the NKSR, in this provision of the ITR, OFAC clarified that the publishing exception does not authorize U.S. persons to provide "individualized or customized services (including, but not limited to, accounting, legal, design, or consulting services), other than those necessary and ordinarily incident to the publishing and marketing of written publications, even though such individualized or customized services are delivered through the use of information or informational materials."  Notably, the type of services OFAC identifies as examples include services such as legal or consulting services that provide economic value.

[19] Nor does the fact that the government charged this as a conspiracy alter this calculus.  The Supreme Court has "repeatedly said that the essence of the crime of conspiracy is 'an agreement to commit an unlawful act.'" *United States v. Jimenez Recio*, 537 U.S. 270, 270 (2003) (quoting *Iannelli v. United States*, 420 U.S. 770, 777 (1975); *see also United States v. Flores*, 945 F.3d 687, 712 (2d Cir. 2019) ("The crux of a conspiracy is an agreement . . . to accomplish something illegal.")  While an indictment for a criminal conspiracy "need not [allege] commission of the substantive offense," it must allege "that the intended future conduct the conspirators agreed upon includes all the elements of the substantive crime." *United States v. Coplan*, 703 F.3d 46, 66 (2d Cir. 2012); *see United States v. Tyson*, 653 F.3d 192, 206 (3d Cir. 2011) (conspiracy's "common goal or purpose must be illegal").  If, has here, the indictment alleges an agreement to undertake actions that, if accomplished, would not constitute a substantive crime, the indictment fails to allege a conspiracy.  *See United States v. Foote*, 413 F.3d 1240, 1250 (10th Cir. 2005).

opportunity to forge a new definition in a criminal proceeding.  As the *Banki* court recognized, "[t]he rule of lenity requires ambiguous criminal laws to be interpreted in favor of the defendants subjected to them."  *See United States v. Santos*, 553 U.S. 507, 514, 128 S.Ct. 2020 (2008). Accordingly, the indictment should be dismissed on this basis,

### d. The Charged Conduct Falls within the Informational Exemption of the Berman Amendment and the FTIA

The indictment should also be dismissed because the charged conduct is statutorily exempt from regulation under the informational exemption.  As set forth above, Congress' Berman Amendment excluded from the export prohibition the export of any information or informational materials, including, but not limited to, publications, films, posters, phonograph records, photographs, microfilms, microfiche, tapes, compact disks, CD ROMs, artworks, and news wire feeds.  50 U.S.C. § 1702(b)(3); *see also* 31 C.F.R. § 560.210(c)(1) (ITSR definition of informational materials); 31 C.F.R. § 510.312(a)(1) (NKSR definition of informational materials).  But under OFAC's interpretation, the informational exemption is not applicable to "transactions related to information and informational materials not fully created and in existence at the date of the transactions, or to the substantive or artistic alteration or enhancement of informational materials, or to the provision of marketing and business consulting services."  31 C.F.R. § 560.210(c)(2) (ITSR); 31 C.F.R. § 510.213 (NKSR).

The high-level publicly available information that Mr. Griffith allegedly provided at the North Korea conference clearly falls within the scope of the informational exemption.  The government is likely to claim that, given that Mr. Griffith gave comments that were not specifically scripted, he necessarily altered them, making them not "fully created" and thereby fell within OFAC's carve-out to the exemption.  But the information Mr. Griffith allegedly provided was fully created; indeed, it was so highly general as to be widely available on the

Internet.  A full reading of the NKSR establishes that this is not the type of new information

OFAC seeks to proscribe.  *See* 31 C.F.R. § 510.213 ("prohibited transactions include payment of

advances for information or informational materials not yet created and completed[;] provision

of services to market, produce or co-produce, create, or assist in the creation of information or

informational materials; and payment of royalties with respect to income received for

enhancements or alterations made by U.S. persons to such information or informational

materials).  Because Mr. Griffith's information was not created, produced, and paid for, it was

not prohibited under the informational exemption.

Mr. Griffith's alleged comments also did not substantively alter or enhance otherwise

public information.  As explained in *Amirnazmi*, in July 2004, in response to a dialogue with the

publishing industry, OFAC issued new regulations regarding how the Berman Amendment, and

OFAC's carve-outs thereto, would apply to U.S. newspapers seeking to publish Iranian-authored

articles.  645 F.3d at 590.  Reversing a prior position, OFAC wrote that "substantive edits to [a]

work's content to make the work more cohesive, efficient, argumentative or effective  . . . . and

to make the work conform to the newspaper's editorial standards would not constitute

substantive or artistic alteration or enhancement of the article or commentary."  *Id.*  Similarly,

the fact that Mr. Griffith may have had leave to speak extemporaneously to make the information

more cohesive or effective does not make the subject matter any less public or remove it from

the realm of protected information.

Finally, to the extent that OFAC's carve-out – that seeks to remove informational

materials "not fully created and in existence at the date of the transactions" from the scope of the

statutory informational exemption (*see id*.) – would apply to Mr. Griffith's alleged conduct, it

would represent an impermissible agency interpretation that should be struck down under

*Chevron U.S.A. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842-43, 104 S.Ct.

2778, 81 L. Ed.2d 694 (1984).  As explained in *United States v. Amirnazmi*, 645 F.3d 564, 581-

82, both in the Omnibus Trade and Competitiveness Act of 1988 (codified at 50 U.S.C. app.

§ 5(b)), and in the Free Trade in Ideas Act (codified as amended at 12 U.S.C. § 95a, 50 U.S.C.

"§ 1702(b)), Congress has taken aim at OFAC's narrow interpretation of the Berman

Amendment.  The House Conference Report regarding the FTIA stated:

> [N]o embargo may prohibit or restrict directly or indirectly the import or
> export of information that is protected under the First Amendment to the
> U.S. Constitution. The language was explicitly intended, by including
> the words "directly or indirectly," to have a broad scope. However, the
> Treasury Department has narrowly and restrictively interpreted the
> language in ways not originally intended. The present amendment is only
> intended to address some of those restrictive interpretations, for example
> limits on the type of information that is protected or on the medium or
> method of transmitting the information.

H.R. Conf. Rep. No. 103–482, at 239 (1994), reprinted in 1994 U.S.C.C.A.N. 398, 483.

In other words, Congress recognized that OFAC's regulations might be interpreted

restrictively in other ways, and those also would be inconsistent with Congress's intention to

respect the First Amendment by broadly permitting the import and export of information.

Accordingly, while other cases have upheld OFAC's regulations, none has involved pure public

information, like the facts here.  *Cf. Amirnazmi*, at 582, 586 (finding defendant's ChemPlan

software, which he had licensed to a nationalized Iranian petrochemical company for a fee, not

informational material because it was dynamic and permitted users to generate "'what if'

scenarios" was "tailored to end users," and "produced customized reports.")  In this case, were

the carve-out to be deemed sufficiently broad as to put Mr. Griffith's speech outside the realm of

protected "information" even though it consisted only of broadly-known public information

obtainable on the internet, it should be struck down as an impermissible agency interpretation

inconsistent with the will of Congress.  *See New York City Health and Hosp. Corp. v. Perales*,

954 F.2d 854, 858 (2d Cir. 1992) (agency interpretation accorded no deference when it was "at odds with the clear intent of the statutes, both facially and as elaborated by legislative history."); *Lewis v. Grinker*, 965 F.2d 1206, 1223 (1992) (ignoring agency interpretation of Medicaid alienage restriction that "would fly in the face of legislative history").

### e. The First and Fifth Amendments Bar Prosecution of Mr. Griffith's Speech

#### 1. Mr. Griffith's Speech Is Constitutionally Protected

The indictment should also be dismissed because it seeks to criminalize pure speech. Mr. Griffith's speech was well within the First Amendment rights that he possesses as a U.S. citizen. To the extent that any OFAC regulation, as applied, criminalizes protected pure speech, it would violate Mr. Griffith's First Amendment rights and not survive strict scrutiny. And whether that speech occurred on U.S. versus foreign soil—in this case Pyongyang, North Korea—matters not.

As an initial matter, the protections under the First Amendment of the Constitution attach to its citizens, wherever they go, and do not stop at this country's borders. *See Reid v. Covert*, 354 U.S. 1, 5-6 (1957) ("When the Government reaches out to punish a citizen who is abroad, the shield which the Bill of Rights . . . provides . . . should not be stripped away just because he happens to be in another land."). Accordingly, courts have repeatedly applied the First Amendment to protect speech outside of the United States. *See, e.g.*, *Haig v. Agee*, 453 U.S. 280, 308-309 (1981) (free speech protections extend "beyond our national boundaries" and, while distinguishing revocation of a passport as restriction on an action, finding that ability to criticize the government—a pure-speech activity—could not be impeded); *see also id.*, 453 U.S. at 319 (Brennan, J. dissenting)( U.S. citizen's exercise of speech abroad was "undoubtedly protected by the Constitution"); *DKT Memorial Fund Ltd. v. Agency for Intern. Dev.*, 887 F. 2d 275, 303, 307 (D.C. Cir. 1989) (Ginsburg, J., dissenting) (stating the Constitution contains within it "the

freedom to communicate, to receive communications, and to maintain associations, at home and abroad").

For example, in *Agency for Intern. Development v. Alliance for Open Society International, Inc.*, 570 U.S. 205, 213 (2013), domestic HIV/AIDS-related organizations seeking to work with foreign entities abroad challenged a U.S. AID policy that mandated that funds could only be used on organizations with explicit policies against sex trafficking and prostitution. The domestic entities challenged the policy requirement, arguing it would stymie their work in foreign countries. The Supreme Court struck down the requirement on First Amendment grounds, finding that the basic principle that freedom of speech "prohibits the government from telling people what they must say" applied to theses nonprofit activities abroad. *Alliance for Open Society*, 570 U.S. at 213. Thus, regardless of where Mr. Griffin was located, his right to freedom of speech followed, and the government's attempts to infringe on those rights runs contrary to the Constitution.

Mr. Griffith's purported remarks in the DPRK on basic principles of cryptocurrency and blockchain computing technology constitute protected First Amendment speech. *See Miller v. California*, 413 U.S. 15, 23 (1973) (courts must "remain sensitive to any infringement on . . . scientific expression"). "The First Amendment .. . . means that the government may not restrict expression because of its message, ideas, subject matter or content." *Chicago Police Dep't v. Mosley*, 408 U.S. 92, 95 (1972).

Here, the government seeks to penalize speech, and does so based on the content of what was communicated. *Holder v. Humanitarian Law Project*, 561 U.S. 1, 28 (2010) (where generally applicable law is directed at individual "because of what his speech communicated," law is subject to strict scrutiny); *Cohen v. California*, 403 U.S. 15, 18 (1971) (breach-of-peace

statute as applied to words on defendant's jacket triggered strict scrutiny, because the conduct

that "the State sought to punish [was] the fact of communication").  Accordingly, the regulation

of Mr. Griffith's remarks is subject to strict scrutiny, and the government bears the heavy burden

of proving both that its regulation is narrowly tailored by "the least restrictive means" and

furthers a compelling state interest.  *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1988).

       In *Holder*, applying strict scrutiny, the Supreme Court upheld an injunction against a

humanitarian group because the group planned to provide direct "material support" to foreign

terrorist organizations by teaching them to engage in certain conflict resolution activities.  561

U.S. at 36.  The Court emphasized its holding was narrow, noting it would "in no way suggest

that a regulation of independent speech would pass constitutional muster, even if the

Government were to show that such speech benefits foreign terrorist organizations."  *Id*. at 39.

Consistent with this pronouncement, in *Alliance for Open Society*, the Supreme Court limited the

*Holder* decision to its facts, stating it applied only where "where the record indicated that support

for . . .  organizations' nonviolent operations was funneled to support their violent activities."

*See* 570 U.S. at 220.  Here, as in *Alliance for Open Society*, the government's "regulation of

independent speech" is unnecessarily overbroad and cannot satisfy strict scrutiny.

       *Al Haramain Islamic Found., Inc. v. U.S. Dep't of Treasury*, 686 F.3d 965 (9th Cir. 2012)

provides an instructive application.  In that case, AHMI-Oregon, a domestic branch of an

international Islamic organization linked to terrorist activities, had all its assets frozen and was

designated a "Specially Designated Global Terrorist" ("SDGT") pursuant to the IEEPA.

MCASO, a multicultural association in Oregon, sought to coordinate with AHMI-Oregon to

"speak[ ] to the press, hold[ ] demonstrations, and contact[ ] the government" on AHMI-

Oregon's behalf.  MCASO argued that IEEPA's restriction on its "coordinated advocacy" with

AHMI-Oregon based on the latter's SDGT designation violated MCASO's First Amendment Rights. Applying the demanding strict scrutiny standard, the *Al Haramain* court agreed, distinguishing *Holder*, which "involved wholly foreign organizations currently at war with a United States ally . . . and involved proposed training" that had a "real, not remote" possibility of furthering terrorism. In contrast, the court in *Al Haramain* found the prohibition on MCASO's coordinated advocacy was not narrowly tailored to "advance the concededly compelling government interest of preventing terrorism." 686 F.3d at 997, 1001. Finding "little evidence" that MCASO's "pure speech" would aid any terrorist organization's "sinister purposes," the Court granted MCASO's First Amendment claim. *Id.* at 1001.

In distinguishing *Holder*, the *Al Haramain* Court noted *Holder* had intentionally delivered a narrow ruling, and had declined to address potential factual scenarios beyond the specific one before it. *Id.* The Ninth Circuit also noted that, unlike *Holder*, *Al Haramain* involved pure-speech conduct and content-based prohibitions, where there was "little evidence that the pure-speech activities proposed by MCASO on behalf of the domestic branch will aid the larger international organization's sinister purposes." *Id.*

Because, as in *Alliance for Open Society* and *Al Haramain,* the conduct at issue here involves pure speech and content-based restrictions, the government must survive strict scrutiny; that is, it must demonstrate that its criminalization of speech is supported by a narrowly tailored restriction that furthers a compelling state interest. But its broad definition of "services" cuts precisely the opposite way, as it is neither narrowly tailored nor in furtherance of any specific state interest. Prosecution of Mr. Griffith for purported remarks at the Pyongyang conference therefore cannot satisfy scrutiny, much less strict scrutiny, and constitutes an impermissible

restraint on his First Amendment right to free speech.  For this reason alone, the indictment

should be dismissed.

### 2.  The Government Did Not Provide Fair Notice of Its Novel Construction of "Service"

The indictment also should be dismissed because the prosecution of Mr. Griffith on this

basis violates his Due Process rights since he did not have fair warning that OFAC or the

Department of Justice would contend that his alleged pure-speech conduct constituted a crime.

The Due Process Clause protects individuals from being "required at peril of life, liberty

or property to speculate as to the meaning of penal statutes."  *Lanzetta v. New Jersey*, 306 U.S.

451, 453 (1939); *see Bouie v. City of Columbia*, 378 U.S.347, 351 (1964).  Courts have "taken

special care to insist on fair warning" where, as here, a statute "regulates expression and

implicates First Amendment values," *Marks v. United States*, 430 U.S. 188, 196 (1977), and

imposes "criminal penalties," *Forbes v. Napolitano*, 236 F.3d 1009, 1011 (9th Cir. 2000).

Mr. Griffith did not have fair warning that "services" would be deemed so broad as to

encompass an unpaid attendance at a conference, where he allegedly provided general remarks

on topics well within the public domain, as he and others have done at numerous blockchain

conferences around the world.  As explained above, the government has not previously defined

services to include an unpaid speech at a conference on broad general topics.  Neither OFAC

regulations or guidance, nor judicial opinions, have sought to encompass such conduct.  Notably,

unlike in *Homa Int'l* or *Banki*, OFAC itself took no civil enforcement action against Mr. Griffith.

Indeed, the government's apparent theory is so aggressive that, as its recent discovery

establishes, OFAC officials did not initially support the prosecution and cast doubts on the

government's theory of "services," representing that Mr. Griffith's conduct of attending a

conference and speaking on very general topics of wide public availability was a "gray area."[20]

It appears that only after the prosecutors and agent lobbied OFAC did it agree to support the

prosecution, and under a much narrow theory than what the prosecution has set forth here.

OFAC's internal dialogue makes clear that the standard for services is not sufficiently defined to

have provided Mr. Griffith fair notice that he would be deemed in violation.[21]

  Criminal liability cannot rest on such a slender reed.  If the definition is so subjective and

unclear that different OFAC officials can reach different conclusions, or if the determination of

"services" is premised on such minute differences of fact (judged with the benefit of hindsight),

then there can be no doubt that Mr. Griffith did not receive fair notice that his conduct could

constitute a criminal offense.

  Due process "bars courts from applying a novel construction of a criminal statute to

conduct that neither the statute nor any prior judicial decision has fairly disclosed to be within its

scope."  *United States v. Lanier*, 520 U.S. 259, 266 (1997).  Here, the government's theory that

Mr. Griffith's purported conference remarks amounted to services is too novel to comply with

due process and fair notice.  Dismissal of the indictment is therefore required.

## CONCLUSION

  For the above reasons, Mr. Griffith respectfully requests that the Court dismiss the

indictment with prejudice.

Dated:  October 22, 2020          Respectfully Submitted,

                   */s/ Brian E. Klein*

                   _____

---

[20] USAO_001745

[21] The government may argue, as it has before, that Mr. Griffith knew his travel might violate regulations because he sent messages reflecting his understanding that the DPRK might wish to violate sanctions.  Recognizing that the DPRK might wish to circumvent the international sanctions regime – a well-documented fact written about in any newspaper – is different than perceiving that one's own conduct might be in violation.

Brian E. Klein
Keri Curtis Axel
Baker Marquart LLP

Sean S. Buckley
Kobre & Kim LLP

*Attorneys for Virgil Griffith*