UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------x

UNITED STATES OF AMERICA        :

        Plaintiff,                      :
   v.                                            20 Cr. 015 (PKC)
                                                         :
VIRGIL GRIFFITH,
                                                         :
        Defendant.
-------------------------------------------------------x

# DEFENDANT VIRGIL GRIFFITH'S
# REPLY MEMORANDUM IN SUPPORT OF MOTION TO DISMISS

BRIAN E. KLEIN
KERI CURTIS AXEL
BAKER MARQUART LLP
777 S. Figueroa Street, Suite 2850
Los Angeles, California 90017
(424) 652-7800

SEAN S. BUCKLEY
KOBRE & KIM LLP
800 Third Avenue
New York, New York 10022
(212) 488-1200

*Attorneys for Virgil Griffith*

## TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ...............................................................................................1

ARGUMENT .....................................................................................................................2

 A. Mr. Griffith's Speech Was Protected Constitutional Conduct..............2

 B. Mr Griffith's Speech Does Not Constitute "Services" Under the Caselaw or Any Definition...................................................................6

 C. Mr Griffith's Speech Constituted Information Under the Information Exemption to the NKSR ...................................................11

 D. To the Extent that OFAC's Carve Out to the Informational Exemption Were to Exclude Mr. Griffith's Speech, It Is Ultra Vires and Should Be Struck Down .......................................................13

CONCLUSION .................................................................................................................15

## **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*DKT Memorial Fund v. Agency for International. Development*,
   887 F. 2d 275 (D.C. Cir. 1989) ................................................................................................ 2

*Federal Housing Finance Agency v. UBS Americas Inc.*,
   712 F.3d 136 (2d Cir. 2013) .................................................................................................... 6

*Haig v. Agee*,
   453 U.S. 280 (1981) ................................................................................................................ 2

*Holder v. Humanitarian Law Project*,
    561 U.S. at 28 (2010) ..................................................................................................... 2, 3, 5

*Holloway v. United States*,
   526 U.S. 1 (1999) .................................................................................................................... 6

*Kadi v. Geithner*,
   42 F. Supp. 3d 1 (D.D.C. 2012) .............................................................................................. 3

*Kalantari v. NITV, Inc.*,
   352 F.3d 1202 (9th Cir. 2003) ................................................................................................ 4

*Kar Onn Lee v. Holder*,
   701 F.3d 931 (2d. Cir. 2012) ................................................................................................... 6

*Kuhne v. Cohen & Slamowitz, LLP*,
   579 F.3d 189 (2d Cir.2009) ..................................................................................................... 6

*Lewis v. Grinker*,
   965 F.2d 1206 (1992) ........................................................................................................... 14

*Liparota v. United States*,
   471 U.S. 419 (1985) ............................................................................................................. 15

*Maryland v. Trump*,
   2020 WL 6381397 (E.D. Pa. Oct. 30, 2020) ........................................................................ 14

*New York City Health and Hospital Corp. v. Perales*,
   954 F.2d 854 (2d Cir. 1992) ................................................................................................. 14

*Nnebe v. Daus*,
   931 F.3d 66 (2d Cir. 2019) ..................................................................................................... 6

*Pettus v. Morgenthau*,
 554 F.3d 293 (2d Cir. 2009) ............................................................................................. 6

*Retirement Board of the Policemen's Annuity & Benefit Fund of Chicago v. Bank of New York Mellon*,
 775 F.3d 154 (2d. Cir. 2014) ............................................................................................ 6

*Robinson v. Shell Oil Co.*,
 519 U.S. 337 (1997) ......................................................................................................... 6

*Securities Investor Protection Corp. v. Bernard L. Madoff Investment Securities LLC*,
 496 B.R. 744 (S.D.N.Y. 2013) ....................................................................................... 15

*Shuttlesworth v. City of Birmingham*,
 394 U.S. 147 (1969) ......................................................................................................... 2

*TikTok Inc. v. Trump*,
 2020 WL 5763634 (D.D.C. Sept. 27, 2020) ................................................................ 4, 5

*United States v. All Funds on Deposit in United Bank of Switzerland*,
 2003 WL 56999 (S.D.N.Y. Jan. 7, 2003) ......................................................................... 8

*United States v. Amirnazmi*,
 645 F.3d 564 (3d Cir. 2011) ............................................................................................. 5

*United States v. Banki*,
 685 F.3d 99 (2d Cir. 2012) ................................................................................... 8, 9, 15

*United States v. Homa International Trading Corp.*,
 387 F.3d 144 (2d Cir.2004) ............................................................................................. 8

*Ward v. Rock Against Racism*,
 491 U.S. 781 (1988) ......................................................................................................... 4

**Statutes**

18 C.F.R. § 366.1 ........................................................................................................................... 7

20 C.F.R. § 210.2 ........................................................................................................................... 7

29 C.F.R. § 779.312 ....................................................................................................................... 7

31 C.F.R. § 510.213 ................................................................................................................. 5, 12

31 C.F.R. § 510.312(a)(1) ............................................................................................................ 11

31 C.F.R. § 560.210(c) ................................................................................................................. 11

31 C.F.R. § 560.538 (b)(1) ............................................................................................................. 9

15 U.S.C. § 717 .............................................................................................................................. 7

15 U.S.C. § 1125(a)(1) ................................................................................................................... 7

15 U.S.C. § 4021(2) ....................................................................................................................... 7

19 U.S.C. § 2114b(5) ..................................................................................................................... 7

22 U.S.C. § 1623(a)(2)(B) ............................................................................................................. 7

29 U.S.C. § 202(a) ......................................................................................................................... 7

50 U.S.C. § 1702(b)(3) ................................................................................................. 4, 11, 13, 15

**PRELIMINARY STATEMENT**

The government's opposition makes clear that it has charged a theory of the word "services" that is unprecedented and encompasses pure, unscripted speech. On such a novel theory, of which defendant Virgil Griffith had no notice, the government claims not a mere regulatory violation, but a criminal offense. Neither the definition of "services" nor the First Amendment countenances this result.

There can be no doubt that what the government seeks to proscribe in this case is speech. The government describes Mr. Griffith's conduct as "giving a presentation;" "supplying . . . conference attendees and participants with information;" "answering questions . . . from conference attendees," and participating in discussions." (Opp. at 5.)

The government is stuck between a rock and a hard place: the further it seeks to expand the definition of the word "services"—as it must to try to shoehorn Mr. Griffith's conduct into it—the more its theory violates the First Amendment and the will of Congress.

The government not only ignores the substantial use of the word "services" in law as a sibling of "goods"—both of which refer to commodities, whether intangible or tangible, that have market value—but also eschews any definition at all, in contravention of statutory construction principles. The government's theory is so broad to encompass *any* unscripted speech providing any type of information in a sanctioned country.

Having expanded the term services to include the mere provision of information, the government next argues that the term "information" does not include Mr. Griffith's speech because OFAC has restricted its definition—again beyond any accepted meaning of the word—to only pre-prepared written materials. OFAC's carve-out of the term "information" goes too far, and it violates both the informational exemption and, more importantly, the First Amendment.

In short, Mr. Griffith did not provide services to anyone when, on his own volition, he traveled to and allegedly spoke at a conference in North Korea. To argue that he did, the

1

government has to twist basic words beyond their common meanings. Not only are the government's contentions statutory and linguistically untenable, but they result in an expansion of the regulatory framework that is so broad as to trample Mr. Griffith's free speech rights. The indictment must be dismissed.

## ARGUMENT

### A. Mr. Griffith's Speech Was Protected Constitutional Conduct

The indictment seeks to penalize Mr. Griffith for the contents of a presentation he gave, an action protected under the First Amendment. While Mr. Griffith does not believe that the definition of "services" in OFAC's regulation encompasses his conduct, if it did, it would fail under the First Amendment since it is not narrowly tailored and cannot survive strict scrutiny analysis. The indictment against Mr. Griffith should be dismissed on this ground alone. Given the importance of this issue, Mr. Griffith addresses it first.

While the First Amendment covers both verbal "pure speech" and non-verbal, symbolic forms of speech (*e.g.*, picketing, protesting), "pure speech" is routinely afforded the highest form of protection. *See Shuttlesworth v. City of Birmingham*, 394 U.S. 147, 152 (1969) (First and Fourteenth Amendments protect symbolic speech but not to the same extent as pure speech). What the government seeks to criminalize here falls squarely into the "pure speech" category: a verbal presentation (a speech by another name) given by Mr. Griffith. The protections of the First Amendment cover this activity regardless of the citizen's location. *Haig v. Agee*, 453 U.S. 280, 308-309 (1981); *DKT Memorial Fun. v. Agency for Intern. Dev.*, 887 F.2d 275, 303, 307 (D.C. Cir. 1989) (Ginsburg, dissenting); Mot at 20-21.

As an initial matter, the government's argument that intermediate scrutiny should apply is not supported by the law, its opposition, or the discovery it cites. (*See* Opp. at 34.) The Supreme Court in *Humanitarian Law Project* confirmed that strict scrutiny applies where "communicating a message" triggers the application of a statute on the defendant. *Holder v. Humanitarian Law Project*, 561 U.S. at 28; Opp. at 35; Mot. at 20-22. While the opposition attempts to pull certain

2

conduct into the mix, that conduct is not what forms the basis of the indictment or the "services" Mr. Griffith allegedly conspired to provide.  For example, the government alleges that Mr. Griffith secured a visa, traveled to North Korea, and encouraged others to attend future conferences (*see* Opp. at 37-38.), but Mr. Griffith is not being charged with violating a travel restriction or with encouraging future conference participation.  A review of the indictment and opposition confirms that it is Mr. Griffith's alleged conference presentation and, more importantly, its purported *contents,* that give rise to the criminal charge against him.  (*See, e.g.*, Opp. at 4 (describing the alleged violations as "giving a presentation on topics . . . including cryptocurrency and blockchain technologies"; "supplying . . . information"; "answering questions" and "participating in discussions" about these technologies); Opp. at 5-7 (detailing the alleged contents of Mr. Griffith's presentation); Ind. ¶ 5.)  Because the indictment seeks to penalize Mr. Griffith's speech based on its alleged content, it is subject to a strict scrutiny analysis.[1]

Similarly, the government's own evidence undercuts its claim that Mr. Griffith is being prosecuted for anything other than his alleged oral presentation at the conference.  For example, while the USAO was actively lobbying OFAC to disregard its initial concerns that the presentation fell into the informational exemption and thus could not constitute a violation, DOJ's National Security Division provided a detailed write-up of the conduct it believed constituted "services."  (Ex. A.)[2]  As even a cursory examination of that write-up makes clear, the "relevant facts" supporting the proposed charge centered entirely on Mr. Griffith's presentation and made no reference to any of the alleged "acts" upon which the USAO now

---

[1]  *Kadi v. Geithner*, 42 F. Supp. 3d 1 (D.D.C. 2012), like *Humanitarian Law Project*, dealt with a restriction on financial support to certain organizations, not with the pure-speech activities at issue here.  Thus, *Kadi* does not support the application of intermediate scrutiny where, as here, it is the contents of a petitioner's speech targeted by a statute or application.

[2]  The documents that are referenced with an exhibit number in this reply are organized in a separately filed Appendix of Exhibits because they are cross-referenced in all three concurrently filed replies.

seeks to rely.  (*Id.*)  Similarly, while being heavily lobbied by the USAO, NSD and FBI to adopt their case theory,³ OFAC informed NSD and the USAO that it "may not be comfortable giving . . . assurance with respect to Griffith's travel to NK."  (Ex. B.)  Unsurprisingly, when OFAC's Chief Counsel finally agreed to provide a witness to testify, it agreed that he would "testify that the presentation by [Mr. Griffith] at the Cryptocurrency Conference in North Korea" constituted a violation of the IEEPA.  (Ex. C.)  Against this backdrop, the government's claim that the criminal violation alleged in the indictment is not limited to Mr. Griffith's presentation is a *post hac* fabrication advanced in an attempt to salvage a prosecution that cannot pass muster under the relevant statutes or the Constitution.

Further, the enforcement of the IEEPA here to restrict (indeed to completely foreclose) speech cannot survive such strict scrutiny as it would not be narrowly tailored by "the least restrictive means."  *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1988); Mot. at 22.  Indeed, to the extent OFAC's definition of "services" were to proscribe Mr. Griffith's speech, as the government contends, it is not tailored at all, contravening both the Constitution and Congress.  Citing the First Amendment, Congress has amplified its exemptions to the President's IEEPA powers twice, including by prohibiting the direct or indirect restriction on exportation of "*any information or informational materials.*"  50 U.S.C. § 1702(b)(3) (emphasis added).⁴  Contrary to the government's arguments, several Courts have affirmed that "Congress has stressed that these limitations be given 'broad scope.'"  *TikTok Inc. v. Trump*, No. 1:20-CV-02658 (CJN), 2020 WL 5763634, at *4 (D.D.C. Sept. 27, 2020) (*citing to Kalantari v. NITV, Inc.*, 352 F.3d 1202, 1205

---

³ *See, e.g.*, Ex. D ("DOJ asked us to hang on [contacting] OFAC …. one or more people have already reached to the [OFAC Attorney] and he's becoming frustrated.").

⁴  The Berman Amendment, clarified in the Free Trade in Ideas Act ("FTIA"), together are referred to as the "informational exemption."  50 U.S.C. § 1702 (b)(3); (*see* Mot. at 10-11).

4

(9th Cir. 2003) (quoting H.R. Conf. Rep. No. 103–482, at 239 (1994)),[5] and *United States v. Amirnazmi,* 645 F.3d 564, 585 (3d Cir. 2011).

The government argues that Mr. Griffith's alleged presentation represents a service akin to monetary assistance because it somehow benefited the DPRK.  (Opp. at 41.)  Such an argument was flatly rejected by the very case the government cites, *Humanitarian Law Project*.  (*See id*. at 39.)  In fact, there, the Supreme Court expressly stated that its holding was not to be taken as a "suggest[ion] that a regulation of independent speech would pass constitutional muster, even if the government were to show that such speech benefits foreign terrorist organizations."  *Id*.  Simply put, regardless of who it benefits, the exportation of information is a constitutionally protected activity, as the Supreme Court recognized.

Further, to the extent that OFAC has tried to write out of existence the Congressional exemption on information through its purported "carve out,"[6]—this also fails strict scrutiny (in addition to contravening Congressional intent).  Under the government's view of the regulation, the carve out is not tailored at all in that it effectively prohibits any unscripted speech in a sanctioned country because it was not "fully created" at the time of export.

As Mr. Griffith's conduct at issue is speech-based, and as the restrictions as applied are content-based, the government must show that its restrictions are narrowly tailored to survive the strict scrutiny required for such infringement on the First Amendment.  Far from being narrowly tailored, the OFAC carve out seeks to be expansive to the point of voiding out the plain language of the Congressional exemptions and cannot survive strict scrutiny.  As a result, the indictment should be dismissed as a violation of the First Amendment.

---

[5]  Indicative of the importance of the First Amendment interests at issue, the District Court in *TikTok Inc. v. Trump* just expanded the scope of injunctive relief, finding that the proposed ban likely would violate IEEPA's express limitation on the restriction of information or informational materials.  *Id*., Dec. 7, 2020 Mem. Opinion, Dkt. 60, at 22-25, 29.

[6]  OFAC's carve-out defines "information and informational materials" to those "fully created and in existence at the time of his transferring the material.'"  31 C.F.R. § 510.213.

### B. Mr Griffith's Speech Does Not Constitute "Services" Under the Caselaw or Any Definition

The government concedes that there is no statutory or regulatory definition of "services," which requires courts to ascertain its plain meaning from the statute itself. (Opp. at 45). Ignoring well-established principles of statutory interpretation and the caselaw, however, the government abandons any attempt to address the definition, arguing only that it should be "broadly" and "expansively" interpreted.

There can be no analysis of the statute without a definition of "services." "[T]he starting point in any case of interpretation must always be the language itself, giving effect to [its] plain meaning." *Kuhne v. Cohen & Slamowitz, LLP*, 579 F.3d 189, 193 (2d Cir. 2009) (internal quotation marks omitted); *Retirement Bd. of the Policemen's Annuity & Benefit Fund of Chicago v. Bank of New York Mellon*, 775 F.3d 154, 165 (2d. Cir. 2014); *Nnebe v. Daus*, 931 F.3d 66, 81 (2d Cir. 2019); *see also Kar Onn Lee v. Holder*, 701 F.3d 931, 936 (2d. Cir. 2012) ("As with any question of statutory interpretation, we begin by examining the text of the statute.").

As the Supreme Court has instructed, "The plainness or ambiguity of statutory language is determined by reference to the language itself, the specific context in which [it] is used, and the broader context of the statute as a whole." *Robinson v. Shell Oil Co.*, 519 U.S. 337, 341 (1997). When interpreting statutes, courts "consider not only the bare meaning of the critical word . . . but also its placement and purpose in the statutory scheme." *Holloway v. United States*, 526 U.S. 1, 6 (1999). Rather than attempt to "construe each phrase literally or in isolation," courts must "attempt to ascertain how a reasonable reader would understand the statutory text, considered as a whole." *Pettus v. Morgenthau,* 554 F.3d 293, 297 (2d Cir. 2009); *Fed. Hous. Fin. Agency v. UBS Americas Inc.*, 712 F.3d 136, 141 (2d Cir. 2013).

Reviewing the term "services" in context as required, it is important to note that "goods" and "services" appear next to each other. Used this way, these words have a common meaning as economic terms that apply to tangible or intangible commodities that are sold. *See*, *e.g.*, Lanham Act, 15 U.S.C. § 1125(a)(1) ("any person who, on or in connection with any goods or

6

services, or any container for goods, uses in commerce"); Fair Labor Standards Act, 29 U.S.C. § 202(a), 29 C.F.R. § 779.312 ("retail and service establishment" determined by "annual dollar volume of goods or services"); Export Trading Company Act, 15 U.S.C. § 4021(2) (defining "service" to mean "intangible economic output"); Trade and Tariff Act of 1984, 19 U.S.C. § 2114b(5) ("'services' means economic activities whose outputs are other than tangible goods."); International Claims Settlement Act, 22 U.S.C. 1623(a)(2)(B) ("the term 'service' means economic activity the output of which is other than tangible goods."); Public Utility Holding Company Act of 2005, 15 U.S.C. § 717, 18 C.F.R. § 366.1 (service defined as "any managerial, financial, legal, engineering, purchasing, marketing, auditing, statistical, advertising, publicity, tax, research, or any other service . . . which is sold or furnished for a charge."); Railroad Retirement Act, 45 U.S.C. 231f, 20 C.F.R. § 210.2 (service defined as "a period of time for which an employee receives payment from a railroad employer for the performance of work").

  Used in the context of "goods" and "services," "services" necessarily have economic value. The United States Bureau of Economic Analysis, within the Department of Commerce, defines "services" as "products that cannot be stored and are consumed at the place and time of their purchase." (Gross Domestic Product ("GDP") then is defined as "The market value of goods and services produced by labor and property in the United States," presuming that services have market value). Given the prevalence of the terms "goods" and "services" in law and economics – uses that share this common meaning – there can be little doubt how a reasonable reader would interpret the term in this or any other statutory context.

  Accordingly, Mr. Griffith advances not a "cramped" definition of services, as the government contends, but the only reasonable reading. (*See* Opp. at 26.) The limited relevant caselaw is in accord. There are three cases in which two Second Circuit panels and Judge Rakoff have grappled with the meaning of "services." *See United States v. Banki*, 685 F.3d 99, 107 (2d Cir. 2012); *United States v. Homa International Trading Corp.*, 387 F.3d 144, 146 (2d Cir.2004) (per curiam) ("*Homa Int'l*"); *United States v. All Funds on Deposit in United Bank of Switzerland*, No. 01 Civ. 2091 (JSR), 2003 WL 56999, at *1 (S.D.N.Y. Jan. 7, 2003) ("*All*

7

*Funds*"). The government references only one of these cases, *Banki*, and only for its holding that "services" does not have an "inherent fee requirement." 685 F.3d at 108. But the fact that a fee is not a pre-requisite to "services" sheds little light on what the term's definition is.

In each of the three cases, the courts addressed the plain meaning analysis. In *Homa Int'l,* citing *All Funds*, the Second Circuit cited a Black's Law Dictionary of "service" "as the performance of something useful for a fee." 387 F.3d at 146. Relying on this language, the defendant in *Banki* had requested a jury instruction stating that executing money transfers to Iran on behalf of others qualified as "services" only if undertaken for a fee. The Court affirmed the denial of the instruction, rejecting the proposition that services has a fee requirement. *Banki*, 685 F.3d at 108.

In *Banki*, the Second Circuit reasoned that a fee is not a *sine qua non* of "services" because services given away for free, such as *pro bono* legal or consulting services, do not lose the quality of being services. *Id*. But there was no dispute in *Banki* that defendant's conduct itself was a service to the recipient (other than the lack of a fee); further, the transaction at issue was but one of many conducted while defendant was engaged in an unlawful money transmission scheme involving an Iranian hawala network. *Id*. at 104.

The various definitions consulted by the *Banki* court are instructive. The Court cited both the Black's Law Dictionary definition adopted in *Homa Int'l.* (defining " 'service' as 'the act of doing something useful for a person or company for a fee") (Black's Law Dictionary 1372 (7th ed. 1999) and an alternative one defining services as "[a]n intangible commodity in the form of human effort, such as labor, skill, or advice." *Id.* at 107. It also cited Merriam-Webster's Collegiate Dictionary 1067 (10th ed. 2000), which defined "service" as "useful labor that does not produce a tangible commodity" and Webster's Third New International Dictionary 2075

8

(Unabridged ed. 1993), which defined "service" as "the performance of work commanded or paid for by another." *See id.*[7]

These definitions are consistent with the use of the "service" across statutes as an intangible economic output or commodity other than goods. As set forth in Mr. Griffith's motion (*see* Mot. at 15-16), the common elements among these definitions are that services are procured or commanded by a party, with a specific nexus between the procuring party's request and the service provider's output, and that the services have economic value.[8] This was decidedly true of the services provided by defendant Banki: the charged money transfer was both conducted for and at the direction of a specific person (defendant Banki's uncle), and for an economic purpose, namely to benefit a citizen of Iran who could not receive a direct transfer from the U.S. *Banki*, 685 F.3d at 104.

In response to Mr. Griffith's summary of the *Banki* definitions, the government argues inappositely and without citation that the purpose of the conference was to allow "the DPRK" to increase its understanding of blockchain and cryptocurrency technologies to avoid U.S. sanctions. (*See* Opp. at 25).[9] Setting aside that the evidence will not establish any such unified purpose, the government's statement is non-responsive. Even if there were a clear purpose for the conference, in the mind of some unnamed and unspecified planners, it would not establish that Mr. Griffith performed a "service" by allegedly speaking at it. (*See id.*)

---

[7] These definitions and the *Banki* court's analysis of them make clear that a fee is an element of the definition, if not a pre-requisite. (*See* Mot. at 15). The government cannot refute this and does not try, choosing instead to create an oversimplified straw man argument that mischaracterizes the point. (*See* Opp. at 24 ("Griffith … argues that his presentation did not constitute a service because Griffith did not receive a fee")).

[8] OFAC's regulations in the ITR context show a similar understanding of the term services. *See, e.g.*, 31 C.F.R. § 560.538 (b)(1)(Authorized transactions necessary and ordinarily incident to publishing under the ITR) ("individualized or customized services (including, but not limited to, accounting, legal, design, or consulting services").

[9] While contending that whether DPRK already possessed a sophisticated understanding of blockchain technology is not at issue, the government consistently makes factual proffers that put at issue DPRK's knowledge (or lack thereof), as here.

9

At best, the government appears to argue that, because the conference was held for a general educational purpose and Mr. Griffith's speech furthered this purpose, this is sufficient to constitute a service. But none of the definitions of "services" would support a finding that a person provides a service simply because his conduct furthers a common purpose. Rather, the various definitions emphasize that someone procure or command that something be done—which contemplates a specific engagement by a boss, supervisor, or client, and specific direction by that person—and the economic element, *i.e.*, that the service provider provide something of economic value to that procuring person.

The government can show neither of these things. The government claims that there is evidence that the DPRK commanded Mr. Griffith's labor because it allegedly pre-approved 15 publicly available articles as conference topics and limited the lectures to those articles. (Opp. at 29). This would be insufficient to meet the definition of "services" even if it were accurate. First, Mr. Griffith was not commanded or procured by anyone to travel and speak at the conference; he voluntarily chose to go as part of a tourist trip. This alone defeats the inference of being procured or commanded or having a boss or client. Second, this allegation lacks the specific nexus between a client, their requests, and the service provider's output that characterizes services with economic value. Finally, the government undermines its own factual proffer by contending that, during his alleged speech, Mr. Griffith spoke freely and largely extemporaneously, drawing on a whiteboard and answering questions from the conference participants. (Opp. at 30). Accordingly, like any conference, it is clear that Mr. Griffith's content was not procured or commanded by anyone and lacks the particularized tailoring to the requests of a client characteristic of services.

This lack of a specific nexus, and the fact that the information was in the public domain, also defeats any inference of economic value. The teaching example the government provides

fails because it ignores these differences.[10]  (*See* Opp. at 22.)  "[S]ynthesizing and explaining" information alone is insufficient as the government claims: people do this for free on Twitter, in community newsletters and meetings, and at conferences throughout the world every day.  When the information is not procured by, and tailored to, a particular entity or client, it does not suffice.

Accordingly, under the undisputed facts, it is clear that, even under the government's allegations, Mr. Griffith did not provide services.  The indictment should be dismissed.

### C.  Mr Griffith's Speech Constituted "Information" Under the Informational Exemption to the NKSR

The indictment should also be dismissed because, even if Mr. Griffith's conduct fell within OFAC's definition of "services" under the IEEPA, it falls within the informational exemption.  50 U.S.C. § 1702(b)(3); *see also* 31 C.F.R. § 560.210(c)(1) (ITSR definition of informational materials); 31 C.F.R. § 510.312(a)(1).  The exemption excludes from the export prohibition "the export of any information or informational materials."  The government's attempts to take Mr. Griffith's presentation and subvert it into its "services" category ignores completely Congress's express will to the contrary – one that was clearly laid out in the informational exemption of the statute.  (*See* Opp. at 27-30.)

The government does not dispute that the informational exemption was meant to include exactly the type of information that Mr. Griffith provided, but argues that OFAC's carve-out – which purports to limit information and informational materials to those "not fully created and in

---

[10] The government's nuclear physicist hypothetical also fails, because nuclear technology is highly controlled and subject to a comprehensive and well-defined regulatory landscape.  Unlike OFAC's vague regulation at issue here, the nuclear physicist in the government's hypothetical would be subject to, for example, export restrictions imposed by the Department of Energy's Nuclear Regulatory Commission, the U.S. Department of Commerce's Bureau of Industry Security ("BIS"), and the State Department's United States Munitions List.  For example, BIS has issued carefully drawn regulations that define "controlled technology" to include "oral communications" but then has carefully circumscribes the subjects that fall in "controlled technology."  That said, Mr. Griffith is not accused of teaching anyone how to make a nuclear bomb and the government's efforts to compare the two rises to the level of "absurdity."  *See* Opp. at 25.

11

existence at the date of the transactions," 31 C.F.R. § 560.210(c)(2) (ITSR); 31 C.F.R. § 510.213 (NKSR), encompasses Mr. Griffith's speech, because it was largely unscripted and involved answering questions from conference participants.

There is no caselaw or other authority that can support such a broad interpretation. Indeed, under the government's interpretation, no unscripted speech of any kind would be permitted in a sanctioned country.  (*See* Opp. at 29 ("Mr. Griffith did not read an academic paper to the audience.")).  OFAC has never sought to apply the restriction as broadly as the government seeks to do here, and, indeed, as noted above, OFAC itself initially deemed Mr. Griffith's conduct to fall in a "grey area" and pushed back against the prosecution team.

Mr. Griffith's speech falls within the carve-out because the information he provided was in the public domain.   Contrary to the government's argument, Mr. Griffith did not "create" any information for the presentation, even if he did not read from a pre-prepared document.  Mr. Griffith had spoken on smart contracts – the topic of his address – numerous times before.  That blockchains may be used for "smart contracts" – contracts that use computer code to digitally verify transactions – is a well-known fact in the public domain.  (*See* Mot. at 3.)  Importantly, even according to the alleged transcript, Mr. Griffith did not discuss how to code a smart contract, or anything remotely similar.  Indeed, if anything demonstrates the lack of technicality in the speech, it is the discussion of *how* smart contracts can be used (what the government calls "potential applications").  In 2018, a *lawyer* gave a similar presentation as a TED talk about potential smart contract applications.[11]  There is thus no "created" information here, even where examples are provided, as speculation about the potential uses of smart contracts is rampant.[12]  In

---

[11]  *See* Olga Mack, How Smart Contracts Will Change the World, TEDxSanFranciso; https://www.youtube.com/watch?v=pA6CGuXEKtQ_.

[12] *Id.* (discussing potential applications for assisting matching kidney donations and giving phones to refugees); *see, e.g.,* https://www2.deloitte.com/us/en/pages/ finance/articles/cfo-insights-getting-smart-contracts.html (trade clearance and settlement; supply chain management, voting); https://www.coindesk.com/santander-blockchain-tech-can-save-banks-20-billion-a-year (banking); https://www.devteam.space/blog/10-uses-for-smart-contracts/ (medical records, property ownership, mortgages, insurance, and voting, among others)

this context, when Mr. Griffith purportedly told the audience that it "could be on the leading edge of technology" and "y'all could be the first," (Opp. at 23), these were tongue-in-cheek references to the fact that the potential future of smart contracts is aspirational and many contemplated uses are dreamed about but have not been actualized.

The government's argument also ignores that 50 U.S.C. § 1702(b)(3) prohibits the restriction of the exportation of (1) "information" and (2) "informational materials."  The only informational materials at issue here are the 15 scholarly articles that the government concedes were pre-prepared and in the public domain.  (*See* Opp. at 29.)  Webster's Dictionary defines "information" as "knowledge obtained from investigation, study, or instruction."  Even according to the government's proffered evidence, in his speech, Mr. Griffith provided only "information" made up of knowledge, which was both discovered by, and also assembled and disseminated by, others in the public domain.  Accordingly, Mr. Griffith's alleged speech, even if it fell outside of the carve-out, is exempt from the IEEPA.

### D. To the Extent that OFAC's Carve-Out to the Informational Exemption Were to Exclude Mr. Griffith's Speech, It Is *Ultra Vires* and Should be Struck Down

If OFAC's carve-out to the information exemption is so broad as to limit "information" to "reading from an academic paper"— the only conduct the government recognizes would satisfy the carve-out's "fully created and in existence" language"—then the exemption violates the will of Congress and the U.S. Constitution and should be struck down.  (*See* Opp. at 29.)

As explained above, recognizing that OFAC continued to issue regulations that encroached on the First Amendment, Congress expanded the informational exemption through the Berman Amendment and the FTIA.  These Acts were designed to rein in executive authority over the importation and exportation of information and informational materials.  Indeed, Representative Howard L. Berman—the sponsor of both the Berman Amendment and the FTIA—stated that their purpose was to "ensure that the President's power to regulate economic relations with foreign countries is not used to inhibit communication with the people of those

countries." 138 Cong. Rec. 15,052 (1992). The FTIA specifically clarified that the informational exemption was intended to have an expansive reach consistent with the First Amendment and applied: (i) not just to actual materials that had been created (*i.e.*, "informational materials") but also to "information" itself; (ii) to such information "regardless of format or medium of transition"; and (iii) through its inclusion of "including but not limited to," clarified that the list of exempted media was intended to be exemplary and not limited in scope.

Against this backdrop, OFAC's regulation regarding "informational materials" should not be afforded *Chevron* deference. The government argues that the Second Circuit has not overruled an OFAC definition, but then relies on a single Third Circuit case to bolster its arguments for deference. (Opp. at 30-33 (citing *Amirnazmi,* 645 F.3d at 583)). At least one court has subsequently declined to extend the reasoning in *Amirnazmi* beyond its facts. *See*, e.g., *Maryland v. Trump*, No. CV 20-4597, 2020 WL 6381397 at *11 (E.D. Pa. Oct. 30, 2020) (limiting *Amirnazmi* to the particular ITR regulation prohibiting "**payment of advances** for information and informational materials not yet created and completed" (emphasis added)).

By contrast, the Second Circuit has struck down agency interpretations at odds with the statute and legislative history on similar facts. *See New York City Health and Hosp. Corp. v. Perales*, 954 F.2d 854, 858 (2d Cir. 1992) (agency interpretation struck down where it was at odds with the clear intent of the statutes); *Lewis v. Grinker*, 965 F.2d 1206, 1223 (1992) (ignoring agency interpretation of Medicaid restriction that "would fly in the face of legislative history"); *Sec. Inv'r Protection Corp. v. Bernard L. Madoff Inv. Sec. LLC*, 496 B.R. 744, 753-54 (S.D.N.Y. 2013) (rejecting interpretation of statute as "certainly novel" and "at odds with" another agency's interpretation). Because the OFAC limitation here flies in the face of the statutory language and the repeatedly stated Congressional intent of ever expanding the exemption, the agency's interpretation should not be afforded deference.

Notwithstanding the above, even OFAC concedes that the so-called "services" Mr. Griffith is alleged to have provided fall into a "grey area," and that "general presentations that are given other places may fall under an exception and not require a license, while a specifically

created presentation would be a service." (Ex. E; *see also* Ex. F ("OFAC (who will have to be a witness on licensing) [is] concerned that Griffith's presentation falls into the exception for 'information or informational materials,' 50 USC 1702(b)(3)")). When even OFAC—the agency responsible for the administration of the sanctions—believes that the applicability of the IEEPA and the NKSR to Mr. Griffith's conduct is unclear, the rule of lenity requires construing the statute and regulations in Mr. Griffith's favor.

If "textual arguments can be made both ways" about whether the informational exemption applies to the conduct alleged in the Indictment, then the regulation must be interpreted in Mr. Griffith's favor. *Banki*, 685 F.3d at 109–11 (reversing ITSR convictions).[13] This rule "ensures that criminal statutes will provide fair warning concerning conduct rendered illegal." *Liparota v. United States*, 471 U.S. 419, 427 (1985).

## CONCLUSION

For the reasons set forth above, the indictment should be dismissed because it fails to allege actions that would constitute a crime.

Dated:  December 8, 2020                                              Respectfully Submitted,

/s/Keri Curtis Axel
Brian E. Klein
Keri Curtis Axel
Baker Marquart LLP

-and-

Sean S. Buckley
Kobre & Kim LLP

*Attorneys for Virgil Griffith*

---

[13] *Banki* makes clear that the rule of lenity is far from a formality. Because Sections 204 and 516 of the ITSR were "at a minimum" ambiguous in exempting a person from aiding the exportation of non-commercial family remittances to Iran, the Second Circuit reversed the convictions based on a stricter interpretation reversed.  685 F.3d at 109.