UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

        v.                                    20 CR 15 (PKC)

VIRGIL GRIFFITH,

              Defendant.              Oral Argument
                               (by telephone)
------------------------------x

                             New York, N.Y.
                             December 22, 2020
                             11:00 a.m.

Before:

                   HON. P. KEVIN CASTEL,

                             District Judge

                   APPEARANCES

AUDREY STRAUSS
     Acting United States Attorney for the
     Southern District of New York
BY: KYLE WIRSHBA
     KIMBERLY RAVENER
     Assistant United States Attorneys

BAKER MARQUART LLP
     Attorneys for Defendant
BY: BRIAN KLEIN
     KERI CURTIS AXEL
     -and-
KOBRE & KIM LLP
BY: SEAN S. BUCKLEY

1          THE COURT:  This is 20 CR 15, United States of America

2     v. Virgil Griffith.  Appearing for the government, please.

3          MS. RAVENER:  Good morning, your Honor, Kimberly

4     Ravener and Kyle Wirshba for the government.

5          THE COURT:  Good morning to you both.

6          And for the defendant.

7          MR. KLEIN:  Good morning, your Honor, this is Brian

8     Klein.  Also on the line is Keri Axel from my law firm as well

9     as Sean Buckley.  And our client, Virgil Griffith, is on the

10    line, too from his home.

11         THE COURT:  Good morning to you all.

12         Mr. Griffith, can you hear me?

13         THE DEFENDANT:  Yes, I can hear you just fine, your

14    Honor.

15         THE COURT:  Mr. Griffith, if you prefer, I would

16    adjourn this conference to a date and time in the future where

17    you could be physically present in a courtroom with me, the

18    judge, on the bench and the prosecutor present and your counsel

19    present with you and be physically present for this conference

20    and argument today.  Would you prefer that I put this off to a

21    date and time where you could be physically present?  And I

22    could do that reasonably, at least, under the present standing

23    order, sometime after January 15, which is really less than a

24    month away.

25         THE DEFENDANT:  No, your Honor.

1           THE COURT:  Are you waiving your physical presence in

2    this proceeding?

3           THE DEFENDANT:  I am.

4           THE COURT:  It seems to me the waiver is knowing and

5    intelligent and it is accepted.

6           One other housekeeping matter.  You will note that I

7    entered an order with regard to the government's obligations,

8    and I am now going to give an oral direction.

9           Pursuant to Rule 5(f), I direct the prosecution to

10   comply with its obligation under *Brady v. Maryland* and its

11   progeny to disclose to the defense all information, whether

12   admissible or not, that is favorable to the defendant

13   materially either to guilt or to punishment and known to the

14   prosecution.  Possible consequences for noncompliance may

15   include dismissal of individual charges or the entire case,

16   exclusion of evidence, and professional discipline or court

17   sanctions on the attorneys responsible.

18          I have entered a written order more fully describing

19   this obligation and the possible consequences of failing to

20   meet it, and I direct the prosecution to review and comply with

21   that order.

22          Does the prosecution confirm that it understands its

23   obligations and will fulfill them?

24          MS. RAVENER:  We do, your Honor.

25          THE COURT:  Now, there is a lot for us to cover this

1    morning.  I think it's probably useful to the parties to

2    perhaps set the stage and to give them an opportunity to

3    correct misimpressions of the Court.

4           But in terms of the legal framework here, there is no

5    substantive charge of violating Section 1701.  This is a case

6    in which there is a single count of conspiracy to violate the

7    law in this regard.  And the fact that it is a conspiracy

8    versus a substantive charge may have consequences to the motion

9    practice we are speaking of today.

10          1701 of the International Emergency Economic Powers

11   Act of Title 50 empowers the issuance of executive orders and

12   also OFAC regulations.  And pursuant to that, in Executive

13   Order 13722, the president at the time, Barack Obama, in

14   essence, barred the export of goods, services, or technology to

15   the DPRK, and this was incorporated, in essence, into

16   regulations at 31 CFR 510.206(a) and 212(b).

17          There is an important exception which is critical to

18   an understanding of where we are in this case.  Let me note, it

19   provides that excepted from the president's authority is any

20   information or informational materials, whether commercial or

21   otherwise, regardless of format or medium of transmission.  And

22   in the regulations it provides at subdivision (c)(2) that this

23   section does not exempt from regulation transactions related to

24   information or informational materials not fully created and in

25   existence at the date of the transactions.

1          Now, there is a question presented on the motion to

2    dismiss regarding the meaning of the term services.  And in

3    that regard there was the *Homa* case, later modified by *Banki,*

4    *Homa* suggesting or stating that a fee for services was a

5    required element and *Banki* making it plain that a fee for

6    services is not required.  And while not defining the term

7    services, the opinion offered a number of dictionary

8    definitions of the term services.  It appears to this judge

9    that *Banki* is the law and not *Homa*, and I proceed from that

10   premise.

11         Of concern to me is that the government's brief

12   appears to lay out some of the services that they believe do

13   not fall within the information exemption.  What I cannot tell

14   is whether the government is exclusively relying on them.  And

15   if they are not, certainly this relates directly to the bill of

16   particulars request.  If the government hasn't laid out all of

17   the services, so that the defendant knows what is or is not

18   arguably within the information exemption, perhaps the

19   government should.

20         Also of concern, if I can get this in front of me, is

21   a communication by Matthew McKenzie on November 19, 2019 at

22   9:31 a.m. with a number of Assistant United States Attorneys

23   cc'd on it.  The reason it's of concern, it's not that as if

24   there is anything wrong about anything that's said in there in

25   any way, shape, or form, but it contains the following

1  statement, if you will just bear with me.  It says:  "That the

2  basis for Griffith's presentation was publicly available

3  information does not undermine this conclusion.  This

4  conclusion is that the information exception doesn't apply."

5      Griffith used his expertise to take publicly available

6  information and package it so that the DPRK audience could

7  better understand the concepts and apply it to circumstances

8  that were unique to issues present in particular within the

9  DPRK.  Doing so is providing a service to the DPRK beyond the

10  mere provision of information materials.

11      Now, those sentences raise serious questions in my

12  mind.  Certainly the author of this memo and perhaps the

13  government at times conflates information and information

14  materials or, maybe a better way to put it would be, leave the

15  word information out and have it focus exclusively on

16  information materials and proffers and interpretation, that if

17  one goes beyond the materials that one has provided a service

18  outside the exemption.

19      On my reading of the exemption, the exemption applies

20  to information and information materials, not to information

21  materials.  Certainly if one were to travel to another country

22  and pass out a copy of the United States Constitution, it might

23  be a service, but it would fall within the information

24  exemption, if you were in a blocked country.  It might be a

25  service, but it would be covered by the information exception.

 1             But what I'm concerned about is that the government is

 2    arguing here that a description of the separation of powers set

 3    forth in the U.S. Constitution, in the three principal

 4    articles, because it's explaining that which is in a published

 5    document would therefore fall outside the exemption.

 6             That's what I'd like to hear from the parties on

 7    first.  We will spend ten minutes aside on the motion to

 8    dismiss, and then there are other matters that I would like the

 9    parties to address on the other motions for bill of particulars

10    and for discovery.

11             Let me turn to defense counsel.  Just confining

12    yourself to the motion to dismiss, I guess one of the hard

13    questions that I would ask you is, if Mr. Griffith was charged

14    with providing services, then you would say, well, the services

15    are perhaps as described in the brief, and you might argue that

16    they fall within the exemption.  But this is not the

17    substantive crime.  This is a conspiracy.  And so, therefore,

18    two coconspirators could agree to go well beyond information

19    falling within the exemption without having done so at the

20    April conference.  So I'd like the defendant to also address

21    the distinction here between the substantive crime and the

22    conspiracy.

23             I turn it over to defense counsel.  Mr. Klein.

24             MR. KLEIN:  Thank you, your Honor.  Ms. Axel is going

25    to address the motion to dismiss, your Honor.

1          THE COURT:  Thank you very much.

2          Ms. Axel, I'll let you proceed.

3          MS. AXEL:  Thank you, your Honor, and thank you for

4     giving us this clear guidance on what you want to talk about.

5     We appreciate how carefully, obviously, you reviewed the briefs

6     and have the issues in mind.

7          With respect to that first -- I think the specific

8     question you had for us, your Honor, with regard to the

9     conspiracy, the government spends really only a paragraph on

10    that issue in their brief, and I think there is a good reason

11    for that.  You still have to have an unlawful objective to have

12    a conspiracy.  And a conspiracy charge obviously is the

13    agreement; that is, the unlawful act.  But you have to have an

14    agreement to an unlawful objective.  Here that unlawful

15    objective is the services.

16         And it leads us back to the same conversation we are

17    having here.  Are the services -- if there was an agreement to

18    provide them in the form of scientific speech, are those

19    services something that falls within this exemption and are

20    protected by the First Amendment.  The Court didn't reference

21    that, but obviously the informational exemption should be

22    coextensive with the First Amendment.  You have to have the

23    unlawful object here, and we don't have it because his speech

24    falls within the informational exemption.

25         Again, the reason I pointed out there was only one

1    paragraph on the issue is, your Honor, there are cases where

2    you might have a conspiracy and overt acts are undertaken and

3    maybe the agreement isn't accomplished.  But, nevertheless, you

4    have the unlawful agreement.  The name is escaping me, but

5    there is one of the IEEPA cases which involved a shipping

6    container that didn't actually make it to Libya, an example of

7    that.

8            But this is not that.  The conference happened.  The

9    government purports to have transcripts which, for purposes of

10   the motion to dismiss, we have not disputed.  So this isn't

11   really one of those situations where it's an inchoate

12   conspiracy or there are actions that go beyond the nature of

13   the conference speech that we are speaking about.

14           I guess I would sort of move --

15           THE COURT:  Here is the hypothetical that I was

16   conjuring in my mind, and I may be way off base.  That's why I

17   have oral argument.  But let's say two arms dealers are

18   promoting their product at the Paris Air Show and they have

19   printed literature about the product they are selling and why

20   it's a useful and efficacious armament.  What they decide is to

21   travel to a country where the sale -- they are U.S. persons and

22   the sale would be blocked under U.S. law, and they go there

23   with the purpose and intent of selling the blocked weapons, and

24   they agree that they are going to endeavor to sell the blocked

25   weapons to the blocked country.  And they go there and they

1  only discuss that which is in the literature they distributed

2  at the Paris Air Show, but yet they could be guilty of the

3  crime of conspiracy to sell the blocked weaponry.  I say that.

4  Maybe they can't.  That's kind of why it's in the form of a

5  question.  But perhaps you could speak to that hypothetical and

6  why your case is the same or different.

7          MS. AXEL:  I think, your Honor, it's always hard to

8  come up with hypotheticals on totally different facts here.

9          First of all, with respect to the printed literature

10  issue, I'm not sure we actually could even agree that there

11  might be a situation where there is this printed literature

12  covering weapons that cannot be sold.  The nature of arms

13  weapons in general is, there is a whole book that deals with

14  what sorts of weapons can be sold and not be sold, or even

15  printed about, a congress regulation.  We may have some

16  distinctions there.

17          Here, where we are talking about an open-force

18  technology, I think we are much more close to just a general

19  scientific exchange than one dealing directly with munition.

20          THE COURT:  Your point is well taken.  Go ahead.

21          MS. AXEL:  Again, your Honor, the purpose and intent

22  of selling particular technology, there is no evidence of that

23  here, your Honor.  That's not the conspiracy that they have

24  alleged.

25          THE COURT:  I guess what I'm driving at is if they

1    went to the conference and before they went to the conference

2    the defendant, with at least one coconspirator, said the idea

3    here is to give a general overview at the conference, which is

4    a prelude to being, you know, engaged as an informal adviser

5    and give further technical information at a later date.  We

6    will start off nice and easy at the first session, but there

7    will be further follow through and there is an agreement, in

8    essence, to transfer information that does not exist that is

9    created specifically and tailored specifically for the DPRK.

10            MS. AXEL:  And I hear that, your Honor.  I hear that.

11   But that just is not this case.  There is no allegation of that

12   here.  We have just a few spray e-mails kind of referenced

13   before and after that are with different people all together

14   than coconspirator 1 and coconspirator 2.

15            And so, you know, that's just not the case that we

16   have here.  Here we had an agreement to go to a conference and,

17   at most, we had an agreement to go to a conference, and that

18   dissipated once the conference ended.

19            I guess, your Honor, I would, given my limited ten

20   minutes, also, I appreciate the Court's focus on the carve-out

21   and we, too, agree that the government's reading of this really

22   reads out information.  It focuses only on information

23   materials.

24            And the way they are interpreting fully created, even

25   by their own example, you would have to simply just read from a

scripted academic paper is the only way that you would fall

within that, and we don't think that's consistent with the

carve-out, we don't think it is consistent with the exemption,

nor consistent with the First Amendment.

And I think that's why we pointed out from the very

beginning that the theory of this case is really at tension.

As broadly as they want to push services, as narrowly as they

want to read information, you end up in a realm where you are

then -- you are restricting speech and it's an as-applied

content-based regulation here, your Honor, and I think that we

would have to -- we would ask the Court to apply strict

scrutiny to that, assuming that the Court will read the

regulations as broadly or -- read the carve-out as broadly as

they would like to read the carve-out.

Finally, I would like to say, as to services, they

don't make any attempt to define it all together, your Honor.

And I think the Court, I'm sure in this and other cases, has to

grapple with the plain-meaning analysis and that begins with

talking about what the term means.  It has to mean something.

You just can't say it's a broad term.

And so we are not at all attempting to offer a cabined

reading of services.  We were grappling with the definitions in

*Banki* and as applied.  The *Banki* court uses examples of

consulting and legal services.  These are the types of services

that we all think about as services that otherwise could be

1   worthy of a fee, but in this instance don't have a fee, in the

2   case of *Banki*.

3        And I think we had a whole string of cites, your

4   Honor, from different applications of the law where goods and

5   services are used to refer to tangible and intangible

6   commodities respectively.

7        We feel as well here, where there are novel

8   interpretations of services and novel interpretations of

9   information materials, that the rule of lenity should apply in

10  defendant's favor, and the indictment should be dismissed.

11       THE COURT:  Thank you.  Let me give the government an

12  opportunity to respond, and we will see where we go from there.

13       MS. RAVENER:  Thank you very much, your Honor.  I'll

14  try to address the Court's questions in turn.

15       First, with respect to the scope of the services at

16  issue in this case, we believe that our brief does cover and

17  specify the services that are at issue, with one clarification

18  that I want to highlight for the Court.

19       In discussing the scope of services at issue and

20  examples of services that Mr. Griffith's conspiracy included,

21  we cite pitching his company to the conference attendees.  And

22  I want to just clarify that we believe that does include the

23  object of providing payment services, cryptocurrency payment

24  services and attendant services, as part of that, as part of

25  the conduct at issue in the conspiracy.

1          THE COURT:  Let's just dwell on that for a second

2     because it's an important point made at least today by both

3     sides.

4          Did this conspiracy end, having achieved its purposes

5     by the time Mr. Griffith departed North Korean air space, or

6     was this a conspiracy of longer duration in which what occurred

7     at the conference was a prelude to further activities?  I hope

8     my question is clear enough for you to answer.

9          MS. RAVENER:  It is, your Honor, and it's clearly the

10     latter.  The indictment alleges a range that includes time

11     postdating the conspiracy up through November 2019.  In our

12     brief we outlined some of the conduct that is included in that

13     time period and Mr. Griffith's continued participation in

14     pursuing the object of the conspiracy.

15          For example, at his first interview with the FBI on

16     May 22, 2019, Mr. Griffith informed the agents of his desire to

17     return to the DPRK and to actually debilitate cryptocurrency

18     exchanges with the DPRK.  Even though he was advised of doing

19     so would likely violate U.S. laws, including IEEPA, he

20     continued to contemplate providing services to the DPRK of this

21     kind.  And in a chat that we cite in our brief on August 6,

22     2019, Mr. Griffith discussed taking those steps with another

23     person.

24          THE COURT:  I'm sorry.  When was that?

25          MS. RAVENER:  In August of 2019, your Honor.

```
1              THE COURT:  So this is after the conference.

2              MS. RAVENER:  It's approximately four months after the

3    conference, and he expresses his desire to return.  He states

4    that he needs to send a unit of cryptocurrency between North

5    and South Korea.  He confirms that he understands that would be

6    a violation of sanctions.  And he insists that he wants to

7    continue to pursue it.

8              The next day he followed up, sending an audio

9    recording describing that he would like to find someone, he

10   intended to find someone to act as an emissary to go and make

11   that cryptocurrency exchange.

12             That's all consistent and a part of his own statements

13   at the conference.  In fact, in his very introduction of

14   himself at the conference, which is also described in our

15   brief, he introduced himself as working for a cryptocurrency

16   foundation, Ethereum Foundation, and he specified, I think the

17   most valuable things we have to offer the DPRK are, No. 1, we

18   can give you -- so Blockchain give you payments that the U.S.

19   can't stop and, No. 2, we can give you contracts that don't go

20   through the U.S.

21             So he was describing and pitching the ability of his

22   company to actually provide Blockchain services, cryptocurrency

23   payment services, and smart contract services to the DPRK and

24   DPRK person, and that set the frame for his entire

25   presentation, that this was the purpose of teaching these
```

1    lessons about how cryptocurrency could be used for sanctions in

2    Asia for money laundering and describing in his presentation

3    the uses of this technology tailored to the DPRK.  It was a

4    bespoke presentation to pitch this broader service that his

5    company specifically could provide, and Griffith's internal

6    notes reflect that he intended to continue to pursue that.

7              THE COURT:  Let me ask you this.  I think I read this

8    from the defendant's brief, but he held the title with the

9    Ethereum Foundation of senior researcher, and I read that that

10   was -- and it's not shocking to me -- it was basically a

11   marketing decision.

12             Did the Ethereum Foundation provide services to others

13   or was it simply a more abstract, you know, promotion of the

14   Ethereum Blockchain?  Or could you ask the Ethereum Foundation

15   to send over one of their senior researchers to help you with a

16   project?  Of course, you would be happy to pay them whatever

17   they wanted for that service.

18             I'm a little bit unclear as to what -- I have a sense

19   of how the foundation was set up, but I don't have a sense of

20   whether they engaged in services, let's say, for hire.

21             MS. RAVENER:  Your Honor, I think we would have to

22   conduct further investigation to answer that question

23   appropriately and whether that was within the ordinary scope of

24   Ethereum's provision of services.  Ethereum does operate its

25   own cryptocurrency called Ether.  And that, I think in and of

1    itself, the ability to use Ether and to utilize Ethereum's

2    Blockchain to conduct financial transactions, is itself

3    potentially a service.  But I don't want to step out of bounds

4    in terms of speaking about Ethereum's product offerings at this

5    time.

6                THE COURT:  Go ahead.

7                MS. RAVENER:  We do have evidence, which, of course,

8    has been provided to the defense, that Mr. Griffith spoke with

9    individuals at Ethereum about his ideas of providing services

10   to the DPRK, and that he was admonished not to go.  He clearly

11   did not adhere to those admonishments and proceeded to do this

12   anyway.  And that is consistent, of course, with the fact that

13   he also sought U.S. Government permission to travel to this

14   conference and that that was similarly denied, and he proceeded

15   to go anyway and to attempt to disguise his travel on his visa.

16               THE COURT:  It's interesting because in a lot of

17   criminal cases the challenge for the government is not, you

18   know, if we think of guilty hand and guilty mind, the

19   government usually doesn't have the problem with the guilty

20   hand part.  They have the problem with the *mens rea* or guilty

21   mind part of it.  But in this case you can have a guilty mind

22   without a guilty hand.

23               Mr. Griffith could have believed what he was doing was

24   utterly unlawful, but it may not have been unlawful.  You have

25   to prove both.  And maybe some of the statements and text

1    messages help you with the guilty mind part of it, but you

2    still have to prove the guilty hand, the guilty act, the *actus*

3    *reus*.

4           MS. RAVENER:  Certainly, your Honor.  And we submit

5    that we can and we will prove that at trial.

6           I want to be clear, to address some of the Court's

7    other points regarding the McKenzie e-mail and the debate over

8    services in this case, that the evidence has developed since

9    the description in that memo and that that memo does not

10   exclusively control.  We believe that our brief and our

11   discussion here today sets forth a more fulsome description of

12   the scope of the conspiracy and the provision of services that

13   was the object of the conspiracy.

14          Of course, with respect to the term information, the

15   distinction drawn by OFAC, it is clear even then, it was clear

16   even at the earliest stages of the case, from Mr. Griffith's

17   own statements, that he had taken PDF course materials provided

18   by the DPRK and created a bespoke presentation for the purpose

19   of this conference, and he lent his expertise to answer

20   questions and to be of assistance to the DPRK person present at

21   that conference.  It's clear that he had done so in

22   coordination with the DPRK and with the approval of the DPRK.

23   In fact, he needed their approval in order to be designated the

24   keynote speaker.

25          And that alone, that conduct alone takes it out of the

1  informational materials exemption set forth in OFAC's

2  regulations and that's confirmed by the correspondence with

3  OFAC on this very question.

4          THE COURT:  Let's pause right there because one of the

5  things I want to make plain, it's not an informational

6  materials exception or exemption.  It's not.  And that's wrong,

7  just from a plain reading of the language of the regulation.

8  It's an information and information materials exemption.  An

9  information, as distinguished from information materials, is

10  consistent with orally communicated information.

11         I realize you cite the Third Circuit's interpretation

12  with regard to bespoke information, but I'm not so sure that I

13  am convinced that information which, when communicated by

14  humans at different times in different places will inherently

15  have a bespoke element, whether you are speaking to high school

16  students, college students, graduate students, but the

17  information may be preexisting information which you tailor to

18  an audience.

19         You are suggesting if you communicate information and

20  you tailor it to the audience, that's outside of the exemption.

21  Isn't that what you urge here?

22         MS. RAVENER:  Well, your Honor, I want to be clear

23  that this interpretation of information and informational

24  materials is not the government's, meaning the prosecution team

25  in this case.  This is the interpretation set forth in the OFAC

1    regulations, which have been longstanding for 30 years, and

2    where we are standing today and were upheld as recently as in

3    the *Amirnazmi* decision, and they are entitled to *Chevron*

4    deference.  I want to put that aside.

5         THE COURT:  I agree with you.  But the regulation says

6    that information that is created is not within the exemption.

7    You won't get any quarrel with me about that, but it's what

8    does it mean to create information?  That's what that is.  And

9    certainly, you know, if I am taking a body of information that

10   is precreated, and I am editing as I go to eliminate

11   information that might be over the head of my audience, that is

12   not creating information.  That is presenting information,

13   editing information, but it's not creating information.  The

14   information existed before the individual walked in the room.

15        So that's what I'm trying to figure out.  Is the

16   government urging that tailoring a presentation of information

17   to an audience, is that the creation of information?  Do you

18   urge that?

19        MS. RAVENER:  Your Honor, I don't think that that

20   needs to be decided in this case, so I do believe that the OFAC

21   regulations and opinion here may cover that scenario.  I think

22   that this case provides for narrower grounds for the Court to

23   understand the scope of the services at issue as being provided

24   here.

25        Mr. Griffith was not merely reciting factual

1    information.  He was teaching lessons about the use of

2    cryptocurrency and the applications of cryptocurrency and how

3    they can be used to evade U.S. sanctions to DPRK persons in the

4    DPRK, and he was doing that in coordination with the DPRK

5    government using content that was preapproved by the DPRK

6    government, and that provided an important service in numerous

7    respects to the DPRK and to the DPRK person present in the

8    audience.

9         I mean, for example, even if the information, the

10   facts that were part of the presentation were available or

11   preexisting or somewhere on the Internet or in a textbook, the

12   DPRK does not generally permit Internet access to its populous.

13   They don't have access to Twitter or TikTok that the defense

14   cites.  Part of the service here is Mr. Griffith's travel as an

15   expert, as a person first in the provision of services, an

16   expert in cryptocurrency.

17        His travel to the DPRK to give this presentation to a

18   selected audience on selected topics in coordination with the

19   DPRK itself was a service that let the DPRK give only the kind

20   of lessons about cryptocurrency they wanted to the audience

21   they approved, without opening the flood gates of quote/unquote

22   information to their population.

23        THE COURT:  I'm proceeding, for the purposes of this

24   argument, from the premises that the government will be able to

25   show -- I'm not deciding it today -- that there was a service.

1    The question is whether that service falls within the

2    information exemption, and I don't believe the information

3    exemption is inapplicable if the audience receiving the

4    information or information materials doesn't know the content

5    until it's disclosed.

6            Under that argument, if you go to an audience in a

7    blocked country and you hand out information materials that are

8    utterly unknown to the members of the audience, but existed

9    previously in a book, that would be a violation because your

10   audience didn't know the content of the information materials

11   and it was only by your coming and handing it out that this was

12   revealed to them.  I think that's a misreading of the

13   exemption, quite candidly.

14           MS. RAVENER:  Your Honor, let me be clear, and I

15   apologize if I confused that issue in any way.

16           I believe that under the OFAC regulation, OFAC's

17   position would be that if all Mr. Griffith had done was gotten

18   on a plane and distributed preexisting publications and left,

19   that that, standing alone, may not violate the sanctions under

20   the regulation.

21           But that's not what he did.  He provided a service by,

22   among other things, synthesizing that information, creating a

23   visual presentation about how these technologies could be used

24   for sanctions evasion, which did not exist, before he created

25   that pitch.

                    And that was all part of a pitch to not only teach

sanctions evasion and money laundering through this

sophisticated technology to DPRK persons, but also to pitch his

own financial processing services.  His notes reflect that he

was attempting to acquire North Korean Internet domains,

including, I believe, blockchain.kp or crypto.kp in order to

sort of enter this marketplace.  He saw it as an economic

opportunity.  And that was very much part of the object of the

conspiracy here.

                    THE COURT:  I think I get the point and I appreciate

that, that it's more than information and information

materials, in your view, distributed at the conference and that

the conspiracy continued to November 2019.

                    Let me give the defense an opportunity to briefly

respond and then we will move on to other issues.  Go ahead.

                    MS. AXEL:  Thank you, your Honor.

                    I think the Court is dead on right when you said that

any information that's orally communicated, preexisting

information, doesn't become subject to this carve-out simply

because it's orally presented and question and answers -- and

you have a question-and-answer period for the audience to

understand the material.  I think that the Court is exactly

right about that.  That is information, even though it is given

in more of an extemporaneous manner.

                    In this respect, your Honor, like one of our analogies

1    would be, you cannot criminalize the speech just because it's

2    in North Korea.  It's the same speech that can be given at

3    Columbia University.

4           The information here is not typically controlled in

5    any matter, like nuclear technology, for example, that they

6    referenced.  The information is, by nature, in the public

7    domain here, and he would have given the exact same speech and

8    did all over the world at different conferences.  The only

9    difference is the ebb and flow with the particular audience

10   watching, but the information itself is the same information.

11          And if you can give it at Columbia University and the

12   First Amendment allows you to give it in the DPRK, this case is

13   not about travel.  It is incident to travel.  It is about that

14   core information.  We agree with your Honor.

15          The government has said things in oral argument, I

16   think, that they are just not willing to say in their brief

17   because they are not supported.  And part of it is what I just

18   heard about part of a pitch.  Mr. Griffith was part of a pitch.

19   He saw it as an economic opportunity.  I will just say, that is

20   not a pitch, your Honor, and we reject it.  We don't think

21   there is any evidence of that.

22          With respect to the Ethereum Foundation, they want to

23   have it both ways.  They say that the Ethereum Foundation did

24   not agree to have anything to do with this conference or to

25   allow Mr. Griffith to go under his formal title, and he didn't.

1   He took a leave of absence.  He did it very publicly so that it

2   would be clear this was just an interest he had in attending, a

3   curiosity.  He took a leave.

4           I also want to clarify, Ethereum is not a company.  He

5   works for a foundation.  Ethereum is a Blockchain.  It's an

6   open-floor piece of software that exists.

7           THE COURT:  I got that point.  There is no Ethereum

8   corporation.  I got it.  The foundation supports the

9   Blockchain, as I gather it.

10          MS. AXEL:  Thank you, your Honor, yes.  That's exactly

11  the point.

12          So this sort of like business suggested, implied that

13  Mr. Griffith is wearing some sort of business hat to promote

14  the Ethereum Foundation, and it is simply not true.

15          THE COURT:  The fact of the matter is that

16  Mr. Griffith, as I understand it, received a paycheck and

17  received a paycheck from the Ethereum Foundation, whether it

18  was a paycheck or it was some sort of compensation for

19  services.  He certainly rendered services to them.  And that is

20  services included promoting the use of the Blockchain, which

21  the foundation thought was a good and worthy use of its

22  employees' time.

23          So you raise an interesting point.  A lot of this is

24  not in the government's brief or submission.  I hear your point

25  loud and clear on that.

1              But, in theory, if he is going for the purpose of

2    encouraging his retention to provide further services in aid of

3    the promotion of Ethereum as a cryptocurrency, whether his

4    motive was pecuniary or not, the conspiracy is broader than

5    that which goes on at the conference itself.  And if his

6    intention was that the presentation at the conference be a

7    precursor to providing detailed information that one would not

8    know or services that are more than just communicating

9    information, then that could be a different story.

10             And one of the problems the defendant has is in our

11   wonderful criminal justice system, we don't have summary

12   judgment motions.  We don't have a procedure for a resolution

13   of the facts prior to trial, nor should we have one.

14             We have a grand jury that's returned an indictment

15   alleging this conspiracy that continues to November 2019, and

16   the grand jury has had evidence before it that caused them to

17   find probable cause to believe this conspiracy existed.  And

18   the law, generally speaking, is that the government is entitled

19   to put on its evidence before a jury, and the defendant is

20   entitled to move at the close of the government's case for

21   judgment of acquittal.

22             Now, I know that there are cases where indictments

23   have been dismissed prior to trial, but they are the distinct

24   exception to the rule.  And a claim of actual innocence is not,

25   generally speaking, a basis for the dismissal of an indictment.

 1          Anyway, I think perhaps what we should do is move on

 2   to other issues.  And I guess the one that I could use the most

 3   help on is whether or not OFAC is an arm of the prosecution

 4   team.  One of the issues that comes up in my mind is let's

 5   assume OFAC -- and we know this.  You already have memos --

 6   OFAC had doubts at various points as to whether or not this was

 7   a violation of the regulations.  I think that's what the

 8   defense -- that's their take on the correspondence and e-mails.

 9          Let me start from their take.  It strikes me that

10   while it's very interesting that they had doubts about whether

11   it was a violation, just as a member of the prosecution team

12   may have had doubts as to whether it was a violation.  That

13   does not translate into any admissible, usable evidence, nor

14   does it necessarily lead to any admissible, useable evidence.

15          I would appreciate hearing on the distinction between

16   a doubt about facts and a doubt about law because we can all

17   agree what a prosecutor's view of the law is does not control

18   any more than a defense counsel's view.  It's left to the

19   judge, whose decision is subject to appellate review, to decide

20   what the law is.

21          How does this factor in?  How does doubt by OFAC as to

22   whether it's a violation of law do anything to the defense?

23          MR. KLEIN:  Your Honor, I think it does come into

24   play.  It's not the only factor we rely on, to be very clear.

25   There are a number of other which I'll quickly address at the

 1   end.

 2           If you turn, actually, to the exhibit you cited to at

 3   the beginning of your discussion, your Honor, which is Exhibit

 4   A, if you look at the first paragraph of that exhibit, the last

 5   sentence, and it's from the prosecutor in the national security

 6   section, the prosecutor is saying -- the reason why they were

 7   giving this presentation was to get OFAC to sign off on the

 8   prosecution and for the arrest.

 9           The last sentence says:  As a result, we ask that OFAC

10   make a licensing determination as soon as possible to enable

11   the FBI to effect an arrest this week.  What they needed and

12   what the rest of the e-mails show they needed was OFAC agreed

13   to do a license determination as well as agree to provide a

14   witness at the trial, which they will need and which they plan

15   to have.

16           And so OFAC's doubt come into play because if OFAC

17   didn't think this was something that should have gone forward,

18   then they wouldn't have the witness, they wouldn't have the

19   licensing determination, which this prosecution is contingent

20   on.

21           THE COURT:  Wait a minute.  Let me pause right there.

22           OFAC did greenlight this, did they not?

23           MR. KLEIN:  Yes.  And you're asking why in a motion to

24   compel we think they are an arm of the prosecution.

25           THE COURT:  That's why you think they are an arm of

1      the prosecution.

2              What I'm saying is, if within OFAC there is a lot of

3      hand ringing, should we, shouldn't we grant a green light, how

4      is that material of use or assistance to the defense that it

5      was a debated question?

6              MR. KLEIN:  What kind of evidence would we find?  If

7      you granted our motion to compel, and we got access to

8      materials that might include discussions like that, how would

9      that be of use to us?

10             THE COURT:  That's a question I'm asking, yes.

11             MR. KLEIN:  For example, your Honor, they are going to

12     put a witness on who is going to have to testify to certain

13     things.  There may be statements by that witness who they put

14     on for which we could impeach that witness.

15             THE COURT:  You are going to get those.  You will get

16     them, right?  The government agrees they are going to turn that

17     over, right, as 3500 material, yes?

18             MR. WIRSHBA:  Yes, your Honor, we will turn that over.

19             THE COURT:  You got that.

20             MR. KLEIN:  I'm glad to hear the government confirm

21     that.

22             Beyond that, your Honor, there may be other

23     discussions which would inform our cross-examination.  To your

24     point about whether it's facts or law, there may be discussion

25     of the law and the facts that would inform our

1    cross-examination of that OFAC witness, that the OFAC witness

2    might not actually have made a statement on, but maybe on that

3    record.

4           The government has also made it clear that they intend

5    to rely on *Chevron* deference and the agency deference.  There

6    may be statements in there that would undercut their ability to

7    rely on the *Chevron* deference.  Again, we don't have access to

8    these records yet, so I don't know what's in there.  But we

9    believe there could be evidence that is helpful to us.  And, at

10   a minimum, the government hasn't even offered to review it for

11   *Brady* material.  And that would be the minimal step that would

12   need to be undertaken and what, at a minimum, we are asking

13   for.

14          THE COURT:  Mr. Klein, with a considerable degree of

15   precision, can you define what it is that you believe the

16   prosecution should be searching for and simply saying, *Brady* or

17   *Giglio* material doesn't exactly answer the question.  Are you

18   looking for information in which there was a debate about

19   whether to greenlight Mr. Griffith's prosecution, as you put

20   it, or are you looking for something different than that, such

21   as the history of OFAC's evolving views under various

22   presidential administrations of the information/information

23   material exemption?

24          MR. KLEIN:  Your Honor, I think we would ask for a

25   number of things.  I think we would ask for impeachment

1    materials that the government has already said they would give.

2    I think we would ask for discussions specific to this case or

3    about Mr. Griffith, or maybe they have done factual writeups of

4    their things about Mr. Griffith or North Korea or the sanction

5    regimes.

6           I think it would also include -- and it goes to

7    another one of our motions to compel points, which is OFAC's

8    understanding of North Korea's cryptocurrency capabilities and

9    Blockchain -- understanding the Blockchain technology, which

10   may also be referenced in these materials or in another set of

11   materials.

12          I think it would be things that go to the issues at

13   play that the government plans to make at play in this case.

14          THE COURT:  This is an issue that cuts both ways.  The

15   government is urging it, and now I hear you urging it.  I can

16   go to my public library or my U.S.-accessible Google searches

17   will give me information about Blockchain and cryptocurrency,

18   but no one in the DPRK can get it.  They are blocked.  Their

19   libraries don't have it and they don't have Google searches, so

20   they don't know it.  They don't have the capability.

21          Are you buying into the government's argument that,

22   therefore, that's not information because people in the DPRK

23   don't know it, even though people in Michigan know it?

24          MR. KLEIN:  Your Honor, those arguments are distinct

25   from each other.  What I'm saying is the government plans to

1   argue and has argued here today that Mr. Griffith made a

2   presentation to people in North Korea and provided a service

3   and that the information -- and in their papers they claim it

4   was information that was to their benefit and essentially they

5   did not know.  That is not true, as far as we know.

6          It's also, I don't believe, true, your Honor, that the

7   people in the DPRK don't have access to Google or the Internet.

8   Not everyone may have it, but some people do.

9          And it goes to our third request, which is information

10  on North Korea's cryptocurrency and Blockchain capabilities,

11  and we cite several cases for an OFAC-sanctioned press release,

12  as well as a case, that demonstrates that North Korea had very

13  sophisticated cryptocurrency and Blockchain capabilities long

14  before Mr. Griffith's trip and alleged speech.

15         THE COURT:  By the way, you might as well also address

16  what is a very common request in this court, with very common

17  dispositions from the judges of this court which is, I need to

18  know all the cooperators.  I need to know who witness 2 is.  I

19  need to know who your witnesses are before trial.  Maybe not

20  all the witnesses.  I don't need to know your law enforcement

21  types.  But I do need to know this person who dealt with my

22  client.

23         That sounds to me no different than any drug

24  conspiracy case or any other case in this courthouse where

25  people seek to have the identity of cooperators disclosed long

1    before trial.  Why is your request any different?

2           MR. KLEIN:  It's different in a couple of ways, your

3    Honor.  One is, we have been provided the witness statements,

4    heavily redacted, of this witness already.  So what we need is

5    confirmation of the witness' identity.  We are not asking for

6    witness statements and we are not asking for a witness list.

7    We are asking for confirmation of this witness' identity.

8           THE COURT:  Witness No. 2's name, that's what it is.

9    You want his name.  You want his identity, right?

10           MR. KLEIN:  Yes.

11           THE COURT:  Why is that any different wanting to know

12   who is it who is cooperating against me in this drug

13   conspiracy?  Every person charged in federal courts dream, and

14   we have rules that require disclosure.  It's the Jencks Act and

15   it's 3500 material.  It's *Giglio* material.  And it's a question

16   of the timing on that.

17           MR. KLEIN:  Two points, your Honor.

18           One is, they had been willing to confirm the

19   identities of the other two alleged coconspirators referenced

20   in the complaint who are referenced only by acronyms.  They

21   have not been willing to confirm the identity of this

22   individual who -- and this makes it unique -- we understand

23   resides abroad and poses special logistical as well as

24   practical difficulties if we want to undertake a Rule 50

25   testimony of this witness.

1              You are right, there are distinctions here.  They have

2    been willing to confirm for other people, but not with this

3    witness.  We have the 3500 material, heavily redacted already,

4    of this witness, but they still won't confirm the identity.

5              Recently we received an additional piece of discovery

6    that has us questioning whether the person we think it is is

7    actually that person.

8              THE COURT:  I get that.  It could very well not be.  I

9    assume if it is the person you think it is, it's less of an

10   issue for them to identify it.

11             MR. KLEIN:  Yes.  That's my point.  And there is also

12   no security concerns that have been articulated, so this is

13   different from the run-of-the-mill case where you can say,

14   that's a cooperating witness and there are security concerns

15   and, you know, this person, you know, is in the U.S. and he

16   will be available for trial, and they can make assurances to

17   the Court.

18             But here they can't make assurances to the Court that

19   this person will be available to testify at trial, although

20   they have indicated they are likely to want to call this

21   person.

22             THE COURT:  Isn't that good news if they are not a

23   witness at trial?

24             MR. KLEIN:  We may want them to testify for us, your

25   Honor.

```
 1              THE COURT:  That one is a little cockeyed for me.

 2   Your client has the ability to produce such witnesses as they

 3   want to produce at trial.  The theory is that the government

 4   may not produce this person.  Maybe they don't have information

 5   that the government wants.  Either the defendant knows this

 6   person and wants to call them.  But if they don't know the

 7   person, they don't know who they are, you lost me there.

 8              MR. KLEIN:  Your Honor, if we learn 30 days before

 9   trial that they disclosed this witness' identity and decide

10   they want to call this witness, who we understand resides

11   abroad and the witness is not willing to come, we will not be

12   able to do a Rule 50 testimony in the time necessary.

13              THE COURT:  The premise of the government disclosing

14   it to you 30 days before trial, correct me if I'm wrong, is the

15   implicit representation they are going to call him as a

16   witness, right?

17              MR. KLEIN:  Yes.  But they have specifically told us

18   that they can't guarantee this person will come.

19              THE COURT:  I understand.  But if they change their

20   mind and they don't want to call him, then they need not

21   disclose the identity to you, right?

22              MR. KLEIN:  Your Honor, we may want to call this

23   person.

24              THE COURT:  But under the agreement with the

25   government, that you have with the government, it gives them
```

1      the carve-out if they decide we definitely won't call him.

2      Then they don't have to give you the identity, right?

3             MR. KLEIN:  We haven't entered into an agreement per

4      se.  They just notified us that they plan to disclose witness'

5      identities 30 days before trial.

6             THE COURT:  It's witness identities.

7             MR. KLEIN:  Yes, your Honor.

8             THE COURT:  I am going to give the government an

9      opportunity to respond, but I want to make sure I understand

10     your arguments on your discovery point, so go ahead.  I've been

11     interrupting enough.  I want to give you an opportunity to

12     complete your argument.

13            MR. KLEIN:  Your Honor, my argument about -- which

14     argument?  I'm sorry I want to make sure.

15            THE COURT:  Any argument you want on your discovery

16     motion.

17            MR. KLEIN:  Sure, your Honor.

18            So we do think that the OFAC was involved in a joint

19     investigation.  We noted that there was this e-mail that wasn't

20     disclosed to us after we filed our opening brief that clearly

21     showed the FBI coordinating with OFAC that we brought to your

22     Honor's attention.  We don't think there are any arguments that

23     are not a joint party.

24            The government tries to differentiate it based on the

25     SEC line of cases, a couple of district court cases.  But one

1   of the key differences there is that the SEC is not part of

2   like the executive branch cabinet.  It's a separate agency that

3   has independent power.

4          So we think we are entitled to this discovery and it

5   is important discovery, and, at a minimum, they should do a

6   *Brady* and *Giglio* review.

7          Our next request is witness 2, which I think we have

8   covered enough of, your Honor.

9          The last is the request for information related to

10  North Korean's cryptocurrency and Blockchain capability.  The

11  government continues to put this in play here, but is not

12  willing to provide us the information.  What we understand it

13  is that North Korea, and I use this broadly, has very

14  sophisticated knowledge of Blockchain technology, very

15  sophisticated knowledge of cryptocurrency that long predates

16  Mr. Griffith's travels to North Korea and his alleged speech.

17         We think that we are entitled to get that information

18  to rebut the government's arguments and what it plans to put in

19  play at trial.  To that end, you know, we have not heard an

20  argument from them that they are not going to make that an

21  issue at the trial.

22         In fact, what we have heard today, I think, would

23  strengthen our view that they plan to put that in play.  And we

24  have asked for a limited search of certain agencies, not a

25  fishing expedition.  We might even be amenable to a reasonable

1 stipulation about North Korea's sophisticated capabilities here

2 and that it predates Mr. Griffith's trip and was widely

3 disseminated knowledge.

4         So I think to that end we think all our motion to

5 compel requests should be granted.

6         THE COURT:  Thank you, Mr. Klein.  That was very, very

7 helpful.  Let me give the government an opportunity to respond.

8         MR. WIRSHBA:  Thank you, your Honor.

9         I'll start by concentrating on the Court's initial

10 questions with respect to OFAC and Mr. Klein's responses to

11 those questions.

12         And I think the trouble with Mr. Klein's responses to

13 your questions about what the defense would expect to see, if

14 it were able to access all of OFAC's materials -- which the

15 government believes is speculation.  The government hasn't had

16 an opportunity to examine those materials -- is that there is a

17 threshold question of whether OFAC is in fact an arm of the

18 prosecution, whether there was a joint investigation in this

19 case.

20         And it's the government's contention, as laid out in

21 its brief, that this is not a joint investigation.  And while

22 it is true that the SEC and OFAC are different, the government

23 cites that line of cases not because it's equating OFAC with

24 the SEC, but because there are relevant factors to this

25 analysis that are included in those cases, including in

1    *Middendorf*, which is the case we cite for the five factors.

2          And those are:  Participation of witness interviews,

3    presentation of the grand jury, reviewing and sharing

4    documents, playing a role in developing strategy, and

5    accompanying the prosecution to court proceedings.

6          And it's the government's contention that those

7    factors should cause the Court to find that OFAC is not an arm

8    of the prosecution, and we lay out the evidence on each of

9    those factors in our brief.

10         THE COURT:  As the defense points out, the *Middendorf*

11   factors, I think they were laid out by Judge Oetken really fit

12   when you are talking about an agency like the SEC and don't fit

13   so well on these facts.

14         Here is the question I have.  To what extent, under

15   executive branch protocol -- by that, I mean, DOJ or OFAC or

16   anybody else in the executive branch -- does OFAC have to, in

17   essence, consent to the prosecution before the prosecution can

18   proceed?

19         MR. WIRSHBA:  Your Honor, I don't want to speak to the

20   policies of any office that is not my own, but I can tell you

21   it is the practice of this office to do exactly what was done

22   in this case, which is to check with OFAC to determine whether

23   or not there was a license for the activity undertaken in a

24   prohibited country, and also to provide a witness.

25         As the Court knows, OFAC is the administrator of the

1   statute and the regulations at issue here, and in these cases

2   the government regularly calls a witness from that agency to

3   opine about the regulations and about their application to the

4   facts.

5        And as part of that process, the government will

6   often, before charging, go to OFAC -- and in this case all the

7   e-mails that are cited are with OFAC's counsel's office -- to

8   discuss whether or not OFAC will be willing to provide a

9   witness, given the facts.

10        Your Honor, I think that Exhibit A, which has been

11   discussed at length, I think is actually evidence that there is

12   no joint investigation here between OFAC and the government

13   because OFAC in this case needed the facts, as is reflected in

14   Exhibit A.  If you look at the attachment noted in that e-mail

15   from Matthew McKenzie, it reflects that the government has

16   already drafted the complaint, which the FBI was going to sign.

17        THE COURT:  Here is the part that I get and the part I

18   don't get.  For example, it may be a necessary part of the

19   prosecution's case to demonstrate that no license was granted

20   by OFAC, and you would need an OFAC witness to testify that

21   I've conducted a diligent search and no search was granted.

22   That part I understand, and I'm not sure that that would make

23   them part of the prosecution team.

24        But what about the argument that OFAC's blessing is

25   required for the element that an OFAC license was required?

1           MR. WIRSHBA:  Your Honor, it's not the government's

2    position that OFAC needs to approve prosecutions in which this

3    statute is at issue.  But the government does regularly utilize

4    OFAC in providing a witness to testify about their area of

5    expertise, and it makes sense that the government would want to

6    know about OFAC's availability to do that very thing before it

7    proceeded to formally charge someone, even if all of the facts

8    had been gathered, the investigation was complete, and the

9    government was ready to make an arrest.

10          Your Honor, I think that it's framed exactly that way

11   in the e-mail, which is that the government was looking for an

12   OFAC licensing determination, and we received that

13   determination from OFAC based on the facts that we provided.

14   These are not facts that were known to OFAC before we provided

15   them to OFAC's counsel's office, and it was not so that they

16   could approve or disapprove of our prosecution, but so that

17   OFAC would be able to make a determination about whether or not

18   it was going to be providing a witness.

19          If the government believed that it had a violation of

20   the IEEPA or the regulations, that it did not think that it

21   needed an OFAC expert, there is certainly no requirement that

22   the government call an OFAC expert at trial.  But OFAC, on its

23   own, took the information that was provided by the government

24   and made an internal determination about whether or not it

25   would provide a witness.

1        THE COURT:  Help me out because I'm going to claim

2   that I don't know the facts as well as the prosecution or the

3   defense, which shouldn't surprise anybody.

4        Tell me, is the November 19, 2019 e-mail from

5   Mr. McKenzie, does that initiate discussions with OFAC about

6   Virgil Griffith's activities in North Korea, or did it predate

7   that, and when does it go back to?

8        MR. WIRSHBA:  Your Honor, that was the first contact

9   between prosecutors in the Southern District and OFAC's

10   counsel's office.  And your Honor is in possession of, I think,

11   all of the communication that the defendant has included in its

12   reply.

13        There were prior discussions, actually they were few

14   and far between, between the FBI and another employee of OFAC.

15        THE COURT:  When do they go back to?

16        MR. WIRSHBA:  They go back to October of 2019.  There

17   was another phone call after the October phone call in

18   November, and then not again until the time period we are

19   discussing here.

20        THE COURT:  Why don't you move on to witness No. 2,

21   and then we will get on to information as to the capabilities

22   of the DPRK with regard to cryptocurrency.

23        Briefly with regard to witness No. 2.

24        MR. WIRSHBA:  Your Honor, I don't believe that I need

25   to spend much time on witness 2.  I think the Court is focusing

1    in on precisely the right issues here.  The government has been

2    very forthcoming with information not only about witness 2, but

3    its other witnesses, at the request of the defense.

4           Contrary to Mr. Klein's arguments, the fact that the

5    government has been forthcoming should be indicative to the

6    Court that the government is withholding any limited

7    information that it believes is sensitive and it has every

8    right to do so under the prior precedent of this Court and many

9    other courts in the Southern District with respect to its

10   witness list, which is precisely what Mr. Klein was requesting.

11          Unless the Court has any additional questions about

12   witness 2, I am happy to proceed to the final motion to compel,

13   which is the documents related to the DPRK case cryptocurrency

14   capabilities.

15          THE COURT:  Please.

16          MR. WIRSHBA:  Thank you, your Honor.

17          THE COURT:  What I want to know is whether the

18   government intends to stand up in front of the jury and argue

19   that the information that Mr. Griffith provided and intended to

20   provide as an object of the conspiracy included information not

21   otherwise known to the DPRK.  Do you plan to do that?

22          MR. WIRSHBA:  No, your Honor.  We do plan to stand up

23   in court --

24          THE COURT:  Hang on now.  Let's pause on that.  That's

25   an important representation that you are making that defense

1   counsel has heard, and I will hold you to.  Is that fair?

2          MR. WIRSHBA:  Of course, your Honor, understood.

3          If I may clarify what the government does intend to do

4   because it can be illuminating in this regard, with the Court's

5   permission.

6          THE COURT:  Yes.

7          MR. WIRSHBA:  The government does intend to present

8   evidence to the jury about how this information and this

9   presentation given by Mr. Griffith was useful to the people who

10  attended the conference.  There is a distinction between the

11  DPRK, which is how the defendant's extremely broad request is

12  framed, anything related to the DPRK's cryptocurrency

13  capabilities, and whether or not a presentation would be

14  helpful or useful or to the people who are actually sitting in

15  the room.  The DPRK government, just like any organization, is

16  not a monolith.  There are different components of the DPRK

17  government and, ultimately, the DPRK government is comprised of

18  individuals.

19         And the government has produced evidence that some of

20  the individuals who heard that presentation were not aware of

21  the concepts being described by Mr. Griffith and about what

22  those concepts could do for people living inside the DPRK,

23  which is precisely what his presentation was tailored to.

24         We know that from two pieces of evidence, mostly, that

25  have been laid out in the briefs.  The first is that these

1     individuals asked questions and those questions reflect their

2     understanding of the concepts and, second, Mr. Griffith himself

3     made statements to the FBI in which he described a lack of

4     sophistication of the people in the audience who were asking

5     questions with certain exceptions and the types of things he

6     was doing to help them better understand these concepts.

7              So whether or not there are materials that reflect the

8     DPRK as a whole or some other unknown component of the DPRK's

9     cryptocurrency capabilities is not at issue in this case.

10             THE COURT:  Thank you.  That's very helpful.

11             Let me give the defense an opportunity to reply.

12             MR. KLEIN:  Your Honor, a couple of points.

13             In an earlier hearing, not in front of your Honor, but

14    in front of Judge Broderick, another government prosecutor made

15    the point that everyone in the DPRK essentially works for the

16    government.  We can track down that transcript.  That's

17    definitely what I remember.

18             THE COURT:  I think the government is making a

19    different point.  They are saying -- I'll get into this later

20    on, but I hear them saying that we are not going to argue that

21    the information that Mr. Griffith did provide or if there was

22    additional information that he hoped to be able to provide and

23    wanted to provide as an object of the conspiracy, they will not

24    argue that it was unknown to the officials of the DPRK.  His

25    position appears to be that it wasn't known to the people in

1    the audience.  And if you assume that they were all employees

2    of the DPRK, it doesn't change that analysis.

3            I think the government would argue that if you are

4    going there and you are teaching a skill and educating somebody

5    on a skill that may be known to others, but you are providing

6    that service, from what I'm hearing, they would argue that

7    that's beyond the information exemption when you set out to

8    guide someone's hand in a skill exercise, and that someone else

9    within the DPRK may have had that skill is beside the point.

10           Now, the fact that they are employed by the DPRK

11   wouldn't seem to be dispositive if we take the statement that

12   was made before Judge Broderick as controlling.  I didn't hear

13   it here, but let's assume that it is the government's position.

14   I don't know that that is dispositive of anything here.

15           MR. KLEIN:  Your Honor, I think we would still make

16   this request because I think -- your Honor, I think they are

17   going to bring it up or it's going to be implicit or the jury

18   won't understand that.

19           I think it also goes to the point that was mentioned

20   earlier because I think -- and your Honor made the point -- I'm

21   not saying you were claiming this is true -- people may think

22   that they don't have access to the Internet there, and they

23   might not have access to information like this, and that is not

24   true, as far as we know.

25           And I think it's important for a jury to understand

1   these, ideas that they are not misled in thinking something

2   different.  And I think, you know, we can contest what happened

3   exactly at that conference and what Mr. Griffith allegedly said

4   or didn't say.  But I suspect, and I strongly believe, and even

5   today I think they said that the information he provided helped

6   the DPRK.

7          I just think it's something that is going to be very

8   ripe, and we should get the information now, and we are

9   entitled to it, or we are entitled to a very broad stipulation

10  so this doesn't become a problem.

11         THE COURT:  I understand your point and I think there

12  is some merit to it.  So I am going to address that in my

13  ruling.  You may want to proceed on your other points.

14         MR. KLEIN:  The other point, and then we would like to

15  talk about the bill of particulars because I think it's become

16  more necessary than ever, based on this argument, what the

17  government said.

18         But my last point about OFAC is, your Honor, first of

19  all, this is the first we have heard of a phone call between

20  the FBI and OFAC sometime after this e-mail, which we did

21  include.  The e-mail with OFAC --

22         THE COURT:  In your reply brief you say that recently,

23  after a response brief was filed, the government produced an

24  FBI report detailing a conference between the FBI and OFAC on

25  October 24, 2019, about a month before the date their response

1    claims.  This is, I think, tab G of the exhibits, and I think

2    this is in the defense's possession.

3          MR. KLEIN:  Mr. Wirshba just brought up another phone

4    call.  I think I heard him say that there was this conference

5    and then one more short one.  I could have been wrong and I

6    misheard that, but I'm pretty confident I heard him say that.

7          THE COURT:  Let's just find that factual point out.

8          Was there a call before October 24, or is October 24

9    the initiation?

10         MR. WIRSHBA:  Your Honor, October 24 is the initiation

11   of conversation between OFAC and the FBI.

12         Your Honor, the follow-up phone call that I'm

13   referring to, which took place on November 7, is the materials

14   that were turned over to the defense.  On August 26, they are

15   clearly labeled in the government's discovery letter as OFAC

16   materials, and there is an e-mail communication between Brandon

17   Cavanaugh and an individual in OFAC, and those are labeled

18   3507-42 and 3507-48 and 49.  These were provided to the

19   defense.  They have had them since August.  And, in any event,

20   they do not show that there was a joint investigation between

21   the FBI and OFAC; merely, that there were discussions about, in

22   this case, as reflected in 3507-48, about passing contact

23   information of individuals from the United Kingdom.

24         THE COURT:  Thank you.

25         You may resume, Mr. Klein.

 1              MR. KLEIN:  I was naturally curious about that because

 2     in this report I think there is no dispute, it was only given

 3     to us after we filed our initial brief and after they had filed

 4     their response.  It is not referenced in their response or even

 5     discussed.  I think it is dispositive of this issue.

 6              I don't have anything further to say on our motion to

 7     compel, your Honor.

 8              THE COURT:  Thank you.

 9              This is the Court's ruling on the defendant's motion

10     to compel.

11              In this case Griffith moves to compel internal OFAC

12     materials relevant to Griffith and his case; secondly, the

13     identity of witness 2; and, thirdly, DOJ, FBI, OFAC, CIA, and

14     NSA documents and communications relating to the DPRK's

15     cryptocurrency and Blockchain capabilities.

16              I will not repeat all that has been discussed in the

17     argument here today, very fine argument.

18              But there was produced by the government certainly the

19     memorandum going back to November 19, 2019, which reflects

20     communications between OFAC and the DOJ regarding bringing on

21     the prosecution, but it's now become apparent that the

22     communications between FBI and OFAC began on October 24, 2019.

23              I want to be clear.  This was produced by the

24     government.  This is not something that was disclosed other

25     than by the government disclosing it, as well they should have.

1          The question here is, generally speaking, when the

2     prosecution conducts a joint investigation with another state

3     or federal agency, courts in this circuit have held that the

4     prosecutor's duty extends to reviewing the materials in the

5     possession of that agency, other agency for *Brady* purposes.

6          And I recognize that my colleague, Judge Oetken, in

7     *U.S. v. Middendorf*, 2018 WL 395694 at *4, set forth a very

8     useful test that applies in many instances.

9          I find that the test does not quite fit here.  It

10    seems to me that here the prosecution arm, and specifically the

11    FBI and the DOJ team, needed and intended to have the review of

12    the facts by OFAC to determine whether, in OFAC's view, a

13    license was required.

14         And I appreciate that when, as, and if an OFAC witness

15    testifies, that 3500 material on that OFAC witness will be

16    turned over to the defense.  But, here, I believe that there is

17    a sufficient involvement of OFAC in the very question of

18    whether a prosecution is viable because they are the ones

19    charged with interpreting their own regulations that the

20    government made a presentation to OFAC, disclosed facts with a

21    view towards getting their view on whether there was a

22    violation of the regulations.

23         I am going to require that the government do a *Brady*

24    review with OFAC that begins as of October 24, 2019, with the

25    initiatory conversation between an FBI agent and someone at

OFAC as for any *Brady* materials in OFAC's possession on or

after that date.

         To that limited extent, the motion of the defendant is

granted.

         With regard to witness No. 2, the case law is that

nothing obligates the government to disclose the identity of

its prospective witnesses before trial.  It need not produce

and the Court is generally not permitted to order the

production of statements by government witnesses until the

witness has testified on direct.  I realize that's really an

issue as to statements.  And, as I understand it, a redacted

version of witness 2's statement has already been disclosed,

and the government does argue that they want to protect witness

2, as Internet supporters of Mr. Griffith have indicated that

they may try and assist Mr. Griffith.  And so it is protecting

the witness.  This is in the government's response at pages 64

and 65.

         I find that there has not been sufficient reason shown

to require the disclosure of the identity of witness 2 at this

stage.  And if the government abandons its decision to call

witness 2, well, then they are not going to be producing 3500

material.  If they do intend to call the person, then, as per

their representations, they will be producing the 3500

material.

         Now, with regard to government agency materials

relating to DPRK cryptocurrency and Blockchain capabilities, I am going to reserve decision on that.  There was a very helpful representation made by the government here today.  And I am going to direct and encourage the parties to work on a stipulation that is directed to the issue raised on this prong of the motion to compel.

The stipulation I'm talking about is a stipulation for use at trial or to govern the evidence at trial.  As it is now, the government has represented, and they will be held to it, that they will not argue at trial that the information Mr. Griffith did disclose or intended to disclose as an object of the conspiracy was above and beyond the then existing capabilities and knowledge of the DPRK, so they have said that. But I will give the parties an opportunity to work out a stipulation, and I see greater good from that effort at a stipulation because I think other issues may arise between now and trial, and this will help.

I am going to require that the proposed stipulation be submitted to the Court no later than January 20, 2021 and an explanation of any remaining dispute, despite the stipulation. It seems to me that there is a lot in this for both sides to get this issue tamped down.

With regard to the bill of particulars, I intend to address that in my decision on the motion to dismiss the indictment, and I will be working hard on that.

1          I have a question that I am going to put to both

2     sides.  I'll hear what each side says.

3          By January 15 of 2021, I will be asked to indicate the

4     cases that I wish to have a jury impaneled for in the second

5     quarter of 2021.  The date for requesting a jury for the first

6     time quarter has passed.

7          The question I have, and I'll start with the

8     government, is, in your view, should I request a trial date for

9     the second quarter of 2021?  If so, are there any blackout

10    dates?  And how long does the government believe it will take

11    for it to put on its case?

12          MS. RAVENER:  Thank you, your Honor.  We believe that

13    the government would be ready to proceed in the second quarter

14    if needed.  I think on a personal level, for the prosecutors in

15    this matter, we have a number of conflicts in the month of May

16    of 2021 and into early June 2021, so we would ask for sometime

17    thereafter.

18          THE COURT:  Let me inquire of the defendant.  Should I

19    put this case in for trial for the second quarter of 2021?

20          MR. KLEIN:  Your Honor, one quick question.  I think

21    you asked the government for a length of trial estimate.

22          THE COURT:  Yes.  That's a fair point.

23          MS. RAVENER:  Thank you.  I apologize.  We are happy

24    to address that as well.  I think our estimate is that the

25    trial can be completed in under two weeks.

1           THE COURT:  Thank you.

2           Go ahead.

3           MR. KLEIN:  Your Honor, we have been talking about

4    this internally, obviously, in the lead-up to this conference,

5    and we had talked about the possibility of maybe May.  Just so

6    your Honor knows, I have a trial in the Western District of

7    Washington scheduled for June that is supposed to be a couple

8    of weeks, and Mr. Buckley has a trial in Chicago, I think it's

9    in July, that's supposed to be in the middle of July that's

10   supposed to be a couple of weeks.

11          THE COURT:  Let's see what I can recap.  The

12   government is not available in May into early June.  You are

13   not available July.  Buckley isn't available in August.  Is

14   that about the lay of the land here?

15          MR. KLEIN:  No, your Honor.  I'm not available in

16   June, and Mr. Buckley isn't available in mid July, I think, to

17   early August.

18          Your Honor, can I raise one point on that?

19          THE COURT:  How about I can put this in for -- there

20   is no guarantee I get the date, but let's say the Tuesday after

21   Labor Day, 2021.  It looks to me like it would be September 7,

22   2021.

23          MR. KLEIN:  Your Honor, I would like to discuss that

24   with my client.  Obviously we are not able to be in the same

25   room.  I can't bend over and whisper into the ear.  That date

1   is a date we had also internally -- September was a date we had

2   discussed.  I do want to discuss it with my client.

3          One thing we want to raise with your Honor, and we

4   plan to probably be raising in the early part of the year is,

5   the loosening of some of his restrictions.  As you know, he has

6   been on very, very tough restrictions.  No Internet access,

7   can't leave his home.

8          THE COURT:  I'll hear you on what else you want to do.

9          This is what I am going to require, that each side

10  write to me by Wednesday, December 30, to advise whether there

11  is any reason why the case cannot be tried on or about

12  September 7, 2021, recognizing that it may be that there is

13  such a demand for trial dates once we get to September that it

14  may be that I won't be able to get jury availability for the

15  month of September.  I would try it for all dates in September,

16  starting on September 7, just so everybody is aware.  I would

17  not say, give me September 7 or don't give me anything.  It

18  would be basically any date in September starting with

19  September 7.  That would be basically the way I would put in my

20  request.  If the trial started on September 30, it would go and

21  it would go for the two weeks into the next quarter.  That's

22  the way this works under the present COVID restrictions.  Of

23  course, if we are at a point where we don't have COVID

24  restrictions, it would be my pleasure to set this for trial in

25  my own courtroom.

1                   MR. KLEIN:  Yes, your Honor.

2                   THE COURT:  Get me that letter by December 30.  And if

3       the government has anything it wants to say, you can get it in

4       on December 30 as well.

5                   MS. RAVENER:  Thank you, your Honor.  We will take the

6       opportunity to confer with the defense about that and see if we

7       can make a joint submission to the Court.

8                   THE COURT:  That would be terrific.

9                   Mr. Klein, is there something else about conditions

10      you wanted to raise, or do you want to do that in a more

11      fulsome letter to me?

12                  MR. KLEIN:  I wanted to just raise the issue because

13      we do plan to probably raise it in a letter, your Honor.  It

14      was becoming pertinent to a trial date and sort of our forward

15      thinking.  We will discuss that and we will raise it in a

16      letter with you.

17                  THE COURT:  That sounds perfectly fine.

18                  It's one thing to have a case with tough issues.  But

19      it is such a joy to a judge to have lawyers who are up to the

20      task who can handle the tough questions.  And I make no

21      apologies for conducting my argument the way I do.  It's maybe

22      how my thinking and brain works, and I do what I do.  But it

23      really was very, very helpful, and I think both sides should be

24      proud in terms of the administration of justice in this case in

25      their succinct and thoughtful presentations.

1          With that, I extend my wishes not just to counsel, but

2     also to Mr. Griffith for peaceful holidays, restful holidays,

3     stress-reduced holidays.  I can't say stress free, but

4     stress-reduced holidays.

5          Let me ask the government, where do we stand on speedy

6     trial?

7          MS. RAVENER:  Thank you, your Honor.  Two things.

8          One is that we would move to exclude time.  I think,

9     given the present posture, we believe it would be appropriate

10    to exclude time, in the interests of justice, until

11    approximately September 7, 2021.  That will be, obviously,

12    subject to follow up by the parties no later than December 30.

13    That will permit the parties additional time to resolve these

14    open issues, discuss the potential for a disposition in this

15    matter, and for the defense to review discovery.

16          THE COURT:  Let me hear from Mr. Klein.

17          MR. KLEIN:  Your Honor, one quick administrative

18    point, and then I'll address that.

19          The appendix of exhibits that we filed, we submitted

20    to your Honor unredacted.  We also submitted it by e-mail to

21    chambers, but it's not been publicly filed because we couldn't

22    file it because we have to attach it to a document.  And so we

23    wanted to let you know that we do want to publicly file.  It's

24    been redacted, the redacted version that we worked on with the

25    government.  I don't know if your Honor's clerk has a

1    suggestion for that or if we should e-mail chambers to try to

2    figure out how to do that.

3            THE COURT:  What you should do is e-mail chambers with

4    a proposed one-sentence order which basically says the Court

5    authorizes the filing of redacted exhibits and whatever it is,

6    if you have a table of contents.  And what's the volume?  How

7    many pieces of paper are we talking about?

8            MR. KLEIN:  It's pretty thick, your Honor, because it

9    attaches a lot of indictments.  I would say it's over 150

10   pages.  I don't have a precise count.

11           THE COURT:  You may have to break it in.  I think I

12   would suggest to you that you break it into part A, part B, and

13   part C with three different orders, perhaps.

14           MR. KLEIN:  OK.  Thank you, your Honor.

15           THE COURT:  I think that would fall within the limits

16   of what you could upload with an order.  That's what I would

17   suggest.

18           MR. KLEIN:  Yes, your Honor.  Thank you.

19           As for the speedy trial, your Honor, I do want to

20   speak with my client.  We are not trying to be difficult,

21   obviously.  But I do want to speak with him.  I don't know that

22   it needs to be decided today, though, because I believe your

23   Honor at the last hearing, the SIPA hearing, excluded time

24   through March 27, I think is the next hearing.  I could be

25   wrong about the date, your Honor.

1          MR. BUCKLEY:  Your Honor, you had set a SIPA sanction

2     for motion deadline of March 19.  So I think that would be a

3     logical place to set the exclusion for, as it will allow the

4     government to prepare its motion and make its motion and the

5     Court considers it.  Just a suggestion.

6          THE COURT:  Thank you.

7          What I am doing is, I am setting a conference in this

8     case for 9:30 on September 7, 2021.  I am excluding time

9     between today and September 7, 2021.  I find that the ends of

10    justice will be served by granting a continuance to September 7

11    and that the need for a continuance outweighs the best

12    interests of the public and the defendants in a speedy trial.

13         The reasons for my finding are, at present there are a

14    number of motions pending.  There is the motion to dismiss, the

15    motion for the bill of particulars, and at least one discrete

16    category of the motion to compel remains outstanding.  There is

17    also a deadline for classified information motions.

18         It is also the case, as the Court has outlined, that

19    the date for requesting trials in the first quarter of 2021 has

20    passed and that the date for requesting trials for the second

21    quarter has not passed.  Having inquired of counsel, for good

22    and sufficient reason, counsel who are necessary in this

23    case -- because this is not a run-of-a-mill case.  This is not

24    something where someone else can be dropped in easily for the

25    prosecution or defense -- that availability seems to indicate,

1    given the fact that we don't pick juries the last two weeks of

2    August, that the most efficacious time to try this case would

3    begin on or about September 7.

4           So, accordingly, I am excluding time, in the interests

5    of justice, until September 7.  I am quite sure we will all be

6    in touch with each other long before that, pursuant to the

7    schedule that I set at this conference.

8           Anything further from the government?

9           MS. RAVENER:  Thank you, your Honor.  Just briefly.

10   If the Court would indulge us for a moment.

11          We want to communicate the Court's ruling to OFAC as

12   promptly as possible, and we want to make sure that we have

13   accurately heard the Court's scope of that ruling, that we

14   should be asking OFAC for any materials related to this case

15   from October 24, 2019 to the present for our review and

16   production to the defense, consistent with our obligations.  Is

17   that correct, your Honor?

18          THE COURT:  Consistent with your obligations, yes,

19   that is correct.

20          MS. RAVENER:  Thank you so much.

21          THE COURT:  Anything further from the defense?

22          MR. KLEIN:  Just happy holidays, your Honor.

23          THE COURT:  Thank you all very much.  Again, I

24   appreciate the clear presentations.

25          We are adjourned.    (Adjourned)