# EXHIBIT A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

OPEN SOCIETY JUSTICE INITIATIVE, DIANE
MARIE AMANN, MILENA STERIO, MARGARET
deGUZMAN, and GABOR RONA,

                Plaintiffs,

                -v.-

DONALD J. TRUMP, President of the United States,
MICHAEL R. POMPEO, Secretary of State, UNITED
STATES DEPARTMENT OF THE TREASURY,
STEVEN T. MNUCHIN, Secretary of the Treasury,
UNITED STATES DEPARTMENT OF JUSTICE,
JEFFREY A. ROSEN, Acting United States Attorney
General, OFFICE OF FOREIGN ASSETS CONTROL,
and ANDREA M. GACKI, Director of the Office of
Foreign Assets Control,

                Defendants.

20 Civ. 8121 (KPF)

**OPINION AND ORDER**

KATHERINE POLK FAILLA, District Judge:[1]

On June 11, 2020, Defendant Donald J. Trump, in his official capacity as President of the United States, issued Executive Order 13,928, *Blocking Property of Certain Persons Associated with the International Criminal Court* (the "Executive Order" or the "Order"), and initial implementing regulations, 31 C.F.R. pt. 520 (the "Regulations"), purporting to exercise authority granted by the International Economic Emergency Powers Act ("IEEPA"), 50 U.S.C. §§ 1701-1708.  Under the Order and the Regulations, designated persons

[1] When a party in an official capacity resigns or otherwise ceases to hold office while the action is pending, the officer's successor is automatically substituted as a party, regardless of the party's failure to so move or to amend the caption; the Court may also order such substitution at any time.  Fed. R. Civ. P. 25(d); *see also Williams* v. *Annucci*, 895 F.3d 180, 187 (2d Cir. 2018); *Tanvir* v. *Tanzin*, 894 F.3d 449, 459 n.7 (2d Cir. 2018).  The Clerk of Court is therefore directed to substitute Jeffrey A. Rosen for Defendant William P. Barr.

associated with the International Criminal Court ("ICC") are subject to economic sanctions, and both designated persons and those who conduct certain types of prohibited interactions with designated persons may be subject to IEEPA's civil and criminal penalties for violations.

On October 1, 2020, Plaintiffs — a public interest law center and four law professors who previously have worked with two designated persons and other ICC personnel, and who desire to continue doing so but for the Executive Order — brought this action to challenge the lawfulness of the Order and the Regulations.  In brief, Plaintiffs allege that the Order and the Regulations violate Plaintiffs' rights under the First and Fifth Amendments to the United States Constitution and are *ultra vires* under IEEPA.  They seek declaratory relief as well as injunctive relief barring Defendants from enforcing IEEPA's civil and criminal penalties against them or designating them under the Order.

Presently before the Court is Plaintiffs' Motion for a Preliminary Injunction, which motion was filed November 3, 2020.  (Dkt. #41-48). Defendants filed their opposition on November 9, 2020 (Dkt. #51-52); Plaintiffs filed their reply on November 23, 2020 (Dkt. #53).  For the reasons stated below, the Court grants Plaintiffs' motion in part.

## BACKGROUND[2]

### A.    The International Criminal Court

The ICC is a permanent international court, based in The Hague, The
Netherlands.  (Compl. ¶ 23).  It was created by a treaty, the Rome Statute of
the International Criminal Court (the "Rome Statute"), to which 123 countries
are currently States Parties.  (*Id.*).  The United States is not a party.  (*See* Jude
Opp. Decl., Ex. A).  The ICC may exercise jurisdiction over the investigation
and prosecution of individuals accused of serious international crimes,
including war crimes, crimes against humanity, and genocide.  (Compl. ¶ 24).
States that ratify or accede to the Rome Statute consent to the ICC's
investigation, prosecution, and punishment of international crimes within the
ICC's jurisdiction that are alleged to have occurred on States Parties' territories
or by their nationals.  (*Id.* at ¶ 25).  The ICC may also investigate and prosecute
international crimes falling under its jurisdiction where the United Nations
Security Council refers the matter to the ICC.  (*Id.* at ¶ 26).  The ICC has no
independent enforcement power, but rather relies upon States Parties to arrest
individuals who are subject to the arrest warrants it issues.  (*Id.* at ¶ 27).

---

[2]     The facts in this Opinion are drawn primarily from Plaintiffs' Complaint (the
"Complaint" or "Compl." (Dkt. #1)), which is the operative pleading in this case; as well
as the Declaration of James A. Goldston ("Goldston Decl." (Dkt. #43)) and its attached
exhibit; the Declaration of Diane Marie Amann ("Amann Decl." (Dkt. #44)); the
Declaration of Milena Sterio ("Sterio Decl." (Dkt. #45)); the Declaration of Margaret
deGuzman ("deGuzman Decl." (Dkt. #46)); the Declaration of Gabor Rona ("Rona Decl."
(Dkt. #47)); the Declaration of Nicholas M. Renzler ("Renzler Decl." (Dkt. #48)) and its
attached exhibits; and the Opposition Declaration of Jennifer Jude ("Jude Opp. Decl."
(Dkt. #52)) and its attached exhibits.

    For ease of reference, the Court refers to Plaintiffs' opening brief as "Pl. Br." (Dkt. #42);
Defendants' opposition brief as "Def. Opp." (Dkt. #51); and Plaintiffs' reply brief as "Pl.
Reply" (Dkt. #53).

The Office of the Prosecutor is one of four "organs" that comprise the ICC, and it is responsible for examining alleged international crimes that fall within the ICC's jurisdiction, carrying out investigations of those crimes, and prosecuting individuals who are allegedly responsible for those crimes. (Compl. ¶ 28). Ms. Fatou Bensouda has served as the Prosecutor of the ICC and the head of the Office of the Prosecutor since 2012, after her election to that position by the States Parties. (*Id.* at ¶ 29). Mr. Phakiso Mochochoko has served as head of the Office of the Prosecutor's Jurisdiction, Complementarity and Cooperation Division since 2011. (*Id.* at ¶ 30).

In March 2020, Ms. Bensouda received authorization through the ICC's internal processes to open an investigation into certain crimes allegedly committed in Afghanistan, a State Party. (Compl. ¶ 31(o)). The investigation encompasses crimes committed since 2003, including crimes allegedly committed by the Taliban, Afghan security forces, and U.S. and allied personnel, both in Afghanistan and in the territory of other States Parties. (*Id.*; *see also* Renzler Decl., Ex. 7). The United States objects to such attempts to assert ICC jurisdiction over U.S. and allied personnel. (*See* Jude Opp. Decl., Ex. A).

**B.** **The International Emergency Economic Powers Act**

IEEPA grants the President certain powers once the President has declared a national emergency with respect to "any unusual and extraordinary threat, which has its source in whole or substantial part outside the United States, to the national security, foreign policy, or economy of the United

States." 50 U.S.C. § 1701(a). When the President has declared such an emergency, the President may "block …, regulate, … prevent or prohibit, any acquisition, … use, transfer, … dealing in, or exercising any right, power or privilege with respect to, or transactions involving, any property in which any foreign country or a national thereof has any interest by any person, or with respect to any property, subject to the jurisdiction of the United States." *Id.* § 1702(a)(1)(B). However, the President may not "regulate or prohibit, directly or indirectly … any postal, telegraphic, telephonic, or other personal communication, which does not involve a transfer of anything of value," or the importation or exportation of "any information or informational materials." *Id.* § 1702(b)(1) & (3).

The President may exercise this authority under IEEPA by issuing an executive order forbidding the dealing in property or interests in property of certain persons, and authorizing federal agencies to "designate" those persons subject to such proscriptions. (Compl. ¶ 60). Designation results in the designated person's inclusion on the Specially Designated Nationals List maintained by the Office of Foreign Assets Control ("OFAC") in the Department of the Treasury. (*Id.* at ¶ 61). Orders issued pursuant to IEEPA forbid "deal[ing] in" a designated person's "property or interests in property," a prohibition that OFAC has interpreted broadly such that virtually any economic interaction with a designated person is forbidden. (*Id.* at ¶ 62).

Those who violate an order issued under IEEPA are subject to a civil penalty of the greater of $307,922 or twice the value of the blocked transaction.

*See* 50 U.S.C. § 1705(a)-(b); 31 C.F.R. § 520.701; 85 Fed. Reg. 19884-02 (2020).  When determining whether to issue a civil penalty, OFAC follows a set process outlined in the agency's regulations.  *See generally* 31 C.F.R. pt. 501, App. A, Economic Sanctions Enforcement Guidelines.  Those who commit, attempt to commit, or conspire to commit a willful violation are also subject to criminal fines of up to $1,000,000 and, if a natural person, up to 20 years' imprisonment.  50 U.S.C. § 1705(c).  Of potential significance to the instant motion, being subjected to the enforcement of IEEPA's civil and criminal penalties is separate and distinct from being designated a sanctioned person under IEEPA.  (Compl. ¶ 64).

## C.    Executive Order 13,928 and Its Implementing Regulations

The Executive Order issued June 11, 2020, purports to implement authority granted to the President by IEEPA.  *See* Executive Order 13,928.  The Order declares a national emergency with respect to "any attempt by the ICC to investigate, arrest, detain, or prosecute any United States personnel without the consent of the United States, or of personnel of countries that are United States allies and who are not parties to the Rome Statute or have not otherwise consented to ICC jurisdiction."  *Id.*

Section 1(a)(i) of the Executive Order blocks and restricts transfer of the property and interests in property that are in the United States, or that come within the possession or control of any United States person, of:

> any foreign person determined by the Secretary of State, in consultation with the Secretary of the Treasury and the Attorney General:

6

[i] to have directly engaged in any effort by the ICC to investigate, arrest, detain, or prosecute any United States personnel without the consent of the United States;

[ii] to have directly engaged in any effort by the ICC to investigate, arrest, detain, or prosecute any personnel of a country that is an ally of the United States without the consent of that country's government;

[iii] to have materially assisted, sponsored, or provided financial, material, or technological support for, or goods or services to or in support of, any activity described in subsection (a)(i)(A) or (a)(i)(B) of this section or any person whose property and interests in property are blocked pursuant to this order; or

[iv] to be owned or controlled by, or to have acted or purported to act for or on behalf of, directly or indirectly, any person whose property and interests in property are blocked pursuant to this order.

Executive Order § 1(a)(i). Section 3 of the Order specifies that this prohibition includes "the making of any contribution or provision of funds, goods, or services by, to, or for the benefit of any person" designated pursuant to the Order. *Id.* § 3(a). The Regulations, issued on September 30, 2020, define "interest" as "an interest of any nature whatsoever, direct or indirect," 31 C.F.R. § 520.310, and "property or interests in property" to include "services of any nature whatsoever," *id.* § 520.310.

On September 2, 2020, Defendant Michael R. Pompeo, in his capacity as Secretary of State, designated Ms. Bensouda and Mr. Mochochoko as foreign persons subject to the sanctions and visa restrictions provided for by the Executive Order. (Compl. ¶¶ 82-85; *see also* Renzler Decl., Ex. 9). As a result, "foreign" persons who engage in prohibited interactions with Ms. Bensouda and

7

Mr. Mochochoko may be subject to both designation under Section 1(a)(i) of the Order and enforcement of IEEPA's civil and criminal penalties.  (Compl. ¶ 71).  Non-"foreign" persons are not subject to designation but may be subject to enforcement of IEEPA's penalties.  *See* Executive Order § 1(a)(i); 31 C.F.R. § 520.701.  (*See also* Pl. Br. 9).

**D.     Plaintiffs**

   **1.     Open Society Justice Initiative**

   Plaintiff Open Society Justice Initiative ("OSJI") is a public interest law center dedicated to upholding human rights and the rule of law through litigation, advocacy, research, and technical assistance.  (Goldston Decl. ¶ 2).  OSJI is a tax-exempt, non-partisan, not-for-profit organization headquartered in New York, New York, and undertakes legal work in a range of thematic areas, including international justice, in a variety of locations outside the United States.  (Compl. ¶ 8; Goldston Decl. ¶ 2).  Prior to the Executive Order Plaintiff OSJI (i) provided assistance to the ICC Office of the Prosecutor on how it might use emerging technologies to analyze evidence of international crimes, including by bringing together experts in the fields of information technology and forensics with staff from the Office of the Prosecutor and supporting the establishment and operationalization of a technical advisory board (Goldston Decl. ¶ 3); (ii) met with staff from the Office of the Prosecutor to assist in improving the ICC's communications with a view to strengthening its effectiveness and public support (*id.* at ¶ 4); (iii) co-organized an online workshop, attended by staff of the Office of the Prosecutor, that addressed

8

strategies for improving the performance of the Office of the Prosecutor, including with respect to investigations and prosecutions (*id.* at ¶ 5); and (iv) met with the Office of the Prosecutor approximately five to fifteen times per year, including two to four calls or meetings per year with Ms. Bensouda (*id.* at ¶ 6).

As a result of the Executive Order and the designation of Ms. Bensouda and Mr. Mochochoko, OSJI has stopped initiating or accepting meetings with Ms. Bensouda, Mr. Mochochoko, or anyone operating directly under their control or acting for them or on their behalf, and has refrained from attending any meeting where such persons are present when attendance could lead to a substantial exchange with them. (Goldston Decl. ¶ 8). OSJI has also limited its participation in an ongoing ICC review process addressing activities that pertain to the Office of the Prosecutor, and has refrained from training civil society groups on matters related to ICC investigations in a number of countries. (*Id.*).

### 2. Diane Marie Amann

Plaintiff Diane Marie Amann is the Emily and Ernest Woodruff Chair in International Law and Faculty Co-Director of the Dean Rusk International Law Center at the University of Georgia School of Law. (Amann Decl. ¶ 2). She is a citizen of the United States and Ireland. (*Id.* at ¶ 4). In 2012, she was appointed Special Adviser to the Prosecutor of the International Criminal Court on Children in and affected by Armed Conflict. (*Id.* at ¶ 5). In that capacity, Plaintiff Amann assisted in the preparation of the Office of the Prosecutor's

Policy on Children. (*Id.* at ¶ 6). Since 2012, Plaintiff Amann provided the Office of the Prosecutor, including Ms. Bensouda, with education, advice, training, and other assistance on matters relating to children and armed conflict. (*Id.*). As a result of the Executive Order and the designation of Ms. Bensouda and Mr. Mochochoko, Plaintiff Amann has stopped advising Ms. Bensouda and the Office of the Prosecutor on matters related to crimes against and affecting children. (*Id.* at ¶¶ 7-8).

### 3. Milena Sterio

Plaintiff Milena Sterio is the Charles R. Emrick Jr.-Calfee Halter & Griswold Professor of Law at the Cleveland-Marshall College of Law. (Sterio Decl. ¶ 2). She is a citizen of the United States and Serbia. (*Id.* at ¶ 4). Plaintiff Sterio has (i) directed student research concerning the investigation and prosecution of international crimes, including the ICC's investigation into the situation in Darfur, which she submitted to the Office of the Prosecutor; (ii) submitted an *amicus curiae* brief to the ICC; and (iii) delivered presentations attended by Office of the Prosecutor staff, which presentations she intended to provide education, advice, training, and assistance to the Office of the Prosecutor, including to Ms. Bensouda and Mr. Mochochoko. (*Id.* at ¶¶ 5-6). As a result of the Executive Order and the designation of Ms. Bensouda and Mr. Mochochoko, Plaintiff Sterio has abandoned plans to continue supervising student research that would otherwise be provided to the Office of the Prosecutor; has refrained from contacting the Office of the Prosecutor to determine supervision topics for her students; and has decided not to submit

further *amicus curiae* briefs supportive of the Office of the Prosecutor to the ICC. (*Id.* at ¶¶ 7-8).

### 4. Margaret deGuzman

Plaintiff deGuzman is a James E. Beasley Professor of Law and Co-Director of the Institute for International Law and Public Policy at Temple University's Beasley School of Law. (deGuzman Decl. ¶ 2). She is a citizen of the United States and Canada. (*Id.* at ¶ 4). Prior to the Executive Order, Plaintiff deGuzman submitted to the ICC *amicus curiae* briefs supportive of positions advanced by the Office of the Prosecutor, including a brief regarding the prosecution of former Sudanese President Omar Al Bashir. (*Id.* at ¶ 5). In addition, Plaintiff deGuzman gave presentations at the ICC and to staff of the Office of the Prosecutor on issues including case selection and prosecutorial discretion; and published academic works and made media appearances supportive of the Office of the Prosecutor, including Ms. Bensouda and Mr. Mochochoko, through which she intended to provide them with education, advice, training, and otherwise to provide them with assistance. (*Id.* at ¶¶ 6-7). As a result of the Executive Order and the designation of Ms. Bensouda and Mr. Mochochoko, Plaintiff deGuzman has terminated her participation in the drafting of an *amicus curiae* brief that supports positions adopted by the Office of the Prosecutor, and also has discontinued plans to present her recently published book to Office of the Prosecutor staff. (*Id.* at ¶¶ 8-9).

11

5.      **Gabor Rona**

Plaintiff Rona is Professor of Practice at Cardozo School of Law and Director of the Law and Armed Conflict Project at the Cardozo Law Institute in Holocaust and Human Rights.  (Rona Decl. ¶ 2).  He is a citizen of the United States and Hungary.  (*Id.* at ¶ 4).  Prior to the Executive Order, Plaintiff Rona submitted an *amicus curiae* brief to the ICC in support of the position of the Office of the Prosecutor, including Ms. Bensouda and Mr. Mochochoko, that the ICC may exercise jurisdiction over alleged crimes committed in relation to the situation in Afghanistan in cases where those crimes occurred in third countries that are States Parties to the Rome Statute.  (*Id.* at ¶ 5).  As a result of the Executive Order and the designation of Ms. Bensouda and Mr. Mochochoko, Plaintiff Rona has decided not to submit further *amicus curiae* briefs to the ICC.  (*Id.* at ¶¶ 6-7).

E.      **Plaintiffs' Claims**

Plaintiffs' Complaint raises four causes of action:

(i)      The Executive Order and the Regulations violate the First Amendment by barring Plaintiffs from engaging in certain speech and advocacy to support the ICC, and by subjecting Plaintiffs to the prospect of civil or criminal sanctions, and designation, for engaging in that speech or advocacy.  (Compl. ¶ 123).

(ii)      The Executive Order's terms "materially assisted," "material … support," and "services to or in support of" violate the Fifth Amendment because they provide no notice to Plaintiffs as to what acts are prohibited, and permit arbitrary enforcement of the Executive Order. The Executive Order's term "foreign person" violates the Fifth Amendment because it provides no notice to Plaintiffs as to whether they could be subject to designation under the Executive Order and permits its

arbitrary enforcement. The Regulations violate the Fifth Amendment by failing to clarify the meaning of any of these terms. (*Id.* at ¶¶ 125-27).

(iii)    The Executive Order is *ultra vires* because it regulates or prohibits, and authorizes Defendants to regulate or prohibit, acts that are exempt from regulation or prohibition under IEEPA. The Regulations are *ultra vires* because they regulate or prohibit acts that are exempt from regulation or prohibition under IEEPA. (*Id.* at ¶¶ 131-32).

(iv)    In enacting and implementing the Executive Order and the Regulations, Defendants did not act in accordance with the First and Fifth Amendments to the U.S. Constitution, violated Plaintiffs' constitutional rights under the First and Fifth Amendments, and exceeded their statutory authority under IEEPA. The Order and Regulations should therefore be set aside under the Administrative Procedure Act (the "APA"), 5 U.S.C. § 706(2)(A)-(C). (*See id.* at ¶¶ 133-34).

In their Motion for a Preliminary Injunction, Plaintiffs address their likelihood of success only as to the first three claims; they do not argue their APA claim in any detail. (*See generally* Pl. Br.; *see also* Pl. Reply 9 n.7 (stating in a footnote that "[e]ven if the Court were to find there is no equitable *ultra vires* cause of action, the Regulations, which were issued by OFAC, still should be found to violate the Administrative Procedure Act," but not elaborating on the argument further)).

## DISCUSSION

### A.   Legal Standards for a Preliminary Injunction

A plaintiff seeking a preliminary injunction against a government entity must establish that: (i) she "is likely to succeed on the merits"; (ii) she "is likely to suffer irreparable harm in the absence of preliminary relief"; and (iii) "the

balance of equities tips in [the plaintiff's] favor, and that an injunction is in the public interest." *Winter* v. *Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *accord Yang* v. *Kosinski*, 960 F.3d 119, 127 (2d Cir. 2020); *see also New York* v. *United States Dep't of Homeland Sec.*, 969 F.3d 42, 58-59 (2d Cir. 2020) ("Where, as here, the government is a party to the suit, the final two factors [*i.e.*, the balance of equities and the public interest] merge." (internal citations omitted)); *Agudath Israel of Am.* v. *Cuomo*, No. 20-3572, 2020 WL 7691715, at *6 (2d Cir. Decl. 28, 2020) ("When 'a preliminary injunction will affect government action taken in the public interest pursuant to a statute or regulatory scheme, the moving party must demonstrate [i] irreparable harm absent injunctive relief, [ii] a likelihood of success on the merits, and [iii] public interest weighing in favor of granting the injunction.'" (quoting *Friends of the E. Hampton Airport, Inc.* v. *Town of E. Hampton*, 841 F.3d 133, 143 (2d Cir. 2016))); *cf. New Hope Family Servs., Inc.* v. *Poole*, 966 F.3d 145, 181 (2d Cir. 2020) ("Thus, 'the dominant, if not the dispositive, factor' in deciding whether to grant a preliminary injunction in this case is New Hope's ability to demonstrate likely success on the merits of its Free Exercise and Free Speech claims." (quoting *N.Y. Progress & Prot. PAC* v. *Walsh*, 733 F.3d 483, 488 (2d Cir. 2013))).

**B.     Likelihood of Success on the Merits**

**1.     Plaintiffs' Claims Regarding Designation Are Not Ripe**

As an antecedent matter to whether Plaintiffs are likely to succeed on the merits of their claims, Defendants argue that Plaintiffs' claims regarding

14

potential designation under the Executive Order are not ripe because "Plaintiffs have presented no factual basis to believe that if they … were to engage in the ICC-related activities described in the complaint, they are likely to be designated and treated equivalently to the ICC's Prosecutor … and one of her senior team members." (Def. Opp. 13). As a result, Defendants argue, Plaintiffs cannot carry their burden of establishing standing as to that element of their claims. (*See id.*).[3] In reply, Plaintiffs contend that their fears of designation are credible and based on more than pure speculation, given Defendant Pompeo's statement that "[i]ndividuals and entities that continue to support Prosecutor Bensouda and Mr. Mochochoko materially risk exposure to sanctions." (Pl. Reply 1 (quoting Jude Opp. Decl., Ex. D)).

Ripeness is a justiciability requirement through which courts seek to avoid the premature litigation of disputes. *See Thomas* v. *Union Carbide Agr. Prod. Co.*, 473 U.S. 568, 579-80 (1985). The ripeness doctrine is intended "to prevent the courts … from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties." *Abbott Labs.* v. *Gardner*, 387 U.S. 136, 148-49 (1967), *overruled on other grounds*, *Califano* v. *Sanders*, 430 U.S. 99, 105 (1977).

---

[3]     Defendants do not dispute the ripeness of Plaintiffs' claims regarding potential enforcement of IEEPA's criminal and civil penalties against them for violating the Order. (*See* Def. Opp. 12 n.5).

Here, the ripeness inquiry is the same as the analysis of whether
Plaintiffs have suffered an injury in fact for the purpose of establishing
standing.  *See Susan B. Anthony List* v. *Driehaus*, 573 U.S. 149, 157 n.5 (2014)
("The doctrines of standing and ripeness 'originate' from the same Article III
limitation. … [T]he Article III standing and ripeness issues in this case 'boil
down to the same question.'" (internal quotation marks and citations omitted)).
As the parties invoking federal jurisdiction, Plaintiffs bear the burden of
establishing standing.  *See Spokeo, Inc.* v. *Robins*, 136 S. Ct. 1540, 1547
(2016).  To establish an injury in fact, a plaintiff must show that she suffered
an injury that is "'concrete and particularized' and 'actual or imminent, not
conjectural or hypothetical.'"  *Spokeo*, 136 S. Ct. at 1548 (quoting *Lujan* v.
*Defs. of Wildlife*, 504 U.S. 555, 560 (1992)).  A plaintiff cannot depend on future
injury for standing purposes if that injury will only arise "at some indefinite
future time," *see Lujan*, 504 U.S. at 564 n.2; rather, the injury must be
"certainly impending," *Clapper* v. *Amnesty Int'l USA*, 568 U.S. 398, 409 (2013).
In a pre-enforcement challenge, imminent injury can be established by a
plausible allegation of "an intention to engage in a course of conduct arguably
affected with a constitutional interest, but proscribed by a statute, [for which]
there exists a credible threat of prosecution thereunder."  *Susan B. Anthony
List*, 573 U.S. at 159 (quoting *Babbitt* v. *Farm Workers*, 442 U.S. 289, 298
(1979)).

Plaintiffs' concerns about possible designation under the Executive
Order — which requires a specific determination by the Secretary of State in

16

consultation with the Secretary of the Treasury and the Attorney General, and
which is discretionary even when a foreign person clearly meets the specified
criteria — are not justified by more than speculation.  To begin, it is not clear
whether any or all of Plaintiffs qualify as "foreign persons" subject to
designation,[4] a point which Plaintiffs emphasize in their discussion of their
Fifth Amendment vagueness claim.  (*See* Pl. Br. 17-19).  Furthermore,
Defendant Pompeo's public statements notwithstanding, to date, no other
person besides Ms. Bensouda and Mr. Mochochoko has been designated under
the Executive Order — not Ms. Bensouda's deputy, the heads of the other
Divisions of the Office of the Prosecutor, subordinate staff members in the
Office, or anyone outside the Office.  (*See* OFAC, Specially Designated Nationals
and Blocked Persons List, available at https://www.treasury.gov/sdn (last
visited January 4, 2021)).  And assuming Defendants are acting in good faith
when they intimate that Plaintiffs will not be subject to designation (*see* Def.
Opp. 13), the Court concludes that Plaintiffs do not face a credible threat that
the Order will imminently be enforced against them in this manner.  *See*
*Clapper*, 568 U.S. at 412 ("Simply put, respondents can only speculate as to
how the Attorney General and the Director of National Intelligence will exercise
their discretion in determining which communications to target.").  Accordingly,
Plaintiffs are unlikely to establish standing and succeed on this element of
each of their claims.

---

[4]     The answer may be different for OSJI versus the individual Plaintiffs.

17

## 2.     Plaintiffs Are Likely to Succeed on Their First Amendment Claim to the Extent They Are Vulnerable to IEEPA Penalties

The Court next considers Plaintiffs' enforcement-based challenges. Plaintiffs' first cause of action alleges that "[t]he Executive Order and the Regulations violate the First Amendment by barring Plaintiffs from engaging in certain speech and advocacy to support the ICC, and by subjecting Plaintiffs to the prospect of civil or criminal sanctions … for engaging in that speech or advocacy." (Compl. ¶ 123). Relief must be granted, they argue, because the Order and the Regulations impose content-based and viewpoint-based restrictions on Plaintiffs without adequate justification and tailoring. (*See* Pl. Br. 11-15). Defendants respond that the Order and the Regulations are content-neutral, but in any case are justified by "compelling" national security and foreign affairs interests and narrowly tailored to the Government's interest in exerting leverage over Ms. Bensouda and Mr. Mochochoko and deterring them from pursuing investigations and prosecutions of U.S. and allied personnel. (*See* Def. Opp. 14-18). As detailed herein, Plaintiffs have the better of the argument.

### a.     The Executive Order and the Regulations Restrict Plaintiffs' Speech

Section 3 of the Executive Order specifies that its prohibition against economic exchanges with sanctioned individuals includes the making "of any contribution or provision of funds, goods, or services by, to, or for the benefit of any" person designated pursuant to the Order. Executive Order § 3(a). The Regulations further define "property or interests in property" to include

18

"services of any nature whatsoever."  31 C.F.R. § 520.310.  Therefore, the Court

must determine whether Plaintiffs' intended speech constitutes the "provision

of … goods, or services by, to, or for the benefit of" Ms. Bensouda and Mr.

Mochochoko, and if so, whether the Order's and the Regulations' restriction of

that speech is constitutionally permissible under the circumstances.

To reiterate, the speech activities for which Plaintiffs are potentially

vulnerable to IEEPA penalties include participating in meetings with members

of the Office of the Prosecutor, including Ms. Bensouda and Mr. Mochochoko,

or others acting under their control or on their behalf; providing presentations,

advice, and training to benefit members of the Office of the Prosecutor;

conducting and supervising research in support of the Office of the Prosecutor;

and submitting *amicus curiae* briefs supportive of the Office of the Prosecutor.

(*See* Pl. Br. 9-10).  The Court agrees with Plaintiffs that their desired conduct

likely qualifies as "services" that either directly or indirectly benefit Ms.

Bensouda or Mr. Mochochoko.  Defendants concede this point when they

describe the "provision of 'education, training, advice, and other forms of

assistance'" as "interactive services," and the drafting of *amicus curiae* briefs as

"'bespoke' legal services."  (Def. Opp. 24-25).  Thus, Plaintiffs are likely to

succeed in showing that their desired speech is prohibited by the Order and

the Regulations.[5]

---

[5]    Defendants represent to the Court that, "absent facts that do not appear to apply here,
such as that a brief was drafted at the specific request of and in coordination with Ms.
Bensouda and/or Mr. Mochochoko, the submission of an *amicus curiae* brief to the ICC
is not prohibited by the EO and Regulations regardless of the brief's content."  (Def.
Opp. 15).  But the text of the Order and the Regulations does not plainly compel that
interpretation.  *Amicus curiae* briefs that express support for the actions and litigating

### b.      The Restrictions Are Subject to Strict Scrutiny

Plaintiffs argue that the Executive Order's and the Regulations' restriction of this speech is content-based and accordingly must be reviewed under strict scrutiny.  (*See* Pl. Br. 11-12).  The restrictions are content-based, Plaintiffs contend, because they treat speech activities differently depending on whether they do or do not benefit designated individuals either directly or indirectly.  (*See id.*).  If Plaintiffs speak in direct support of Ms. Bensouda or Mr. Mochochoko or in ways that indirectly benefit them — for example by providing advice on process improvements or substantive legal and factual questions — Plaintiffs risk being penalized under IEEPA; if Plaintiffs speak in opposition to Ms. Bensouda or Mr. Mochochoko or in ways that do not support the projects and personnel they oversee, Plaintiffs face no such risk.  (*See id.*).  Defendants respond that, "[o]n their face, these restrictions do not implicate speech, and are content-neutral as they draw no distinction based on the message or content of the funds, goods, or services provided."  (Def. Opp. 14).

"Government regulation of speech is content based if a law applies to particular speech because of the topic discussed or the idea or message expressed."  *Reed* v. *Town of Gilbert*, 576 U.S. 155, 163 (2015).  "Some facial distinctions based on a message are obvious, defining regulated speech by particular subject matter, and others are more subtle, defining regulated

---

positions of Ms. Bensouda and Mr. Mochochoko potentially benefit those individuals in cases before the ICC.  That is true whether the briefs are initiated and authored entirely independently or instead drafted in coordination with the designated individuals.  Accordingly, the Court considers *amicus curiae* briefs among those forms of speech the Order and the Regulations restrict.

speech by its function or purpose." *Id.* Here, Plaintiffs' speech is restricted if, and only if, it has the function or purpose of benefitting Ms. Bensouda or Mr. Mochochoko. This is content-based restriction. *Cf. Holder* v. *Humanitarian Law Project*, 561 U.S. 1, 27 (2010) (explaining that the material support to terrorism statute regulates speech on the basis of its content because whether the plaintiffs may speak to designated terrorist groups depends on whether such speech imparts "specialized knowledge" or only "general or unspecialized knowledge."). Consequently, the Court will apply strict scrutiny. *See id.*; *see also Al Haramain Islamic Found., Inc.* v. *U.S. Dep't of Treasury*, 686 F.3d 965, 997 (2d Cir. 2012).

Under the strict scrutiny framework, Defendants must "prove that the restriction furthers a compelling interest and is narrowly tailored to achieve that interest." *Reed*, 576 U.S. at 171 (quoting *Arizona Free Enter. Club's Freedom Club PAC* v. *Bennett*, 564 U.S. 721, 734 (2011)). A law is not narrowly tailored if a less restrictive alternative would serve the same interests. *See United States* v. *Playboy Entm't Grp.*, 529 U.S. 803, 813 (2000).

Defendants assert a compelling governmental interest in "protecting the personnel of the United States and its allies from investigation, arrest, detention, and prosecution by the ICC without the consent of the United States or its allies." (Def. Opp. 16 (citing Jude Opp. Decl., Ex. C, D)). Plaintiffs accordingly focus on the restrictions' ostensible failure to serve that interest in a manner that complies with strict scrutiny, rather than the validity of the

21

interest itself.  (*See* Pl. Reply 4-6).[6]  It is well-established that "[p]rotection of the foreign policy of the United States is a governmental interest of great importance."  *Haig* v. *Agee*, 453 U.S. 280, 307 (1981).  And as a general rule, the "evaluation of the facts by the Executive … is entitled to deference" when it comes to "sensitive and weighty interests of national security and foreign affairs."  *Humanitarian Law Project*, 561 U.S. at 33-34.  The Court has been provided no basis to doubt the weight of the Government's interest or the sincerity of its belief that the Executive Order and the Regulations are necessary to serve that interest.  Accordingly, the Court accepts the Government's claimed interest and moves on to the tailoring of the restrictions.

Plaintiffs argue that the Executive Order and the Regulations are not narrowly tailored because they sweep far more broadly than is necessary to address the Government's stated concern about the investigation and prosecution by the ICC of U.S. and allied personnel.  (*See* Pl. Br. 13-14).  The Order and the Regulations prohibit speech activities that benefit Ms. Bensouda or Mr. Mochochoko in any way, regardless of whether there is a nexus between that activity, or the benefit of that activity, and the Office of the Prosecutor's Afghanistan investigation.  (*See id.* at 14).  As a result, Plaintiffs believe they are barred from providing advice to the Office of the Prosecutor on a range of topics and from assisting with other ICC investigations and prosecutions,

---

[6]     In their opening brief, Plaintiffs state in a conclusory manner that the Executive Order and the Regulations do not serve a compelling governmental interest, but they do not explain or provide any support for this position.  (*See* Pl. Br. 13).

including those for which the United States has previously expressed support. (*See id.*).

Defendants do not argue in response that the restrictions, as Plaintiffs understand them, are not overinclusive, but instead insist that Plaintiffs are wrong about how much speech the Executive Order and the Regulations restrict.  (*See* Def. Br. 18).  In Defendants' view, "[t]he prohibitions in the EO and Regulations do not prevent Plaintiffs from providing assistance or other services to the ICC or the Office of the Prosecutor (which have not been designated) and Plaintiffs generally can assist on ICC investigations so long as they do not transact with the two designated individuals."  (*Id.*).  But it is unclear to the Court how Plaintiffs could provide services to the Office of the Prosecutor or to others involved in ICC investigations without indirectly benefitting Ms. Bensouda, given that she is the head of the Office of the Prosecutor and oversees the investigations Plaintiffs would support if able.  As a practical matter, the distinction Defendants attempt to draw between supporting the Office of the Prosecutor and supporting Ms. Bensouda is illusory.

As a result, the restrictions prohibit or chill significantly more speech than even Defendants seem to believe is necessary to achieve their end, *i.e.*, to obtain and exert leverage over Ms. Bensouda and Mr. Mochochoko so as to induce them to desist from their investigation of U.S. and allied personnel.[7]

---

[7]     Even if the Court applied intermediate scrutiny rather than strict scrutiny, Plaintiffs still would likely prevail because the Order and the Regulations burden substantially more speech than necessary.  *See Holder* v. *Humanitarian Law Project*, 561 U.S. 1, 26-27 (2010) (explaining that under intermediate scrutiny, "a 'content-neutral regulation

And without any details as to how OFAC intends to implement a licensing scheme for this sanctions regime, the Court cannot conclude, as Defendants suggest (*see* Def. Opp. 20), that such a scheme likely provides an adequate safety valve. *See City of Lakewood* v. *Plain Dealer Publ'g Co.*, 486 U.S. 750, 764 (1988) (stating that the Government may not condition speech "on obtaining a license or permit from a government official in that official's boundless discretion").

It may be the case that the additional implementing regulations Defendants say are forthcoming could mitigate these concerns by, for example, providing narrowing constructions of certain terms. But on the current record, the Court agrees with Plaintiffs that the Executive Order and the Regulations are not narrowly tailored, and hence Plaintiffs are likely to succeed on their First Amendment challenge.

### 3. Plaintiffs Are Unlikely to Succeed on Their Fifth Amendment Claim

In their second claim, Plaintiffs allege that the Executive Order and the Regulations violate Plaintiffs' Fifth Amendment rights because the terms "materially assisted," "material … support," and "services to or in support of," provide no notice to Plaintiffs as to what acts are prohibited, while the term "foreign person" provides no notice to Plaintiffs as to whether they could be subject to designation. (*See* Compl. ¶¶ 125-27; *see also* Pl. Br. 15). These

---

will be sustained under the First Amendment if it advances important governmental interests unrelated to the suppression of free speech and *does not burden substantially more speech than necessary to further those interests.*" (emphasis added) (quoting *Turner Broad. Sys., Inc.* v. *FCC*, 520 U.S. 180, 189 (1997)).

vague terms, Plaintiffs argue, permit arbitrary enforcement of the Executive Order in violation of the constitutional guarantee of Due Process.  (*See* Compl. ¶¶ 125-26).  Defendants respond that the terms in dispute all "appear in the parts of the EO that establish criteria for who may be designated, not proscriptions on any activities of non-designated persons such as Plaintiffs." (Def. Opp. 19).  Thus, "Plaintiffs need not guess at the meaning of these terms in the EO, because they do not directly regulate their conduct."  (*Id.*).

As discussed previously, the Court has determined that Plaintiffs unlikely to succeed on their claim that they face an imminent threat of designation.  In consequence, they are similarly unlikely to establish standing to challenge as unconstitutionally vague those terms that apply only to the designation process, because Plaintiffs are not injured by the alleged vagueness.  This applies to all four of the terms Plaintiffs contest: "foreign person," "materially assisted," "material … support," and "services to or in support of."  *See* Executive Order § 1(a)(i).[8]  Consequently, the Court agrees with Defendants that Plaintiffs' vagueness challenge is unlikely to succeed.

### 4.    Plaintiffs' *Ultra Vires* Claim Is Not Ripe

Plaintiffs' third claim is that the Executive Order and the Regulations are *ultra vires* because they exceed the authority granted to the President under

---

[8]    This is to be distinguished from, for example, those terms that concern what conduct may be subject to IEEPA penalties.  *See, e.g.*, Executive Order § 3 ("The prohibitions in section 1(a) of this order include … provision of … *services by, to, or for the benefit of any person* [designated pursuant to section 1(a)]." (emphasis added)); 31 C.F.R. § 520.310 (including within the terms "property" and "property interests" "*services of any nature whatsoever*" (emphasis added)).  Plaintiffs do not raise a Fifth Amendment challenge to these terms or any others outside the section 1(a) criteria.

IEEPA by failing to incorporate IEEPA's "informational materials" exception. (*See* Compl. ¶¶ 131-32; Pl. Br. 22-23). Defendants respond that Plaintiffs lack a private right of action to challenge whether the Executive Order and the Regulations are consistent with IEEPA's authorizations and constraints, and that, in any event, there is no disconnect between IEEPA and the Order and the Regulations. (*See* Def. Opp. 22-23). Plaintiffs reply that they possess an equitable right of action to enjoin *ultra vires* conduct by executive officials; that even if they do not, the Regulations, issued by OFAC, still should be found to violate the APA; and that the failure to recognize explicitly, in either the Order or the Regulations, IEEPA's "informational materials" exception indicates that the President and OFAC improperly disregarded this exception. (*See* Pl. Reply 9-10). As it turns out, however, this claim is not ripe.

### a.    **Availability of Equitable Relief**

While IEEPA does not contain an express private right of action for those against whom it is enforced to challenge that enforcement, it includes a section regarding the President's authorities and constraints on those authorities that does appear to assume that judicial review will be available. *See* 50 U.S.C. § 1702. Specifically, subsection (c), which concerns the handling of classified information related to IEEPA determinations, begins, "In any judicial review of a determination made under this section... ." *Id.* § 1702(c). If Congress did not expect there to be an equitable mechanism for judicial review of the executive branch's exercise of authority under section 1702, this would be peculiar language to include. Furthermore, there is a "long history of judicial review of

illegal executive action," arising out of English courts of equity. *Armstrong* v. *Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327 (2015). "When an executive acts *ultra vires,* courts are normally available to reestablish the limits on his authority." *Chamber of Commerce of U.S.* v. *Reich*, 74 F.3d 1322, 1328 (D.C. Cir. 1996) (quoting *Dart* v. *United States*, 848 F.2d 217, 224 (D.C. Cir. 1988)); *see also Am. Sch. of Magnetic Healing* v. *McAnnulty*, 187 U.S. 94, 108 (1902) ("The acts of all [executive branch] officers must be justified by some law, and in case an official violates the law to the injury of an individual the courts generally have jurisdiction to grant relief."). Thus, the Court may review the challenged Executive Order and the Regulations for their compliance with the statute that purportedly authorizes their issuance.

Next, Defendants argue that "Plaintiffs cannot obtain relief against the President for his actions in connection with the EO" because "[f]ederal courts have 'no jurisdiction … to enjoin the President in the performance of his official duties.'" (Def. Opp. 22 (quoting *Mississippi* v. *Johnson*, 71 U.S. 475, 501 (1866))). To be sure, the absolutism of *Mississippi* v. *Johnson* has been undercut somewhat in the years since, *see Franklin* v. *Massachusetts*, 505 U.S. 788, 802 (1992) (plurality opinion) (stating that the Supreme Court has "left open the question whether the President might be subject to judicial injunction" under certain narrow circumstances), but prudence dictates avoiding the question whether injunctive relief may be awarded against the President in this case. *See id.* (describing the district court's grant of injunctive relief against the President as an "extraordinary" step that "should have raised

27

judicial eyebrows"). Answering that question is unnecessary because "[r]eview of the legality of Presidential action can ordinarily be obtained in a suit seeking to enjoin the officers who attempt to enforce the President's directive." *Id.* at 815 (Scalia, J., concurring in part and concurring in the judgment); *see also Reich*, 74 F.3d at 1328 ("Even if the Secretary were acting at the behest of the President, this does not leave the courts without power to review the legality of the action, for courts have power to compel subordinate executive officials to disobey illegal Presidential commands." (internal quotation marks omitted) (quoting *Soucie* v. *David*, 448 F.2d 1067, 1072 n.12 (D.C. Cir. 1971))). Here, the operative decisions that pose a threat to Plaintiffs, *i.e.*, the decision to designate persons under section 1(a) of the Executive Order and the decision to impose penalties under IEEPA for non-compliance, are delegated to agents of the President — namely, the other individual Defendants — against whom injunctive and declaratory relief is available. Therefore, Plaintiffs may challenge the Executive Order and the Regulations as *ultra vires* and seek to block their implementation by the subordinate official Defendants.[9]

### b. Applicability of the Informational Materials Exception

Plaintiffs allege that the Executive Order and the Regulations run afoul of IEEPA's "informational materials" exception, which prohibits the President from regulating or prohibiting, "directly or indirectly":

> the importation from any country, or the exportation to any country, whether commercial or otherwise,

---

[9] The Court declines Plaintiffs' invitation to weigh in on the viability of Plaintiffs' APA claim because Plaintiffs did not address the issue in their opening brief. (*See* Pl. Reply 9 n.7).

> regardless of format or medium of transmission, *of any information or informational materials*, including but not limited to, publications, films, posters, phonograph records, photographs, microfilms, microfiche, tapes, compact disks, CD ROMs, artworks, and news wire feeds.

50 U.S.C. § 1702(b)(3) (emphasis added). In Plaintiffs' view, the Regulations' reference to IEEPA's "personal communications" exception but omission of the "informational materials" exception "carries the implication that the Executive Order and Regulations do not exempt the importation or exportation of information or informational materials, as the statute requires." (Pl. Br. 23 (citing *Hardy* v. *N.Y.C. Health & Hosps. Corp.*, 164 F.3d 789, 795 (2d Cir. 1999)); *see also* Pl. Reply 10). And Plaintiffs contend that their speech is covered by that exception "because it is informational in nature, exported to the Netherlands, and transmitted telephonically or via the Internet." (Pl. Br. 23; *see also* Pl. Reply 10 (stating that section 1702(b)(2) "fully applies" to "Plaintiffs' advice, memoranda, and *amicus* briefs")).

Defendants respond that Plaintiffs' *ultra vires* challenge fails because the Executive Order expressly provides that it "shall be implemented consistent with applicable law," including IEEPA, and there is no reason to assume that it is OFAC's intention to prohibit conduct specifically exempted under IEEPA. (*See* Def. Opp. 23). *Cf. J.E.M. Ag Supply, Inc.* v. *Pioneer Hi-Bred Int'l, Inc.*, 534 U.S. 124, 143-44 (2001) ("[W]hen two statutes are capable of coexistence, it is the duty of the courts, absent a clearly expressed congressional intention to the contrary, to regard each as effective."); *Rattigan* v. *Holder*, 689 F.3d 764, 770 (D.C. Cir. 2012) (applying the "coexistence" canon to an apparent conflict

between a statute and an Executive Order).  Additionally, Defendants say, even if the omission potentially creates a problem with respect to materials covered by the exception, the exception does not apply to Plaintiffs' desired contributions.  (*See* Def. Opp. 24).  Plaintiffs' actions — the provision of "education, training, advice, and other forms of assistance" to the ICC and the Office of the Prosecutor — are "interactive services provided to a specific recipient over a period of time, not the export of 'standardized' information or informational materials in a 'widely circulated' fashion" to which the exception applies.  (*Id.*).

Any attempt by OFAC to impose IEEPA penalties for conduct covered by the "informational materials" exception plainly would be *ultra vires*.  But, at present, it is no more than speculation that OFAC intends to violate that provision in its enforcement of the Executive Order.  Defendants acknowledge that IEEPA's language is "clear" and that the Executive Order "'shall be implemented consistent with applicable law.'"  (Def. Opp. 23 (quoting Executive Order § 11(b))).  Furthermore, it is an open question whether OFAC will adopt the same narrow interpretation of "informational materials" as it has with respect to other sanctions regimes.  *See, e.g.*, 50 C.F.R. § 560.210(c)(2) (in the context of the Iranian sanctions regime, excluding from the exception, *inter alia*, "information or informational materials not fully created and in existence at the date of the transactions," "business consulting services," and "services to market, produce or co-produce, create, or assist in the creation of information or informational materials").  Accordingly, the question of the legal validity of

that interpretation of the exception, or any other potential interpretation, and

its applicability to the conduct in which Plaintiffs wish to engage, is not now

properly before the Court.

## C.    Irreparable Harm

Plaintiffs argue that the Executive Order limits Plaintiffs' speech by

subjecting them to enforcement under IEEPA, and thus causes irreparable

harm.  (Pl. Br. 24).  Defendants seemingly concede that irreparable harm is tied

up with the merits of the constitutional claims and do not contest it separately.

(*See* Def. Opp. 25 ("Plaintiffs' argument that they have demonstrated

irreparable harm depends entirely on them demonstrating a clear likelihood of

success on the merits of their First Amendment claim which, for the reasons

discussed above, they cannot do.")).

As relevant here, given Plaintiffs' likelihood of success on some of their

First Amendment claims, courts "presume[]" irreparable harm when a plaintiff

"alleges injury from a rule or regulation that directly limits speech."  *Bronx*

*Household of Faith* v. *Bd. of Educ.*, 331 F.3d 342, 349-50 (2d Cir. 2003).  *See*

*also N.Y. Progress & Prot. PAC*, 733 F.3d at 486 ("The loss of First Amendment

freedoms, even for minimal periods of time, unquestionably constitutes

irreparable injury." (quoting *Elrod* v. *Burns*, 427 U.S. 347, 373 (1976) (plurality

opinion))); *Evergreen Ass'n* v. *City of New York*, 740 F.3d 233, 246 (2d Cir.

2014) (finding irreparable harm based on the fact that the challenged law

"compels Plaintiffs to make disclosures or face penalties").  Furthermore,

Plaintiffs have "establish[ed] an actual chilling effect."  *Bronx Household,* 331

F.3d at 349.  The prospect of enforcement under IEPPA has caused Plaintiffs not to speak, and hence to forgo exercising their First Amendment rights.  (*See* Goldston Decl. ¶ 8; Amann Decl. ¶ 8; Sterio Decl. ¶ 8; deGuzman Decl. ¶ 9; Rona Decl. ¶ 7).  Thus, enjoining Defendants from enforcing IEEPA's civil and criminal penalties against Plaintiffs would eliminate this chill and prevent irreparable harm.  Accordingly, this factor weighs in favor of granting the preliminary injunction.

**D.      Balance of Equities and Public Interest**

Finally, the Court must "balance the competing claims of injury, consider the effect on each party of the granting or withholding of the requested relief, and pay particular regard to the public consequences in employing the extraordinary remedy of preliminary relief."  *725 Eatery Corp.* v. *City of New York*, 408 F. Supp. 3d 424, 469 (S.D.N.Y. 2019) (internal alterations, quotation marks, and citations omitted).  Plaintiffs argue that, given their likelihood of success on the merits of at least their First Amendment claim, they should prevail because "[t]he Government does not have an interest in the enforcement of an unconstitutional law."  (Pl. Br. 24 (quoting *N.Y. Progress & Prot. PAC*, 733 F.3d at 488)).  Defendants respond that the balance of the equities and the public interest weigh against a preliminary injunction because significant national security and foreign policy interests are at stake and an injunction would interfere with the President's determination of how best to proceed.  (*See* Def. Opp. 25 (citing, *inter alia*, *Holy Land Found. for Relief & Dev.* v. *Ashcroft*,

32

219 F. Supp. 2d 57, 84 (D.D.C. 2002); *Milena Ship Mgmt. Co.* v. *Newcomb*, 804 F. Supp. 846, 854 (E.D. La. 1992))).

The Court is mindful of the Government's interest in defending its foreign policy prerogatives and maximizing the efficacy of its policy tools. Nevertheless, "national-security concerns must not become a talisman used to ward off inconvenient claims — a 'label' used to 'cover a multitude of sins.'" *Ziglar* v. *Abbasi*, 137 S. Ct. 1843, 1862 (2017) (quoting *Mitchell* v. *Forsyth*, 472 U.S. 511, 523 (1985)). For largely the same reasons discussed above in the analysis of Plaintiffs' First Amendment claims, the Court concludes that the proffered national security justification for seeking to prevent and potentially punish Plaintiffs' speech is inadequate to overcome Plaintiffs' and the public's interest in the protection of First Amendment rights. *See N.Y. Progress & Prot. PAC*, 733 F.3d at 488 ("[S]ecuring First Amendment rights is in the public interest."). Accordingly, the Court finds that the balance of equities tips in Plaintiffs' favor.

## CONCLUSION

For the reasons stated above, Plaintiffs' Motion for a Preliminary Injunction is GRANTED in part. Defendants are hereby enjoined from enforcing IEEPA's civil or criminal penalty provisions against Plaintiffs for conduct specifically addressed in Plaintiff's Complaint and in this Opinion and Order, to the extent that such conduct is alleged to have been committed in violation of Executive Order 13,928.

The initial pretrial conference in this matter will take place on **February 4, 2021**, at **10:00 a.m**.

33

SO ORDERED.

Dated:     January 4, 2021
           New York, New York

 

_____
KATHERINE POLK FAILLA
United States District Judge