UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------ X
                                                                   :
UNITED STATES OF AMERICA                                           :
                                                                   :
                        -v.-                                       :              20-cr-15 (PKC)
                                                                   :
VIRGIL GRIFFITH                                                    :          OPINION AND ORDER
                                                                   :
                                        Defendant.                 :
                                                                   X
_____

CASTEL, U.S.D.J.

          Defendant Virgil Griffith is charged in an indictment with conspiring to violate

the International Emergency Economic Powers Act ("IEEPA"), 50 U.S.C. §§ 1701–1706. (Doc

9 at ¶ 1.)  The indictment alleges that an object of the fifteen-month conspiracy was to provide

services to the Democratic People's Republic of North Korea ("DPRK") without the required

government approvals.  (Id. at ¶ 2.)  He now moves to dismiss the indictment or, alternatively,

demands a bill of particulars.

          Defendant Griffith's motions and the government's speaking response rely on

facts that are not alleged in the grand jury's indictment.  Among the extraneous materials are

emails, documents, transcripts of remarks by Griffith made in the DPRK, audio recordings of

Griffith, statements made to the Federal Bureau of Investigation ("FBI") and the pre-indictment

complaint submitted in support of an arrest warrant.  In the main, the materials were produced

by the government to Griffith.  On the motions, the parties seek to draw inferences favorable to

their positions from these materials.

          Sometimes it is necessary to state the obvious.  If a grand jury returns a lawful

indictment that provides adequate notice and states a federal crime, a defendant who pleads not

guilty ordinarily must proceed to trial in order to be vindicated.  There is no procedure, generally speaking, for pretrial summary adjudication of a federal criminal prosecution.  In part, this is because of deference to the grand jury's finding of probable cause, the high burden of proof imposed on the government, the relatively limited discovery required under Rule 16, Fed. R. Crim. P., and the timing requirement under the Jencks Act for production of witness statements, 18 U.S.C. § 3500(a).

Examining the indictment in light of the parties' arguments, the Court concludes that it provides adequate notice of the charges against Griffith sufficient to enable him to prepare for trial and, if it becomes necessary, plead double jeopardy as a defense.  Further, upon review of the law governing the offense conduct, the indictment states a federal crime and violates no constitutional prohibition.  Thus, the motion to dismiss will be denied.  Griffith's demand for a bill of particulars will also be denied.

BACKGROUND

Griffith asserts that he is an American citizen from Tuscaloosa, who at the time of the acts underlying the indictment, was domiciled in Singapore working for the Ethereum Foundation as a Senior Researcher.  (Doc 65 (D. Mem.) at 8.)  His position was similar to a business development manager for the Foundation.  (Id. at 9.)  As part of his employment and interest in cryptocurrencies, Griffith spoke and gave presentations at various panels or conferences about the technology.  (Id.)

In August 2018, Griffith learned about a cryptocurrency conference in North Korea.  (D. Mem. at 10.)  Since early 2018, Griffith wanted to establish an Ethereum environment in the DPRK, at one point texting a colleague, "we'd love to make an Ethereum trip to the DPRK and setup an Ethereum node. . . . It'll help them circumvent the current

sanctions on them."  (Doc 72 (G. Mem.) at 12.)  Griffith also sent texts to a colleague speculating that while he was not sure why the DPRK was interested in cryptocurrencies, it was "probably avoiding sanctions."  (Id.)

In January 2019, Griffith applied to the State Department for permission to travel to the DPRK, informing them that he would speak at a cryptocurrency conference about "the applications of blockchain technology to business and anti-corruption."  (D. Mem. at 11; Doc 1 at ¶ 5.)  The State Department denied his request, though according to the defense, they did not inform him that traveling to DRPK or participating in the conference would violate United States law.  (Id.)  Griffith was determined to attend despite the denial, and sought the approval of the DPRK UN Mission in Manhattan.  He sent the mission (via email) copies of his CV, passport, and explained his desire to attend the conference.  (G. Mem. at 10.)  He was granted a visa a month later.

Griffith flew to the DPRK on April 18, 2019.  The conference was held from April 23 to April 24.  He flew back to Singapore on April 25.  (G. Mem. at 11.)  The parties characterize the nature of Griffith's presentation differently.  Griffith claims that he spoke before approximately 100 North Koreans, covering very basic information about use of blockchain technology, use of "smart contracts," and "information that one could readily learn from a Google search[.]"  (D. Mem. at 12.)  The government claims that Griffith gave a presentation and answered questions on cryptocurrency topics that were pre-approved by the DPRK and largely surrounded the potential to launder money and evade sanctions.  (G. Mem. at 11.)  The government obtained portions of audio recordings of the conference that have been produced to the defendant.

Upon returning to Singapore, Griffith visited the U.S. embassy to report his trip, and was interviewed by a State Department official for "several hours."  (D. Mem. at 12.)  On May 22, 2019, he traveled to New York and was interviewed by the FBI at their request.  (Id; G. Mem. at 19.)  On November 6, 2019, he was questioned over the phone by the FBI.  (Id.)  On November 12, 2019, he again was interviewed by the FBI, this time in San Francisco, where he voluntarily turned over his cell phone.  (D. Mem. at 12.)  On or about November 28, 2019, he was arrested at Los Angeles International Airport on a criminal complaint.  On January 7, 2020, an indictment was filed charging him with one count of conspiring to violate the IEEPA, 50 U.S.C. §§ 1701–1706.  (Doc 9 at ¶ 1.)

MOTION TO DISMISS THE INDICTMENT

The indictment must provide "a plain, concise, and definite written statement of the essential facts constituting the offense charged. . . ."  Rule 7(c)(1), Fed. R. Crim. P.  "An indictment must sufficiently inform the defendant of the charges against him and provide enough detail so that he may plead double jeopardy in a future prosecution based on the same set of events."  United States v. De La Pava, 268 F.3d 157, 162 (2d Cir. 2001).  "An indictment, however, need not be perfect, and common sense and reason are more important than technicalities."  Id.

Dismissal is only appropriate "in very limited and extreme circumstances. . . ." United States v. Broward, 594 F.2d 345, 351 (2d Cir. 1979).  Dismissal "is an 'extraordinary remedy' reserved only for extremely limited circumstances implicating fundamental rights."  De La Pava, 268 F.3d at 165; see also United States v. Fields, 592 F.2d 638, 647 (2d Cir. 1978) (dismissal of an indictment is "the most drastic remedy available" and an "extreme sanction").

A pretrial motion to dismiss an indictment must not weigh the sufficiency of the evidence.

United States v. Alfonso, 143 F.3d 772, 777 (2d Cir. 1998).

> A.   The Indictment Provides Adequate Notice and
>      Protection Against Double Jeopardy.

The indictment provides Griffith with adequate notice of the charges against him and protects against the risk of double jeopardy.  Here, the indictment on its face alleges the time period of the offense (in or about August 2018 to in or about November 2019), the place of the offense (this District, the DPRK and elsewhere), the participants in the conspiracy (Griffith and others known and unknown) and two objects of the conspiracy ("did provide and cause others to provide services to the DPRK, without first obtaining the required approval" and "would and did evade and avoid, and attempt to evade and avoid, the requirements of U.S. law with respect to the provision of services to the DPRK").  (Doc 9.)  It further alleges the laws (50 U.S.C. § 1705), regulations (31 C.F.R. §§ 510.212(a)-(b)) and Executive Orders (13466 and 13722) that Griffith is charged with having violated.

"An indictment need do little more than to track the language of the statute charged and state the time and place . . . of the alleged crime."  United States v. Tramunti, 513 F.2d 1087, 1113 (2d Cir. 1975) (citation omitted).  This indictment tracks the language of the IEEPA and accompanying regulations.  As such, it meets the threshold of providing notice of the charged offense, its approximate time frame and sufficient detail of the subject matter to enable the defendant to plead double jeopardy in any subsequent prosecution.  The indictment satisfies the Fifth and Sixth Amendments.  Whether the government can prove the allegations beyond a reasonable doubt or whether the defendant has a viable defense are matters left for trial.  "An indictment returned by a legally constituted and unbiased grand jury . . . if valid on

its face, is enough to call for trial of the charge on the merits." Costello v. United States, 350
U.S. 359, 363 (1956).

> ### B.   The Indictment Alleges Conduct that States a Crime.

While framed as a challenge to the face of the indictment and its legal and
constitutional infirmities, Griffith, in actuality, argues that the facts that are likely to be
presented at trial will not support a lawful conviction.  His argument vacillates between
complaining of the paucity of facts alleged in the indictment[1] and an assertion that the
government's evidence and theory of the case will not succeed in proving a crime: "While the
indictment lists not a single allegation of fact, based on the government's complaint, its filing in
this case, and the discovery it has produced to date, it appears that the government's theory is
that by attending and speaking at a blockchain conference in Pyongyang, Mr. Griffith provided
'services' because he 'provided the DPRK with valuable information on blockchain and
cryptocurrency technologies, and participated in discussions regarding cryptocurrency
technologies to evade sanctions and launder money.' "  (D. Mem. at 17–18.)

The Court will begin with a review of the statute, regulations and Executive
Orders that co-conspirators, including Griffith, allegedly agreed to violate.  It will then address
each of Griffith's principal arguments.

The IEEPA gives the President the authority "to deal with unusual and
extraordinary threat[s] . . . to the national security, foreign policy, or economy of the United
States" by "declar[ing] a national emergency with respect to such threat."  50 U.S.C. § 1701(a).
In exercising this power, the President may "investigate, regulate, or prohibit" as proscribed by
section 1702 of the act.  Criminal penalties under the act are for those who "willfully commit[],

---

[1] "There are scant other details. . . ." (D. Mem. at 15). "It . . .  is not a speaking indictment."  (Id.)  It "fails to set
out the acts of Mr. Griffith that the government believes are within the scope of the conspiracy. . . ."  (Id.)

willfully attempt[] to commit, or willfully conspire[] to commit, or aids or abets the commission of" a violation of the President's regulations or prohibitions issued pursuant to the IEEPA.  50 U.S.C. § 1705(c).

Pursuant to the statute, the President issued Executive Order 13466 in 2008 which declared an emergency to deal with the threat to national security posed by the DPRK. Exec. Order 13466, 73 Fed. Reg. 36787 (June 26, 2008).  Following this order, the Office of Foreign Assets Control ("OFAC") promulgated the North Korea Sanctions Regulations ("NKSR").  31 C.F.R. Part 500.  As diplomacy with the DPRK worsened, more Executive Orders were issued, and the NKSR were amended and reissued.  Most important here is Executive Order 13722, issued on March 15, 2016 that prohibits:

> (i)     the exportation or reexportation, direct or indirect, from the United States, or by a United States person, wherever located, of any goods, services, or technology to North Korea;. . . .
>
> (iii)   any approval, financing, facilitation, or guarantee by a United States person, wherever located, of a transaction by a foreign person where the transaction by that foreign person would be prohibited by this section if performed by a United States person or within the United States.

Exec. Order 13722, 81 Fed. Reg. 14943 (March 15, 2016).

Following Executive Order 13722, OFAC amended and reissued the NKSR to mirror the order's directive.  The regulations prohibit the "exportation or reexportation, directly or indirectly, from the United States, or by a U.S. person, wherever located, of any goods, services, or technology to North Korea" and "[a]ny conspiracy formed to violate the prohibitions set forth in this part[.]"  31 C.F.R. §§ 510.206(a), 510.212(b).  The regulations state that "U.S. persons may not, except as authorized by or pursuant to this part, provide legal, accounting, financial, brokering, freight forwarding, transportation, public relations, or other services to any person in North Korea or to the Government of North Korea. . . ."  31 C.F.R. §

510.405(d)(1).  It is this Executive Order and these regulations that Griffith is accused of violating.

Of considerable significance to Griffith's arguments are two amendments to the IEEPA that comprise an "information exception" to the act's regulatory reach.  In 1988, Congress exempted "informational materials" from sanctions regulations under the NKSR.  See Omnibus Trade and Competitiveness Act of 1988, Pub. L. No. 100–418, § 2502, 102 Stat. 1107, 1371 (1988) (codified at 50 U.S.C. app. § 5(b), 50 U.S.C. § 1702(b)) (the "Berman Amendment").  The Act did not define "informational materials," but stated that they non-exhaustively include "publications, films, posters, phonograph records, photographs, microfilms, microfiche, tapes, compact disks, CD ROMs, artworks, and news wire feeds."  50 U.S.C. § 1702(b)(3).  OFAC amended and reissued the NKSR to account for the amendment.

To clarify the reach of the exception, OFAC issued a regulation stating that the exemption did not apply to "transactions related to information or informational materials not fully created and in existence at the date of the transactions, or to the substantive or artistic alteration or enhancement of information or informational materials, or to the provision of marketing and business consulting services."  31 C.F.R. § 510.213(c)(2).  In 1994, Congress passed the Free Trade in Ideas Act ("FTIA"), which amended the IEEPA by slightly broadening the scope of "information" captured under the exception, noting that "information" was exempted "regardless of format of medium of transmission."  See Pub. L. No. 103–236, § 525, 108 Stat. 382, 474 (1994).  As the government notes, the FTIA did not direct OFAC to adjust the NKSR.  (G. Mem. at 37.)  No amendment was expressly mandated, and none was made to the regulation precluding materials not fully created or that have been substantively or artistically altered from qualifying under the information exception.

8

Griffith argues that his conduct does not meet the definition of providing "services" to the DPRK, as he only discussed well-known and well-understood features of cryptocurrency and blockchain technologies.  In the alternative, he argues that his conduct falls under the information exception of the Berman Amendment and FTIA, that the OFAC regulation defining the scope of the information exception is impermissible, and that his conduct is protected by the First and Fifth Amendments.

1.  The Government May Prove at Trial that an Object of the Conspiracy was to Provide "Services."

The parties agree that the NKSR do not define "services" itself, so they look to controlling case law.  "Services" has been defined for other regulations promulgated pursuant to the IEEPA, in particular, those imposing sanctions on Iran.

Griffith relies on United States v. Homa Int'l Trading Corp. for the principle that "[t]he term 'services' is unambiguous and refers to the performance of something useful for a fee."  387 F.3d 144, 146 (2d Cir. 2004).  He asserts that he was not paid by the DPRK to attend and speak at the conference.  He argues that under Homa, he has not provided services to the DPRK.

Subsequent Circuit law firmly points to the conclusion that the language in Homa was dicta.  The Second Circuit dealt with the same regulation as Homa—the ban of providing services to Iran—in United States v. Banki, 685 F.3d 99 (2d Cir. 2012).  But there, the Banki court noted that reading a fee requirement into the term "services" would allow entities and individuals to provide uncompensated assistance and services to Iranian corporations with no consequence.  Id. at 108.  Instead, the panel looked to the various dictionary definitions of "services," most of which did not require a fee.  See, e.g., Merriam–Webster's Collegiate Dictionary 1067 (a service is "useful labor that does not produce a tangible

commodity"); Black's Law Dictionary 1372 (7th ed. 1999) (a service is an "intangible commodity in the form of human effort.").  The panel noted the "broader text and purpose" of the statute and regulations, which were designed to have the sweeping effect of isolating Iran and concluded that the definition of services was also meant to be broad.  Id. at 107.  Against this backdrop, the conduct at issue in Banki (facilitating money transfers between individuals in the U.S. and Iran) was a service, regardless of whether a fee was paid or not.  The "language in Homa suggesting that the receipt of a fee [was] a necessary element of a 'service'" was relegated to mere "dicta."  Id.  Recent cases have consistently followed this broader definition of "services."  See, e.g., United States v. Atilla, 966 F.3d 118, 124 (2d Cir. 2020) (citing Banki to note that the execution of a bank transaction is a service under the Iranian sanctions regulations, whether a fee was exchanged or not); United States v. Nejad, 18-cr-224 (AJN), 2019 WL 6702361, at *4 (S.D.N.Y. Dec. 6, 2019) (adopting the broad definition of services from Banki).  The Court concludes that that Banki is the controlling law in this Circuit.  The failure to allege that Griffith was paid a fee by the DPRK does not render the indictment defective.  The indictment alleges an object of the conspiracy was "to provide services to the DPRK" (Doc 9 at ¶ 2).  This is sufficient and encompasses the provision of useful labor or human effort whether or not compensation was contemplated.

2. The Government May Prove at Trial that the "Services"
   Fall Outside the "Informational Exception."

Griffith further argues that, even if his speaking engagement is considered "services," the conduct is statutorily exempt from the NKSR under the information exception.  As interpreted by OFAC, the exception only applies to materials that are "fully created and in existence at the date of the transactions."  31 C.F.R. § 510.213(c)(2).

The exception has not been construed by the Second Circuit.  In determining what is included in this exception (again in the context of Iranian sanctions), the Third Circuit has stated that "the key distinction rests between informational materials that are widely circulated in a standardized format and those that are bespoke."  United States v. Amirnazmi, 645 F.3d 564, 587 (3d Cir. 2011).  Griffith argues that because his presentation was nothing more than "high-level publicly available information" without substantive alteration, it falls under the exception.  (D. Mem. at 23.)  The government characterizes his presentation differently.  It claims to have evidence that will show that Griffith drew diagrams on a whiteboard while speaking and concluded his time with a brief question-and-answer session. (G. Mem. at 20, 31.)  There is a factual dispute that, in the face of the grand jury's indictment, can only be resolved by a petit jury.

In the alternative, Griffith argues that OFAC's interpretation of the information exception is impermissible, and that the exception was not meant to be limited to preexisting material.  OFAC amended its regulations in light of the Berman Amendment to provide that "[t]he prohibitions contained in this part do not apply to the importation from any country and the exportation to any country of any information or informational materials . . . . "  31 C.F.R. § 510.213(c)(1).  It further provided that "This section does not exempt from regulation transactions related to information or informational materials not fully created and in existence at the date of the transactions, or to the substantive or artistic alteration or enhancement of information or informational materials, or to the provision of marketing and business consulting services."  31 C.F.R. § 510.213(c)(2).

Griffith relies upon a House Conference Report surrounding the passage of the FTIA which assertedly indicates that the information exemption was meant to be interpreted

broadly.  According to Griffith, a presentation consisting of exclusively public information is meant to be exempt from regulation, whether it is fashioned specifically to the needs of its audience or not.  (D. Mem. at 25.)  In response, the government again points to the Amirnazmi case, where the Third Circuit recited the history of the law, amendments, and corresponding regulations before concluding that "OFAC's interpretation of IEEPA's informational-materials exemption is 'based upon a permissible construction of the statute.' "  Amirnazmi, 645 F.3d at 586 (quoting Chevron U.S.A. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 843 n.9 (1984)).  The government (and the panel in Amirnazmi) also point to the fact that the FTIA did not direct OFAC to adjust its interpretive regulation.

The Court concludes that OFAC's interpretation of the information exception is permissible. "Since neither the Berman Amendment nor its legislative history is so clear as to make judicial deference inappropriate, the Court must defer to OFAC's interpretation. . . ." Capital Cities/ABC v. Brady, 740 F. Supp. 1007, 1012 (S.D.N.Y. 1990).  In enacting the Berman Amendment, "Congress sought to ensure the robust exchange of informational materials would not be unduly inhibited by OFAC."  Amirnazmi, 645 F.3d at 586.  OFAC's regulation does not impede this goal.  The Court provisionally defers to OFAC's interpretation of the statute.

Significantly, the grand jury has not charged Griffith with a substantive violation of the IEEPA but with a conspiracy to violate IEEPA.  The government has represented, both in their brief and at oral argument, that Griffith's speaking engagement at the April 2019 conference was a major step in a long-term plan to persuade and assist the DPRK in using Ethereum to avoid sanctions and launder money.  (See Gov. Mem. at 27; see also Doc 82 (12/22/2020 Transcript) at 22–23.)  Even if Griffith's presentation at the conference, taken in

isolation, did not qualify as the provision of services, or was exempt under the information exception, evidence at trial may be sufficient to demonstrate his guilt in conspiring to provide services.  The charged conspiracy is alleged to have been in existence from August 2018 through November 2019, extending seven months after the April speaking engagement. "[T]he law does not require that an indictment set forth every act committed by the conspirators in furtherance of the conspiracy."  United States v. Mostafa, 965 F. Supp. 2d 451, 467 (2d Cir. 2013).

The facts will emerge at trial.  The jury will be free to draw reasonable and permissible inferences and will decide the ultimate factual issues.  The Court declines the invitation to opine whether the government's proof will fail to establish "services" falling outside the information exception.

3.   The Statute, Regulations and Executive Orders as Applied to Griffith's Alleged Participation in the Charged Conspiracy Have Not Been Shown to Violate His First Amendment Rights.

Griffith next argues that "[t]he indictment should be dismissed because it seeks to criminalize pure speech."  (D. Mem. at 26.)  Elsewhere Griffith argues that "[t]o the extent that any OFAC regulation, as applied, criminalizes protected pure speech, it would violate Mr Griffith's First Amendment rights. . . ." (Id.)  Framed this way, he is asserting that the enforcement of the statute, regulations and Executive Orders against him violates his First Amendment free speech rights.

In making an "as applied" challenge, Griffith must show that the application of the law to him deprived him of a protected right.  Field Day, LLC v. Cnty. of Suffolk, 463 F.3d 167, 174 (2d Cir. 2006).  See also Picard v. Clark, 475 F. Supp. 3d 198, 203 (S.D.N.Y. 2020) (Cote, J) ("In an as-applied challenge. . . a court must assess whether a statute, even if

constitutional on its face, 'deprived the individual to whom it was applied of a protected right.' ") (quoting <u>Field Day</u>, 464 F.3d at 167).

The difficulty of an as applied challenge in this case arises from its present posture.  The indictment charges Griffith with participation in a fifteen-months' long conspiracy to violate the statute, regulation and Executive Orders.  No substantive crime is alleged.  In their briefing to this Court, the government and Griffith each venture beyond the indictment and do not agree on the precise contours of the conspiratorial activities.  The government claims that the co-conspirators agreed to advise the North Koreans on how "to evade and avoid sanctions by using blockchain and cryptocurrency technologies." (G. Mem. at 32.)  Griffith asserts that the government's evidence shows that his remarks at the April conference consisted of only "general articles in the public domain" and "very general information . . .  available on the Internet."  (D. Mem. at 18.)   Because the government's evidence has not been presented at a trial, Griffith's briefing does not address the seven-month period following the April 2019 conference.  He faces a practical difficulty in mounting as an applied challenge to a conspiracy charge in a pretrial setting.[2]

The Court assumes for the purpose of this motion that the regulatory scheme as applied and enforced against Griffith is subject to strict scrutiny.[3]  Strict scrutiny applies when

---

[2] Griffith's challenge presents both a different factual and procedural context than that in the recent thoughtful opinion of Judge Failla in <u>Open Society Justice Initiative v. Trump</u>, 20 cv 8121 (KPF), 2021 WL 22013 (Jan. 4, 2021).  There, the Court had a well-supported preliminary injunction record with seven filed declarations, rather than an indictment which merely states the allegations the government must prove.  <u>Id</u>. at *1, n.2.  The Executive Order and regulation in <u>Open Society</u> was addressed to the International Criminal Court ("ICC"), a creature of treaty, and not to a foreign state that "increasingly imperils the United States and its allies."  Exec. Order 13722, 81 Fed. Reg. 14943 (March 15, 2016).  The Executive Order and regulation in <u>Open Society</u> would have prevented assistance on ICC investigations "including those for which the United States has previously expressed support," <u>Open Society</u>, 2021 WL 22013, at *8, and was thus overbroad whereas any and all services or support of the DPRK is arguably detrimental to the interests of the United States.

[3] If, as the government argues, intermediate scrutiny is appropriate, then the regulatory scheme in surviving strict scrutiny would survive intermediate scrutiny as well.

the government regulation either "defin[es] regulated speech by particular subject matter," or "by its function or purpose," as "[b]oth are distinctions drawn based on the message a speaker conveys." Reed v. Town of Gilbert, 576 U.S. 155, 163–64 (2015). Such restrictions "are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests." Id. at 163. The narrow tailoring requirement is met only where "the challenged regulation is the least restrictive means among available, effective alternatives." Ashcroft v. ACLU, 542 U.S. 656, 666 (2004).

        The Court concludes that the government has a compelling interest in preventing the provision of services to the DPRK. The IEEPA explicitly authorizes the President "to deal with unusual and extraordinary threat[s.]" 50 U.S.C. § 17041(a). He has found that the situation in the DPRK is "an unusual and extraordinary threat to the national security and foreign policy of the United States[.]" Exec. Order 13466, 73 Fed. Reg. 36787 (June 26, 2008). Since then, several more Executive Orders have been issued, each specifying the reasons why the national security threat is increasing. Executive Order 13551 cites the "unprovoked attack that resulted in the sinking of the Republic of Korea Navy ship Cheonan and the deaths of 46 sailors in March 2010" and "the announced test of a nuclear device and its missile launcher in 2009[.]" Exec. Order 13551, 75 Fed. Reg. 53837 (Aug. 30, 2010). Executive Order 13722, the Order promulgating the services ban at issue here, cites the "February 7, 2016, launch using ballistic missile technology and [the] January 6, 2016, nuclear test[.]" Exec. Order 13722, 81 Fed. Reg. 14943 (March 15, 2016). As several courts have held, "maintaining national security. . . is a public interest of the highest order." American Civil Liberties Union v. Clapper, 785 F.3d 787, 826 (2d Cir. 2015).

The Court also concludes that the regulatory scheme is narrowly tailored to achieve this compelling government interest.  First, the regulations and Executive Orders are aimed at a designated country: DPRK.  Second, the regulatory scheme has an express exemption that forecloses enforcement against "the exportation to any country of any [pre-existing] information or informational materials . . .  whether commercial or otherwise, regardless of format or medium of transmission."  31 C.F.R. § 510.213(c)(1) & (2).  Third, the regulations implement a licensing scheme.  Griffith could have but did not seek a license from OFAC to attend the conference and render services to the DPRK.  (See Doc 86 – Ex. C and Ex. D.)  Lastly, the government seeks to enforce the regulatory scheme against Griffith under a criminal statute that requires it to prove beyond a reasonable doubt that he "willfully" conspired to violate the law.  50 U.S.C. § 1705(c).  In combination, the Court concludes that the regulatory scheme is narrowly tailored to achieve a compelling government interest and survives strict scrutiny as applied to Griffith.

This holding is consistent with Holder v. Humanitarian Law Project, 561 U.S. 1, 28 (2010), in which the Supreme Court held that a ban on providing "service" or "material support" to foreign entities designated as "foreign terrorist organizations" survived strict scrutiny.  The statute in Holder, in the Court's words, reached "material support . . .  in the form of speech."  Id. at 28.  The support at issue consisted generally of "monetary contributions. . . legal training, and political advocacy . . ." Id. at 10.  But the Court noted that the regulations were targeted only at "designated" terrorist organizations, id. at 36, the criminal enforcement provisions required that the person have acted "knowingly," id., and the regulations did not prohibit independent advocacy on behalf of the designated groups, even though it prohibited advocacy in coordination with or at the behest of such groups, id. at 24.

Griffith cites to a Ninth Circuit case sustaining a First Amendment challenge to an OFAC regulatory scheme prohibiting coordinated political advocacy with an Oregon-based group that had been classified as a "specially designated global terrorist." Al Haramain Islamic Foundation Inc. v. U.S. Dept. of Treasury, 686 F.3d 965 (9th Cir. 2012). But there, the proposed services were to be rendered by a fully domestic organization to a "domestic branch office" of a foreign entity. The Ninth Circuit explicitly distinguished the case before it from "the Supreme Court's concern about foreign nations' perception of 'Americans furnishing material support to foreign groups.' " Al Haramain, 686 F.3d at 1000 (quoting Holder, 561 U.S. at 33). The Ninth Circuit also concluded that the services under scrutiny in Al Haramain were unlikely to raise any money for the designated terrorist organization, and that even if they did, the organization's assets were frozen by law. Id. at 999. Because of the non-monetary and domestic nature of the advocacy at issue in Al Haramain, the Ninth Circuit held that the organization had "a First Amendment right to engage in the forms of coordinated advocacy that it seeks, such as holding a joint press conference with AHIF–Oregon" and that "[t]he content-based prohibitions . . . violate the First Amendment." Id. at 1001.

Griffith's challenge has nothing to do with advocacy, whether independent or coordinated. He is charged with knowingly and willfully participating in a conspiracy to provide services to the DPRK, a foreign state which "increasingly imperils the United States and its allies." Exec. Order 13722, 81 Fed. Reg. 14943 (March 15, 2016). It will be part of the government's burden to prove that (1) Griffith knowingly and willfully joined a conspiracy with knowledge of its unlawful object, i.e. the providing services to the DPRK; (2) that the services were to be more than providing preexisting information; and (3) the services were to be provided without a required OFAC approval. Applying strict scrutiny, the regulatory scheme as

applied to Griffith serves a compelling foreign policy interest of the United States and imposes the least restrictive burden on speech.[4]

> 4. The Statute, Regulation and Executive Orders provide
> Fair Warning of The Prohibited Conduct.

Griffith also argues that he did not have fair warning of the "novel" construction of "service" relied on by the government and thus his prosecution violates his Fifth and Sixth Amendment rights.  (D. Mem. at 30.)  "As generally stated, the void-for-vagueness doctrine requires that a penal statute define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement."  United States v. Rybicki, 354 F.3d 124, 129 (2d Cir. 2003) (quoting Kolender v. Lawson, 461 U.S. 352, 357 (1983)).  Emphasis is given to the notice requirement when the statute "implicates First Amendment values."  Marks v. United States, 430 U.S. 188, 196 (1977).

"A scienter requirement may mitigate a law's vagueness, especially where the defendant alleges inadequate notice."  Rubin v. Garvin, 544 F.3d 461, 467 (2d Cir. 2008) (citing Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc., 455 U.S. 489, 499 (1982)).  Where "the punishment imposed is only for an act knowingly done with the purpose of doing that which the statute prohibits, the accused cannot be said to suffer from lack of warning or knowledge that the act which he does is a violation of law."  United States v. Tannenbaum, 934 F.2d 8, 12 (2d Cir. 1991) (quoting Screws v. United States, 325 U.S. 91, 102 (1945) (plurality

---

[4] Services by their nature are intangible and are often rendered through the words of the service-provider, whether lawyer, accountant, financial advisor or technology advisor.  As alternative holding, the Court concludes that speech concerning cryptocurrency transactions or  blockchain technology is "an essential but subordinate component" of the service and "it lowers the level of appropriate judicial scrutiny."  Ohralik v. Ohio State Bar Ass'n, 436 U.S. 447, 457 (1978).

opinion)) (Bank Secrecy Act provision requiring reporting by financial institutions not void for vagueness when applied to an individual because the Act defined financial institutions to include "[a] person who engages as a business in dealing in or exchanging currency" and defendant knew he was "committing a wrongful act.").

The IEEPA has a scienter requirement; it only punishes those who "willfully commit[], willfully attempt[] to commit, or willfully conspire[] to commit, or aids or abets the commission of" the law or regulations.  50 U.S.C. § 1705(c).  In order to succeed, the government will have to prove beyond a reasonable doubt that Griffith willfully violated the law.  The government represents that it will offer evidence that Griffith expressed a desire to return to the DPRK and help them utilize cryptocurrency and blockchain technology but knew that he would likely have to send someone in his place to avoid violating the law.  (G. Mem. at 21.)  He was aware that the use of cryptocurrency would enable the DPRK to flout international sanctions.  (Id. at 12.)  For this reason, Griffith fails in his void for vagueness challenge to the statute, regulations and Executive Orders.

For the reasons explained above, the indictment states a crime and Griffith's motion to dismiss it is denied.

MOTION FOR A BILL OF PARTICULARS

Griffith also moves for a bill of particulars under Rule 7(f), Fed. R. Crim. P. Specifically, he asks for a bill of particulars to identify (1) the "services" he has allegedly provided to the DPRK; (2) all known co-conspirators; and (3) the acts and events that occurred in the Southern District of New York.  For the reasons stated herein, the motion will be denied.

Rule 7(f) permits a Court to direct the government to file a bill of particulars when necessary to allow a defendant "to prepare for trial, to prevent surprise, and to interpose a

plea of double jeopardy should he be prosecuted a second time for the same offense."  United States v. Bortnovsky, 820 F.2d 572, 574 (2d Cir. 1987).  "A bill of particulars is required only where the charges of the indictment are so general that they do not advise the defendant of the specific acts of which he is accused."  United States v. Chen, 378 F.3d 151, 163 (2d Cir. 2004) (quoting United States v. Walsh, 194 F.3d 37, 47 (2d Cir. 1999)).  However, "[a] bill of particulars is not a general investigative tool, a discovery device or a means to compel the government to disclose evidence or witnesses to be offered prior to trial."  United States v. Gibson, 175 F. Supp. 2d 532, 537 (S.D.N.Y. 2001).  "The decision of whether or not to grant a bill of particulars rests within the sound discretion of the district court.  Generally, if the information sought by the defendant is provided in the indictment or in some acceptable alternate form, no bill of particulars is required."  Bortnovsky, 820 F.2d at 574 (internal citations omitted).

Griffith contends that he is in the dark as to the services he is accused of providing to the DPRK.  But Griffith's briefing to this Court makes it plain that through discovery he has learned much of the government's evidence.  He does not seek the bill of particulars simply as a means to learn facts, but to limit proof at trial.   As already stated, a bill of particulars is not a discovery tool to limit the government's evidence.  See Gibson, 175 F. Supp. 2d at 537.

Griffith is not accused of providing services to the DPRK; he is accused of participating in a conspiracy that existed over an extended time period to "provide and cause others to provide services to DPRK" and to "evade and avoid, and attempt to evade and avoid" United States sanctions on the DPRK.  (Doc 9 at ¶¶ 2–3.)   A conspiracy by definition includes two or more persons and this conspiracy is alleged to have taken place over fifteen months.

Requiring the government to delineate each "service" separately is unnecessarily confining and will lead to unwarranted semantic debate as to whether the conspiratorial agreement encompassed numerous overlapping services each of which must be separately delineated or one or more all-encompassing services.

Griffith also moves to have the government identify all known co-conspirators. The government is "under no obligation to give [Griffith] advance warning of the witnesses who would testify against him." United States v. Alessi, 638 F.2d 466, 481 (2d Cir. 1980) (citing Weatherford v. Bursey, 429 U.S. 545, 559 (1977)); see also Gibson, 175 F. Supp. 2d at 537.

Cases on which Griffith relies involved widespread drug distribution rings with over ten defendants and far more co-conspirators. United States v. Leno, 00-cr-632 (WHP), 2001 WL 8356 (S.D.N.Y. Jan. 2, 2001); United States v. Feola, 651 F. Supp. 1068 (S.D.N.Y. 1987). He also relies on false claims cases in which defendants submitted many claims, but the original indictment did not specify which were allegedly false. See Bortnovsky, 820 F.2d at 574 (defendants entitled to a bill of particulars delineating which insurance claims for burglaries were false when 4,000 documents were produced relating to twelve claims); United States v. Nachamie, 91 F. Supp. 2d 565, 571 (S.D.N.Y. 2000) (defendant entitled to a bill of particulars delineating which Medicare claims were false when 200,000 documents were produced that related to 2,000 claims). In those cases, by forcing the defendants to identify which claims were false, "the burden of proof [was] impermissibly . . . shifted to [defendants]." Bortnovsky, 820 F.2d at 575. Griffith's indictment is a far cry from this. It alleges one count of conspiring to provide services to the DRPK. He is fully aware that the conspiracy is alleged to have lasted

fifteen months and surrounded his desire to assist the DRPK in developing cryptocurrency capabilities.

Lastly, Griffith moves to have the government set forth all relevant events that took place in the Southern District of New York.  But Griffith has already moved to dismiss the indictment for improper venue, and the Court denied the motion.  (Doc. 53.)  As the Court has already held, "courts in this Circuit have found venue to be proper where a jury could reasonably conclude that the emails in question were sent or received in the relevant district." (Id.) (collecting cases).  The government alleges that certain acts furthering the conspiracy occurred in the Southern District of New York and has specified at least one such specific act. (G. Mem. at 61.)  At trial, the government will have the burden of proving that an act furthering the conspiracy took place within the district, by a preponderance of the evidence.  United States v. Tzolov, 642 F.3d 314, 318 (2d Cir. 2011).  And "the defense will be free to contest the government's evidence concerning venue and present its own theory, should it choose to do so." (Doc 53.)  A bill of particulars is not a method for the defendant to frame an argument that the government's trial evidence concerning venue will be insufficient.  United States v. Murgio, 209 F. Supp. 3d 698, 720–21 (S.D.N.Y. 2016).

CONCLUSION

Having considered the entirety of his arguments, defendant Virgil Griffith's motions to dismiss the indictment and for a bill of particulars are DENIED.  The Clerk is directed to terminate the motions (Docs 62, 65).

SO ORDERED.

P. Kevin Castel
United States District Judge

Dated: New York, New York
      January 27, 2021