

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

March 5, 2021

**BY ECF**

Honorable P. Kevin Castel
United States District Judge
Southern District of New York
500 Pearl Street
New York, New York 10007

  Re: *United States v. Virgil Griffith*, 20 Cr. 15 (PKC)

Dear Judge Castel:

  The Government writes in response to the defendant's request to adjust his conditions of pretrial release to allow (i) substitution of a curfew instead of home detention enforced by electronic monitoring; and (ii) general travel to Los Angeles with 48-hours' notice to the Pretrial Services Department. The Government respectfully submits that the defendant has failed to present new information or changed circumstances to justify reopening this Court's bail determinations, and that the proposed modifications are inappropriate in light of the serious risk of flight and danger to the community presented by Griffith.[1]

<u>**Background**</u>

  As brief background, Griffith was arrested on November 28, 2019 at the Los Angeles International Airport before boarding a flight to Baltimore, Maryland. On December 2, 2019, Griffith was presented in the Central District of California ("CDCA"). While a magistrate judge in CDCA initially ordered the defendant bailed on certain conditions, Judge Cote, sitting in Part I, stayed the CDCA release order pending the defendant's arrival in this District. On December 26, 2019, the defendant was presented before Magistrate Judge Moses, who ordered the defendant detained, citing the defendant's significant cryptocurrency assets, lack of transparency regarding the defendant's financial holdings, delay in disclosing an unknown residence in Puerto Rico, lack of ties to the United States, the nature of the offense conduct, and the defendant's own statements expressing interest in renouncing his U.S. citizenship, purchasing citizenship

---

[1] With apologies, the Government seeks leave to file this letter *nunc pro tunc*. The parties initially proposed, and the Court adopted, a schedule requiring the Government's opposition no later than March 2, 2021. The undersigned inadvertently failed to adhere to that schedule and regret the error. In light of that error and after discussions with defense counsel, the parties propose that the defendant be granted additional time to reply to the Government's opposition and propose a reply date of March 12, 2021.

elsewhere, and setting up a money laundering operation in North Korea. Presentment Tr. 46-48 (attached hereto as Exhibit A). Griffith appealed that order to Judge Broderick, who was sitting in Part I.

On December 30, 2019, Judge Broderick ordered the defendant released on bail under strict conditions.  Those conditions included:  (1) a $1,000,000 bond co-signed by the defendant's sister, father, and mother; (2) securing the bond with two homes owned by the sister and parents; and (3) home detention in his parents' home in Alabama with electronic and GPS monitoring. *See* Dkt. 8. Judge Broderick also allowed the defendant to travel to the New York area for the purpose of attending court or meeting with his attorneys. *See id*. ¶ 8. Judge Broderick's order further provided that "[t]o the extent the Government deems it necessary, in connection with all visits to and from the New York Districts, Defendant shall be accompanied to the airport by an agent of the Federal Bureau of Investigation or other investigative agency designated by the Government, who shall ensure that he boards his flight." *Id*.

On July 20, 2020, the defendant moved to modify his bail conditions, including by removing the same home detention provision he challenges again. *See* Dkt. 48. On July 24, 2020, the Court denied the defendant's request for a bail modification, ruling:

> I will point out that the proof of risk of flight, which I find by a preponderance of the evidence is supported by the defendant's obvious access to sources outside the United States. He is of great value to those who wish to evade U.S. or U.N. sanctions with his knowledge and they would be incentivized to help him flee. So I find that the conditions that are presently existent satisfy that.
>
> Further, this is my finding by clear and convincing evidence that the conditions are necessary because Mr. Griffith presents a danger to the community and persons in that community other than himself. . . . [I]t is . . . the willingness to travel knowing of the likely exposure of the risk he was willing to take is such that this man in my view has the ability to respond to detailed questions with technical information and knowledge that poses a grave danger. That's my concern here and the modest restrictions that Judge Broderick imposed appear to me to address that danger as well as the risk of flight.

Dkt. 56 at 24-25 (attached hereto as Exhibit B).

On February 11, 2021, the defendant submitted a letter requesting, with the Government's consent, modifications of his pretrial release, including: to allow the use of an e-reader, to remove the drug testing requirement, and allow the use of email, subject to monitoring by Pretrial Services. *See* Dkt. 92. The Government would not consent, however, to the defendant's release from home detention or general travel to Los Angeles on 48 hours' notice and, on February 23, 2021, the defendant filed the instant motion for a bail modification. *See* Dkt. 95.

## Legal Standards

A determination of bail conditions "may be reopened . . . at any time before trial if the judicial officer finds that information exists that was not known to the movant at the time of the hearing and that has a material bearing on the issue whether there are conditions of release that will reasonably assure the appearance of such person as required and the safety of any other person and the community." 18 U.S.C. § 3142(f)(2)(B); *see also United States v. Rodriguez*, 2015 WL 6503861, at *1 (S.D.N.Y. Oct. 26, 2015) ("[T]he hearing can be reopened if the court finds that information exists that was not known to the defendant at the time of the hearing and that has a material bearing on the issue that was decided."). However, "[a] bail hearing should not be reopened on the basis of information that was available to the defendant at the time of the hearing." *United States v. Lewis*, No. 16 Cr. 212, 2016 WL 6902198, at *2 (S.D.N.Y. Nov. 16, 2016) (citing *United States v. Hare*, 873 F.2d 796, 799 (5th Cir. 1989). Courts in this District have found that "new and material information for Section 3142(f)(2)(B) purposes consists of something other than a defendant's own evaluation of his character or the strength of the case against him: truly changed circumstances, something unexpected, or a significant event." *United States v. Esposito*, 354 F.Supp.3d 354, 358-59 (S.D.N.Y. 2019) (*quoting United States v. Quinones*, No. 13 Cr. 83S, 2016 WL 1694998, at *1 (W.D.N.Y. Apr. 28, 2016)).

The Government bears the burden of showing by a preponderance of the evidence that the defendant poses a risk of flight or, by clear and convincing evidence, that the defendant poses a danger to the community, and that no condition or combination of conditions can address those risks. *See* 18 U.S.C. § 3142(f); *United States v. Sabhnani*, 493 F.3d 63, 75 (2d Cir. 2007); *United States v. Mercedes*, 254 F.3d 433, 436 (2d Cir. 2001).

In assessing a defendant's risk of flight and the danger to the community presented by release, a court must consider four factors:

> (1) the nature and circumstances of the offense charged . . . ;

> (2) the weight of the evidence against the person;

> (3) the history and characteristics of the person, including—

>> (A) the person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings; and

>> (B) whether, at the time of the current offense or arrest, the person was on probation, on parole, or on other release pending trial, sentencing, appeal, or completion of sentence for an offense under Federal, State, or local law; and

(4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release.

18 U.S.C. § 3142(g).

## Discussion

The defendant's proposed bail modifications are inappropriate because the defendant has not identified any new and material information justifying his request to modify his bail conditions, and because the proposed modifications do not adequately account for the fact that Griffith remains a risk of flight and danger to the community, as the Court found as recently as July 2020.

Regarding Griffith's request to substitute a curfew for home detention, the Court already considered and rejected such a proposal. Then as now, Griffith is a flight risk. Griffith has significant ties to foreign jurisdictions. For years prior to his arrest, Griffith worked for a European organization and lived in Singapore. Shortly before his arrest, he was actively exploring renouncing his United States citizenship, including by paying thousands of dollars to purchase citizenship in Caribbean nations. Ex. A, Presentment Tr. 11-12. Griffith appears to have believed that this wealth could help him avoid serious criminal sanctions, including with respect to the conduct at issue in this very case. Shortly after leaving the DPRK, on or about April 26, 2019, Griffith wrote in a series of electronic messages to his mother:

> Griffith: I think I'm going to be the connector in Blockchain-mediated economic relations between dprk and South Korea
>
> Griffith: Should be fun
>
> Griffith: Hopefully won't have much jail time for it
>
> Griffith: I'll try to be wealthy enough to pay my bail.

On top of his foreign ties, wealth, and disregard for the law, the defendant's specialized skills and expertise indicate he has access to means to facilitate flight. The defendant is highly technologically adept, with substantial knowledge of and experience with the darkweb, which can be used to obtain, among other things, false identifications, requiring restrictions even on his use of the Internet to ensure he does not flee prosecution. *See* Dkt. 50 at 7-8.

Moreover, the evidence against Griffith has only grown stronger since the bail hearing. The Government now has audio recordings of parts of Griffith's presentation and his answers to questions during the 2019 Cryptocurrency Conference in Pyongyang, which included highly technical information about blockchain and cryptocurrency technologies. As detailed in its opposition to the defendant's pretrial motions, the Government has also obtained additional communications between Griffith and several other people, which establish that Griffith intended to help North Korea evade sanctions through the use of blockchain and cryptocurrency technologies long before and even after the conference he attended. Moreover, the Court recently denied the defendant's motions, *see* Dkt. 89, 99, making even more likely the defendant's eventual

trial on the pending charge. On that charge, Griffith faces significant sentencing exposure if he is convicted—the Government's preliminary calculation of the Sentencing Guidelines Range is 57 to 71 months' imprisonment. The fact that the proof against the defendant is very strong and he faces significant time in prison if convicted provides him with a strong incentive to flee.

The defendant argues that concern about the defendant's access to financial resources "has been addressed" because he no longer has access to the cryptocurrency wallets he kept in his Singapore apartment. Dkt. 95 at 3. The amelioration of that concern, however, depends on Griffith's having told Pretrial Services the complete truth about his access to untraceable cryptocurrency. Indeed, Judge Moses found it "troubling" that Griffith chose not to provide full disclosures of his financial holdings, particularly given his expertise in cryptocurrency, and noted that his unknown wealth could make the value of a bond secured by his parents' home "pale in comparison." Ex. A, Presentment Tr. 26, 46. In the information that Griffith did disclose, he admitted that he held substantial cryptocurrency assets on unspecified exchanges accessible via the Internet, and not solely in these "cold storage" wallets in the Singapore apartment. *Id.* at 15-16. The Government and Pretrial Services have never received a full report of the defendant's financial holdings, making it impossible to assess whether the value of the bond is sufficiently meaningful to this defendant. Moreover, the prices of cryptocurrencies have skyrocketed over the past year, and so even small amounts of cryptocurrency that Griffith retained, or acquired since his arrest, would provide substantial assets that could be used to flee and compensate the family members who signed his bond for any losses if the bond is forfeited. For example, the value of a *single* ether, the unit of currency of the Ethereum Foundation, is presently worth approximately $1,494.87 U.S. dollars.[2] The rate of return on investments in ether is approximately 99.88% over just the past year to date. *Id.* As a result, Griffith's finances, known to be primarily held in cryptocurrency, could be worth significantly more today than they were even one year ago. A single year of Griffith's salary at Ethereum – reported by him to be $150,000 annually – could be worth tens, if not hundreds, of millions of dollars if it was held in ether.[3]

As the Court determined, the "grave danger" that the defendant presents to the community justifies strict conditions of pretrial release. Dkt. 56 at 24-25. That risk of danger has not changed since the time of the defendant's arrest. The charges reflect that the defendant used his expertise to conspire to provide financial services to a hostile foreign power, the DPRK, and DPRK persons. As the Court knows, the defendant's contact with law enforcement after he returned from the DPRK did not deter him from continuing to pursue efforts to illegally provide services to North Korea. As evidenced by his private text message conversations, the defendant continued to pursue projects in the DPRK, including the planned 2020 DPRK Cryptocurrency Conference, even as he was meeting with FBI agents.[4] Griffith's electronic communications show that he attempted to

---

[2] *See* https://www.coindesk.com/price/ethereum (last visited March 5, 2021).

[3] As recently as January 2017, when Griffith was employed by Ethereum, the price of a single unit of ether was as little as $7. https://www.investopedia.com/news/how-did-ethereums-price-perform-2017/ (last visited March 5, 2021).

[4] The 2020 DPRK Cryptocurrency Conference was ultimately cancelled after United Nations experts warned the public not to attend and flagged the event as a likely violation of international sanctions. *See* https://www.reuters.com/article/us-northkorea-sanctions-un-exclusive/exclusive-u-

recruit approximately eight other U.S. Citizens to attend with him. In August 2019, the defendant told an associate in a series of electronic messages that he intended to go back to North Korea to engage in a transaction which he explicitly acknowledged would violate sanctions. When the associate expressed concern that "[i]t makes me nervous for you to defy the US government and go again," Griffith stated that he would "figure something out." The next day, Griffith stated in a voice message to the same person: "Probably worst comes to worst, I'll find someone to send as like an emissary to go and I'll like tell that person what to do via the phone.  Yeah, I can always do that, because it seems like the Americans let you get away with it once." Following those conversations, only approximately two months before his arrest, Griffith sent text messages where he proposed founding "a money laundering company in North Korea," should he be fired from his position at the Ethereum Foundation. As this Court recognized, these activities make the defendant highly valuable to those who wish to evade U.S. and U.N sanctions, posing a clear danger to national security.

Also fatal to the defendant's motion is his failure to demonstrate the need for an adjustment from home detention, other than to say that it is an inconvenience to alert Pretrial Services in advance of trips to the grocery store. *See* Dkt. 95 at 3. This is an insufficient basis for reopening the prior bail determinations. Judge Broderick—and later this Court—found that home detention was the least restrictive condition that would adequately ensure the safety of the community and the defendant's appearance in Court. If Griffith wishes to leave his home, he could work outside his parents' home, as permitted by the home detention ordered by the Court. Thus far, however, he has chosen not to do so. That Griffith would prefer to leave his home at times of his choosing is unsurprising, but not a basis for a bail modification.

The Government also opposes the defendant's request, as currently framed in his application, for a bail modification permitting trips to Los Angeles. As the Government advised defense counsel in our discussions, the Government is sensitive to the defendant's need to consult with counsel and would consent to particular trips, if proposed. General access to fly from Alabama to Los Angeles, however, would undermine the Court's bail conditions and is unnecessary and impractical during the ongoing COVID-19 pandemic. Because the defendant presents such a significant flight risk, any air travel, particularly to international airports, is highly problematic. For this reason, the defendant's current conditions provide that for any air travel to New York, the Government may arrange to have Griffith "accompanied to the airport by an agent of the Federal Bureau of Investigation or other investigative agency designated by the Government, who shall ensure that he boards his flight." *See* Dkt. 8. The notice conditions in place for travel to New York also permit the Government to conduct surveillance of Griffith's travel if deemed necessary. At a minimum, the Government submits that the same conditions and restrictions should apply to any travel to Los Angeles for the defendant, and that as a result, 48 hours' notice to Pretrial Services for travel to Los Angeles is not viable to ensure the availability of adequate supervision.

---

n-sanctions-experts-warn-stay-away-from-north-korea-cryptocurrency-conference-idUSKBN1ZE0I5 (last visited March 5, 2021).

The defendant's request is further complicated by the COVID-19 pandemic.[5] Under current quarantine requirements, any trip by Griffith to California would require a stay of at least 11 days away from his home detention in order to accommodate even a single day of meetings with counsel. The Government is fully prepared to work with the defense to make arrangements to permit Griffith to do so for planned meetings with his counsel with sufficient notice to the Government, but such extensive surveillance coverage for more than a week at a time, particularly in another jurisdiction, simply cannot be arranged on the ad-hoc broad basis that the defendant proposes.

The defendant argues that they are merely seeking parity between the defendant's ability to travel to New York and travel to Los Angeles. But the defendant's access to Los Angeles is accompanied by additional risks not present for trips to New York. As described above, the defendant was arrested in Los Angeles, where he had been staying with friends in the days before his apprehension. Such a social network could be helpful in facilitating the defendant's flight from prosecution. The Government remains willing to work with the defense to arrange appropriate supervision of the defendant for specified trips to Los Angeles if necessary for him to meet with his counsel, but such general access presents an increased risk of flight. The Government notes that the defendant already remains able to travel to New York to meet with counsel here, or to have his counsel travel (whether from New York or Los Angeles) to Alabama to meet him. However, the defendant's choice to engage counsel in Los Angeles, in addition to counsel in New York, does not justify general travel to Los Angeles for a defendant on home detention, for weeks at a time, with as little as 48 hours' notice. Such a change in conditions would not be adequate to protect against the defendant's risk of flight.

---

[5] The state of California presently requires a self-quarantine period of 10 days for any incoming travelers from other states, prior to meeting with any persons outside their household. *See* "Do I need to self-quarantine when I arrive in California?," available at https://covid19.ca.gov/travel/#:~:text=Traveling%20into%20California%20from%20other,health care%20needs%20or%20other%20emergency (last visited March 5, 2021).

## Conclusion

For the foregoing reasons, the defendant's requests to modify his bail conditions should be denied.

Respectfully submitted,

AUDREY STRAUSS
United States Attorney for the
Southern District of New York

By:      _____/s/_____
Kimberly Ravener / Kyle A. Wirshba
Assistant United States Attorneys
(212) 637-2358 / 2493

Cc:    Brian Klein, Esq.
Sean Buckley, Esq.
Attorneys for Virgil Griffith (By ECF)

# Exhibit A

```
 1                      UNITED STATES DISTRICT COURT
                       SOUTHERN DISTRICT OF NEW YORK
 2

 3   ------------------------------------X   **SEALED PROCEEDING**
                                        :
 4   UNITED STATES OF AMERICA,          :   19-MJ-10987
                                        :
 5                                      :   December 26, 2019
                   v.                   :
 6                                      :   500 Pearl Street
     VIRGIL GRIFFITH,                   :   New York, New York
 7                                      :
                      Defendant.        :
 8   ------------------------------------X

 9
                TRANSCRIPT OF CRIMINAL CAUSE FOR ARRAIGNMENT
10               BEFORE THE HONORABLE BARBARA C. MOSES
                      UNITED STATES MAGISTRATE JUDGE
11

12   APPEARANCES:

13

14   For the Government:           KIMBERLY RAVENER, ESQ.
                                   United States Attorney's Office
15                                 Southern District of New York
                                   1 Saint Andrews Plaza
16                                 New York, New York 10007

17   For the Defendant:            SEAN BUCKLEY, ESQ.
                                   Kobre & Kim
18                                 800 Third Avenue
                                   New York, New York 10022
19

20

21   Court Transcriber:            SHARI RIEMER, CET-805
                                   TypeWrite Word Processing Service
22                                 211 N. Milton Road
                                   Saratoga Springs, New York 12866
23

24

25


     Proceedings recorded by electronic sound recording,
     transcript produced by transcription service
```

2

1   **(GOVERNMENT MICROPHONE NOT WORKING.)**

2           THE CLERK:  <u>USA v. Virgil Griffith</u>.  Counsel, state

3   your name for the record.

4           MS. RAVENER:  Good afternoon, Your Honor.  Kimberly

5   Ravener for the Government.

6           THE COURT:  Good afternoon.  You may be seated.

7   Ladies and gentlemen in the back, you may be seated.

8           MR. BUCKLEY:  Good afternoon, Your Honor.  Sean

9   Buckley for Dr. Virgil Griffith.

10           THE COURT:  Mr. Buckley, you may be seated.

11           MR. BUCKLEY:  Thank you.

12           THE COURT:  Mr. Griffith, I am Magistrate Judge

13   Moses.  You were born in the U.S. and speak and understand

14   English; correct?

15           THE DEFENDANT:  Yes.

16           THE COURT:  May I have the date and time of the

17   arrest, please?

18           MS. RAVENER:  Yes, Your Honor.  Mr. Griffith was

19   originally arrested on November 28th of this year.  However,

20   he arrived in this district on December 23rd, that is Monday

21   after five p.m. approximately.

22           THE COURT:  Was he released by the magistrate judge

23   in California or is he in custody -- was he in custody?

24           MS. RAVENER:  Your Honor, Mr. Griffith was

25   originally presented pursuant to Rule 5(c)(3) in Los Angeles.

3

1   The magistrate judge in Los Angeles set conditions to permit

2   Mr. Griffith's potential release.  However, upon an appeal by

3   the U.S. Attorney's Office to this district, Judge Cote in her

4   Part One capacity stayed that order --

5            THE COURT:  Pending presentment and bail here?

6            MS. RAVENER:  Yes.  I'll reach out to Judge Cote's

7   chambers to advise her of his arrival.  However, they are not

8   looking [inaudible].

9            THE COURT:  But I'm open.

10            MS. RAVENER:  Thank you, Your Honor.

11            THE COURT:  All right.  So, Mr. Griffith, the

12   purpose of today's proceeding is to advise you of certain

13   rights that you have, to inform you of the charges against

14   you, to consider whether counsel should be appointed for you

15   and to decide under what conditions if any you shall be

16   released pending trial.

17            Much of what I am about to tell you you have heard

18   before in California but I encourage you to listen carefully

19   because it is important information.

20            You have the right to remain silent.  You are not

21   required to make any statements.  Even if you have already

22   made any statements to the authorities you do not need to make

23   any further statements.  Any statements that you do make can

24   be used against you.

25            You have the right to be released either

4

1   conditionally or unconditionally pending trial unless the

2   Court finds that there are no conditions that would reasonably

3   assure two things.  Number one, your presence in court when

4   required, and number two, the safety of the community.

5          If you are foreign national you have the right to

6   request that a consular officer from your country of origin be

7   notified of your arrest.  I'm required to give all defendants

8   this information whether or not I believe that they are

9   foreign nationals.  In some cases a treaty or other agreement

10  may require the U.S. to give that notice whether it is

11  requested by the defendant or not.

12         You have the right to be represented by an attorney

13  during all court proceedings including this one and during all

14  questioning by the authorities.  If you cannot afford an

15  attorney I will appoint one today to represent you.

16         Mr. Buckley, you are retained; correct?

17         MR. BUCKLEY:  That is correct, Your Honor.

18         THE COURT:  So there is no application for

19  appointment of counsel at this time.

20         MR. BUCKLEY:  That's correct.

21         THE COURT:  All right.  I see, sir, that you have

22  been charged via complaint.  I have a copy of the complaint

23  here.  The complaint is the document containing the formal

24  legal charges against you.  I see that you are charged in

25  Count One with conspiracy to violate the International

5

1   Emergency Economic Powers Act in violation of Title 50 of the

2   United States Code Section 1705 and Executive Orders 13,466

3   and 13,722 and also Title 18 of the United States Code Section

4   3238.

5           Counsel, have you received a copy of the complaint

6   and have you reviewed it with your client?

7           MR. BUCKLEY:  I have received a copy of the

8   complaint, Your Honor, and my co-counsel, Brian Klein and

9   Kerry Axel have reviewed it with the client.

10          THE COURT:  Do you waive its public reading?

11          MR. BUCKLEY:  We do, Your Honor.

12          THE COURT:  Because you have been charged by

13  complaint, sir, you have a right to a preliminary hearing.  At

14  the preliminary hearing the Government will have the burden of

15  establishing that there is probable cause to believe that the

16  crime for which you are being charged has been committed and

17  that you are the person who committed it.

18          If you are in custody you have a right to that

19  hearing within 14 days.  If you are not in custody you have a

20  right to that hearing within 21 days.  However, no preliminary

21  hearing will be held if you are indicted by a grand jury or if

22  an information is filed against you by the Government on or

23  before the date on which the hearing was scheduled.

24          I will set a preliminary hearing date at the

25  conclusion of our proceedings this afternoon but before we get

6

1  to that let us discuss the question of conditions of release,

2  if any.  My understanding is that the Government seeks

3  detention.  Is that correct?

4          MS. RAVENER:  Correct, Your Honor.

5          THE COURT:  Briefly please give me the grounds on

6  which you make the request.  Are you contending that the

7  defendant presents a serious risk of flight under Section

8  3142(f)(2) --

9          MS. RAVENER:  Yes --

10          THE COURT:  -- by any change?

11          MS. RAVENER:  Yes.

12          THE COURT:  And you're not moving on dangerousness;

13  correct?

14          MS. RAVENER:  Correct.

15          THE COURT:  So, Mr. Griffith, you may have heard a

16  version of this before but as you -- you'll hear it again from

17  me.  The Bail Reform Act requires that I release you either

18  with or without conditions unless I determine that there are

19  no conditions that would reasonably assure your presence in

20  court when required or the safety of the community.

21          In this case the Government is concerned about your

22  appearance in court when required and consequently has

23  requested that you be detained without bail as a flight risk.

24          I must therefore determine whether there are any

25  conditions or combination of conditions that will reasonably

7

 1    assure that you will be in court when you need to be in court.
 2    In making this determination I am required to consider a
 3    number of factors including the nature and circumstance of the
 4    offense as charged, which I get from the complaint, the weight
 5    of the evidence against you, which I may hear about from the
 6    Government, your own history and characteristics and the
 7    nature and seriousness of the danger to the community or the
 8    right -- the risk of flight that may be presented by the facts
 9    that will be laid out before me.

10         The Government ultimately bears the burden of
11    establishing that you are a flight risk and they need only
12    establish that by a preponderance of the evidence.  That is
13    the standard that we use here.  Because it is the Government's
14    burden I will ask the Assistant United States Attorney to
15    begin and to tell me why I should detain this defendant.

16         MS. RAVENER:  Thank you, Your Honor.  Mr. Griffith
17    should be detained because no conditions or combination of
18    conditions can reasonably assure his appearance in court
19    because a preponderance of the evidence shows he presents a
20    tremendous we submit unacceptable risk of flight.

21         First, Your Honor, Mr. Griffith's lack of community
22    ties.  He has no known ties to the Southern District of New
23    York or the surrounding area.

24         THE COURT:  Why was he charged in the Southern
25    District of New York?

8

1          MS. RAVENER:  Your Honor, his venue was established

2   here in part because his conduct touched on --

3          THE COURT:  Through the banking channels?

4          MS. RAVENER:  I'm sorry?

5          THE COURT:  Because of the banking channels touched

6   New York.

7          MS. RAVENER:  I'm not sure about the banking

8   channels in this particular case, Your Honor, but part of the

9   matter by which the defendant traveled to North Korea we

10  believe [inaudible].

11         THE COURT:  He changed planes in New York?

12         MS. RAVENER:  No, Your Honor, not a change of planes

13  but other steps in order to acquire the ability to travel to

14  [inaudible] among other things.

15         But regardless, Your Honor, the fact that where the

16  case is charged is not necessarily what's at issue here.

17  What's at issue here is whether the defendant will appear for

18  prosecution.

19         THE COURT:  And he's offering it, if I understand

20  it, to reside with his parents in Alabama where presumably he

21  does have ties.

22         MS. RAVENER:  Well, Your Honor, we can speak to that

23  in the next couple of levels.  Again, this is just one of many

24  reasons why we don't believe that bail is appropriate for this

25  defendant.

9

1          The defendant lived outside, completely outside the

2  United States for several years.  He resides in Singapore.

3  During his time in the United States prior to his arrest he

4  had no stable or permanent residence.  He was staying with a

5  variety of unknown persons in different cities and now he

6  proposes to reside with his parents in Alabama.  He has not

7  resided there for quite some time as far as we are aware and

8  we expect that it would be difficult for Pretrial to insure

9  any kind of strict supervision about location.  My

10  understanding from speaking with Pretrial Services is that

11  that supervision would essentially be delegated to the local

12  district to monitor Mr. Griffith.

13          THE COURT:  Sure.

14          MS. RAVENER:  And in order for him to appear in

15  court --

16          THE COURT:  Is that the Northern District of

17  Alabama?

18          MS. RAVENER:  I believe so, Your Honor.  And that in

19  order for him to appear in court he would almost necessarily

20  have to fly there.

21          THE COURT:  Of course.

22          MS. RAVENER:  Now, once Mr. Griffith gets to an

23  airport all our ability, law enforcement's ability to control

24  which plane he gets on and insure that he does not flee

25  prosecution becomes very [inaudible] and incredibly difficult

10

1   to enforce.  So there are logistical hurdles with the path

2   that's been proposed here.  That's one factor among many.

3          In addition, he demonstrated that he has the ability

4   to obtain documents in order to flee.

5          THE COURT:  Tell me about that.

6          MS. RAVENER:  As part of this offense, Your Honor,

7   to that level [inaudible] provide some context.  The defendant

8   is charged with participating in a conspiracy to evade the

9   United States [inaudible] against the Democratic People's

10  Republic of Korea, [inaudible] North Korea.  As part of that,

11  Mr. Griffith is a crypto currency expert.

12         THE COURT:  And a computer scientist.

13         MS. RAVENER:  And a computer scientist, yes.  Travel

14  to North Korea despite being informed by the State Department

15  that he did not receive permission to go, that they should not

16  travel there for his own safety and for other reasons, he

17  evaded that directive in part by securing a visa through

18  elicit means to travel to the DPRK.

19         THE COURT:  What were the elicit means?

20         MS. RAVENER:  Your Honor, he engaged in financial

21  transactions designed to avoid detection of his purchase of

22  that visa.  By so doing he acquired a visa to travel to North

23  Korea.  He insured that it would not appear on his United

24  States passport so as to further evade detection by

25  authorities here.  And he found the means to travel illegally

11

1  to North Korea.

2          While there, and this is a significant part of the

3  offense, Your Honor, Mr. Griffith's furthered the conspiracy

4  to provide services to North Korea by way of educating the

5  North Korean government and others about how to establish

6  crypto -- a crypto currency exchange in North Korea for the

7  purpose of engaging in money laundering and [inaudible].

8          When he was questioned by the FBI voluntarily about

9  this travel, he informed them that he would be willing to do

10 it again.  He remains [inaudible].  He was [inaudible] by his

11 activities.  We have records indicating his discussions about

12 other means to travel.  For example, he's repeatedly expressed

13 an intention to renounce his United States citizenship.

14          THE COURT:  Expressed to whom?

15          MS. RAVENER:  To family.

16          THE COURT:  And you know this from?

17          MS. RAVENER:  A search conducted of Mr. Griffith's

18 phone.

19          THE COURT:  Okay.

20          MS. RAVENER:  And in the course of those

21 communications Mr. Griffith described how he planned to

22 intentionally purchase citizenship from another country, a

23 Carribean nation.

24          THE COURT:  Which one?

25          MS. RAVENER:  I believe it was St. Kitts, Your

12

1   Honor.

2   THE COURT:  I thought St. Nevis was at the top of

3   the list these days.

4   MS. RAVENER:  I may be having them mixed up.

5   THE COURT:  Maybe they're one in the same, Nevis and

6   St. Kitts.

7   MS. RAVENER:  They're close together, yes.

8   THE COURT:  Go ahead.

9   MS. RAVENER:  But in any event, Your Honor, no

10  matter where the defendant is located, and we'll speak further

11  about his expertise when it comes to technology or electronic

12  communication of crypto currency, it remains a troubling risk

13  that this defendant could seek citizenship and by [inaudible]

14  acquire a passport from another foreign nation that would

15  enable him to travel [inaudible] law enforcement here.

16  Again, the necessity of having him stay out of the

17  district [inaudible] right away only heightens the risk that

18  he would utilize those means to flee.

19  Further, his intention to renounce his U.S.

20  citizenship and [inaudible] purchase his [inaudible] from

21  another nation indicates the lack of respect for this country

22  and [inaudible] laws.  This was all by the way, Your Honor,

23  before he even knew he was under investigation.  So now that

24  he's under arrest [inaudible] to pursue these steps has

25  increased exponentially.

13

1          THE COURT:  Well, presumably when he consented to a

2    search of his cell phone he knew he was under investigation.

3    That was in November.  Correct?

4          MS. RAVENER:  Correct, Your Honor.

5          THE COURT:  So this was before then.

6          MS. RAVENER:  Those are communications that were

7    located on the phone [inaudible].

8          THE COURT:  Okay.

9          MS. RAVENER:  In addition, this defendant has

10   substantial assets that he [inaudible].

11         THE COURT:  Those assets include crypto currency

12   wallets and so forth.

13         MS. RAVENER:  Correct, Your Honor.  And that's

14   critical to the court's analysis here because all we have to

15   go on with respect to those assets are Mr. Griffith's own

16   admissions that he possesses at least $250,000 worth of assets

17   that are almost entirely contained in crypto currency

18   exchanges.  He did not identify those exchanges to Pretrial

19   Services.  He did not identify that currency to Pretrial

20   Services.

21         THE COURT:  And you found out about them from his

22   family?

23         MS. RAVENER:  No, Your Honor.  This is based on the

24   analysis of the Pretrial Services report but I can speak to

25   some other information of how [inaudible] the financial

14

1  [inaudible].

2        THE COURT:  Let me go back for a moment if you don't

3  mind.  I'm sorry to keep jumping you around.

4        MS. RAVENER:  No problem.

5        THE COURT:  But I want to go back to a moment to

6  what you said about him procuring a visa through elicit means.

7  All it says in the complaint, which was sworn to by a law

8  enforcement officer, is that he purchased the visa from the

9  North Korean mission or consulate or whatever it is that they

10 have here for 100 Euros.  What is elicit about that?

11       MS. RAVENER:  Your Honor, my understanding is that

12 he engaged in financial transactions in order to hide his

13 payment for that purchase in different currencies.

14       THE COURT:  What?  What?  What did he do?

15       MS. RAVENER:  Your Honor, that's the extent of the

16 detail I can provide on that particular transaction now.

17       THE COURT:  You also told me -- I think you told me

18 that he was advised by the Government not to go to North Korea

19 but he did anyway.  It says in Paragraph 18 of the complaint

20 that he did not seek or receive approval from OFAC to travel.

21       MS. RAVENER:  So that's a separate matter, Your

22 Honor.

23       THE COURT:  That's just OFAC?

24       MS. RAVENER:  OFAC is --

25       THE COURT:  What branch of the Government told him

15

1  not to go?

2          MS. RAVENER:  So with respect to being advised not

3  to go that's from the State Department, and again Mr.

4  Griffith's communication [inaudible] cell phone request that

5  he understood he was advised [inaudible] the State Department

6  to travel to North Korea let alone to travel there for this

7  purpose of [inaudible] conspiracy yet he did so anyway.  OFAC

8  has a separate licensing regime that is part of the technical

9  requirement of this offense and he didn't receive that

10  [inaudible].

11          THE COURT:  All right.

12          MS. RAVENER:  That's administered by the Department

13  of the Treasury.

14          Turning to his assets, Your Honor, we have only

15  credibly obtained information that Mr. Griffith provided to

16  Pretrial Services very little detail and what it does tell us

17  though is what we already know which is that Mr. Griffith has

18  significant assets that are all contained in crypto currency

19  which is by definition virtually untraceable and as his

20  employer, the Ethereum Foundation, advertises accessible

21  anywhere in the world.  Mr. Griffith provides no accounting of

22  how much money in Ether [inaudible] currency he has.  He

23  provides --

24          THE COURT:  Which he presumably has some being an

25  employee.

16

1          MS. RAVENER:  Correct, Your Honor.  We believe so

2     and his communications indicate that he and his family have

3     substantial investments in Ether.

4          THE COURT:  Well, according to the Pretrial Services

5     report the defendant stated that he had as you say

6     approximately $250,000 worth of assets, not all of which are

7     digital.  According to Pretrial he stated that he had 120,000

8     in crypto currency exchanges, 65,000 in a digital cold storage

9     wallet, and another 65,000 in old fashioned savings accounts,

10    one in Singapore and one in Puerto Rico.

11         MS. RAVENER:  Correct, Your Honor.  And even taking

12    that at face value, those are assets significant enough to

13    permit this defendant to flee.

14         THE COURT:  And outside of the country.

15         MS. RAVENER:  To flee, and of course our perspective

16    is that these assets may not even encompass Mr. Griffith's

17    full wealth --

18         THE COURT:  Because you don't know what you don't

19    know.

20         MS. RAVENER:  -- because these are self reported.

21    Right.  And because of the lack of detail that he opted to

22    provide to Pretrial in reporting these assets.  He gives no

23    numbers with respect to these particular currencies as I said

24    or what kind of currencies they are.  He describes that he

25    does have a salary from the Ethereum Foundation of $150,000

1   annually but that he also receives some kind of consulting

2   income.  He provides no information or data about that

3   consulting income.

4          THE COURT:  So he's provided no banking records or

5   employment records you're telling me.

6          MS. RAVENER:  Correct.  As far as we can tell, Your

7   Honor.

8          Now, coupling that information with what we know

9   about Mr. Griffith, which is that again he's a crypto currency

10  expert who's used his own expertise already to commit an

11  offense that is all about hiding assets, engaging secretive

12  untraceable elicit transactions for the purpose of laundering

13  money, evading the United States sanctions and rules.

14         He has referred to himself in text message

15  communication uncovered by the Government's investigation as a

16  maintainer of the world's largest portal to the dark web.

17         THE COURT:  Who did he say that to?

18         MS. RAVENER:  I believe to the parents, Your Honor.

19         THE COURT:  In text?

20         MS. RAVENER:  Yes.

21         THE COURT:  Okay.

22         MS. RAVENER:  Your Honor, as part of the offense he

23  documented his own plans to attempt to disguise his support to

24  the DPRK as some kind of humanitarian aid to be passed from

25  South Korea to North Korea.  Another means of hiding money

18

1   intended for elicit purposes.

2          Again, communications with his parents.  His parents

3   have described that his assets are 99 percent in untraceable

4   unreported crypto currencies.  That's as of approximately

5   March 2018.  We have no way of confirming the scope of his

6   actual wealth and no way of securing those funds so that he

7   cannot use them to flee.  They are by nature untethered to the

8   financial system and outside of the Government's reach and

9   that is exactly why Mr. Griffith uses them.

10          Just to give Your Honor a sense of the scope of

11   these things because another factor here is that while Mr.

12   Griffith may say -- may place a value on that crypto currency

13   to Pretrial Services today, these are values that fluctuate

14   quite widely.

15          THE COURT:  I understand they're very volatile or

16   they can be.

17          MS. RAVENER:  So just to give Your Honor an example

18   of the scope of how [inaudible] range.  Reports today, Your

19   Honor, describe that there's a spike in some markets fears

20   because a large stakeholder in Ether, the [inaudible] currency

21   that Mr. Griffith --

22          THE COURT:  May or may not possess.

23          MS. RAVENER:  -- traffics in -- a large stakeholder,

24   an unidentified stakeholder against selling off enormous

25   amounts of Ether on Christmas Day, yesterday.

1          THE COURT:  And you are suggesting that this

2    defendant may be that mysterious stakeholder or may not be.

3          MS. RAVENER:  We don't know that, Your Honor, but

4    what we do know is just by way of example that that can happen

5    at a moment's notice.  And what these reports indicate is that

6    those -- that sudden effort to sell of a large piece of a

7    stakeholder's interest in Ether is worth $25 million standing

8    here today.

9          Now, what will it be worth tomorrow?  We don't know

10   but that is how much this kind of currency can be worth for a

11   large stakeholder and a person with expertise in this kind of

12   technology, and that is exactly the kind of expertise and

13   exposure that Mr. Griffith has had and the kind of social

14   connections worldwide that Mr. Griffith has.

15         THE COURT:  So let me get more granular with you.

16   You believe he may have access to substantial liquid and

17   untraceable sums of money or assets that can be converted

18   quickly into United States or other national currencies and

19   you believe he does not respect the law and will be looking

20   for a way to evade the law.  How does he get out of the

21   country?

22         MS. RAVENER:  Well, Your Honor, that's where the

23   challenge of this proposal to have Mr. Griffith reside in a

24   separate state that would require flight in order to come

25   here, permitted flight in order to come here.

20

1          THE COURT:  Let's assume we can solve that problem.

2  Let's assume that he offers through his counsel today to rent

3  an apartment in New York and subject himself to house arrest

4  there.

5          MS. RAVENER:  Well, Your Honor, I think they're

6  still running into a serious risk of flight because Mr.

7  Griffith has the means, the financial means --

8          THE COURT:  Right.

9          MS. RAVENER:  -- the technological capability and

10 matrix.

11         THE COURT:  Has he ever traveled under a false

12 passport or a false name that you know of?

13         MS. RAVENER:  We know that he has changed his name,

14 Your Honor, that he's --

15         THE COURT:  But he's changed his name legally for

16 vanity purposes, correct --

17         MS. RAVENER:  As far as we know, yes.

18         THE COURT:  -- some time ago.

19         MS. RAVENER:  But, Your Honor, again, a person who

20 is able to secure [inaudible] without U.S. Government

21 permission to --

22         THE COURT:  For 100 Euros apparently.

23         MS. RAVENER:  -- to the DPRK --

24         THE COURT:  But he traveled on his own passport

25 under his own name; correct?

1          MS. RAVENER:  Your Honor, I don't believe -- I have

2    to check on whether he utilized his United States passport in

3    order to do so.  I believe that he traveled on his own name.

4    He was assigned a North Korean government handler while there.

5          THE COURT:  Right.

6          MS. RAVENER:  So this entire event and his

7    [inaudible] in it was orchestrated in concert with those

8    authorities.  Someone who's capable of having that kind of

9    access is certainly capable of obtaining a means to flee from

10   the United States either by plane or other means.

11         As we discussed, he has expressed an interest in --

12         THE COURT:  You think the South Korean government is

13   going to send a private plane for him?

14         MS. RAVENER:  I'm sorry, Your Honor?

15         THE COURT:  You think the South Korean government --

16   the North Korean government, excuse me, is going to send a

17   private plane for him and obscure him out of the country?

18         MS. RAVENER:   Your Honor, I'm not suggesting any

19   particular scenario.  What we are indicating is that he has

20   expressed an interest in purchasing citizenship elsewhere

21   which would result in him acquiring passports from another

22   country whether that can be done in a different name or some

23   other means that we cannot [inaudible] ineffectively.  It's --

24   all it takes is one mistake at the border for Mr. Griffith to

25   be able to cross over and for us to lose the ability to bring

22

1   him back to face justice.

2            THE COURT:  Okay.

3            MS. RAVENER:  Mr. Griffith's incentives to do that

4   are incredibly high.  He apparently believes that he had a

5   strong incentive to renounce his U.S. citizenship before he

6   was arrested.  Now he faces accountability and potential

7   prison time in addition to other sanctions as a result of his

8   commission of the instant offense.

9            So to the extent he sought to expatriate and avoid

10  contact with the United States and the United States Marshals

11  before his arrest that incentive just increased by orders of

12  magnitude.  He was not taking this seriously previously, Your

13  Honor.

14           THE COURT:  Well, I'm sure he's about to tell me

15  that that's all changed and he now takes it very, very

16  seriously.

17           MS. RAVENER:  Well, we'll hear it I'm sure from the

18  defense, Your Honor, but in the meantime those are our very

19  serious concerns about this defendant's assets, capability and

20  interest in fleeing prosecution.

21           THE COURT:  But as far as you know he has not up

22  until now traveled under a false name or a false passport;

23  right?

24           MS. RAVENER:  I don't have that information no, Your

25  Honor.

23

1          THE COURT:  All right.  And the way he got to North

2   Korea as far as you are able to tell me today was by obtaining

3   a visa from North Korea against the advice and the laws of the

4   United States in your view but obtaining a visa for 100 Euros

5   in his own name and having it stamped on a separate piece of

6   paper.

7          MS. RAVENER:  Which he avoided attaching to his

8   United States passport.

9          THE COURT:  Right.

10          MS. RAVENER:  Yes.  So therefore it was unknown to

11   the United States authorities.

12          THE COURT:  Right.  With no criminal record, what

13   would the guidelines say here?

14          MS. RAVENER:  Your Honor, we believe that the

15   guidelines at this time although the investigation is ongoing

16   are approximately 15 to 21 months incarceration but of course

17   the Court I'm sure is aware that for someone like Mr. Griffith

18   who prior to now has never spent any time in prison that is a

19   severe sanction that could cause someone to flee because any

20   amount of prison time for someone who has not yet experienced

21   that is a drastic change in their circumstances and as we said

22   before Mr. Griffith was highly motivated to avoid U.S. law

23   enforcement previously before this arrest.

24          THE COURT:  Right.  I got that point.

25          MS. RAVENER:  And how that incentive has increased.

24

1  The prison time he faces regardless of amount only enhances

2  that.

3          The other thing, Your Honor, that I think we need to

4  address is the particular circumstances that are proposed by

5  the defense with respect to a bail package.  I'll reserve on

6  that if the Court permits.

7          THE COURT:  Sure.  I'll hear the --

8          MS. RAVENER:  So our position is detention.

9          THE COURT:  I'll hear the proposal from the defense

10  and I'll come back to you for a response.

11          MS. RAVENER:  Thank you, Your Honor.

12          THE COURT:  Mr. Buckley.

13          MR. BUCKLEY:  Yes.  Thank you, Your Honor.  So as

14  the Court noted at the outset the burden is on the Government

15  to establish risk of flight by a preponderance.

16          THE COURT:  By a preponderance.

17          MR. BUCKLEY:  Respectfully, Judge, nothing about

18  what Ms. Ravener has said carries that burden.  She went on at

19  length about crypto, crypto currency and the fact that Dr.

20  Griffith uses crypto currency.  There's nothing illegal about

21  using crypto currency.

22          THE COURT:  Why didn't he provide the Government

23  with a fuller accounting of his crypto assets?

24          MR. BUCKLEY:  He wasn't asked.  In fact, during the

25  Pretrial Services interview, Your Honor --

1          THE COURT:  And it didn't occur to you or to him?

2          MR. BUCKLEY:  -- he was trying to volunteer

3   additional information about the type of crypto exchanges

4   which is reflected in the Pretrial Services report on which --

5   in which he had those accounts.

6          As far as the specifics of the accounts, if that's

7   something that is important for the Court, we can work -- put

8   together a list of those accounts for the Court but the mere

9   fact that he uses crypto currency along with millions of other

10  people throughout the world by no means supports this idea

11  that he's a risk of flight or that he's taking affirmative

12  measures to conceal assets for any use, let alone fleeing

13  these charges.

14         The Government has made reference to these vague

15  substantial assets that would allow him to flee.  He's

16  outlined what he believes his assets are.  We can get

17  additional details on that for the Court's consideration but

18  even if that quantity identified in the Pretrial Services

19  report is considered substantial, and respectfully I think a

20  lot of that is in the eye of the beholder, we would submit

21  that the remedy for that is by setting a condition of release

22  that would require him or his loved ones to have to forfeit an

23  amount in excess of that amount, and that's what we proposed

24  here.

25         I think it's telling, Your Honor, that in this

26

1  case --

2          THE COURT:  What do you mean forfeit an amount in

3  excess?

4          MR. BUCKLEY:  If he were to flee.  Have them sign a

5  bond, an appearance bond in an amount that exceeds --

6          THE COURT:  You just mean an ordinary appearance

7  bond.

8          MR. BUCKLEY:  Yes, an ordinary appearance bond

9  secured by --

10          THE COURT:  If your client -- if your client flees

11  mom and dad lose their equity in their house.  How does that

12  help if there are a few million dollars in Ethers?

13          MR. BUCKLEY:  I'm sorry, Your Honor.  I couldn't

14  hear you.

15          THE COURT:  I think the point that Ms. Ravener is

16  trying to make, and you'll correct me if I'm wrong, is that in

17  addition to the tangible assets that the Government knows

18  about and can put a lien on such as the home, the parents'

19  home and so forth, there may be assets substantially in excess

20  of that amount that the Government doesn't know about and by

21  definition can't know about which may make the value of the

22  equity in the defendant's parents' home pale in comparison.

23  It might be a sensible choice under the circumstances to risk

24  the home because there are more assets elsewhere.

25          MR. BUCKLEY:  Understood, Your Honor, and if there

1   was anything to that point beyond pure speculation I think

2   then that argument might hold water and might perhaps support

3   the preponderance standard but beyond the fact that he's

4   engaged in crypto exchanges and crypto currency there's

5   nothing to substantiate that speculation.  This is the

6   Government's --

7         THE COURT:  No, he's not someone who's simply

8   investing crypto currency.  He is someone who designs crypto

9   currency exchanges for a living.  Correct?

10        MR. BUCKLEY:  That's correct.

11        THE COURT:  That does put him in a slightly

12  different position from someone who merely invests in crypto

13  currencies among other things particularly since the crime of

14  which he's accused involves furnishing advice, know-how and

15  expertise regarding establishing crypto currency exchanges to

16  a regime with which the United States prohibits such commerce.

17        MR. BUCKLEY:  That is the allegation of the

18  complaint.

19        THE COURT:  That is the allegation.

20        MR. BUCKLEY:  We dispute the allegations of the

21  complaint obviously, Judge.  But nevertheless, while those

22  factors may apply not uniquely by any means.  Crypto currency

23  is one of the biggest developing markets right now and there

24  are plenty of people who might not have as well credentialed a

25  background as Dr. Griffith but plenty of people who engage

28

1   with these crypto exchanges, who program these crypto
2   exchanges, who run these crypto exchanges, and it can't simply
3   be that by virtue of being engaged with a crypto exchange you
4   somehow have a heightened showing under the Bail Reform Act as
5   to why bail is appropriate in this case.
6           THE COURT:  No, the showing remains the same.  The
7   question is whether the crypto currency investments and
8   expertise along with the other factors that the Government
9   cited to me meet the Government's relatively low more likely
10  than not preponderance burden.
11          So perhaps you should discuss some of the other
12  factors that the Government brought up, namely the manner in
13  which he traveled to North Korea, the things he said about
14  what he was doing there and what he planned to do in the
15  future, the statements he is said to have made about
16  renouncing his U.S. citizenship and/or purchasing citizenship
17  elsewhere.
18          MR. BUCKLEY:  Well, Your Honor, on each of those
19  points, and we have requested pre-indictment discovery from
20  the Government for that exact reason because we are relying
21  upon the portions of statements cited in the complaint.  We
22  have not seen the underlying statements.  We don't know if
23  they're taken out of context, if they are being
24  mischaracterized or if they are just incorrect.  The
25  statements regarding, for example, renunciation of U.S.

1  citizenship I think Ms. Ravener said came from a search of his

2  cell phone --

3          THE COURT:  Correct.

4          MR. BUCKLEY:  -- which we don't have.  So we would

5  need discovery in order to address the merits of those

6  statements but it's our position that those statements are in

7  fact being taken out of context.

8          I do think it's telling, Judge, that two separate

9  Pretrial Services offices, first Central District of

10  California and then here in the Southern District of New York

11  had determined that in spite of the charges and in spite of

12  his crypto background that he is an appropriate candidate for

13  release under the Bail Reform Act.

14          THE COURT:  So defense attorneys make this argument

15  to me all the time as you can imagine and I find myself

16  reminding defense attorneys frequently that one of the -- at

17  least one of the factors which I am required to take into

18  account under the Bail Reform Act the strength of the evidence

19  is not known to or really accessible by Pretrial Services and

20  often as appears to be the case here as well some of the

21  evidence related to flight risk which is intertwined with the

22  merits evidence is simply not known to Pretrial Services.  So

23  bear that in mind.

24          MR. BUCKLEY:  But -- I understand that, Judge, but

25  here we have two separate Pretrial Services offices as well as

1  a magistrate judge in the Central District of California who

2  was able to hear these arguments from the Government about the

3  strength of its case and the nature of the case and determined

4  that he should be released on conditions.

5        THE COURT:  Well, speaking of prior determinations

6  by judges, a United States District Judge in this district

7  felt otherwise.  So perhaps one question I should ask you now

8  is what new information do you have to present to me that

9  would suggest to me that Judge Cote was wrong.

10       MR. BUCKLEY:  Yes, Your Honor.  Respectfully here,

11 and I'm not looking to fault Judge Cote or anybody else.

12 Judge Cote was not provided with the record in this case.

13 Judge Cote was not provided with the Pretrial Services report.

14 Judge Cote was not provided with a copy of the bail

15 transcript.

16       THE COURT:  From California?

17       MR. BUCKLEY:  From California, correct.

18       THE COURT:  Neither was I.

19       MR. BUCKLEY:  Understood, Your Honor, but you have

20 the benefit of the Pretrial Services report and you have the

21 benefit of argument from counsel.  Judge Cote was provided

22 when she issued her order of staying it, not overturning the

23 determination, just staying it until arrival in this district

24 was provided with a letter from the Government attaching a

25 copy of the complaint.  Nothing further.  None of the factors

1    that need to be required under the Bail Reform Act which are

2    now in front of you in the form of Pretrial Services.   Two

3    separate reports from two separate Pretrial Services offices,

4    Your Honor that outline the relevant factors that go through

5    the analysis and that independently come to a conclusion that

6    this is a defendant who should be released on an appearance

7    bond secured by cash or property.

8            So respectfully, Judge, I think that's what's

9    different between what's being presented here to the Court and

10   what was presented to Judge Cote.

11           THE COURT:  So what you're telling me is that Judge

12   Cote didn't have as much information as the magistrate judge

13   did in California or as I do.

14           MR. BUCKLEY:  That's correct, Your Honor.

15           THE COURT:  But the question I asked you was has

16   anything changed since the magistrate judge in California made

17   that determination.

18           MR. BUCKLEY:  No, Your Honor, other than my client

19   has been incarcerated since Thanksgiving Day and has been

20   transported to this district.

21           THE COURT:  So your showing has not improved since

22   then.  For example, even though as you say it's been a month

23   and I assume that you are an experienced and knowledgeable

24   defense counsel it didn't occur to you or your client to

25   provide the Government or Pretrial Services here in New York

32

1  with greater transparency into your client's assets.

2          MR. BUCKLEY:  Judge, this is the first time that I'm

3  standing here that I've heard that concern from the

4  Government.

5          THE COURT:  Okay.

6          MR. BUCKLEY:  So as I said, it's certainly something

7  that we can address and provide additional disclosures

8  regarding but that was not raised as a concern in the Central

9  District of California and today is the first time that I've

10 heard it relied upon at such length.

11         THE COURT:  Where would your client live?

12         MR. BUCKLEY:  As proposed we would have our client

13 live in Alabama with his parents at their residence.

14         THE COURT:  What's your second choice?

15         MR. BUCKLEY:  He could reside -- give me one moment.

16                 [Pause in proceedings.]

17         MR. BUCKLEY:  There's a residence here in the

18 Southern District of New York where he could stay.

19         THE COURT:  Whose residence?

20         MR. BUCKLEY:  A friend of his.

21         THE COURT:  He would live with a friend?

22         MR. BUCKLEY:  Yes, Your Honor.

23         THE COURT:  Has the friend been consulted about

24 this?

25         MR. BUCKLEY:  Not yet, Your Honor.

33

1          THE COURT:  Where does the friend live?

2                    [Pause in proceedings.]

3          MR. BUCKLEY:  In Manhattan, Your Honor, off of Bed

4    City.

5          THE COURT:  All right.  What else do you propose?

6          MR. BUCKLEY:  As far as the conditions?  It would be

7    co-signed by three financially responsible people.

8          THE COURT:  Two of whom are his mother and his

9    father.

10          MR. BUCKLEY:  Who are here today in court, Your

11    Honor.

12          THE COURT:  Ma'am, sir, thank you for coming.

13          MR. BUCKLEY:  And the third would be his sister, his

14    only sibling who resides in -- outside of --

15          THE COURT:  And each of them is willing to put up

16    their home; correct?

17          MR. BUCKLEY:  That's correct, Your Honor.  As well

18    as if the Court would require I know that Dr. Robert Griffith

19    is prepared to put up cash if that's easier for the Court or

20    more expeditious.

21          THE COURT:  Anything else?

22          MR. BUCKLEY:  The only other point I would make,

23    Judge, is that with regard to the sentence that he faces --

24          THE COURT:  The potential guidelines, yes.

25          MR. BUCKLEY:  Yes, the potential guidelines.  Ms.

34

1   Ravener actually stated that based on the allegation in the

2   complaint it's currently calculated at 15 to 21 months.

3   That's not with acceptance of responsibility.  With acceptance

4   of responsibility he would fall into Zone B which would be 8

5   to 14 months.

6              THE COURT:  Okay.  And is there anything in the

7   record thus far indicating acceptance of responsibility on

8   your client's part?  Ms. Ravener indicates that statements

9   made thus far, including statements made to the family,

10  indicate the opposite or to be more precise, indicate lack of

11  recognition or remorse.

12             MR. BUCKLEY:  Okay.  Yes, Your Honor, there is in

13  the record ample to show acceptance of responsibility.

14  Immediately after the time period alleged in the complaint the

15  defendant walked into the State Department and self reported.

16  He was then contacted by the FBI and the FBI asked him to come

17  to New York to participate in a voluntary interview.  The

18  defendant traveled to New York and spoke with the FBI at

19  length.  He traveled on his own money to New York in order to

20  meet with the FBI.  That was followed by the subsequent

21  meeting which is the November 12th meeting set forth in the

22  complaint which occurred in San Francisco where again he

23  agreed to be interviewed at length by the FBI.

24             Indeed I think something that the Court should be

25  aware of is that in advance of his arrest on I believe it was

1  November 25th prior counsel for Dr. Griffith was actively

2  engaged in discussions with the U.S. Attorney's Office to set

3  up a follow up meeting.

4          THE COURT:  This U.S. Attorney's Office --

5          MR. BUCKLEY:  This U.S. Attorney's Office yes, Your

6  Honor, including one of the AUSA's who signed this complaint

7  that occurred on approximately November 25th and then he was

8  arrested two days later on Thanksgiving Day.

9          In each of those interviews, and I don't believe Ms.

10 Ravener or anybody from the Government, certainly not set

11 forth in the complaint, has contended that he was dishonest or

12 evasive or concealing facts.  Instead the allegations of the

13 complaint if true suggests that he made substantial statements

14 to the FBI.  So I think that there is ample evidence of record

15 that shows acceptance of responsibility here.

16         With regard to the issue surrounding renunciation of

17 citizenship or obtaining a passport from a different country,

18 I do think it's telling that while Dr. Griffith has resided in

19 Singapore for the past three to four years for work purposes

20 he otherwise has been a lifelong resident of the United

21 States.  Born and raised in Alabama.  Spent a brief spell in

22 Pennsylvania while his parents were doing their residencies as

23 medical doctors, and then he's educated in Indiana and at Cal

24 Tech.  So he has substantial ties to this community, and it's

25 also worth noting that in addition to residing in Singapore he

1  does own a residence in Puerto Rico and part of the context --

2          THE COURT:  Why does he own a residence in Puerto

3  Rico?

4          MR. BUCKLEY:  So that's part of the context here is

5  discussions surrounding renunciation of citizenship there are

6  number of reasons that individuals seek to renounce

7  citizenship, not the least of which is ex [inaudible] living

8  abroad who don't want to be subject to United States taxes

9  while paying taxes in a separate regime.

10          THE COURT:  Sure.  There are lots of reasons other

11  than evading criminal law enforcement to seek citizenship in

12  another jurisdiction but when the person seeking citizenship

13  or talking about seeking citizenship in another jurisdiction

14  happens to be under arrest and is in the midst of discussions

15  about whether he is a flight risk or not you can't ignore

16  that.

17          MR. BUCKLEY:  Understood.  I'm not suggesting that

18  the Court ignore it but the reason for the property in Puerto

19  Rico is that while certain of his colleagues had suggested to

20  him that it would be important that you renounce citizenship

21  or obtain citizenship in a different jurisdiction rather than

22  taking that step Dr. Griffith purchased property in Puerto

23  Rico.

24          THE COURT:  That's the United States.

25          MR. BUCKLEY:  It's a protector of the United States.

37

1          THE COURT:  Yes.

2          MR. BUCKLEY:  Yes, Your Honor.  It's subject to --

3          THE COURT:  I'm not following your logic.  He's

4    still subject to federal tax.

5          MR. BUCKLEY:  It's subject to a different tax regime

6    is the point.

7          THE COURT:  So you're saying that it's favorable

8    compared to mainland United States but not as favorable as

9    some offshore tax havens.

10          MR. BUCKLEY:  That is one explanation, yes.

11          THE COURT:  And you're suggesting that he purchased

12    property in Puerto Rico because he was willing to move

13    offshore to a U.S. protector but not willing to renounce his

14    U.S. citizenship.

15          MR. BUCKLEY:  That's correct, Judge.  Puerto Rico

16    also is a developing area in the crypto space and given his

17    job it also made sense for that reason.

18          THE COURT:  Has he ever lived there?

19          MR. BUCKLEY:  In Puerto Rico?

20          THE COURT:  Yes.

21          MR. BUCKLEY:  When he attended the first meeting

22    with the FBI he was traveling from his residence in Puerto

23    Rico to Manhattan.

24          THE COURT:  No.  I mean lived there.  Not spent the

25    night there.  Lived there.

38

1          MR. BUCKLEY:  He has lived predominantly for the

2    past three to four years in Singapore, Judge.

3          THE COURT:  Which is where Ethereum has him working;

4    correct?

5          MR. BUCKLEY:  That's correct, Your Honor.

6          THE COURT:  And he rents an apartment there?

7          MR. BUCKLEY:  And I'm sorry, Judge.

8          THE COURT:  And he rents an apartment in Singapore?

9          MR. BUCKLEY:  He rents an apartment in Singapore,

10   that's correct.

11         THE COURT:  Anything else?

12         MR. BUCKLEY:  If I could just have a moment.

13                    [Pause in proceedings.]

14         MR. BUCKLEY:  The only other item I would note, and

15   as the court noted, after the November 12th interview with the

16   FBI he clearly understood that he was under investigation

17   since they took his phone and had suggested that that was the

18   case and given that his counsel was engaged with this U.S.

19   Attorney's Office regarding his case, prior to traveling from

20   California where he was arrested he had been instructed by the

21   FBI not to return to his residence in Singapore until they had

22   an opportunity to speak further with him and he did exactly

23   that, Judge.  He listened to the FBI agent.  He didn't

24   purchase a return ticket.  He waited to hear from them and he

25   had counsel engage with the U.S. Attorney's Office even to the

1   degree that they sent his itinerary for his flight from Los

2   Angeles to Baltimore Washington International Airport to the

3   AUSA's prior to his travel in order to make a showing of good

4   faith and the trip from L.A. when he was arrested at L.A., he

5   wasn't seeking to leave the country.  He was seeking to fly to

6   Baltimore to celebrate Thanksgiving with his family at his

7   sister's house outside of Baltimore.

8          THE COURT:  Thank you.  Ms. Ravener, I'd like you to

9   start [inaudible] addressing -- sorry, we have a new

10  microphone that I haven't gotten the hang of it yet.  It's

11  down low -- by addressing counsel's representations regarding

12  Mr. Griffith's cooperation, voluntary cooperation with law

13  enforcement since he came under investigation including his

14  voluntary surrender.

15         MS. RAVENER:  Yes, Your Honor.  So it is true that

16  Mr Griffith met voluntarily with the FBI on two occasions at

17  which he made certain statements to the FBI as documented in

18  the complaint which was before you, before the Central

19  District of California magistrate and before Judge Cote.

20         In terms of any further discussions, once Mr.

21  Griffith retained counsel yes, our office was engaged in

22  contact with that counsel but no, there was no -- we were not

23  informed to my knowledge that there would be any further

24  cooperation from Mr. Griffith or any meeting.  So that is

25  where things stood prior to Mr. Griffith's arrest.

40

1          I'm happy to address the Court's other questions or

2    move on to a few other points.

3          MR. BUCKLEY:  Judge --

4          THE COURT:  Is it true that after being asked not to

5    leave the country by the FBI for a period of time for

6    questioning the defendant did not leave the country and kept

7    the FBI or other law enforcement agencies apprised of his

8    travels within the United States?

9          MS. RAVENER:  I don't think it's accurate to say

10   that he kept law enforcement fully apprised of his travels

11   within the United States.  I believe that at one point, at

12   least one point in time we were unable to locate Mr. Griffith

13   and became very concerned and at that point in time counsel

14   was contacted and he did provide travel information for Mr.

15   Griffith.

16         THE COURT:  That was the flight to Baltimore?

17         MS. RAVENER:  Yes.

18         THE COURT:  Okay.

19         MS. RAVENER:  Just to provide some additional

20   context.  So yes, there has been contact with Mr. Griffith by

21   law enforcement.  There has been contact with counsel.  That

22   was a prior counsel to Mr. Buckley and Mr. Buckley has co-

23   counsel in L.A. who we also have been in contact with since

24   Mr. Griffith's arrest.

25         THE COURT:  All right.

41

1          MS. RAVENER:  A couple of other key points.  I think

2   first of all Your Honor touched on a key issue here which is

3   that at a minimum the defendant has not given adequate

4   financial information to [inaudible] proposed bail package.

5          THE COURT:  When did your office make defense

6   counsel aware of your concerns hinging on those facts as you

7   did to me today?

8          MS. RAVENER:  Your Honor, we have spoken with Mr.

9   Buckley's co-counsel in Los Angeles about that [inaudible]

10  separate locations including prior to his presentment in the

11  Central District of California and the fact that he

12  [inaudible] any of Mr. Griffith's resources made it very

13  difficult to assess any possible proposal and gave us

14  discomfort with the bail package proposed in the Central

15  District of California [inaudible] concern here today.

16         Among other things, we've now also learned that Mr.

17  Griffith may very well have misled Pretrial Services in the

18  Central District of California which states in the Pretrial

19  Services report at Page 3 the defendant does not own property.

20  We've now heard that actually the defendant does own some kind

21  of property in Puerto Rico.

22         THE COURT:  Is this new news to you this evening?

23         MS. RAVENER:  Your Honor, I'm aware of it through --

24  I'm aware that it was a possibility through our investigation

25  because among other things and another fact to share with the

42

1   Court is that we aware that Mr. Griffith holds at least one

2   shell company which is domiciled in Puerto Rico which he

3   refers to as a shell company.  So that is just one more

4   example, Your Honor, of how Mr. Griffith has either in a

5   generous reading provided insufficient information but there

6   is also evidence that would permit this Court to [inaudible]

7   Mr. Griffith has provided misleading information in the course

8   of his Pretrial Services interviews and preparation for his

9   bail application.

10          That's [inaudible] troubling particularly when it's

11  overlaid in the context of Mr. Griffith's expertise in crypto

12  currency and other forms of technology that would permit him

13  to evade law enforcement detection and apprehension.

14          As another example of that, Your Honor, again this

15  is derived from Mr. Griffith's cell phone and our ongoing

16  investigation, only approximately a month ago Mr. Griffith

17  appears to have encountered some difficulties in his workplace

18  and informed his parents that perhaps he'd leave his job and

19  "sell a money a laundering company in North Korea as an

20  alternative."  This kind of conduct and contemplation by the

21  defendant of fleeing to unreachable places, to engage in

22  further criminal acts using untraceable hidden means in which

23  he possesses highly skilled expertise makes him an

24  unacceptable flight risk.

25          He should be detained.  It is the only means to

43

1   assure his appearance in court here in this district for

2   prosecution.  Should the Court consider however any of the

3   defendant's proposals with respect to release, we would again

4   ask to be heard and we'd ask Your Honor for that opportunity

5   at the appropriate time.

6          THE COURT:  Mr. Buckley, when did your client first

7   disclose his residence in Puerto Rico to any government

8   authority?

9          MR. BUCKLEY:  So, Your Honor, I don't believe I said

10  he owned the residence and I'd like -- I misspoke.  He rented

11  the residence and he disclosed that on the Pretrial Services

12  report.

13         THE COURT:  So he doesn't own any property?

14         MR. BUCKLEY:  He does not own it. He rents it.

15         THE COURT:  What's the point of renting a place in

16  Puerto Rico?  What's the tax advantage if you're not actually

17  living there?

18                   [Pause in proceedings.]

19         MR. BUCKLEY:  He was considering eventually moving

20  to live there full time.

21         THE COURT:  Does he rent any property elsewhere in

22  this country or outside of it where he's considering living

23  full time?

24                   [Pause in proceedings.]

25         MR. BUCKLEY:  He rents property in Puerto Rico and

44

1    he rents property in Singapore.  He doesn't own or rent any

2    other properties here in the United States or elsewhere.

3                THE COURT:  Any brief response?

4                MS. RAVENER:  Your Honor, our only evidence of that

5    is the defendant's own word and it's simply not enough to

6    overcome the preponderance of the evidence here which

7    demonstrates that he's a flight risk with global connections

8    and assets that enable him for example to rent an apartment

9    that he's barely ever resided at and rarely goes to.  That's a

10   person who has the ability to acquire real estate abroad as a

11   means of pursuing flight and prosecution.  He can facilitate

12   that by accessing his digital wallet anywhere in the globe

13   with a touch of a few keys on a computer.  That's precisely

14   why Mr. Griffith cannot be released on conditions, why there's

15   no combination of conditions that can give this Court comfort

16   that he will appear and abide by the conditions set for him.

17                THE COURT:  Anything else?

18                MR. BUCKLEY:  Yes, Your Honor.  I wanted to address

19   the contemplated meeting that didn't occur because they

20   arrested Dr. Griffith on Thanksgiving Day.  But the

21   communications between counsel and the AUSA at the Southern

22   District of New York very clearly contemplated such a meeting.

23   They discussed trying to schedule something for the week of

24   Thanksgiving.  Dr. Griffith's prior counsel was unable to do

25   so because it's a Thanksgiving holiday and the AUSA replied "I

1   hope you're enjoying the week off and understood.  We would,

2   however, like to set something up quickly thereafter so we can

3   do that while you're away.  What days, locations might work

4   for you?"  There very clearly was a meeting contemplated here,

5   a meeting that Dr. Griffith was willing to attend.  This was

6   the correspondence that included the flight for his

7   Thanksgiving Day flight to join his family in the Baltimore

8   area and I believe Dr. Griffith also provided his prior

9   counsel with flight information to send to the FBI and the

10  U.S. Attorney's Office of his flight from Oakland to Burbank

11  that preceded that flight from L.A. to Baltimore Washington

12  International.  So there were at least two instances where he

13  provided travel information.

14          THE COURT:  Right.  Thank you both very much.

15                  [Pause in proceedings.]

16          THE COURT:  This case like many bail cases that come

17  before me is not an easy one.  Having listened, however, to

18  all of the arguments and proffers by counsel for both sides, I

19  come to the conclusion that based on what I know now there are

20  no conditions I can impose that will reasonably assure this

21  defendant's appearance as required in connection with this

22  case.

23          I make that decision based on all of the facts which

24  have been presented to me including those in the California

25  and New York Pretrial Services report, the allegations of the

1   complaint sworn to by a law enforcement agent, and the

2   representations made to me by counsel.

3          To just -- for the edification of counsel I will

4   simply touch on a few of the factors which I found of

5   significance which is not to say that other factors were not

6   also of significance but these stood out to me.

7          I do find it difficult to conclude that I can

8   reasonably assure the appearance of a defendant who owns

9   significant crypto currency assets in accounts which are not

10  traceable or accessible to the Government by nature.  This is

11  what crypto currency in part is for.  That risk, while it is

12  certainly not unlawful in and of itself to invest in crypto

13  currencies, for a defendant in the position of Mr. Griffith

14  who has now been under arrest for a month not to have provided

15  some visibility into those accounts, some documentation, some

16  assurance to the Government that he owns what he says he owns

17  and not more than that and that what he says he owns is in the

18  currencies or accounts that he says they are in I find

19  troubling particularly in connection with the fact that he is

20  not merely a crypto currency investor, he is a crypto currency

21  expert and a very skillful crypto currency expert who is

22  accused in this very case of using that expertise to secretly

23  aid a sanctioned foreign nature, namely North Korea.

24          I am somewhat troubled by what appears to be a delay

25  in disclosing the existence of the residence in Puerto Rico

1    whether owned or rented.  I am somewhat troubled by the fact

2    that the defendant has lived primarily abroad for the last

3    three or four years and that his personal ties with the

4    exception of his parents, and I don't discount that.  That's

5    an important personal tie but his other personal ties appear

6    to be primarily outside of the country but I'm also troubled

7    by the fact that even after a month in custody and

8    understanding the concerns of the Government the defendant did

9    not offer until today and in a rather sketchy last minute

10   manner to subject himself to the supervision of the Southern

11   District of New York's Pretrial Services at a traceable

12   residence in New York which would not require air travel to

13   come to court.

14          Finally, I think what pushed me over and made me

15   agree with the Government that the Government has met is

16   preponderance of the evidence burden here is the statements

17   that I am told the defendant has made including in private

18   conversations or conversations that he believed at the time to

19   be private with his family about renouncing his U.S.

20   citizenship, obtaining citizenship in jurisdictions that -- if

21   it is St. Kitts and Neves do not have extradition treaties

22   with the United States and/or perhaps jokingly, perhaps not,

23   setting up money laundering operation in a hostile nation,

24   namely North Korea.

25          Now, I have also considered the factors that counsel

48

1  set out to me including his voluntary cooperation with the FBI

2  in this country for a period of at least several weeks,

3  perhaps longer than that prior to his arrest.  That does count

4  with me but it doesn't count enough given the other factors

5  which I have heard this evening.

6           I want to thank the defendant's parents for coming

7  to court today.  I understand this must be very difficult for

8  you and I appreciate your willingness to pledge your assets

9  and co-sign a bond to support your son.  I want to assure you

10  that it is not -- my decision is not based on any lack of

11  effort on your part or any doubt in your own sincerity that

12  you would do everything that you could to make sure that your

13  son honors his legal obligations.  But based on the other

14  factors which I have heard this evening, Dr. Griffith, you

15  will be detained without bail.

16           When shall I set the preliminary hearing?

17           MR. BUCKLEY:  Your Honor, we would request it within

18  14 days as required by the statute.

19           THE COURT:  Sure.  Fourteen days from today is

20  January the 9th.  So I'll put you down for a preliminary

21  hearing on January 9th.

22           Anything further from the defense?

23           MR. BUCKLEY:  Yes, Your Honor.  With regard to that,

24  we do think that there is a potential Rule 5 violation given

25  the amount of time that it took for him to be transported from

49

1   California to here.  It's not something we're asking the Court

2   to address right now but I just want to be clear that we

3   reserve our rights to raise it at a later date.

4           THE COURT:  That reminds me.  You say that Judge

5   Cote was acting in her Part One capacity; is that correct?

6           MS. RAVENER:  Correct, Your Honor.

7           THE COURT:  And since the matter has not been

8   indicted I take it there is no district judge conference set

9   in this matter.

10          MS. RAVENER:  Correct, Your Honor.

11          THE COURT:  All right.  So thank you for bringing

12  that to my attention.  You know what to do.

13          MR. BUCKLEY:  Yes, Your Honor.  The other thing that

14  I was going to ask counsel, out of town counsel, Brian Klein,

15  is flying in overnight and will be here tomorrow.  We likely

16  will take an appeal of this order to the Part One judge.

17          THE COURT:  Sure.

18          MR. BUCKLEY:  So if the Court can direct the

19  Marshals or the U.S. Attorney's Office to coordinate to make

20  sure that Dr. Griffith is able to be presented for an appeal

21  as soon as tomorrow.  Given the amount of time that has lapsed

22  we are anxious to get finality on this.

23          THE COURT:  Ms. Ravener, who's on Part One tomorrow,

24  do you know?

25          MS. RAVENER:  I believe Judge Broderick is on Part

50

1    One this week, Your Honor.  So I think it's up to Judge

2    Broderick upon a submission from the defense as to when he'll

3    hear any appeal.  Of course the defense has a right to seek

4    that and we will make every effort to make Mr. Griffith

5    produced in court at an appropriate time set by Part One.

6              THE COURT:  So it will be up to the district judge

7    to set a time for that and I'm sure he will set it with the

8    production of your client in mind.

9              MR. BUCKLEY:  Okay.  Thank you, Your Honor.

10             THE COURT:  We'll be adjourned.

11                           *  *  *  *  *

12

13

14

15

16

17

18

19

20

21

22

23

24

25

51

1        I certify that the foregoing is a court transcript from

2   an electronic sound recording of the proceedings in the above-

3   entitled matter.

4

5                          *Shari Riemer*                          

6                              Shari Riemer, CET-805

7   Dated:   December 27, 2019

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# Exhibit B

K706GRIC

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

        v.                     20 CR 15(PKC)

VIRGIL GRIFFITH,

          Defendant.

------------------------------x

                          New York, N.Y.
                          July 24, 2020
                          1:30 p.m.

Before:

              HON. P. KEVIN CASTEL,

                          District Judge

                    APPEARANCES

AUDREY STRAUSS
     Acting United States Attorney for the
     Southern District of New York
MICHAEL KROUSE
KYLE WIRSHBA
KIMBERLY J. RAVENER
     Assistant United States Attorneys

BAKER MARQUART, LLP
     Attorneys for Defendant
BRIAN E. KLEIN
KERI C. AXEL

KOBRE & KIM, LLP
     Attorneys for Defendant
SEAN S. BUCKLEY

K706GRIC

1              (Case called; telephone conference)

2              THE COURT:  This is United States of America v. Virgil

3    Griffith, 20 CR 15.

4              Appearing for the government?

5              MR. KROUSE:  Yes, your Honor.  Good afternoon.  This

6    is Michael Krouse for the United States.  With me on the line

7    are Kyle Wirshba and Kimberly Ravener.

8              THE COURT:  Good afternoon to you all.

9              For the defendant.

10             MR. KLEIN:  Good afternoon.  This is Brian Klein.

11   Along with me is Keri Axel and Sean Buckley and my client

12   Virgil Griffith is also on the line and is appearing by

13   telephone from Alabama.

14             THE COURT:  Mr. Klein, am I correct that your client

15   waives his physical appearance and agrees to proceed

16   telephonically?

17             MR. KLEIN:  Yes, your Honor.

18             THE COURT:  Mr. Klein, this is your application.  I

19   have obviously read your letter, your submission, the

20   government's and position and I am ready to proceed.

21             MR. KLEIN:  Thank you, your Honor.  This morning we're

22   going to keep things interesting for you and Ms. Axel is going

23   to argue for Mr. Griffith.

24             THE COURT:  Wonderful.

25             MS. AXEL:  Good afternoon, your Honor.  It is good

K706GRIC

1    morning here in Los Angeles, your Honor.

2              THE COURT:  Good morning then to you.

3              MS. AXEL:  Thank you, your Honor.

4              Your Honor, yes, I am sure you now have had an

5    opportunity to look at the application we submitted and Judge

6    Broderick's order and as the Court now knows, Mr. Griffith has

7    a stringent package of pretrial release conditions that were

8    set by Judge Broderick in January.  We have moved for an

9    amendment of two of the conditions.  One is a removal of

10   electronic monitoring and as mentioned in the application of

11   course Mr. Griffith would like to have the electronic

12   monitoring equipment removed and be moved to a curfew system

13   instead.  We're bringing that request at the instigation of

14   Carl Wallace.  The supervising Pretrial Release officer in

15   Alabama requested that we make that part of our request.  From

16   Mr. Griffith's perspective, he would love to have that

17   restriction lifted.

18             The internet restriction is the one that he would

19   really like the Court to focus on.  And he really can't do

20   anything I think, your Honor, productive.  I think most judges,

21   courts, Pretrial Services officers would love for defendants to

22   be in a situation such as getting a job and he can't do that

23   with the internet restriction that he currently has that allows

24   him to communicate only with counsel.  He simply cannot do

25   things like take a class online or participate in Zoom meetings

K706GRIC

1    or communicate by email with friends.  Many of the things,

2    which I think we all even now more in the pandemic situation

3    realize how dependent we are on it.

4            We waited to bring this application, your Honor.  We

5    are mindful and sensitive of not wanting to burden the Court

6    with litigation when it wasn't ripe.  So we waited to bring

7    this I think until the conditions were ripe.  For example, I

8    think it is quite critical that cryptocurrency drives, his cold

9    wallets, as those are referenced, have now been secured.  I

10   think a key piece of the government's argument concerning

11   flight was that those were essentially sort of unsecured

12   resources that could not be traced.  Again, while we dispute

13   the premise about tracing them, nevertheless those cold wallets

14   are the key to accessing cryptocurrency.  We understand the

15   government's concern and we always agreed not to go into the

16   apartment or take any acts to try to take custody of those, but

17   it took some period of time to actually work out a situation

18   where those could be secured by counsel and they now have been.

19   So I think that is a key changed circumstance.

20           I think that the global pandemic, your Honor, we would

21   submit, which the Court yesterday referred to as a national

22   emergency, is also a critical changed circumstance.  I am sure

23   the Court has entertained petitions from defendants to get out

24   of jail and I know many of those petitions have been granted.

25   In this instance I think it definitely makes it harder for

K706GRIC

1    anyone to travel.  Certainly more difficult for U.S. citizens

2    to travel.  I had an international vacation I had to cancel

3    this summer.  You simply cannot move around the way you used,

4    but I think it has changed the lens by which we view things.  I

5    think things were very transitional at the time that the

6    parties were in front Judge Broderick and Mr. Griffith's life

7    obviously was completely disrupted at the time and we may not

8    have fully appreciated how that restriction would wreck havoc

9    on his ability to do anything to do productive.

10           Specifically, your Honor, the work situation has

11   changed.  I think the record in front of Judge Broderick makes

12   it clear that the Court there was interested in his working.

13   Pretrial Services has always recommended that a condition of

14   his release be that he works and Judge Broderick required about

15   work and at the the time we simply didn't know.  The conditions

16   of his arrest were laid out in her papers, but he is arrested

17   on Thanksgiving.  He is transported in November or December to

18   New York.  He doesn't get an appearance until the day after

19   Christmas and his first appearance before Judge Broderick took

20   place in early January.  So things were very much in the air

21   and we just did not have information or really had much

22   opportunity to give thought to work and what that might look

23   like.

24           It is clear now that he is going to still be on leave

25   at the Ethereum Foundation, but he has been offered a

K706GRIC

1    consulting contract and we offered to make that available to

2    the Court *in camera* if the Court wishes to see it.  I think he

3    would be available to do other types of that kind of work.

4    Given his skill set and I think the where the work world is at

5    your Honor, he has to have the ability to work online, on the

6    internet in order to do that kind of productive work and to use

7    his skills.  So I think that situation has also changed since

8    the time of the initial hearing.

9         I would say, your Honor, particularly during this

10   pandemic, the way for him to get a job is to have internet

11   access and have monitored internet access.  This is going to

12   get beyond my technical expertise, your Honor, but he does

13   back-end work on people's servers from a computer perspective

14   and it is the type of work that is protected by trade secrets.

15   And Pretrial Services monitoring software, which Mr. Griffith

16   also has to pay for which is on the computer now which takes an

17   image of your screen regularly and transmits, is not secure.

18   We had a conversation yesterday about VPNs, and people

19   obviously go to great steps to protect their data as employers

20   would want their data protected.  So I think it is critical for

21   his work to be able to have that kind of internet access.

22        Finally just on the changed circumstance I will say,

23   your Honor, it appeared to us as Judge Broderick recognized

24   that this is a fluid situation and he even provided the parties

25   an opportunity to come back before the final assignment of a

K706GRIC

1    judicial officer, which of course we now have in your Honor.

2    So we think that these are changed circumstances and this is an

3    appropriate time to revisit these conditions so that

4    Mr. Griffith can be as productive as possible while here on

5    release.

6             THE COURT:  Thank you, Ms. Axel.

7             Let me hear from the government.

8             MR. KROUSE:  Yes, your Honor.

9             Before the Court are two requests that the defense has

10   made.  It sounds as though the request to lift home confinement

11   is not one that the defense is pressing.  They continue relying

12   on the Pretrial Services officer.  So that one the government

13   will just say that the defendant remains a risk of flight for

14   all the reasons laid out in the government's papers and all the

15   reasons that were expressed to Judge Broderick.  Judge

16   Broderick found that there were conditions that would

17   reasonably assure the defendant's appearance in court.  One of

18   those conditions was the home confinement condition.  The

19   defense doesn't express any justification really for why that

20   condition should be lifted at this time.  Unless the Court has

21   questions about that, I will move to the internet monitoring

22   condition.

23            THE COURT:  Well, Judge Broderick appears to have

24   ordered home detention with electronic and GPS monitoring; is

25   that correct?

K706GRIC

1          MR. KROUSE:  Yes, your Honor.

2          THE COURT:  Let me just hear defense counsel as to

3    precisely what about that that you seek to have modified if

4    anything.

5          MS. AXEL:  Your Honor, we would be happy for

6    Mr. Griffith to have curfew, but it is specifically the

7    electronic and GPS monitoring.  I think when you use the words

8    "home detention," I think the difference is that with home

9    detention he has to be specifically approved for even things

10   like going out to take a course or going to the gym.

11   Mr. Griffith has expressed to me like there are times when he

12   is needed to go pick up food for the family or he would like to

13   go pick up food for the family even those sorts of things on

14   home detention have to be approved and he can't always get in

15   contact with Mr. Wallace to get approval to do things that help

16   make him also a productive member of his family unit.  I am not

17   sure of the terminology necessarily used in your district, but

18   I think we would ask for simply a curfew without the home

19   detention or electronic monitoring so he could both pick up

20   food, go to the coffee shop, go to the gym without approval,

21   etc.

22         THE COURT:  Thank you.

23         Go ahead, Mr. Krouse.

24         MR. KROUSE:  Your Honor, from the government's

25   perspective he shouldn't be doing any of those things while on

K706GRIC

1    home detention.  He needs specific approval to leave the home

2    for legitimate reasons, which include work, which could include

3    attorney visits and things of that nature.  The government's

4    argument before Judge Broderick is that he should be detained

5    as a risk of flight.  Judge Broderick determined that there

6    were bail conditions that would reasonably assure the

7    defendant's presence and ordered very strict bail conditions to

8    include home detention with electronic monitoring.

9           I am not hearing anything from the defense about why

10   that condition is no longer required.  Judge Broderick found

11   that it was.  The government's position is that it is required.

12   And that if anything the strength of the evidence in this case

13   has enormously grown since the time we were before Judge

14   Broderick.  So if anything, the defendant's incentive to flee

15   in light of the strength of the government's evidence against

16   him, in light of the substantial term of imprisonment he could

17   face, the government put in its letter what its initial

18   determination of what the sentencing guidelines would be all

19   provide an incentive for the defendant to flee.  So if anything

20   what was before Judge Broderick has now grown stronger and the

21   home detention with electronic monitoring in the government's

22   view is both appropriate and necessary to ameliorate any risk

23   of flight that the defendant poses.

24          THE COURT:  All right.  Now let me ask the government

25   is the restriction on computer use and the requirement of

K706GRIC

loading monitoring software limited to risk of flight, or is
there some other justification for this condition?

MR. KROUSE:  Your Honor, it is both in the
government's view.  So there is a justification for the risk of
flight.  The defendant is an expert on the dark web.  Our
understanding is that he developed a browser for the dark web.
As your Honor is likely aware, the dark web can be used for a
number of elicit purposes, including to secure identity
documents and things of that nature which could facilitate the
defendant's ability to flee the jurisdiction.

The danger to the community is also a factor to
consider here.  The defendant has a sophisticated knowledge of
technology, which the government has laid out in its papers
which underlie the charges in this case.  He has expressed
several times a willingness to use that technological knowledge
to assist the regime, namely, North Korea with the development
of blockchain and cryptocurrency technologies.  We discussed
several communications that the defendant had with the
co-conspirator regarding the possibility of shipping a rig in
order to mine cryptocurrency on behalf of North Korea.  He
traveled to North Korea to provide a presentation on these
technologies.  Giving the defendant untethered access to the
internet would possibly allow him to reach back out to
co-conspirators to further North Korea, to possibly chill the
government's investigation, to contact individuals who are

K706GRIC

1    possible witnesses for the government's investigation all of

2    which underscores the necessity to have the monitoring

3    technology in place.

4           It is not the case that Mr. Griffith can't use the

5    internet.  That's not what Judge Broderick said.  He said that

6    he can't have a Smartphone and that if he uses the computer

7    that has internet access or some internet device, it needs to

8    be monitored except when he is speaking or emailing with his

9    defense counsel.  In our view that strikes the appropriate

10   balance.  There is no reasons provided by the defense for

11   lifting that condition other than this unclear in the

12   government's view notion that he can't work as a result of that

13   condition.  The reality is he may need to find a job that is

14   consistent with the conditions of release that were imposed by

15   Judge Broderick and there is no reason to lift that condition

16   as far as the government can tell.

17          THE COURT:  Can you tell me whether Judge Broderick's

18   order was premised upon a finding by the preponderance that

19   these were the conditions that can reasonably assure the

20   defendant's appearance, or whether the restrictions were in

21   part based on a danger to the community to persons other than

22   defendant?

23          MR. KROUSE:  Your Honor, I may be wrong and I would

24   want to look more closely, but I don't believe Judge Broderick

25   made a specific finding on that point.

K706GRIC

1                  THE COURT:  Okay.

2                  MR. KROUSE:  He gave conditions that he thought were

3       appropriate for the defendant's release.  It's possible he had

4       in mind both.  I don't think it is entirely clear as the

5       defense makes it that it is purely a risk of the flight that

6       the Court was relying on because I don't think he said that one

7       way or another.

8                  MS. AXEL:  Your Honor, I will jump in here.  The

9       government --

10                 THE COURT:  I am happy to have you jump in, but I

11      think Mr. Krouse isn't done.

12                 Are you done, Mr. Krouse?

13                 MR. KROUSE:  Yes, I am, your Honor.

14                 THE COURT:  Okay.  You are welcome to reply.

15                 MS. AXEL:  Yes, your Honor.  The government never

16      argued detention.  They never argued danger.  Not in three

17      hearings did they ever argue danger.  I don't know if the Court

18      has access to the Pretrial Services report, but the issues here

19      were never about danger and they didn't argue that.

20                 I think the Court focused early on on the first

21      questions to Mr. Krouse about sort of the nexus between what is

22      purpose of a condition and is it addressed to just reasonably

23      assure that the defendant will appear or whether it was

24      addressed to something else like danger.  I think it can only

25      have been addressed to assure defendant's reasonable appearance

K706GRIC

1    because that is the only thing that was ever argued.  They have

2    never argued that he is a danger.  He is not a danger, your

3    Honor.

4              I think the whole pattern of his very much out and

5    public communications about the decision to go to North Korea

6    shows that.  In fact, we obviously don't agree with everything

7    in the government's proffer about his case; but I think what

8    the Court can take from that is none of that was high tech.

9    We're not talking about somebody getting on and doing some sort

10   of programming thing.  He is not accused of actually using his

11   computer skills for ill.  He gave a lecture and they put in the

12   remarks of what the they allege he said in that lecture.

13   That's the sum total of it.  They never alleged that he is a

14   danger and he is not a danger.

15             I am happy to speak briefly to the dark web issue,

16   your Honor, which was put in front of Judge Broderick.  And I

17   think we were very well able to point out that in fact

18   Mr. Griffith in the context of his knowledge of the dark web

19   has used those skills for good.  Your Honor, we handed up to

20   Judge Broderick -- I wasn't there and the Court wasn't there

21   giving the time of it, but I read the transcript and I

22   participated in the preparation for it.  We handed up to Judge

23   Broderick the research paper.

24             Mr. Griffith is a Ph.D and had a research interest in

25   the dark web and prepared a paper about access to the dark web.

K706GRIC

1    One of the key findings of that paper, your Honor, is in fact

2    that it is not completely dark because it's used for human

3    rights purposes.  A business many times can use it when their

4    countries do not allow them to access Facebook and have free

5    speech that we have here.  He wrote a research paper to that

6    and he in fact got kicked out of the tour project, which was a

7    project where they had created this sort of Google device to

8    access the dark web because Mr. Griffin insisted on cooperating

9    with law enforcement and he has cooperated with law enforcement

10   in teaching and talking about the dark web.  He provided a

11   lecture to Interpol.  In the government's discovery there are

12   correspondence with an FBI agent in Las Vegas, who sent a

13   request for him to pull logs in furtherance of an FBI

14   investigation.  Her name is Anne M. Kempf.  He did so without

15   subpoena so that the data could be preserved.  So he has

16   cooperated with law enforcement.  He has never been accused of

17   doing anything wrong.  So I think it is very important for the

18   Court to sort of separate out these whiffs or suggestions of

19   dangerous use of the internet from really which poses a risk of

20   flight.  There is nothing about his use of the internet that

21   poses a risk of flight.  There is just this mere speculation of

22   something untoward on the dark web.  I suggest, your Honor,

23   that is mere speculation.  There is no evidence to support it.

24   We don't accept it.  We have represented defendants who's

25   expatriate or less.  It is actually a very complicated process

K706GRIC

1    and it is not so easy.  So we reject that suggestion.  But it

2    mere speculation and if in fact Mr. Griffith wanted to use the

3    dark web for such purpose, he likely would not do so on his

4    home computer, your Honor.

5              THE COURT:  Why is that?

6              MS. AXEL:  Well, I think if you were the Dr. Evil,

7    your Honor, that they made him out to be, he wouldn't sit at

8    his home computer that the government could come in and get a

9    warrant to take after he fled and use that to provide the

10   research trail, which would show exactly how he got his

11   passport.  That sort of defies logical sense.

12             THE COURT:  Okay.

13             MS. AXEL:  I am sure the Court if familiar with the

14   idea of a burner phone from a drug deal.

15             THE COURT:  I am.

16             MS. AXEL:  Well, you could imagine someone would get a

17   burner computer and they would go to a public spot where they

18   would have an ISP that couldn't be traced.  So what this

19   restriction does is it doesn't keep anyone from doing these

20   farfetched scenarios that the government proffers concerning

21   speculatively buying a passport somewhere.  What it does do,

22   though, is keep him from Zoom calls with counsel, internet

23   research with counsel, getting a job with an employer that

24   would require his communications to be confidential, doing a

25   workout that is available on YouTube, taking an online course

K706GRIC

    1    of some kind and all of that legitimate stuff that all of us

    2    do.  It keeps him from that when it does not really secure

    3    against these wild scenarios that the government posits.

    4            Coming back to another point that I just need clean

    5    up, your Honor, Judge Broderick's order doesn't allow him to

    6    use the internet but the monitoring software for any purpose.

    7    It only allows him to use the internet for communications with

    8    counsel, and we have had an ongoing dialogue with Pretrial

    9    Services exactly what that means.  We have to revisit it

   10    because there are a lot of things that go on in communication

   11    with counsel that are not limited to just emails from their

   12    email device.

   13            So it is a much broader restriction than they make it

   14    out to be.  You he cannot have internet on his phone, which

   15    means no smart device.  He cannot order or post from his phone.

   16    He can't have internet on his computer other than what is in

   17    purposes -- I think for the sole purposes of communications

   18    with counsel.  So he cannot do what the government is saying

   19    that he can do.  It is prohibited by the way that the order is

   20    drafted.  All right.  Here is my concern and you are welcome to

   21    address it.  Why isn't their clear and convincing evidence in

   22    this case that the defendant represents a danger to the

   23    community and persons other than himself?  He assisted it

   24    appears from the transcripts or endeavored to assist the DPRK

   25    in learning how cryptocurrency works and providing them

K706GRIC

1    information.

2            For example, in addition to his attendance at the

3    conference, the government alleges that he proposed over an

4    encrypted application "If you find someone in North Korea, we'd

5    love to make an Ethereum trip to the DPRK and set up an

6    Ethereum node."  And when questioned whether the plan made

7    economic sense Griffith responded, "It does actually.  It will

8    help them circumvent the current sanctions on them."  He made

9    repeated reference to the ability of the DPRK with the

10   knowledge of blockchain and cryptocurrency to evade both U.S.

11   and U.N. sanctions.  That comes up multiple times during the

12   transcript.  My concern is there is a lot you can read on the

13   internet about blockchain technology and about cryptocurrency.

14   I have done so myself in connection with other work.

15           MS. AXEL:  Yes, your Honor.

16           THE COURT:  The fact of the matter is there are

17   aspects of it that a person with Mr. Griffith's skills,

18   knowledge, experience and background could supply questions

19   that he could answer that would either elucidate risks of

20   detection to the North Koreans or means to avoid that risk of

21   detection.  The problem with information once transmitted it

22   cannot be clawed back.  Why doesn't that based on the probable

23   cause finding by the grand jury and the evidence proffered by

24   the government support a finding that releasing the computer

25   restriction also, in particularly if the home confinement or

K706GRIC

1    home detention is lifted, so that he can go elsewhere and use

2    the computer in an unmonitored setting, why doesn't that

3    present a danger of damaging advice being provided to the North

4    Koreans?

5              MS. AXEL:  Well, your Honor, it is difficult to know

6    exactly where to start.  First of all, I will point that it is

7    the government's burden to prove that he is a danger and they

8    have never argued that and that is for a reason, your Honor.  I

9    would love to contextualize again some of the arguments that

10   they have made on the merits to point out this is really about

11   a trip to North Korea to attend the conference the remarks of

12   which at least -- we're not conceding that it is an accurate

13   transcript or that it is an inadmissible transcript, but the

14   government has submitted to the Court what it believes that the

15   defendant said there.  I think to contextualize that, that is

16   the only direct contact with North Korea that the government

17   has alleged.  I would submit it is the only one that they will

18   ever allege is that trip itself.  Those remarks are at a high

19   level of generality.

20             Again, we have defenses to this case.  I don't think

21   we want to tip our full hand to what those are, your Honor, but

22   those are not services.  They have alleged services and those

23   are not services.  In fact, I am familiar with the Court's --

24   the briefing before the Court in SEC v. Telegram because we do

25   that type of work and I know the education the Court has had

K706GRIC

1    there concerning blockchain.  This kind of information was at

2    an extremely high level.  It is not how to make a

3    cryptocurrency and not how to make a cryptocurrency exchange,

4    which the government said at one point.  It is totally

5    nontechnical.  It is the type of thing you discuss at a

6    conference.  It is not the type of thing you do when you sit

7    down at your computer to draft code.  None of that occurred and

8    none of that is alleged to have occurred.

9          The government has also strung together, setting aside

10   the conference, a few other events.  Your Honor, again, we want

11   to satisfy the Court's concern that there is no danger

12   presented without divulging all the defense theories in this

13   case; but I think the events concerning a node were ones that

14   were actual communications involving the Ethereum Foundation

15   itself.  Those ended because -- again, I don't want to divulge

16   the entire theory of the case, but that whole conversation is

17   completely separate from the conference itself.  I think what

18   those communications do show is again there is not – he has no

19   alliance to anybody at the DPRK.  None of those communications

20   shows that he does.

21         The final aspect that the Court referred to about

22   exchange of cryptocurrency, again, that also is not in any kind

23   of communication with the DPRK correctly.  They are not

24   providing technical information to anybody.  Again, there is an

25   end of that story that I think we need to save for the actual

K706GRIC

```
1    merits of the case itself, but I think that the evidence will

2    show that there is no back channel to the DPRK and I don't

3    think there is anyone alleged there.  So, your Honor, there is

4    no evidence that defendant would or has directly contacted the

5    DPRK and would pose a danger in that respect.  And the

6    information that was provided at the conference as the Court

7    can see is consistent with what is available on the internet.

8            So it is not a concern.  Obviously Mr. Griffith has

9    already been punished for that conduct.  He has been arrested

10   in the United States.  He has transported across the country.

11   He has been told not to communicate with witnesses.  The

12   government made another point here about how important it is

13   that he communicated with these witnesses but then they never

14   gave us a list of whose these people.  So we as a defense have

15   done our own instructions, but they have no evidence that he

16   has done anything improper with the telephone he has that has

17   no smart access, but to contact those people.  So the idea that

18   he would be so stupid to go off to try to provide some active

19   assistance now when he never did so before, I just think that

20   we're far afield from really a conversation about a danger

21   which he doesn't pose or a risk of flight, which he also

22   doesn't pose.

23            THE COURT:  Thank you.

24            Since this is the government's burden of proof

25   certainly on release and release conditions, I will give Mr.
```

K706GRIC

1    Krouse the opportunity to respond.

2             MR. KROUSE:  Thank you.

3             Just on this danger to the community point, defense

4    counsel is correct that the government didn't argue that before

5    Judge Moses or Judge Broderick relying instead on what we

6    believe was the stronger ground of risk of flight.  We did

7    argue for detention.  Of course now that the defense has sought

8    to reopen the bail argument before your Honor, it is our view

9    that your Honor can consider both grounds to continue that

10   condition or to make any other modification that the Court

11   deems appropriate.

12            So just on this point, your Honor, the government

13   argued for detention for the defendant.  We believe that he

14   posed a risk of flight for all the reasons we laid out -- the

15   strength of the evidence, the prospects of punishment, the ties

16   to foreign jurisdictions, the unknown nature of the defendant's

17   financial resources.  All of that in the government's view

18   posed a risk of flight.

19            On this point of internet access, the government

20   strenuously argued for a complete ban on any use of the

21   internet by the defendant.  Judge Broderick decided to do a

22   more limited version of that to allow the defendant

23   opportunities to use the internet to communicate with his

24   counsel, but he did impose certain restrictions in light of the

25   defendant's sophisticated technological knowledge and that was

K706GRIC

 1    appropriate.  The defense's argument seems to be that

 2    Mr. Griffith's lack of use of the internet is some

 3    inconvenience to him, but that shouldn't move the Court.  This

 4    was a balance that Judge Broderick struck as a way of not

 5    detaining him in prison.  So the fact that he has certain

 6    inconveniences that normal citizens don't have is not a ground

 7    to lift a restriction that is appropriate in order to address

 8    the specific risk of flight posed by the defendant and the

 9    government believes in light of your Honor's questions the risk

10    danger that he could pose using his technological knowledge to

11    continue to advise North Korea about cryptocurrency and

12    blockchain technologies.

13            The defense's argument here seems to be there should

14    nobody restriction in place because if he was really going to

15    do that he would find some other way to do that like using a

16    burner lap top or burner phone.  That doesn't seem to be a

17    strong argument.  The government is limited in how it can

18    control the defendant's actions when he is on bail, which is

19    why the government argued for detention in the first place.

20    That is not a reason to lift all restrictions because they

21    would somehow be not fruitful.  The government does want to

22    make it a little more difficult for the defendant to do things

23    that he might decide to do while on bail that are consistent

24    with the things that he was doing before he was released on

25    bail.

K706GRIC

1          So the defense argument that travel to North Korea and
2     providing this technical knowledge to one of the most dangerous
3     and human rights violating countries in the world is somehow
4     not significant conduct and doesn't illustrate a desire to
5     assist North Korea I think is inaccurate.  The defense argument
6     that the government's evidence doesn't show anything beyond
7     just certain types of technical information provided by the
8     defense is also off base.  The government doesn't have a full
9     transcribed recording of the entire conference.  We don't know
10     exactly what Mr. Griffith said every second he was there and
11     every single person he spoke to.  We don't know who he
12     connected with in North Korea, whose contact information he
13     might have obtained, who he might have spoken to later.  We
14     don't have full visibility on that.  We're limited by what
15     evidence we've been able to gather up to point, which is
16     significant.  The recordings are just a snippet of the full
17     conference.  We're not claiming that we have every single
18     communication made by the defendant during that conference.
19          We have not been able to gain access to the
20     defendant's lap top even with our search warrant.  We don't
21     know if the defendant was utilizing the dark web to have
22     communications with people that he met in North Korea after he
23     left the conference or before he traveled to the conference.
24     There is a lot we don't know here.  It's prudent in the
25     government's mind to take steps to try to prevent the defendant

K706GRIC

 1    from further damaging national security by communicating

 2    possibly with other people and one prudent step toward that end

 3    is to monitor his internet access.  There is nothing the

 4    defense has said in the government's mind that justifies

 5    limiting that monitoring condition on his bail in light of the

 6    national security concerns posed and in light of the legitimate

 7    risk of flight that the defendant poses.

 8              THE COURT:  Thank you, Mr. Krouse.

 9          Thank you, Ms. Axel.

10          This is the Court's decision on the application of

11    Virgil Griffith to modify the present bail conditions and to

12    remove the condition of home confinement or detention and/or to

13    at least modify them to a curfew and eliminate the electronic

14    monitoring and GPS and also to modify the restriction of access

15    to internet capable devices that are monitored and then use

16    only for email communications with counsel.

17          It seems to me that Judge Broderick struck a fair

18    balance in this case.  I will point out that the proof of risk

19    of flight, which I find by a preponderance of the evidence is

20    supported by the defendant's obvious access to sources outside

21    the United States.  He is of great value to those who wish to

22    evade U.S. or U.N. sanctions with his knowledge and they would

23    be incentivized to help him flee.  So I find that the

24    conditions that are presently existent satisfy that.

25          Further, this is my finding by clear and convincing

K706GRIC

| | |
|---|---|
| 1 | evidence that the conditions are necessary because Mr. Griffith |
| 2 | presents a danger to the community and persons in that |
| 3 | community other than himself.  The reason I make this finding |
| 4 | is having reviewed the partial transcript and which both sides |
| 5 | say are unsure of the actual accuracy, the comments reflected |
| 6 | therein are of a quote/unquote high level.  In other words, it |
| 7 | would enable anyone to develop a blockchain in and of |
| 8 | themselves, but the point is that he was able to -- |
| 9 | MS. AXEL:  Hello.  Did we lose the Court. |
| 10 | MR. KROUSE:  I think we should wait to see if he calls |
| 11 | back. |
| 12 | THE COURT:  I guess it is a mark of the length of our |
| 13 | proceeding that the battery on my phone ran out and I have |
| 14 | secured another phone.  So that's where we are. |
| 15 | As I was pointing out, it is not merely the transcript |
| 16 | but the willingness to travel knowing of the likely exposure of |
| 17 | the risk he was willing to take is such that this man in my |
| 18 | view has the ability to respond to detailed questions with |
| 19 | technical information and knowledge that poses a grave danger. |
| 20 | That's my concern here and the modest restrictions that Judge |
| 21 | Broderick imposed appear to me to address that danger as well |
| 22 | as the risk of flight. |
| 23 | So the application to modify bail conditions is |
| 24 | denied. |
| 25 | Anything further from the government? |

K706GRIC

1           MR. KROUSE:  No, your Honor.  Thank you.

2           THE COURT:  Anything further from the defendant?

3           MS. AXEL:  Well, I have one question if I may, your

4     Honor.

5           THE COURT:  I don't about questions; but if you have

6     an application you want to make, I am happy to hear it.

7           MS. AXEL:  Okay.  Well, I think my application to the

8     Court would be I think there is confusion here about at least

9     the order itself and how it applies to the use of the internet.

10    Would the Court permit the defendant to use the internet on his

11    computer that is monitored but not just for communications with

12    counsel?  As I said even just to assist the criminal defense,

13    he needs to be able to use the internet beyond the

14    communications with counsel.  He needs to run internet searches

15    for example.  So if that were on the monitored computer, which

16    apparently was what the government's thought that the order

17    was -- we have been reading it more conservatively -- would the

18    Court allow him to use a monitored computer for whatever

19    purpose on the internet?

20          THE COURT:  I understood your application to apply

21    specifically to the limitation on use of the computer except

22    for communications with counsel.  I know I read that and I

23    think you say right in your letter that the restriction of his

24    access to the internet be modified.  "He is only permitted to

25    email with his counsel."  So there is no confusion on this.

K706GRIC

1    That is what your application was and that is what I understood

2    it to be and that is what I ruled on.

3                MS. AXEL:  Okay.  Thank you, your Honor.

4                THE COURT:  Anything else from the defendant?

5                MR. KLEIN:  Your Honor, this is Mr. Klein.

6                THE COURT:  Yes, sir.

7                MR. KLEIN:  I had one point that I forgot to raise

8    yesterday when we were discussing the motion schedule that I

9    wanted to raise.

10               THE COURT:  Yes, sir.

11               MR. KLEIN:  Which is we wanted to ask your Honor to

12   inquire with the government if they plan to supersede between

13   now and the time of motion practice.  If so, we would request

14   that they do so a month in advance of motion practice just for

15   the simple fact that we're not writing motions that get mooted

16   or somehow would radically change by a superseding indictment.

17               THE COURT:  I understand your concern.  If the

18   government supersede, I have no idea.  That's their

19   prerogative.  That is between the government and the grand

20   jury.  You will have a basis to argue whatever you want to

21   argue in terms of an extension in the schedule or change in the

22   schedule.

23               MR. KLEIN:  Thank you, your Honor.

24               THE COURT:  Thank you all very much for the very fine

25   presentations.

K706GRIC

1          We're adjourned.

2                              oOo