

Waymaker LLP
777 S. Figueroa Street, Suite 2850
Los Angeles, California 90017
T 424.652.7800

March 12, 2021

Author's Direct Dial No.
**(424) 652-7800**

**VIA E-MAIL**

Author's Email Address
**kaxel@waymakerlaw.com**

Honorable P. Kevin Castel
United States District Judge
Southern District of New York
500 Pearl Street
New York, New York 10007

Re:   United States v. Virgil Griffith,
      20 Cr. 15 (PKC)

Dear Judge Castel:

      We write in reply to the government's opposition to defendant Virgil Griffith's request for modest modifications of two pretrial release conditions.  In short, the requested modifications would permit him: (1) to travel to Los Angeles to meet with his lead attorneys on parity with the conditions applicable to attorney visits in this District; and (2) to leave his parents' home from 8 a.m. to 8 p.m.  for personal errands and appointments around Tuscaloosa, while remaining subject to GPS and electronic monitoring.  The government's objections do not survive fair scrutiny, with many of them unsupported by the facts and based on readily disprovable assertions.  Mr. Griffith respectfully asks this Court to carefully evaluate the government's arguments and factual assertions, including its claimed need to have Mr. Griffith under constant FBI surveillance when he travels to court or to meet with his attorneys.

      The pandemic has substantially lengthened the time of Mr. Griffith's pretrial release.  It has imposed prolonged limitations on his liberty and created impediments to his ability to meet with counsel that merit revisiting his conditions.  On the record presented, and given Mr. Griffith's compliance with his current bond conditions and need to prepare for trial, the defense submits that the requested modifications are appropriate.  They represent the least restrictive set of conditions necessary to assure his appearance at trial while also ensuring his Sixth Amendment right to counsel.

**Changed Circumstances and Disproven Government Claims
Since Prior Bond Hearings**

      The government contends that that it is inappropriate to revisit Mr. Griffith's pretrial release conditions because no new and material information supports the requested modifications.  (Government's March 5 Opposition ("Opp.") at 4).  Quite to the contrary, as this and other courts have recognized, the pandemic is an unprecedented condition that has altered



many aspects of the operation of the justice system, from its ability to effect a speedy trial to the necessity for detention and custody.  *See, e.g., United States v. Rodriguez*, Case No. 00-cr-761-2(JSR), 2020 WL 5810161, at *3 (S.D.N.Y. Sept. 30, 2020) (Rakoff, D.J.) (ordering sentence reduction because the pandemic had made inmate's "incarceration harsher and more punitive than would otherwise have been the case" and the severity of sentence "as a result of the COVID-19 outbreak exceed[ed] what the Court anticipated at the time of sentencing").

At the time of his initial bond hearings in December 2019, it was obviously not anticipated that in-person court appearances (and therefore visits to New York) would be eliminated, and travel restricted, as has been the case.  Further, it is unclear at present whether Mr. Griffith will even be brought to trial in September 2021, approximately 21 months after his indictment.  Because of the backup of trials due to the pandemic, it could be much later.  This latter fact alone is sufficient to constitute new and material circumstances that justify modification of the current conditions.

In addition, the government fails to acknowledge that Judge Broderick was open to amending Mr. Griffith's travel restrictions.  At the hearing, Judge Broderick first held that Mr. Griffith could travel to Los Angeles to visit counsel, with certain limitations.  (*See* Opp., Ex. B at 36 ("The answer is yes, but it has to be coordinated specifically with the government. In other words, it has to be of limited duration. The government needs to know where he will be staying in California. You will provide them with an itinerary in advance.")).  The government then objected, and Judge Broderick stated that instead he would limit the defendant to Tuscaloosa and New York "at least initially" but that such restriction could be "revisit[ed] if in fact Mr. Griffith . . . had a clean record in terms of Pretrial Services and visiting." (*Id.* at 37).  The fact that Mr. Griffith does have a clean record is a sufficient reason to revisit the matter, as Judge Broderick expressly invited.

Another changed condition from the hearing before Judge Broderick relates to Mr. Griffith's access to cryptocurrency in Singapore.  Mr. Griffith has, with the government's agreement, worked with a Singapore attorney to have his cold wallets (on which cryptocurrency is stored) sequestered in a manner that deprives him of access to the cryptocurrency contained on them.  This is important new and material information that distinguishes Mr. Griffith's current situation from that presented to Judge Broderick, wherein the government repeatedly cited to the cryptocurrency contained on those devices as evidence that he presented a risk of flight.  The government tacitly acknowledges this, and despite agreeing to the sequestration measures described above, persists in its unfounded claim that Mr. Griffith's compliance with Judge Broderick's order in this regard is not sufficient because the government still does not know the full universe of Mr. Griffith's "untraceable cryptocurrency." (Opp. at 5).  This is wrong for several reasons.

As an initial matter, digital assets are not in fact untraceable, and the government knows (or, at least, should know) this.  Undersigned counsel work on many investigations where the government traces such assets and apprehends suspects.  If the government had any interest in attempting to trace Mr. Griffith's assets, there are many ways in which it could have gone about


doing so over the last 18 months of its investigation.[1]  Instead, the government has elected to continue to make unsupported claims about Mr. Griffith's assets and about his candor with Pretrial Services.

The government also cites Judge Moses as finding it "troubling" that Griffith "chose not to provide full disclosures of his financial holdings." (Opp. at 5, citing Ex. A, at 26, 46).  But the factual predicate on which Judge Moses relied – that Mr. Griffith had opted to provide to the Pretrial Services Office little detail as to his cryptocurrency assets –is simply wrong.  Judge Moses was led to this erroneous conclusion by the government, who repeatedly blamed Mr. Griffith for the fact that his assets were summarized in the Pretrial Services Report.  (*See* Opp., Ex. A at 13 ("[A]ll we have to go on with respect to those assets are Mr. Griffith's own admissions that he possesses at least $250,000 worth of assets that are almost entirely contained in crypto currency exchanges.  He did not identify those exchanges to Pretrial Services.  He did not identify that currency to Pretrial Services"); 15 ("Mr. Griffith provides no accounting of how much money in [Ethereum] currency he has"); 16 ([O]ur perspective is that these assets may not even encompass Mr. Griffith's full wealth … because these are self reported….  And because of the lack of detail that he opted to provide to Pretrial in reporting these assets.  He gives no numbers with respect to these particular currencies.")

But, in fact, it was the Pretrial Services Officer, not Mr. Griffith, who summed up his assets on the initial Pretrial Services Report and told Mr. Griffith he did not need to provide further detail.  So, far from Mr. Griffith opting to provide minimal detail, he provided more detail to the officer than that officer opted to include in the report.  Importantly, Mr. Griffith has also never been asked – by the government or Pretrial Services – to provide more detailed information.[2]  Accordingly, the allegation that Mr. Griffith failed, at his election, to provide more detail to the Pretrial Services is wrong.

Judge Moses was also likely influenced by the government's overbroad claims about the facts of the case, such as the allegation that Mr. Griffith "educat[ed] the North Korean

---

[1] Indeed, the Department of Treasury's Office of Foreign Assets Control (OFAC), with which the FBI worked jointly to investigate and prosecute this matter, routinely imposes sanctions and fines on individuals and entities based on the tracing tracing cryptocurrency transactions and assets, and designates and forefeits digital wallets and assets.  *See, e.g.*, https://home.treasury.gov/news/press-releases/sm556.

[2] Mr. Griffith's initial appearance in Los Angeles was on November 29, 2019, and he was ordered released on conditions, as Pretrial Services had recommended.  After the government sought a stay from Judge Cote, he was detained and it took almost a month to transport him across the country, where his initial presentment took place on December 26, 2019.  During that period, government counsel never asked for an accounting of his assets and, as to the cryptocurrency maintained on cold wallets in Singapore, expressly directed defense counsel not to have anyone take custody of those devices, on penalty of obstruction.



The Hon. P. Kevin Castel
March 12, 2021
Page 4 of 7

government and others about how to establish . . . a crypto currency exchange in North Korea for the purpose of engaging in money laundering" (*Id.* at 11; *see also* 17:9-13: "[H]e's a crypto currency expert who's used his own expertise already to commit an offense that is all about hiding assets, engage secretive untraceable elicit transactions for the purpose of laundering money.") As this Court well knows from the motion to dismiss, the government had and continues to have no evidence that Mr. Griffith helped anyone set up a crypto-currency exchange, hide assets, or launder money.³ Indeed, the recent stipulation between the parties demonstrates the government agrees that Mr. Griffith did not provide any information to the North Korean regime that it did not already possess. (Dkt. No. 96).

It has to be kept in mind that the Bail Reform Act does not permit reliance on unsubstantiated, much less incorrect, proffers. *See, e.g.*, *United States v. DeFede*, 7 F. Supp. 2d 390, 393–94 (S.D.N.Y. 1998) ("The fact that the Bail Reform Act does not require an evidentiary hearing prior to the issuance of any detention order of course does not mean that a court is free to detain a defendant by arbitrarily crediting an unpersuasive government proffer over an unsubstantiated proffer of denial by the defendant. The stakes in pretrial detention are too high."). This should be especially true at this juncture. Given that this matter is full year into discovery, and given that the government seized and now has access to Mr. Griffith's iPhone, iPad, and personal laptop – on which his whole life was organized – it is wholly inappropriate for the government to seek to rely on baseless (and disproven) facts such as the claim that he has a secret stash of assets. *See, e.g., United States v. Bodmer*, 2004 WL 169790 (S.D.N.Y. July 9, 2004), at *3 (rejecting the government's argument that the defendant likely had "vast financial resources in undisclosed offshore accounts" as speculation).

**The Requested Modifications Are Appropriate Given the Pandemic, Mr. Griffith's Need to Meet with Counsel, and His Compliance with His Conditions to Date**

- **GPS and Electronically Monitored Curfew in Tuscaloosa**

The government objects to Mr. Griffith's request to be able to leave the house without notice to Pretrial Services but with a curfew and GPS monitoring, a modification with which Pretrial Services agrees. In doing so, it claims a lack of changed conditions and argues that home detention is the "least restrictive condition" to ensure defendant's appearance. As

---

³ The government's only support for its reference to money laundering in this case comes from an alleged text from Mr. Griffith referenced on page 6 of the opposition that was taken out of context. In the text, Mr. Griffith was clearly joking with his parents about what he might do in the event that he was fired from the Ethereum Foundation. Judge Broderick recognized that the government might be overplaying the import of this quotation, and asked to view the whole text in context. (*See* Judge Broderick Dec. 29, 2019 Order Under Seal, Question #13 ("What were the exact words used by Mr. Griffith . . . ?"). The text message from Mr. Griffith starts "I'm moody. I might get fired." As defense counsel explained at the hearing, and as seen in this text and others, Mr. Griffith can "say thing[s] that are provocative and not meant to be taken seriously," especially in talking with his own parents. (Opp., Ex. B at 21).


discussed above, changed conditions exist.  As for his alleged flight risk, there remains zero evidence of actual flight risk; instead the government's arguments are based solely on its unsubstantiated claims, which cannot carry its burden to establish risk of non-appearance by a preponderance of the evidence.  To the contrary, Mr. Griffith has been in compliance with the conditions of his bond for more than a year, has taken affirmative measures to limit his access to foreign cryptocurrency, and studiously has attended every court appearance in this case.  All of this provides ample support for the conclusion that GPS-monitored home confinement at his parents' house (which they would lose if he were to abscond) with a curfew are sufficient limitations in the current environment to ensure his continued appearance.

- **Travel to Los Angeles to Prepare for Trial**

The government has raised certain logistical objections to Mr. Griffith's proposal to travel to Los Angeles, namely that travel is "highly problematic" given his flight risk and the pandemic.  The government indicates that it would consent to "particular trips" to Los Angeles, if law enforcement accompanies him to an airport (which is entirely outside of Mr. Griffith's control), as is permitted under the current conditions for trips to New York.  The government contends, however, that such process would require more than 48 hours' notice.  (Opp. at 6).  Given the FBI's role in Mr. Griffith's prior travel to New York, the government does not need more than 48 hours and, indeed, surveillance is unnecessary.  In any event, Mr. Griffith simply seeks parity with the condition governing travel to this District so he can meet with his lead counsel to prepare for trial.

As an initial matter, the government from the beginning has overstated the risk of flight from travelling domestically from U.S. airports.  Government counsel stated to Judge Moses that "once Mr. Griffith gets to an airport all our ability, law enforcement's ability to control which plane he gets on and ensure that he does not flee prosecution becomes very [inaudible] and incredibly difficult to enforce."  (Opp., Ex. A at 9-10.)  But discovery now provided to Mr. Griffith shows that the FBI took photographs and surveillance notes of Mr. Griffith at the airport upon his arrival to the U.S. on October 5, 2019.  (*See, e.g.*, USAO_003260-003262.)  Further, the chance that Mr. Griffith could board an international flight without a valid passport is infinitesimally low, particularly given the pandemic, which has produced fewer passengers in the terminal and additional identity checks.

In any event, the relevant condition in the current bond that the government seeks to apply to Los Angeles travel as well should be more than sufficient to permit further surveillance, and does not require more than 48 hours' notice.  This condition, which the defense does not oppose, states as follows: "To the extent the Government deems it necessary, in connection with all visits to and from the New York Districts, Defendant shall be accompanied to the airport by an agent of the Federal Bureau of Investigation or other investigative agency designated by the Government, who shall ensure that he boards his flight."  (Dkt. No. 15 ¶ 8.)  Notably, the FBI's Los Angeles field office is one of its three largest field offices in the country and thus is more than capable of conducting whatever surveillance or accompaniment the government deems



necessary. There simply is no justifiable reason to treat Los Angeles any differently than New York.

The government's objection also appears disingenuous. Due to the pandemic, Mr. Griffith was able to travel to New York only once for a court appearance, but the defense believes that the FBI did not monitor him other than possibly a cursory checks at airports, *i.e.*, they did not have FBI agents accompany him or surveil him once he left the airport and while he stayed at his hotel in New York City. The defense offered to coordinate with the government to permit the FBI to take him to the airport upon departure or arrival, but the government declined. We request the Court inquire with the government as to the steps the FBI previously took to determine whether the government would even undertake the surveillance efforts it claims are necessary.

Searching for reasons to oppose, the government also suggests that Mr. Griffith has a "social network" in Los Angeles that could assist him to flee because he stayed with individuals in Los Angeles prior to his apprehension. This argument should be disregarded for several reasons.

First, the government raises this argument without identifying why this social network would assist Mr. Griffith in a serious federal crime, *i.e.*, helping him abscond. Of course, it has no such evidence of any such plot or any credible reason to believe that would take place. Such speculation therefore should carry no weight.

Second, although it is true that he previously stayed with friends in Los Angeles, this was only after the government asked him not to leave the United States, so, in compliance with their request, he stayed in Los Angeles with friends. For the government now to attempt to fault him for agreeing to do what the FBI asked of him—even though he was under no legal or ethical obligation to do so—defies all logic and reason. Tellingly, while residing with individuals from this "social network," Mr. Griffith made no effort to flee and kept the FBI apprised of his whereabouts. Indeed, again with no legal or other obligation to do so, he proactively informed the government of what flight he would take to Maryland to visit his family for Thanksgiving, and they arrested him in Los Angeles as he was boarding the very domestic flight about which he had previously informed the FBI.

Third, Mr. Griffith has friends in New York. In response to Judge Moses's question, he indicated that he would be able to reside with one of those friends pending trial if the Court believed that was necessary. (*See* Opp., Ex. A at 32, 33). Of course, also he has family and friends in Tuscaloosa, where he grew up and went to college. Overall, his alleged social network in Los Angeles is hardly unique or nefarious, and is no reason to deny him the ability to visit with his attorneys there.

Finally, the government raises concerns with Covid-19 quarantine requirements, but those should not be of concern either. Mr. Griffith would not travel to California in violation of any quarantine requirements. He can also agree not travel when a 10- or 14-day quarantine is



required.  Mr. Griffith has also received his first vaccination shot, and with cases rapidly declining in Los Angeles, the quarantine is likely to be lifted.

*** 

For these reasons, Mr. Griffith respectfully requests that the Court grant his requested modifications of his pretrial release conditions.

Sincerely yours,

Brian E. Klein
Keri Curtis Axel
Waymaker LLP

-and-

Sean S. Buckley
Kobre & Kim LLP

*Attorneys for Virgil Griffith*