1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,

4            v.                          20 CR 15 (PKC)

5   VIRGIL GRIFFITH,

6                Defendant.              Hearing
    ------------------------------x

7
                                         New York, N.Y.
8                                        July 20, 2021
                                         2:10 p.m.
9

10  Before:

11
                        HON. P. KEVIN CASTEL,
12
                                         District Judge
13
                            APPEARANCES
14
    AUDREY STRAUSS
15       United States Attorney for the
         Southern District of New York
16  BY:  KIMBERLY RAVENER
         KYLE WIRSHBA
17       Assistant United States Attorneys

18  BAKER MARQUART LLP
         Attorneys for Defendant
19  BY:  BRIAN KLEIN
         KERI CURTIS AXEL
20
    Also Present:
21  John Moscato, U.S. Pretrial Services

22

23

24

25

1          (Case called)

2          THE COURT:  Good afternoon.

3          MS. RAVENER:  Good afternoon, your Honor, Kimberly

4     Ravener and Kyle Wirshba for the government.  We are joined at

5     counsel table by Pretrial Services Officer John Moscato.

6          THE COURT:  Good afternoon.

7          Mr. Moscato, you're a pretrial services officer in

8     this district?

9          MR. MOSCATO:  Yes, your Honor.

10         MR. KLEIN:  Good afternoon, your Honor, Brian Klein

11    with Kerry Axel and Virgil Griffith.

12         THE COURT:  Good afternoon to you all.

13         This is a bail review hearing, and I'll hear from the

14    government.

15         MS. RAVENER:  Thank you, your Honor.

16         As we have submitted in our letter, the defendant has

17    violated his bail conditions.  The bail order in place in this

18    case specifically prohibits the defendant from accessing his

19    cryptocurrency accounts.  As the government has submitted, the

20    defendant and now, as he asserts, an individual acting on his

21    behalf have attempted to do exactly that.

22         Defense counsel's response admits that, at a minimum,

23    the defendant sent a follow-up e-mail to a cryptocurrency

24    exchange pursuing his access to cryptocurrency accounts there,

25    which, as the government has advised the Court, held nearly $1

1    million in cryptocurrency at the time.

2         We will credit that the defendant may be using a third

3    party to act on his behalf at least some of the time.  That is

4    a problem in and of itself, your Honor, because it evades the

5    computer monitoring conditions that are supposed to be in place

6    for this defendant.

7         But even putting aside this convoluted explanation

8    about how the defendant's mother purported to impersonate him

9    in an attempt to get access to these cryptocurrency accounts

10   and how defense counsel claims they advised her she could do

11   so, that follow-up e-mail sent by the defendant is an explicit

12   violation of paragraph 14 of the bail order, and the defense

13   provides no basis for how this e-mail could have possibly been

14   within the scope of their described advice.  What we have seen

15   is only smoke and mirrors from the defense to try to

16   rationalize the defendant's conduct post hoc.

17        Even assuming that the defendant's mother sent that

18   first message to the exchange, the message was written in the

19   first person.  It was designed to mislead the exchange into

20   providing access to the defendant's cryptocurrency accounts.

21   If not directly to the defendant, then to his agent.  This

22   interpretation is a wholesale circumvention of the bail

23   conditions.  It is absurd to read the conditions to permit an

24   agent of the defendant to act on the defendant's behalf, to do

25   the very things that the order prohibits.

1          The risk of flight is not mitigated by the defense

2     counsel's involvement in these bail violations.  The evidence

3     shows that the defendant, and others acting on his behalf in

4     concert with him, exploited their alleged advice.  Defense

5     counsel cannot possibly know that once access was granted to

6     these accounts, if this scheme worked, that the sole actions

7     the defendant would take would be to pay his legal fees.  It's

8     also concerning that defense counsel's apparent advice was

9     motivated by a desire, apparently, to get paid.

10         The prohibition on the defendant's access to his

11    cryptocurrency accounts is a central feature to the bail terms

12    in this case and that's so for good reason.  He is a

13    millionaire with few U.S. ties and a high incentive to flee.

14    He expressed a desire to renounce his U.S. citizenship and

15    purchase citizenship elsewhere.

16              THE COURT:  When and where was that?

17              MS. RAVENER:  Your Honor, that was during, I believe,

18    still the period of 2019 or so, after he committed the offense.

19              THE COURT:  How do you know that?  How do you know

20    that this is something he did?

21              MS. RAVENER:  We have text messages, your Honor, that

22    reflect those statements, and we would be happy to present them

23    to the Court.

24              THE COURT:  Have they been produced to the defendant?

25              MS. RAVENER:  They have, your Honor.

1           The defendant is also charged, obviously, with a

2    serious national security offense that involved the evasion of

3    U.S. law and travel to a hostile foreign nation.

4           THE COURT:  What's the maximum term of imprisonment on

5    the counts in the indictment?

6           MS. RAVENER:  I believe it's 20 years, your Honor.

7           THE COURT:  Go ahead.

8           MS. RAVENER:  The defense's incentive to flee has only

9    intensified as the case has persisted, as the Court has ruled

10   on motions as we proceed to trial.  We are facing trial in just

11   two months.

12          It bears noting for the Court that the government is

13   investigating the funds in this account.  But what we

14   understand from reviewing the particular account the defendant

15   tried to access here is that it doesn't even hold the bulk of

16   the defendant's assets, and we know that because it does not

17   appear to contain the defendant's payments from his actual job,

18   which was at the Ethereum Foundation.  So this is not even an

19   account that holds has salary, your Honor, and yet it holds

20   nearly $1 million in assets.

21          As we have described to the Court, this is also a

22   U.S.-based exchange and, in contrast, we have much less

23   visibility into the full scope of the defendant's holdings.  He

24   was based in Singapore in the years leading up to his offense

25   and throughout his offense, and he has maintained few ties here

1    to the United States other than his family.

2           THE COURT:  In reading submissions there are

3    occasional references, which I am not sure are accurate, to the

4    funds having been frozen.  That's not true to your knowledge,

5    is it?

6           MS. RAVENER:  Your Honor, our understanding is that

7    the cryptocurrency exchange at issue has taken the position

8    that they will not release the funds to the defendant.

9           THE COURT:  That's not because of process served on

10   them by any governmental authority, to the best of your

11   knowledge, but their own reasoned decision assessing their

12   potential legal exposure?

13          MS. RAVENER:  That's our understanding, your Honor.

14          Now, I will just note, of course, the government did

15   provide a copy of the bail order in this case to the exchange.

16          I also want to address a couple of other matters

17   placed at issue by the defense in part.  The defendant's travel

18   to Los Angeles last week, your Honor, was not without incident,

19   as the defense reports.  The defendant was kicked out of the

20   hotel he reported to the Court and the government he was

21   staying at.  We understand that the defendant did notify

22   pretrial services that that happened, but the defense never

23   notified the government, never notified the Court, as we

24   believe was required under the order, that he changed hotels.

25   We now know that the reason the defendant was kicked out of

1    that hotel was because, among other things, he bragged that he

2    was under investigation by the FBI and encouraged employees to

3    read about his activities with North Korea and cryptocurrency.

4           This pattern of conduct, in addition to the attempt to

5    access the cryptocurrency exchange, shows a repeated flagrant

6    lack of respect for these proceedings, for the bail conditions,

7    and for the Court.  It further emphasizes that we simply cannot

8    trust that the defendant will honor those conditions and appear

9    in court here for a trial.  It heightens his risk of flight

10   that he repeatedly shows such disrespect.

11          I'd also like to address this matter about the alleged

12   involvement of pretrial services in this violation.  We do have

13   one of the pretrial services officers here in court, and we

14   have made the local officer available by telephone, if needed.

15          But we have learned that the pretrial services office

16   only approved the defendant's mother to act as a "secretary,"

17   in the defense's terms, in theory, to help him get a job.  The

18   defendant never got a job.  That approval was, therefore,

19   obsolete.  We have confirmed with pretrial services that the

20   only other thing they believe the defendant's mother was doing

21   for him on the Internet was tasks related to assisting in his

22   defense, which apparently involved using some kind of

23   Internet-based software, as reported to pretrial services.

24          There was no general awareness, as the defense claims,

25   that the defendant's mother was acting as his all-purpose agent

1    on the Internet, unbound by any other bail conditions, nor

2    could there be.  By their account, for example, there would be

3    no violation of the bail conditions if the defendant's mother,

4    for example, went on the dark web to purchase a passport for

5    him or liquidated his cryptocurrency and then provided him the

6    cash in fiat money or purchased citizenship for him in another

7    country, as his own communications reflect he had a desire to

8    do.

9            This cannot be the case.  The defendant knows better.

10   The defendant, and it appears he worked with others, has

11   violated his bail conditions and there must be recourse from

12   this Court.  Thank you, your Honor.

13           THE COURT:  Thank you.

14           Mr. Klein.

15           MS. AXEL:  Good afternoon, your Honor, Keri Axel.

16   I'll be speaking for Mr. Griffith.

17           THE COURT:  Ms. Axel.

18           MS. AXEL:  Your Honor, as we explained in our papers,

19   we apologize to the Court for the confusion that occurred here.

20   But there really is, I think, a misunderstanding.  There was no

21   violation of the bail order in this case and certainly no

22   intent to flee.

23           Your Honor, I have explained in the papers my reading

24   of the order and I -- as it says, it is a provision -- as we

25   interpreted it, we believe that Mr. Griffith is barred from

1    using the Internet to access.  But ultimately not to -- he is

2    not barred from accessing any financial account with the

3    exception of the specific provision in paragraph 5 that

4    governed cold wallets.  And we sequestered those cold wallets,

5    as we were ordered to do, and we met and conferred, and those

6    are secured, as previously described to the government and to

7    the Court.  We took care of that.

8          With that being said, he has other financial accounts.

9    And in consultation with his parents -- and his dad is here in

10   court today, he is here from Alabama, his mother,

11   unfortunately, was not able to travel because she, as the Court

12   notes, recently lost her mother and was really not just feeling

13   up to coming to New York today.  But she is available, should

14   we ever need to bring her in by phone -- with his parents, who

15   really have always been a constant force in his life with

16   respect to managing his finances, they were beginning to think

17   ahead to trial in September and beginning to think about how to

18   make a plan to pay for counsel to come to trial.

19         In that respect, they reached out and my advice was,

20   your Honor, and I have explained and taken responsibility for

21   this, and I have talked to both Coinbase and I have talked to

22   the government about my interpretation of the order.  My

23   interpretation of the order was Mr. Griffith himself could not

24   access the Internet to access his account, but that didn't

25   prevent his parents from doing it, just like they could access

1    a bank account or a brokerage account on his behalf.  His

2    finances, so to speak, I don't believe, in my read of this

3    order, are restricted by the order.

4        THE COURT:  Now, if Mr. Griffith wishes to assert

5    advice of counsel -- I'll hand this out to you.  Let me have it

6    marked as Court Exhibit 1.  I'll hand one out to each side.

7        This is, I believe, an accurate statement of the law

8    in this circuit on advice of counsel in the criminal context

9    taken from a charge to the jury on the subject in the case

10   that's been affirmed by the Court of Appeals for the Second

11   Circuit.

12       In considering whether the defendant acted willfully

13   and with knowledge, you must consider whether he honestly and

14   in good faith sought the advice of a competent lawyer as to

15   what he may lawfully do.  This means that he sought and

16   obtained legal advice regarding a proposed course of conduct

17   before proceeding with that course of conduct.  You must

18   consider whether the individual fully and honestly presented

19   all relevant facts to his lawyers and whether he honestly

20   followed such advice in good faith, relying on it and believing

21   it to be correct.

22       In short, you should consider, whether in seeking and

23   obtaining advice from lawyers, the individual intended for his

24   acts to be lawful.  If he did so, he cannot be convicted of a

25   crime that requires willful and unlawful intent, even if such

advice were an inaccurate description of the law.

On the other hand, no defendant can willfully and knowingly violate the law and excuse himself from the consequences of his conduct by asserting that he followed the advice of a lawyer. Whether the individual acted in good faith, the purpose of seeking guidance as to the specific acts in this case, before engaging in those acts, whether he made a full and complete presentation of the facts to his lawyer and whether he acted substantially in accordance with the advice received are questions for you to determine.

If the defendant wishes to rely on advice of counsel, all facts presented to his lawyer in connection with his course of conduct are relevant. They are waived. There is no privilege protecting them. That's why it's a serious step to assert advice of counsel.

Now, it is the case that this is a bail review hearing. It's very different than, say, for example, in a criminal proceeding where an individual is accused of violating the terms of his supervised release. One must show a violation. And if there is no violation of the terms of supervised release, the matter is at end. That is not the case with bail review.

So, for example, if there were competent evidence that a particular individual was looking at, calling up, finding flight schedules to Dubai, that's not a crime, and it may not

1   be a violation of any order whatsoever.  But that may change

2   the calculus on the risk of flight.

3         The same is true, for example, if someone won the

4   lottery and their financial condition changed.  They didn't do

5   anything wrong in winning the lottery, but it may be the

6   circumstance for bail review and a different calculus on

7   whether or not the person should be released on bail.

8         If you want to raise advice of counsel, it seems to me

9   that it is fair game for the government to inquire whether or

10  not and what was described as the set of facts to his counsel.

11  Was it described to them that he would be asking the coin

12  exchange to delete the two-factor authorization protocol

13  because the FBI had seized his phone.  These are questions that

14  become important.  You tell me.

15        MS. AXEL:  I suppose I would like to confer with my

16  client and my colleague about it, advice of counsel, your

17  Honor.

18        Could I perhaps address the two-factor authentication

19  question and some of the other of Ms. Ravener's comments?

20        THE COURT:  Sure.

21        MS. AXEL:  With respect to the two-factor

22  authentication, I think the entire message, which we submitted

23  to your Honor on the supplemental briefing once we received it,

24  I think actually indicates that there really was no desire to

25  be surreptitious or violate any condition of bond.

1          The thing about the FBI tells the reader, I don't have

2    access to these devices.  You guys may need to do what you are

3    going to do with respect to getting appropriate access to this

4    account, and I think that was in fact the full intention.  As

5    we put in the supplemental message, when his mother sent that

6    electronic message, they expressly put in my e-mail address, my

7    number.  And they did that knowing that the process would take

8    some period of time, that there likely was a red flag on the

9    account and that over some period of time someone would then

10   reach out to me, as they did, in fact, eventually, casually.

11   It didn't seem like it was in a hurry when it occurred.  I

12   didn't think anything of it, given what I already knew.

13         I said we would submit a power of attorney.  We would

14   do everything that we needed to do to make sure it was properly

15   accessed through the parents' account.  That's exactly, I

16   think, the intent of the message.  The message shows that was

17   the intent behind it.  This was going to fold over a slower

18   period of time.  And it would not be unusual in the family that

19   the family take control of Mr. Griffith's accounts in this

20   matter.  I think that was the intent.

21         Your Honor, viewed in that intent, I think you can see

22   there is no actual violation of the bond, nor is there, to the

23   Court's point, there is no real concern about this being in any

24   way connected with an intent to flee at all.  It is just really

25   a misunderstanding about what was OK for Mrs. Griffith to do,

1   and a mistake in not expressly stating that it was

2   Mrs. Griffith initiating the inquiry.

3          With respect to the e-mails, your Honor, all the

4   e-mails do, I'm sure the Court has sent a customer service

5   inquiry.  I did so recently or I actually -- I am trying to

6   think of the example.  But what happens is, when your issue has

7   been opened for some time, you get an automated message.  It

8   has a customer number on it or a ticket number assigned to the

9   thing that you have entered and it just has hashtags and says,

10  if you don't respond to this message, your inquiry will be

11  closed.  That's what he responded to, just saying yes, I still

12  need assistance.  That in and of itself, your Honor, we submit

13  is also not a bond violation.  He just at that point was

14  keeping up the previous inquiry and that was done on the e-mail

15  account that is monitored.

16          THE COURT:  Was the other e-mail on the account that

17  was monitored?

18          MS. AXEL:  The other is not an e-mail.  It had to be

19  done electronically.  You go to Coinbase's website and you

20  initiate an inquiry.  You check boxes.  This is my

21  understanding.  Kim is giving me a look.  I have seen the

22  discovery and I've talked to the family.  My understanding is,

23  it's an electronic message sent through the web.  So, no, the

24  mother did that on her own device or on a family device.

25          THE COURT:  And the defendant sent the response to the

1    e-mail himself.  Is that accurate?

2              MS. AXEL:  Upon receiving an inbound request in June,

3    at some period of time later he responded.

4              THE COURT:  Himself directly.

5              MS. AXEL:  Himself directly.  Remember, your Honor, he

6    is allowed to e-mail.  So he is just saying, I need assistance

7    to keep the account inquiry open.  That's all it does.  It

8    doesn't resolve it.  It's not providing any information.  It's

9    not substantively answering questions.  It's just keeping the

10   account open.

11             THE COURT:  I'll give you an opportunity to respond to

12   this.

13             Let me read the order entered by Judge Broderick

14   sitting in part I on January 2, 2020 at paragraph 14.  It does

15   say he is allowed to e-mail, but listen to what Judge Broderick

16   said.

17             Defendant's Internet activity will be limited to

18   communicating with his counsel by e-mail.  Defendant is not to

19   access the Internet for any other purpose and is specifically

20   prohibited from accessing any of his cryptocurrency accounts

21   and from accessing the dark web.

22             You maintain that he has the right and the ability to

23   directly e-mail with persons other than his counsel under this

24   order?

25             MS. AXEL:  Your Honor, yes.  You had modified the

1    order.  We have a modification that allows him to e-mail for

2    other purposes.  What is that, in April of this year?  He does

3    have a modification that allows him to e-mail on the monitor

4    computer.

5                THE COURT:  So this is my fault.  OK.

6                MS. AXEL:  It's just --

7                THE COURT:  It seems like it is my fault.

8                MS. AXEL:  I didn't mean to suggest that.

9                THE COURT:  I'm suggesting it.  I don't think you were

10   suggesting it.  I'm suggesting it.  That was your application.

11               MS. AXEL:  Yes, your Honor.

12               THE COURT:  What number is that on the docket?

13               MS. AXEL:  We are searching for it, your Honor.

14               I do know it's after -- here it is.  Docket 92.

15               THE COURT:  It seems to me that that related to

16   e-mails with nonattorneys.  How do you account for the balance

17   of 14, which reads:  Defendant is not to access the Internet

18   for any other purposes and specifically is prohibited from

19   accessing any of his cryptocurrency accounts and from accessing

20   the dark web.  That wasn't modified, correct?

21               MS. AXEL:  Yes, your Honor.

22               THE COURT:  Yes, it was not modified.

23               MS. AXEL:  Correct, it was not modified.

24               THE COURT:  Go ahead.

25               MS. AXEL:  To answer the Court's question, I think

1   what accounts for it is that we did not view this as accessing

2   his cryptocurrency account.  Access is restricted.  That's

3   really the whole point of the initial inquiry, to allow someone

4   to access.

5          THE COURT:  The cryptocurrency -- it may be true as to

6   the cryptocurrency.  It's not true as to the account.

7          MS. AXEL:  An e-mail in response to an automated

8   customer service --

9          THE COURT:  No.  I'm talking about -- listen.  You

10   have a problem here, Ms. Axel.  Part of the problem arises from

11   your letter.  Your letter makes it plain that Mr. Griffith sent

12   the communications to Coinbase.

13          When Mr. Griffith was denied permission to use the

14   Internet to work, I don't know when that was.  When was that?

15   I thought we just decided that I had modified his bail

16   conditions.  What do we mean on page 4 of your letter?  When

17   Mr. Griffith was denied permission to use the internet to work,

18   I thought we just established that he may use e-mails to

19   communicate with nonattorneys.

20          MS. AXEL:  Yes, your Honor.  Different chronology of

21   events, your Honor.  In July 2020, we specifically moved for

22   him to be able to use the Internet directly, not just via

23   e-mail, but actually use the Internet to be able to work; for

24   example, to be able to log in and to be able to use a

25   cloud-based server for a potential employee.  To do programming

1    directly on a computer as, of course, might be within the scope

2    of his services, were he allowed to work.

3              THE COURT:  Let's continue.

4              When Mr. Griffith was denied permission to use the

5    Internet to work, Mr. Griffith collaborated with his parents on

6    a system that would permit him to work.  The idea -- and this,

7    by the way, parenthetically, he was not going to work for

8    Coinbase, I take it, right?

9              MS. AXEL:  No.

10             THE COURT:  The idea was that his mother, Dr. Susan

11   Griffith, could act as an assistant to access the Internet on

12   his behalf to permit him to do work that required Internet use

13   while complying with, presumably, the Internet restrictions of

14   his bond.

15             It later goes on to say, when undersigned counsel

16   advised Mr. Griffith that his parents could access the Coinbase

17   account on his behalf, Mr. Griffith and his mother thought this

18   meant she could attempt to gain access using this secretarial

19   arrangement.  Your letter acknowledges that the access of the

20   Internet was on his behalf.  It was on his behalf and in his

21   name.  Those are the facts.

22             MS. AXEL:  Your Honor, just to put it in context --

23             THE COURT:  Is that correct?  It was in his name and

24   on his behalf, yes?

25             MS. AXEL:  Yes, your Honor.

1          To put that in context, your Honor, these little

2     things where the parents need to access the Internet on his

3     behalf do come up.  For example, they came up as we entered

4     court today.  He had to have a phone to use to get his

5     temperature done to get in.

6          THE COURT:  No, he didn't.  He could have made

7     application to me, and I would have cut an order to give him

8     access.

9          MS. AXEL:  We didn't even know that these restrictions

10    occurred, so we showed up at 1:30.

11         THE COURT:  How many times have you been to this court

12    in this case?  Zero, I think.

13         MS. AXEL:  One pre-COVID.

14         THE COURT:  In my courtroom?

15         MS. AXEL:  Yes.

16         Mr. Griffith's father, who is here, used his phone,

17    put in Mr. Griffith's name, they used his phone to get his

18    temperature done, and Mr. Griffith came in.  After which

19    Mr. Griffith's dad then had to set up a new identity and use

20    his phone again.

21         THE COURT:  You think that's fine.  You are like

22    bragging that this is good.

23         MS. AXEL:  These kinds of things happen all the time

24    and Mr. Griffith has constantly consulted Carl, his pretrial

25    services officer in Alabama, who has used the word to us and to

1    the family that for certain life issues, yes, Mr. Griffith's

2    family could access the Internet on his behalf.

3              THE COURT:  And this was a life in when he contacted

4    Coinbase.

5              MS. AXEL:  It was, your Honor, because they are going

6    to need money for their defense.

7              THE COURT:  According to your letter, his father is

8    paying the cost of the defense.  So I take it that the cost of

9    the defense is not, directly or indirectly, being paid by any

10   person other than the father.  The Ethereum Foundation is not

11   paying any portion of the legal fees, is that correct?

12             MR. KLEIN:  Your Honor, we would be happy to talk with

13   you in camera about who is paying for the defense, but we will

14   tell you we feel like that's something we should talk to you

15   about, and maybe not in a public courtroom, in terms of how his

16   defense is being financed.

17             THE COURT:  The problem, Mr. Klein and Ms. Axel, is

18   you're putting forth a story that is likely not true.

19             MR. KLEIN:  Your Honor, absolutely what we put in our

20   papers we spent a lot of time and it is accurate.  That's why

21   you see things --

22             THE COURT:  It may be accurate, but it may also be

23   misleading.

24             MR. KLEIN:  Your Honor, we do not believe it's

25   misleading.

1              THE COURT:  Come on over to the sidebar.  Let's hear

2    it.

3              (Pages 22-23 SEALED)

1                    (In open court)

2                    THE COURT:  Go ahead, Ms. Axel.

3                    MS. AXEL:  Your Honor, just a few other things.  The

4     alleged involvement by pretrial services, I have spoken

5     personally with Carl many times, and I have spoken with him

6     about these events several times.

7                    With respect to what's in our papers regarding the

8     general awareness that this arrangement continued, I read that

9     to him, and then Mr. Klein got on the phone in a separate call

10    and we read it again to him twice to make sure he was

11    comfortable with that.  Frankly, he was actually comfortable

12    with even stronger wording the first time I read it to him, and

13    we backed it down.  He began to get very nervous sort of being

14    in the middle of this.

15                   I think it is a difficult situation.  He knows the

16    family.  As we have said, they are upstanding members of the

17    community in Tuscaloosa.  They are both doctors.  They are

18    church-going people.  They are not going to help him flee.

19    They have a million dollar bond on their own house and it is

20    quite significant in Tuscaloosa to have that kind of a bond.

21    That's a lot of money.

22                   Carl, knowing them, did not view that they would in

23    any way, shape, or form be involved in any effort for anyone to

24    flee.  They are really law-abiding people.  They are very

25    careful people, too, which is why they began to sort of think

1    about this plan to pay counsel in advance.

2            Recognizing that we all could have done things better,

3    I will certainly pledge to be better at making sure all

4    communications are clear and are clear with John as well

5    because we have sort of two layers of different supervision

6    here.  There is the local person in Tuscaloosa and then there

7    is the person here.

8            THE COURT:  Let me be clear.  Pretrial services works

9    for the Court.  No pretrial services officer has the power to

10   modify a judicial ruling.

11           And pretrial services knows that, right, Mr. Moscato?

12           MR. MOSCATO:  That's correct.

13           THE COURT:  You can have all the conversations you

14   want with pretrial services and maybe it's a relevant thing for

15   me to think about in this case.  But that which is prohibited

16   by a court order cannot be permitted, regardless of what a

17   lawyer for the individual says or the pretrial service officer

18   says.  It may bear on the defendant's intent, but that's as far

19   as it goes.

20           MS. AXEL:  In addition to bearing on the defendant's

21   intent, it is also often necessary for defendants to consult

22   pretrial services officers when issues come up about areas and

23   whether or not they violate a court order.  So I think that was

24   the spirit of asking the questions here.  How can we do this

25   and not violate the court order.

1           I think in that respect pretrial services officers, as

2     arms of the Court, do make those kind of determinations every

3     day.  So this is an area where they felt, the family felt that,

4     given the relationship with Carl and what he had said, that

5     there was a green light for this secretarial practice.  And

6     they understood that to be the case in working with him to

7     comply with the order, not to violate it or not to modify it in

8     any way.

9           If we thought we were seeking a modification, of

10    course, we would come to the Court and ask for it.  We have

11    multiple times.  The Court has granted them.  The Court has

12    denied them.  All of those things.  We understand the Court's

13    authority in that matter and have no issue with that.  We

14    weren't asking Carl or John for any kind of a modification.  It

15    was a reading of the order, your Honor.

16          Does the Court have other questions for me?

17          THE COURT:  You didn't respond, I noticed prominently,

18    to the contention by the government that in 2019 there were

19    text messages sent by Mr. Griffith regarding changing his

20    citizenship.

21          MS. AXEL:  Your Honor, that issue was prominently

22    litigated at the time of Mr. Griffith's initial bond hearing,

23    and we responded in writing to the issue of those text

24    messages, and I think they were both misconstrued, and we had

25    ultimately, you know, a response to exactly what he decided to

1  do.

2         That issue was not raised in their papers, and I would

3  not want to not properly respond to the Court exactly the whole

4  story.  That whole issue was out in front of Judge Broderick.

5  He asked for further support.  He asked for the text messages

6  themselves.  And that was litigated when the first bond order

7  was put in place.  And, with that, we have conditions that we

8  currently have, which have been sufficient to mitigate risk of

9  flight.

10         I do point out, again, this issue of the Coinbase

11  account was raised by the government prior to his travel to Los

12  Angeles.  We knew that they had concerns.  They were as

13  strenuous in their objections as they have been today.  We

14  provided our explanation of what happened.  I had already

15  talked to Coinbase and promised to follow up with them about

16  what they needed in order to hopefully work together on

17  something that might ultimately allow the parents to access his

18  account or maybe to take over the account with the power of

19  attorney, and we discussed that.  And, with that, we also made

20  great steps to put them in touch with Carl directly so they can

21  speak to him.  We provided his information to them.

22  Vice-versa.  We literally said, Carl, you need to call them.

23  Here are their numbers.  With that, we didn't hear anymore.

24  That was Friday afternoon.

25         Mr. Griffith traveled on July 5 to meet with us, was

1  in Los Angeles all week, and then the government filed its

2  papers on Friday.  Knowing that they were moving for this bond

3  revocation hearing, he then flew back to Tuscaloosa, stayed

4  there and came to court today.  He has traveled twice to New

5  York, once before the cryptocurrency hard drives were all

6  secured.  He has traveled twice to Los Angeles, once going and

7  coming, both knowing this was happening over his head.  There

8  really is no intent to flee here, your Honor, and no connection

9  at all between these events and any attempt to flee.

10           THE COURT:  Thank you.

11           It's the government's burden on a bail review

12  application, so I will give the government the last word.

13           MS. RAVENER:  Thank you, your Honor.  There are a

14  couple of points I'd like to address.

15           First of all, with respect to this matter about the --

16  whether in fact there has been a bail violation, and defense

17  counsel has spent a lot of time explaining how they worked on

18  this issue allegedly.

19           But earlier this year defense counsel raised with the

20  government the fact that the defendant generally wanted to cash

21  in on the rising value of cryptocurrency.  Quite obviously,

22  they raised this issue with us because they understood that

23  cryptocurrency accounts could not be accessed pursuant to the

24  bail order.  Otherwise, there would have been no need for the

25  conversation.

1          And we specifically advised the defense at that time

2     that they should come back to us with a proposal on how that

3     could possibly be done without the defendant accessing his

4     cryptocurrency accounts and increasing the risk of flight in

5     this case.  We then heard nothing further from defense counsel

6     about this matter.

7          And this issue, again, was of great concern when we

8     litigated their motion to modify his bail conditions in March.

9     We again raised our concerns about his access to these

10    cryptocurrency accounts.  The funds in this particular account,

11    your Honor, are subject to further investigation for, at a

12    minimum, the reasons I have stated.

13         All of that goes to show that this appears to the

14    government to be much more likely a post hoc rationalization of

15    the defendant's bail violation.  There can be no dispute, and

16    we have the communications that were produced to us, available

17    here for the Court, there can be no dispute that the message

18    that was sent to this cryptocurrency exchange was seeking

19    access to the cryptocurrency itself.  The message said, my

20    lawyers now tell me it is permitted for me to access my

21    cryptocurrency on this exchange, and then it sought removal of

22    the two-factor authentication restricting access to the account

23    precisely so that access to the funds could be had.

24         What troubles the government, your Honor, to focus

25    back on the risk of flight, which is really at the heart of the

1    issue, is that this is part of a pattern of conduct from this

2    defendant.  And we understand that defense counsel is now

3    standing behind that pattern of conduct, but it doesn't make

4    the pattern of conduct any more excusable.  When he is told no,

5    he attempts to circumvent that rule.  That's what's happened

6    with the cryptocurrency prohibition.  That's frankly what has

7    happened with respect to the issue of his alleged efforts to

8    work.

9            Defense counsel acknowledges they moved back in July

10   of 2020 for him to have access to the Internet for him to

11   allegedly work.  This Court denied that application because of

12   the serious issues presented by the defendant's risk of flight,

13   not including his significant assets that are held in

14   undisclosed locations, his lack of transparency with pretrial

15   services about his financial condition, his lack of ties to the

16   United States, the fact that he was living in Singapore working

17   for a European foundation for years before he was arrested, his

18   offense conduct, of course, actually providing services to the

19   DPRK and the DPRK persons, and the fact that he is an expert in

20   the dark web, who has actually created a program that enables

21   one to search the dark web where things like false passports

22   can be bought.

23           To go back to your Honor's questions, I unfortunately

24   don't have the exact text messages with me.  We are happy to

25   supply them to the Court.  But it was shortly before the

defendant's arrest that he sent messages actively exploring

renouncing his United States citizenship, describing his

interest in paying thousands of dollars to purchase citizenship

in a Caribbean nation.

And he appears to believe that his wealth could help

him avoid significant criminal sanctions, including with

respect to the conduct at issue in this case.  Shortly after

leaving North Korea, on April 26, 2019, the defendant wrote the

following to his mother, the person who defense counsel now

alleges is acting as his purported secretary.  I think I am

going to be the connector in Blockchain mediated economic

relations between DPRK and South Korea.  Should be fun.

Hopefully won't have much jail time for it.  I'll try to be

wealthy enough to pay my bail.

Your Honor, that's part of a continuous pattern.  On

August 7, 2019, while the offense was still ongoing, during the

conspiracy, the defendant spoke the following words in an audio

message to another person regarding his plans to conduct a

financial transaction between North and South Korea:

"Probably, worst comes to worst, I'll find someone to send as

like an emissary to go, and I'll like tell that person what to

do via the phone.  Yes.  I can always do that because it seems

like the Americans let you get away with it once."

The defendant has demonstrated a pattern of evading

the law, evading court orders.  It's not news that one of the

1  means by which he does that and has been doing that apparently

2  for much of the pendency of this case, as well as during his

3  offense conduct, is to try to act behind the scenes and use

4  agents to act on his behalf.  This was clearly prohibited,

5  explicitly prohibited by the bail order.

6        The defendant was originally detained in this case,

7  your Honor.  He was detained by the magistrate precisely

8  because he presented such an extreme risk of flight, and he was

9  released only on appeal to Judge Broderick sitting in part I,

10 based on these stringent conditions.  The defendant has

11 demonstrated that he is spending much of his time working to

12 circumvent those very conditions and, we submit, has actually

13 violated them.

14        THE COURT:  Thank you.

15        Ms. Axel, there was a new matter brought up.

16        MS. AXEL:  A lot of new matters, your Honor.

17        Many of the arguments here are things that were really

18 fully litigated at the time of the initial bail hearing.  They

19 weren't raised in the short letter to your Honor.  I just feel

20 like we really don't have the full record in front of us to

21 respond to all of them, as we have responded to them before.

22 I'm too old, your Honor, to remember every one of the things

23 that we went down and hunted down to respond to them.

24        THE COURT:  Ms. Axel, the one truth here is that in

25 this proceeding today the Court does not look like you would

1   look in the violation of supervised release at what some

2   violation is and whether the violation occurred or not.  You

3   look at the entirety of the circumstances and determine whether

4   there are conditions or combinations of conditions that can

5   reasonably assure the appearance of the defendant in future

6   proceedings.  That's what a bail review hearing does.

7          MS. AXEL:  I agree entirely with your Honor about

8   that.  Because of that, your Honor, I think you have to look at

9   the entirety of the circumstances here and say, you know, it

10  would be unfair to find a violation based on, you know, perhaps

11  what the Court thinks as inaccurate or bad legal advice that

12  was misinterpreted by the family.  That just does not strike me

13  as fair, looking at the entirety of the circumstances.

14         Of course, your Honor, and I dialogued about the dark

15  web back in the hearing in July.  That I remember succinctly.

16  What we put in at the time is, the government has offered

17  discovery that shows that Mr. Griffith in fact met with law

18  enforcement and assisted law enforcement, both U.S. and

19  Singapore-based law enforcement, with accessing the dark web.

20  He viewed this as really more of a research interest to show

21  how people use the dark web.

22         Also, people like dissidents, people for human rights

23  purposes.  He has written a paper on that.  And then he also

24  assisted law enforcement.  So everything is just flipped on its

25  head.

1        I think it's also important for me to respond because

2   I know this and I was there personally.  From the very

3   beginning the prosecution in this district has said there was a

4   lack of transparency with regard to resources because in the

5   initial pretrial package prepared by pretrial services, there

6   was a summary of financial resources rather than a delineation

7   of pretrial resources.  I sat by Mr. Griffith in lockup in the

8   U.S. Marshals with the U.S. pretrial services officer in Los

9   Angeles.  When Mr. Griffith tried to provide more detail about

10  different accounts, the pretrial services officer says, I just

11  need a summary.

12       And that is what is the basis of this consistent

13  representation that he hasn't been forthcoming with pretrial

14  services.  We have never heard that from pretrial services.  We

15  have never called the person in Los Angeles, but I was there

16  and he did say that.  It's not a fair representation of the

17  facts.

18       As I also said to your Honor when we had this dialogue

19  over the phone in July, Mr. Griffith has a Ph.D. from Cal Tech.

20  If he wants to do something like these crazy, surreptitious

21  uses of finding his way to the dark web to go procure a

22  passport, your Honor, there are other ways to do it that are

23  not sitting in his home working with his parents, trying to be

24  on the monitored advice, talking to pretrial services.  That's

25  just not what a crazy doctor does.  They go sit in Starbucks.

1    They access the dark web.  None of that is happening.

2         These errors of judgment have been made very

3    transparently through e-mail messages that are obviously going

4    to trigger legal review, e-mail messages that -- electronic

5    messages that reference that the FBI is involved, e-mail

6    messages that say contacts counsel from the mother involved.

7         While it's unartful, inaptly done, it's certainly not

8    consistent with any intent to violate your Honor's orders.  It

9    really is not.  Quite to the contrary, the attempt is to stay

10   within the home, within the strictures that have been provided

11   by this Court.

12        Finally, your Honor, we would say, you know, we, of

13   course, are amenable to continuing to confer about what

14   condition the Court feels would minimize the risk of flight or

15   provide greater clarity so that we don't have to involve Carl

16   anymore or ask any questions, whatever the Court would like to

17   proffer in that way.  We only have a few months of trial.

18   Nothing here has changed.  We obviously still request a way to

19   access this account and want to do that lawfully and in

20   accordance with this Court's orders.  That's what we would

21   really like to try to accomplish.

22        THE COURT:  Thank you.

23        MS. AXEL:  Thank you.

24        THE COURT:  This is the Court's statement of reasons

25   for its decision on reviewing the bail conditions of defendant,

1    Virgil Griffith.

2            In considering the issue I've considered the totality

3    of circumstances since this case was filed and an indictment

4    was filed January 7, 2020.  I have considered the fact that

5    defendant came here today for this proceeding.  I have

6    considered that defendant is charged in a single count of

7    conspiracy to violate the International Emergency Economic

8    Powers Act and, according to the government, faces imprisonment

9    for up to 20 years.

10           I have considered the fact that in the interim, since

11   the indictment and the setting of bail in this case, there have

12   been a number of rulings that the Court has issued in the case

13   and that now we are getting close to trial in this action.

14           I have considered the fact that the Court has been

15   open to modifying the defendant's bail and has done so.  Did it

16   last February, as we established in an order.

17           The fact of the matter is that without even

18   considering defendant's e-mails in this case -- or not e-mails,

19   but electronic communications in this case with Coinbase, the

20   circumstances have changed.  One important circumstance that

21   has changed, not because of defendant's doing, but his Coinbase

22   holdings of cryptocurrency has gone from what is described by

23   defense counsel to something -- or the government as something

24   in the neighborhood of $100,000 to today closer to a million

25   dollars.  That's a new circumstance and not one that is the

1    defendant's doing.  But it changes the calculus on this

2    particular individual's incentives to flee.

3            Now, with regard to whether or not the Court's order

4    was violated, it doesn't take a lot of depth to conclude that

5    it has been violated.  Paragraph 14 says, unambiguously:

6    Defendant is not to access the Internet for any other

7    purposes -- this is the e-mail communications -- any other

8    purposes and is specifically prohibited from accessing any of

9    his cryptocurrency accounts and from accessing the dark web.

10   The explanation that he used his mother as a secretary, in

11   essence, to communicate, as the letter puts it, "on his

12   behalf," that the mother could "act as an assistant to access

13   the Internet on his behalf" reflects that a person of

14   reasonable intelligence, which Mr. Griffith is, would know that

15   that would not permit him to access the Internet, which is

16   specifically prohibited of accessing any of his cryptocurrency

17   accounts.

18           The text message that was sent was sent in the name of

19   Mr. Griffith.  "I presume my account was restricted due to the

20   pending litigation against me.  My lawyers now tell me that it

21   is permitted for me to access my cryptocurrency on Coinbase.

22   If you'd like, you can speak to her, Keri Axel, and the e-mail

23   address.  You can also reach me at an e-mail address or via

24   phone, telephone number.  Related, I am going to need the 2FA,

25   two-factor authorization, removed as the FBI took my devices

1    away.

2         Now, that was accessing the account.  If not accessing

3    the account, it was attempting to access the account.

4    Accessing the account does not mean necessarily withdrawing

5    funds.  Although I take it that he asserted to Coinbase that my

6    lawyers now tell me that it is permitted for me to access my

7    cryptocurrency -- not my account -- my cryptocurrency on

8    Coinbase.

9         I don't believe I heard Ms. Axel go that far today,

10   that it is perfectly permissible, perfectly permissible,

11   provided the mother has used and sends the message on his

12   behalf, to access the cryptocurrency.  I didn't hear that.  I

13   heard that it was OK, in counsel's view, to use the mother to

14   do indirectly what the defendant cannot do directly.  It's no

15   different than Mr. Griffith coming into my courtroom and saying

16   he didn't violate the order because he used voice recognition

17   software.  He didn't type it.  The machine did it.  He spoke

18   words into the machine and the machine did it.

19        My concern is with flight.  I think it was a difficult

20   question that Judge Broderick had when he first had this bail

21   application and came to a different conclusion than the

22   magistrate judge; in that respect, Judge Broderick's decision.

23   But the calculus has now changed.

24        The defendant is remanded to the custody of the United

25   States Marshal until trial.

1          Is there anything further from the government?

2          MS. RAVENER:  No, your Honor.

3          THE COURT:  Anything further from the defendant?

4          MS. AXEL:  No, your Honor.

5          THE COURT:  Thank you all very much.

6          (Adjourned)