UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------x

UNITED STATES OF AMERICA       :

         Plaintiff,       :

      v.                     20 Cr. 15 (PKC)

                       :

VIRGIL GRIFFITH,           ORAL ARGUMENT REQUESTED

                       :

         Defendant.
--------------------------------------------------------x

# DEFENDANT VIRGIL GRIFFITH'S
# OPPOSITION TO THE GOVERNMENT'S
# MOTIONS IN LIMINE

BRIAN E. KLEIN
KERI CURTIS AXEL
WAYMAKER LLP
777 S. Figueroa Street, Suite 2850
Los Angeles, California 90017
(424) 652-7800

SEAN S. BUCKLEY
KOBRE & KIM LLP
800 Third Avenue
New York, New York 10022
(212) 488-1200

*Attorneys for Virgil Griffith*

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ...........................................................................................1

ARGUMENT ...................................................................................................................2

I.     THE GOVERNMENT'S EFFORTS TO ADMIT BROAD CATEGORIES OF
EVIDENCE IDENTIFIED ARE PREMATURE BECAUSE OF THE LACK OF
THE REQUIRED SPECIFICITY...................................................................................2

II.    THE RULE AGAINST HEARSAY BARS ALLEGED STATEMENTS THE
GOVERNMENT SEEKS TO OFFER.............................................................................7

    A.    The Proffered Statements Do Not Qualify As Co-Conspirator Statements
Under Federal Rule of Evidence 801(d)(2)(E). ....................................................7

        1.    Applicable Law ...............................................................................7

        2.    Purported Pre-Conspiracy Communications Cannot Qualify As
Co-Conspirator Statements in Furtherance of the Alleged
Conspiracy. ....................................................................................8

        3.    The Government Cannot Establish that Purported Statements of
Alleged Co-Conspirators CC-1 and CC-2 Were in Furtherance of
the Alleged Conspiracy...................................................................11

        4.    The Government Has Not Established That the Purported
Statements of Alleged Co-Conspirators CC-3, CC-4, and CC-5
Were in Furtherance of the Conspiracy ......................................13

    B.    The Government Has Failed to Establish that Any of the Purported
Statements Are Admissible As Statements Against Interest Under Rule
804(B)(3)...........................................................................................................17

        1.    Applicable Law .............................................................................17

        2.    The Government Has Not Demonstrated the Unavailability of a
Single Witness To Satisfy Rule 804(B)(3). .................................18

        3.    The Government Cannot Demonstrate that the Alleged Statements
Were Made Against the Witness' Interests As Required by Rule
804(b)(3). .....................................................................................19

        4.    Evidence of Mr. Griffith's Irrelevant and Inflammatory Statements
Likewise Should Be Excluded ......................................................33

i

**TABLE OF CONTENTS:** **(continued)**                                   **Page(s)**

C.      The Alleged Statements of Individuals 3, 4 and 5 Must Be Evaluated on a
        Case-By-Case Basis to Determine if They Qualify as a Hearsay Exception.........21

D.      The Overarching Effect of the Admission of the Various Out-of-Court
        Statements the Government Intends to Offer Would Be to Violate the
        Confrontation and Due Process Clauses ................................................................22

III.    THE PROFFERED STATEMENTS ARE OUTSIDE THE BOUNDS OF
        FEDERAL RULE OF EVIDENCE 404 AND SHOULD BE PRECLUDED AS
        UNFAIRLY PREJUDICIAL AND CONFUSING TO THE JURY UNDER
        RULE 403 ...............................................................................................................22

A.      Applicable Law ......................................................................................................24

B.      The Pre-Conspiracy Evidence Goes Outside the Boundaries of the
        Indicted Offenses and Cannot Be Admitted Under Rule 404(b) ...........................26

C.      Likewise, Rule 404(b) Does Not Permit the Admission of Mr. Griffith's
        Post-Conference Conduct .......................................................................................27

D.      Analysis of Various Post-Conference Statements ..................................................28

        1.      Alleged Proposed ETH Exchange ..............................................................28

        2.      Alleged Attempts to Promote the 2020 Conference ...................................29

        3.      Alleged Australia and KP Statements.........................................................29

        4.      Purported Tax Issues...................................................................................29

        5.      Alleged Violation of the Travel Ban...........................................................31

V.      The Government's Motion to Preclude "Extraneous Evidence" Regarding
        the DPRK's Crypto Capabilities Should Be Denied...............................................35

CONCLUSION.......................................................................................................................37

**TABLE OF AUTHORITIES**

Page(s)

## <u>Cases</u>

*Barber v. Page*,
    390 U.S. 719 (1968).............................................................................18

*Bourjaily v. United States*,
    483 U.S. 171 (1987)............................................................ 8, 12, 13, 16

*Command Cinema Corp. v. VCA Labs*,
    464 F. Supp. 2d 191 (S.D.N.Y. 2006) ...................................................3

*Glenn v. Bartlett*,
    98 F.3d 721 (2d Cir. 1996) ..................................................................12

*Hardy v. Cross*,
    565 U.S. 65 (2012)...............................................................................18

*Manko v. United States*,
    63 Fed.Appx. 570 (2d Cir. 2003)........................................................31

*Michigan v. Bryant*,
    562 U.S. 344 (2008).............................................................................24

*Nat'l Union Fire Ins. Co. v. L.E. Myers Co.*,
    937 F. Supp. 276 (S.D.N.Y. 1996) .......................................................3

*Ohio v. Roberts*,
    448 U.S. 56 (1980)...............................................................................18

*Old Chief v. United States*,
    519 U.S. 172, 182–83, 117 S.Ct. 644 L.Ed.2d 574 (1997) ................26

*Russell v. United States*,
    369 U.S. 749 (1962).............................................................................25

*United States v. Al-Sadawi*,
    432, F.3d 419 (2d Cir. 2005) ..............................................................34

*United States v. Amuso*,
    21 F.3d 1251 (2d Cir. 1994) ...............................................................34

**TABLE OF AUTHORITIES**: (continued)                                    Page(s)

*United States v. Bakhtiar*,
    994 F.2d 970 (2d Cir. 1993) ...............................................................18

*United States v. Birney*,
    686 F.2d 102 (2d Cir.1982) ................................................................26

*United States v. Bowe*,
    F.2 1, 15 (2d Cir. 1966) ...................................................................31

*United States v. Chan*,
    184 F. Supp. 2d 337 (S.D.N.Y. 2002) ................................................3

*United States v. Cooper*,
    286 F. Supp. 2 1283 (D. Kan. 2003).................................................30

*United States v. Coppola*,
    671 F.3d 220 (2d Cir. 2012) ...............................................................8

*United States v. Cota*,
    953 F.2d 753 (2d Cir. 1992) .............................................................12

*United States v. Crawford*,
    541 U.S. 36 (2004).............................................................................24

*United States v. Diaz*,
    176 F.3d 52 (2d. Cir. 1999) .........................................................8, 16

*United States v. Garcia*,
    291 F.3d 127 (2d Cir. 2002) ....................................................... 25, 27

*United States v. Geaney*,
    417 F.2d 1116 (2d. Cir. 1969) ............................................................8

*United States v. George*,
    266 F.3d 52 (2d Cir.2001) ................................................................26

*United States v. Gonzalez*,
    559 F.2d 1271 (5th Cir. 1977) ..........................................................20

**TABLE OF AUTHORITIES:** (continued)                                    **Page(s)**

*United States v. Katsougrakis*,
   715 F.2d 769 (2d Cir. 1983) ..................................................................18

*United States v. Mandell*,
   752 F.3d 544 (2d Cir. 2014) ...............................................................8, 11

*United States v. Myers*,
   550 F.2d 1036 (5th Cir. 1977) .............................................................34

*United States v. Paccione*,
   949 F.2d 1183 (2d Cir.1991) ...............................................................26

*United States v. Pirro*,
   212 F.3d 86 (2d Cir. 2000) ..................................................................25

*United States v. Puco*,
   476, F.2d 1099 (2d. Cir. 1973) ............................................................10

*United States v. Sanchez*,
   790 F.2d 245 (2d Cir. 1986) ................................................................34

*United States v. Saneaux*,
   365 F. Supp. 2d 493 (S.D.N.Y. 2005) ...................................... 8, 10, 16

*United States v. Tracy*,
   12 F.3d 1186 (2d Cir. 1993) ...........................................................8, 16

*United States v. Williams*,
   506 F.3d 151 (2d. Cir. 2007) ...............................................................19

*United States v. Yu-Leung*,
   51 F.3d 1116 (2d Cir. 1995) ..................................................................3

*Williamson v. United States*,
   512 U.S. 594 (1994)..............................................................................19

**Federal Cases**

1 McCormick on Evidence § 190 (8th ed. 2020)....................................25

18 U.S.C. §1544.....................................................................................31

**TABLE OF AUTHORITIES**: (continued)                                    **Page(s)**

50 U.S.C. § 1702(a)(1)(B) ........................................................................20

*Uncharged Conduct Evidence* § 1:3, at 1-18 (2015) ...............................24

**Out of State Cases**

Federal Rule of Evidence 103(a) ........................................... 2, 3, 7

Federal Rule of Evidence 106................................................................5

Federal Rule of Evidence 401 ............................................ 27, 29, 31

Federal Rule of Evidence 402 ...............................................................27

Federal Rule of Evidence 403 ...................................................... passim

Federal Rule of Evidence 404(a) ........................................ 29, 30, 31, 33

Federal Rule of Evidence 404(b) ................................................. passim

Federal Rule of Evidence 404(b)(1) ....................................................25

Federal Rule of Evidence 404(b)(2) ................................... 25, 27, 30

Federal Rule of Evidence 801(d)(2)(3)................................................13

Federal Rule of Evidence 801(d)(2)(E) ....................................... passim

Federal Rule of Evidence 801(d)(3) ....................................................16

Federal Rule of Evidence 802(d)(3) ....................................................10

Federal Rule of Evidence 804(b)(3) ..................................... 17, 18, 19

████████████████████████ ..............................................................13

## PRELIMINARY STATEMENT

The Court should deny the government's motions *in limine*.  They are premature, problematic, and fatally flawed.

The government seeks the admission of vast amounts of purported evidence, but it neither attached exhibits for the Court's review nor provided Bates numbers as a reference to facilitate locating and reviewing those records.  Only upon the defense's request did the government provide a revision of its motions containing citations to discovery materials.  Even after the defense's diligent review of those materials (some of which were text messages that comprised over 1,500 pages, but of which the quoted statement was a few lines), it remains unclear in many instances exactly what the government seeks to admit and which arguments in the motions are applicable to which evidence.  In the rare instance where there was a pinpoint citation provided (which, again, was often not the case), it is unclear whether the government seeks to offer certain alleged evidence (*e.g.,* text message quotes) in isolation or as part of a broader piece of evidence (*e.g.,* a chain in which the quote appears).  Compounding this overarching problem, the government has continued to produce voluminous discovery in the past few weeks that will likely impact the defense's arguments.

Still, where it can, the defense sets forth below various detailed objections (*e.g.,* inadmissible hearsay or unfairly prejudicial arguments) where the government's motions have identified purported evidence with sufficient particularity.  Further, the defense addresses the government's request to preclude evidence regarding the Democratic People's Republic of Korea's ("DPRK's") cryptocurrency and blockchain capabilities. This request should be denied as that evidence is relevant and goes directly to the charges against Mr. Griffith.  It is also inconsistent with the government's own expert notice, which indicates that the government

intends to call an expert regarding the DPRK and U.S.-DPRK relations.  The government cannot have it both ways.

Mr. Griffith reserves his right to raise additional arguments once the defense has reviewed the substantial amount of discovery produced in the last two weeks and the government identifies its alleged evidence with the required specificity to permit the type of pretrial rulings regarding admissibility of evidence contemplated by Federal Rule of Evidence 103(a).

All that said, the parties have been conferring since late last week, and the government has agreed to provide to the defense a preliminary set of trial exhibits on a rolling basis, with a projected completion date of September 17, 2021.  As of the date of this opposition, however, the defense has received no indication beyond the specific portions of communications quoted in the government's motions what the government intends to offer.  To the extent it does not do so, the Court should require the government to indicate in its proposed trial exhibits the *precise* statements it seeks to introduce (*e.g.,* highlight the pertinent portion of an alleged text string). Most, if not all, of the government's motions are not ripe until this disclosure has occurred and the defense has had sufficient time to review the government's proposed exhibits.

In sum, the Court should deny the motions for preliminary rulings as to admissibility of purported evidence and statements and deny the government's request to preclude evidence regarding the DPRK's cryptocurrency and blockchain capabilities.

## ARGUMENT

### I. The Government's Efforts to Admit the Broad Categories of Evidence Identified Are Premature Because Those Efforts Lack the Required Specificity.

In its motions, the government seeks to admit a significant volume of evidence, arguing it bears directly on the substantive issues in this case but without sufficiently identifying the statements it seeks to admit.  (*See, e.g.*, Gov't Motions *in Limine* at 42 ("Mot.") [Dkt. No. 131]

[seeking to introduce statements by alleged co-conspirators without identifying those statements].)[1]  Federal Rule of Evidence 103(a) provides that "a motion in limine may preserve an objection when the issue (1) is fairly presented to the district court, (2) is the type of issue that can be finally decided in a pre-trial hearing, and (3) is ruled upon without equivocation by the trial judge." *United States v. Yu-Leung*, 51 F.3d 1116, 1121 (2d Cir. 1995) (discussing Fed. R. Evid. 103(a)).  The government fails to meet Rule 103(a)'s first two requirements of being "fairly presented" and capable of being finally decided in a pre-trial hearing.  "[C]ourts considering a motion in limine may reserve judgment until trial, so that the motion is placed in the appropriate factual context." *Command Cinema Corp. v. VCA Labs*, 464 F. Supp. 2d 191, 200 (S.D.N.Y. 2006) (quoting *United States v. Chan*, 184 F. Supp. 2d 337, 340 (S.D.N.Y. 2002)); *see Nat'l Union Fire Ins. Co. v. L.E. Myers Co.*, 937 F. Supp. 276, 286-87 (S.D.N.Y. 1996) (deferring motion *in limine* ruling because proponent failed to provide "the precise basis for the evidence").

The so-called "evidence" the government seeks to admit in advance of trial appears to be made up of purported emails, direct messages on various messaging platforms, and oral statements purportedly recorded by an alleged co-conspirator.[2]  The defense and the Court, however, need to understand exactly which evidence (including specific statements) the

---

[1] Specifically, the government claims: "The statements of CC-1, CC-2, CC-3, CC-4, CC-5, and CC-6, including those described above, are admissible as co-conspirator statements and as statements against interest."  (Mot. at 42.).  But it does so without indicating what all those statements are, referring back only to select isolated statements included in the motions' "Background" section.

[2] Throughout its motions, the government often refers to "evidence" and "statements" interchangeably.  The defense has tried to parse out what the government is referring to in its motions.  But the defense is hamstrung by the government's lack of specificity, including its failure to attach any exhibits to its motions or cite the evidence it seeks to introduce with particularity.

3

government intends to introduce at trial, what the applicable basis for admission is as to each, and view the evidence (particularly the statements) within the context provided by the government's discovery to date (which is still, as of yet, incomplete and greatly redacted).  The government has not provided this necessary information.  By way of illustration:

- The government has moved to admit "the statements of . . . CC-6" under Federal Rules of Evidence 801(d)(2) or 804(b)(4); however, the defense does not see any statements of CC-6 in the government's motions (only a statement of Mr. Griffith that purports to paraphrase a statement of CC-6 (Mot. at 18)), so it is unclear what alleged statements of CC-6 the government is seeking to admit.  (*Id.* at 42.)

- The government seeks to admit alleged notes Mr. Griffith made before speaking at the conference, but the citation the government provided was to an entire unprocessed forensic image of a laptop.  (*See id.* at 12, 14.)  The defense is continuing to look for this alleged statement in the discovery.

- The government has moved to admit alleged text messages on different messaging apps, but the messages are not always in sequential order, and it is unclear what messages would be included.  (*See id.* at 3, 5.)

At a high-level, while the government repeatedly quotes from portions of alleged statements to support its request to be able to offer broad categories of evidence at trial, it does not state with specificity which statements it intends to offer or in any way limit its proffered evidence of those broad categories.  This failure makes the government's motion impossible to rule on in the pre-trial context.

The government's motions also did not attach exhibits for the Court's review or provide Bates numbers as a reference.  About a week after filing, at the defense's request, the government provided a revision of motions' fact section containing discovery citations.  In some instances, the discovery production numbers tie back to massive electronic files that contain

hundreds or thousands of communications, which often involve multiple parties.[3]  Even where

the citation was more precise, the communication was often part of a longer string of alleged

statements (*e.g.,* a text chain), for which the defense is uncertain what else the government

intends to seek to introduce.

These problems are magnified by the government's ongoing and voluminous discovery

productions.  To date, the government has produced millions of pages of discovery that span

multiple terabytes of electronic data.  These productions have been made on a rolling basis

commencing in January 2020 and continuing until as recently as this past Friday, August 27,

2021.  Indeed, the defense has received substantial discovery productions in the past two weeks

on August 17, 20, and 27, 2021.  In total, the government has produced well over two terabytes

of data.  Many of the forensic copies the government produced are identified by a single Bates

number in the production, but in fact, include many megabytes of data spanning the entire

contents of an electronic device (including user files, operating files, etc.).  There are at least the

contents of nine digital devices produced in discovery, some of which were obtained from

Singapore.  There are also records obtained by subpoena or search warrant to third parties.  The

---

[3] For example, the government provided an internal control number, USVGR00127896, for this purported statement: "Griffith wrote that, while he asked Ethereum management 'if we'd directly do this,' he was told that, because of sanctions, only 'doing so through an intermediary is possible.'"  (Mot. at 4.)  This is not a Bates number in the government's production to the defense.  The control number referenced in an Excel spreadsheet (USAO_00427) appears to be an index and contains 2,139 entries for communications with corresponding columns for identifying information such as Master Date, From, To, CC, BCC, Subject, Author, and Title.  For hundreds of these entries, many of these columns are blank.  This spreadsheet does not appear to contain the body of any of the messages cited by the government in its motions *in limine*.  It is impossible for the defense to understand—let alone object to—the specific portions of this massive file that the government intends to offer, not knowing, for a particular message, what platform it was on, or how the government intends to authenticate or offer the individual messages, and whether there are other portions of that communication that should be admitted as non-hearsay context or pursuant to the so-called "rule of completeness."  *See* Fed. R. Evid. 106.

overwhelming majority of the government's discovery has been produced as electronic files in their native format.  In many instances, these electronic files contain electronic copies of forensic downloads of the entire contents of email accounts, Whatsapp communications, computer hard drives, and other forms of electronic media.  (*See, e.g.,* USAO_001559 (iCloud search warrant return, a 63 GB zipped file); USAO_001647(forensic extraction of Mr. Griffith's laptop computer, a 25 GB zipped file)).  These files are often given only a single Bates number, rather than identifying the individual material contain within.

The defense should not be expected to, and cannot, make the necessary and appropriate evidentiary objections under these conditions.  The authenticity of each statement the government seeks to introduce must be evaluated by knowing, for example, what device it came from, or which party produced it, and determining whether the defense may have appropriate and good faith bases to object to its authenticity and admissibility given the context.  The manner in which the government has produced discovery has been burdensome to the defense from the beginning, but the recent volume of eleventh-hour productions in this fashion has compounded the problem and serves only to underscore this need.  The only way to address these serious problems is for the government to identify for the defense and Court all of the specific alleged statements it intends to offer at trial (including the specific portions of the relevant communications).  The government has agreed to provide its proposed trial exhibits to the defense, on a rolling basis, by September 17, 2021.  While the defense is hopeful that the government's production of trial exhibits will promptly start to address these concerns, the defense continues to await information from the government as to when and how it anticipates

making this "rolling" production.[4]  To the extent those exhibits do not provide the necessary information (*e.g.,* highlight the purported statements in a text message the government intends to introduce), the defense requests the Court issue an order for the government to do so.

Overall, neither the Court nor the defense currently have the information needed to make determinations as to the admissibility of any of the government's proffered evidence because the government's motions do not supply sufficient detail to permit the Court to enter a pretrial ruling of admissibility pursuant to Rule 103(a).  Therefore, the Court should reserve ruling on the government's motions *in limine* until the government has adequately identified the evidence it seeks to admit.

## II.     The Rule Against Hearsay Bars Alleged Statements the Government Seeks to Offer.

### A.     The Proffered Statements Do Not Qualify As Co-Conspirator Statements Under Federal Rule of Evidence 801(d)(2)(E).

The government wishes to introduce a number of purported co-conspirator statements, but they do not qualify under Federal Rule of Evidence 801(d)(2)(E).  The reasons include the proffered statements were made before the alleged conspiracy, were not statements made in furtherance of the alleged conspiracy or were made by individuals who do not meet the standard for being considered a co-conspirator.  Thus, these statements should not be admitted.

#### 1.     Applicable Law

Before an alleged co-conspirator's statements may be admitted under Rule 801(d)(2)(E), the government must show, by a preponderance of the evidence, the following: (1) a conspiracy that included the declarant and the defendant existed; and (2) the statement was made during the course and in furtherance of that conspiracy.  *Bourjaily v. United States*, 483 U.S. 171, 175

---

[4] In its most recent discovery production on August 27, 2021, the government indicated with respect to one category of the production—identified only as "Communications" and consisting of 231 separate single-page PDFs that appear to comprise portions of various different documents—that "[t]hese materials include communications that the Government intends to introduce as evidence at trial."

(1987); *United States v. Mandell*, 752 F.3d 544, 552 (2d Cir. 2014) (to admit co-conspirator statements, government must establish "by a preponderance of the evidence (a) that there was a conspiracy, (b) that its members included the declarant and the party against whom the statement is offered, and (c) that the statement was made during the course of and in furtherance of the conspiracy.") (quoting *United States v. Coppola*, 671 F.3d 220, 246 (2d Cir. 2012)); *see also United States v. Saneaux*, 365 F. Supp. 2d 493, 497 (S.D.N.Y. 2005) ("[T]here must also be some *independent* corroboration of the defendant's participation in the conspiracy") (emphasis added).

Since co-conspirator statements are "presumptively unreliable," the government must offer "some independent corroboration of the defendant's participation in the conspiracy." *United States v. Diaz*, 176 F.3d 52, 83 (2d. Cir. 1999); *Saneaux*, 365 F. Supp. 2d at 497.  If a district court permits the co-conspirator statements to be submitted into evidence on a conditional basis, the government must persuade the district court in its case-in-chief "that the conditionally admitted coconspirator statements were made during and in furtherance of a conspiracy *of which both the declarant and the defendant were members*[.]"  *United States v. Tracy*, 12 F.3d 1186, 1199 (2d Cir. 1993).  If the government cannot meet this burden, the district court "should instruct the jury to disregard the statements, or if those statements were 'so large a proportion of the proof as to render a cautionary instruction of doubtful utility,' should declare a mistrial."  *Id.* (quoting *United States v. Geaney*, 417 F.2d 1116, 1120 (2d. Cir. 1969).

## 2.     Purported Pre-Conspiracy Communications Cannot Qualify As Co-Conspirator Statements in Furtherance of the Alleged Conspiracy.

The government is seeking to introduce into evidence alleged co-conspirator statements that precede the time period of the alleged conspiracy pursuant to Rule 801(d)(2)(E).  The law, however, does not permit this, and the Court should exclude any such statements.

Although the indictment is silent as to the identity of any alleged member of the conspiracy, the criminal complaint identified two individuals (CC-1 and CC-2), who were purportedly affiliated with the blockchain conference in the DPRK.  For the first time since the

complaint was filed, the government identifies four new individuals (CC-3, CC-4, CC-5, and CC-6) that it seeks to label as "co-conspirators."  Other than CC-6, none of the four newly identified individuals are alleged to have participated in the DPRK conference in April 2019 or the planning for such conference.  The government also acknowledges that the time period of Mr. Griffith's alleged involvement with some of these individuals, including the statements proffered, precedes the time period identified in the indictment, which is August 2018 to November 2019.[5]  (*See* Mot. at 30.)[6]

The pre-August 2018 statements the government seeks to admit involve an alleged idea (in its early stages) by Mr. Griffith to put a Ethereum node[7] in the DPRK, which he allegedly discussed with a number of individuals, none of whom became a co-conspirator.  (*See* Mot 2-6.) In April 2018, CC-3, who was traveling to the DPRK for a marathon, allegedly offered to put Mr. Griffith in touch with CC-4, a tour group operator, with connections in the DPRK.  (*Id*. at 3-4.)  But, as the government notes, CC-4 was "skeptical," identifying numerous obstacles that would require circumvention to accomplish a node and noting (as summarized further below) that it was critical that the project be legally compliant.  (*Id.* at 4.)  CC-5, a South Korean cryptocurrency conference organizer, merely allegedly agreed in June 2018 to convey the request to South Korean sources located in Seoul, and then allegedly reported back that they were not interested at that time.  (*Id.* at 4-6.)

---

[5] *See* Indictment ¶ 1 "From at least in or about August 2018, up to and including in or about November 2019 ."  (Dkt. No. 9; *see also* Dkt. 89 at 13 (January 27, 2021 Order on Motion to Dismiss) ("The charged conspiracy is alleged to have been in existence from August 2018 through November 2019, extending seven months after the April speaking engagement.").

[6] *See id.* ("Griffith's plan to establish the node appears to have commenced in approximately February 2018, but it continued well into at least September 2018 (*i.e.*, into the time period alleged in the Indictment)."

[7] A node is simply a computer that connects to the relevant blockchain network and supports that network through the validation, relay, and recording of cryptocurrency transactions.

The Court should keep in mind that after various discussions with a number of people, Mr. Griffith expressly communicated to multiple persons that he had decided not to pursue the node idea. The final email that the government proffers on this subject, purportedly sent by Mr. Griffith to what the government calls "the Dark Web Entity," is dated September 23, 2018. (*Id.* at 7). In the proffered email, Mr. Griffith clearly states he was abandoning the ETH node idea. The government omits the Dark Web Entity's response, in which it also clearly indicated it had no interest in pursuing any node in the DPRK either. The abandoned idea, which never left its infancy and could be described, at best, as "inchoate," has no bearing on the conduct alleged in the conspiracy and thus cannot be admissible under Rule 801(d)(2)(E).

The government appears to contend that pre-conspiracy statements by alleged co-conspirators are admissible under Rule 801(d)(2)(E) to show the formation of the conspiracy, the prior relationship between the conspirators, and to provide context. (*Id.* at 30-31, 42-43.) Yet it is established law in the Second Circuit that, in order to be admissible, co-conspirator statements "must be made *during the course* of a conspiracy." *Saneaux*, 365 F. Supp. 2d at 499 (S.D.N.Y. 2005) (emphasis in original). This "temporal requirement" prohibits admission of coconspirator statements "made after the cessation of the conspiracy or before its formation." *Id.; United States v. Puco*, 476, F.2d 1099, 1109 (2d. Cir. 1973) (holding the temporal requirement "protect[s] against the use of unreliable evidence"). Rule 801(d)(2)(E) requires that the statement be made "during" the conspiracy. And since the "touchstone" of the "in furtherance" requirement is whether the statement is "designed to promote the accomplishment of the conspiracy's goals," a statement made while a conspiracy is not in existence cannot be in furtherance of that conspiracy. *Saneaux*, 365 F. Supp. 2d at 500. Any statement that precedes August 26, 2018[8] should thus not be admitted pursuant to Rule 802(d)(3).

---

[8] *See id.* at 6 (citing alleged email to korea@korea-dpr.info inquiring "Can American citizens attend the blockchain conference?").

### 3.    The Government Cannot Establish that Purported Statements of Alleged Co-Conspirator, CC-2, Were in Furtherance of the Alleged Conspiracy.

The government seeks to introduce purported statements of CC-2 as co-conspirator statements.  (*See generally* Mot. at 8-14, 42.)  These statements often are not identified with particularity or in their entirety and are in the form of various emails, messages, photographs, and recordings and transcripts that pertain to, and post-date, the DPRK conference.   The Court should also not permit this under Rule 801(d)(2)(E) because the government has not established, and cannot establish, that CC-2 was a member of the charged conspiracy.  *See United States v. Mandell*, 752 F.3d at 552 (requiring the government to demonstrate not only the existence of the conspiracy but also that "its members *included the declarant* and the party against whom the statement is offered") (emphasis added).

As an initial matter, nothing about the proffered statements by CC-2 establish that he conspired for any unlawful purpose.  As a UK national who resides in Malta, CC-2 is not subject to U.S. sanctions and cannot conspire to violate them unless he engages in transactions either within the United States or that involve any property subject to the jurisdiction of the United States.  (*See* Mot. at 8.)  His statements at a conference in the DPRK about how the DPRK can avoid sanctions without touching upon the United States cannot subject him to liability under the IEEPA.

███████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████



The Court is not bound by the rules of evidence in assessing a proffered co-conspirator statement, and proof as to each prong may include hearsay statements and other admissible evidence. *See Bourjaily v. United States*, 483 U.S. 171, 178-79 (1987) ("Congress has decided that courts may consider hearsay" in making preliminary factual determinations relevant to Rule 801(d)(2)(E)); *United States v. Cota*, 953 F.2d 753, 758 (2d Cir. 1992) (hearsay statement will be considered along with independent evidence that defendant participated in the conspiracy). Further, in making these determinations, the Court may properly rely on any available evidence, including the hearsay statements itself. *Bourjaily*, 483 U.S. at 181 ("court, in making a preliminary factual determination under Rule 801(d)(2)(E), may examine the hearsay statements sought to be admitted"); *accord Glenn v. Bartlett*, 98 F.3d 721, 728 (2d Cir. 1996).

Such statements directly undercut the existence of the alleged conspiracy as well as CC-2's purported involvement in that conspiracy. They also demonstrate why the Court should require the government to proffer more reliable evidence establishing the existence of its alleged conspiracy as well as the purported membership of CC-1 through CC-6 in that conspiracy before

conditionally admitting the statements of any of these alleged co-conspirators as statements in furtherance of the alleged conspiracy.[9]

The defense also specifically objects to the purported DPRK conference audio recordings (and transcripts), as well as alleged conference pictures and videos. The government previously committed to disclose certain information regarding those recordings 30 days before trial, and the defense reserves the right to file an *in limine* motion to exclude them, should there remain foundation or authenticity concerns following that disclosure.

### 4. The Government Has Not Established That the Purported Statements of Alleged Co-Conspirators CC-3, CC-4, and CC-5 Were in Furtherance of the Conspiracy.

Based on the disclosures contained in the motion, the defense objects to the government's attempt to admit alleged statements of CC-3, CC-4, and CC-5 pursuant to Rule 801(d)(2)(3) because the government cannot satisfy its requirements.[10] The government has not cleared any of the *Bourjaily* test hurdles, and the potential prejudice is too great to permit any of their statements to be admitted conditionally and subject to trial proof.

The government has gone too far in attempting to sweep unconnected and innocent persons, CC-3, CC-4, and CC-5, into an unfounded conspiracy. Starting with CC-3, the government argues that CC-3 was involved in Mr. Griffith's attempts to set up a node in DPRK,



but a closer examination of the proffered statements shows that CC-3, in fact, had no involvement in any alleged conspiracy.  (*See* Mot. at 3-6, 9.)  At most, CC-3 was asked to make an introduction between Mr. Griffith and CC-4, which CC-3 did.  (*Id.* 3-5.)  Following that introduction, the government does not claim CC-3 was involved in further discussions between Mr. Griffith and CC-4, assisted anyone tied to the alleged conspiracy further, or received any monetary benefit associated with the alleged conspiracy.  Under these circumstances, the government cannot establish by even a preponderance of the evidence that CC-3 was a co-conspirator.  Even by the statements in the government's motions, it is clear that CC-3 merely made an introduction to alleged CC-4, the person arranging her tour.  While CC-3 was copied on their subsequent messages, CC-3 provided no response to all, save one statement where Mr. Griffith asks for recommendations for a lawyer familiar with DPRK sanctions law, a conversation that points against a conspiracy to violate sanctions and mor towards ensuring that any actions remained within the permissible boundaries of the law.

The government has also failed to inform the Court that, at the government's request, CC-3 was interviewed by the Singaporean police, and made a number of statements that undercut the government's claims.  During that interview, CC-3 stated, among other things, that CC-3 used to share a co-working space with Mr. Griffith, the culture of which was to "encourage[] discussions" and people were used to "throwing ideas."  (3506-280.)  CC-3 further stated that CC-3 thought Mr. Griffith was "eccentric," and often made "random comments." (*Id.*)  CC-3 learned "not to take his words too seriously and sometimes ignore[] his remarks." (*Id.*)  CC-3 merely intended to be an "introducer" and did not plan to be involved in subsequent conversations with alleged CC-4 and Mr. Griffith.  CC-3 further stated that she thought the node idea was "unwise and impractical," and that the plan was "still in its infancy back in 2018."  She thought that Mr. Griffith's was also "not sure of his own plans."   Ultimately, CC-3 was "not aware of its progress, if any."  (*Id.*)

To provide appropriate context to the government's proffered statements by CC-3, these, among other statements, are vital, yet the government fails to mention them in its brief.  By

itself, this a problem, as the Court deserves the full factual picture in making its evidentiary rulings.  But it also renders it unclear as to whether the government would introduce the full spectrum of statements at trial, or only the out-of-context statements it proffers in its motion. The latter would be unacceptable and require the defense to move to admit these additional statements under Federal Rule of Evidence 106, but, again, the government's lack of clarity as to the parameters of the statements it seeks to admit make it impossible to make that determination at this time.

CC-4's alleged interactions with Mr. Griffith between April and August 2018 also do not support the conspiracy theory the government is pushing.  CC-4 is a British citizen, who by the government's own account was skeptical of Mr. Griffith's alleged DPRK node idea and wanted to get permission from the British embassy "given the likely sanctions implications."  (Mot. at 4.)  The government's motions include some additional e-mails Mr. Griffith allegedly wrote to which CC-4 did not respond.  (*Id.*)  CC-4 only allegedly writes Mr. Griffith in August 2018 with a proposal involving "register[ing] as Joint Venture."  (*Id.* at 5.)  Doing so does not indicate involvement in nefarious plan to avoid sanctions, especially when one considers that CC-4 wanted to consulate with the British Embassy first.  Rather, it all sounds very much like CC-4 was working with Mr. Griffith on a legal way to place a node in the DPRK.

As for CC-5, when viewed in proper context, the communications with CC-5 do not at all support the inference of a conspiracy between CC-5 and Mr. Griffith to circumvent sanctions. The entire communication chain, from late June/early July 2018, actually pertains to a blockchain conference CC-5 was planning in Seoul, South Korea, with attendees which included the Mayor, as well as "the Seoul City government, regulators, and corporates."  As conference organizer, CC-5, through Mr. Griffith, was asking the Ethereum Foundation to attend and send a prominent speaker for conference in *South* Korea, not the DPRK.  Similarly, when CC-5 stated that "the NK node idea was considered," CC-5 was reporting back from communications with the government in Seoul, South Korea, not with the DPRK directly.  (*See id.*)  CC-5's statements in response to Mr. Griffith's alleged inquiry about placing a node in the DPRK only indicate that

both CC-5 wanted to follow the law, which Mr. Griffith's alleged response confirms he did too. (*See* Mot. at 6.)

Further, the government has offered absolutely no independent corroboration of these individuals' involvement in any conspiracy *other than* the statements it seeks to offer. *See Diaz*, 176 F.3d at 83; *Saneaux*, 365 F. Supp. 2d at 497 ("The court may consider the hearsay statements themselves, but these statements are presumptively unreliable, and for such statements to be admissible, there must be some independent corroboration."). The government's own brief makes clear that these are foreign witnesses who the government has no intention of trying to bring to trial, making their out-of-court statements, if admissible, their only testimony. But as is apparent from the government's failure to point to any independent connection between these alleged co-conspirators and Mr. Griffith, outside of the statements themselves, that there is no discovery tying them to the alleged IEEPA violations or otherwise placing them within the indictment's alleged conspiracy. Accordingly, these statements cannot fall within the bounds of Rule 801(d)(3)'s hearsay exception and should not be admitted.

Finally, the government should not be able to conditionally admit such information subject to later proof because the information is too prejudicial and there is no indication that the government can provide any proof other than the statements themselves. *See Tracy*, 12 F.3d at 1199. As far as the defense knows, there will be no evidence from CC-3, CC-4, and CC-5 other than the alleged statements themselves. This, therefore, is not the routine case in which documents are offered provisionally and then later linked to the co-conspiracy by other independent evidence.

While the government may sometimes be given latitude to introduce co-conspirator statements subject to later proof, the statements of the newly-identified alleged co-conspirators CC-3, CC-4 and CC-5 would not qualify because they do not meet the *Bourjaily* standard. Should the government conditionally admit the alleged statements as co-conspirator statements, and the conspiracy not be proven (as it will not be), it will poison the well of the entire case and result in a mistrial. For these three alleged co-conspirators, the government is trying to rely

solely on out-of-court messages to bring in different conduct, which occurred in a different time frame, than the conference-related evidence.  Should the government introduce these statements without independent corroboration of the conspiracy between the co-conspirator declarant and the defendant, and there is no such evidence, a cautionary instruction would be of doubtful utility. There are simply too many messages the government is seeking to introduce, with too little context, among disparate people, that a jury would be easily misled and confused by their proffer and then what it could consider versus what it would need to ignore.  The whole trial could be colored by the evidence and a mistrial would result.

### B.    The Government Has Failed to Establish that Any of the Purported Statements Are Admissible As Statements Against Interest Under Rule 804(B)(3).

Alternatively, the government seeks to introduce the statements of the various alleged co-conspirators under Rule 804(b)(3).  (Mot. at 41.)  Yet the motions fail to establish any of the prerequisites required to offer such statements under this hearsay exception.  Accordingly, the motions should be denied in this respect as well.

### 1.    Applicable Law

Pursuant to Federal Rule of Evidence 804(b)(3), an out-of-court statement that is against the declarant's penal interests is admissible if the declarant is unavailable and the following conditions are met:

> (A) a reasonable person in the declarant's position would have made [the statement] only if the person believed it to be true because, when made, it was so contrary to the declarant's proprietary or pecuniary interest or had so great a tendency to invalidate the declarant's claim against someone else or to expose the declarant to civil or criminal liability; and
>
> (B) [the statement] is supported by corroborating circumstances that clearly indicate its trustworthiness, if it is offered in a criminal case as one that tends to expose the declarant to criminal liability.

Fed. R. Evid. 804(b)(3).  Under Rule 804(b)(3), the statement of an unavailable witness is admissible if, when made, the statement so far tended to subject the speaker to criminal liability that a reasonable person would not have made the statement unless he believed the statement to

be true.  *See United States v. Bakhtiar*, 994 F.2d 970, 977 (2d Cir. 1993).  For the Rule 804(b)(3)

exception to apply, "the proponent must show (1) that the declarant is unavailable as a witness,

(2) that the statement is sufficiently reliable to warrant an inference that a reasonable man in the

declarant's position would not have made the statement unless he believed it to be true, and

(3) that corroborating circumstances clearly indicate the trustworthiness of the statement."

*United States v. Katsougrakis*, 715 F.2d 769, 775 (2d Cir. 1983) (internal quotations and

modifications omitted).

> ## 2.      The Government Has Not Demonstrated the Unavailability of a Single Witness To Satisfy Rule 804(B)(3).

The government's proffer regarding these statements fails to satisfy even the first prong

of Rule 804(b)(3)'s requirements since it makes no reference to any efforts to secure the

testimony of individuals whose statements it now asks for permission to offer at trial.  Rather,

without any basis in law or fact, the government simply contends that the exception applies

without making the requisite showing that any of these witnesses would actually *be* unavailable.

(*See* Mot. at 43.)  That alone is fatal to its motion.

A witness is not unavailable to testify "unless the prosecutorial authorities have made a

good-faith effort to obtain his presence at trial."  *Barber v. Page*, 390 U.S. 719, 724–25 (1968)

(prosecution failed to show unavailability of witness where it took no action to secure his

presence at trial beyond determining that he was serving federal prison sentence).  "The lengths

to which the prosecution must go to produce a witness . . . is a question of reasonableness."

*Ohio v. Roberts*, 448 U.S. 56, 74 (1980) (state showed unavailability of witness when it

questioned her mother as to her whereabouts and served five subpoenas for witness at her

parents' residence before trial); *see also Hardy v. Cross*, 565 U.S. 65, 71–72 (2012) (state

showed unavailability of witness where it took various steps to find her after learning that she

was missing).

The mere fact that witnesses are located abroad is not, by itself, sufficient to satisfy the

unavailability standard under Rule 804(b)(3).  (*See* Mot at 43.)  The government's ability to

conduct its investigation well beyond the boundaries of the United States and with substantial cooperation from foreign law enforcement is evidenced by the simple fact that it has obtained—and intends to offer—electronic devices and recordings that it obtained from abroad.  In fact, the government has produced substantial correspondence showing cooperation with the government of Singapore (where CC-3 resides).  The U.S. also has Mutual Legal Assistance Treaties with countries where at least most of other alleged co-conspirators reside, including Spain.  Such cooperation agreements make it possible for the government to request interviews, and it also could seek to serve process or take their depositions abroad.  The government, however, has apparently done none of those things, attempting instead to rely only on proffered fragments of alleged conversations on messaging services and email.  Because the government has not made even a cursory showing of any of these witnesses' unavailability to testify, the proffered evidence cannot be admitted under Rule 804(b)(3).

> **3.     The Government Cannot Demonstrate that the Alleged Statements Were Made Against the Witness' Interests As Required by Rule 804(b)(3).**

Even if the government were to show any of these foreign witnesses is unavailable, it would not be able to show that any of the proffered statements were made against the interest of the witness, as each of the alleged co-conspirators is a foreign national.  Under Rule 804(b)(3), admissibility of a statement against interest "hinges on whether the statement was sufficiently against the declarant's penal interest that a reasonable person in the declarant's position would not have made the statement unless believing it to be true."  *United States v. Williams*, 506 F.3d 151, 155 (2d. Cir. 2007) (internal quotations omitted).  The Supreme Court has underscored that the broader context of the statement is critical to the analysis, and admission is only appropriate if the statement would be against the interest of a reasonable person "in the declarant's shoes[.]"  *Williamson v. United States*, 512 U.S. 594, 603 (1994).

The IEEPA applies only to United States persons or to individuals who seek to engage in "transactions involving[] any property [] subject to the jurisdiction of the United States."  50

U.S.C. § 1702(a)(1)(B).  The IEEPA does not apply to foreign nationals involved in wholly foreign transactions that never touch upon the United States.  It bears mentioning that Mr. Griffith was residing in Singapore at this time.  The government therefore fails to show that *any* of the alleged co-conspirators believed they were exposing themselves to any criminal liability in the United States whatsoever (*e.g.,* CC-4 was a British citizen who wanted to consult with the British government).  (*See* Mot. at 4.)  When there is no threat of criminal liability, statements may not be admitted under Rule 804(b)(3).  For example, in *United States v. Gonzalez*, 559 F.2d 1271, 1273 (5th Cir. 1977), in which a convicted co-conspirator was given immunity, the court held that his out-of-court statements were inadmissible, since his "statement could not subject him to criminal liability."  Here, the foreign co-conspirators' statements were not made against their penal interests.  The IEEPA cannot impose criminal liability on them, nor has the government shown (or even suggested) that the co-conspirators were violating the laws of any other jurisdiction.

Quite to the contrary, many of the messages the government cites themselves indicate that the individuals intended to be and believed that they were legally compliant with their own laws.  CC-4, in one of the emails cited by the government (Mot. at 4), states that "re: sanctions, further research would be required on this front" and "certainly from our end."   CC-4 further notes that their "work" "is all authorized and recognized by both the DPRK side, but also within the rules and expectations of what is currently allowed *vis a vis* current UN and US sanctions, etc. and British Embassy position there etc."[11]  CC-4 could not have been clearer that he believed his activities to be legally compliant and did not intend to violate applicable sanctions rules.

---

[11]  The government has cited this as USVGR00128191.  This not a Bates number that exists in the government's production to the defense.  Again, it appears to refer to rows in an Excel spreadsheet that appears to be an index of communications and contains some basic information to identify them.  With this information, the defense has run its own searches in its own email database and located an email that contains the quoted text.  This further illustrates that the issues are not ripe, because the defense (and the Court) need to see the actual email that the government intends to offer rather than the defense having to guess.

Messages from CC-5 equally indicate an intent to comply with local applicable law. As described above, the context of the June 30 and July 4, 2018 emails that the government cites on page 5 of its motion is that CC-5 is in acting as an intermediary between two local mayors, including the Mayor of Seoul City, Korea, regarding a possible Ethereum summit.[12]  The very conversation the government references regarding possibly "setting up an institution at DPRK" was actually a conversation that took place with the "Seoul City government" and not with DPRK representatives or officials.  (*See* Mot. at 5.)

Since the IEEPA does not apply to these foreign nationals, and the statements reflect that the individuals were all seeking to remain in compliance with their local applicable laws, these statements are not against the self-interest of the foreign individuals who made them.  Therefore, the government cannot use Rule 804(b)(3) for as the basis for their admission and to avoid hearsay rules.

### C.   The Alleged Statements of Individuals 3, 4 and 5 Must Be Evaluated on a Case-By-Case Basis to Determine if They Qualify as a Hearsay Exception.

The government makes a generalized argument that various statements by individuals identified as Individuals 1-5[13] may be received as non-hearsay statements offered not for the truth, but for the "purpose of placing [Mr.] Griffith's plainly admissible statements in context." (Mot. at 44.)  Perhaps so, but each email at issue must be evaluated individually.  Whether that is the government's true purpose, or whether in certain instances, the government may in fact be offering a statement for its truth (or for dual purposes) can only be analyzed in the context of the complete email or message chain (rather than the snippets listed in the government's background statement).  Depending on the statement, the defense may object to the admission of certain

---

[12] The government has cited these emails as USVGR00012476 and 12487.  Again, while these are not Bates numbers, the defense has identified emails containing the quotes cited by the government.

[13] The government has not in fact identified any statements *from* Individuals 1 and 2 the government wishes to introduce; they are merely identified as recipients of certain of Mr. Griffith's emails.

proffer statements (subject to the rule of completeness), but it must first be able to make a full evaluation on a statement-by-statement basis.

This is a further example where the parties should meet and confer after the government serves its exhibit list, determine whether agreements may be reached, and then submit any challenges to contested documents to the Court.

> **D.    The Overarching Effect of the Admission of the Various Out-of-Court Statements the Government Intends to Offer Would Be to Violate the Confrontation and Due Process Clauses**

The hearsay rules were intended, among other purposes, to ensure that out-of-court statements were not admitted without an opportunity to confront witnesses.  A few exceptions were carved out to permit the introduction of evidence that had some inherent reliability (like business records).  The statements the government seeks to introduce here lack such inherent reliability.  Further, the limited hearsay exceptions were not mean to provide the government opportunity to avoid calling witnesses altogether.  While the defense does not have full optics into the government's strategy and its witness list, it appears that it does not intend to call as witnesses most, if not all, of the alleged co-conspirators it names.  Permitting them all to be named co-conspirators and putting in their statements without the opportunity to cross-examine them and contextualize their messages amounts to a violation of the Confrontation Clause and Due Process Clause of the Constitution.

It is well known that messages on social media messaging platforms are inherently unreliable.  People tend to write quickly, on-the-go and off-the-cuff, and do not carefully think through whether their writing reflects their actual meaning.  Legal jurisprudence has had little opportunity to consider this problem, as most case law on the hearsay rules dates to an analog era, when writing was a laborious, thoughtful process and people carefully considered and edited their words before committing them to writing.  The existing case law is a square peg for the round hole of online social media and its prevailing culture of irony, bombast, and "meme" in-jokes.  In the social media era, even presidents and titans of industry fire off frivolous, typo-filled

tweets on a regular basis—in May, 2011, Tesla founder Elon Musk, whom the *New York Times* described as an "unreliable narrator," tweeted what was clearly a tongue-in-cheek poll, asking his followers whether Tesla should accept Dogecoin, a "jokey cryptocurrency."[14]  No one illustrates this point more forcefully than former president Donald Trump, whose social media flights of fancy the *Washington Post* noted are often "just  musings of the president and sometimes we react as if everything he tweets is far more dramatic than it probably is."[15]  Judges have referred to President Trump's tweets as both "speculation" and not "pure fact" to find that they lacked legal significance.[16]  If the President's social media messages are not reliable as statements of facts or intent, as the government itself has argued, it is certainly unfair for the government to claim someone had intent to commit a crime based on similarly offhand messages.

As recognized in a 2016 article by Professor Villesenor of UCLA in a Harvard Journal of Public Policy article, given the explosion of the volume of communications given technology,

> The potential impact of impulsive and spontaneous expression has also changed. . . .  The role of speaker intent is more complex than ever before. And questions regarding intent are particularly acute when expression allegedly falls outside the bounds of First Amendment protection and, relatedly, within the scope of criminal statutes addressing communications.

---

[14] Sorkin, Andrew Ross, et al., *Elon Musk Makes a Hard Swerve on Bitcoin*, The *New York Times*, *available at* https://www.nytimes.com/2021/05/13/business/dealbook/musk-tesla-bitcoin.html (May 13, 2021).

[15] Phillips, Amber, *How Seriously Should We Take Trump's Tweets?  Apparently This Debate Will Never End*, The Washington Post, *available at* https://www.washingtonpost.com/news/the-fix/wp/2017/07/27/how-seriously-should-we-take-trumps-tweets-apparently-this-debate-will-never-end/ (July 27, 2017).

[16] Jansen, Bart, *Trump's tweets: Judges in government secrecy cases say they are 'speculation' and not 'pure fact,* USA Today, *available at* https://www.usatoday.com/story/news/politics/2018/12/30/trump-tweets-judges-doj-lawyers-foia-lawsuits/2197524002/.

39 Harv. J.L. & Pub. Pol'y 631.  This case is unique because, not only does it include a high volume of such messages but, indeed, it appears that the government intends to rely almost solely on them in lieu of testimony concerning intent.

The Supreme Court has repeatedly inveighed against the admission of out-of-court testimonial statements.  *See, e.g., United States v. Crawford*, 541 U.S. 36, 53-54 (2004) (holding that the "historical record" shows that "the Framers would not have allowed admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination."); *Michigan v. Bryant*, 562 U.S. 344, 357-58 (2008) (the "basic purpose" of the Confrontation Clause was to target the admission of out-of-court testimonial statements "exemplified at the notorious treason trial of Sir Walter Raleigh").  While certain hearsay statements have been considered non-testimonial and therefore not barred by *Crawford*, this case presents a novel and legally untested scenario, in which the government appears to rely almost entirely on hearsay exceptions that, without a live witness, take on the role of testimonial statements.  These exceptions were meant to admit statements that the law has deemed inherently reliable.  Informal, off-the-cuff social media messages decidedly do not fit that mold; they should not be allowed to form the foundation of the government's conspiracy charge against Mr. Griffith.

## III.    The Proffered Statements Are Outside the Bounds of Federal Rule of Evidence 404 and Should Be Precluded As Unfairly Prejudicial and Confusing to the Jury Under Rule 403

The government also argues that this evidence should be admitted under Rule 404(b) as evidence of Mr. Griffith's intent, knowledge, or motive.  (Mot. at 38.)  However, as the proffered evidence should not be admitted under Rule 404(b) because it goes outside the boundaries of the indictment and can serve no permissible purpose.

### A.    Applicable Law

"[I]t is axiomatic that the defendant need answer only for the crime he or she is currently charged with."  1 Edward J. Imwinkelried, *Uncharged Conduct Evidence* § 1:3, at 1-18 (2015).

In other words, to satisfy the protections afforded by the Sixth Amendment and properly inform a defendant of "of the charges against him and [] assur[e] that he is tried on the matters considered by the grand jury, the indictment must state some fact specific enough to describe a particular criminal act, rather than a type of crime." *United States v. Pirro*, 212 F.3d 86, 93 (2d Cir. 2000). And "the prosecution [may] not fill in elements of its case with facts other than those considered by the grand jury." *Id.* at 92 (citation omitted). "The very purpose of the requirement that a man be indicted by grand jury is to limit his jeopardy to offenses charged by a group of his fellow citizens acting independently of either prosecuting attorney or judge." *Russell v. United States*, 369 U.S. 749, 771 (1962). A defendant cannot "be convicted on the basis of facts not found by, and perhaps not even presented to, the grand jury which indicted him." *Pirro*, 212 F.3d at 92 (citing to Russell, 369 U.S. at 770).

For that reason, Rule 404(b)(1) prohibits the use of evidence related to a defendant's other crimes or previous wrong acts for which he has not been charged. Evidence of other uncharged acts is not admissible to show bad character or propensity to commit the charged offenses. *See* Fed. R. Evid. 404(b)(1); 1 McCormick on Evidence § 190 (8th ed. 2020). Evidence of "other acts" undermines the presumption of innocence, 1 McCormick § 190, at 1146 n.1 (collecting cases), and invites the risk of conviction on the improper basis of past deeds other than those charged. 1 Imwinkelried § 1:3. "Other acts" evidence therefore is admissible only for purposes "such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident," Fed. R. Evid. 404(b)(2), but not "to show a defendant's criminal propensity." *United States v. Garcia*, 291 F.3d 127, 136 (2d Cir. 2002).

In addition to the relevancy of the evidence that the government seeks to admit or preclude, however, such evidence is subject to the probative-prejudice balancing test of Federal Rule of Evidence 403. Rule 403 permits the exclusion of evidence, even if relevant, "if its probative value is substantially outweighed by a danger of ... unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting of time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403. The Second Circuit has stated that the "'district court is obviously

25

in the best position to do the balancing mandated by Rule 403,' and accordingly grants 'broad discretion' to the district court to admit or exclude evidence pursuant to Rule 403." *United States v. George*, 266 F.3d 52, 63 (2d Cir.2001) (quoting *United States v. Birney*, 686 F.2d 102, 106 (2d Cir.1982) (citation omitted)).

The Advisory Committee Notes to Rule 403 define "unfair prejudice" as "an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." Further, it is "well within [a] court's discretion to draw the line to exclude testimony that . . . could well cause the jury to be influenced by sympathies having no bearing on the merits of the case." *United States v. Paccione*, 949 F.2d 1183, 1201 (2d Cir.1991). Additionally, when a court conducts a Rule 403 balancing, it must weigh "[i]f an alternative were found to have substantially the same or greater probative value but a lower danger of unfair prejudice, . . . . with an appreciation of the offering party's need for evidentiary richness and narrative integrity in presenting a case . . . ." *Old Chief v. United States*, 519 U.S. 172, 182–83, 117 S.Ct. 644, 136 L.Ed.2d 574 (1997).

### B.     The Pre-Conspiracy Evidence Goes Outside the Boundaries of the Indicted Offenses and Cannot Be Admitted Under Rule 404(b)

Mr. Griffith has been charged with conspiracy to violate the IEEPA based on two groups of activities: (1) his participation in the April 2019 cryptocurrency conference in the DPRK (Compl. at ¶ 15(g-i) and (2) his alleged attempts, following the conference, to facilitate the exchange of a unit of cryptocurrency from the DPRK to South Korea (Compl. at ¶ 15(j)). There is no mention in the complaint or the indictment of the 2018 conduct or any kind of conduct that pre-dates Mr. Griffith's participation in the cryptocurrency conference. And, as described above, the pre-conference conduct involved a separate, unrelated effort that never went past the early stages before being abandoned in its entirety and was not included in any of the actions that make up the basis of the government's charges against Mr. Griffith. Therefore, the pre-conspiracy evidence the government falls too far afield of the activities alleged within the scope of the indictment to have any bearing on whether Mr. Griffith acted willfully to violate sanctions.

It is clearly not part of any of the activities alleged to make up the crimes with which Mr. Griffith has been charged. As the evidence is unrelated to the charged crimes, the government cannot be attempting to use this evidence "for any purpose other than to show a defendant's criminal propensity." *Garcia*, 291 F.3d at 136. Such purposes are the precise opposite of what Rule 404(b) seeks to avoid.

The government also fails to identify the specific prongs of Rule 404(b) it believes apply to the various statements it seeks to offer, thereby failing to supply the notice required under Rule 404(b)(2)(A). (*See* Mot. at 31 ("this evidence is admissible … to show, among other things, the defendant's motive, opportunity, intent, preparation, plan and knowledge.").) This catch-all statement lacks the specificity to prove notice as well as to permit a full response.

Further, the government also has not shown that Mr. Griffith had any co-conspirator with respect to the idea, so as to admit their statements. (*See supra* at II(A),(3) and (4)). To permit the admission of this evidence which falls outside of the charges in the indictment would run the great risk of confusing and misleading the jury as to what alleged crimes Mr. Griffith is actually on trial for.

### C.      Likewise, Rule 404(b) Does Not Permit the Admission of Mr. Griffith's Post-Conference Conduct

The government attempts to introduce a number of miscellaneous statements under the category of "Post-Conference Conduct," including statements concerning Mr. Griffith's alleged attempt to facilitate a financial transaction of 1 Ether with the DPRK, as well as an alleged effort to promote the contemplated 2020 DPRK blockchain conference, fund travel for DPRK persons to work with a technology association, and secure certain domain names. (Mot. 34-36.) None of these actions relates to the charges in the indictment. As such, all of this purported evidence is irrelevant pursuant to Rules 401 and 402 and its admission would violate Rule 403.

D.       **Analysis of Various Post-Conference Statements**

1.       **Alleged Proposed ETH Exchange**

The government seeks to introduce certain statements of Mr. Griffith and others (whom the government identifies as "Individuals") regarding the idea of sending one unit of Ether between South Korea and the DPRK as a peace gesture.  The statements that the government proposes to admit make clear that the idea was an inchoate one at best.  As opposed to the 2018 conduct, the government does not allege that Mr. Griffith conspired with anyone to make such an exchange happen.  With the exception of one email with CC-2 (Mot. at 21),[17] the government does not allege that any identified statements are admissible as co-conspirator statements.

Rather, it appears that most of the statements that the government seeks to admit took place between Mr. Griffith and Individual-5, who is a U.S. citizen.  The government has not indicated that Individual-5 is unavailable.  As such, their statements are inadmissible, except as necessary to place Mr. Griffith's comments in context.  In that respect, the government should meet and confer with the defense as to the statements it proposes to admit to determine if agreements can be reached.

For the reasons discussed, these statement also are not admissible under Rule 404(b).  They do not show Mr. Griffith's motive or intent regarding the conference—which occurred before these statements were made.  Indeed, given the direct evidence the government claims to have of the conference itself, it is hard to imagine what his post-conference comments to non-conference attendees about a wholly different topic (a peace gesture to take place at a future date) could be probative of what occurred at the conference.  The topic then also has the potential to cause jury confusion.  It will certainly require the defense to explain concepts such as cryptocurrency transfers, and how they are conducted, among other things.  This is an unnecessary trial-within-a-trial and should be precluded.

---

[17] The defense is willing to consider a stipulation to admit this email, subject to the rule of completeness.

### 2.      Alleged Attempts to Promote the 2020 Conference

For similar reasons, Mr. Griffith's alleged attempts to promote a potential DPRK conference in 2020 should be precluded.  Under a Rule 404(b) analysis, they have absolutely no bearing on Mr. Griffith's motive, opportunity, or intent to violate the IEEPA in attending the 2019 conference, which occurred before any of the emails the government seeks to introduce. They therefore are further collateral and irrelevant statements that simply muddy up the trial record and should be precluded under Rules 401, 403, and 404(a).

### 3.      Alleged Australia and KP Statements

The government also seeks to offer an October 28, 2019 email about a tech conference in Australia and the possibility of DPRK delegation to attend.  This exchange is of no relevance, and is hard to follow.  It should be precluded under Rule 401 and 403.  The underlying idea—of a DPRK delegation attending a conference about domain names in Australia—is unrelated to the DPRK conference or any of the other alleged conduct.  It is not a statement in furtherance of the conspiracy, as it occurs well after the conference, is unrelated to the conference, and appears to be an idea that Mr. Griffith just passed along with no further follow up.  While the defense is not clear who the alleged "international technology association" person was, responding and attempting to place this communication in context would require the defense to put on rebuttal evidence that would distract from the core issues in the case.  It therefore should be barred under Rule 403.

### 4.      Purported Tax Issues

Equally removed from the issues present is the November 2019 email the government cites regarding Mr. Griffith's tax obligations.  (*See* Mot. at 37.)  The government conclusorily lumps this statement with another statement concerning the travel ban (addressed above), labeling them both "direct evidence."  But the admission of any statements regarding tax filings is unrelated factually or legally to the issues in the case and should be analyzed separately.

Evidence of Mr. Griffith's tax history is neither direct evidence nor admissible under Rule 404.  The government clearly seeks to offer the emails regarding Mr. Griffith's taxes as bad character evidence, which is barred by Rule 404(a) and does not satisfy any 404(b) exception. Notably, Griffith's statement regarding his tax filings was made in November 2019, half a year after the conference.  This post-conference statement cannot be admitted to show Griffith's intent, preparation, absence of mistake, or any other of the permitted uses under Rule 404(b)(2).

Furthermore, because Mr. Griffith's tax matters are irrelevant to the question of his guilt in this matter, and will be substantially more prejudicial than probative, they must be excluded under Rule 403.  *See United States v. Cooper*, 286 F. Supp. 2 1283, 1292 (D. Kan. 2003) (evidence of Medicare fraud defendants' failure to file tax returns held inadmissible for lack of relevance and "potential for unfair prejudice from portraying the defendants as persons who avoid tax responsibilities.").

Moreover, the issue will surely devolve into a trial-within-a-trial.  The evidence shows that, even before the November 2019 email cited in the government's motion, Mr. Griffith was diligently working to update his tax filings.  In September 2019, Mr. Griffith exchanged several messages over Whatsapp with his father, expressing frustration that "filing this has been miserable," as he "tried to work with TurboTax, but they will only work with US-based numbers[.]"  Mr. Griffith's father noted that it had "been awhile" since the family's accountant had completed Griffith's returns, "perhaps since you moved to Singapore."  Mr. Griffith responded that he had assumed the family accountant had continued to prepare his returns, writing "I was perhaps foolishly believing those were just magically being taken care of."  Mr. Griffith subsequently engaged H&R Block, and then his family accountant, in an attempt to bring his taxes and returns current, a process that was unduly complicated due to issues presented by his foreign residence and the fact that he received payments in digital assets.  Should the government put in Mr. Griffith's stray comment about his tax return, the defense will have no alternative but to put in evidence demonstrating the numerous steps he in fact took to bring his taxes up to date, all of which are irrelevant to the crime with which Mr. Griffith is charged.

For the same reasons, the reference in the other email referring to taxes should be redacted.  (*See* Mot. at 36-37 (referencing May 23, 2019 WhatsApp message regarding the possible consequences of visiting the DPRK).)  Left alone, it does not provide an accurate picture of Mr. Griffith's efforts regarding his complex tax issues.  Correcting the misimpression caused by the government's proposed emails therefore threatens to create a trial within a trial as to Mr. Griffith's tax history that would "confuse and mislead the jury by focusing its attention on collateral issues "that would "unnecessarily delay the trial."  *United States v. Bowe*, F.2 1, 15 (2d Cir. 1966); *Manko v. United States*, 63 Fed.Appx. 570, 573 (2d Cir. 2003) (refusing to admit evidence of defendant's civil settlement with the IRS as the trial would have been "diverted from the central issue of guilt or innocence," had "little probative value," and would have "confused and misled the jury").  Mr. Griffith's tax history is simply irrelevant and must be excluded under Rules 401, 403, and 404(a).

### 5.       Alleged Violation of the Travel Ban

The government seeks to offer as direct evidence certain emails and text messages from Mr. Griffith as evidence of his knowledge of the U.S. ban on citizens traveling to North Korea.  (*See* Mot. at 33, 36-37.)  As the government charged Mr. Griffith with a violation of IEEPA and not a violation of 18 U.S.C. § 1544, Misuse of Passport, these statements cannot be considered direct evidence.

Alternatively, the government alleges that these emails are Rule 404(b) evidence concerning defendant's knowledge or intent of U.S. prohibitions.  As knowledge evidence and as party admissions, the defense does not object to the May 2, 2019 text message (Mot. at 33, n.11) or the portion of the May 23, 2019 WhatsApp message regarding the possible consequences of visiting the DPRK (Mot. at 36-37), subject to any rule of completeness objections not being resolved at the parties' meet-and-confer.  For the reasons set forth above, however, the defense requests that the portion of the May 23, 2019 WhatsApp messages referencing Mr. Griffith's taxes be redacted.  Should there be any other messages on this topic, the defense reserves the

right to object.

### 6.    Unspecified Statements About Firing Guns and Touring a Battleship Similarly Should be Precluded

In one of its most egregious demonstrations of the governments willingness to disregard the need for proffered evidence to be relevant and not unfairly prejudicial, in a single throwaway sentence towards the end of its brief, the government represents that it intends to offer Griffith's statements about the "DPRK's nuclear weapons program,"[18] and "Griffith's own notes of his activities in the DPRK, which include firing guns used to kill Americans and touring a captured battleship." (Mot. at 39.) The government proffers that it intends to offer these unspecified statements in order to demonstrate Griffith's "minimal regard for the consequences of his actions."[19] Mr. Griffith is not charged with any of this other conduct, it has no relevance whatsoever. To the contrary, the only reason the government proffered by the government for the admission of such inflammatory and irrelevant evidence is tantamount to an admission by the government that it intends to offer these alleged statements in order to establish that Mr. Griffith had a propensity to commit the sole crime with which he is charged (*i.e.*, if he has a minimal regard for the consequences of his actions in some respects, he must have similar disregard in all respects). That is expressly what Rule 404(b) prohibits, and the government should be precluded from offering such evidence for that reason alone.

Even if it were not offered for this clearly inappropriate purpose, the Court nonetheless should preclude the evidence as unfairly prejudicial and likely to sow jury confusion. *See* Fed.

---

[18] Any such evidence related to the DPRK's nuclear weapons program or suggestion that Mr. Griffith was involved with it should be precluded for the reasons set forth in Mr. Griffith's separately filed motions *in limine*.

[19] This argument is advanced in order to try to convince this Court that other evidence the government intends to offer, when considered in conjunction with this clearly inadmissible evidence, cannot be unfairly prejudicial because it is not "more inflammatory than the charged crime." (*See* Mot. at 39.) This effort to minimize the unfair prejudice of certain evidence by comparing it to even more outrageous and irrelevant evidence that the government seeks to offer should be rejected by the Court.

R. Evid. 403.  None of the conduct described is in and of itself illegal, and putting it before the jury will only serve to inflame their passions and evoke an emotional reaction.

### 7. Evidence of Mr. Griffith's Other Irrelevant and Inflammatory Statements Likewise Should Be Excluded

Finally, the government includes a category it calls "Griffith's Statements About Money Laundering, U.S. Citizenship, and the Payment of Taxes." (Mot. at 36.)  The very title of this section demonstrates that the government knows these are irrelevant documents.  The admission of these documents would derail the focus of the trial from the crime charged and, instead, lead to many trials within the trial.  All of these statements are offered for no purpose other than to sully Mr. Griffith's character, and they therefore are inadmissible and should be excluded under Rules 404(a) and 403.

#### a. Statements Regarding Obtaining Another Passport

Mr. Griffith's temporal interest in getting a second passport (which is not the same thing as renouncing citizenship and the government has, at times, implied) is wholly irrelevant to the crimes charged in this case and any probative value is substantially outweighed by its potential prejudice.

Citing an email in November 2019, after Mr. Griffith's second FBI interview, about seeking to purchase a St. Kitts passport, the government argues that the email should be admitted because it "reflects his intent and plan to potentially flee the U.S. rather than face the consequences of his actions[.]"  (Mot. at 38.)  This argument does not hold water.  Mr. Griffith already lived abroad in Singapore prior to his arrest.  At the time of the statement, he had remained in the U.S. at the request of the FBI, and in fact he continued to do so until the time of his arrest on Thanksgiving Day, at which time he attempted to travel *within* the United States to visit his family after giving the U.S. Attorney's Office notice of his travel.  In fact, since his indictment, Mr. Griffith has cleared any and all inter-U.S. travel through the appropriate channels and at no point has he attempted to leave the district, much less the country, without that approval. This is hardly the behavior of a person seeking to flee the country.

Although the government does not identify them specifically, any other statements about obtaining a St. Kitts or Nevis passport equally fail the relevance standard.  Whatever frustration or fear Mr. Griffith may have felt that allegedly caused him to vent to friends about this idea, he never applied for a second passport and made no attempt to avoid the jurisdiction of the United States.

The Second Circuit has held that, "since flight evidence can be powerful," the party seeking to introduce it must offer "a satisfactory factual predicate . . . from the which the jury can infer consciousness of guilt from flight."  *United States v. Al-Sadawi*, 432, F.3d 419, 424 (2d Cir. 2005).  The factual predicate requirement "ensures that the evidence is probative in a legal sense and protects the defendant against the possibility of the jury drawing unsupported inferences from otherwise innocuous behavior."  *United States v. Amuso*, 21 F.3d 1251, 1260 (2d Cir. 1994); *see also United States v. Sanchez*, 790 F.2d 245, 252 (2d Cir. 1986) (flight evidence must "provide the jury with more than an opportunity for 'mere conjecture and speculation'.") (quoting *United States v. Myers*, 550 F.2d 1036, 1050 (5th Cir. 1977)).  The government has not met its burden here, as it has not shown any factual predicate that would demonstrate that Mr. Griffith's alleged "pursuit" of a St. Kitts passport was anything but an innocuous lark.

Further, the admission of any statements about obtaining a second passport would lead to a trial-within-a-trial, as the defense would need to show that St. Kitts and Nevis do extradite their citizens to the United States; [20] thus, the desire to get a passport from these countries would be irrelevant to an individuals' desire to evade the reach of U.S. law enforcement.  Further, it is not uncommon that, due to the United States' ambiguous and slow regulation with regard to digital assets, individuals with digital assets have often sought other venues for their tax filings.  Should the government elicit the St. Kitts comment or similar evidence, the defense would need to elicit Mr. Griffith's potential other motives to obtain citizenship in a jurisdiction other than the U.S.,

---

[20] *See* https://www.state.gov/wp-content/uploads/2019/02/12805-Saint-Kitts-and-Nevis-Law-Enforcement-Extradition-9.18.1996.pdf.

which lead to the litigation of distracting collateral issues.  Accordingly, these statements should be excluded.

### b.      The Joke about Money Laundering

The government strains the bounds of relevance in seeking to admit Mr. Griffith's purported text to his parents stating that, if he were fired, he would "setup [sic] a money laundering company in North Korea."  (*See* Mot. at 23.)  This is classic Rule 403 evidence that should be excluded.  As the government noted in its motion, this purported text was sent after a bad day at work, when he believed he would be fired by the Ethereum Foundation.  (*Id*.)  This text must be seen in context for what it was—a bit of acerbic gallows humor.  The government cannot seriously contend that Mr. Griffith would share plans to set up a criminal enterprise with his family via text message.

Further, the very concept of a "money laundering company in North Korea" is absurd on its face.  What even is a "money laundering company" and how would one set one up (in North Korea or anywhere)?  The statement is obviously facetious.   If the government believes there are such companies, and that Mr. Griffith seriously believed he could create one, it would cut against their prior statement, made by AUSA Krouse during the December 30, 2019 bail hearing, "[t]here aren't businesses in North Korea.  Everything is run by the state."  (12/30/19 Tr. at 24:18-25:2 (Dkt. No. 50-1).)

In sum, Mr. Griffith's statement, clearly made in jest in a family group chat, does not have a modicum of probative value, and would create unfair prejudice to Mr. Griffith if admitted

## V.      The Government's Motion to Preclude "Extraneous Evidence" Regarding the DPRK's Crypto Capabilities Should Be Denied

The government's request to exclude "extraneous" evidence regarding the DPRK's cryptocurrency and blockchain capabilities should be denied.  (*See* Mot. at 46-51.)  The evidence it seeks to exclude is not "extraneous."  Rather, it is clearly relevant and goes directly to the indictment's charge against Mr. Griffith.

The sole charge against Mr. Griffith is conspiracy to violate the IEEPA provisions banning the provision of "services" to the DPRK.  (Ind. ¶ 2.)  What precisely constitutes a service is neither defined by the IEEPA nor by OFAC guidelines and regulations.  The common ground among any definition of services is the provision of a benefit to the other party, as the government's own motion admits.  (*See* Mot. at 48.)  There should be no doubt that through argument and evidence at trial the government is going to claim, both directly and implicitly, that what Mr. Griffith allegedly conspired to do had, or would have had, some benefit to the DPRK. And, indeed, the government has previously confirmed that it "does intend to present evidence to the jury about how this information and this presentation given by Mr. Griffith was useful to the people who attached the conference."  (Dkt. 82 at 44:7-10.)  If there already existed a high level of information regarding cryptocurrency and blockchain capabilities within the DPRK, then any the information Mr. Griffith allegedly provided at the conference would have been merely duplicative of what was already common knowledge and cannot be considered a benefit.

Further, the government should not be permitted to use the parties' DRPK-related stipulations as a shield to keep out evidence.  That stipulation helped resolve a discovery issue. But it was not meant to deny Mr. Griffith's ability to offer DRPK-related evidence while permitting the government to seek to introduce whatever it wishes.

Indeed, the government attempts to use DPRK-related evidence as a sword as well as a shield.  The government has noticed the expert testimony of an academic on the DPRK, DPRK-U.S. relations, DPRK nuclear capabilities, and sanctions.  Under the government's argument here, the defense could not even cross-examine the proposed expert on the very topics on which the government intends to her testimony.

Evidence of DPRK's capabilities in cryptocurrency and blockchain is highly relevant to the charge against Mr. Griffith and is precisely the type of information the jury should be assessing whether Mr. Griffith conspired to violate the IEEPA.  (*See*, e.g., Dkt. 89 at 11 (in ruling on whether the content of the information contained in Mr. Griffith's presentation could be considered a service as opposed to information under the IEEPA exemptions that it was "a

36

factual dispute that…can only be resolved by a petit jury"); *id*. at 17 ("It will be part of the government's burden to prove that…the services were to be more than providing preexisting information…").)  There is no danger of misleading the jury, as the government claims, when evidence goes precisely to the issues the jury must determine.  (*See* Mot. at 51.)  As such, the government's request to exclude this evidence should be denied.  Mr. Griffith should be permitted to introduce such evidence if he chooses to do so, whether on cross-examination or during his own case-in-chief.

## CONCLUSION

For the reasons set forth above, the Court should deny the government's motions *in limine*.

Dated:  August 30, 2021                         Respectfully Submitted,

                                                                */s/ Brian E. Klein*
                                                                _____

                                                                Brian E. Klein
                                                                Keri Curtis Axel
                                                                Waymaker LLP

                                                                -and-

                                                                Sean S. Buckley
                                                                Kobre & Kim LLP

                                                                *Attorneys for Virgil Griffith*