UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - X
:
  UNITED STATES OF AMERICA
:
    - v. -
:
  VIRGIL GRIFFITH,          20 Cr. 15 (PKC)
:
         Defendant.
:
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - X


**GOVERNMENT'S OPPOSITION TO THE DEFENDANT'S MOTIONS *IN LIMINE*
AND MOTION TO PRECLUDE CERTAIN DEFENSE EXPERT TESTIMONY**


AUDREY STRAUSS
United States Attorney for the
Southern District of New York
One St. Andrew's Plaza
New York, New York 10007



Kimberly J. Ravener
Kyle Wirshba
Assistant United States Attorneys
-Of Counsel-

## <u>TABLE OF CONTENTS</u>

I. The Defendant's Motions to Exclude Certain Evidence and Argument Should be Denied ... 2

   A. Relevant Law ........................................................................................................ 2

   B. The Defendant's Wealth and Cryptocurrency Holdings ..................................... 2

   C. The Defendant's Involvement with Tor and the "Dark Web" ............................. 4

   D. The DPRK's Nuclear Program............................................................................ 6

II. The Defendant's Proposed Expert Testimony Should Be Precluded in Part ..................... 10

   A. Applicable Law ................................................................................................. 10

   B. The Defendant's Proffered OFAC Expert Testimony Should Be Precluded.................. 12

      1. Relevant Facts ............................................................................................ 12

      2. Discussion .................................................................................................. 13

   C. The Defendant's Proffered Cryptocurrency and Blockchain Expert Testimony
      Should Be Limited and Precluded in Part ...................................................... 17

      1. Relevant Facts ............................................................................................ 17

      2. Discussion .................................................................................................. 18

III. Conclusion ....................................................................................................................... 22

# **TABLE OF AUTHORITIES**

## Cases

*Bourjaily v. United States*, 483 U.S. 171 (1987) ........................................................ 10

*Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993) ........................................ 11

*Donovan v. Centerpulse Spine Tech Inc.*, 416 F. App'x 104 (2d Cir. 2011) ................ 18

*Gen. Elec. Co. v. Joiner*, 522 U.S. 136 (1997) ........................................................... 11

*Highland Cap. Mgmt., L.P. v. Schneider*, 379 F. Supp. 2d 461 (S.D.N.Y. 2005) ............ 11, 20

*Kumho Tire Co., Inc. v. Carmichael*, 526 U.S. 137 (1999) .......................................... 11

*LaSalle Bank Nat'l Ass'n v. CIBC Inc.*, 2012 WL 466785 (S.D.N.Y. 2012) .......... 11, 20

*Nimely v. City of New York*, 414 F.3d 381 (2d Cir. 2005) ........................................... 14

*Old Chief v. United States*, 519 U.S. 172 (1997) ................................................ 4, 6, 10

*United States v. Amuso*, 21 F.3d 1251 (2d Cir. 1994) ................................................. 20

*United States v. Banki*, 2010 WL 1875690 (S.D.N.Y. 2010) ................... 14, 15, 16, 21

*United States v. Barrow*, 400 F.3d 109 (2d Cir. 2005) ............................................... 20

*United States v. Bilzerian*, 926 F.2d 1285 (2d Cir. 1991) ............................................. 9

*United States v. Brown*, 2017 WL 2493140 (S.D.N.Y. 2017) ...................................... 4

*United States v. Duncan*, 42 F.3d 97 (2d Cir. 1994) ............................................. 14, 21

*United States v. Gracesqui*, 730 F. App'x 25 (2d Cir. 2018) ........................................ 5

*United States v. Grote*, 961 F.3d 105 (2d Cir. 2020) ............................... 14, 15, 16, 21

*United States v. Jasper*, 2003 WL 223212 (S.D.N.Y. 2003) ....................................... 18

*United States v. Kadir*, 718 F.3d 115 (2d Cir. 2013) .......................................... 4, 6, 10

*United States v. Livoti*, 196 F.3d 322 (2d Cir. 1999) .................................................... 2

*United States v. Lopez*, 2019 WL 1570818 (S.D.N.Y. 2019) ............................... 14, 21

*United States v. Mejia*, 545 F.3d 179 (2d Cir. 2008) .................................................. 21

*United States v. Quattrone*, 441 F.3d 153 (2d Cir. 2006) .................................... 4, 6, 10

*United States v. Robinson*, 702 F.3d 22 (2d Cir. 2012) ................................................ 6

*United States v. Roldan Zapata*, 916 F.2d 795 (2d Cir. 1990) ..................................... 2

*United States v. Scop*, 846 F.2d 135 (2d Cir. 1988) ............................................. 11, 15

*United States v. Torres*, 2021 WL 1947503 (S.D.N.Y. 2021) .................................... 21

*Zaccaro v. Shah*, 746 F. Supp. 2d 508 (S.D.N.Y. 2010) ..................................... 14, 21

**Statutes**

18 U.S.C. § 3231 ................................................................................................ 18

18 U.S.C. § 3238 ................................................................................................ 18

**Other Authorities**

31 C.F.R. § 510 ................................................................................................. 13

International Emergency Economic Powers Act (IEEPA), 50 U.S.C. § 1701, et seq. .......... *passim*

**Rules**

Federal Rule of Evidence 16 .............................................................................. 18

Federal Rule of Evidence 401 .............................................................................. 2

Federal Rule of Evidence 402 .............................................................................. 2

Federal Rule of Evidence 403 ..................................................................... 1, 2, 4, 6

Federal Rule of Evidence 702 ..................................................................... *passim*

The Government respectfully submits this memorandum in opposition to defendant Virgil Griffith's motions *in limine* and in support of a motion to preclude certain of the expert testimony noticed by the defense.

In his motions *in limine*, Griffith seeks to exclude evidence and argument relating to (1) the defendant's personal wealth and cryptocurrency holdings, (2) the defendant's involvement with Tor and the "Dark Web," and (3) the DPRK's nuclear program. The Government's evidence on these topics will be limited, and based upon the defendant's own statements, co-conspirator statements, and conduct in the course of the offense, as reflected in the facts set forth in the Government's motions *in limine*. (Dkt. 131 ("Gov't MIL")).[1] For the reasons set forth below, because the Government's limited evidence on these matters is relevant and does not run afoul of Federal Rule of Evidence 403, there is no basis to preclude the Government's presentation of such evidence and argument. Therefore, the defendant's motions *in limine* should be denied.

The Government also moves to preclude certain expert testimony noticed by the defendant. Specifically, the Government moves to preclude expert testimony from a former OFAC employee regarding the scope and meaning of relevant legal terms such as the Berman Amendment, OFAC's procedures and enforcement discretion, and analogies to other regulatory frameworks not at issue in this case. The Court will instruct the jury on the legal terms, and the defendant has not established the relevance of OFAC's practices or defense analogies to the Commerce Department and "other travel bans." The Government also moves to compel further disclosures regarding the defense's cryptocurrency expert, including details regarding his proffered opinions and the bases for those opinions, and to preclude him from offering what amounts to an opinion that the

---

[1] The Government hereby incorporates by reference the definitions of terms and abbreviations used in its motions *in limine*.

defendant did not provide a service to the DPRK at the Conference. The defendant's experts should not be permitted to usurp the Court's role in providing legal instructions, or to offer what amount to legal conclusions based on evaluation of the evidence in this case that the jury alone will evaluate as the finders of fact at trial.

## I.   The Defendant's Motions to Exclude Certain Evidence and Argument Should be Denied

### A.   Relevant Law

The Federal Rules of Evidence define relevant evidence as evidence that "has any tendency to make a fact more or less probable than it would be without the evidence; and . . . the fact is of consequence in determining the action." Fed. R. Evid. 401. Irrelevant evidence is not admissible. Fed. R. Evid. 402. Courts may exclude relevant evidence where its probative value is substantially outweighed by a danger of prejudice, confusion of the issues, wasting time, or needlessly presenting cumulative evidence. Fed. R. Evid. 403. Evidence is not unduly prejudicial when it is not "more inflammatory than the charged crime." *United States v. Livoti*, 196 F.3d 322, 326 (2d Cir. 1999).

### B.   The Defendant's Wealth and Cryptocurrency Holdings

Because the Government intends to limit its evidence on the defendant's wealth and cryptocurrency holdings to only that which is relevant and does not run afoul of Federal Rule of Evidence 403, there is no basis to preclude the Government's presentation of such evidence and argument. Therefore, the defendant's motions *in limine* should be denied.

As set forth in the Government's motions *in limine*, the Government intends to introduce evidence that Griffith offered to help fund various services for the DPRK, including a cryptocurrency mining node in the DPRK at a cost of approximately $10,000, (*see* Gov't MIL at 4), and to fund specific travel for DPRK persons, (*see id*. at 23; *see also id*. at 21 (noting Griffith's August 6, 2019 message to CC-2, which the Government plans to offer, stating that "Ethereum

2

Foundation can't touch anything DPRK. But I can fund some things myself.")). The Government also intends to introduce Griffith's inculpatory statements, immediately following the Conference, "I think I'm going to be the connector in Blockchain-mediated economic relations between dprk and South Korea[.] Should be fun[.] Hopefully won't have much jail time for it[.] I'll try to be wealthy enough to pay my bail." (*See id.* at 19).

This limited evidence implicating the defendant's financial resources is direct proof of his participation in the charged conspiracy, and squarely admissible in the Government's case in chief. While the Government does not otherwise plan to offer evidence of the defendant's financial resources, to the extent the defense presents evidence or argument that fairly puts the defendant's financial condition in issue, the Government may seek to cross-examine witnesses regarding this subject and to further address any such contentions by offering limited rebuttal evidence. For example, to the extent that the defense presents evidence or argument questioning whether the defendant's financial proposals to assist the DPRK were genuine, the Government may seek to introduce limited evidence that the defendant had the financial capability to follow through on these offers.

Rule 403 does not bar the admission of the evidence outlined above that the Government plans to offer in its case-in-chief because none of it is unfairly prejudicial; it is evidence of the charged crime. This evidence is highly probative of the defendant's participation in the charged offense, including various steps he took to work with and to aid the DPRK despite his knowledge of the applicable sanctions. This evidence is also probative because it reflects that the defendant acted willfully, that is, with intent to violate the law (an element of the charged crime), as it includes, for example, the defendant's brazen acknowledgments that despite the fact that his company would not "touch anything" involving the DPRK, he intended to do so independently,

and that he could face "jail time" but planned to manage that risk by using his wealth to pay bail. (Gov't MIL at 19). "Evidence offered by the Government is by design prejudicial to a defendant," and Rule 403's restrictions on unfairly prejudicial evidence "speaks to the capacity of some concededly relevant evidence to lure the factfinder into declaring guilt on a ground different from proof specific to the offense charged." *United States v. Brown*, No. S2 16 Cr. 559 (DLC), 2017 WL 2493140, at *1-2 (S.D.N.Y. June 9, 2017) (quoting *Old Chief v. United States*, 519 U.S. 172, 180 (1997)); *see also United States v. Quattrone*, 441 F.3d 153, 186 (2d Cir. 2006) ("All evidence introduced against a defendant, if material to an issue in the case, tends to prove guilt, but is not necessarily prejudicial in any sense that matters to the rules of evidence." (citation omitted)). Here, this evidence would not "tend[] to have some adverse effect upon a defendant *beyond* tending to prove the fact or issue that justified its admission into evidence." *United States v. Kadir*, 718 F.3d 115, 122 (2d Cir. 2013) (emphasis in original) (citation omitted).

### C.  The Defendant's Involvement with Tor and the "Dark Web"

Similarly, the defendant's second motion should be denied because the Government intends to present only limited, targeted, and highly probative evidence about the defendant's involvement with Tor and the "Dark Web."

As described in the Government's motions *in limine*, the Government intends to introduce one email in which the defendant contacted an individual affiliated with Tor, forwarding a message from CC-4 and stating:

> I once mentioned to you the idea of doing a node in DPRK. I was going to put an Ethereum node there, but I eventually decided it was too edgy and decided against it. However, Tor doesn't mind being edgy in these ways. If torservers.net or others would like to crowdfund putting a Tor node in DPRK, I bet they'd do it under the same conditions described below.

4

> If you got enough interest and willpower on your side (will require setting up a nonprofit in North korea), I'm willing to make the introductions.

(Gov't MIL at 7-8). The Government also intends to introduce a copy of the defendant's curriculum vitae ("CV") that the FBI seized from his Google email account, and a March 7, 2019 email that Griffith sent to the DPRK's United Nations Mission in New York with a link to the CV. The defendant sent this CV at the direction of CC-1, after CC-1 advised that the defendant needed to submit a CV in order to secure clearance from the DPRK government to participate in the Conference, including the "approval of our DPRK mission in NY." (Gov't MIL at 10). Griffith's CV listed "Tor2web, Tor Roster, and OnionLink," all dark web projects, among the defendant's "notable work" in its introductory lines, identifies "Tor" and "dark web" among his proficiencies, and describes the defendant's work at Ethereum as including "developing decentralized VPN [virtual private network] system to replace Tor," and lists a host of his prior experience in the self-described "Darkweb."

The Government plans to elicit limited testimony, such as from Witness-2, a Conference participant, explaining the basic nature of these terms in order to help the jurors understand the defendant's self-professed specialized skills, his communications with the DPRK government, and how the defendant marketed himself and the potential value of his services to the DPRK. The Government also expects to elicit testimony about the defendant's relationship to other attendees at the Conference, which included contacts established through the defendant's work on dark web projects, such that the testimony will include limited references to that subject area. All of this evidence is probative of Griffith's participation in the charged conspiracy with other Conference attendees, and the specialized nature of the services to the DPRK that were one of the objects of the conspiracy. *See United States v. Gracesqui*, 730 F. App'x 25, 29 (2d Cir. 2018) (upholding the

admission of "background evidence to show the evolution of the relationship between participants in the crime").

Rule 403 does not bar this evidence either. This evidence is highly probative of the defendant's communications in furtherance of the charged conspiracy, is inextricably linked with the charged conduct, and necessary to complete the story of the crimes on trial. Any risk of unfair prejudice would not outweigh the clear probative value of the evidence because the defendant's work experience involving Tor and the dark web are not more inflammatory than the charged conspiracy to provide services to North Korea, a nation under sanctions from the United States, the United Nations, and much of the global community. *See Old Chief*, 519 U.S. at 180; *Quattrone*, 441 F.3d at 186; *Kadir*, 718 F.3d at 122; *United States v. Robinson*, 702 F.3d 22, 36-37 (2d Cir. 2012) (upholding admission of evidence necessary to complete the story of the crime on trial where it was "no more inflammatory" than the charges).

### D. The DPRK's Nuclear Program

The defendant's motion to bar any evidence or argument related to the DPRK's nuclear program should be denied because the Government intends to introduce only limited factual and expert evidence on that subject, which is firmly anchored in the proof of the defendant's participation in the charged conspiracy and not unduly prejudicial.

As the Government highlighted in its motions *in limine*, Griffith knew of the DPRK's nuclear program prior to his travel to the DPRK, discussed that program in the course of committing the charged offense, and expressed the view, when planning to attend the Conference, that the DPRK would "probably like to start" funding its nuclear weapons program with cryptocurrency. Specifically, during an electronic message conversation beginning on August 31, 2018, Griffith stated the following:

Griffith:         I think this con[ference] is about as safe as a trip to dprk is

|                |                                                                                                                  |
|----------------|------------------------------------------------------------------------------------------------------------------|
|                | going to get for the next 4-5 years.                                                                              |
| Griffith:      | It's a business event, it's just after the summit, and it's a fancy con. And DPRK wouldn't want to scare away Blockchain talent that'll let them get around sanctions |
| Individual-3:  | What if they're funding their drug trade and nuclear program with crypto?                                          |
| Griffith:      | Unlikely.  But they'd probably like to start doing such.                                                          |

(*See* Gov't MIL at 7).   Griffith's expressed belief that the very kind of cryptocurrency-related services that he was traveling to the DPRK to help provide could be used to further its nuclear program, and his lack of concern for that risk, is directly relevant to Griffith's knowledge of the sanctions and willful violation of the services and evasion prohibitions.

Similarly, the defendant wrote to an Ethereum colleague on September 6, 2018 falsely claiming that he "will not be pursuing a node in the dprk," citing "the concern" that the U.S. President "would receive a memo that says Ethereum is funding dprk's nukes" and "act[] rashly." Nonetheless, weeks later, the defendant contacted an individual affiliated with Tor proposing to "crowdfund putting a Tor node in DPRK" and forwarding his own detailed communications with a co-conspirator on how to do so. (*See* Gov't MIL at 7-8). Earlier, on December 30, 2017, CC-3 sent a news article to the defendant, notifying him that Singapore was "warn[ing] action against those who continue to trade with North Korea off its shores," and specifically quoting from the article that this "trade suspension came more than two months after the [Singaporean] Ministry of Foreign Affairs advised Singaporeans to avoid non-essential travel to North Korea following Pyongyang's sixth nuclear test."  The article that CC-3 sent to Griffith, which the Government also plans to offer in its case-in-chief, stated that "the Singapore Customs said it has adopted several new sanctions 'in rapid succession' this year, in accordance with United Nations Security Council Resolutions (UNSCRs) imposed on North Korea for its repeated nuclear and missile provocations

that drove tensions sky high in the region." The defendant responded, "Mannnn . . . . DPRK is getting dicier." This evidence goes directly to the defendant's knowledge and intent to evade sanctions, as it tends to show that he persisted in his pursuit of aiding the DPRK, including by traveling to the DPRK, in the face of this warning from Singapore authorities, his nation of residence, which specifically referenced the DPRK's nuclear program as a reason to avoid such activity.

Griffith spoke about the DPRK's use of nuclear weapons, including missiles in particular, at the Conference as part of the tailored services he provided and pitched to the DPRK audience. Griffith's notes for his "Blockchain and Peace" presentation describe "generic uses for DPRK" of blockchain technology, including "using smart-property to disable nukes based on upon fu[l]filled conditions." This statement in Griffith's notes refers to Griffith's proposal, made at the Conference, that the DPRK could link the threat of a nuclear weapon, or choose to disable it ("disable nukes"), through smart contracts built upon blockchain technology. At trial, the Government will introduce recordings from the Conference reflecting that Griffith in fact instructed the DPRK audience about the potential use of smart contracts in direct relationship to the DPRK's missile program as follows:

> Before you couldn't hold a country accountable like this behaves. Like if it's a big country. Like there's nothing you could do. Now there is. So just an idea, so hypothetically you could have something where you could have a module on a missile, and the module could say something like you know if all the news reports say that sanctions on North Korea have been lifted, the missile will deactivate. But only then. And so this will give the U.S., I guess, confidence that Korea really will follow through to say that no no if you get rid of the sanction, the missile really are gone, like really. And so this is fundamentally a new way where they are automatic agreements you can't take back.
> . . . .
> [S]ay  things like you know, we want there to be less artillery in the DMZ, and say you know if there is less artillery then that we agree

> to, I don't know, say one of the missiles, exactly one being deactivated, or something like that and this is the way to start small, otherwise we get comfortable with technology.

In other words, Griffith specifically pitched the DPRK audience on the "idea" that they could gain leverage in sanctions negotiations by placing a "module on a missile" to "deactivate" the missile, but only "if you [i.e., the United States] get rid of the sanction, the missile are really gone." Griffith also pitched the use of the same technology to leverage the DPRK's control over missiles to negotiate for "less artillery in the DMZ," that is, weapons in the Korean Peninsula's Demilitarized Zone.

The Government also plans to offer limited expert testimony to help the jurors understand references to the DPRK's nuclear program in communications by Griffith and others in connection with the charged conspiracy, which is not unduly prejudicial in light of the defendant's own words. *See United States v. Bilzerian*, 926 F.2d 1285, 1294 (2d Cir. 1991) (expert testimony admissible to "help a jury understand unfamiliar terms and concepts"). Specifically, the Government seeks to elicit the following expert testimony, in substance, relating to the DPRK's nuclear program:

- One of the purposes of the U.S. and U.N. sanctions upon the DPRK is to deter the DPRK's nuclear proliferation efforts, through diplomatic and trade pressures. This expert testimony is admissible to help the jurors understand the references discussed above to the DPRK's nuclear program in relation to the sanctions regime, including, for example, the reference to U.N. sanctions in the above-quoted article that CC-3 sent Griffith, which included the observation that the DPRK's "repeated nuclear and missile provocations . . . drove tensions sky high in the region," and Griffith's statement about how the U.S. government might react if Ethereum "is funding dprk's nukes."

- The DPRK conducted six nuclear weapons tests between 2006 through 2017, including a test of a nuclear bomb designed to be mounted on missiles in its arsenal. This limited testimony is admissible to help the jurors understand CC-3's reference to the DPRK's "sixth nuclear test" in the December 30, 2017 text message exchange with Griffith, as well as Griffith's statements at the Conference about the potential use of blockchain technology in connection with the DPRK's missile program.

- In the context of the Korean Peninsula, the term "DMZ," or demilitarized zone, refers to a strip of land running near the 38th parallel north that serves as a buffer zone

> between South Korea and the DPRK, near which the DPRK has placed thousands of soldiers and pieces of artillery. This limited testimony is admissible to help the jurors understand Griffith's reference during his presentation at the Conference to the goal of securing "less artillery in the DMZ."

Such limited evidence regarding the DPRK's nuclear program, carefully circumscribed to provide context for admissible statements by the defendant and others relating to the charged conspiracy, does not run afoul of Rule 403. Evidence of the defendant's crime and his state of mind, especially given that the Government must prove willfulness in this case, is not "unfairly" prejudicial. *See Old Chief*, 519 U.S. at 180; *Quattrone*, 441 F.3d at 186; *Kadir*, 718 F.3d at 122. In addition, the defense has repeatedly indicated that Griffith's intent will be a central issue at trial, and has signaled that they may argue that Griffith acted in good faith to comply with the U.S. sanctions regime.[2] The defendant's statements indicating that cryptocurrency technology, the area in which he conspired to provide services to the DPRK, could have value to contribute specifically to funding the DPRK's nuclear program, serve to undermine any notion that the defendant was acting in good faith, and are probative for demonstrating his willfulness in evading the sanctions regime.

## II. The Defendant's Proposed Expert Testimony Should Be Precluded in Part

### A. Applicable Law

Under Rule 702, an expert may testify if his or her "scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702. The party that proffers expert testimony bears the burden of showing that it is admissible. *See Bourjaily v. United States*, 483 U.S. 171, 175-76 (1987). The trial court must also find that the proposed testimony is both relevant and reliable prior to admitting it into

---

[2] *See, e.g.*, Dkt. 137 at 19-20 (defendant's requests to charge, seeking an instruction on this issue).

evidence. *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589-90 (1993); *see Kumho Tire Co., Inc. v. Carmichael*, 526 U.S. 137, 141 (1999). Specifically, the trial judge has "the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Daubert*, 509 U.S. at 597. The trial judge's exclusion of expert testimony will be affirmed unless it constitutes an abuse of discretion. *See Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 139, 142 (1997).

Rules 401, 402, and 403 likewise provide that relevant evidence is admissible when it tends to make the existence of any fact that is of consequence more or less probable than it would be without the evidence, but may be excluded if its probative value is substantially outweighed by, among other things, the danger of unfair prejudice, confusion of the issues, and misleading the jury. "Expert evidence can be both powerful and quite misleading because of the difficulty in evaluating it.  Because of this risk, the judge in weighing possible prejudice against probative force under Rule 403 . . . exercises more control over experts than over lay witnesses." *Daubert*, 509 U.S. at 595 (citation and quotations omitted).

For the same reason, an expert cannot speculate as to the credibility, state of mind, or motivations of others.  *See, e.g.*, *United States v. Scop*, 846 F.2d 135, 142 (2d Cir. 1988) ("[E]xpert witnesses may not offer opinions on relevant events based on their personal assessment of the credibility of another witness's testimony. The credibility of witnesses is exclusively for the determination by the jury."); *Highland Cap. Mgmt., L.P. v. Schneider*, 379 F. Supp. 2d 461, 469-470 (S.D.N.Y. 2005) (rejecting expert's attempt to speculate "regarding the state of mind and motivations of certain parties" and as to the "knowledge possessed by defendants and non-parties"); *LaSalle Bank Nat'l Ass'n v. CIBC Inc.*, 2012 WL 466785, at *7 (S.D.N.Y. Feb. 14, 2012) ("Additionally, an expert may not testify as to facts not within his personal knowledge, and may

not opine as to a party's state of mind, whether a party acted in bad faith, or as to the credibility of witnesses.").

## B.   The Defendant's Proffered OFAC Expert Testimony Should Be Precluded

The defense has notified the Government that the defendant intends to offer expert testimony relating to legal issues that have already been litigated, OFAC's procedures, OFAC's exercise of discretion in enforcement and other decisions, and analogies to the Commerce Department and "other travel bans."  The Court will instruct the jury regarding the meaning and scope of the legal issues cited in the defendant's expert notice, and expert testimony applying the expert's legal conclusions to the evidence would usurp the province of the jury.  In the absence of evidence linking the defendant's state of mind to OFAC's procedures and discretion, expert testimony regarding those issues would be irrelevant and unduly prejudicial.  So too would testimony regarding regulatory schemes not at issue in this case.  Accordingly, the Court should preclude testimony from the defense OFAC expert.

### 1.   Relevant Facts

On August 30, 2021, the defendant notified the Government of its intention to call a former OFAC employee to testify as an expert about the following matters, which are numbered in the list below and cited in the Discussion section as "Def. Bullet [Number]":[3]

1. "The history, scope, and nature of the so-called Berman Amendment and the information and informational [materials] exemptions (collectively, the 'Informational Exemption') to the IEEPA."

2. "OFAC's Office of Enforcement, its function and procedures in enforcing OFAC regulations through civil proceedings and the steps such a civil investigation would involve, as well as OFAC's coordination with the Department of Justice and the U.S. Attorney's Offices."

---

[3] In the evening of September 3, 2021, the defense disclosed that the former OFAC employee that they intend to call as an expert is Amber Vitale.

3. "OFAC's enforcement of the NKSR regulations."

4. "How OFAC historically has applied the Informational Exemption to conduct that is pure speech, including but not limited to the significance of information being publicly available as opposed to being developed specifically for a particular presentation. As part of this opinion, we expect the expert will opine that an individual's protected speech would not be considered by OFAC to constitute a provision of services if the content of that speech and the information it disclosed was publicly available regardless of the sophistication of the audience."

5. "The interplay between the IEEPA and OFAC sanctions as compared to the Commerce Department's export control regulations."

6. "Licensing determinations and OFAC enforcement actions related to activities that arguably qualify for protection under the Informational Exemption, as well as analogous situations involving the civil enforcement of other travel bans.

(*See* Defense Expert Notice, attached hereto as Exhibit A).

  *2. Discussion*

The defense's proffered OFAC expert testimony consists of:

- <u>Legal concepts</u> such as the meaning and scope of the Berman Amendment (Def. Bullet 1), the informational materials exemption set forth at 31 C.F.R. § 510.312(a)(1) and 31 C.F.R. § 510.213(c)(1)-(2) (Def. Bullet 1), "protected speech" (Def. Bullet 4), "provision of services" (Def. Bullet 4), and the "interplay between the IEEPA and OFAC sanctions" (Def. Bullet 5).

- <u>OFAC procedural issues</u>, including "OFAC's Office of Enforcement" (Def. Bullet 2), "civil proceedings" (Def. Bullet 2), "civil investigation" (Def. Bullet 2), and "coordination" with DOJ (Def. Bullet 2).

- <u>OFAC's exercise of discretion</u>, including "enforcing OFAC regulations" (Def. Bullet 2), "OFAC's enforcement of the NKSR regulations" (Def. Bullet 3), "[h]ow OFAC historically has applied the Informational Exemption" (Def. Bullet 4), "[l]icensing determinations" (Def. Bullet 6), and "OFAC enforcement actions" (Def. Bullet 6).

- <u>Analogies</u>, which are unexplained in the defense notice and appear to be inapt, to the "Commerce Department's export control regulations" (Def. Bullet 5), and "civil enforcement of other travel bans" (Def. Bullet 6).

The Court should preclude this testimony in its entirety.  First, expert testimony regarding

legal concepts would improperly "usurp the role of the trial judge in instructing the jury as to the

13

applicable law," which the Second Circuit has consistently held "'by definition does not aid the jury in making a decision,' and is therefore inadmissible under Federal Rule of Evidence 702." *United States v. Grote*, 961 F.3d 105, 121 (2d Cir. 2020) (quoting *Nimely v. City of New York*, 414 F.3d 381, 397 (2d Cir. 2005) (internal quotation marks and citation omitted)); *United States v. Duncan*, 42 F.3d 97, 101 (2d Cir. 1994) ("[T]he use of expert testimony is not permitted if it will usurp . . . the role of the jury in applying th[e] law to the facts before it. When an expert undertakes to tell the jury what result to reach, this does not *aid* the jury in making a decision, but rather attempts to substitute the expert's judgment for the jury's." (internal citations and quotation marks omitted) (emphasis in original)); *United States v. Lopez*, No. S1 18 Cr. 6 (DLC), 2019 WL 1570818, at *6 (S.D.N.Y. Apr. 11, 2019) (precluding the majority of a defense expert's testimony where it threatened to "intrude on the Court's obligation to describe the legal standard for the jury, or on the jury's duty to be the sole and exclusive fact finder."); *Zaccaro v. Shah*, 746 F. Supp. 2d 508, 518 (S.D.N.Y. 2010) (Castel, J.) (excluding expert testimony that would "improperly usurp the role of the Court and the jury" and "undertakes to tell the jury which conclusion to reach"); *United States v. Banki*, No. S1 10 Cr. 08 (JFK), 2010 WL 1875690, at *3 (S.D.N.Y. May 10, 2010) ("It is not for the jury to decide what the [Iranian Transaction Regulations] means and whether its language requires or simply permits transfers by U.S. banks; instead, the jury's task is only to determine whether Defendant's alleged conduct violates the law as laid out by the Court.").

The parties have already litigated the implications of the Berman Amendment, the informational materials exemption, and First Amendment "pure speech" issues to the charged conduct, and the Court has rendered decisions on these matters. (*See* Dkt. 89 (Opinion & Order)). In considering these issues, this Court has already found that the Indictment in this case states a crime, survives strict scrutiny under a First Amendment analysis, that the applicable regulations

14

did not deprive Griffith of fair notice that his conduct would constitute a crime, and that OFAC's interpretation of its regulations – which the defendant seeks to contest through the proffered testimony – is permissible. (*Id*. at 12, 18-19). Given those rulings, the defendant's expert should not be permitted to "opine that an individual's protected speech would not be considered by OFAC to constitute a provision of services." (Def. Bullet 4). This is precisely the kind of testimony regarding legal concepts and their applications that fails to satisfy Rule 702 because it would improperly usurp the role of the trial judge in instructing the jury as to the applicable law, and by definition cannot aid the jury in making a decision. *See Grote*, 961 F.3d at 121. The parties have also proposed legal instructions to the jury regarding the scope of the topics included in the defendant's expert notice.  (Dkt. 130 at 11 (Gov't requests to charge); Dkt. 137 at 15-17, 53 (defense requests to charge)).  Nevertheless, after asking the Court to instruct the jurors on these topics, the defense proffered expert testimony on some of the same issues.  The defense's proffered expert testimony is particularly improper to the extent they intend to use it to advance their arguments, presented at the motion to dismiss stage, that "OFAC's interpretation of the information exception is impermissible, and that the exception was not meant to be limited to preexisting material." (*See* Dkt. 89 at 11). This Court has rejected that argument, (*id*. at 12), and purported expert testimony designed to undermine the validity of OFAC's interpretation of this regulatory provision would plainly be inappropriate and designed to invite nullification. The proffered expert testimony regarding the interpretation of these regulatory provisions and constitutional issues should be precluded for the same reasons set forth in *Banki* and *Grote*: such testimony is not helpful to the jury, and risks confusing the jurors with competing instructions by the Court and a defense witness. Nor should the defense expert be permitted to apply his opinions regarding the scope of legal terms, which the Court alone will define for the jury, to the evidence.

*See Grote*, 961 F.3d at 121; *Banki*, 2010 WL 1875690, at *3; *Scop*, 846 F.2d at 140-141 (finding error where expert "opinions were calculated to 'invade the province of the court to determine the applicable law and to instruct the jury as to that law,'" testimony "drew directly upon the language of the statute and accompanying regulations," and the admission of expert testimony on legal terms and issues "would give the appearance that the court was shifting to witnesses the responsibility to decide the case" (internal citations omitted)).

Second, the defense has not established the relevance of expert testimony relating to OFAC's procedures and exercise of discretion, and such testimony would run afoul of Rule 403. In *Banki*, the district court precluded these types of expert testimony from a former OFAC official. For example, the court found that expert testimony regarding OFAC's historical enforcement positions, including its alleged choice to overlook certain violations in the past, was not admissible in the absence of "evidence in the record to establish a factual link between Defendant's state of mind and OFAC's under-enforcement policy." *Banki*, 2010 WL 1875690, at *2-3. Here, in the absence of evidence that the defendant relied on the opinions of the defense expert or someone with similar views during the course of the conspiracy, expert testimony regarding OFAC's procedures and discretion is not admissible. *See Grote*, 961 F.3d at 121 (holding that expert's "proposed testimony would not have been probative of what [defendants] understood"). Moreover, the defense has not established the relevance of OFAC's "licensing determinations . . . related to activities that arguably qualify for protection" (Def. Bullet 6), as there is no evidence that Griffith ever sought a license. And it is unclear why OFAC's "civil enforcement" tools have any bearing on the trial evidence because OFAC did not pursue that enforcement tool against the defendant. Rather, testimony regarding other enforcement options available to the Executive

Branch could improperly inject public policy, selective prosecution, and nullification issues into the record before the jury.

Finally, the defense has not established the relevance of analogies to the Commerce Department and "other travel bans," and testimony from an expert regarding those issues would not assist the jurors.

For all of these reasons, the Court should preclude the defendant's proposed expert testimony from a former OFAC employee.

### C. The Defendant's Proffered Cryptocurrency and Blockchain Expert Testimony Should Be Limited and Precluded in Part

The defendant should also be precluded from offering certain testimony from its cryptocurrency expert, Andreas M. Antonopoulos. While portions of Antonopoulos's proposed testimony may be permissible to explain certain terms and technology, the defense should be required to supplement the notice to inform the Government of the bases for Antonopoulos's opinions, and Mr. Antonopoulos should not be permitted to offer opinions regarding whether Griffith or others provided services at a conference Mr. Antonopoulos did not attend.

### 1. Relevant Facts

As part of its expert notice, the defendant indicates that Antonopoulos is expected to testify that:

1.  "The information allegedly disclosed by Mr. Griffith at the Pyongyang cryptocurrency conference was neither unique to that conference nor prepared or tailored specifically to that conference and indeed consisted of publicly available information that could have been accessed by an individual with access to the Internet, including but not limited to similar presentations given by Mr. Griffith in other fora"; and

2.  "Nothing about the information presented by Mr. Griffith or others during the Pyongyang cryptocurrency conference was tailored to or otherwise unique to that particular event or locale. The information alleged presented by Mr. Griffith was known ubiquitously in this industry and easily accessible to anyone with an Internet connection."

17

(Ex. A at 3).

The defense also seeks to offer testimony from Mr. Antonopoulos relating to the Government's venue allegations under 18 U.S.C. § 3231, but not 18 U.S.C. § 3238, including:

1. Unspecified "observations based upon his review of the information provided by Oath, Inc. in response to a subpoena issued by counsel for Mr. Griffith";

2. "The Verizon records provide no basis to believe that that the DPRK Email Account was accessed or otherwise acted upon within the Southern District of New York in response to Mr. Griffith's email to dprk.un@verizon.net. To the contrary, available information strongly supports the conclusion that it was not"; and

3. "The accuracy with which one could predict whether the DPRK Email Account was accessed from a location within the United States—let alone from within the Southern District of New York—is vanishingly small to non-existent and certainly well below a 50/50 chance."

(Ex. A at 4).

   *2. Discussion*

First, the defendant's notice lacks adequate specificity regarding Mr. Antonopoulos's opinions and the bases for those opinions. *See* Rule 16(b)(1)(C) (requiring notice of the bases for conclusions); *see also Donovan v. Centerpulse Spine Tech Inc.*, 416 F. App'x 104, 106 (2d Cir. 2011) ("[A]n expert opinion requires some explanation as to how the expert came to his conclusion and what methodologies or evidence substantiate that conclusion . . . ."); *United States v. Jasper*, No. 00 CR. 825(PKL), 2003 WL 223212, at *3 (S.D.N.Y. Jan. 31, 2003) ("[T]he Advisory Committee emphasized that the most important aspect of this mutual discovery obligation is the provision of a summary of the bases of the expert's opinion."). With regard to bases, the notice states that Mr. Antonopoulos "may rely" on "his own research and publications in this field as well as other similar cryptocurrency conferences he has attended at which Mr. Griffith and others presented the same or similar information to their audiences."  (Ex. A at 2*; see also id*. at 3 (referring to "similar presentations given by Mr. Griffith in other fora")).  The notice purports to

identify expert opinions Mr. Antonopoulos presently holds and seeks to offer at trial. It is therefore insufficient for the defense to suggest that the expert "may" rely on certain things to reach conclusions the defense has already proffered to the Government. Mr. Antonopoulos either has, or has not, relied on these categories of information as bases for his opinions. And he should be required to disclose to the Government, forthwith, the "research," "publications," "similar presentations," and "cryptocurrency conferences" referenced in the defense expert notice. (*Id*. at 2-3).

The defendant should also be required to disclose, forthwith, the unspecified "observations" by Mr. Antonopoulos that the defense intends to offer at trial relating to records from Oath and Verizon. (*Id*. at 4). Similarly, the defense should be required to specify the "available information" that Mr. Antonopoulos relies on in support of his opinion that "[t]he Verizon records provide no basis to believe that that the DPRK Email Account was accessed or otherwise acted upon within the Southern District of New York in response to Mr. Griffith's email to dprk.un@verizon.net." (*Id*.) Mr. Antonopoulos appears to be prepared to offer opinions based on technical analysis of records from Oath, Verizon, and other unspecified "information" – to a degree of certainty corresponding to the Government's preponderance burden on venue – regarding "[t]he accuracy with which one could predict whether the DPRK Email Account was accessed from a location within the United States." (*Id*.) The defense should be required to disclose the particulars of this analysis so that the Government can evaluate it and consider whether to offer expert testimony to rebut Mr. Antonopoulos's opinion.

Second, because Mr. Antonopoulos did not attend the Conference, he should not be permitted to offer opinions regarding information "disclosed by Mr. Griffith at the Pyongyang cryptocurrency conference" or "presented by Mr. Griffith or others during the Pyongyang

cryptocurrency conference." (*Id.* at 3). He is not a percipient witness to those events at the Conference, and he should not be permitted to straddle the line between fact and expert witness by testifying about his recollection of other presentations he observed. *See United States v. Barrow*, 400 F.3d 109, 124 (2d Cir. 2005) ("[T]his court has frequently cautioned as to the risks presented by allowing a law enforcement officer to testify as both a fact and an expert witness."). Insofar as his opinions would be based on evaluating the Government's recordings and photographs from the Conference, the jurors will be more than capable of that task. Mr. Antonopoulos's opinions would not assist them and would encroach on their role as the finders of fact. *See United States v. Amuso*, 21 F.3d 1251, 1263 (2d Cir. 1994) (district court should not admit "expert testimony where the evidence impermissibly mirrors the testimony offered by fact witnesses, or the subject matter of the expert's testimony is not beyond the ken of the average juror").

For similar reasons, Mr. Antonopoulos should not be permitted to opine on how the defendant "prepared" his presentation at the Conference and whether the defendant "tailored" it. (Ex. A at 3). Mr. Antonopoulos is not in a position to explain to the jury what the defendant did to prepare the presentation, or the defendant's intent during preparation and delivery. *See Highland Cap.*, 379 F. Supp. 2d at 469-70 (rejecting expert's attempt to speculate "regarding the state of mind and motivations of certain parties" and as to the "knowledge possessed by defendants and non-parties"); *LaSalle Bank Nat'l Ass'n v. CIBC Inc.*, 08 Civ. 8426 (WHP) (HBP), 2012 WL 466785, at *7 (S.D.N.Y. Feb. 14, 2012) ("Additionally, an expert may not testify as to facts not within his personal knowledge, and may not opine as to a party's state of mind, whether a party acted in bad faith, or as to the credibility of witnesses."). Mr. Antonopoulos can only speculate regarding those issues, and he should not be permitted to do so.

Finally, Mr. Antonopoulos should not be permitted to offer an expert opinion relating to the straightforward process of evaluating whether information in Griffith's presentation overlapped with other sources. The jurors are more than capable of comparing evidence related to Griffith's presentation to other sources, should the defendant offer admissible evidence relating to how he prepared the presentation and the sources he claims overlap with his remarks. *See, e.g.*, *United States v. Torres*, No. 20 Cr. 608 (DLC), 2021 WL 1947503, at *6 (S.D.N.Y. May 13, 2021) ("[I]f the purported expert testimony 'concerns matters that the average juror is . . . capable of understanding on his or her own,' it is also inadmissible." (quoting *United States v. Mejia*, 545 F.3d 179, 194 (2d Cir. 2008))). And the defense should not be permitted to elicit testimony from Mr. Antonopoulos that amounts, at bottom, to his opinion based on evaluation of the trial evidence that the defendant's presentation at the Conference was not a "service" under IEEPA and related regulations. *See Grote*, 961 F.3d at 121 (holding that expert testimony regarding legal concepts in the trial judge's instructions "'by definition does not aid the jury in making a decision,' and is therefore inadmissible under Federal Rule of Evidence 702."); *Duncan*, 42 F.3d at 101 (noting the inadmissibility of fexpert testimony that would "usurp . . . the role of the jury in applying th[e] law to the facts before it" and "attempts to substitute the expert's judgment for the jury's") (internal citations and quotation marks omitted)); *Lopez*, 2019 WL 1570818, at *6 (precluding defense expert testimony on similar grounds); *Zaccaro*, 746 F. Supp. 2d at 518 (excluding expert testimony that "undertakes to tell the jury which conclusion to reach"); *Banki*, 2010 WL 1875690, at *3 (precluding improper expert testimony interpreting sanctions regulations in an IEEPA prosecution).

## III.  Conclusion

For the reasons set forth herein, the Court should deny the defendant's motions *in limine,* and grant the Government's motions to preclude and limit the defense's proposed expert testimony.

DATED:      New York, New York
            September 3, 2021

Respectfully submitted,

AUDREY STRAUSS
United States Attorney
Southern District of New York

By:    ___/s/_____
       Kimberly J. Ravener
       Kyle A. Wirshba
       Assistant United States Attorneys
       Tel: (212) 637-2358 / 2493

Exhibit A



**Waymaker LLP**
777 S. Figueroa Street, Suite 2850
Los Angeles, California 90017
T 424.652.7800

Author's Direct Dial No.
**(424) 652-7814**

Author's Email Address
**bklein@waymakerlaw.com**

**By E-mail**

August 30, 2021

AUSA Kimberly Ravener
AUSA Kyle Wirshba
United States Attorney's Office
Southern District of New York
1 Saint Andrews Plaza
New York, New York 10007

> **Re:**   *United States v. Virgil Griffith*,
> **20 Cr. 15 (PKC)**

Dear Counsel:

We write in response to the government's August 21, 2021 expert disclosure and request for reciprocal disclosure from the defense.

Although we did not request expert notice pursuant to Federal Rule of Criminal 16(b)(1)(G) so no reciprocal disclosure is required, *see* Fed. R. Crim. P. 16(b)(1)(C)(i), in an effort to streamline these proceedings to preserve judicial and party resources, we inform you that, to the extent Mr. Griffith presents an affirmative defense case, he may call the following witnesses to offer expert testimony on the topics described below.

<u>**Andreas M. Antonopoulos**</u>

- As set forth in more detail in his *curriculum vitae*, which is attached, Mr. Antonopoulos is an expert in cryptocurrency, Bitcoin, Ethereum, and blockchain technology.  He has worked almost exclusively in the blockchain industry since at least 2012.  His education and professional qualifications to offer the below-described opinions are set forth in detail his *curriculum vitae*.  Mr. Antonopoulos is more than qualified to offer his expected expert testimony.

- In forming his opinions, Mr. Antonopoulos has relied upon his education, knowledge, experience, and training in computer science and blockchain technology, as well as his



specific and extensive education, knowledge, experience, and training in the fields of computer science, blockchain technology, Ethereum, data communications, networks, and distributed systems.  As part of the basis for his opinions, Mr. Antonopoulos may rely upon his own research and publications in this field as well as other similar cryptocurrency conferences he has attended at which Mr. Griffith and others presented the same or similar information to their audiences.  Mr. Antonopoulos also has reviewed relevant portions of the government's discovery produced as of the date of this notice, as well as discovery produced by counsel for Mr. Griffith pursuant to his obligations under Rule 16(b)(1)(A).

- Based on the foregoing training and experience, as well as his review of discovery materials in this case, Mr. Antonopoulos is expected to offer the following background testimony:

    o Explain the background and characteristics of blockchain networks, including the culture and operation of open-sourced software, how decentralization works and secures these networks, and how tokens are created and used in blockchain networks.

    o Explain the terminology of cryptocurrency, which refers to certain blockchain token and is also called digital assets, that it is designed to work as a medium of exchange and/or a store of value, how types of cryptocurrencies (*e.g.*, Bitcoin, Ether, *etc.*) differ, and the nature of the exchanges on which cryptocurrencies are transacted. (This will include a discussion of an Ether transaction involving 1 Ether, *i.e.,* what happens when a party "sends" 1 Ether to another party.)

    o Provide background information regarding Ethereum and the Ethereum Foundation, including but not limited to the Ethereum network's creation, its unique contributions to blockchain development, the nature of its open-source software, including what applications use the network, the role that Ether tokens play on Ethereum, and the role Ether plays in the world of digital currency, as well as the function of the Ethereum Foundation and its goals.

    o Explain that an Internet Protocol address, commonly referred to as an "IP address" is a unique address that identifies a device on the internet or a local network.  Internet Protocol is the set of rules governing the format of data sent via the internet or local network.  Further:

        ▪ In essence, IP addresses are the identifier that allows information to be sent between devices on a network: they contain location information and make devices accessible for communication. The internet needs a way to differentiate between different computers, routers, and websites. IP addresses provide a way of doing so and form an essential part of how the internet works.



- o Explain what a "VPN" is and how Internet users use VPNs to establish protected network connections when using public networks, including but not limited to the use and significance of encryption associated with VPNs when trying to determine the location or identity of a particular Internet user.

- As part of that background testimony, we expect that Mr. Antonopoulos will testify about the following terms of art, among others, that are relevant to the jury's determination—and beyond the ken of the average person's understanding—in this case:

  - o Open-source software

  - o Protocol specification

  - o Ethereum Clients

  - o Ethereum Network(s)

  - o Ethereum Blockchain

  - o Ether Currency

  - o Ethereum Miners

  - o Ethereum Nodes

- Based on the foregoing training and experience, as well as his review of discovery materials in this case, Mr. Antonopoulos is expected to offer the following expert opinions:

  - o Nodes are not specific to Ethereum and perform a variety of purposes not limited to cryptocurrency or blockchain technology but more broadly relate to Internet and Internet access generally.

  - o The information allegedly disclosed by Mr. Griffith at the Pyongyang cryptocurrency conference was neither unique to that conference nor prepared or tailored specifically to that conference and indeed consisted of publicly available information that could have been accessed by an individual with access to the Internet, including but not limited to similar presentations given by Mr. Griffith in other fora.

  - o Nothing about the information presented by Mr. Griffith or others during the Pyongyang cryptocurrency conference was tailored to or otherwise unique to that particular event or locale.  The information allegedly presented by Mr. Griffith was known ubiquitously in this industry and easily accessible to anyone with an Internet connection.



- o VPNs are commonly used by nations like DPRK to avoid and evade sanctions, which otherwise would prohibit users in the DPRK or operating on behalf of the DPRK from accessing Internet services and networks.

- o Individuals accessing the Internet from an ISP or IP address located in or traceable to the DPRK would not be able to access directly a U.S.-based ISP, including Verizon.net or Amazon Cloud Services.

- o His observations based upon his review of the information provided by Oath, Inc. in response to a subpoena issued by counsel for Mr. Griffith.

- o The Verizon records provide no basis to believe that that the DPRK Email Account was accessed or otherwise acted upon within the Southern District of New York in response to Mr. Griffith's email to dprk.un@verizon.net.  To the contrary, available information strongly supports the conclusion that it was not.

- o The accuracy with which one could predict whether the DPRK Email Account was accessed from a location within the United States—let alone from within the Southern District of New York—is vanishingly small to non-existent and certainly well below a 50/50 chance.

**Former OFAC Employee**

The defense anticipates calling a former U.S. Department of Treasury Office in the Office of Foreign Asset Control ("OFAC") to testify about the following:

- The history, scope, and nature of the so-called Berman Amendment and the information and informational exemptions (collectively, the "Informational Exemption") to the IEEPA.

- OFAC's Office of Enforcement, its function and procedures in enforcing OFAC regulations through civil proceedings and the steps such a civil investigation would involve, as well as OFAC's coordination with the Department of Justice and U.S. Attorney's Offices.

- OFAC's enforcement of the NKSR regulations.

- How OFAC historically has applied the Informational Exemption to conduct that is pure speech, including but not limited to the significance of information being publicly available as opposed to being developed specifically for a particular presentation.  As part of this opinion, we expect the expert will opine that an individual's protected speech would not be considered by OFAC to constitute a provision of services if the content of that speech and the information it disclosed was publicly available regardless of the sophistication of the audience.



AUSAs Ravener and Wirshba
August 30, 2021
Page 5 of 5

- The interplay between the IEEPA and OFAC sanctions as compared to the Commerce Department's export control regulations.

- Licensing determinations and OFAC enforcement actions related to activities that arguably qualify for protection under the Informational Exemption, as well as analogous situations involving the civil enforcement of other travel bans.

We have identified an expert who is prepared to offer opinions on the topic areas above based upon their prior experience with and employment by OFAC in enforcement. The expert has cleared conflicts. Given Mr. Griffith's incarceration and the due dates on the various filings in this case, we have been unable to meet with him to finalize the retention of the expert. We anticipate that we will be able to confirm the identity of the person and provide their *curriculum vitae* by the end of this week.

\*\*\*

Mr. Griffith explicitly reserves the right to amend and/or supplement these disclosures based upon, among other things, additional discovery produced, counsel's ongoing review of the recent productions, trial preparation, disclosures about anticipated witness testimony, and ultimately the evidence (testimonial or opinion) offered in the government's direct case.

As always, we remain available to discuss this or any other aspect of the case.

Sincerely,

Brian E. Klein
Keri Curtis Axel
Waymaker LLP

-and-

Sean S. Buckley
Kobre & Kim LLP

*Attorneys for Virgil Griffith*

Encl.