UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------x

UNITED STATES OF AMERICA　　　　:

　　　　　　　Plaintiff,　　　　:
　　　　v.　　　　　　　　　　　　　　20 Cr. 15 (PKC)
　　　　　　　　　　　　　　　　:
VIRGIL GRIFFITH,
　　　　　　　　　　　　　　　　:
　　　　　　　Defendant.
-------------------------------------------------------x


**DEFENDANT VIRGIL GRIFFITH'S MEMORANDUM OF LAW IN OPPOSITION
TO THE GOVERNMENT'S MOTION TO PRECLUDE EXPERT TESTIMONY**


BRIAN E. KLEIN
KERI CURTIS AXEL
WAYMAKER LLP
777 S. Figueroa Street, Suite 2850
Los Angeles, California 90017
(424) 652-7800

SEAN S. BUCKLEY
AMANDA N. TUMINELLI
KOBRE & KIM LLP
800 Third Avenue
New York, New York 10022
(212) 488-1200

*Attorneys for Virgil Griffith*

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................. 1

LEGAL STANDARD............................................................................................. 3

ARGUMENT ...................................................................................................... 5

I.     The Court Should Permit the Expert Testimony of Ms. Vitale ........................... 5

    A.   Ms. Vitale's Expected Testimony ..................................................... 6

    B.   Ms. Vitale's Testimony Is Relevant and Proper Expert Testimony................. 6

    C.   Ms. Vitale's Testimony Would Not Invade the Province of the Court or Jury, and Is Consistent with this Court's Prior Rulings............................................. 12

II.    The Defense's Expert Disclosure Related to Mr. Antonopoulos's Expert Testimony Is More Than Sufficient Pursuant to Rule 16 and His Testimony Is Proper Expert Testimony ...... 15

    A.   Mr. Antonopoulos's Expected Testimony ...................................... 16

    B.   The Defense's Expert Disclosure Meets the Rule 16 Requirements; No Further Detail Is Needed......................................................................... 16

    C.   Mr. Antonopoulos's Proffered Opinions Are Admissible and Appropriate Expert Testimony..................................................................... 19

CONCLUSION.................................................................................................. 23

# TABLE OF AUTHORITIES

## Cases

*Baker v. Urban Outfitters, Inc.*,
  254 F. Supp. 2d 346 (S.D.N.Y. 2003)......................................................................... 4

*Chambers v. Mississippi*,
  410 U.S. 284 (1973)............................................................................................... 3

*Crane v. Kentucky*,
  476 U.S. 683 (1986)............................................................................................... 4

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
  509 U.S. 579 (1993).......................................................................................... 3, 5

*Highland Cap. Mgmt. v. Schneider*,
  379 F. Supp. 2d 461 (S.D.N.Y. 2005)..................................................................... 5

*In re Fosamax Prods. Liab. Litig.*,
  645 F. Supp. 2d 164 (S.D.N.Y. 2009)..................................................................... 8

*In re Mirena IUD Prods. Liab. Litig.*,
  169 F. Supp. 3d 396 (S.D.N.Y. 2016)..................................................................... 7

*In re Oliver*,
  333 U.S. 257 (1948)............................................................................................. 12

*Krys v. Aaron*,
  112 F. Supp. 3d 181 (D.N.J. 2015)......................................................................... 7

*Kumho Tire Co. v. Carmichael*,
  526 U.S. 137 (1999)............................................................................................... 4

*United States v. Amuso*,
  21 F.3d 1251 (2d Cir. 1994).............................................................................. 4, 21

*United States v. Banki*,
  No. S1 10 Cr. 08 (JFK), 2010 WL 11606509 (S.D.N.Y. May 26, 2010) ............................ 9, 12

*United States v. Banki*,
  No. S1 10 Cr. 08 (JFK), 2010 WL 1875690 (S.D.N.Y. May 10, 2010) ................................ 12

*United States v. Barrow*,
  400 F.3d 109 (2d Cir. 2005)................................................................................. 21

*United States v. Bednar*,

728 F.2d 1034 (8th Cir. 1984) ............................................................................. 8

*United States* v. *Brandt*,

196 F.2d 653 (2d Cir. 1952)............................................................................. 10

*United States* v. *Cerna*,

No. CR 08-0730 WHA, 2010 WL 2347406 (N.D. Cal. June 8, 2010) ..................... 17

*United States* v. *Dukagjini*,

326 F.3d 45 (2d Cir. 2003)................................................................................ 4

*United States* v. *Duncan*,

42 F.3d 97 (2d Cir. 1994)................................................................................. 5

*United States* v. *Gaudin*,

515 U.S. 506 (1995)......................................................................................... 4

*United States* v. *Homa Int'l Trading Corp.*,

387 F.3d 144 (2d Cir. 2004)............................................................................. 9

*United States* v. *Johnson*,

No. ED CR 09-00089VAP, 2011 WL 2261125 (C.D. Cal. June 7, 2011) ................ 17

*United States* v. *Litvak*,

808 F.3d 160 (2d Cir. 2015)............................................................................. 10

*United States* v. *Locascio*,

6 F.3d 924 (2d Cir. 1993)................................................................................. 5

*United States* v. *Lombardozzi*,

No. S1 02 Cr. 273 (PKL), 2003 WL 1907965 (S.D.N.Y. Apr. 17, 2003) ................ 4

*United States* v. *Lumpkin*,

192 F.3d 280 (2d Cir. 1999)............................................................................. 5

*United States* v. *Mavashev*,

No. 08-CR-902(DLI)(MDG), 2010 WL 234773 (E.D.N.Y. Jan. 14, 2010) ............... 17

*United States* v. *Nejad*,

No. 18 Cr. 224 (AJN) (S.D.N.Y. 2020) ........................................................... 7, 10

*Washington* v. *Texas*,

388 U.S. 14 (1967)......................................................................................... 3, 12

**<u>Statutes</u>**

18 U.S.C. § 1001 ............................................................................................ 12

**<u>Rules</u>**

Fed. R. Crim. P. 16 ................................................................................................ 17

Fed. R. Crim. P. 16(b)(1)(C) ................................................................................. 17

Fed. R. Crim. P. 16(b)(1)(C)(i) .............................................................................. 1

Fed. R. Evid. 401 .................................................................................................. 11

Fed. R. Evid. 403 .................................................................................................. 11

Fed. R. Evid. 702 ......................................................................................... 3, 4, 17

Fed. R. Evid. 703 .................................................................................................. 17

Fed. R. Evid. 704(a)-(b) ........................................................................................ 23

Fed. R. Evid. 705 .................................................................................................. 17

## PRELIMINARY STATEMENT

Mr. Griffith respectfully submits this memorandum in opposition to the government's motion to preclude certain defense expert testimony.  (ECF No. 146 ("Gov't. Mot.").)  On August 30, 2021, Mr. Griffith disclosed to the government that he intends to call two expert witnesses: [1] Andreas Antonopoulos, an expert in cryptocurrency and blockchain technology, and Amber Vitale, a former employee of the U.S. Department of Treasury Office in the Office of Foreign Assets Control ("OFAC").[2]  Copies of Mr. Griffith's disclosure and the résumés of Mr. Antonopoulos and Ms. Vitale are attached as Exhibit A ("Defense Expert Disclosure")[3].

First, the government seeks to exclude testimony from Ms. Vitale concerning certain legal issues, OFAC's procedures, OFAC's exercise of discretion in enforcement and other decisions, and analogies to other travel bans.  (Gov't. Mot. at 12.)  The government does not contend that Ms. Vitale is not qualified to testify as an expert on such topics but instead seeks to exclude such testimony because, according to the government, the testimony invades the province of the Court and jury and is irrelevant.  (Gov't. Mot. at 13-17.)  As explained below, Ms. Vitale's testimony will not invade the province of the Court or usurp the role of the jury and it is undoubtedly helpful for the jury to hear and relevant to the charged conduct.

Additionally, the government's motion must be read in light of the government's own

---

[1] Although the defense did not request expert notice from the government, so no reciprocal disclosure was required, *see* Fed. R. Crim. P. 16(b)(1)(C)(i), in an effort to streamline these proceedings to preserve judicial and party resources, the defense agreed to and did disclose its expert witnesses to the government on August 30, 2021.

[2] While Mr. Griffith's expert disclosure noticed that he intended to call a former OFAC employee and did not originally include Ms. Vitale's name because her retention was still being finalized, Mr. Griffith thereafter notified the government of Ms. Vitale's name and sent her *résumé* on September 3, 2021.

[3] On September 10, 2021, the defense served a revised disclosure for Mr. Antonopoulos, which is attached here as Exhibit B.  We respectfully submit that none of the amendments in that amended disclosure are material to the arguments presented in the government's motion.

expert notice, where the government disclosed that they too plan to offer expert testimony regarding "the history and basis for United Nations, United States, and international sanctions against the Democratic People's Republic of Korea ('DPRK' or 'North Korea')" and the concepts of "Peace" and "Juche" within the North Korean regime.  A copy of the government's expert disclosure is attached as Exhibit C ("Gov't. Expert Disclosure").

The government cannot have it both ways and represent that testimony related to the U.S. sanctions against the DPRK is relevant when the government offers it, but not when the defense offers it.  Moreover, as a former OFAC employee, Ms. Vitale is far more qualified to testify about the topics noticed by the government in its expert disclosure than Dr. Celeste Arrington, who is a professor of political science and international affairs, has no significant experience with or expertise related to North Korea, and has never worked for OFAC.  (*See* Gov't. Expert Disclosure.)

Second, the government moves to compel additional information related to Mr. Antonopoulos's expert testimony and seeks to exclude certain "opinions" related to Mr. Griffith's presentation at the Pyongyang Cryptocurrency Conference ("Conference").  (Gov't. Mot. at 19-21.)  In doing so, however, the government does not contend that Mr. Antonopoulos is not qualified to testify as an expert on any of the topics identified, nor does it argue that the information provided is insufficient for the government to determine whether Mr. Antonopoulos is qualified to testify about the topics identified.

Mr. Griffith's disclosure regarding Mr. Antonopoulos's testimony was more than sufficient pursuant to Federal Rule of Criminal Procedure 16, and, in fact, is significantly more detailed than the government's expert disclosures in this case.  Mr. Griffith's expert disclosure contains details about Mr. Antonopoulos's education, knowledge, experience, and training, as

well as the information he relied on and reviewed in connection with this case.  (*See* Defense Expert Disclosure.)  No further information is required by Rule 16.  However, in a gesture of good faith, the defense will produce further information in response to the government's request for details regarding the "research," "publications," "similar presentations," and "cryptocurrency conferences" that Mr. Antonopoulos relied on as a basis for his opinions.  (Gov't. Mot. at 19.)

Last, Mr. Antonopoulos's proffered opinions concerning Mr. Griffith's presentation at the Conference constitute appropriate expert testimony.  Mr. Antonopoulos will not opine on whether Mr. Griffith's conduct amounted to him providing a "service" to the DPRK at the Conference.  Instead, Mr. Antonopoulos will rely on his knowledge and experience in the cryptocurrency industry to opine as to whether the information provided by Mr. Griffith to Conference attendees was unique or distinct from the information provided at other similar conferences, whether in content or in the manner of delivery, as opposed to being well-known and publicly available to anyone with access to the Internet.  Accordingly, Mr. Antonopoulos's testimony is proper expert testimony pursuant to Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) and should not be excluded.

For the reasons discussed below, the government's motion should be denied in its entirety.

## LEGAL STANDARD

"Few rights are more fundamental than that of an accused to present witnesses in his own defense." *Chambers v. Mississippi*, 410 U.S. 284, 302 (1973).  "Just as an accused has the right to confront the prosecution's witnesses . . . he has the right to present his own witnesses to establish a defense.  This right is a fundamental element of due process of law." *Washington v. Texas*, 388 U.S. 14, 19 (1967).  In addition to the due process clause, the right to "a meaningful opportunity to present a complete defense" inheres in the jury trial, compulsory process, and

confrontation clauses of the Sixth Amendment.  *See Crane v. Kentucky*, 476 U.S. 683, 690

(1986); *United States v. Gaudin*, 515 U.S. 506, 510 (1995).  That opportunity would be empty if

the government were permitted to exclude competent evidence central to the defendant's claim

of innocence.  *Crane*, 476 U.S. at 690.

Expert witness testimony is admissible if it satisfies Rule 702 and the standards of

*Daubert* and its progeny.  *See also Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141, 147-48

(1999).  Under Rule 702:

> A witness who is qualified as an expert by knowledge, skill, experience, training,
> or education may testify in the form of an opinion or otherwise if:
> > (a) the expert's scientific, technical, or other specialized knowledge will
> > help the trier of fact to understand the evidence or to determine a fact in
> > issue;
> > (b) the testimony is based on sufficient facts or data;
> > (c) the testimony is the product of reliable principles and methods; and
> > (d) the expert has reliably applied the principles and methods to the facts
> > of the case.

A party seeking to introduce expert testimony "bears the burden of establishing its admissibility

by a preponderance of the evidence."  *Baker v. Urban Outfitters, Inc.*, 254 F. Supp. 2d 346, 353

(S.D.N.Y. 2003)

"The Rules of Evidence provide a liberal standard for the admissibility of expert

testimony," *United States* v. *Dukagjini*, 326 F.3d 45, 52 (2d Cir. 2003), and the Second Circuit

has held numerous times that expert testimony can be helpful to inform the jury about concepts

involved in the trial that are "beyond the ken of the average juror."  *United States v.*

*Lombardozzi*, No. S1 02 Cr. 273 (PKL), 2003 WL 1907965, at *4 (S.D.N.Y. Apr. 17, 2003); *see*

*also United States v. Amuso*, 21 F.3d 1251, 1264 (2d Cir. 1994).  This standard requires a

"common sense inquiry into whether the untrained layman would be qualified to determine

intelligently and to the best possible degree the particular issue without enlightenment from those

having a specialized understanding of the subject involved in the dispute."  *United States v.*

*Locascio*, 6 F.3d 924, 936 (2d Cir. 1993) (internal quotation marks omitted).  Undoubtedly,

"[e]xpert witnesses are often uniquely qualified in guiding the trier of fact through a complicated

morass of obscure terms and concepts."  *United States v. Duncan*, 42 F.3d 97, 101 (2d Cir.

1994).  However, as with all evidence, the Court acts a "gatekeeper," to ensure that "an expert's

testimony both rests on a reliable foundation and is relevant to the task at hand."  *Daubert*, 509

U.S. at 597.  "In deciding whether expert testimony will be helpful to the fact-finder, the Court

must determine whether the testimony 'usurp[s] either the role of the trial judge in instructing the

jury as to the applicable law or the role of the jury in applying that law to the facts before it.'"

*Highland Cap. Mgmt. v. Schneider*, 379 F. Supp. 2d 461, 468 (S.D.N.Y. 2005) (quoting *United

States v. Lumpkin*, 192 F.3d 280, 289 (2d Cir. 1999)).

## ARGUMENT

### I.      The Court Should Permit the Expert Testimony of Ms. Vitale

The government moves to preclude expert testimony from Ms. Vitale, a former OFAC

employee, "relating to legal issues that have already been litigated, OFAC's procedures, OFAC's

exercise of discretion in enforcement and other decisions, and analogies to the Commerce

Department and 'other travel bans.'"  (Gov't. Mot. at 12.)  The government does not contend that

Ms. Vitale is unqualified to testify as an expert on such topics, but instead, seeks to exclude such

testimony because, according to the government, the testimony invades the province of the Court

and jury and is irrelevant.  None of these arguments bear weight.  Ms. Vitale's testimony is

directly relevant to the conduct charged in this case, will not invade the province of the Court,

and will be helpful to the jury.  Accordingly, the government's motion to preclude Ms. Vitale's

testimony should be denied.

### A.      Ms. Vitale's Expected Testimony

As explained in the Defense Expert Disclosure, Exhibit A, Ms. Vitale is expected to

testify to the following topics:[4]

- The history, scope, and nature of the so-called Berman Amendment and the information and informational exemptions (collectively, the "Information Exemption") to the IEEPA.

- OFAC's Office of Enforcement, its function and procedures in enforcing OFAC regulations through civil proceedings, and the steps such a civil investigation would involve, as well as OFAC's coordination with the Department of Justice and U.S. Attorney's Offices.

- OFAC's enforcement of the NKSR regulations.

- How OFAC historically has applied the Information Exemption to conduct that is pure speech, including but not limited to the significance of information being publicly available as opposed to being developed specifically for a particular presentation. As part of this opinion, we expect the expert will opine that an individual's protected speech would not be considered by OFAC to constitute a provision of services if the content of that speech and the information it disclosed was publicly available regardless of the sophistication of the audience.

- The interplay between the IEEPA and OFAC sanctions as compared to the Commerce Department's export control regulations.

- Licensing determinations and OFAC enforcement actions related to activities that arguably qualify for protection under the Informational Exemption, as well as analogous situations involving the civil enforcement of other travel bans.

### B.      Ms. Vitale's Testimony Is Relevant and Proper Expert Testimony

Contrary to the government's contention, the proffered topics to which Ms. Vitale will

testify to do not constitute purely "legal concepts," and instead are factual concepts that would be

helpful for the jury to understand and relevant to Mr. Griffith's state of mind.

---

[4] The government attempts to repackage the information in the expert disclosure to lump information together into the categories "Legal concepts," "OFAC procedural issues," "OFAC's exercise of discretion," and "Analogies." (Gov't. Mot. at 13.)  The defense declines the invitation to refer to these categories, which are misrepresentative of the disclosed topics, and instead, refers the Court to the original construction of the topics that Ms. Vitale will testify about, as laid out here and in Exhibit A.

Ms. Vitale's testimony concerning the history, scope, and nature of the International Emergency Economic Powers Act (the "IEEPA") sanctions related to North Korea, the Berman Amendment and exceptions to the IEEPA, and the OFAC's Office of Enforcement's policies, procedures, and history of enforcement is helpful background information that is beyond the ken of the average juror and critical to the jury's understanding of the alleged conduct in this case. Ms. Vitale will explain the factual background and context of the IEEPA and OFAC's implementing regulations, their history, and how OFAC has applied the law historically. *See United States v. Nejad*, No. 18 Cr. 224 (AJN) (S.D.N.Y. 2020), ECF No. 210 at ¶ 12 (permitting the government's proffered OFAC officer to testify as fact witness and not as an expert, in general, about the content of the applicable sanctions at issues but not as to "the legal requirements of applicable regulations"). This information will contribute to the jury's understanding of the meaning and significance of other evidence at trial.

Contrary to the government's claims, these are not impermissible legal conclusions. (*See* Gov't. Mot. at 14-15.) Explaining complex regulatory landscapes and the manner in which they are applied is a common area of testimony in criminal as well as civil cases, and the Court can draw a line between helpful testimony and legal conclusions. *See Krys v. Aaron*, 112 F. Supp. 3d 181, 192 (D.N.J. 2015) (permitting testimony of former Director of the Division of Trading & Markets at the CFTC, and rebuttal testimony from former Managing Director and Co-General Counsel of the Equities Division of Goldman, Sachs & Co. as to the regulations and common industry practices relative to the segregation of customer funds, while precluding specific opinions as to whether any Defendant acted in compliance with legal duties and/or violated any segregation requirement); *In re Mirena IUD Prods. Liab. Litig.*, 169 F. Supp. 3d 396, 478-79 (S.D.N.Y. 2016) (former FDA doctor's expert testimony about the agency's pharmaceutical

approval process did "not usurp the role of the jury, but rather merely helps them understand a complicated statutory framework."); *In re Fosamax Prods. Liab. Litig.*, 645 F. Supp. 2d 164, 190-191 (S.D.N.Y. 2009) (same FDA doctor from *Mirena* permitted to testify as to the reasonableness of a drug company's development and marketing of a drug in light of her understanding of the agency's "complex regulatory framework"); *see also United States v. Bednar*, 728 F.2d 1034, 1048 (8th Cir. 1984) (in prosecution for making false entries in records of brokerage firm, SEC agent was permitted to provide expert testimony regarding new account cards that must be maintained under agency regulations).

Ms. Vitale's proffered testimony is consistent with the permitted testimony in these cases and it is designed to rebut the testimony of the government's expert if she is permitted to testify—and the defense submits she should not be—about "the history and basis for United Nations, United States, and international sanctions against" North Korea, including the rationale for those sanctions, what they cover, and how they have evolved over time.[5] (Gov't. Expert Disclosure at 1-2.) The government should not be permitted to argue that it may call an expert on such topics, but the defense may not call an OFAC expert who is far better qualified to discuss the same topics.[6]

The topics that Ms. Vitale would speak to are directly relevant to the issues presented to

---

[5] The government also sought to include testimony regarding North Korea's development of nuclear weapons and other weapons programs, human rights abuses, and the concepts of the words "Peace" and "Juche" within the North Korean regime, along with the case of Mr. Warmbier. However, for the reasons explained in Mr. Griffith's motion to preclude expert testimony there is literally no relevance whatsoever to those topics in this matter. (ECF No. 147 at 6-7.)

[6] As discussed in Mr. Griffith's motion to preclude expert testimony the government's proposed expert on these topics, Dr. Arrington, is wholly unqualified to testify as an expert regarding such topics. (ECF No. 147 at 8-11.) The government should instead call an OFAC employee. At the very least, the government should not object to the defense calling a former OFAC employee to discuss the very same topics it proposed to have an expert testify about.

the jury.  One of the elements of the charged conspiracy is whether there was a "violation of any license, order, regulation, or prohibition issued pursuant to the IEEPA."  OFAC's own procedures and processes in evaluating what conduct needs a license or constitutes a violation, the facts that it considers, and the precedent it draws upon, are all relevant to whether there was a violation of a license, order, or regulation on these facts.

These topics proposed for Ms. Vitale are also relevant to Mr. Griffith's state of mind with respect to the charged conduct and his understanding of the sanctions at issue.  "In order to establish the willfulness element of the IEEPA/ITR charge, the Government must prove that Defendant 'acted with knowledge that his conduct was unlawful.'"  *United States v. Banki*, No. S1 10 Cr. 08 (JFK), 2010 WL 11606509, at *2 (S.D.N.Y. May 26, 2010) (quoting *United States v. Homa Int'l Trading Corp.*, 387 F.3d 144, 147 (2d Cir. 2004).  The government takes issue with Ms. Vitale offering testimony related to OFAC's licensing determination when Mr. Griffith never sought a license, but, if Mr. Griffith believed that what he was doing did not require an OFAC license, that kind of testimony precisely relates to Mr. Griffith's state of mind.  Similarly, OFAC's not using certain civil enforcement tools against Mr. Griffith is relevant to whether he acted "intentionally and purposefully" with "a bad purpose to disobey" the law.  (*See* Gov't. Request to Charge (ECF No. 130), Request No. 7 (p. 12)).  Here, the defense offers Ms. Vitale's testimony not for the improper purposes alluded to by the government, but instead offers it to rebut issues at the core of the government's burden to prove his knowledge, intent, and purpose.

State of mind will be presented and argued mostly through circumstantial evidence.  The Second Circuit has admonished that circumstantial evidence—including expert evidence— bearing on the defendant's state of mind should be admitted.  "Culpable intent or lack of good faith is not merely an element of the crime . . . it is in fact practically crucial" where the facts are

9

largely undisputed.  *United States v. Brandt*, 196 F.2d 653, 657 (2d Cir. 1952) ("And hence, since it may be only inferentially proven, … no events or actions which bear even remotely on its probability should be withdrawn from the jury unless the tangential and confusing elements interjected by such evidence clearly outweigh any relevancy it may have.").  The Second Circuit reiterated the point, and reversed and remanded for new trial, much more recently, where the trial court excluded expert testimony that bore directly both on whether the accused had such guilty state of mind and on the materiality of the defendant's alleged misrepresentations.  *See United States v. Litvak*, 808 F.3d 160, 180-90 (2d Cir. 2015).  Here, the government should not be permitted to urge the jury to consider evidence related to Mr. Griffith's guilty state of mind from circumstantial evidence while the defense is excluded from offering circumstantial evidence of alternative, non-criminal knowledge, intent, and good faith.

In its opposition to the defense's motion *in limine* to exclude prejudicial evidence related to the background of the DPRK nuclear program, the government explained that it intends to offer such evidence as related to Mr. Griffith's state of mind.[7]  Simply put, evidence of the DPRK's nuclear weapons program has no place in a prosecution for alleged sanctions violations unrelated to nuclear weapons any more than evidence of terrorism belongs in a prosecution for violations of the Iranian Transactions Sanctions Regulations.  *Cf. Nejad*, No. 18 Cr. 224 (AJN) (S.D.N.Y. 2020) at ECF No. 210, ¶ 13 ("The Government may not elicit testimony from Mark Dubowitz—or any of its other witnesses—referencing terrorism or economic jihad."); see also

---

[7] (Gov't. Mot. at 6-10; Gov't. Mot. at 7 ("Griffith's expressed belief that the very kind of cryptocurrency-related services that he was traveling to the DPRK to help provide could be used to further its nuclear program, and his lack of concern for that risk, is directly relevant to Griffith's knowledge of the sanctions and willful violation of the services and evasion prohibitions."); Gov't. Mot. at 10 (arguing that evidence regarding the DPRK's nuclear program bears on the government's burden to prove willfulness and "undermine[s] any notion that the defendant was acting in good faith").)

ECF No. 147 at 6.  While evidence intending to link Mr. Griffith to the DPRK nuclear program

is unfairly prejudicial, will undoubtedly confuse the issues, and mislead the jury as to the actual

scope and nature of the charged crime, it is also irrelevant to the actual charged conduct in this

case and intended solely to enflame the passions of the jurors and clearly should be precluded.

*See* Fed. R. Evid. 401, 403.  Whereas, what is relevant to this case is the history of public

enforcement actions involving U.S. sanctions on the types of services provided to North Korea,

OFAC's policies and regulations of such services, and Mr. Griffith's knowledge of sanctions or

lack thereof.  This evidence would actually bear on the government's burden to prove willfulness

and would rebut the government's argument that Mr. Griffith did not act in good faith.

Indeed, in the government's motion, which also served as an opposition to the defense's

motions *in limine*, the government has restated its intention to offer testimony and evidence

about the DPRK's nuclear weapons program.  (*See* ECF No. 146.)  For the reasons stated in the

defense's motions *in limine*, the government should not be permitted to do so.  (ECF No. 136 at

9-10).  Similarly, the government has noticed an expert, Dr. Arrington, on these very topics, and

the defense has moved to preclude Dr. Arrington's opinions about the reasons for the sanctions

because they are of minimal probative value and highly prejudicial.  (ECF No. 147 at 4-8).

The defense did not, however, oppose the government offering a relevant, properly

noticed, and qualified expert from OFAC, as explained in its motion.  (ECF No. 147 at 3.)  This

type of testimony has been permitted in this District, much along the lines that the government is

offering here.

The government's citation to *United States v. Banki* does not compel a different result.

There, the government moved to preclude the former director of OFAC from testifying as a

defense expert about the regulations enforced by OFAC.  *See United States v. Banki*, No. S1 10

11

Cr. 08 (JFK), 2010 WL 1875690, at *1 (S.D.N.Y. May 10, 2010).  While the *Banki* court granted

the motion to exclude in part, ruling the expert could not testify about the "legal requirements" of

the statute at issue there or OFAC regulations, it *allowed* a former OFAC director to testify as an

expert to OFAC's under-enforcement policy, holding such testimony was relevant to the

government's burden to prove the defendant made false statements "knowingly and willfully."

*See Banki*, 2010 WL 1875690, at *2; *Banki*, 2010 WL 11606509, at *3 (citing 18 U.S.C. § 1001)

(reasoning that defendant downloading OFAC factsheet which mentions "family remittance

exception" could support jury finding defendant believed his conduct was legal under such

exception).  The district court held that while the expert could not "opine directly about

Defendant's motive to lie or lack thereof," if there was a sufficient factual connection between

OFAC's under-enforcement policy and the defendant's state of mind regarding the legality of his

conduct, the jury should consider such evidence.  *See Banki*, 2010 WL 11606509, at *3.  Here

too, there will be a sufficient connection made between OFAC policy and Mr. Griffith's state of

mind and knowledge with respect to the alleged conduct.

Far from irrelevant, Ms. Vitale's expert testimony goes directly to the core of the

government's allegation that Mr. Griffith violated and conspired to violate the IEEPA.  The

Constitution entitles Mr. Griffith to defend against those charges and to offer evidence and

argument to do so.  *See Washington*, 388 U.S. at 18 (holding the accused's right to "his day in

court" "include[s], as a minimum," his right to examine witnesses and offer testimony in his

defense) (quoting *In re Oliver*, 333 U.S. 257, 273 (1948)).

### C.     Ms. Vitale's Testimony Would Not Invade the Province of the Court or Jury, and Is Consistent with this Court's Prior Rulings

The government also argues that the parties have litigated aspects of the law related to the

Berman Amendment, the information exemption to the IEEPA, and the First Amendment,

foreclosing Ms. Vitale's ability to testify as to those topics lest her testimony invade the province

of the Court.  (Gov't. Mot. at 14-16.)  Additionally, the government contends that since certain

"legal concepts" were included in the proposed jury instructions, Ms. Vitale should not be

permitted to testify about the topics discussed above because such testimony would usurp the

jury's role.  (*Id.* at 13-14.)  These arguments mischaracterize Ms. Vitale's proposed testimony

and do not preclude the topics actually noticed by the defense.

While the Court decided that the indictment would not be dismissed based on arguments

related to the Berman Amendment, the information exemption, and the First Amendment, the

Court explicitly left open that the jury would decide certain questions related to the factual issues

to be resolved at trial.  (*See, e.g.,* Jan. 27, 2021 Opinion and Order ("MTD Opinion"), ECF No.

89 at 13.)  Regarding the information exemption, the Court held that: "The facts will emerge at

trial.  The jury will be free to draw reasonable and permissible inferences and will decide the

ultimate factual issues.  The Court declines the invitation to opine whether the government's

proof will fail to establish 'services' falling outside the information exception."  *Id.*

The government, however, argues that Ms. Vitale's testimony would improperly advance

the defense arguments in support of Mr. Griffith's motion to dismiss that OFAC's interpretation

of the information exception is impermissible and the Court "has rejected that argument."

(Gov't. Mot. at 15 (citing ECF No. 89 at 11, 12).)  Contrary to the government's characterization

of the Court's decision, the Court did not "reject" that argument.  (*See id.*)  In fact, the Court held

OFAC's interpretation of the information exemption is "permissible" and "provisionally

deferr[ed] to OFAC's interpretation" pending evidence presented at trial.  (ECF No. 89 at 11,

12.)  Ultimately, whether or not the parties litigated certain legal issues directed to the face of the

indictment does not preclude Mr. Griffith from presenting the jury with expert testimony

13

regarding the open factual questions the jury must resolve.

In one example cited by the government, the government argues that Ms. Vitale may not "opine that an individual's protected speech would not be considered by OFAC to constitute a provision of services," because it usurps the role of the Court in instructing the jury on the law. (Gov't. Mot. at 15.)  The defense, however, never represented that its contemplated OFAC expert—now confirmed to be Ms. Vitale—would be expected to offer opinions of this nature. To that end, Ms. Vitale will not instruct the jury on the law as it relates to a criminal violation of the IEEPA, as is the Court's responsibility, and will not instruct the jury that they should conclude that the conduct alleged in this case did or did not involve Mr. Griffith providing a "service" to the DPRK.  Instead, as a former OFAC employee, Ms. Vitale would be testifying as to what factors OFAC would have considered a provision of services versus protected speech during her tenure in response to a factual situation, which is not the same thing as a determination of guilt or innocence in a criminal trial.[8]

Let it be clear that the defense is not seeking to invite jury nullification.  If the jury determines that the conduct it is considering properly falls within the bounds of the information exemption to the IEEPA, that will not amount to "nullification."  (*Contra* Gov't. Mot. at 15.)  It would instead be a proper and factual determination that charged conduct did not violate the law with which Mr. Griffith is charged.  That is a far cry from nullification.  Providing the jury with information that would allow the jury to determine whether Mr. Griffith's alleged conduct meets

---

[8] Contemplated testimony of this nature should come as no surprise given the record in this case of the debate about whether Mr. Griffith's alleged actions fell within a "gray area" of the IEEPA as protected speech or information or informational materials.  The defense submits that it is relevant to Mr. Griffith's state of mind whether and how OFAC had enforced sanctions against individuals for speech-related activities and to what extent such enforcement decisions were readily available to the public.

a statutory definition and exemption, and understanding other conduct that has been found to fall

under that exemption, is not nullification but is an effort to aid the jury in upholding the law.

Last, the government seems to suggest that just because a topic is covered in the jury

instructions, it means an expert may not testify about such topics.  (*See* Gov't. Mot. at 15.)  This

is not the law and would render a broad swath of expert testimony improper if it were true.  In

the defense's proposed jury instructions pertaining to the information exemption and First

Amendment, the defense proposed language that would include the Court instructing the jury

that if the jury finds – as a factual matter – that the conduct alleged by the government falls

within the information exemption, the jury must acquit Mr. Griffith.  This, necessarily, involves

a question of fact for the jury to decide: "Were the services to be provided more than just a

recitation of preexisting information?"  (*See* ECF No. 89 (MTD Opinion) at 17 ("It will be part

of the government's burden to prove that (1) Griffith knowingly and willfully joined a

conspiracy with knowledge of its unlawful object, i.e., the providing services to the DPRK; (2)

that the services were to be more than providing preexisting information; and (3) the services

were to be provided without a required OFAC approval."))  The defense is entitled to present

evidence that assists the jury in deciding that question of fact.

For the reasons stated above, the government's motion to exclude anticipated expert

testimony from Ms. Vitale should be denied.

## II.   The Defense's Expert Disclosure Related to Mr. Antonopoulos's Expert Testimony Is More Than Sufficient Pursuant to Rule 16 and His Testimony Is Proper Expert Testimony

In its motion to preclude certain defense expert testimony, the government moves to

"compel further disclosures" regarding the testimony of Mr. Antonopoulos, a cryptocurrency and

blockchain expert, and to prevent Mr. Antonopoulos from offering "an opinion that the

defendant did not provide a service to the DPRK at the Conference."  (Gov't. Mot. at 1-2.)

However, as the Court can see in Exhibit A, the defense provided a more than sufficiently detailed disclosure of Mr. Antonopoulos's expert qualifications as required by Federal Rule of Evidence 702, the topics of his expected testimony and opinions, and the information on which he relies to come to his conclusions. In addition, nowhere in the disclosure does the defense say that Mr. Antonopoulos will offer an opinion on whether Mr. Griffith provided a "service" to the DPRK, and the defense does not plan for him to render such an opinion.

Importantly, the Court should keep in mind that the government does not contend that Mr. Antonopoulos is not qualified to testify as an expert on any of the topics identified in the disclosure, nor does it argue that the information provided is insufficient for the government to determine whether Mr. Antonopoulos is qualified to testify about the topics identified in the disclosure.

Accordingly, the government's motion with respect to Mr. Antonopoulos should be denied.

### A.    Mr. Antonopoulos's Expected Testimony

Mr. Antonopoulos's qualifications and expected testimony are discussed in the Defense Expert Disclosure, Exhibit A, which also attaches his résumé. The government's motion includes only an excerpt of the defense disclosure related to Mr. Antonopoulos. (Gov't. Mot. at 17-18). A full view of the disclosures contained in Exhibit A demonstrates Mr. Antonopoulos's full level of expertise and background, which for the sake of brevity, the defense incorporates by reference.

### B.    The Defense's Expert Disclosure Meets the Rule 16 Requirements; No Further Detail Is Needed

The government contends that the defense expert disclosure lacks adequate specificity regarding Mr. Antonopoulos's opinions and the bases for those opinions. (Gov't. Mot. at 18.)

However, as explained below, the defense's expert disclosure clearly meets the requirements of Rule 16.

Under Federal Rule of Criminal Procedure 16(b)(1)(C), the defendant must give the government "a written summary of any testimony that the government intends to use under Federal Rules of Evidence 702, 703, or 705 during its case-in-chief," provided that this summary need only "describe the witness's opinions, the bases and reasons for those opinions, and the witness's qualifications." The purpose of the expert disclosure requirement is to "minimize surprise that often results from unexpected expert testimony, reduce the need for continuances, and to provide the opponent with a fair opportunity to test the merit of the expert's testimony through focused cross-examination." Fed. R. Crim. P. 16, advisory committee's note to 1993 amendment. If the witness is to offer an opinion, the "most important" requirement is "a summary of the bases of the expert's opinion." *Id.*

However, "Rule 16(a) (1)(G) does not require recitation of the chapter and verse of the experts' opinions, bases and reasons. No rule, statute, or decision necessitates such comprehensive disclosure." *United States v. Cerna*, No. CR 08-0730 WHA, 2010 WL 2347406, at *2 (N.D. Cal. June 8, 2010); *see also United States v. Mavashev*, No. 08-CR-902(DLI)(MDG), 2010 WL 234773, at *2 (E.D.N.Y. Jan. 14, 2010) ("[T]he court finds the government's disclosure regarding [the expert witness] to be satisfactory, as it provides the defendant ample opportunity to prepare a cross-examination."); *United States v. Johnson*, No. ED CR 09-00089VAP, 2011 WL 2261125, at *3 (C.D. Cal. June 7, 2011) (holding defense notice of expert testimony "sufficiently detailed": "Thus, the notice sets forth Ristuccia's proposed opinion testimony and the bases for his opinions, and provides significantly more detail than the Government's disclosure to Defendant regarding the testimony of its expert witness.").

17

The defense's disclosure related to Mr. Antonopoulos's testimony plainly meets the Rule 16 standard.  In addition to providing Mr. Antonopoulos's résumé, which details his education, experience, and areas of focus and study, the disclosure explains what Mr. Antonopoulos will base his opinions on,[9] as well as documents produced by the government and defense counsel. (Defense Expert Disclosure.)  The disclosure lists the topics on which Mr. Antonopoulos will provide background information as an expert in the cryptocurrency and blockchain fields and the terms of art that he will define for the jury.  (*Id.*)  It also details the subject matter of the opinions that Mr. Antonopoulos will offer to the jury.  (*Id.*)  In sum, the disclosure more than meets the Rule 16 standard for expert disclosures and no further information is needed to allow the government to adequately prepare for cross examination.[10]

The government argues that the defense should be required to disclose the "observations" Mr. Antonopoulos made with respect to records produced by defense counsel from Oath and Verizon, and the "available information" that Mr. Antonopoulos relied on in support of his opinions with respect to information from Oath and Verizon. (Gov't. Mot. at 19.)  This request

---

[9] In a true dance of semantics, the government points to the use of the "may" in the following sentence to argue that the notice is not sufficiently detailed: "As part of the basis for his opinions, Mr. Antonopoulos may rely upon his own research and publications in this field as well as other similar cryptocurrency conferences he has attended at which Mr. Griffith and others presented the same or similar information to their audiences." (Gov't. Mot. at 18.)  The word "may" was not intended to mean that Mr. Antonopoulos may or may not have relied on those categories of information.  He did, in fact, rely on his own research and publications in the field and his attendance at other cryptocurrency conferences.  Defense counsel simply wrote "may" to indicate that Mr. Antonopoulos has multiple sources to rely on when he testifies to the jury and given that the defense has no burden, and Mr. Antonopoulos's testimony will be designed in part to rebut the government's direct evidence, it is unclear at this juncture what Mr. Antonopoulos actually will or will not have to say.

[10] It is also worth noting that the defense disclosure for Mr. Antonopoulos is significantly more detailed than the disclosure the government made about its own expert, Dr. Arrington, and the government's disclosure would not satisfy its own demands for information in its instant motion. (*Compare* Gov't. Expert Disclosure, *with* Defense Expert Disclosure.)

goes beyond the requirements of Rule 16 and imposes an outsized expectation of expert

disclosure that would implicate defense strategy.  Simply put, the government is not entitled to a

summary of all of Mr. Antonopoulos's testimony.  The government has in its possession all of

the information that Mr. Antonopoulos has reviewed with respect to Oath and Verizon and with

respect to the statements made at the Conference.[11]  This is sufficient to put the government on

notice as to the subject matter of Mr. Antonopoulos's opinions and the bases for his anticipated

opinions.

Mr. Antonopoulos's testimony is sufficient to put

the government on notice as to his qualifications, the facts and data he relied on, and his

opinions.  However, without waiving the arguments above, as noted in the introduction to this

memorandum, the defense will produce further information in response to the government's

request for details regarding the "research," "publications," "similar presentations," and

"cryptocurrency conferences" that Mr. Antonopoulos relied on in this case.  (Gov't. Mot. at 19.)

In all other respects, the government's motion to compel further information should be denied.

Respectfully, if the Court does order the defense to make further disclosures related to Mr.

Antonopoulos, the government should be required to make similarly detailed disclosures with

respect to Dr. Arrington.

### C.   Mr. Antonopoulos's Proffered Opinions Are Admissible and Appropriate Expert Testimony

The government seeks to preclude Mr. Antonopoulos from testifying to what it

---

[11] Mr. Antonopoulos's opinions are informed further by his authorship and review of publicly available literature on these very topics that existed prior to the Conference some of which was publicly available in the Korean language. Moreover, the September 10th Amended Disclosure withdraws one of the proposed topics of Mr. Antonopoulos's anticipated testimony on this subject.

characterizes as three "opinions": (1) "opinions regarding information 'disclosed by Mr. Griffith at the Pyongyang cryptocurrency conference' or 'presented by Mr. Griffith or others during the Pyongyang cryptocurrency conference'"; (2) an opinion "on how the defendant 'prepared' his presentation at the Conference and whether the defendant 'tailored' it"; and (3) an opinion "relating to the straightforward process of evaluating whether information in Griffith's presentation overlapped with other sources."  (Gov't. Mot. at 19-21.)  It appears that this is the government's attempt to recast two opinions contained in the expert disclosure:

- The information allegedly disclosed by Mr. Griffith at the Pyongyang cryptocurrency conference was neither unique to that conference nor prepared or tailored specifically to that conference and indeed consisted of publicly available information that could have been accessed by an individual with access to the Internet, including but not limited to similar presentations given by Mr. Griffith in other fora.

- Nothing about the information presented by Mr. Griffith or others during the Pyongyang cryptocurrency conference was tailored to or otherwise unique to that particular event or locale. The information allegedly presented by Mr. Griffith was known ubiquitously in this industry and easily accessible to anyone with an Internet connection.[12]

(Defense Expert Disclosure at 3.)  The government's descriptions mischaracterize the subject matter of Mr. Antonopoulos's proffered opinions in the disclosure, which are admissible and proper expert testimony.

With respect to the first category of "opinions," the government seeks to prevent Mr. Antonopoulos from testifying about any information presented by Mr. Griffith or others at the

---

[12] The defense's September 10, 2021 disclosure altered this topic to read as follows: "Nothing about the information presented by Mr. Griffith or others during the Pyongyang cryptocurrency conference was tailored to or otherwise unique to that particular event or locale.  The information allegedly presented by Mr. Griffith was known ubiquitously in this industry, easily accessible to anyone with an Internet connection, and even to individuals without Internet access because the topics he discussed also have been published in numerous books, including those in the Korean language."

Pyongyang conference and any "recollection of other presentations he observed."  (Gov't. Mot. at 19-20.)  This is the broadest possible description of information Mr. Antonopoulos could testify to, and as described by the government, would subsume everything at the trial.  The government does not cite any rule or caselaw authority that prevents Mr. Antonopoulos from testifying to opinions based on the alleged conduct that is at the heart of this case —the presentation given by Mr. Griffith at the Conference —but instead argues that Mr. Antonopoulos was not present at the conference and should not be allowed to testify based purely on government recordings and photographs.[13]  Experts are allowed to formulate opinions based on the facts central to the case and are rarely if ever firsthand observers to the conduct at issue.  The cases cited by the government have no bearing on Mr. Antonopoulos's testimony and actually undermine its argument, because Mr. Antonopoulos is not merely serving as a conduit for factual testimony, but will offer expert opinions based on his experience, education, and knowledge, as well as his understanding of facts of the case.  (*See* Gov't. Mot. at 20, citing *United States v. Barrow*, 400 F.3d 109, 124 (2d Cir. 2005) (upholding decision to admit expert testimony and urging district courts to be careful about allowing law enforcement officers to testify as both fact and expert witnesses); *Amuso*, 21 F.3d at 1264 (upholding decision to admit expert testimony of law enforcement officer regarding operational methods of organized crime families where testimony "overlapped to a degree" with fact witnesses)).

---

[13] Presumably, the government's argument would also apply to prevent the testimony of all of the government's case agents, experts, or any other witness that was not a fact witness physically present in the DPRK for the Conference.  Rather, as the defense expects the government will try to do with its own witnesses in its case-in-chief, Mr. Antonopoulos is expected to testify about what actually was said at the conference based upon his review and analysis transcripts and recordings produced by the government and other recent government disclosures.  The thrust of Mr. Antonopoulos's testimony in this regard thus is based on recordings he heard and materials produced by the government as purported evidence of what Mr. Griffith did and said at the conference.

The second category of opinions the government seeks to exclude are related to "how the defendant 'prepared' his presentation" and "whether the defendant 'tailored' it." (Gov't. Mot. at 20.) Mr. Antonopoulos is not going to testify as to how Mr. Griffith actually prepared his presentation or speculate as to Mr. Griffith's "intent during preparation and delivery." (*Id.*) Instead, Mr. Antonopoulos will testify, as described in the disclosure, to whether the information presented was "consisted of publicly available information that could have been accessed by an individual with access to the Internet" and "was known ubiquitously in this industry." (Defense Expert Disclosure at 3.) Given Mr. Antonopoulos's depth of experience and knowledge of the cryptocurrency industry and blockchain technology, he is well qualified to opine on whether the information actually conveyed by Mr. Griffith and others at the conference was information that was widely known to the industry or publicly available on the Internet. Mr. Antonopoulos need not speculate as to these issues because he has actual personal knowledge of what information is discussed extensively in his particular field of expertise and available on the internet and can compare that knowledge to what is presented on videos and in transcripts of the Conference.

Lastly, the government seeks to exclude "an expert opinion relating to the straightforward process of evaluating whether information in Griffith's presentation overlapped with other sources," arguing that jurors "are more than capable of comparing evidence related to Griffith's presentation to other sources," so long as the defense offers admissible evidence of other sources. (Gov't. Mot. at 21.) Far from a "straightforward process," this argument would require jurors to have a comprehensive knowledge of what information is available in the cryptocurrency industry and what information related to such topics is publicly available on the internet. Instead, it is far more helpful to the jury to have an expert who is steeped in the industry and industry-specific information available online explain to them what information is out there. And contrary to the

government's argument that this amounts to Mr. Antonopoulos testifying that the conduct at issue was or was not a "service" under the IEEPA, Mr. Antonopoulos is not going to discuss IEEPA or the information exemption at all.[14]  (*See* Gov't. Mot. at 21.)

In sum, Mr. Antonopoulos's opinions contained in the defense disclosure are proper expert testimony pursuant to Rule 702 and *Daubert*, and he should not be precluded from testifying as to those opinions.

## CONCLUSION

For the reasons set forth above, the Court should deny the government's motion to preclude certain expert testimony from Ms. Vitale and Mr. Antonopoulos.

Dated:  September 10, 2021

<div style="margin-left:50%">

Respectfully Submitted,

*/s/* Sean S. Buckley

Sean S. Buckley
Amanda N. Tuminelli
Kobre & Kim LLP

-and-

Brian E. Klein
Keri Curtis Axel
Waymaker LLP

*Attorneys for Virgil Griffith*

</div>

---

[14] Note that to the extent the government argues that Mr. Antonopoulos will tell the jury what verdict to reach, which is not what the defense purports to have Mr. Antonopoulos do, that would still be admissible evidence.  Under Rule 704, an expert's testimony may embrace an ultimate issue to be decided by the trier of fact as long as it does not express an opinion on the defendant's mental state as an element of the crime charged.  Fed. R. Evid. 704(a)-(b).