UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                              :
UNITED STATES OF AMERICA                      :
                                              :
   - v. -                                    :                    20 Cr. 15 (PKC)
                                              :
VIRGIL GRIFFITH,                              :
                                              :
                      Defendant.          :
                                              :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**GOVERNMENT'S OPPOSITION TO THE DEFENDANT'S SUPPLEMENTAL
MOTION *IN LIMINE* TO PRECLUDE EXPERT TESTIMONY AND MOTION TO
PRECLUDE TESTIMONY OF CERTAIN GOVERNMENT OFFICIALS**

AUDREY STRAUSS
United States Attorney
Southern District of New York
One St. Andrew's Plaza
New York, New York 10007

Kimberly J. Ravener
Kyle A. Wirshba
Assistant United States Attorneys
- Of Counsel -

i

## <u>TABLE OF CONTENTS</u>

**THE GOVERNMENT'S EXPERT WITNESSES SHOULD BE PERMITTED** ................... 1

   I. Relevant Facts ........................................................................................................ 2

   II. Applicable Law ..................................................................................................... 4

      A. Rule 702 ............................................................................................................ 4

      B. Rule 403 ............................................................................................................ 6

   III. The Defendant's Motion to Preclude the Testimony of Dr. Arrington Should Be Denied .. 6

      A. Dr. Arrington's Proposed Expert Testimony on North Korea Will Be Appropriately Cabined and Is Admissible ................................................................................. 6

      B. The Proposed Topics Comply with Rules 401, 403 and 702 ............................................ 14

      C. Dr. Arrington Is Qualified to Serve as an Expert on North Korea ................................... 15

   IV. The CART Expert Disclosures Are Sufficient ..................................................... 19

**THE DEFENDANT'S DEMAND FOR TESTIMONY SHOULD BE PRECLUDED** ......... 22

   I. The Demand Letter ............................................................................................... 22

   II. The Proposed Testimony Related to the IEEPA and OFAC Sanctions Regimes Should Be Precluded ........................................................................................................... 24

      A. Application of Laws and Regulations to Griffith .......................................................... 24

      B. Application of IEEPA and OFAC Regulations to Unrelated Cases ................................. 30

   III. The Proposed Other Topics of Testimony Are Similarly Inadmissible ............................. 32

**CONCLUSION** ......................................................................................................... 35

## TABLE OF AUTHORITIES

**Cases**

*Old Chief v. United States*, 519 U.S. 172 (1997) ........................................................ 15

*United States ex rel. Touhy v. Ragen*, 340 U.S. 462 (1951) ........................................ 1

*United States v. Al Moayad*, 545 F.3d 139 (2d Cir. 2008) ........................................ 15

*United States v. Amuso*, 21 F.3d 1251 (2d Cir. 1994) ................................................ 5

*United States v. Atilla*, S4 15 Cr. 867 (2017) ............................................................. 13

*United States v. Banki*, 2010 WL 11606509 (S.D.N.Y. 2010) .................................. 31

*United States v. Berry*, 318 F. App'x 569 (9th Cir. 2009) ........................................ 20

*United States v. Bilzerian*, 926 F.2d 1285 (2d Cir. 1991) .......................................... 7

*United States v. Blake*, 195 F. Supp. 3d 605 (S.D.N.Y. 2016) .................................. 33

*United States v. Boyle*, 2010 WL 286624 (S.D.N.Y. 2010) ...................................... 18

*United States v. Carton*, 2018 WL 6040652 (S.D.N.Y 2018) .................................. 28

*United States v. Davidson*, 220 F. App'x 5 (2d Cir. 2007) ...................................... 34

*United States v. Davidson*, 308 F. Supp. 2d 461 (S.D.N.Y. 2004) .......................... 33

*United States v. Dey*, 409 F. App'x 372 (2d Cir. 2010) ............................................ 18

*United States v. Duncan*, 42 F.3d 97 (2d Cir. 1994) ............................................ 4, 14

*United States v. Elfgeeh*, 515 F.3d 100 (2d Cir. 2008) ............................................ 15

*United States v. Farhane*, 634 F.3d 127 (2d Cir. 2011) ........................................ 5, 18

*United States v. Figueroa*, 618 F.2d 934 (2d Cir. 1980) ............................................ 6

*United States v. Ford*, 435 F.3d 204 (2d Cir. 2006) .................................................. 28

*United States v. Grote*, 961 F.3d 105 (2d Cir. 2020) ................................................ 30

*United States v. Kadir*, 718 F.3d 115 (2d Cir. 2013) .......................................... 15, 34

*United States v. Knox*, 687 F. App'x 51 (2d Cir. 2017) ............................................ 32

*United States v. Livoti*, 196 F.3d 322 (2d Cir. 1999) .................................................. 6

*United States v. Locascio*, 6 F.3d 924 (2d Cir. 1993) ................................................ 5

*United States v.* Marin, 669 F.2d 73 (2d Cir. 1982) .................................................. 34

*United States v. Marsh*, 568 F. App'x 15 (2d Cir. 2014) .......................................... 20

*United States v. Matera*, 489 F.3d 115 (2d Cir. 2007) ................................................ 5

*United States v. Mustafa*, 753 F. Appx. 22 (2d Cir. 2018) ...................................... 18

*United States v. Pitre*, 960 F.2d 1112 (2d Cir. 1992) ................................................... 6

*United States v. Roldan Zapata*, 916 F.2d 795 (2d Cir. 1990) ..................................... 6

*United States v. Rosario*, 2014 WL 6076364 (S.D.N.Y. 2014) ................................... 19

*United States v. Saldarriaga*, 204 F.3d 50 (2d Cir. 2000) ......................................... 33

*United States v. Schwartz*, 924 F.2d 410 (2d Cir. 1991) .............................................. 4

*United States v. Scott-Emuakpor*, 2000 WL 288443 (W.D. Mich. 2000) ................... 20

*United States v. Shipp*, 422 F. Supp. 3d 762 (E.D.N.Y. 2019) ..................................... 5

*United States v. Skelos*, 2018 WL 2254538 (S.D.N.Y. 2018) ..................................... 28

*United States v. Wexler*, 522 F.3d 194 (2d Cir. 2008) .................................................. 4

*United States v. Williams*, 506 F.3d 151 (2d Cir. 2007) ......................................... 5, 19

*United States v. Zackson*, 12 F.3d 1178 (2d Cir. 1993) ................................................ 6

*Warmbier v. Democratic People's Republic of Korea*, 356 F. Supp. 3d 30 (D.D.C. 2018) ......... 19

## Other Authorities

28 C.F.R. § 16 .................................................................................................................. 1

31 C.F.R. § 510 ............................................................................................................... 23

International Emergency Economic Powers Act ................................................... passim

Iranian Transactions Sanctions Regulations ........................................................... 23, 30

North Korea Sanctions Regulations .............................................................. 23, 24, 30, 33

## Rules

Federal Rule of Evidence 401 .............................................................................. 2, 14, 27

Federal Rule of Evidence 403 .......................................................................... 2, 6, 14, 31

Federal Rule of Evidence 702 ...................................................................... 2, 4, 14, 20

Federal Rule of Evidence 801 ............................................................................... 28

Federal Rule of Evidence 803 ............................................................................... 28

Federal Rule of Evidence 804 ............................................................................... 28

On September 6, 2021, defendant Virgil Griffith filed a supplemental motion *in limine* (Dkt. 147, the "Def. Mot.") seeking to (1) preclude the testimony of the Government's proposed expert witness on North Korea, Dr. Celeste Arrington, and, in the alternative, requesting further disclosures of the witness's anticipated testimony and a *Daubert* hearing, and (2) preclude the testimony of agents from the Federal Bureau of Investigation's Computer Analysis and Response Team ("CART," and collectively, the "CART Experts") regarding their forensic imaging and examination of various electronic devices, on the grounds that the Government's expert notice for these witnesses is insufficient. Both motions should be denied.

On September 8, 2021, the Government received a demand from the defendant for the testimony of FBI special agents and Department of Justice attorneys at the upcoming trial. While the Government is working with the relevant Department of Justice components to facilitate the defendant's request to make these witnesses available in the event any of them is in a position to provide admissible testimony, *see* 28 C.F.R. § 16.23; *United States ex rel. Touhy v. Ragen*, 340 U.S. 462 (1951), the Government seeks an *in limine* ruling precluding the testimony of these government employees on the topics proposed by the defendant. As described in more detail below, the defendant's letter identifies possible testimony that is irrelevant, calls for inadmissible hearsay, and would be more prejudicial than probative.[1]

### **THE GOVERNMENT'S EXPERT WITNESSES SHOULD BE PERMITTED**

The defendant's motions regarding the Government's experts should be denied. First, Dr. Arrington is a highly qualified professor possessing ample expertise regarding North Korea, and her proposed expert testimony will be cabined and focused on explaining concepts and events

---

[1] The Government hereby incorporates by reference the definitions of terms and abbreviations used in its motions *in limine*.

referenced in the evidence in this case, including Griffith's own statements and those of his co-conspirators, consistent with Federal Rules of Evidence 401, 403, and 702. Griffith's motion to preclude Dr. Arrington does not accurately reflect the status and content of the Government's disclosures, which include the early production of 3500 material for Dr. Arrington. Griffith's motion also attempts to manufacture controversies that do not exist, for example, by objecting to Dr. Arrington offering testimony regarding blockchain and cryptocurrency technology, a matter that has never been proposed by the Government as a topic of Dr. Arrington's testimony, inaccurately describing the scope of Dr. Arrington's proposed testimony on the sanctions regime, and minimizing Dr. Arrington's qualifications. Griffith's motion should be denied without a *Daubert* hearing.

Second, Griffith's motion seeking additional disclosures and to otherwise preclude the testimony of the CART Experts lacks any basis. Without explanation or support, the defense summarily "requests that the Court order the government to provide additional disclosures regarding any such potential expert testimony or preclude the FBI CART witnesses from offering any opinion testimony." (Dkt. 147 at 4). This cursory motion fails to identify any actual deficiency in the Government's disclosures, and additional disclosures will be provided in any event, to the extent any additional material is created, on a rolling basis consistent with the Court's schedule for the production of 3500 material. For the reasons set forth below, this motion should be denied.

## I.  Relevant Facts

On August 21, 2021, the Government notified the defense of its intent to call Dr. Arrington as an expert witness in North Korean politics and history. A copy of the Government's initial expert disclosure is attached hereto as Exhibit A, along with Dr. Arrington's resume, which is attached as Exhibit B. Dr. Arrington serves as the Korea Foundation Associate Professor of Political Science and International Affairs at George Washington University's Elliott School of

International Affairs and a faculty member of George Washington University's Institute for Korean Studies. Dr. Arrington specializes in comparative politics, with a regional focus on the Koreas and Japan, including North Korea. She currently teaches an undergraduate-level course at George Washington University entitled "Politics in the Two Koreas," as well as a course in "Korean Politics" for master's students, which examine North Korean history, politics, citizenship, its nuclear and missile programs, and the global response to seek change in the DPRK through sanctions and other measures. She holds a doctorate from the University of California – Berkeley in Political Science, a Masters of Philosophy from the University of Cambridge, and an undergraduate degree from Princeton University with a certificate in East Asian Studies.

On September 3, 2021, the Government produced 3500 material for Dr. Arrington, reflecting its notes of multiple conversations with Dr. Arrington regarding her potential testimony in this case. On the same date, the Government filed its opposition to the defendant's motions *in limine*, which additionally detailed Dr. Arrington's anticipated testimony regarding the DPRK's nuclear program and its relevance to the charged conduct, in particular, to provide context for the statements of the defendant and his co-conspirators, as well as to explain terms and events cited by them. (Dkt. 146 at 9-10.) The Government produced additional 3500 material for Dr. Arrington on September 13, 2021, and intends to continue to do so on a rolling basis in advance of trial.

The Government's August 21, 2021 expert notice to the defense also disclosed the Government's intent to call six CART Experts to testify regarding their forensic analysis of electronic devices and digital accounts recovered and searched during the course of this investigation, which will be necessary if stipulations cannot be reached to authenticate this evidence. (Ex. A at 2-3). The forensic extractions generated by these CART Experts were identified in the notice, both by describing each device and by their corresponding Bates number

in the Government's discovery productions. The Government has also disclosed resumes for each of the CART Experts, and 3500 material for one CART Expert, Louis DiOrio, was disclosed on September 3, 2021. As noted above, to the extent that additional 3500 material is created for the CART Experts, the Government will produce it on a rolling basis consistent with the Court-ordered schedule for such material.

## II.   Applicable Law

### A.   Rule 702

Pursuant to Federal Rule of Evidence 702, which governs the admissibility of expert testimony:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

Fed. R. Evid. 702. Under this standard, expert testimony is generally admissible if it will assist the trier of fact to understand the evidence or to determine a fact in issue. *See United States v. Duncan*, 42 F.3d 97, 101 (2d Cir. 1994) ("[E]xpert witnesses are often uniquely qualified in guiding the trier of fact through a complicated morass of obscure terms and concepts. Because of their specialized knowledge, their testimony can be extremely valuable and probative . . . ."); *United States v. Wexler*, 522 F.3d 194, 204 (2d Cir. 2008) (to aid the jury, an expert's proposed testimony must "shed light on activities not within the common knowledge of the average juror") (internal citations omitted). The decision to admit expert testimony rests soundly with the discretion of the trial court. *See United States v. Schwartz*, 924 F.2d 410, 425 (2d Cir. 1991).

The Second Circuit has, on numerous occasions, approved of the admission of expert testimony to explain historical background and terminology in various contexts, in cases ranging from those involving terrorist organizations to La Cosa Nostra. *See United States v. Locascio*, 6

4

F.3d 924, 936 (2d Cir. 1993) (upholding FBI agent testimony, as an expert witness, "on the nature and function of organized crime families, imparting the structure of such families and disclosing the 'rules' of La Cosa Nostra"); *United States v. Amuso*, 21 F.3d 1251, 1263-64 (2d Cir. 1994) (affirming the admission of testimony "regarding the organization, structure and terminology of organized crime families" and noting that such testimony lies "beyond the knowledge of the average citizen"); *United States v. Matera*, 489 F.3d 115, 121 (2d Cir. 2007) (approving the admission of expert testimony regarding "the composition and structure of organized crime families generally" and noted that "this Circuit has approved the admission of expert testimony in organized crime cases 'to help explain the operation, structure, membership, and terminology of organized crime families.'") (collecting cases); *United States v. Farhane*, 634 F.3d 127, 158-59 (2d Cir. 2011) (affirming expert testimony regarding the "history and structure" and "background" on al Qaeda).

A district court is not required to hold a formal *Daubert* hearing prior to qualifying an expert witness. *See United States v. Williams*, 506 F.3d 151, 161 (2d Cir. 2007) ("While the gatekeeping function requires the district court to ascertain the reliability of [the expert's] methodology, it does not necessarily require that a separate hearing be held in order to do so."); *United States v. Shipp*, 422 F. Supp. 3d 762, 769 (E.D.N.Y. 2019) (denying *Daubert* hearing where the court reviewed other judicial decisions, studies, and academic articles substantiating the proposed expert testimony). Rather, the admission of expert testimony pursuant to Rule 702 is satisfied "if, at the time the expert testimony is presented to the jury, a sufficient basis for allowing the testimony is on the record." *See Williams*, 506 F.3d at 161 (citing 4 Weinstein's Federal Evidence § 702.02[2] (2d ed. 2006)).

### B. Rule 403

Courts may only exclude the evidence under Rule 403 if the probative value of the evidence is "*substantially* outweighed by the danger of unfair prejudice." *United States v. Zackson*, 12 F.3d 1178, 1182 (2d Cir. 1993) (emphasis added). Evidence is unfairly prejudicial "only when it tends to have some adverse effect upon a defendant beyond tending to prove the fact or issue that justified its admission into evidence." *United States v. Figueroa*, 618 F.2d 934, 943 (2d Cir. 1980). All relevant evidence is to some degree prejudicial; *unfair* prejudice means, however, an "undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." Rule 403, Advisory Comm. Note. Evidence is not unduly prejudicial when it is not "more inflammatory than the charged crime." *United States v. Livoti*, 196 F.3d 322, 326 (2d Cir. 1999); *United States v. Pitre*, 960 F.2d 1112, 1120 (2d Cir. 1992); *United States v. Roldan Zapata*, 916 F.2d 795, 804 (2d Cir. 1990).

### III. The Defendant's Motion to Preclude the Testimony of Dr. Arrington Should Be Denied

Dr. Arrington's proposed testimony is admissible because it will be closely hewed to the evidence in this case and her experience easily qualifies her as an expert on North Korea without the need for a *Daubert* hearing.

### A. Dr. Arrington's Proposed Expert Testimony on North Korea Will Be Appropriately Cabined and Is Admissible

As an initial matter, much of the defense's objections to Dr. Arrington's proposed testimony are moot. To be clear, none of the Government's disclosures indicated that Dr. Arrington would testify regarding "cryptocurrency and blockchain-related topics allegedly discussed" by the defendant, as the defense asserts. (*See* Def. Mot. at 2). The Government has no intention of eliciting testimony on these topics from Dr. Arrington. The Government's notification that Dr. Arrington would address "particular concepts discussed by Griffith at the 2019 Pyongyang Blockchain and

6

Cryptocurrency Conference, or raised by Griffith in his interviews with FBI," Ex. A at 1-2, specified that Dr. Arrington would address matters relating to the global sanctions on the DPRK and their purpose to deter North Korea's nuclear program among other things, the use of the term "peace" inside North Korea, the concept of North Korea's "juche" ideology, and the matter of Otto Warmbier. The Government does not intend to have Dr. Arrington "walk through the sanctions regulations charged in this case," or "tell the jury what is prohibited and illegal under the regulation" or any similar matter. (*See* Def. Mot. at 2). Indeed, the Government agrees that such testimony should not be elicited by either party. (*See* Dkt. 146 (Gov't Mot. to Preclude Def. Expert) at 12-17). As explained below, the Government no longer intends to elicit testimony from Dr. Arrington on the matter of Otto Warmbier either.

Dr. Arrington's proposed testimony will cover limited topics to help the jurors understand specific terminology and events referenced by Griffith and others in connection with the charged conspiracy, which is not unduly prejudicial in light of the defendant's own words. *See United States v. Bilzerian*, 926 F.2d 1285, 1294 (2d Cir. 1991) (expert testimony admissible to "help a jury understand unfamiliar terms and concepts"). Specifically, the Government seeks to elicit the following expert testimony from Dr. Arrington, which relates to specific evidence as set forth below.

1. **Introductory Background on the DPRK**

Dr. Arrington will provide a brief introductory background regarding North and South Korea, consisting, in substance, of the following:

- The DPRK (North Korea) and the Republic of Korea (South Korea) became separate countries following World War II. The first leader of the DPRK was Kim Il-Sung and its government is a totalitarian Communist state that has continuously been led by Kim Il-Sung's family. Kim Il-Sung's son, Kim Jong-Il, assumed the leadership of North Korea after his death, and Kim Il-Sung's grandson, Kim Jong-Un, now leads the country. Kim Il-Sung is viewed as a father figure for the nation and both he and his descendant rulers are treated as quasi-deities, regarded as

7

"Suryeong" in Korean, which means "Great Leader" or "Supreme Unchallengeable Leader." The speeches of all three Kims are treated with reverence and studied on a weekly basis by the citizenship.

Testimony providing an introductory background on the DPRK, including the identities of its rulers and their roles in society, will help the jury understand the statements of the defendant and his co-conspirators reflected in recordings of the Conference and other documents, as well as items possessed by Griffith at the time of his arrest. For example, the recordings show that CC-2 opened the Conference by referencing Kim Il-Sung, Kim Jong-Il, and telling the audience that the Conference would explain "how you can use this [blockchain] technology here in the DPRK in order to not only distribute funds but also to potentially use this within your legal system and in building a . . . economy which Supreme Leader Kim Jong-un spoke about recently in his address to the 14th Supreme People's Assembly." At the time of his arrest, months after the Conference, Griffith was carrying three North Korean texts by Kim Jong-Il and Kim Jong-Un in his suitcase: "Kim Jong Il: On the Juche Idea," "Kim Jong Un: On Accelerating the Victorious Advance of Socialism," and "Kim Jong Un Aphorisms." Dr. Arrington's proposed testimony will aid the jury to understand CC-2's references to the three leaders of the DPRK and to his citation of a particular Kim Jong Un speech, the nature of the texts carried by Griffith and their importance in North Korea, and will place CC-2's choice of words in the context of DPRK terms and practices.

Limited testimony regarding North Korea's form of government is also appropriate to place in context Griffith's statements to the U.S. government about his travel to North Korea and his intent. For example, on January 25, 2019, Griffith wrote to the U.S. State Department's Special Validations office seeking permission to travel to the DPRK for the Conference, falsely claiming that "[g]iven the sanctions on scientific exchange with the DPRK, my talk will be solely on the applications of blockchain technology to business and anti-corruption." Dr. Arrington's testimony

will aid the jury to understand that there are no private businesses permitted to operate in the DPRK without the state's involvement, because the DPRK government seeks to run all businesses and aspects of daily life, and no realistic role exists for citizens to appeal for "anti-corruption" measures outside of the DPRK government.

### 2. "Peace" and Tensions with the United States

Dr. Arrington will testify regarding the usage and meaning of the term "peace" in North Korea and North Korean perceptions of tension with the United States, consisting, in substance, of the following:

- The term "peace" is commonly understood inside North Korea to signify an end to outside pressure on the DPRK regime, including the military threat from the U.S. and South Korean military alliance as well as the Korean War. The Korean War started because the DPRK invaded South Korea in June of 1950, with the objective of unifying the Korean Peninsula under its rule. The U.S. did not start the Korean War, but the DPRK blames the U.S. for the Korean War and views the U.S. as an enemy. The Korean War was frozen in an armistice and never ended, so technically the DPRK and the U.S. are still at war.

- The U.S.S. Pueblo was a U.S. Navy ship attacked and captured by North Korea in 1968, the U.S. servicemembers aboard were held hostage for nearly a year, and the ship is used by North Korea as a museum.

Testimony to place the DPRK's usage and meaning of the term "peace" in the context of the country's history, its relationship to the United States, and the status of the Korean War will aid the jury to understand the Conference presentations and the DPRK's actions with respect to presenters such as Griffith. The evidence will show that CC-2 provided Griffith and other attendees with topics and materials pre-approved by the DPRK government for the Conference including "Blockchain and Peace." Griffith told FBI that peace was the topic of his presentation at the Conference, which has a specialized meaning within North Korea and to the DPRK government that selected the topic. Data obtained from Griffith's computer reflects that Griffith adopted the title, "Blockchain and Peace," for his own presentation, which carried a particular meaning to the

DPRK officials who selected it, and to the DPRK audience. Indeed, Griffith's remarks during this "Blockchain and Peace" presentation began by emphasizing that "the most important feature of blockchains is that they are open. And the DPRK can't be kept out no matter what the USA or the UN says." Griffith's notes and communications similarly repeatedly reference the DPRK's desire for "reunification" as a means to achieve peace. For example, Griffith took notes during his trip to North Korea, documenting certain of his activities, including April 18, 2019 notes reflecting that "DPRK is passionate about reunification." Griffith later sought to conduct a cryptocurrency transaction between North and South Korea, which he claimed in various communications would be an act of "reunification." Testimony regarding the meaning of these terms in the context of North Korean politics and civil society will aid the jury in understanding Griffith's adoption of the DPRK's interest in "reunification," a term invoking a particular mission for the DPRK that has been pursued through military means in the past, the DPRK's selection of "Blockchain and Peace" for the presentations they commissioned, and Griffith's incorporation of these terms into his remarks as a means of tailoring his Conference presentation to the North Korean audience and ongoing dealings with North Koreans, an important issue in assessing whether the defendant conspired to provide services to the DPRK as charged.

Griffith's April 19, 2019 notes from his time in the DPRK reflect that the North Koreans were "very proud of their capture of US military craft," and state that he "would like to get a copy of the video from the Liberation museum saying how America started the Korean war." Griffith then circulated a link to the U.S.S. Pueblo incident in a chat conversation among attendees of the Conference. Dr. Arrington's testimony as summarized above will therefore provide context for the jury and assist it in understanding Griffith's reference to the U.S.S. Pueblo.

### 3.  "Juche"

Dr. Arrington will testify regarding the meaning of the term "juche" in North Korea, consisting, in substance, of the following:

- The term "juche" roughly translates to "self-reliance" and refers to a thought system based on the idea that the DPRK must be self-sufficient in every way, including economic and military independence. The Juche ideology was originally developed in the 1950s in response to the historical subjugation of the North Korean people under foreigners. At present, Juche is used to control the population through, among other things, requiring DPRK citizens to make sacrifices in the spirit of Juche to ensure an independent North Korea.

Testimony to explain the DPRK's usage and meaning of the unique term "Juche" will be essential to aid the jury to understand Griffith's own presentation at the Conference. A recording of the Conference reflects that, at his presentation, Griffith stated, "One of the more interesting things is that blockchains allow greater self-reliance in both banking and contracts. So you can have contracts without an authority. This is similar to a Juche idea." Griffith also returned from the DPRK with a book, "Kim Jong Il: On the Juche Idea," as noted above, and told FBI "that a major selling point to the North Koreans at the conference was essentially that Bitcoin was the ultimate form of Juche through the concept of 'Juche banking' which would make the DPRK virtually independent from the banking system." Without background from Dr. Arrington, the jury will be unable to understand the meaning of this uniquely North Korean concept, and the significance of Griffith's incorporation of the term into his remarks.

### 4.  The Purpose of the Sanctions and Their Connection to Nuclear Weapons

In the Government's opposition to the defendant's motions *in limine* to preclude any references to nuclear weapons, *see* Dkt. 146 at 6-10, the Government specified that it proposed to elicit the following testimony, in substance, from Dr. Arrington:

- The U.S., the U.N., and other U.N. member states have imposed sanctions on the DPRK. One of the purposes of the U.S. and U.N. sanctions upon the DPRK is to

deter the DPRK's nuclear proliferation efforts and nuclear weapons development, through diplomatic and trade pressures.

This expert testimony is admissible to help the jurors understand the references discussed above to the DPRK's nuclear program in relation to the sanctions regime, including, for example, the reference to U.N. sanctions in an article that CC-3 sent Griffith, which included the observation that the DPRK's "repeated nuclear and missile provocations . . . drove tensions sky high in the region," Griffith's statement about how the U.S. government might react if Ethereum "is funding dprk's nukes," and Griffith's instructions to the DPRK audience about the potential use of smart contracts in direct relationship to the DPRK's missile program. (Dkt. 146 at 7-9 (describing Griffith's Conference presentation on an "idea" to give the DPRK "something where you could have a module on a missile, and the module could say something like you know if all the news reports say that sanctions on North Korea have been lifted, the missile will deactivate. But only then.").

Also as noted in the Government's opposition to the defendant's motions *in limine*, *id*. at 9-10, the Government further plans to elicit from Dr. Arrington, in substance:

- The DPRK conducted six nuclear weapons tests between 2006 through 2017, including a test of a nuclear bomb designed to be mounted on missiles in its arsenal.

- In the context of the Korean Peninsula, the term "DMZ," or demilitarized zone, refers to a strip of land running near the 38th parallel north that serves as a buffer zone between South Korea and the DPRK, near which the DPRK has placed thousands of soldiers and pieces of artillery.

The first portion of this limited testimony is admissible to help the jurors understand CC-3's reference to the DPRK's "sixth nuclear test" in the December 30, 2017 text message exchange with Griffith, as well as Griffith's statements at the Conference about the potential use of blockchain technology in connection with the DPRK's missile program. (*Id*. at 7-8, 10). The latter explanation is admissible to help the jurors understand Griffith's reference during his

presentation at the Conference to the goal of securing "less artillery in the DMZ." (*Id.* at 8-10).

As set forth in the Government's prior briefing, limited expert testimony regarding the purpose and intent of the U.S. and United Nations sanctions on the DPRK is permissible not only to help the jurors understand the references to the DPRK's nuclear program discussed by Griffith and his co-conspirators in relation to the sanctions regime, as cited above, but also to lay a foundation to explain how those statements contributed to, and reflected, Griffith's knowledge of the substantial sanctions on the DPRK and his willful efforts to evade them. *See United States v. Atilla*, S4 15 Cr. 867 (RMB) (Nov. 28, 2017 Tr. at 150-200) (admitting expert witness testimony in an IEEPA prosecution regarding the historical origin, purpose, objectives, and impact of Iranian sanctions, including the relationship of the sanctions to Iran's nuclear program, missile program, support for terrorism and other malign activity). This basic connection between the DPRK's actions, and the purpose of the sanctions, will also help the jury understand why the relevant statute – the International Emergency Economic Powers Act – has been invoked with respect to the DPRK government and persons, in contrast to other countries.[2]

To be clear, contrary to the defendant's assertions, the Government does not intend to elicit from Dr. Arrington any information beyond that summarized above relating to the nature, scope, and application of the sanctions. (*See* Dkt. 153 (Def. Opp. to Gov't Mot. to Preclude Experts) at 13 (claiming that the defense's proffered sanctions expert would somehow serve to rebut Dr. Arrington's testimony)).

---

[2] The defendant's citation to *United States v. Nejad*, No. 18 Cr. 224 (AJN), is inapposite. There, the Government narrowed its proposed expert testimony and the court formalized that position by barring testimony relating to two terms: "terrorism" and "economic jihad." (*See* Dkt. 189 and 210.) In *Nejad*, in contrast to *Atilla*, where testimony regarding the term "economic jihad" and other malign activity by Iran was permitted, there was no evidence that those terms were used by the defendant or members of the conspiracy. Here, the Government has already proposed only limited categories of testimony regarding North Korea, carefully hewed to the admissible evidence.

### 5.  Otto Warmbier

The Government's initial disclosures proposed that Dr. Arrington would testify regarding the events surrounding Otto Warmbier. The Government expects that the evidence will show that prior to Griffith's travel to North Korea, he went to the U.S. Embassy in Singapore to seek permission to travel to North Korea. That permission was denied. In addition, Embassy personnel met with the defendant and attempted to dissuade him from pursuing travel to North Korea, in significant part out of concern for the defendant's own safety, and discussed the hazards of travel to North Korea, including in particular, the case of Otto Warmbier, with the defendant. In lieu of expert testimony, the Government anticipates eliciting brief fact testimony to explain that discussion between Embassy personnel and the defendant, and to contextualize Griffith's statements and actions. As a result, the defendant's motion to preclude Dr. Arrington's testimony on this subject is now moot.

### B.  The Proposed Topics Comply with Rules 401, 403 and 702

In each instance, as set forth above, Dr. Arrington's proposed testimony will help the jury understand the history, terminology, and events in North Korea referenced in the defendant's own statements and those of his co-conspirators that are beyond the ken of the average juror. *See Locascio*, 6 F.3d at 936 (applying Rule 702 to conduct a "common sense inquiry into whether the untrained layman would be qualified to determine intelligently and to the best possible degree the particular issue without enlightenment from those having a specialized understanding of the subject involved in the dispute") (internal quotation marks omitted); *United States v. Duncan*, 42 F.3d 97, 101 (2d Cir. 1994) ("Expert witnesses are often uniquely qualified in guiding the trier of fact through a complicated morass of obscure terms and concepts.").

Dr. Arrington's proposed testimony on these subjects would not violate Rule 403, because it will be closely cabined to help the jury understand the unique history, terminology, and events

discussed by the defendant and his co-conspirators. The explanation of terms that appear in the evidence and are relevant to the conspirators' states of mind is not "unfairly" prejudicial. *See Old Chief v. United States*, 519 U.S. 172, 180 (1997); *United States v. Kadir*, 718 F.3d 115, 122 (2d Cir. 2013). Unlike the cases cited by the defendant, such evidence would not invoke "terrorism when a defendant is not charged with terrorism." (Def. Mot. at 5 (citing *United States v. Al Moayad*, 545 F.3d 139, 166 (2d Cir. 2008) (*quoting United States v. Elfgeeh*, 515 F.3d 100, 127 (2d Cir. 2008)). The defendant is charged with conspiring with others to provide services to North Korea, and with evading and avoiding U.S. sanctions, in violation of U.S. law. Here, the very services that the defendant conspired to provide were explicitly linked, in the defendant's own words, to North Korea's nuclear weapons programs, North Korea's particular view of achieving "self-reliance" and "peace" by evading U.S. and U.N. restrictions, and North Korea's own mission of "reunification." *See supra* 7-13. To aid the jury to understand the context for the defendant's and his co-conspirators' statements, limited expert testimony to explain this terminology and related events is entirely appropriate.

### C.  Dr. Arrington Is Qualified to Serve as an Expert on North Korea

The defense disputes Dr. Arrington's qualifications as an expert on North Korean sanctions, the concepts and uses of the phrases "peace" and "juche" in North Korea and their meaning within the North Korean regime, and the Warmbier case, and seeks a *Daubert* hearing to disqualify her testimony on these topics. In support of their position, the defense emphasizes that Dr. Arrington has not published articles on the U.S. sanctions on North Korea and lacks "real-world experience working with the North Korean sanctions." (Def. Mot. at 10). The defense acknowledges that Dr. Arrington has written about North Korean human rights abuses, including a book covering the topic, but argues that her work focuses "on the impact in Japan and South Korea" and she was not personally involved in the case of Mr. Warmbier. As reflected above, the

15

Government no longer seeks to elicit testimony from Dr. Arrington regarding Mr. Warmbier. The defense's critique fails to undermine Dr. Arrington's qualifications to testify on the remaining limited subjects noticed by the Government, and does not justify any need for a *Daubert* hearing in this case.

Dr. Arrington is a highly-credentialed academic at a top American university. (Ex. B. at 1). She teaches both undergraduate and graduate-level courses that examine issues in North Korea, including authoritarianism and democratization (or lack thereof), economic development, political participation, civil society, and North Korea's nuclear and missile programs, illicit activities, and human rights, as well as dialogue, sanctions, and the possibility of unification. (*See, e.g.*, Syllabus, attached hereto as Exhibit C, at 1; Ex. B at 6). Dr. Arrington has been engaged in the study of the DPRK and U.S., South Korean, and Japanese policies to effect change in the DPRK, including denuclearization, for approximately twenty years. In the course of her research, Dr. Arrington has interviewed approximately one dozen defectors from North Korea, that is, citizens of North Korea who have escaped the country despite the regime's general policy forbidding travel outside its borders for the vast majority of its citizens. She has reviewed additional defector testimonies published by the United Nations' Commission of Inquiry and reports issued by the United Nations' Panel of Experts, surveyed scholarship in the field, including books and think tank reports reflecting research on DPRK persons living in China and other DPRK defectors, and studied North Korean publications and news sources, such as the Korean Central News Agency, the state news agency of North Korea, and Rodong Sinmun, a North Korean newspaper that serves as the official newspaper of the Central Committee of the Workers' Party of Korea. Dr. Arrington possesses advanced Korean language skills, which enables her to review relevant source material in its original language as needed. (Ex. B. at 7).

In addition to her work at George Washington University, Dr. Arrington currently serves as a Governing Board Member and Program Chair for the Association of Korean Political Science. *Id*. Dr. Arrington has also participated in seminars for the United States intelligence community and taught a seminar for new U.S. foreign service officers to provide training on East Asia, including the DPRK, South Korea, and Japan. (*See* Ex. B at 4).

Dr. Arrington has written multiple publications relating to North Korea's abductions and North Korean human rights issues. These publications include a book, <u>Accidental Activists: Victim Movements and Government Accountability in Japan and South Korea</u> (Ithaca: Cornell University Press, 2016), devoting a substantial chapter to North Korea's abductions of thousands of foreign nationals since the Korean War. (Ex. B at 1). The book draws on Dr. Arrington's extensive background knowledge of North Korean history, government, and civil society, and her research into the experiences of DPRK defectors and abductees, through interviews as well as her analysis of media and government publications. Dr. Arrington has also published articles relating to North Korea in peer-reviewed journals and periodicals, including the following:

- "The Mutual Constitution of the Abductions and North Korean Human Rights Issues in Japan and Internationally," *Pacific Affairs* 91, no. 3 (September 2018): 471-98.

- "Linking Abductee Activism and North Korean Human Rights Advocacy in Japan and Abroad," in Andrew Yeo and Danielle Chubb, eds., <u>North Korean Human Rights: Activists and Networks</u> (Cambridge University Press, 2018): 85-108.

- "The Abductions Issue in Japan and South Korea: Ten Years after Pyongyang's Admission," *International Journal of Korean Studies* 17, no. 2 (Spring/Summer 2013): 108-39.

- Review of "Japanese Society and the Politics of the North Korean Threat," by Seung Hyok Lee (2016), *Journal of Japanese Studies* 45, no. 1 (Winter 2019): 173-78.

- Review of "Witness to Transformation: Refugee Insights into North Korea," by Stephan Haggard and Marcus Noland (2011), *Political Science Quarterly* 126, No.

4 (Winter 2011 – 2012): 682-83.

- "Japan and South Korea Can't Get Along: Why America Needs to Help Its Allies Mend Fences," *Foreign Affairs* (with Andrew Yeo) (July 31, 2019).

- "Abe is Aching for a Seat at the Table," *East Asia Forum* (with Isozaki Atsuhito), http://www.eastasiaforum.org/2018/07/19/abe-is-aching-for-a-seat-at-the-table/ (July 19, 2018) (discussing the "three main concerns" of "North Korea's abductions of Japanese nationals in the 1970s and 1980s, North Korea's missiles and North Korea's nuclear program" in the context of international relations).

- "South Korea's president was impeached. North Korea is increasingly threatening. Here's what you need to know," The Monkey Cage, *The Washington Post* (March 12, 2017).

(*See* Ex. B at 2-3.)

Dr. Arrington's experience demonstrates that her testimony will be based on sufficient facts and data, and serve as the product of reliable principles and methods. The kind of expert testimony proffered here, to provide jurors with background on established entities, and to explain terminology particular to those entities, such as criminal enterprises, has been routinely upheld. *See Farhane*, 634 F.3d at 158-59 (affirming expert testimony regarding the "history and structure" and "background" on al Qaeda, as well as its terrorist activities, even where derived in part from Internet sources); *United States v. Dey*, 409 F. App'x 372, 374 (2d Cir. 2010) (affirming expert testimony regarding organized crime terminology and code language in La Cosa Nostra); *United States v. Boyle*, No. 08 Cr. 523, 2010 WL 286624, at *2 (S.D.N.Y. Jan. 15, 2010) (permitting testimony regarding "the operation, structure, membership, and terminology of organized crime families"). Dr. Arrington's factual bases and methodology are "similar to that employed by experts that have been permitted to testify in other federal cases" on analogous issues, such as terrorist organizations and the Mafia. *United States v. Mustafa*, 753 F. Appx. 22 (2d Cir. 2018) (citing cases); *Farhane*, 634 F.3d at 159 (finding "considerable factual basis" for expert testimony regarding al Qaeda where witness had completed relevant graduate studies, worked at

18

organizations focusing on terrorism and al Qaeda, consulted with federal agencies, published a book on al Qaeda, and engaged in ongoing efforts to review materials relevant to terrorism and al Qaeda, including guilty pleas of operatives); *see also Warmbier v. Democratic People's Republic of Korea*, 356 F. Supp. 3d 30, 36 (D.D.C. 2018) (accepting the testimony of a "deeply knowledgeable expert from the Fletcher School of Law and Diplomacy at Tufts University" who described "North Korea as 'unique' in the world today" to inform the court's analysis of the Warmbier family's claims for civil damages).

Lastly, the Government respectfully submits that its disclosures of Dr. Arrington's proposed testimony, including the additionally detailed information supplied in this opposition and the 3500 material produced to the defense, satisfy the requirements of Rule 16(a)(1)(G). The Government's disclosures are more than sufficient to ensure that "the proposed testimony [will not be] a surprise." *United States v. Rosario*, No. 09 Cr. 415 (VEC), 2014 WL 6076364, at *4 (S.D.N.Y. Nov. 14, 2014). The Government has disclosed the specific topics of Dr. Arrington's expected testimony, her qualifications, and a thorough description of the bases for her knowledge. The fulsome preview of Dr. Arrington's testimony provided above, in particular, renders the defendant's request for further disclosures moot. For the same reasons, there is no need for a *Daubert* hearing in advance of qualifying Dr. Arrington on the limited subjects set forth above, in light of her extensive qualifications. *See Williams*, 506 F.3d at 161-62 (upholding denial of *Daubert* hearing where the court considered the use of similar testimony in other cases, and the Government provided a thorough foundation prior to presenting expert's testimony to the jury).

## IV.   The CART Expert Disclosures Are Sufficient

As set forth above, the Government's disclosures regarding the CART Experts provided the defense with notice of the topic of their proposed testimony (namely, their forensic extractions of Griffith's electronic devices), their resumes, and the forensic extractions generated by these

19

CART Experts, described by device and by their corresponding Bates number in the Government's discovery productions. The forensic extractions themselves serve as the experts' reports.

The Government may not seek to offer these witnesses as expert witnesses, as the focus of their testimony will be on what they found on the devices rather than any area of specialized knowledge on which they relied in conducting their examinations. *See United States v. Marsh*, 568 F. App'x 15, 16-17 (2d Cir. 2014) (finding no error in allowing lay, non-expert testimony relating to search of electronic device where witness simply "explained his training," "described" his search, and "testified to the contents of the messages retrieved from the phone"); *United States v. Berry*, 318 F. App'x 569, 569 (9th Cir. 2009) (agent's testimony not expert testimony where he "simply testified to what he found on the [defendant's] hard drive . . . , without expressing an opinion that required specialized knowledge or offering insight beyond common understanding"); *United States v. Scott-Emuakpor*, 2000 WL 288443, at *12 (W.D. Mich. 2000) ("The question before the Court at this time is not whether these witnesses have the expertise, for example, to develop sophisticated software programs. The question is whether they have the skill to find out what is on a hard drive or a zip drive. Apparently, they have this skill because they determined what was on the drives."). However, the Government is prepared to qualify these witnesses as experts under Federal Rule of Evidence 702 in the event that it is deemed necessary to do so.

Moreover, the Government has provided 3500 material for one of the CART Experts, well in advance of the Court-ordered deadline, and will continue to do so on a rolling basis to the extent their testimony is necessary. The defense has not identified any actual deficiency in the Government's disclosures. Instead, the defense generally asserts a demand for "additional disclosures." As a result, there is no basis for the defendant's motion to preclude the testimony of

the CART Experts, nor is there any basis for the Court to order "additional disclosures" at this time. Continuing disclosures will be provided in the form of 3500 material for these witnesses. The defendant's motion regarding the CART Experts should be denied.

**THE DEFENDANT'S DEMAND FOR TESTIMONY SHOULD BE PRECLUDED**

The Court should preclude the testimony proposed by the defendant in his September 8, 2021 letter demanding that the Government make available for testimony in the defendant's case-in-chief FBI agents and Department of Justice attorneys (the "Demand"). The Demand is attached hereto as Exhibit D. As set forth below, testimony from these witnesses on the topics identified in the Demand are irrelevant, either outside their personal knowledge or otherwise consisting of inadmissible hearsay, and more prejudicial than probative. In light of this inadmissibility, the Government seeks an *in limine* ruling precluding the proposed testimony form the identified witnesses.

**I.  The Demand Letter**

In the Demand, the defendant seeks the testimony of five FBI special agents and two attorneys from the National Security Division ("NSD") of the Department of Justice (the "Witnesses"). While two of the FBI agents were, prior to Griffith's arrest, on the New York-based FBI squad responsible for the investigation and participated in interviews of the defendant, the remaining three FBI agents were not. These other three FBI employees served in supervisory roles for different components, specifically:

- A Supervisory Special Agent ("SSA") at the FBI Headquarters' ("FBI-HQ") Counterintelligence Division who served as a Detailee to OFAC;

- Another SSA at the FBI-HQ Counterintelligence Division who served as a Program Manager in the Global Technology Transfer Unit ("GTTU");

- A Unit Chief at FBI-HQ Counterintelligence Division for GTTU.

These individuals did not participate in investigating the facts of this case.

Regarding the attorneys from NSD, one serves as the NSD attorney assigned to this case ("Attorney-1") and the other is his supervisor ("Attorney-2").

The Demand explains that the defense "may seek to elicit testimony form one or more of these witnesses about the following topics," without specifying which witness would be questioned about which topic:

1. "The FBI's assessment and enforcement of the North Korea Sanctions Regulations ('NKSR') as set forth at 31 C.F.R. 510, et seq.";

2. "The FBI's coordination and communications with representatives of the U.S. Department of State ('State Department') regarding Mr. Griffith's alleged activities purportedly related to North Korea, prior to, during, and following the 2019 Pyongyang Cryptocurrency Conference";

3. "The FBI interviews of Mr. Griffith";

4. "The IEEPA generally as well as the Information and Informational Materials Exemption and the Berman Amendment to the IEEPA as applied in this case or other applications of the NKSR, the Iranian Transactions Sanctions Regulations, and the IEEPA";

5. "Analysis of the underlying facts pertaining to the prosecution of Virgil Griffith in *United States v. Virgil Griffith*, including but not limited [to] the FBI's assessment of the conduct as reflected in communications with the NSD, the State Department, the Office of Foreign Assets Control ('OFAC'), and the USAO-SDNY";

6. "Coordination and discussions between and among the FBI, the Department of Treasury broadly and OFAC more specifically, and the Department of Justice (to include United States Attorneys' Offices and the NSD) regarding North Korea's cryptocurrency and blockchain capabilities, enforcement actions and contemplated enforcement actions to try to deter individuals from providing, offering to provide, or preventing individuals to communicate with North Korea on these topics, and any discussions related to allegations specific to Virgil Griffith or the individuals identified as CC-1 through CC-6 in the government's filings";

7. "Communications and analyses regarding USAO-SDNY and NSD's request for an OFAC licensing opinion and potential witness testimony in connection with a contemplated criminal prosecution of Mr. Griffith";

8. "Communications and analyses regarding any and all types of background checks, including an OFAC license history report, the FBI ran or requested other agencies to run on Virgil Griffith";

9. "Communications and analyses regarding any search warrants related to Mr. Griffith, including warrants on his personal electronic devices and computer servers, his purported social media accounts, and his purported email accounts";

10. "The 2019 Pyongyang Cryptocurrency Conference"; and

11. "The purported 2020 Pyongyang Cryptocurrency Conference."

Ex. D at 2-3. These topics are cited below as "Demand Bullet [Number]."

After receiving the Demand, on September 9, 2021, the Government met and conferred with defense counsel for Griffith. During that conversation, the Government inquired as to the admissibility of testimony by the proposed Witnesses. The Government advised the defense that it believed that the vast majority of the Demand had identified improper areas for testimony. When asked for the relevance of these categories, counsel asserted that these categories of proposed testimony were relevant to issues involving the evidence and the state of mind of the defendant. Regarding the relevance of testimony about internal Government deliberations, counsel asserted that, to the extent that evidence will be adduced that Griffith's conduct required a license, the defense believes it can elicit evidence that this conduct was debated at OFAC to undermine willfulness.

## II.   The Proposed Testimony Related to the IEEPA and OFAC Sanctions Regimes Should Be Precluded

The Demand seeks testimony from the Witnesses related to (i) the applicability of various legal regimes to the "underlying facts pertaining to the prosecution of Virgil Griffith" and communications about the same; and (ii) general Government practices regarding the enforcement of the NKSR, IEEPA, and efforts to combat the North Korea threat to national security, and internal intergovernmental communications about other investigations completely unrelated to this case. This proposed testimony is wholly irrelevant and inadmissible.

### A.   Application of Laws and Regulations to Griffith

The defendant proposes to call the Witnesses in his case-in-chief to testify about the applicability of relevant laws and regulations to the facts of this case and communications about the same. In particular, he seeks to elicit testimony from the Witnesses about:

24

- "The IEEPA generally as well as the Information and Informational Materials Exemption and the Berman Amendment to the IEEPA <u>as applied in this case</u>" (Demand Bullet 4 (emphasis added));

- "<u>Analysis of the underlying facts</u> pertaining to the prosecution of Virgil Griffith . . . including but not limited [to] the FBI's assessment of the conduct as reflected in communications with the NSD, the State Department, the Office of Foreign Assets Control ('OFAC'), and the USAO-SDNY" (Demand Bullet 5 (emphasis added));

- "Coordination and discussions between and among the FBI, the Department of Treasury broadly and OFAC more specifically, and the Department of Justice (to include United States Attorneys' Offices and the NSD) regarding . . . allegations <u>specific to Virgil Griffith or the individuals identified as CC-1 through CC-6 in the government's filings</u>" (Demand Bullet 6 (emphasis added)); and

- "Communications and analyses regarding USAO-SDNY and NSD's request for an OFAC licensing opinion and potential witness testimony in connection with a <u>contemplated criminal prosecution of Mr. Griffith</u>" (Demand Bullet 7 (emphasis added)).

Testimony by the Witnesses on these topics would be improper. The Witnesses' personal analyses of application of the law to the facts of this case are irrelevant to whether Griffith conspired to provide services to the DPRK and would be far more prejudicial than probative. Similarly, intergovernmental communications about the investigation into Griffith and his co-conspirators—unknown to Griffith at the time of his criminal conduct—have no bearing on this case and constitute inadmissible hearsay.

## 1. Facts

On July 29, 2020, August 18, 2020, August 26, 2020, May 7, 2021, May 28, 2021, June 22, 2021, and August 20, 2021, the Government disclosed to the defendant records reflecting correspondence between and among the SDNY prosecutors, NSD, and OFAC. As reflected in the communications produced by the Government, on November 18, 2019, one of the Witnesses subpoenaed by the defendant, Attorney-2, contacted OFAC and stated: "We have a scenario we'd like to run by someone at OFAC related to a DPRK service.  Any chance one of you is available in the next couple of hours?" (USAO_001750). That same day, an AUSA on the prosecution team

learned from another attorney subpoenaed by the defendant, Attorney-1, that an OFAC official had asked whether Griffith's presentation fell into the exception for "information or informational materials." (USAO_001744). Additional emails produced by the Government to the defense demonstrate that one attorney at OFAC had identified these complications and raised questions about the application of this exemption to Griffith's conduct.

The next morning, on November 19, 2019, Attorney-1 sent an email memo drafted by the SDNY prosecution team to OFAC, formally requesting "an OFAC Licensing Determination in the matter of Virgil Griffith." (USAO_001746). The prosecution team's memo provided OFAC with a summary of the relevant facts, and an analysis of why Griffith's presentation did not fall within the exemption for "informational materials." The memo assessed that Griffith's presentation, based on what was known at the time, did not fall under the exemption, "because Griffith created the presentation for the cryptocurrency conference and the DPRK government." (USAO_001747). Additionally, Griffith took questions during the Conference, "during which, by his own admission, Griffith discussed with more knowledgeable conference attendees topics such as the creation of cryptocurrency through mining." (*Id.*). Because Griffith "used his expertise to take publicly available information and package it so that the DPRK audience could better understand the concepts and apply it to circumstances that were unique to issues present in particular within the DPRK," the memo assessed that Griffith's conduct violated IEEPA. (*Id.*).

On November 20, 2019, prosecutors, NSD, and OFAC had another phone call, during which OFAC stated that it would "get us [SDNY and NSD] an answer promptly, and signaled that they would support the prosecution." (USAO_001751). Later that day, OFAC counsel sent an email to the prosecutors and NSD, in which counsel stated: "I expect we'll be able to get back to you tomorrow (hopefully by noon) with the assurance you need, at least as to Griffith's

26

presentation at the conference." (USAO_001754).

OFAC's Chief Counsel then opined, in a November 20, 2019, internal OFAC email, that "I just spoke with DOJ . . . . The bottom line is that I think *it will be easy for OFAC* to make an assurance to DOJ that the criminal information does in fact spell out one or more IEEPA violations that are not Bermanized, and as to which OFAC did not issue a license." (USAO_009006 (emphasis added)).

OFAC ultimately confirmed that the defendant's conduct was not covered by any exemption to OFAC's regulations and formally supported the prosecution. On November 21, 2019, counsel for OFAC sent SDNY and NSD an email, which stated:

> This confirms that if asked, OFAC will provide a witness to testify that the facts set out in the attached Sealed Complaint show violations of the North Korea Sanctions Regulations, 31 CFR Part 510.  The witness would testify that the presentation by Virgil Griffith at the Cryptocurrency Conference in North Korea referenced in the Sealed Complaint constituted a violation of 31 CFR §§ 510.206(a) (prohibited exportation of services to North Korea) and 510.212(b) (conspiracy to violate prohibitions set forth in 31 CFR Part 510).

(USAO_001752).

### 2.  Discussion

The Court should not permit the defendant to elicit testimony from the Witnesses regarding their views on the application of law, which the Court will instruct the jury about, to the evidence in this case (Demand Bullets 4-5), or internal communications discussing the then-existing views of other individual federal employees about the application of law to the evidence (Demand Bullets 6-7).

The defendant's request for testimony from the Witnesses about their analysis of the facts of this case in relation to applicable laws is irrelevant. *See* Fed. R. Evid. 401. The personal opinions of FBI agents and NSD attorneys—unknown to Griffith at the time of his illegal conduct—have

no bearing on the existence of a conspiracy to violate sanctions, Griffith's state of mind in forming an agreement to violate IEEPA, or on whether the object of that agreement constituted a violation of IEEPA. Moreover, the defense apparently seeks to render two NSD attorneys as witnesses in this case. These attorneys, of course, have not had any direct interactions with the defendant and lack any personal knowledge of the factual events properly at issue at the upcoming trial.

The same is true for internal intergovernmental communications between various components of the U.S. Government about whether and to what extent Griffith's conduct constituted a violation of applicable laws and regulations. These communications are not only irrelevant, but any prior statements, messages, or emails of Government employees discussing the application of the facts of this case to the law would constitute out-of-court statements offered for the truth of the matters asserted not subject to any exception. *See* Fed. R. Evid. 801, 803-804; *see also United States v. Ford*, 435 F.3d 204, 215 (2d Cir. 2006) (excluding statement of AUSA on hearsay grounds and noting that, for such statements to be admitted, they must be "the equivalent of testimonial statements"); *United States v. Carton*, No. 17 CR. 680 (CM), 2018 WL 6040652, at *4 (S.D.N.Y. Oct. 26, 2018) (refusing to find out-of-court statements of AUSA, FBI agent, and Victim Witness Unit admissible under Rule 801(d)(2)); *United States v. Skelos*, No. 15-CR-317 (KMW), 2018 WL 2254538, at *5 (S.D.N.Y. May 17, 2018) ("[O]ut-of-court statements by Government agents are generally not admissible as party admissions under Federal Rule of Evidence 801(d)(2)."), *aff'd*, 988 F.3d 645 (2d Cir. 2021).

Admission of Government employees' views of the merits of this case would also be unduly prejudicial and misleading, including because they reflect views of Government employees at a time when the investigation was in its infancy. Such evidence would improperly leave the jury with the mistaken impression that these communicants knew the full scope of the evidence against

Griffith when offering their opinions. At the point when OFAC was initially communicating with the Government about this case, however, the Government had yet to uncover much of the evidence that will be presented to the jury at trial, including recordings, photographs, and video depicting the Conference. (*See also* Dkt. 131 (Gov't MIL) at 1-24 (describing extensive evidence anticipated at trial)).

Regardless, admission of these communications would confuse and mislead the jury because OFAC's ultimate determination was that Griffith's conduct—even what little of it was known at that time—constituted a violation of IEEPA and OFAC's regulations. As described above, OFAC's Chief Counsel wrote in an internal email that "it will be easy for OFAC to make an assurance to DOJ that the criminal information does in fact spell out one or more IEEPA violations that are not Bermanized." (USAO_009006; *see also* Dkt 82 (Dec. 22, 2020 Tr.) at 28 ("The Court: . . . OFAC did greenlight this, did they not? Mr. Klein: Yes.")). To leave the jury with the misimpression that OFAC did not support the prosecution because of questions raised by one OFAC official junior to the Chief Counsel, who did not speak for the Treasury Department, in the course of ongoing internal deliberations, would be highly misleading and confusing.

In any event, at bottom, the requested testimony about OFAC's internal deliberations in connection with the Griffith case is not admissible, and the defense is seeking to put before the jury a matter not properly at issue in this trial. In considering whether to grant a motion to compel discovery from OFAC, at the December 22, 2020 conference, this Court stated:

> It strikes me that while it's very interesting that [OFAC] had doubts about whether it was a violation, just as a member of the prosecution team may have had doubts as to whether it was a violation. That does not translate into any admissible, usable evidence, nor does it necessarily lead to any admissible, usable evidence.

(Dkt. 82 (Dec. 22, 2020 Tr.) at 27). The defense has not offered any explanation to justify the Court departing from this view.

29

To the extent the defendant intends to call the Witnesses to describe their understanding of the law, that testimony should also be precluded. (*See* Dkt. 146 (Gov't Mot. to Preclude Def. Expert) at 12-17). As this Court noted on December 22, 2020, "we can all agree what a prosecutor's view of the law is does not control any more than a defense counsel's view. It's left to the judge, whose decision is subject to appellate review, to decide what the law is." (Dkt. 82 at 27); *see also United States v. Grote*, 961 F.3d 105, 121 (2d Cir. 2020) (holding that testimony on a "legal issue" would "usurp the role of the trial judge in instructing the jury as to the applicable law" (internal quotation marks and citation omitted)).

**B.   Application of IEEPA and OFAC Regulations to Unrelated Cases**

The Demand also seeks testimony from the Witnesses regarding general law enforcement practices with respect to the NKSR and the application of relevant laws and OFAC's regulations to unrelated cases. In particular, the Demand seeks to have the Witnesses testify about:

- "The FBI's assessment and enforcement of the North Korea Sanctions Regulations ('NKSR') as set forth at 31 C.F.R. 510, et seq." (Demand Bullet 1);

- "The IEEPA generally as well as the Information and Informational Materials Exemption and the Berman Amendment to the IEEPA as applied in . . . other applications of the NKSR, the Iranian Transactions Sanctions Regulations, and the IEEPA" (Demand Bullet 2); and

- "Coordination and discussions between and among the FBI, the Department of Treasury broadly and OFAC more specifically, and the Department of Justice (to include United States Attorneys' Offices and the NSD) regarding North Korea's cryptocurrency and blockchain capabilities, enforcement actions and contemplated enforcement actions to try to deter individuals from providing, offering to provide, or preventing individuals to communicate with North Korea on these topics . . . . (Demand Bullet 6)."

Testimony about these topics should also be precluded as irrelevant and likely to confuse and distract the jury, which will receive its instructions on the law as it applies to this case from the Court.

As an initial matter, to the extent the defendant seeks to question the Witnesses about

"North Korea's cryptocurrency and blockchain capabilities," the Government has already moved to preclude evidence on this topic and agreed not to present evidence of its own regarding the same. (*See* Dkt. 131 (Gov't MIL) at 46-52). These demands of the Witnesses, who are involved in various active law enforcement and intelligence investigations involving the DPRK, or who oversee sensitive national security prosecutions into the DPRK and other foreign adversaries, only underscore the impropriety of extraneous testimony about the DPRK's cryptocurrency and blockchain capabilities and highlight the risk of distracting the jury with a sideshow about investigations and prosecutions unrelated to Virgil Griffith.

The remainder of these demands essentially seek testimony about both (i) the Government's general practices in enforcing IEEPA and OFAC regulations, and (ii) information about other investigations, enforcement actions, and prosecutions. Neither category is permissible. The Government's enforcement practices and enforcement decisions, untethered from the defendant's knowledge of those practices or investigations, have no bearing on the defendant's *mens rea*.

For the reasons set forth in the Government's opposition to the defendant's proposed expert testimony, testimony regarding OFAC's enforcement practices and exercise of discretion is not relevant to the facts of this case and would violate Rule 403. (*See* Dkt. 146 (Gov't Mot. to Preclude Def. Expert) at 16.) As in *United States v. Banki*, No. S1 10 CR. 08 (JFK), 2010 WL 11606509 (S.D.N.Y. May 26, 2010), testimony about OFAC's enforcement practices and exercise of discretion, whether from an expert or a lay witness, can only be permitted "if, but only if, there is prior evidence in the record to establish a factual link between Defendant's state of mind and OFAC's under-enforcement policy." *Id*.

Here, by contrast, there is no similar evidence. Griffith did not carefully consider OFAC's

prior enforcement actions before working with others to provide services to the DPRK and evade and avoid U.S. sanctions. Instead, he repeatedly recognized that what he was planning to do would violate the sanctions levied against the DPRK. (*See* Dkt. 131 (Gov't MIL) at 3-4, 7 (when CC-3 questioned whether the plan to set up an Ethereum node made "economic sense," Griffith responded, "It does actually[.] It'll help them circumvent the current sanctions on them"; Griffith wrote CC-4 "Another benefit of an Ethereum node in dprk . . . It'll make it possible for them to avoid sanctions on money transfer"; and Griffith acknowledged to Individual-3 that the DPRK's interest in cryptocurrency was "probably avoiding sanctions . . . who knows")).

The defendant should thus be precluded from offering testimony of the Witnesses about sanctions enforcement practices in general or specific investigations unrelated to Griffith's case.

### III.   The Proposed Other Topics of Testimony Are Similarly Inadmissible

The Demand requests testimony form the Witnesses on other topics that either inappropriately attack the Government's investigation or call for inadmissible hearsay.

Two of the remaining topics demand testimony from the Witnesses about the Government's investigative techniques. In particular:

- "Communications and analyses regarding any and all types of background checks, including an OFAC license history report, the FBI ran or requested other agencies to run on Virgil Griffith" (Demand Bullet 8); and

- "Communications and analyses regarding any search warrants related to Mr. Griffith, including warrants on his personal electronic devices and computer servers, his purported social media accounts, and his purported email accounts" (Demand Bullet 9).

As with the Demand's other requests, the proposed testimony will almost certainly consist of inadmissible hearsay. Just as importantly, however, the defendant should not be permitted to call witnesses to place the Government's investigation on trial. *United States v. Knox*, 687 F. App'x 51, 54 (2d Cir. 2017) (affirming instruction that "the government is not on trial"). As this Court

recently instructed in *United States v. Fuentes Ramirez*, and consistent with the Government's proposed jury charge in this case, *see* Dkt. 130 at 19 (Request No. 11),

> There is no legal requirement that law enforcement agents investigate crimes in a particular way or that the government prove its case through any particular means. While you are to carefully consider the law enforcement evidence introduced by the government, you are not to speculate as to why they used the techniques they did or why they did not use other techniques. The government is not on trial. Law enforcement techniques are not your concern.

Jury Charge, *United States v. Fuentes Ramirez*, No. 15 Cr. 379 (PKC), Dkt. 308, 1150 (S.D.N.Y. Apr. 6, 2021); *see also United States v. Saldarriaga*, 204 F.3d 50, 53 (2d Cir. 2000). To the extent the defendant wishes to take issue with the Government's investigative techniques, he may do so in pretrial motions to be adjudicated by this Court. Attempting to call the Government's investigative techniques into question before the jury, through the Witnesses, however, would be plainly improper.

The Demand also seeks testimony from the Witnesses about "[t]he FBI's coordination and communications with representatives of the U.S. Department of State ('State Department') regarding Mr. Griffith's alleged activities purportedly related to North Korea, prior to, during, and following the 2019 Pyongyang Cryptocurrency Conference" (Demand Bullet 2). Like the internal intergovernmental communications about the NKSR, testimony about these communications would constitute inadmissible hearsay and, unless the communications were known to the defendant, would be irrelevant to whether the defendant conspired to violate IEEPA.

The Demand also seeks testimony from the Witnesses about "[t]he FBI interviews of Mr. Griffith." Only two of the Witnesses participated in interviews of the defendant, and in any event, courts regularly prevent defendants from admitting self-serving statements to law enforcement made after crimes are completed. *See, e.g.*, *United States v. Blake*, 195 F. Supp. 3d 605, 610

(S.D.N.Y. 2016); *United States v. Davidson*, 308 F. Supp. 2d 461, 480 (S.D.N.Y. 2004), *aff'd*, 220 F. App'x 5 (2d Cir. 2007) (refusing to admit as evidence of the defendant's state of mind self-serving statements to law enforcement); *see also United States v. Marin*, 669 F.2d 73, 84 (2d Cir. 1982) (when a "defendant seeks to introduce his own prior statement for the truth of the matter asserted, it is hearsay, and it is not admissible"); *United States v. Kadir*, 718 F.3d 115, 124 (2d Cir. 2013) ("A defendant may not introduce his own prior out-of-court statements because they are hearsay, and . . . not admissible.") (internal quotation marks omitted).

Finally, the Demand requests testimony from the Witnesses about "[t]he 2019 Pyongyang Cryptocurrency Conference," and "[t]he purported 2020 Pyongyang Cryptocurrency Conference." (Demand Bullets 3, 10, and 11, respectively). To the Government's knowledge, however, none of the Witnesses participated in these events in any first-hand capacity. As a result, everything that the Witnesses know about these events appears highly likely to constitute hearsay.

Because testimony from the Witnesses on these remaining demands would also be inadmissible, the Court should preclude the defense from inquiring of the Witnesses about these topics as well.

## <u>CONCLUSION</u>

For the foregoing reasons, the Government respectfully submits that the Court should deny the defendant's motions to preclude the expert testimony of Dr. Arrington and the CART Experts, and preclude testimony from the identified FBI agents and NSD attorneys on the topics listed in the defendant's September 8, 2021 letter.

Dated:      New York, New York
         September 13, 2021

Respectfully submitted,

AUDREY STRAUSS
United States Attorney

By: _____/s/_____
    Kimberly J. Ravener
    Kyle A. Wirshba
    Assistant United States Attorneys
    (212) 637-2358 / 2493

35

Exhibit A



**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

The Silvio J. Mollo Building
One Saint Andrew's Plaza
New York, New York 10007

August 21, 2021

**VIA EMAIL**

Brian Edward Klein
Waymaker LLP
777 S. Figueroa Street Suite 2850
Los Angeles, CA 90017
Email: bklein@waymakerlaw.com

Sean Stephen Buckley
Kobre & Kim LLP
800 Third Avenue
Suite 6th Floor, 10022
New York, NY 10017
Email: Sean.Buckley@kobrekim.com

   **Re:**  *United States v. Virgil Griffith*, 20 Cr. 15 (PKC)

Dear Counsel:

   Based on your request, this letter provides notice, pursuant to Rule 16(a)(1)(G) of the Federal Rules of Criminal Procedure ("Fed. R. Crim. P."), of certain expert testimony that the Government intends to offer during its case-in-chief at trial. The Government reserves the right to call additional expert witnesses, and will promptly provide notice if the Government elects to do so.

Celeste L. Arrington

   At trial, the Government expects to offer testimony from Dr. Celeste L. Arrington, an expert in North Korean politics and history. Dr. Arrington is a professor at the George Washington University where she teaches about, among other things, the politics of North and South Korea.

   Dr. Arrington is expected to testify about the history and basis for United Nations, United States, and international sanctions against the Democratic People's Republic of Korea ("DPRK" or "North Korea"), and about particular concepts discussed by Griffith at the 2019 Pyongyang

Blockchain and Cryptocurrency Conference, or raised by Griffith in his interviews with FBI. *See United States v. Bilzerian*, 926 F.2d 1285, 1294 (2d Cir. 1991) (expert testimony admissible to "help a jury understand unfamiliar terms and concepts"). In particular, the Government anticipates eliciting testimony from Dr. Arrington regarding the following topics:

o **Sanctions**. The United Nations, United States, and other international actors have imposed sanctions on the DPRK based on, among other things, North Korea's development of nuclear weapons, other weapons programs, and human rights abuses. These sanctions include, among other things, limits on trade, luxury goods, and access to international banking and finance. The sanctions are intended to change the conduct of DPRK leadership, punish for human rights abuses, and prevent the DPRK form securing materials needed for its weapons programs. These sanctions have become more comprehensive over time and have made it difficult to secure goods inside the DPRK.

o **Peace**. The term peace is commonly understood inside North Korea to signify an end to outside pressure on the DPRK regime, including, the military threat from the United States and South Korean military alliance as well as the Korean war.

o **Juche**. Juche roughly translates to "self-reliance" and is a thought system based on the idea that the DPRK must be self-sufficient in every way, including economic and military independence. The Juche ideology was developed in the 1950s in response to the subjugation of the North Korean people under foreigners. At present, Juche is used to control the population through, among other things, requiring DPRK citizens to make sacrifices in the spirit of Juche to ensure an independent North Korea.

o **Otto Warmbier**. Otto Warmbier was an American citizen who traveled to the DPRK as part of a tourist group and was arrested by authorities in the DPRK. After a public trial and conviction, Warmbier remained in the DPRK for approximately seventeen months and was eventually returned to the United States in a coma. Warmbier died shortly thereafter.

Attached is a copy of Dr. Arrington's resume.

<u>CART Examiners</u>

At trial, the Government also expects to offer testimony from Victoria R. Tenpenny, Nicole C. Kwasnaza, Christian M. Isolda, Ramiro E. Mendez, Peter R. Conroy, and Louis DiOrio. Each of these witnesses is a Forensic Examiner with the Federal Bureau of Investigation ("FBI") assigned to the Computer Analyst Response Team ("CART"). The Government expects that these examiners will testify regarding the forensic analysis of electronic devices and digital accounts recovered and searched during the course of this investigation. More specifically, the Government expects that the examiners will testify about extractions of the following devices and search

warrant returns: Griffith's Cellphone (USAO_000427), Griffith's iPad (USAO_001560), Griffith's iCloud (USAO_001559), Griffith's laptop (USAO_001647), Wtness-2's drives (3502-12.0545, 3502-13.00001, 3502-14.0001), Griffith's Singaporean devices (USAO_ 009083-009087), and Griffith's MacBook (USAO_008793-008794).

Attached are copies of the resumes of Victoria R. Tenpenny, Nicole C. Kwasnaza, Christian M. Isolda, Ramiro E. Mendez, and Peter R. Conroy. The resume of Louis DiOrio will follow under separate cover.

<u>Conclusion and Reciprocal Disclosure</u>

In light of your request for the foregoing notice, the Government hereby requests reciprocal notice under Fed. R. Crim. P. 16(b)(1)(C). In addition, the Government reiterates its request for reciprocal disclosure of any results or reports of physical or mental examinations and of scientific tests or experiments made in connection with this case, or copies thereof, which are in the defendant's possession or control, and which the defendant intends to introduce as evidence or otherwise rely on at trial or which were prepared by a witness whom the defendant intends to call at trial.

The Government also reiterates its request that the defendant disclose prior statements of witnesses he will call to testify, including expert witnesses. *See* Fed. R. Crim. P. 26.2; *United States v. Nobles*, 422 U.S. 225 (1975). We request that such material be provided on the same basis upon which we agree to supply the defendant with 3500 material relating to Government witnesses.

Very truly yours,

AUDREY STRAUSS
United States Attorney


By: /s _____
       Kimberly J. Ravener
       Kyle A. Wirshba
       Assistant United States Attorneys
       (212) 637-2358 / 2493

Exhibit B

Updated: Mar. 2021

# CELESTE L. ARRINGTON

The George Washington University



## ACADEMIC POSITIONS

**The George Washington University**
*Korea Foundation Associate Professor of Political Science and International Affairs* 2020 – present
*Korea Foundation Assistant Professor of Political Science and International Affairs*, 2012 – 2020
Core Faculty, GW Institute for Korean Studies

**Program in Law and Public Affairs, Princeton University**
*Fellow*, 2017 – 2018

**Institute for Advanced Study**, Princeton, NJ
*Ginny and Robert Loughlin Founders' Circle Member*, School of Social Science, 2011 – 2012

**Program on U.S.-Japan Relations, Harvard University**
*Advanced Research Fellow*, 2010 – 2011

## EDUCATION

**University of California, Berkeley**                      Ph.D., Political Science, 2010

**University of Cambridge, Trinity College**               MPhil, Japanese Studies, 2004

**Princeton University**                                   A.B., *Summa cum Laude*
Woodrow Wilson School of Public and International Affairs; certificate in East Asian Studies, 2003

## BOOKS AND MANUSCRIPTS IN PROGRESS

*Accidental Activists: Victim Movements and Government Accountability in Japan and South Korea* (Ithaca: Cornell University Press, 2016).
Part of the Studies of the Weatherhead East Asian Institute publication series at Columbia University. Reviewed in *Mobilization, Journal of Asian Studies, Pacific Affairs, Asian Journal of Law and Society, Japanese Law in the Asia-Pacific, Journal of Japanese Studies, International Studies Review, Global Asia, Social Science Japan Journal, Political and Legal Anthropology Review*

*From Manners to Rules: Activism for Legalistic Policy Solutions in South Korea and Japan* (monograph, under contract with Cambridge University Press, Studies in Law and Society).

*Rights Claiming in South Korea*, co-edited with Patricia Goedde (New York: Cambridge University Press, 2021).

## PEER-REVIEWED ARTICLES

"Insider Activists and Secondhand Smoke Countermeasures in Japan," *Asian Survey* 61, no. 4 (July/August 2021).

"Cause Lawyering and Movement Tactics: Disability Rights Movements in South Korea and Japan," with Yong-il Moon, *Law & Policy* 42, no. 1 (January 2020): 5-30.

"The Mechanisms behind Litigation's 'Radiating Effects': Historical Grievances against Japan," *Law & Society Review* 53, no. 1 (March 2019): 6-40.

"Hiding in Plain Sight: Pseudonymity and Participation in Legal Mobilization," *Comparative Political Studies* (online first May 10, 2018), 52, no. 2 (Feb. 2019): 310-341.

"The Mutual Constitution of the Abductions and North Korean Human Rights Issues in Japan and Internationally," *Pacific Affairs* 91, no. 3 (September 2018): 471-498.

"The Access Paradox: Media Environment Diversity and Coverage of Activist Groups in Japan and Korea," *Journal of East Asian Studies* 17, no. 1 (March 2017): 69-93.

"Leprosy, Legal Mobilization, and the Public Sphere in Japan and South Korea," *Law & Society Review* 48, no. 3 (Sept. 2014): 563-93.

"The Abductions Issue in Japan and South Korea: Ten Years after Pyongyang's Admission," *International Journal of Korean Studies* 17, no. 2 (Spring/Summer 2013): 108-39.

"The Politics of NGOs and Democratic Governance in South Korea and Japan," with Lee Sook-Jong, *Pacific Focus* 23, no. 1 (April 2008): 75-96.

"Democratization and Changing Anti-American Sentiments in South Korea," with Oh Chang Hun, *Asian Survey* 47, no. 2 (March/ April 2007): 327-50.

## PEER-REVIEWED CHAPTERS IN EDITED VOLUMES & PROCEEDINGS

"Legal Mobilization and the Transformation of State-Society Relations in the Realm of Disability Policy in Korea," in *Civil Society and the State in Post High Growth East Asia*, edited by David Chiavacci, Simona Grano, and Julia Obinger (Amsterdam University Press, 2020): 297-323.

"How to Analyze Data: Qualitative Content and Frame Analysis," in *Studying Japan: Research Design, Fieldwork, and Methods*, edited by Nora Kottmann and Cornelia Reiher (Nomos Verlag, 2020): 349-362.

"Linking Abductee Activism and North Korean Human Rights Advocacy in Japan and Abroad," in Andrew Yeo and Danielle Chubb, eds. *North Korean Human Rights: Activists and Networks* (Cambridge University Press, 2018): 85-108.

"The Public Sphere in South Korea: Civil Society, the Media, and Democracy," *Asian Journal of International Studies*, Special Issue: Proceedings of the Second Workshop on Korean Studies (II) 22 (2017): 47-64.

"Japan-South Korea Relations and Litigation," in *Challenges Facing Japan*, (Washington: The Maureen and Mike Mansfield Foundation, 2014): 11-20.

## WORKS IN PROGRESS

"Bottom-Up Drivers of Institutional Change: Legal Mobilization and Disability Rights in South Korea and Japan" (under review).

"From Good Will to Rules: Disability Rights and Activism in South Korea and Japan," for *Current History*.

"Mobility Rights and Contention in South Korea and Japan," (working paper).

## BOOK REVIEWS

Review of "Japanese Society and the Politics of the North Korean Threat," by Seung Hyok Lee (2016), *Journal of Japanese Studies* 45, no. 1 (Winter 2019): 173-178.

Review of "Curative Violence: Rehabilitating Disability, Gender, and Sexuality in Modern Korea," by Eunjung Kim (2017), *Pacific Affairs* 91, no. 1 (March 2018): 172-174.

2

Review of "Making We the People: Democratic Constitutional Founding in Postwar Japan and South Korea," by Chaihark Hahm and Sung Ho Kim (2015), *Pacific Affairs* 90, no. 2 (June 2017).

Review of "Witness to Transformation: Refugee Insights into North Korea," by Stephan Haggard and Marcus Noland (2011), *Political Science Quarterly* 126, No. 4 (Winter 2011 – 2012): 682-83.

## OTHER WRITING

"Japan and South Korea Can't Get Along: Why America Needs to Help Its Allies Mend Fences," *Foreign Affairs* (with Andrew Yeo) (July 31, 2019).

"Japan claims it's restricting exports to South Korea because of 'national security.' Here's the real reason why." The Monkey Cage, *The Washington Post* (July 18, 2019).

"Abe is Aching for a Seat at the Table," *East Asia Forum* (with Isozaki Atsuhito), http://www.eastasiaforum.org/2018/07/19/abe-is-aching-for-a-seat-at-the-table/ (July 19, 2018).

"South Korea ended its review of its 'comfort women' deal with Japan. Here's what you need to know," The Monkey Cage, *The Washington Post* (Jan. 11, 2018).

"Episode 7: New Voices in the Struggle over History," *Council on Foreign Relations Podcast*, Dec. 5, 2017, https://www.cfr.org/podcasts/episode-7-new-voices-struggle-over-history.

"South Koreans will elect a new president on Tuesday. Here's what to expect," with See-Won Byun, The Monkey Cage, *The Washington Post* (May 7, 2017).

"South Korea's president was impeached. North Korea is increasingly threatening. Here's what you need to know," The Monkey Cage, *The Washington Post* (March 12, 2017).

"South Korea's president was just impeached. This is what it means and what comes next," The Monkey Cage, *The Washington Post* (Dec. 12, 2016).

"Can Japan and Korea 'Resolve' the Question of Japan's Korean Sex Slaves during WWII?" The Monkey Cage, *The Washington Post* (Jan. 13, 2016).

## GRANTS, FELLOWSHIPS, & AWARDS

| | |
|---|---|
| SSRC Research Fellowship | 2020 – 2021 |
| Fellow at the Princeton University Program in Law and Public Affairs | 2017 |
| Association for Korean Studies, 5-year grant—core faculty, GW Institute for Korean Studies (GWIKS) | 2016 |
| SOAR Faculty Research Fund, Elliott School—The George Washington University | 2016 |
| Korea Foundation Field Research Fellowship (declined) | 2016 |
| University Facilitating Fund—The George Washington University | 2015 – 2016 |
| Summer Research Grant, Sigur Center for Asian Studies—GWU | 2015 |
| Policy Research Scholar, GWIPP—GWU | 2013 – 2014 |
| Summer Research Grant, Sigur Center for Asian Studies—GWU | 2013 |
| Member of Cohort I, U.S.-Korea Scholar-Policymaker Nexus—Mansfield Foundation | 2013 – 2015 |
| Summer Research Grant, Sigur Center for Asian Studies—GWU | 2012 |
| Member of Cohort II, U.S.-Japan Network for the Future Program—Mansfield Foundation | 2012 – 2014 |
| Member, School of Social Science—Institute for Advanced Study | 2011 – 2012 |
| Advanced Research Fellow, Program on U.S.-Japan Relations—Harvard University | 2010 – 2011 |
| Center for Japanese Studies, Dissertation Fellowship—UC Berkeley | 2009 – 2010 |

| | |
|---|---|
| Fulbright IIE Fellowship for Japan—Graduate Research Fellow, University of Tokyo | 2008 – 2009 |
| Dean's Fellowship—UC Berkeley | 2007 – 2008 |
| Harvey Fellowship—Mustard Seed Foundation | 2006 – 2009 |
| Foreign Language and Area Studies (FLAS) Fellowship for Korean—UC Berkeley | 2006 – 2007 |
| Center for Japanese Studies, Summer Language Funding—UC Berkeley | 2006 |
| Foreign Language and Area Studies (FLAS) Fellowship for Korean—UC Berkeley | 2005 – 2006 |
| Boren Graduate Fellowship, National Security Education Program for Korean | 2004 – 2006 |
| Foreign Language and Area Studies (FLAS) Fellowship for Japanese—UC Berkeley | 2004 – 2005 |
| Marjory Chadwick Buchanan Senior Thesis Prize—Princeton University | 2003 |
| Elected to Phi Beta Kappa—Princeton University | 2003 |
| All-Ivy Academic Honors—Princeton University | 2003 |
| National Scholar-Athlete Award—NCAA Division I, Women's Rowing, Princeton | 2002 & 2003 |
| R.W. van de Velde Award—Woodrow Wilson School, Princeton | 2002 |

## INVITED TALKS & WORKSHOPS

| | |
|---|---|
| 2020 | University of Pennsylvania, Center for East Asian Studies |
| 2020 | Syracuse University, Moynihan Institute of Global Affairs |
| 2020 | Loyola Marymount University, Global Policy Institute |
| 2019 | University of Michigan, Bridging Methodological Divides in Japanese Studies. |
| 2019 | University of Michigan, Nam Center for Korean Studies and Center for Japanese Studies. |
| 2019 | Freie Universität Berlin, International Conference on Studying Japan. |
| 2019 | Temple University, Comparative Politics Colloquium. |
| 2018 | Center for the Study of Law and Society, University of California, Berkeley. |
| 2018 | GW Institute for Korean Studies Signature Conference: The Evolution of Rights in Korea (co-organizer). |
| 2018 | New York University Law School. |
| 2018 | Princeton University, Program in Law and Public Affairs, LAPA Seminar. |
| 2018 | Texas Christian University. |
| 2017 | Wesleyan University, the Catalyst Conference on East Asian Studies. |
| 2017 | U.S. Department of State, Analytic Exchange. |
| 2017 | Wilson Center, Asia Program. |
| 2017 | Truth and Human Rights in North Korea (THiNK), George Washington University. |
| 2017 | Mansfield Foundation, Capitol Hill Dialogue, Japan-U.S. Task Force on New Approach to the DPRK. |
| 2016 | Princeton University, Program in Law and Public Affairs and the Qualitative Research Colloquium. |
| 2016 | Foreign Affairs Congressional Staff Association and Wilson Center, Korean History and Public Policy. |
| 2016 | Harvard University, Program on U.S.-Japan Relations. |
| 2016 | Council on Foreign Relations, Roundtable on Northeast Asian Nationalisms and Alliance Management. |
| 2015 | Kyung Hee University, South Korea. |
| 2014 | Capitol Hill and Mansfield Foundation, Challenges Facing Japan. |
| 2013 | Ministry of Unification, International Conference on Korean Unification and International Cooperation. |
| 2013 | Johns Hopkins University SAIS, Reischauer Center for East Asian Studies Seminar Series. |
| 2012 | University of Pennsylvania, Law School. |
| 2012 | Institute for Advanced Study, School of Social Sciences Lunch Seminar. |
| 2011 | University of California, Berkeley, Workshop on Korean Studies. |
| 2011 | Harvard University, Japanese Contemporary Politics Study Group. |
| 2011 | University of Southern California, Rising Stars of Korean Studies Workshop. |
| 2010 | Harvard University, Program on U.S.-Japan Relations Seminar. |
| 2010 | Wellesley College. |
| 2010 | University of Southern California, West Coast Workshop on International Relations in East Asia. |
| 2009 | U.S. Embassy, Tokyo. |
| 2009 | Chuo University, Japan. |

4

2008     Sophia University, Japan.

## CONFERENCE PAPERS & OTHER PRESENTATIONS

"Cause Lawyering: Infrastructures for Using and Changing Legal Opportunities in South Korea and Japan," paper presented at the Annual Meeting of the Law and Society Association, June 1, 2019.

"Disability Rights and Evolving Legal Opportunity Structures in South Korea and Japan," Comparative Politics Symposium, Temple University, April 15, 2019.

"Disability Rights Movements, Lawyers, and Tactical Innovation in Japan and South Korea," paper presented at the Annual Meeting of the International Studies Association, March 29, 2019.

"Rights Refracted: Disability Rights Diffusion and Evolving Legal Opportunity Structures in South Korea and Japan," Center for the Study of Law and Society, UC Berkeley, Oct. 22, 2018.

"Evolving Legal Opportunity Structures in South Korea," paper presented at *The Evolution of Rights in Korea*, a conference I co-organized at the GW-Institute for Korean Studies, April 20-21, 2018.

"Legal Opportunity Structures and Political Participation through the Courts in South Korea," paper presented at the Annual Meeting of the Association for Asian Studies, March 23-26, 2018.

"The Past in Present-Day East Asian Politics," Texas Christian University, March 8, 2018.

"The Radiating Effects of Litigation Related to Historical Grievances against Japan," paper presented at *Korea on Trial: Law and Justice in the Face of Violence*, University of Pennsylvania, April 28, 2017.

"Rights Activism and Legislation for Persons with Disabilities in Japan and Korea," Annual Meeting of the American Political Science Association, Sept. 1-4, 2016 (with Yong-il Moon).

"Lawyers' Networks and Policy Change in Japan and South Korea," Annual Meeting of the Association for Asian Studies, March 31 – April 3, 2016.

"Court-Based Conflicts and Cross-National Cooperation," paper presented on a panel that I organized ("Japan: A Swing to the Right?") for the Meeting of the Association for Asian Studies, March 26 – 29, 2015.

"Mobilizing Support for the Sick: South Korean and Japanese Patient Activism in the Digital Era," paper presented on a panel that I organized ("Activism in East Asia in the Digital Age") for the Annual Meeting of the American Political Science Association, Aug. 28 – 31, 2014.

"Names and Namelessness: Plaintiff Anonymity and Legal Mobilization in Japan and Korea," Annual Meeting of the Law and Society Association, May 30 – June 2, 2013.

"Legal Mobilization in Japan: Using Litigation to Influence Policy-Making," Annual Meeting of the American Political Science Association, Sept. 1 – 4, 2011.

"Transnational Legal Mobilization: Japanese Cause Lawyers and Leprosy Redress Movements in East Asia," Annual Meeting of the Law and Society Association, June 2 – 4, 2011.

"State Accountability and Responsiveness to Victim Redress Movements in South Korea and Japan," Annual Meeting of the American Political Science Association, Sept. 2 – Sept. 5, 2010.

"Interest Group Influence in Policy-Making Processes: Comparing the Abductions Issue and North Korea Policy in Japan and South Korea," Annual Meeting of the American Political Science Association, 2007.

## SELECT MEDIA CONTRIBUTIONS & APPEARANCES

*The New York Times*, Nov. 3, 2017; Sept. 19, 2018; Aug. 1, 2019.
*The Washington Post*, Sept. 21, 2017.
*Los Angeles Times*, Aug. 17, 2019.
*Bloomberg*, Aug. 27, 2017.
*PRI*: Nov. 8, 2017; Nov. 17, 2020.
*Deutsche Welle*, Aug. 26, 2017.
*Canadian Broadcasting* Corporation, June 21, 2017, January 2018.
*NHK*: television interview, May 9, 2017.
*Yonhap*: Nov. 2, 2020; Jan. 20, 2021.
*Kyodo News*: profile and interview, Jan. 17, 2017.
*Korea Times*: July 26, 2019.
*WUSA9* live television interview on *Off Script* 7pm news: April 14, 2017.
*NPR*: live interview on AirTalk with Larry Mantle, June 12, 2018.
*Hearst TV*: television interview, July 3, 2018.
*Arirang News*: television interview, Dec. 23, 2019.
*DongA Ilbo*: May 29, 2013; March 18, 2015; March 10, 2017.
*Chosun Ilbo*: Jan. 11, 2017.
*Hankook Ilbo*: July 16, 2019.
*Tokyo Shimbun*: May 10, 2017.
*Chūnichi Shimbun*, May 13, 2017.
*Ryukyu Shimpo*: May 10, 2017.
*Hokkaido Shimbun*: May 12, 2017.
*Nishi Nippon Shimbun*: March 8, 2017; May 25, 2017; July 2, 2017.
*South China Morning Post*, Nov. 22, 2018.
*Christian Science Monitor*: Feb. 13, 2017.
*Voice of America*, March 8, 2017; Sept. 12, 2018; March 20, 2019.
*Radio Free Asia*: Sept.12, 2012; April 10, 2013; Oct. 25, 2016; March 27, 2017; Aug. 14, 2019.

## TEACHING

**The George Washington University**
 *Politics in the Two Koreas (undergraduate)*
 *Korean Politics (master's students)*
 *States and Societies in East Asia (master's students)*
 *State-Society Relations in East Asia ("writing-in-the-discipline" seminar)*
 *Protest and Participation in East Asia ("writing-in-the-discipline" seminar)*
 *Social Movements (doctoral)*

**Harvard University**
 *Human Rights and Democracy in East Asia (junior research seminar)*—lecturer

**University of California, Berkeley**
 *Northeast Asian Politics: Japan*—teaching assistant for Steven K. Vogel
 *Introduction to International Relations*—teaching assistant for Amy Gurowitz
 *The Politics of Japan*—teaching assistant for T.J. Pempel

## TRAINING & PROFESSIONAL EXPERIENCE

| | |
|---|---|
| **Foreign Expert, Korean Unification for Junior International Experts**—Seoul | July 2013 |
| **Graduate Student Researcher for Prof. Steven K. Vogel**—UC Berkeley | 2009 – 2010 |

Updated: Mar. 2021

| | |
|---|---|
| **Visiting Research Fellow, Institute of Social Science—**University of Tokyo | 2008 – 2009 |
| **Inter-University Center for Japanese Language Studies—**Yokohama, Japan | Summer 2006 |
| **Yonsei University, Korean Language Institute—**Summer Special Program | Summer 2005 |
| **Editorial Intern at the Arms Control Association (ACA)—**Washington, DC | Summer 2002 |
| **Public Affairs Intern, U.S. Embassy in Tokyo, Japan—**Tokyo American Center (TAC) | Summer 2001 |
| **Princeton in Ishikawa, Japan—**Japanese Language Program | Summer 2000 |

## FOREIGN LANGUAGES

| | | |
|---|---|---|
| **Japanese**—advanced | **German, Swiss-German**—fluent | **Greek**—proficient |
| **Korean**—advanced | **French**—fluent | **Italian**—proficient |

## PROFESSIONAL AFFILIATIONS & OTHER ACTIVITIES

| | |
|---|---|
| **Editorial Board Member—***Asian Survey* | 2019 – present |
| *Social Science Japan Journal* | 2020 – present |
| **Governing Board Member, Association of Korean Political Science** | 2019 – 2022 |
| **Program Chair for APSA—**Association of Korean Political Science | 2019 – 2021 |

**Manuscript Reviewer—***World Politics, Comparative Political Studies, Law & Society Review, Journal of Asian Studies, International Relations of the Asia Pacific, Routledge, Pacific Affairs, PS: Political Science & Politics, Journal of Japanese Political Science, Korea Journal, Indiana Journal of Global Legal Studies, Law & Social Inquiry, Historia Scientarium, Korea Observer.*

| | |
|---|---|
| **Comparative Politics Workshop, George Washington University—**co-organizer | 2016-17, 2018-20 |
| **Institute for Korean Studies, George Washington University—**core faculty | 2016 – present |

**Member—**American Political Science Association, Law & Society Association, Association for Asian Studies, International Studies Association

**Member—**Mansfield Foundation's U.S.-Japan Network for the Future (Cohort II) and Mansfield/ Korea Foundation/ CSIS U.S.-Korea Scholar-Policymaker Nexus (2013-15)

| | |
|---|---|
| **Harvard Contemporary Japanese Politics Study Group—**member | 2010 – 2011 |
| **Japanese Politics Study Group—**UC Berkeley | 2004 – 2010 |
| **Young Leaders' Program, Pacific Forum, CSIS** | 2005 – 2007 |
| **Royal Institute for International Affairs, Korea and Japan Discussion Groups** | 2003 – 2004 |

7

Exhibit C

# POLITICS IN THE TWO KOREAS                    PSC 2368

Wed. & Fri. 11:10 a.m. – 12:25 p.m.            Professor Celeste Arrington
Spring 2021                                    ███████████

Taught online
Office hours: ████████████████████████████████████████████
Remote Office: ████████████████████████████
Office hours sign-up: ██████████████████████████

## Course Description

In this course, we will examine political institutions, political processes, and policy issues in South Korea (the Republic of Korea, ROK) and North Korea (the Democratic People's Republic of Korea, DPRK). We will trace the evolution of political institutions and examine the legacies of Japanese colonial rule, national division, and authoritarian rule. Topics include authoritarianism and democratization (or lack thereof), economic development, political participation, civil society, and policy making. In the final part of the semester, our focus will turn to inter-Korean relations and regional security. We will examine issues related to North Korea's nuclear and missile programs, illicit activities, and human rights, as well as dialogue, sanctions, and the possibility of unification.

## Learning Outcomes

1. Effectively access, use, and assess Korea-related information resources through both GW's libraries and the Internet more broadly
2. Evaluate the strengths and weaknesses of various explanations social scientists have proposed for dynamics related to political institutions, socioeconomic development, and policy outcomes in both Koreas
3. Engage critically in policy and academic debates about politics on the Korean Peninsula, applying key theoretical concepts from comparative politics and international relations
4. Improve your ability to write and speak about political institutions and processes
5. Develop an abiding interest in the future of the Korean peninsula

## Requirements (for details see below)

1. Discussion forum postings—4 times per semester with 4 posts each time (20%)
2. Class participation (15%)
3. Map quiz (5%)—online by 5 p.m. on Jan. 22
4. Policy analysis paper (25%)—due by email by 11 a.m. on March 31
5. Book presentation (10%)—in class on April 14 and 16
6. Final exam (25%)—"take home" open book, to be completed within 24 hrs of final date

1

**Class Meetings**

Unless otherwise noted, all class sessions will take place synchronously in our WF 11:10 a.m. to 12:25 p.m. timeslot via Zoom within Blackboard. Click on the Zoom Class Meeting link on the Blackboard toolbar. The classroom passcode is 2KoreasGW. All sessions will be recorded and saved to the cloud, which is accessible via the Zoom Classroom Link on Blackboard.

Class will involve a mixture of lectures (most synchronous, some pre-recorded), small-group activities, discussions, presentations, and films. Attendance and participation are expected.

**Required Readings and Blackboard**

All readings are on Blackboard. There are no required textbooks that must be purchased for this course. The required readings complement the lectures and serve as a basis for online discussion. Both lectures and readings will be covered on the exam and should be integrated into discussion forum posts and your paper. **Complete all assigned readings before the first class of each week.**

The course syllabus, assignment instructions, helpful citations guides, links to Korean news media, and the discussion forum are on Blackboard. Check Blackboard regularly.

Use Blackboard to access links to the virtual classroom for synchronous learning and links to pre-recorded content for asynchronous learning. I will also make announcements via email.

**Course Requirements and Grading**

**Discussion Board Postings—one new thread by Mon. 5pm and three replies by Tues. 5pm:** Each week, one third of the students (divided alphabetically) will post comments on Blackboard. Thus, you will post four times over the course of the semester. You should post <u>one new thread in the week's discussion forum by Monday at 5 pm and reply to at least three classmates' threads by 5 pm on Tuesday</u>. Each post (including your replies) should be one to two paragraphs (about 200 words) and utilize evidence or findings from course readings and related current events/news stories. Make sure all comments are thoughtful and substantive, and cite your sources in text (e.g., Y. Lee 2009, 34). Proofread all posts since these are pieces of writing. Remember that a human being wrote each post. Be respectful. The discussion forum is intended to maintain engagement, facilitate in-class discussion, and build community. Postings are worth 20% of your final grade.

**Participation**: You will get the most out of this class if you attend every class and come prepared to participate actively. High-quality participation entails completing all readings and assignments on time, articulating thoughtful questions and insights about the readings to class, listening respectfully to your classmates, and adding your ideas to our discussion forum and shared notes in class. Sign in to our virtual classroom on time for synchronous learning and keep your video on to be engaged. Participation counts for 15% of your final grade.

**Policy Analysis Paper (30% of your final grade)—Due March 31**
For this assignment you will write a 6-page essay (max 2,000 words) analyzing the politics of a particular policy area, such as disaster management, North Korea's nuclear program, or inter-Korean dialogue. You should focus on a specific issue (e.g., prosecutorial reform, COVID management, unemployment, low birth rates, housing prices, sanctions enforcement or relief, disaster relief, etc.) that is being discussed in Korea during the semester. Base your analysis mainly on course readings, government websites, and relevant news stories that you gather from quality newspapers and magazines (refer to the links on Blackboard). Rather than advocating for a particular policy, use insights from course readings and lectures to deconstruct the political dynamics of the issue. For example, what government agencies, political parties, interest groups, and civil society actors are involved in policymaking? What interests do they bring to the debate and how do their interactions explain outcomes? What historical factors affect policymaking in this area? How have the politics of this policy changed over time? **Incorporate at least five course readings and fifteen media and/or government sources to support your analysis**. Start reading Korea-related news coverage as soon as possible to choose a topic and begin gathering relevant articles. Further instructions are on Blackboard. **Please clear your topic with me by Week 5.**

**GW's Korean Studies Research Guide**: ███████████████████
**GW's Korea Librarian**: ███████████████

**Book Presentation—In class on April 14 and 16**
In mid-April, groups of students will present different books related to North Korea to the class. Detailed instructions are on Blackboard. The books (listed below) include refugees'/defectors' memoirs, journalistic accounts, and a former U.S. soldier's story. They contain different perspectives on politics, the state, and life in the DPRK and the human rights situation in the North. The presentations are worth 10% of your final grade. All members of the group will receive the same grade. You will get to choose the book mid-semester.

**Extra Credit:** Attend a Korea-related public lecture (GWIKS or think tanks) and write a page linking it to course readings—in detail with citations (up to 5 times, up to 5% of total grade).

**Course Policies**
Etiquette for the virtual classroom: Mute yourself and keep your video on during class to show yourself present and engaged. Unmute yourself only to speak. For the sake of your own and classmates' learning, minimize distractions in the space from which you are virtually joining class. Avoid inappropriate attire or locations, walking around, conversing with others (even on mute), etc. To obtain the best connection quality, turn off other programs and devices that may be using your Internet. Conduct yourself as you would in a professional environment and show respect to your classmates. Please email me if you must miss part or all of class or if you have any concerns.

Formatting Written Work: Submit all written work in Times New Roman, 12-point font, and double-spaced with one-inch margins and page numbers. Use APA or Chicago style guidelines.

3

<u>Late Assignments</u>: Papers will be docked by 1/3 of a grade (i.e., from a B+ to a B) for each day.

<u>Grade Disputes:</u> All grade disputes must be submitted to me in writing.

**Average amount of out-of-class learning expected:** 5 hours minimum per week.

**Academic Integrity Code**
Do your own work. Academic dishonesty is defined as cheating of any kind, including misrepresenting one's own work, taking credit for the work of others without crediting them and without appropriate authorization, and the fabrication of information. For details and complete code, see: studentconduct.gwu.edu/code-academic-integrity.

The University's "Guide of Academic Integrity in Online Learning Environments" is available at studentconduct.gwu.edu/guide-academic-integrity-online-learning-environments. Consult me if you have any questions about what constitutes proper use of published or unpublished sources.

**University Policy on Observance of Religious Holidays**
In accordance with University policy, students should notify faculty during the first week of the semester of their intention to be absent from class on their day(s) of religious observance. For details and policy, see: students.gwu.edu/accommodations-religious-holidays.

**Support for Students Outside the Classroom**
**Writing Center:** GW's Writing Center cultivates confident writers in the University community by facilitating collaborative, critical, and inclusive conversations at all stages of the writing process. Working alongside peer mentors, writers develop strategies to write independently in academic and public settings. Appointments can be booked online. See https://gwu.mywconline.com/.

**Virtual Academic Support:** A full range of academic support is offered virtually in fall 2020. See coronavirus.gwu.edu/top-faqs for updates. Writing and research consultations are available online. See academiccommons.gwu.edu/writing-research-help.

**Academic Commons:** Academic Commons provides tutoring and other academic support resources to students in many courses. Students can schedule virtual one-on-one appointments or attend virtual drop-in sessions. Students may schedule an appointment, review the tutoring schedule, or access other academic support resources at academiccommons.gwu.edu. For assistance contact academiccommons@gwu.edu.

**Disability Support Services (DSS)** 202-994-8250: Any student who may need an accommodation based on the potential impact of a disability should contact Disability Support Services to establish eligibility and to coordinate reasonable accommodations. For more information, see: https://disabilitysupport.gwu.edu/.

**Counseling and Psychological Services 202-994-5300:** GW's Colonial Health Center GW's Colonial Health Center offers counseling and psychological services, supporting mental health and personal development by collaborating directly with students to overcome challenges and difficulties that may interfere with academic, emotional, and personal success. For additional information, see: https://healthcenter.gwu.edu/counseling-and-psychological-services.

4

<u>**Course Topics and Reading Assignments**</u>

**Week 1: Jan. 13 & 15—Introduction and Japanese Colonial Rule**

Michael J. Seth, *A Concise History of Korea*, 3rd edition, (Lanham: Rowman & Littlefield, 2020): 285-326. (whole book available online via Gelman)


<u>PART I: THE EMERGENCE OF TWO KOREAS</u>

**Week 2: Jan. 22—Liberation and National Division**

*(no class Jan. 20: Inauguration Day)*

*Map quiz: take it online on Blackboard on Jan. 22*

Michael E. Robinson, *Korea's Twentieth Century Odyssey* (Honolulu: University of Hawai'i Press, 2007): 100-120.

William Stueck, *Rethinking the Korean War* (Princeton University Press, 2002): 61-83.

*Film: Memory of Forgotten War (stream via Blackboard before class)*


**Week 3: Jan. 27 & 29—Authoritarianisms**

*Jan. 25 @ 2pm: Attend GWIKS Lecture, "Dictator's Modernity Dilemma," Joan Cho*

Gregg Brazinsky, *Nation Building in South Korea: Koreans, Americans, and the Making of a Democracy* (Chapel Hill: University of North Carolina Press, 2007): 13-40 (1-11 are optional).

Seung-mi Han, "The New Community Movement: Park Chung-Hee and the Making of State Populism in Korea," *Pacific Affairs* 77, no. 1 (2004): 69-93.

Wonjun Song and Joseph Wright, "The North Korean Autocracy in Comparative Perspective," *Journal of East Asian Studies* 18, no. 2 (July 2018): 157-80.


**Week 4: Feb. 3 & 5—Economic Growth and the State**

Yong-Chool Ha and Myung-koo Kang, "Creating a Capable Bureaucracy with Loyalists: The Internal Dynamics of the South Korean Developmental State, 1948-1979," *Comparative Political Studies* 44, no. 1 (Jan. 2011): 78-108.

Michael J. Seth, *A Concise History of Modern Korea*, 3rd edition, (Lanham: Rowman & Littlefield, 2020): 363-398.

(OPTIONAL) David C. Kang, "Bad Loans to Good Friends: Money Politics and the Developmental State in South Korea," *International Organization* 56, no. 1 (Winter 2002): 177-207.

**Week 5: Feb. 10 & 12—Democratic Transition in the ROK**

Joan E. Cho and Paul Y. Chang, "Socioeconomic Foundations of South Korea's Democracy Movement" in Youna Kim (ed.), *Routledge Handbook of Korean Culture and Society: A Global Approach* (London: Routledge, 2016): 63-75.

A. David Adesnik and Sunhyuk Kim, "South Korea: The Puzzle of Two Transitions," in *Transitions to Democracy: A Comparative Perspective*, Kathryn Stoner and Michael McFaul, eds., (Baltimore: Johns Hopkins University Press, 2013): 266-98.

**PART II: POLITICAL INSTITUTIONS AND PROCESSES**

**Week 6: Feb. 17 & 19—South Korea's Electoral Politics and Policymaking**

Olli Hellmann, "Party System without Parties: Evidence from Korea," *Journal of East Asian Studies* 14, no. 1 (Jan.-Apr. 2014): 53-84.

Jiso Yoon, *Advocacy and Policymaking in South Korea* (SUNY Press, 2016): 1-10, 35-56.

**Week 7: Feb. 24 & 26—Civil Society and Contentious Politics in South Korea**

Youngho Cho, Mi-Son Kim, and Yong Cheol Kim, "Cultural Foundations of Contentious Democracy in South Korea: What Type of Democracy Do Korean Citizens Prefer?" *Asian Survey* 59, no. 2 (2019): 272-294.

Sunhyuk Kim and Jong-Ho Jeong, "Historical Development of Civil Society in Korea Since 1987," Journal of International and Area Studies 24, no. 2 (2017): 1-14.

Nan Kim, "Candlelight and the Yellow Ribbon: Catalyzing Re-Democratization in South Korea," *The Asia-Pacific Journal* 15, no. 14-5 (July 2017): 1-17.

**Week 8: Mar. 3 & 5—The Courts in Korean Politics**

Jongcheol Kim, "Courts in the Republic of Korea: Featuring a Built-in Authoritarian Legacy of Centralization and Bureaucratization," in Jiunn-rong Yeh and Wen-Chen Chang, eds. *Asian Courts in Context* (Cambridge University Press, 2014): 112-42.

Jaewon Kim, "South Korea: Reshaping the Legal Profession," in Richard Abel, ed. *Lawyers in the 21st Century Vol. 1* (Hart Publishing, 2020): 789-800.

**Week 9: Mar. 10 & 12—Understanding DPRK Policymaking**

Patrick McEachern, "Centralizing North Korean Policymaking under Kim Jong Un," *Asian Perspective* 43, no. 1 (Winter 2019): 35-67.

John Ishiyama and Taekbin Kim, "Authoritarian Survival Strategies and Elite Churn: the Case of North Korea," *International Area Studies Review* 23:2 (2020): 160-76.

(OPTIONAL) Patrick McEachern, "Interest Groups in North Korean Politics," *Journal of East Asian Studies* 8, no. 2 (May-Aug. 2008): 235-258.

***Spring Break: March 15 – 19 (no class)***

**Week 10: Mar. 24 & 26—Famine, Marketization, & Political Participation in the DPRK**

Hazel Smith, *North Korea: Markets and Military Rule* (Cambridge: Cambridge University Press, 2015): 186-234.

Andrei Nikolaevich Lankov, In-ok Kwak, and Choong-Bun Cho, "The Organizational Life: Daily Surveillance and Daily Resistance in North Korea," *Journal of East Asian Studies* 12, no. 2 (May-Aug. 2012): 193-214.

Stephan Haggard and Marcus Noland, *Witness to Transformation: Refugee Insights into North Korea* (Washington DC: The Peterson Institute for International Economy Press, 2011): 101-117.

(SKIM) Nat Kretchun et al., "Compromising Connectivity," InterMedia, (Feb. 2017) http://www.intermedia.org/wp-content/uploads/2017/02/Compromising-Connectivity-Final-Report_Soft-Copy.pdf.

7

**P**ART **III: I**NTER-**K**OREAN **R**ELATIONS AND THE **F**UTURE OF THE **K**OREAN **P**ENINSULA

**Week 11: Mar. 31 & Apr. 2—The North Korean Issue and Regional Security**

    *Policy analysis papers due—March 31 @ 11am*

    **Guests (3/31): Emma Chanlett-Avery and Mark Manyin, CRS**

    Hazel Smith, "Bad, Mad, Sad, or Rational Actor?: Why the 'Securitization' Paradigm Makes for Poor Policy Analysis of north Korea," *International Affairs* 76, no. 3 (2000): 593-617.

    Eleanor Albert, "North Korea's Military Capabilities," *Council on Foreign Relations Backgrounder*, https://www.cfr.org/backgrounder/north-koreas-military-capabilities.

    "(Summary) Report of the Commission of Inquiry on Human Rights in the Democratic People's Republic of Korea," UN General Assembly, A/HRC/25/63 (Feb. 7, 2014).

    (SKIM) Sheena Chestnut Greitens, "Illicit: North Korea's Evolving Operations to Earn Hard Currency," *Committee for Human Rights in North Korea* (2014).

**Week 12: Apr. 7 & 9—Pressure and Dialogue as Policies toward the DPRK**

    *April 6: attend Rights Claiming in South Korea Book Launch*

    **Guest (4/7): Mark Tokola, KEI**

    Stephan Haggard and Marcus Noland, *Hard Target: Sanctions, Inducements, and the Case of North Korea* (Palo Alto: Stanford University Press, 2017): 1-27.

    David C. Kang and Victor D. Cha, *Nuclear North Korea: A Debate on Engagement Strategies* (New York: Columbia University Press, 2018): 186-214.

    Justin V. Hastings, "The Complex Relationship between Sanctions and North Korea's Illicit Trade," *Asia Policy: National Bureau of Asian Research* 13, no. 3 (July 2018): 28-34.

**Week 13: Apr. 14 & 16—North Korea through Defectors' Eyes (*read <u>one</u> of the following*)**

    Kang Chol-Hwan and Pierre Rigoulot, trans. Yair Reiner, *The Aquariums of Pyongyang: Ten Years in the North Korean Gulag* (New York: Basic Books, 2001).

Charles Robert Jenkins, with Jim Frederick, *The Reluctant Communist: My Desertion, Court-Martial, and Forty-Year Imprisonment in North Korea* (Berkeley: University of California Press, 2008).

Barbara Demick, *Nothing to Envy: Ordinary Lives in North Korea* (New York: Spiegel & Grau, 2010).

Blaine Harden, *Escape from Camp 14* (New York: Penguin, 2012).

Jang Jin-sung, trans. Shirley Lee, *Dear Leader: Poet, Spy, Escapee—A Look Inside North Korea* (New York: Atria, 2014).

Yeonmi Park with Maryanne Vollers, *In Order to Live: A North Korean Girl's Journey to Freedom* (New York: Penguin Press, 2015).

Hyeonseo Lee with David John, *The Girl with Seven Names* (New York: Collins, 2016).

Masaji Ishikawa, trans. Risa Kobayashi, *A River in Darkness: One Man's Escape from North Korea* (Amazon Crossing, 2018).

## Week 14: Apr. 21 & 23—North-South Relations, Nationalism, and Unification

### Guest (4/21): Soojin Park, Wilson Center

Yangmo Ku, Inyeop Lee, and Jongseok Woo, *Politics in North and South Korea: Political Development, Economy, and Foreign Relations* (Routledge, 2018): 192-214.

Emma Campbell, "The End of Ethnic Nationalism? Changing Conceptions of National Identity and Belonging among Young South Koreans," *Nations and Nationalism* 21, no. 3 (2015): 483-502.

Asan Institute for Policy Studies, *South Korean Perceptions of the Denuclearization of North Korea*, (February 2019) http://en.asaninst.org/wp-content/themes/twentythirteen/action/dl.php?id=46669.

# Exhibit D

# KOBRE & KIM

800 Third Avenue
New York, New York 10022
www.kobrekim.com
Tel +1 212 488 1200

September 8, 2021

**BY ELECTRONIC MAIL AND FEDEX**

AUSA Kimberly Ravener
AUSA Kyle Wirshba
United States Attorney's Office
Southern District of New York
1 Saint Andrew's Plaza
New York, NY 10007

Re:     Demand for Testimony in *United States v. Virgil Griffith*

Dear Counsel:

As you know, we represent defendant Virgil Griffith in the criminal prosecution captioned *United States v. Virgil Griffith*, 20 Cr. 015 (PKC) brought by your office ("USAO-SDNY") in the Southern District of New York.[1]  As you also know, trial currently is scheduled to commence on September 27, 2021.

Pursuant to 28 C.F.R. § 16.23, we make a formal demand for the testimony of the following individuals, whom we understand to be current employees of the Federal Bureau of Investigation (the FBI):

- ███████████ ;

- ████████████ ;

- ██████████ ;

- ████████████ ; and

---

[1]  Given that the United States is a party to the proceeding underlying this request, and that it is being prosecuted by the USAO-SDNY, we have left out additional details regarding the nature of the charges, where the proceeding is to take place, etc.  If additional details are necessary for your or the originating component's representatives, we are happy to provide it.

**Americas** (New York, Buenos Aires, Chicago, Delaware, Miami, San Francisco, São Paulo, Washington DC)
**Asia-Pacific** (Hong Kong, Seoul, Shanghai), **EMEA** (London, Tel Aviv), **Offshore** (BVI, Cayman Islands)

Kobre & Kim refers to Kobre & Kim llp, a New York Limited Liability Partnership.

AUSAs Ravener and Wirshba
September 8, 2021
Page 2

- 

We also make a formal demand for the testimony of the following individuals, whom we understand to be employed by the Department of Justice's National Security Division ("NSD"):

- ███████████; and

- ███████████[2]

Enclosed please find copies of Rule 17 subpoenas directed to each employee.  Pursuant to 28 C.F.R. § 16.23(c), to the extent Mr. Griffith presents a defense case, we may seek to elicit testimony from one or more of these witnesses about the following topics:

- The FBI's assessment and enforcement of the North Korea Sanctions Regulations ("NKSR") as set forth at 31 C.F.R. 510, *et seq.*;

- The FBI's coordination and communications with representatives of the U.S. Department of State ("State Department") regarding Mr. Griffith's alleged activities purportedly related to North Korea, prior to, during, and following the 2019 Pyongyang Cryptocurrency Conference;

- The FBI interviews of Mr. Griffith;

- The IEEPA generally as well as the Information and Informational Materials Exemption and the Berman Amendment to the IEEPA as applied in this case or other applications of the NKSR, the Iranian Transactions Sanctions Regulations, and the IEEPA;

- Analysis of the underlying facts pertaining to the prosecution of Virgil Griffith in *United States v. Virgil Griffith*, including but not limited the FBI's assessment of the conduct as reflected in communications with the NSD, the State Department, the Office of Foreign Assets Control ("OFAC"), and the USAO-SDNY;

- Coordination and discussions between and among the FBI, the Department of Treasury broadly and OFAC more specifically, and the Department of Justice (to include United States Attorneys' Offices and the NSD) regarding North Korea's cryptocurrency and blockchain capabilities, enforcement actions and contemplated enforcement actions to try to deter individuals from providing, offering to provide, or preventing individuals to communicate with North Korea on these topics, and any discussions related to allegations

---

[2] As you are aware, each of the aforementioned individuals was involved in various discussions regarding the substance and merits of the investigation that led to the prosecution of this matter, which communications have been produced to the defense in discovery and which we believe are relevant topics at trial.  While the communications were produced to the defense, to the extent there remain any privilege concerns, we are happy to discuss those concerns with the USAO-SDNY or any other component to come to a reasonable accommodation.

AUSAs Ravener and Wirshba
September 8, 2021
Page 3

specific to Virgil Griffith or the individuals identified as CC-1 through CC-6 in the government's filings;

- Communications and analyses regarding USAO-SDNY and NSD's request for an OFAC licensing opinion and potential witness testimony in connection with a contemplated criminal prosecution of Mr. Griffith;

- Communications and analyses regarding any and all types of background checks, including an OFAC license history report, the FBI ran or requested other agencies to run on Virgil Griffith;

- Communications and analyses regarding any search warrants related to Mr. Griffith, including warrants on his personal electronic devices and computer servers, his purported social media accounts, and his purported email accounts;

- The 2019 Pyongyang Cryptocurrency Conference; and

- The purported 2020 Pyongyang Cryptocurrency Conference.

We are available to discuss any questions that you may have regarding the above demand for testimony and the scope and nature of the anticipated testimony. We reserve all rights to supplement or modify these topics based upon trial preparation, the government's disclosure of proposed exhibits, as well as evidence presented in the government's case-in-chief.

Sincerely,

/s/

Sean S. Buckley
+1-212-488-1253

-and-

Brian E. Klein
Keri Curtis Axel
Waymaker LLP

*Attorneys for Virgil Griffith*

Encls.

cc:     General Counsel, Federal Bureau of Investigation