L9EKGRIC

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,

4            v.                              20 CR 15 (PKC)

5   VIRGIL GRIFFITH,

6                Defendant.

7   ------------------------------x

8                                           New York, N.Y.
                                            September 14, 2021
9                                           4:40 p.m.

10

    Before:
11
                        HON. P. KEVIN CASTEL,
12
                                            District Judge
13
                            APPEARANCES
14
    AUDREY STRAUSS,
15       United States Attorney for the
         Southern District of New York
16   KIMBERLY RAVENER
     KYLE ADAM WIRSHBA
17       Assistant United States Attorneys

18   BRIAN EDWARD KLEIN
     SEAN STEPHEN BUCKLEY
19   KERI CURTIS AXEL
         Attorneys for Defendant
20

21

22

23

24

25

L9EKGRIC

```
 1              (Case called)
 2              MS. RAVENER:  Good afternoon, your Honor.  Kimberly
 3    Ravener and Kyle Wirshba, for the government.
 4              THE COURT:  Good afternoon to you both.
 5              And for the defendant?
 6              MR. KLEIN:  Good afternoon, your Honor.  Brian Klein,
 7    with Keri Axel and Sean Buckley, and sitting next to me is the
 8    defendant, Virgil Griffith.  He's in custody.
 9              THE COURT:  Good afternoon to you all.  Thank you for
10    accommodating me.  I am trying a case in Courtroom 23B of this
11    courthouse, and we broke early with the jury, and I appreciate
12    your accommodating my schedule.
13              So let's talk about motions in limine.
14              I have received and reviewed the motions, the
15    responses to the motions, and I assume the parties have said
16    what they wanted to say in their motion papers.
17              Is that correct, for the government?
18              MS. RAVENER:  It is, your Honor.
19              THE COURT:  For the defendant?
20              MR. KLEIN:  Yes, your Honor.  We may want to add a
21    little bit on --
22              THE COURT:  Sure.  No, go right ahead.
23              MR. KLEIN:  Your Honor, because there have been other
24    filings since the time of that filing, in particular, the
25    government has filed things related to its expert and raised
```

L9EKGRIC

1    different issues, and I think one of the motions they filed was

2    to exclude the defense from introducing into evidence our

3    argument what they term extraneous evidence regarding the DPRK.

4              THE COURT:  All right.  Well, we'll get to that, and

5    when we get to that, you'll let me know what you want to raise.

6              But, first, let's start with the argument on

7    statements.  Is there anything you wanted to add on that,

8    Mr. Klein?

9              MR. KLEIN:  In terms of our opposition?

10             THE COURT:  Yes.

11             MR. KLEIN:  No.

12             THE COURT:  Okay.

13             So, first of all, I think the defense is correct in

14   the following respects:

15             Number one, that I don't know, and they don't know,

16   the full extent of statements that are being offered, nor they

17   say are they in a position to have a view on authenticity.  And

18   I'll add on to that, that with regard to 403 considerations, I

19   don't fully know whether or not something may have -- the

20   probative value may be outweighed by, for example, danger of

21   unfair prejudice or jury confusion in all instances.  I can't

22   possibly know that.

23             But there is a fundamental point to start with, and

24   that is with regard to the indictment in this case, and there

25   is an argument that Griffith's initial attempts to develop what

L9EKGRIC

1   the government calls cryptocurrency infrastructure in the DPRK

2   is excludable.  And reading the flavor of the briefs that have

3   been submitted in this case, it is as if Mr. Griffith was

4   charged with conspiracy to attend a conference in the DPRK.

5   That's the crime he's charged with committing.

6             That's not what the grand jury indicted him for.

7             So let's begin with the first principles.  The grand

8   jury indicted him for participation in a conspiracy, from at

9   least in or about August 2018 up to and including in or about

10  November 2019, to conspire to violate licenses, orders,

11  regulations, and prohibitions in the IEEPA, and that's the

12  charge, and there are two objects.  One is that it was part of

13  the conspiracy that Griffith and others would and did provide

14  and cause others to provide services to the DPRK.  That's one

15  of the two objects.  The second object is that Griffith and

16  others conspired to evade and avoid and attempt to evade and

17  avoid the requirements of U.S. law with respect to providing

18  services to the DPRK.

19            So those are the two objects of the conspiracy that

20  runs from August 2018 up to 2019.

21            Now, the government says it is seeking to offer

22  statements in the period of February 2018 through June of 2018,

23  and they are not during or in furtherance of the conspiracy.

24  They don't come in as proof, direct proof, of conduct during

25  the conspiracy.  They are, however, it seems to me, the ones

L9EKGRIC

1    that have been tendered, background to the conspiracy, and,

2    further, they are not hearsay because, under 801(d)(2), they're

3    offered against the opposing party and they're party

4    statements.

5            So, for example, the government wants to offer the

6    February 17th, 2018 message to CC3, and he asks CC3 whether he

7    knew anyone in North Korea, we'd love to make an Ethereum trip

8    to DPRK to set up an Ethereum node, and he adds that it will

9    help them circumvent the current sanctions on them.

10           Well, the message has nothing whatsoever to do with

11   the fact that the Singaporean later on, the government

12   contends, became a member of the conspiracy.  That's not why

13   this comes in; it comes in as a party statement and as

14   background to the conspiracy.

15           Similarly, with regard to the April 2018 emails,

16   Virgil is the guy who would like to get the node started, and

17   Griffith then wrote to CC4 that he was willing to spend $8,000

18   on ItNix, explain the steps "buying the mining rig, ship it to

19   them, pay someone or some entity to continue maintaining it."

20           The statements of others cannot be admitted for the

21   truth of their content.  And it seems to me that Griffith's

22   statement comes in; the other statements only comes in in the

23   context of shedding light on what it is that Griffith is

24   saying, and they're not for their truth.  So that's where I

25   come out.  There's a continued exchange on or about that date

L9EKGRIC

with other statements, but the gist of it is that party

statements by Griffith are not hearsay and they're relevant as

background to the conspiracy.

The same, June 30, 2018, Griffith emails CC5, tells

CC5 he's seeking for and introducing potential business

partners or personnel to the company, and he says that it's an

exchange about the South Korean government being open to

supporting The Ethereum Foundation.  Now, here, on this email,

I'm not sure if it's probative of anything relative to the

background to the conspiracy, and so I have to reserve on

something like that.  I don't know whether it's relevant or

not; it may not be.

Now, with regard to the August 7th exchange, this

is -- of course, the grand jury says that the conspiracy

started in or about August 2018 and the August 7th exchange is

with CC4, but I cannot determine that CC4 was then a member of

the conspiracy.  I don't have any basis to conclude that.  But

Griffith's statements would come in as party statements,

background, and CC4's and CC5's would be necessary in order to

understand what Griffith is saying, not for the truth of their

content.

August 24, 2018, Griffith writes a long paragraph to

CC5 asking if South Korea wanted to curry our favor by setting

up the DPRK node because we would do it myself, ourselves, but

we're scared of the sanctions.  It seems to me that South Korea

L9EKGRIC

is allowed to violate those sanctions.  I've been asked to step
away from the project, but if you ever see a lead to do this,
we'd love you for it.  That comes in as a party statement.

CC5's response, it's quite sensitive, so I have to be
careful, too — I don't think that comes in because, first of
all, it's not a coconspirator statement at this point.  CC5
hasn't been shown to have joined the conspiracy.  And it's not,
as far as I can tell, necessary to the understanding of
Griffith's statements on August 24, 2018.

On September 23, 2018, Griffith emails an individual
asking if he would be interested in setting up the DPRK node
and forwarding some of the CC4 communications.  That comes in,
again, as a party statement, at least on background; it's not
conspiratorial conduct, but it certainly comes in as a party
statement.  Whether there is any other evidentiary basis for
it, I can't say at this stage.

And, certainly, messages by Griffith to a DPRK email
account asking, can Americans attend the conference, yes, no
problem — this is a statement during, and in furtherance of,
the conspiracy.

Now, with all statements made during and in
furtherance of the conspiracy, they're subject to connection.
They are subject to the strictures of the *Bourjaily* case and
the case law under *Bourjaily*, so they're all subject to being
stricken if, at the end of the government's case, I cannot find

L9EKGRIC

by a preponderance of the evidence that the declarant was a

member of the conspiracy when the statement was made and that

the statement was during and in furtherance of the conspiracy.

But preliminarily, and subject to that statement, the

August 27, 2019 communication from CC2 to Griffith would seem

to come in.

The August 31, 2019 statement is not by a member or a

purported member of the conspiracy; it's just an individual who

asks why is Griffith willing to risk his safety to go to the

DPRK, and he responds:  DPRK wouldn't want to scare away

blockchain talent.  That'll let them get around sanctions.

So individual 3's statement is not for the truth of

its content, but Griffith's statement is a party statement.

Then we have the DPRK invitation that's proof of the

conspiracy listing CC1 and CC2 as organizer and technical

advisor.  Certainly the December 19, 2019 initial payment comes

in.

The January 24th, 25th, and 27th exchanges are, at

minimum, party statements bearing on Griffith's intent, even to

the extent that they're with Individual 4, who was not a member

of the conspiracy they still are party statements.

The February 14 communication with CC1 is, it appears,

likely a statement by a coconspirator during and in furtherance

of the conspiracy, as is Griffith's communications on

February 18th, February 28th, and March 7th of 2019.

L9EKGRIC

1        There were statements made by Griffith and others

2   during the conference, and they are direct proof of the

3   conspiracy.  To the extent they are statements by persons who

4   were not coconspirators, they come in for the fact that they

5   were said, because it's part of the back-and-forth and the

6   interchange, and if they're coconspirators, then they're

7   potentially in furtherance of the conspiracy.

8        Likewise, the communications on April 20, 26th, 27th,

9   and May 14th look like they're likely statements during and in

10   furtherance of the conspiracy, except for the April 26th to

11   Griffith's parents, which is nothing more than a party

12   statement, not a coconspirator statement.

13        And, similarly, the statements made by Griffith to law

14   enforcement on May 22nd, 2019, November 6th and November 12th,

15   2019, they're party statements.

16        Now, with regard to the May 23rd, 2019 exchange, this

17   is about you should get your taxes in order, that ordinarily, I

18   would say, would not come in if that's all it was about, it

19   would not even come in for the truth of its content, but it's

20   Griffith's response that makes this relevant in terms of

21   consciousness of guilt.  The email could be reasonably read to

22   indicate he's not at all concerned about taxes, but his

23   engaging in other conduct could result in his imprisonment.

24        The statements, again, from August 4th, 2019,

25   August 5th, August 7th, August 9th, October 2, October 28, and

L9EKGRIC

1    November 2018 -- well, let me leave November 2018 out -- the

2    ones I just mentioned, they're either coming in as statements

3    and the rest of the conversation with the other party to the

4    conversation is coming in, either to make the statement, party

5    statement, understandable, or some of them, for example, with

6    CC2, may come in, and CC1, for the truth of their content.

7            With regard to the November 18 communication, I

8    discovered I didn't file a tax return for 2015-2018, but,

9    weirdly, the IRS hasn't contacted me, that's out.  I don't see

10   where -- the probative value to that is outweighed by the

11   danger of unfair prejudice, so I'm excluding that.

12           November 17 comes in as a party statement.

13           So that's where I am on the statements, and I have

14   some sympathy for what the defense says, that they don't know

15   the full context, they don't know the foundation, et cetera.

16   Some of that may be developed at trial, and there may be

17   instances where you'll able to persuade me that something that

18   didn't strike me as having a 403 dimension does in fact.

19           Now, is there something the defense wanted to say on

20   the DPRK's cryptocurrency capabilities?

21           MR. KLEIN:  Yes, your Honor.

22           THE COURT:  Okay.  Go ahead.

23           MR. KLEIN:  So, your Honor, the government moves,

24   going back where I started, to preclude what they consider

25   extraneous evidence.

L9EKGRIC

1          THE COURT:  Right.

2          MR. KLEIN:  And their response or the reasons they

3  outline why were because when we engaged in pretrial motion to

4  compel litigation, there was a stipulation they agreed to enter

5  into, and I think your Honor is well aware of that stipulation.

6  Again, that was over a discovery dispute.  This trial is about

7  cryptocurrency, a blockchain, in North Korea.  So any evidence

8  that the defense would want to offer about that would seem

9  highly relevant, particularly because it's focused around the

10  proper time frame, which it is.

11          THE COURT:  Relevant to what issue?

12          MR. KLEIN:  Relevant to the issue of services,

13  relevant to the issue of --

14          THE COURT:  How is it relevant to the issue of

15  services?

16          MR. KLEIN:  Sure, your Honor.

17          So, again, it goes to the stipulation where the

18  government said they won't present evidence or argument that

19  the information my client allegedly provided in the

20  cryptocurrency conference was not -- I'm just reading from it,

21  your Honor, sorry -- was beyond the then existing capabilities

22  and knowledge of the government of North Korea.  And so one

23  thing we want to show, your Honor, is that North Korea

24  possessed tremendous cryptocurrency and blockchain capabilities

25  prior to Mr. Griffith's visit.

L9EKGRIC

1          THE COURT:  Why is that relevant?

2          MR. KLEIN:  Because then it would not -- he's not

3     providing the service, your Honor.

4          THE COURT:  Okay.  Thank you.  That's what I was

5     asking.

6          MR. KLEIN:  Sorry.

7          THE COURT:  Well, because it's not obvious, but I

8     wanted to find out what your reason was because I didn't want

9     to misinterpret.

10          Okay.  Go ahead.

11          MR. KLEIN:  And even with this stipulation, your

12     Honor, the government can clearly leave the impression — and

13     they want to — they do plan to present evidence that certain

14     individuals at the conference gained information new to them.

15     That's included in our stipulation.  So they do plan to present

16     evidence like that, and they're also going to call an expert to

17     talk about North Korea.  Presumably, some of these issues will

18     be ripe for discussion with their expert, if you permit their

19     expert to testify.

20          THE COURT:  All right.

21          Just bear with me.  Are you finished?

22          MR. KLEIN:  I think so, your Honor.

23          THE COURT:  Okay.  Just bear with me a moment.

24          (Pause)

25          THE COURT:  All right.  Much of this case is about the

L9EKGRIC

1    fact that the defendant's position is that what he provided was

2    information, not services, correct?  That's what the defendant

3    has argued already to me in this case.  Correct?

4              MR. KLEIN:  Yeah, we've described it as services and

5    information, your Honor, but --

6              THE COURT:  All right.  Well, services that amount to

7    only information, right?

8              MR. KLEIN:  Yes.

9              THE COURT:  Because if it's services that are more

10   than information, then it's services, you're not in the

11   protected zone, right?

12             And the government argues that you're outside that

13   protected zone.

14             Now, I want to give you a hypothetical, and

15   hypotheticals always have problems associated with them, and I

16   realize that.  But the point is, it illustrates, to me at least

17   in thinking about it, to what extent is it relevant, from the

18   government's standpoint or your standpoint, what technical

19   capabilities the North Koreans had in cryptocurrency.

20             So here's the hypothetical:

21             So Country A is a country that is subject to similar

22   types of or the same type of sanctions that we're dealing with

23   here, and a technician in Country A downloads a manual on how

24   to repair a Dell laptop computer, downloads it from the

25   internet, distributes it to fellow technicians, and over time

L9EKGRIC

1    and with practice, 20 technicians in Country A develop the

2    ability to repair Dell laptop computers.

3        Now, thereafter, a lone U.S. citizen travels to

4    Country A to repair a Dell computer, and attempts to do so.

5    That conduct is services even though there are 20 technicians

6    in Country A who are capable, equally capable, of doing the

7    same thing.  That's hypo one.

8        Hypo two:  A lone U.S. citizen travels to Country A

9    and delivers a manual and then leaves, delivers the Dell repair

10   manual, and leaves.  That appears to me to be information, not

11   services, and that doesn't turn on whether 20 people have the

12   manual or no one in Country A has the manual.  In both of those

13   instances, it's services by means of information which is not

14   criminal conduct, arguably.

15       So that's my hypothetical, and it leads me to the

16   conclusion that it does not matter whether or not the DPRK had

17   capabilities in cryptocurrency.  As in the first hypothetical,

18   there are 20 people in Country A who can repair Dell laptop

19   computers, but a U.S. person travels there with the purpose and

20   intent of repairing a Dell computer, it's not a defense that 20

21   people in that country could have done so.  By the same token,

22   if it's delivering the manual, and it's only information, it

23   doesn't become a crime because no one in that country had the

24   manual; if the manual was available, and it's nothing other

25   than preexisting information that is being delivered, the same

L9EKGRIC

1    way a copy of the U.S. Constitution, a copy of the Bible,

2    whatever it may be.

3              So I won't ask the pointed question.  I'll ask you to

4    react, and then I'll give the government an opportunity to

5    react.

6              MR. KLEIN:  Your Honor, can I have a moment to talk

7    with my colleagues?

8              THE COURT:  Sure.

9              (Pause)

10             MR. KLEIN:  Your Honor, thank you for that moment to

11   confer with my colleagues.

12             So I do appreciate these hypotheticals, and I

13   understand that this case poses a lot of interesting, novel,

14   and somewhat complex issues.

15             I think, in addressing the first hypothetical, that's

16   not the case here, as we know.  My client isn't accused of

17   doing some sort of physical labor in a country, fixing like a

18   plane or a car or anything like that.

19             When I get to number two, your Honor -- when we get to

20   number two, and we think about what you're asking, which I

21   think is a good question, I think what we're getting to is that

22   the government's theory is that the information they allege my

23   client, our client, is providing at this conference is new

24   information, and that's what's different between, and in one

25   and two, the information in the manual because the manual comes

L9EKGRIC

1   after, right?  It's not new information.

2          THE COURT:  Yes, well, I gave it actually both ways.

3   He comes with the manual, and if 20 people already have the

4   manual or no one has the manual, it's still information.  So,

5   in a way, I'm agreeing with your point, I think.  I'm probably

6   disagreeing more with the government on this.

7          MR. KLEIN:  Yes, your Honor, and we always appreciate

8   that, when that happens.

9          THE COURT:  Of course.

10          MR. KLEIN:  But I would also say, and, again, what's

11   also different, and I would point this out, and I think your

12   Honor understands this, the information allegedly provided was

13   readily and publicly available.  So this Dell manual in your

14   hypothetical may not have been readily and publicly available,

15   but — and, again, it goes to our expert — the information

16   provided in this case, if the government can prove it was

17   provided, was something that is the first click on Google, was

18   well-known and publicly available information.

19          THE COURT:  All right.

20          Let me say, Mr. Klein, that that's an issue I haven't

21   gotten to, and I'm suspecting -- I don't know whether it will

22   be a jury question on the difference between, in my

23   hypothetical, he physically has the manual in hand.  You're

24   raising a worthy point that I'm not deciding right this second,

25   about what does it mean to access something on Google versus to

L9EKGRIC

1    have already accessed it.  I'm not going there.

2            But from your side of the table, let's start with the

3    more optimistic one, which is if they had 20 copies of the

4    manual, or they had no copies of the manual, they never heard

5    of the manual, and someone puts it on the table and delivers it

6    to them, they never heard of it, this manual has much greater

7    value to them, but it's information in either of those

8    instances.  Whether they had the capability or they didn't have

9    the capability, it's information, and, therefore, if it's

10   solely information, there is not a crime.  That's what I'm

11   agreeing with.  I think you're urging that, unless I'm missing

12   something here.

13           MR. KLEIN:  We are urging, your Honor, that this was

14   not a crime, yes.

15           THE COURT:  Well, I know that, but for that reason.

16   That's more important to me.  I understand you hear sweet words

17   like "not a crime," but it's the logic that I'm asking whether

18   you agree with.

19           MR. KLEIN:  Your Honor, we do agree -- and, again, I

20   know this is parsing it because it is somewhat complex, but we

21   do agree that there was not a crime committed here because the

22   information Mr. Griffith allegedly provided was not a service,

23   and as I explained earlier, it was not new information, it was

24   well-known publicly available information.

25           THE COURT:  All right.  Thank you.

L9EKGRIC

1            Let me hear from the government.  I've heard the

2    defendant's viewpoint.  I don't mind spending a little bit of

3    time on this because this is the heart of the case, I think.

4            So what's the government's position?

5            MR. WIRSHBA:  Your Honor, the government's position is

6    that the Court has set out in its hypotheticals what the

7    government understands to be an accurate description of the law

8    and that those hypotheticals would directly speak to the issue

9    that we're talking about here, which is whether or not there's

10   relevance to the cryptocurrency capabilities of the DPRK as a

11   whole.

12           Of course, the government disagrees about what it was

13   that was actually done within North Korea, for example, and

14   whether or not that would fall within the information or

15   informational materials exception, of course, but with respect

16   to the Court's hypotheticals, the government believes that the

17   Court is spot on, and that what those hypotheticals show is

18   that there is no relevance to the cryptocurrency capabilities

19   of the DPRK as a whole or individuals with whom -- within the

20   DPRK, but with whom Mr. Griffith never came in contact.

21           THE COURT:  You want to respond, Mr. Klein?

22           MR. KLEIN:  Your Honor — I apologize, I was just being

23   handed a noted by my cocounsel — I think that he's summing up

24   our view again, and I think this is right, which is, their case

25   is premised on the idea that our client provided info to the

L9EKGRIC

1    DPRK to do things and that information was a service, right?

2    And that's where we land.

3              THE COURT:  When you threw in the "right," please

4    don't do that to me because it poses a burden on me — if I'm

5    silent, then you must have agreed with me or something.

6              MR. KLEIN:  Your Honor, I'm not --

7              THE COURT:  I know, I know, it's a habit some people

8    have.

9              Thank you, Mr. Klein.

10             So where I come out is -- and the door is going to

11   swing both ways on a lot of this, but, no, the defense cannot

12   offer evidence as to DPRK capabilities, and neither may the

13   government.  That's my ruling.

14             Now, it also comes up -- and I will jump ahead, but

15   it's a logical jump ahead, and I apologize for jumping ahead,

16   but the government wants to offer an expert, if I understand

17   it, or you want to preclude them from offering an expert on

18   such things as Korean nuclear capabilities or the like or why

19   or how North Korea got on a prohibited list.  That strikes me

20   as being no more relevant in this case than a prosecutor in a

21   fentanyl case wanting to explain why there are laws against

22   controlled substances and why and how fentanyl got on the list

23   or heroin got on the list.  That doesn't come into evidence.

24   The Court instructs on the law, and it's not probative evidence

25   of anything.  It seems to me the government is allowed to offer

L9EKGRIC

1   evidence that they have to prove as part of their case that

2   there is a restriction and the restriction is proven by

3   whatever listing North Korea is on.  So it can briefly do that,

4   but not why it's on a listing or on an embargo; that's not what

5   we're going to do here.

6            To the extent it has any probative value, it's

7   outweighed by the danger of unfair prejudice.

8            And, similarly, I come out the same way as to the

9   Berman Amendments.  The Berman Amendment are relevant in this

10  case.  They're relevant as a legal doctrine in this case.

11  That's for the Court to instruct.  It's not why we have Berman

12  Amendments, it's not why we have an embargo on North Korea;

13  it's North Korea is a prohibited country and information is

14  protected.  And my job, as the judge, is to communicate these

15  concepts to the jury clearly, maybe even repetitively, I don't

16  know, but that's where I come out on that for both an expert on

17  generally an explanation of why there is an IEEPA and why

18  North Korea is on it.

19            Does the government want to comment on any of that?

20  Do you accept my ruling, or do you want to tussle?

21            MS. RAVENER:  Your Honor, we accept the Court's ruling

22  with respect to those parties.

23            I think there are two points that I'd seek to clarify,

24  and if I'm getting ahead of the Court, please --

25            THE COURT:  No, go ahead.

L9EKGRIC

1          MS. RAVENER:  One is that with respect to the

2    government's proffer of an expert witness, we did propose some

3    other areas for Dr. Arrington's testimony that relate, for

4    example, to --

5          THE COURT:  Juche.

6          MS. RAVENER:  -- Juche.

7          THE COURT:  No, I read the Second Circuit's case law.

8    I think the latest one was Judge Hall's decision in United

9    States against Mejia.  I don't know if that's the last one or

10   the last big word in that area, and certainly experts can

11   explain the meaning of terminology.  That is not controversial.

12         MS. RAVENER:  Understood, your Honor.  That's very

13   helpful to us and --

14         THE COURT:  I probably said the word wrong.  It's not

15   Juche, but whatever it is.

16         MS. RAVENER:  I can confess that the entire government

17   team has been practicing to get that right, and I can't say

18   that we have it right either, but Juche, I believe.

19         THE COURT:  Okay.  Whatever it is.

20         MS. RAVENER:  So, Judge, thank you for that, and we'll

21   adhere to those parameters.  Of course, if the Court has more

22   specifics...

23         With respect to the defense experts, I would just seek

24   some further clarification as well.  We concur that testimony

25   regarding the scope, for example, of the Berman Amendment is

L9EKGRIC

1   not appropriate from a witness, that that's left to the Court's

2   instructions.

3          There are other areas along what we believe to be

4   precisely the same lines with its expert for precisely the same

5   reasons that the defense has proposed with respect to their

6   OFAC expert, a former OFAC official.  We did move to preclude

7   that testimony --

8          THE COURT:  Well, I understand.  This is the

9   under-enforcement expert?

10          MS. RAVENER:  Correct.

11          THE COURT:  Which the defendant argues is relevant to

12   lack of intent.  And I know that there was a decision, I

13   believe, by Judge Nathan and one by Judge Keenan, which I've

14   looked at, and I don't think either one of them answers — no

15   disrespect to my colleagues, they didn't need to answer the

16   question that I'm faced with.  But it does strike me -- again,

17   I apologize for how my brain works, all right?  Everybody's

18   brain works differently.  So when I try to think about that, I

19   do think of analogies.  And the analogy that comes to mind is

20   an illegal reentry by a person previously convicted of a

21   serious offense, and that's a crime.

22          It would strike me that it is no defense to that crime

23   that a defendant said, oh, I committed that -- I did that under

24   the presidential administration of President A, not the

25   presidential administration of President B, and I knew

L9EKGRIC

President A was not big on enforcing the laws, so I didn't

commit the crime.  That strikes me as not relevant evidence and

not admissible.

Now, what else they want to say in response -- I mean,

the nice thing here is the defendant's case comes after the

government's case.  Who knows what doors the government may

open.  I don't know, and I'm not going to get too deeply into

confining you until I know what doors have been opened, but my

take is that under-enforcement evidence is not relevant

evidence in this case.

So let me talk about the personal wealth and

cryptocurrency holdings of Mr. Griffith.  And the government

does not intend to offer such evidence.  They have some

discrete items of evidence about possible funding of a mining

node for 8 or 10 thousand dollars and funding travel to the

DPRK.  That seems to be of a different category, and that would

come in.  But the government is not allowed, and will not be

permitted, to offer evidence that Mr. Griffith did or did not

get rich on cryptocurrency or otherwise.  It's just not

relevant in this case.

The crack statement, in jest, "I'll try to be wealthy

enough to pay my bail" is relevant even as a jest, not to show

he is wealthy or he's planning to become wealthy; it's a

statement of, yeah, I know I'm at risk of getting arrested.

That's why it's relevant.  It goes to consciousness and intent.

L9EKGRIC

1     So that's why I'm not going to exclude that.

2              And, again, the defense moves to exclude evidence

3     regarding involvement with Tor and the dark web.  Well, the

4     government is not going to be permitted to wander into this

5     area and describe the defendant as a man who frequents the dark

6     web, ladies and gentlemen, and you can only wonder what that

7     might mean.  That's not going to happen in this trial.  There

8     are specific items, for example, on the defendant's CV that may

9     be relevant, but the defendant has to -- rather, the government

10    has to show me why they are relevant.  I don't know why they

11    are relevant.

12             I mean, there is an email that Griffith sent to an

13    individual who worked for a dark web entity where he says:  I

14    once mentioned to you the idea of doing a node in the DPRK.  I

15    was going to put an Ethereum node there, but I eventually

16    decided it was too edgy and decided against it.  However, Tor

17    doesn't mind being edgy in these ways.  If Torservers.net or

18    others would like to crowdfund putting a Tor node in the DPRK,

19    I'd bet they'd do it under the same conditions described below,

20    et cetera.

21             That evidence comes in, and in that sense, I guess the

22    reference to Tor on his resume makes sense.  Why and where does

23    the term dark web come in and why should it be mentioned in

24    this trial at all?

25             MS. RAVENER:  Your Honor, I'm not sure that the

L9EKGRIC

1    government does intend to elicit it.  I'll just reserve that.

2    To the extent the defense does present evidence from a

3    purported cryptocurrency expert that touches on areas that

4    could open that door, we would reserve our right in our

5    rebuttal case.

6              THE COURT:  Right.

7              MS. RAVENER:  But with respect to our case in chief,

8    I'm not sure that we intend to offer much, if anything, on this

9    subject --

10             THE COURT:  Well, you'll let me know before you offer

11   anything or the words come out of your mouth or are shown to

12   the jury.  You'll flag it for me ahead of time.

13             MS. RAVENER:  We can do that, your Honor.  And you've

14   identified the one email and the CV, which are the documents

15   that we currently have in mind.

16             THE COURT:  All right.  Okay.

17             So I've already discussed DPRK's nuclear program,

18   et cetera.

19             Where it comes in, to a limited extent — and it's not

20   really the government introducing it — it's in emails by

21   Griffith, and Individual 3 says to him:  What if they're

22   funding their drug trade and nuclear program with crypto?  And

23   Griffith responds:  Unlikely, but they'd probably like to start

24   doing such, and he wrote an Ethereum colleague that he would

25   not be pursuing the DPRK node because the U.S. president,

L9EKGRIC

 1    quote, "would receive a memo that says Ethereum is funding DPRK

 2    nukes."

 3              Now, I have to ask the government, why would the fact

 4    that he's not pursuing a DPRK node be relevant to your case?

 5    Maybe the defendants want to offer it, but how is that relevant

 6    to your case?

 7              MS. RAVENER:  Your Honor, it's relevant because that

 8    statement by the defendant wasn't true.  It was weeks later

 9    that the defendant contacted the other individual affiliated

10    with Tor proposing to crowdfund putting a node in DPRK despite

11    his claimed walking away from the subject.

12              THE COURT:  All right.  So you're saying this exchange

13    with the Ethereum Foundation and the exchange with Individual 3

14    came after the email that I quoted that starts, I once

15    mentioned to you the idea of doing a node in the DPRK; is that

16    what you're saying?

17              MS. RAVENER:  Your Honor, I just want to check that

18    date.  I don't want to be mistaken.

19              THE COURT:  Sure.

20              Well, let me say if it's not before, then I'm inclined

21    to exclude them.  If they're after the prior communication,

22    then I would be inclined to allow it.

23              MS. RAVENER:  Understood, your Honor, and, regardless,

24    we just want to get it right for you.

25              THE COURT:  Right.

L9EKGRIC

1          (Pause)

2          MS. RAVENER:  Okay.  Yes, your Honor.  I'm looking at

3    the dates now.  So the first statement, your Honor, is from

4    August 24th, 2018, and the second statement where Griffith

5    actually pursues following up with trying to get someone else

6    to follow through on the node plan is September 23rd --

7          THE COURT:  That's the GoFundMe one?

8          MS. RAVENER:  Correct.

9          Basically, offering to crowdfund the effort.

10         THE COURT:  All right.  That's presumptively

11   admissible subject to the defense telling me that the

12   chronology is in error or the like.

13         I'm going to exclude, it seems to me, CC3 sending an

14   article from a newspaper stating that Singapore was warning to

15   avoid nonessential travel to the DPRK because of the six

16   nuclear tests, that if that has any probative value, it's

17   substantially outweighed by the danger of unfair prejudice.  So

18   that does not come in.

19         MR. KLEIN:  Your Honor --

20         THE COURT:  Yes.

21         MR. KLEIN:  Your Honor, with regard to the emails or

22   messages we're talking about, we feel very strongly that you

23   can redact the word "nuclear," and you can redact the word

24   "drug trade," and the government would still able to get what

25   it wants, but I think using the word "nuclear" in this

L9EKGRIC

courtroom — and it's a bad pun — it would be like dropping a

nuclear bomb in this courtroom, in this case.  And I think

there's a way -- again, we made our position clear, it

shouldn't come in at all, but we think those terms could be

redacted, and you get rid of what we view as an incredible

classic 403 problem there.

THE COURT:  Well, I'll think about it.  I want to hear

from the government on that — I'll give them an opportunity to

get me a letter on that — but I do realize that even in the 403

analysis, it is significant that this is coming out of the

defendant's mouth.  That doesn't mean that anything that comes

out of the defendant's mouth is excluded from 403; that's

certainly not the case, and I think I've already excluded

something under 403 that came out of the defendant's mouth.

It may be that in the two emails, one where it says

drug trade and nuclear program, that could be redacted to read,

their illicit programs and president would receive a memo that

says Ethereum is funding illicit programs.  But I'll give the

government until Friday to get me a letter on that.

MS. RAVENER:  Thank you, your Honor.  We would like an

opportunity to address that.

THE COURT:  Okay.

There is the motion with regard to access to

information after September 10th, 2020, that were the fruits of

the search warrant.  So, as I understand the facts, during some

L9EKGRIC

1    period of time ending September 10, case agents reviewed the

2    fruits of the search warrant, which was, I gather,

3    undifferentiated contents of certain electronic storage

4    material and segregated that which they believed was relevant,

5    and that that material was accessed, the segregated impertinent

6    material was accessed, after September 10, 2020, but not by

7    anyone on the prosecution team.

8          The defense says, be that as it may, this is, number

9    one, either systematic and pervasive conduct, or, number two,

10   outrageous conduct that warrants dismissal of the indictment

11   without a showing of prejudice.

12         Now, the Second Circuit has said in, I believe it was,

13   *United States v. Walters*, a case with which I have some

14   familiarity, that the statement in a Supreme Court decision — I

15   don't remember the name, something like Port Huron or Port

16   something or other — was, it appeared to the circuit, to be

17   dicta and that no case had ever been dismissed on the

18   systematic evasive basis, but there is such an exception

19   recognized by the Supreme Court for outrageous misconduct.

20        I am going to, number one, make sure that the

21   representation that was made with regard to members of the

22   prosecution team accessing material is correct.  I'm getting

23   more than a mere summary statement in the August 24 letter that

24   no one did.  I want declarations from all members of the

25   prosecution team because it appears to me that if those

L9EKGRIC

1   representations are correct, the issue still exists and the

2   defendant is still able to show that it is outrageous

3   misconduct.

4          However, there is not, in my view, since this is not a

5   case that's talking about prejudice to the defendant, this is

6   an issue that can be addressed after the trial.  Today, to

7   state the obvious, is September 14th.  A jury will be selected

8   on September 27th, and, as I noted at the outset, I'm presently

9   on trial.  The issue does not disappear necessarily if

10  Mr. Griffith is acquitted; it doesn't disappear if Mr. Griffith

11  is convicted.  If he is convicted, it may provide the basis to

12  vacate the conviction.  If he's acquitted, it may provide the

13  basis for other remedial relief that the Court can impose, but

14  so long as I am satisfied that the prosecution team did not

15  access the material, I plan to go forward on September 27th.  I

16  wanted to put that on the record so that everybody knows where

17  I am on it.

18         Now, are there other issues that the government wants

19  to raise that I should address today?

20         MS. RAVENER:  Your Honor, we do want to just note for

21  the Court that last night, the defendant filed, for the first

22  time, a Rule 15 motion with respect to a witness located --

23         THE COURT:  Yes, this is the second, yes, deposition.

24  Your time to respond hasn't even -- I don't know anything about

25  it, to tell the truth, other than that a motion was filed.

L9EKGRIC

1             MS. RAVENER:  Thank you, your Honor.

2             And I just want to alert the Court that we do intend

3    to oppose that motion.

4             THE COURT:  And you're going to get that in on the

5    17th, right?

6             MS. RAVENER:  We can --

7             THE COURT:  Friday?

8             MS. RAVENER:  We can do that, your Honor, with one

9    request for the Court to consider:  It is Yom Kippur this week,

10   which has truncated our time.

11            THE COURT:  Right.

12            MS. RAVENER:  If it would be possible for the Court to

13   accept our opposition on the following Monday?

14            THE COURT:  Done.  That's fine.  Thank you.

15            MS. RAVENER:  Thank you.

16            THE COURT:  Anything else?

17            I'm going to get to you, Mr. Klein.

18            MR. KLEIN:  You were just looking at me so straight,

19   your Honor.

20            THE COURT:  Okay.  That's all right.

21            (Pause)

22            MS. RAVENER:  Pardon me, your Honor?

23            THE COURT:  One second, please.

24            MS. RAVENER:  Yes.

25            THE COURT:  Yes.

L9EKGRIC

1        MS. RAVENER:  Pardon me, your Honor, if you could

2   indulge us one more moment?

3        THE COURT:  Yes.

4        MS. RAVENER:  We do appreciate the Court is very busy

5   on other matters.

6        THE COURT:  That's all right.

7        MS. RAVENER:  We also want to note, we did file a more

8   extensive response with respect to our proposed North Korea

9   expert, Dr. Arrington --

10       THE COURT:  I know.

11       MS. RAVENER:  I know it's just filed late last night.

12       -- as well as to preclude certain testimony --

13       THE COURT:  What time was it last night?  I know the

14   defendants filed one at 11:46 p.m. on Friday night.  When did

15   you file yours?

16       MS. RAVENER:  Your Honor, we were in a similar time

17   range.

18       THE COURT:  I thought that.

19       MS. RAVENER:  So we certainly don't expect to take

20   those issues up today, but we do want to just make sure that

21   the Court is aware we would appreciate any guidance we could

22   receive on those issues in advance of trial and --

23       THE COURT:  Well, wait a minute.

24       MS. RAVENER:  -- our response to the Court.

25       THE COURT:  Listen, your expert -- are you talking

L9EKGRIC

1 about Arrington?

2          MS. RAVENER:  Yes, your Honor.

3          THE COURT:  What guidance didn't I give you today that

4 you need?

5          MS. RAVENER:  Your Honor, that, I think, we do

6 understand.  It's the second portion of the government's motion

7 with respect to certain testimony that the defense seeks to

8 offer.

9          THE COURT:  OFAC testimony?

10          MS. RAVENER:  No, your Honor.  The defense has served

11 subpoenas on multiple members of the FBI as well as two

12 Department of Justice National Security Division attorneys.

13          THE COURT:  Is this the under-enforcement issue?

14          MS. RAVENER:  Your Honor, it appears to relate to a

15 host of issues that we believe to be globally impermissible,

16 inadmissible testimony.  Again, the briefing is available for

17 the Court when your Honor is ready to --

18          THE COURT:  But, listen, I have to read it, but --

19          MS. RAVENER:  Of course.

20          THE COURT:  -- you're giving me a preview.  You're

21 saying when you read it, you will not know what these witnesses

22 are for.  Isn't that what you're telling me?

23          MS. RAVENER:  No, your Honor.  And let me do a better

24 job, if I can try.

25          THE COURT:  Okay, sure.

L9EKGRIC

1              MS. RAVENER:  I'm going to turn this over, actually,

2     to my colleague.

3              THE COURT:  Good.

4              MS. RAVENER:  Thank you.

5              MR. WIRSHBA:  Your Honor, so the government filed a

6     brief last night, and it was very late, that attached a letter

7     from the defense seeking to admit testimony from certain FBI

8     agents and certain attorneys within the National Security

9     Division related to a host of different topics.  The government

10    attached that letter and made arguments about why those topics

11    should be inadmissible at trial.

12             If it's helpful, your Honor, it's Exhibit D to the

13    motion filed last night.

14             THE COURT:  One second, please.

15             (Pause)

16             THE COURT:  So this is Exhibit A?

17             MR. WIRSHBA:  No, your Honor.  The letter from the

18    defense is Exhibit D.

19             THE COURT:  Hang on a second now.

20             MR. WIRSHBA:  And the government's brief on this topic

21    begins at page 22.

22             THE COURT:  Well, the first topic sounds to me like

23    the under-enforcement issue, the FBI's assessment and

24    enforcement of the North Korea sanctions regulations.  Maybe

25    it's not precisely under-enforcement, it's enforcement

L9EKGRIC

philosophy.  That's that.

          The second topic is FBI's coordination and

communications with representatives of the Department of State

regarding Griffith's alleged activities purportedly related to

North Korea prior to, during, and following the cryptocurrency

conference.

          Why is that relevant?

          MR. BUCKLEY:  Your Honor, if I may, just to set the

table here or set the stage for us a little bit.  This letter

is not a letter seeking to admit various topics of testimony.

This is a letter required by the *Touhy* regulations, where we

are required to provide notice to the government of the various

topics that we may seek to offer testimony for.  We haven't had

an opportunity, obviously, to respond to the government's

submission.

          I will note that the government indicated in its

submission that we had met and conferred regarding these

topics.  That's not accurate.  We had a preliminary

conversation to front the issue.  We had agreed to have further

discussions about it.  And I think, in view of the Court's

rulings here today --

          THE COURT:  There will be further discussions?

          MR. BUCKLEY:  Yes, your Honor.

          And the other point I wanted to raise with the Court,

though, is the point that the Court made earlier, which is, the

L9EKGRIC

1    defense goes second, right -- withdraw the right, your Honor --

2    the defense goes second.  We have to provide this notice at

3    this stage of the proceedings.  We don't know what doors

4    they're going to open.

5              THE COURT:  I understand, I understand, and that's

6    true.

7              But what I am going to direct you to do is confer.

8              MR. BUCKLEY:  Understood, your Honor.

9              THE COURT:  Both sides have a bit more than what they

10   knew before, as a result of today's conference.

11             Now, does that complete the government's list of

12   things they wanted me to address?

13             MR. WIRSHBA:  Your Honor, there is one additional

14   thing.  If your Honor is planning to take up the search warrant

15   issue after trial, with the assistance of the declarations that

16   you've ordered for Friday, the government would ask to be able

17   to put over its briefing until after trial as well and supply

18   the declarations that your Honor has requested.

19             THE COURT:  No, no, no, no.  You're going to supply

20   the declarations -- if you're telling me you need till Monday

21   on the declarations, that's a different story, but the

22   declarations come before the trial.

23             MR. WIRSHBA:  Absolutely, your Honor.  We're supplying

24   the declarations on Friday, as ordered.

25             The government also suggested that it might file a

L9EKGRIC

1    brief on Friday.  With the Court's permission, if the Court is

2    putting off that issue until after trial, the government would

3    request to adjourn that deadline until after trial, but, of

4    course, we will be putting in the declarations as ordered.

5          THE COURT:  Well, the thing I want you to respond to

6    is, if you look at what I said in my order, as opposed to what

7    the defendant is, I didn't ask you to respond to the motion to

8    dismiss by Friday.  That's not in my order.

9          MR. WIRSHBA:  Understood, your Honor.

10          THE COURT:  But what I did ask you to do was to

11    respond to the defense's request for certain information.

12    That's in my order.

13          MR. WIRSHBA:  We will do that, your Honor.

14          THE COURT:  Okay.

15          Now, with regard to the response to the motion to

16    dismiss, I will hold that in abeyance.  If I find, based on

17    what I get on Friday, that there's a need to, I will let you

18    know; if not, then I would put it off until after the trial.

19          MR. WIRSHBA:  Understood, your Honor.

20          THE COURT:  All right.

21          Mr. Klein?

22          MR. KLEIN:  Your Honor, two points on that:

23          One was, our motion is also a motion to suppress in

24    the alternative --

25          THE COURT:  Yes.

L9EKGRIC

1      MR. KLEIN:  -- all the evidence that was hosted on

2  Palantir, and that would need to be decided before trial, your

3  Honor.

4      THE COURT:  Yes.  Well, I can tell you right now, if

5  the government does what I've asked them to do, then implicit

6  in my ruling that the trial goes forward, subject to your

7  motion, if you persuade me that it's outrageous misconduct,

8  it's a multistep process.  I suppose I could just jump to

9  dismissing the indictment or I could suppress the evidence, in

10  which event, there may be insufficient evidence to support the

11  indictment, but it would get you to the same place if I

12  concluded there was outrageous misconduct.

13      MR. KLEIN:  Your Honor, the suppression isn't premised

14  on outrageous conduct.  I think if you read our brief, your

15  Honor, that's not the standard we need to meet.

16      THE COURT:  Well, I have read your brief.  I didn't

17  read the brief the government filed last night.  I read your

18  brief.

19      MR. KLEIN:  So, then, the Fourth Amendment suppression

20  is not premised on outrageous conduct.  That's not the standard

21  that would need to be applied here for the Court to suppress

22  the evidence we're seeking to suppress.

23      THE COURT:  So tell me the standard.  Don't hold me in

24  suspense.

25      MR. KLEIN:  So, your Honor, on page 9 and 10 here --

L9EKGRIC

```
 1              THE COURT:  Right.
 2              MR. KLEIN:  If you turn to page 8, 9, and 10 --
 3              THE COURT:  Go ahead.
 4              MR. KLEIN:  I'm grabbing it, your Honor.
 5              THE COURT:  I'm not surprised you're reading it.
 6    You're trying to figure out what it is.  I got it.
 7              MR. KLEIN:  I didn't intend to argue this motion
 8    today, your Honor.
 9              THE COURT:  No, I got it, I got it, there's a lot on
10    your plate.
11              MR. KLEIN:  So, your Honor, on page 9 --
12              THE COURT:  Yeah, you say:  Flagrant disregard of the
13    warrant's terms, the drastic remedy of suppression of all
14    evidence seized may be justified.  All right.
15              And what I'm saying is, because -- listen, you found
16    out about this on August 24th, time is short, trial was a
17    little bit over a month away, and you didn't know everything
18    that you knew last Friday night at 11:46, but you filed your
19    motion Friday night at 11:46.  Friday night was September 10th,
20    today is September 14th, and we're going to trial on
21    September 27th.
22              The ground that you assert is an assessment of whether
23    it's outrageous misconduct, whether it's flagrant disregard.
24    It's not a different standard.  It's not as if there is a
25    doctrine which said that is independent of the doctrines
```

L9EKGRIC

1    intertwined with your motion to dismiss the indictment.  And

2    I'm going to take that up after the trial, and that will be

3    true with the suppression issue.

4            If the government is able to make clean

5    representations along the lines I indicated, then I am not

6    suppressing the evidence prior to trial, I'm not dismissing the

7    indictment, but the issue is reserved until after trial.

8            MR. KLEIN:  Yes, your Honor.

9            THE COURT:  That's my ruling.

10           MR. KLEIN:  And, your Honor, one point on that point

11   moving on.

12           THE COURT:  Right, sure.

13           MR. KLEIN:  In terms of members of the prosecution

14   team who are submitting declarations on Friday, the defense

15   would understand that would include individuals at OFAC who

16   were involved in this case because the government -- the Court

17   had previously found that OFAC was part of the prosecution

18   team.

19           THE COURT:  When did I find that?

20           MR. KLEIN:  When we moved to compel evidence, your

21   Honor related to OFAC, and your Honor found -- and, again, it's

22   not precisely in those words, but your Honor ordered the

23   government to produce evidence related to OFAC because OFAC got

24   entangled with the FBI in terms of the investigation of this

25   case.

L9EKGRIC

1          THE COURT:  I'll hear from the government on that one.

2          MR. WIRSHBA:  Your Honor, that's not the government's

3     understanding of your Honor's order when you made it with

4     respect to OFAC.  Your Honor ordered the government to conduct

5     a review for certain materials at OFAC, but it is not the case

6     that there are individuals at OFAC who are on the prosecution

7     team.  No one at OFAC has participated in a witness interview,

8     reviewed any of the evidence in any of the search warrants, or

9     any other of the indicia of being on the prosecution team.

10          THE COURT:  Well, see, here's the issue I have:  If

11     there is a clean representation from the case agents, the

12     prosecutors, those working with them in putting together this

13     case, that clean representation, by my recollection of my own

14     order, says, and that they're not aware of anyone else having

15     access to the information.

16          So that would mean that if someone at OFAC did

17     something — and maybe it's outrageous mis -- I'm not going to

18     rule on that now, but if OFAC did something, the government, as

19     they sit here today, the prosecution, doesn't even know what

20     that information was.  I'm not going to require them to learn

21     the prohibited information at this juncture.  So that's why, as

22     a practical matter, I'm going to stick to where I am.

23          MR. KLEIN:  Your Honor, moving on, we had filed a

24     motion, a letter motion, regarding Coinbase.

25          THE COURT:  Yes.  Let me -- not to cut you off, but

L9EKGRIC

1    let me say this about it:  This is accessing something at

2    Coinbase.  You're a good lawyer, you've got a good team

3    together, and I'm going to assume that this really wasn't

4    thought through, but there is no set of facts under which the

5    Court could have signed the order you proposed — none

6    whatsoever.  They, in effect, adjudicate Mr. Griffith's

7    ownership of this account.  They adjudicate whether there are

8    any claims or liens of third persons, and this is all done

9    without notice or an opportunity to be heard by Coinbase.

10          Mr. Klein, have you read the order recently?  Maybe a

11   member of your team has the order.  Take a look at it.

12          MS. AXEL:  I have it, your Honor.

13          THE COURT:  Yes.  Basically, I order nonparty Coinbase

14   to release funds in this account to Mr. Griffith.  Maybe you

15   might have wanted to say, Judge, can you enter an order that

16   says there is nothing in United States against Virgil Griffith,

17   20 CR 15, that restricts Coinbase's ability to release bonds —

18   that might be something we could have a discussion on — but the

19   form of the order does not work.

20          MS. AXEL:  Okay, your Honor, yes, we have been in

21   communications with Coinbase, and I think the fear is exactly

22   that they just don't want to step on any toes, particularly in

23   light of the prior briefings that we've had in this case.

24          My understanding is they have no objection to handing

25   this money over to somebody and liquidating the account and, in

L9EKGRIC

1    fact, have expressed a preference toward liquidating the

2    account.  The form of how to do that exactly, you know, I'm

3    happy to go back to them and make sure that this form is

4    acceptable to them and resubmit to the Court.

5            THE COURT:  Right.  But I want to hear what the

6    government's position is on an order which says, in essence,

7    there is nothing in United States against Virgil Griffith which

8    precludes Mr. Griffith seeking property owned by him from a

9    third party such as Coinbase.

10           MS. RAVENER:  Your Honor, that does strike the

11   government as infinitely more appropriate than the order sought

12   by the defense, both for the procedural issues and other

13   reasons outlined by the Court.

14           We will just put on the record that those funds remain

15   subject to ongoing investigation, from the government's

16   perspective.  We have concerns about those funds.  We obviously

17   have no order restraining them — that is true, we aren't

18   seeking one now, your Honor — but when the defense sought our

19   consent initially, we advised them that we could not provide

20   such consent and, in part, asked them to identify to us what

21   was the provenance of those funds.  They represented to us that

22   those funds, they believed, to be the product of Mr. Griffith's

23   salary at Ethereum.  Based on the facts available to the

24   government, that does not comport with what we know, and, as a

25   result, we could not provide our consent with respect to that

L9EKGRIC

1    particular account.  All of that is just to highlight for the

2    Court — in addition, by the way, to the lack of clarity, given

3    Mr. Griffith's own statements, as to whether these funds could

4    be subject to an IRS lien or have been properly accounted for

5    here — that there could be other issues beyond any of our

6    knowledge and that we don't believe it's appropriate to enter

7    anything more than to say that the funds are not restricted

8    pursuant to this criminal case, as the Court has said.

9              THE COURT:  Okay.

10             So you'll get me a revised order on notice to the

11   government, and I would ask the government to respond within

12   two business days of receiving the proposed order.

13             Then, if there's no objection, and it's in a properly

14   formed order, I'll enter it.  All right?

15             And no harsh criticism intended by the form of the

16   order, but I couldn't do that —-

17             MR. KLEIN:  Your Honor, we will revise it and submit

18   it to you.  Thank you for —- there's a few very minor

19   logistical, but quick things.

20             THE COURT:  Sure.  Go ahead.

21             MR. KLEIN:  One, we would like your Honor to permit

22   Ms. Axel and I and anybody to bring phones and laptops into the

23   court.

24             THE COURT:  Well, certainly laptops, what you should

25   do is contact my deputy during business hours, and she may be

L9EKGRIC

1    able to assist you, but there is a form of an order that you

2    would have to submit, and the cell phone restriction has been

3    lifted during the pandemic for trial participants.

4              MR. KLEIN:  Ah, okay.

5              THE COURT:  So if you're a trial participant, it's

6    lifted, and there's a good reason for that — because we're in a

7    different period.  I've lived through the most strictly

8    enforced period of this pandemic, and we still have strict

9    enforcement, but you really could not take off a facemask to

10   communicate with a member of your staff, and you're limited,

11   you will be limited in the number of people who will be at

12   counsel table.  So it's important that you be able to text

13   someone to say, bring in the next witness or I need this

14   document or the like.  So that's going to be permissible.

15   You'll be fine there.

16             MR. KLEIN:  Yes, your Honor, we appreciate that.

17             Do we need to bring a copy of the docket, or we should

18   talk to your deputy about how we --

19             THE COURT:  No, no.  I don't know how the CSOs go

20   about it, but as Mr. Buckley could suggest, although he always

21   waved his way in, so maybe he doesn't know anything about this,

22   is a possibility, but usually what happened is the CSOs would

23   call up chambers and say, there's some guy by the name of Klein

24   who thinks he has a case before the judge, is he for real,

25   should we let him bring his phone and --

L9EKGRIC

```
1        MR. KLEIN:  You can send me home some days, if you
2   want, your Honor.
3        THE COURT:  -- we'll take care of that, but I don't
4   think there's any order there.  If you need an order or you get
5   hassled, then we'll give you an order, but most lawyers don't
6   seem to have a problem with what I just described.
7        MR. KLEIN:  Your Honor, clothes for Mr. Griffith
8   during trial?
9        THE COURT:  You need to get me an order.
10       MR. KLEIN:  Yes.
11       THE COURT:  It's an order to the marshals, and you
12  have to supply the clothes to the marshals.  Your job is to
13  talk to the marshals and find out what they need, but one of
14  the things they do need is an order from me.  You'll get that
15  to me, and I'll sign it.
16       MR. KLEIN:  Yes, your Honor.
17       Mr. Griffith's family has inquired about, and I know
18  you mentioned the restrictions about attendance, but obviously
19  his parents are very interested in attending his trial and
20  maybe some friends and family.
21       THE COURT:  Here is the story:  It's probably worth
22  your while to go into one of the courtrooms where one of these
23  trials are taking place.  I'm, these days, up in 23B.  I have
24  no idea where this trial will take place, but there are seating
25  restrictions, as there are today, on where you can sit and
```

L9EKGRIC

1    social distancing.

2            So, subject to those restrictions, the family is

3    welcome to be in the courtroom.  I think what I will do for

4    this case is provisionally set up an overflow arrangement, and

5    the overflow room will probably be right here.  So we will do

6    that, and I think usually the CSOs are pretty good if you say

7    it's family, if they're mother and father, not if 45 people say

8    we're family, that might not go so well.

9            MR. KLEIN:  Yes.

10           THE COURT:  But if there's a mother and father, I

11   fully expect the CSOs will accommodate in the actual courtroom

12   rather than the overflow, but I can't guarantee that.

13           MR. KLEIN:  Yes, one of our questions was on that.

14           Are exhibits handled differently now?

15           THE COURT:  Yes.  All electronic.  Unless it's

16   physical evidence, it's all electronic.

17           One of the things you need to do is, you need to

18   prepare a USB drive — and this is going to be the job of the

19   government — with all admitted exhibits and an index to the

20   admitted exhibits.  So you'll get your admitted exhibits,

21   unless the government has already loaded them on there, and

22   that goes into the jury room during deliberations, and they

23   will have an electronic device -- it's not a laptop, they're

24   going to have a full-sized large monitor, several of them, but

25   they will be instructed on how to access the exhibits on the

L9EKGRIC

1    USB drive.

2            MR. KLEIN:  During the course of the trial, everything

3    is going to be electronic, no paper exhibits?

4            THE COURT:  No paper exhibits, yes.

5            MR. KLEIN:  Okay.

6            THE COURT:  And there are, I won't say, no possibility

7    of a sidebar, but no sidebar.  I finished a trial over the

8    summer where, in two weeks, there were literally no sidebars.

9    The case I have on trial now is a criminal case; there have

10   been no sidebars.  We take things up on breaks.  I'm not saying

11   never, I'm not saying it couldn't happen, but it's got to be

12   something that really couldn't have been anticipated.

13           MR. KLEIN:  Your Honor, there's one other issue, and

14   this -- we know you don't run the MCC, but we have had real

15   difficulty getting access to our client, and there has been

16   some suggestion that he may be moved to the MDC and put in

17   quarantine for 14 days, which makes it so that he couldn't --

18   potentially, we're not sure exactly of all the rules because

19   they're constantly --

20           THE COURT:  Well, that's going to be -- the government

21   can't go to trial if there isn't a defendant.  I really frown

22   on absentee trials.  So if the government wants to go to trial

23   on September 27th, they're going to need to be able to have a

24   defendant who can be here and can be returned to the place of

25   incarceration, or you don't get a trial or Mr. Griffith gets

L9EKGRIC

1    released.  Those are about the only options.

2         I have not — and I think I would — get the warning

3    that the MCC is going to be closed down, everybody's going to

4    the MDC, but I think if I was down to the 72-hour mark or the

5    five-day mark, I probably would know, and I haven't heard that

6    yet, but it's on the government's shoulders to make sure that I

7    have a defendant on September 27th and all succeeding days.

8         MR. KLEIN:  Yes.

9         MS. RAVENER:  Your Honor, that's the first we've heard

10   of any concern of that nature, and we will look into it.

11        THE COURT:  Okay.

12        MR. KLEIN:  And just to be clear, we would request

13   that he stay at the MCC through trial, assuming it's open and

14   they don't shut the whole facility down.

15        THE COURT:  Sure, sure.  Well, yes, me, too.  I'm with

16   you on that.  Great idea.  I can't get it through my head what

17   it would be like if defendants have to be produced from the MDC

18   every day for trial.  Things are -- I guess I'm requesting to

19   be learning about that because when they lock the door on the

20   MCC, I guess that's what will happen.

21        MR. KLEIN:  Yes, your Honor.  Thank you for -- let me

22   just check and make sure there's nothing else, but I think that

23   is it, your Honor.

24        THE COURT:  Hang on now.

25        (Pause)

L9EKGRIC

1          THE COURT:  Well, listen, my first thanks go to my

2     wonderful court reporter who has stayed with us tonight — thank

3     you, Andrew — and thank you for the very fine briefing on

4     everything.  It was a pleasure to read good briefing.

5          MR. KLEIN:  Your Honor, three seconds?

6          THE COURT:  Yes.

7          MR. KLEIN:  Just we're not sure how long the

8     government's case is going to be in chief right now, so we'd

9     ask that we get some information on that.  We'd also ask for --

10    if your Honor has anticipation for opening statements, how long

11    you anticipate, we'll work that out when we arrive for the

12    trial.

13         THE COURT:  No, no, we're not going to work it out

14    when we arrive.  This is always a painful part of the process,

15    but I'll ask:  How long does the government think it wants for

16    its opening statement?

17         MS. RAVENER:  Your Honor, approximately 20 minutes.

18         THE COURT:  Okay.

19         And yours will be that or less, I assume, yes?

20         MR. KLEIN:  We were hoping for half an hour, your

21    Honor.

22         THE COURT:  I think it's fair, then I'm going to

23    expand the government's.

24         MR. KLEIN:  Fine.

25         THE COURT:  But, no, I could do that, I think I'm

L9EKGRIC

1    going to limit both sides to 20 minutes.  That should be

2    adequate for the case.  So let's limit it to 20 minutes.

3            Jury selection, you may or may not know -- well, what

4    happens on the morning of trial:  You're going to go to the

5    courtroom, we're going to tell you what courtroom to go to.

6    There will be no jurors there.  But that's where we'll

7    assemble.  Then we're going to head down to the jury assembly

8    room, and the jury selection process will take place in there.

9    And there will be room at counsel table, generally speaking,

10   for two prosecutors and two defense counsel and the defendant.

11   Sometimes, in a one-defendant case, we can do better than that;

12   I can't promise that in the jury assembly room.  And then when

13   there's a sidebar, usually, it will be one attorney from each

14   side at the sidebar with the jurors.  There's a little bit more

15   flexibility on the final strikes.  I realize that that's a

16   little bit logistically difficult, and we can accommodate more.

17           What else?

18           MS. AXEL:  Can I ask a question about that, your

19   Honor?

20           THE COURT:  Sure.

21           MS. AXEL:  The COVID list that applies when we have to

22   come into the courtroom, that basically you report if you have

23   really any symptoms of the common cold.  Is that the same list

24   for jurors, and does that give them an opportunity to

25   essentially avoid service or decide whether they want to

L9EKGRIC

1    participate?

2              THE COURT:  Well, I don't know, what did you do when

3    you came in today?  Because the questions have been changed.  I

4    personally — me, as a judge of this court — have to do this

5    every day I am in the courthouse.  There's the QR code, you

6    scan it, you're asked the question are you fully vaccinated,

7    and so on and so forth.  If not, then you -- if you have COVID

8    symptoms or you have been to a quarantine location or in

9    contact with a person who has COVID, you're not immediately

10   allowed in.  What happens is, there is a COVID response team

11   available in this court by phone that makes a determination of

12   whether or not it is safe for that person to come into the

13   courthouse, period.  But it's not the CSOs' job to enforce that

14   as such.  If someone cannot come in under the restrictions,

15   they should so indicate, and then we'll get an indication from

16   the team.

17             But, most emphatically, we are not collecting data on

18   whether jurors have or have not been vaccinated.  An

19   unvaccinated juror is welcome to serve.  We don't say, are you

20   vaccinated or not vaccinated?  It's not part of the voir dire

21   process.  There is, obviously, the need to know -- maybe the

22   person tested positive for COVID, we would need to know that in

23   order to be able to restrict that person from infecting other

24   people in the building, but that is isolated from the jury

25   selection process.

L9EKGRIC

1          MR. KLEIN:  Your Honor, the government's estimate for

2     the length of trial, it would also be helpful to us, your

3     Honor, in our planning.

4          THE COURT:  What do you think you need for the length

5     of this trial, as I have now -- I've made it a more efficient

6     trial for you, for one thing, right?

7          MS. RAVENER:  Your Honor, our estimates are the same

8     as they've always been.  We anticipate that the government's

9     case could be completed in approximately a week and may go into

10    two, and we hope, though we don't know at all what the

11    defense's case may be, but it may be completed in two weeks.

12         We'd also just note that we've already produced

13    approximately 180 exhibits to the defense as well as 3500

14    material for many witnesses.

15         THE COURT:  Okay.

16         So everything you've said is consistent with what I've

17    heard and known all along, so...

18         MR. KLEIN:  And, your Honor, hopefully, we will pick a

19    jury and get to opening statements right away.  Could we ask

20    for the government's, at least, first day witness list a few

21    days in advance?

22         THE COURT:  You guys are going to talk to each other.

23         MR. KLEIN:  Okay.

24         THE COURT:  I'm not refereeing this.  I don't want to

25    hear about battles back and forth.  Talk to each other.  And

L9EKGRIC

1   this is a case where it's likely that there will be a defense

2   case, and sauce for the goose is sauce for the gander, and the

3   one thing I won't tolerate, because I've actually had lawyers

4   who have tried this, is, oh, well, you're going to give me 24,

5   48 hours on the government's case and your witnesses, and, of

6   course, I'll do the same, and then it gets to the defense case,

7   and they go ha-ha-ha, I'm not going to do that.  And that would

8   not go well.  Of course, they don't say with a ha-ha-ha, they

9   just say, oh, your Honor, this is all unexpected and I didn't

10  know.

11          But talk to the government, work it out.  You have

12  things to talk about, including your subpoenas.  You need to

13  talk.

14          MR. KLEIN:  We will do so.  We have been talking, your

15  Honor.  We talked before we came in here.

16          THE COURT:  Okay.  Good.  What else?

17          MS. RAVENER:  Nothing further from the government,

18  your Honor.

19          MR. KLEIN:  Nothing further from the defense, your

20  Honor.

21          THE COURT:  Okay, that's good.  So I will see you on

22  September 27th, 9:30 a.m., in the courtroom that we're assigned

23  to.  Stay well until then.  Be well.

24          MR. KLEIN:  Thank you, your Honor.

25          MS. RAVENER:  Thank you, your Honor.  * * *