UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------x

UNITED STATES OF AMERICA        :

              Plaintiff,        :

      v.                        20 Cr. 15 (PKC)

                       :

VIRGIL GRIFFITH,            

                       :

              Defendant.
--------------------------------------------------------x

**DEFENDANT VIRGIL GRIFFITH'S
SENTENCING MEMORANDUM**

Brian E. Klein
Keri Curtis Axel
Sam S. Meehan
Waymaker LLP
777 S. Figueroa Street, Suite 2850
Los Angeles, California 90017
(424) 652-7800

Sean S. Buckley
Amanda N. Tuminelli
Kobre & Kim LLP
800 Third Avenue
New York, New York 10022
(212) 488-1200

*Attorneys for Virgil Griffith*

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ...............................................................................1

DISCUSSION .....................................................................................................3

    I.     The Presentence Report and the Guidelines Calculation ......................3

    II.    Virgil's Personal History and Characteristics .......................................3

          a.    Virgil's Upbringing, Academic Background, and Career..........3

          b.    Testimonials From Virgil's Friends, Family, and Professional Peers ....................................................................................5

          c.    Virgil's Charity Work While on Pretrial Release .....................9

          d.    ████████████████████ ..................12

          e.    ████████████████████ .............................12

          f.    ██████████████████████████ ...............................................................15

          g.    Virgil's Remorse and How That Has Changed Him................16

          h.    ███████████████████████████ ..............................................18

    III.    The Nature and Circumstances of the Offense....................................22

    IV.    The Need to Avoid Unwarranted Sentencing Disparities (§ 3553(a)(6)) ..................................................................................................28

    V.    The Remaining 18 U.S.C. § 3553(a) Factors Support a 24-Month Sentence ..............................................................................................33

          a.    A 24-Month Sentence Is Sufficient to Recognize the Seriousness of the Offense and to Provide Just Punishment....34

          b.    Virgil's Pre-Sentence Confinement Eliminates the Need for a Long Sentence ......................................................................35

          c.    A 24-Month Sentence is Sufficient for General and Specific Deterrence, to Promote Respect for the Law, and To Protect the Public (§ 3553(a)(2)(B and C)) .................................................41

CONCLUSION ................................................................................................44

# TABLE OF AUTHORITIES

**Cases**

*Federal Defenders of New York, Inc. v. Federal Bureau of Prisons, et al.*,
  19 Cv. 660 (MKB) (E.D.N.Y.) (Sept. 2, 2021)....................................................... 40

*Garofalo v. Gravano*,
  23 F. Supp. 2d 279 (E.D.N.Y. 1998)..................................................................... 41

*Sarvestani v. United States,*
  Case No. 13 Cr. 214 (PGG), 2015 WL 7587359 (S.D.N.Y. Nov. 25, 2015).......... 29, 30, 33

*United States v. Adelson*,
  441 F. Supp. 2d 506 (S.D.N.Y. 2006).................................................................. 42

*United States v. Amirnazmi*,
  645 F.3d 564 (3d. Cir. 2011)............................................................................... 30

*United States v. Amirnazmi,*,
  Case No. 08-cr-00429, (E.D. Pa. 2010) .............................................................. 29

*United States v. Aracena de Jesus*,
  20 Cr. 19 (PAE) (S.D.N.Y. July 1, 2020) ........................................................... 36

*United States v. Banki*,
  685 F.3d 99 (2d Cir. 2012)................................................................................. 29

*United States v. Banki,*
  Case No. 10 cr-00008 (S.D.N.Y. 2010) .............................................................. 29

*United States v. Blake*,
  89 F. Supp. 2d 328 (E.D.N.Y. 2000).................................................................. 22

*United States v. Cull*,
  446 F. Supp. 2d 961 (E.D. Wisc. 2006) ............................................................. 43

*United States v. Edwards*,
  595 F.3d 1004 (9th Cir. 2010)........................................................................... 41

*United States v. Gonzalez*,
  No. 18 Cr. 669 (JPO) (S.D.N.Y. Apr. 2, 2021)........................................... 35, 36

*United States v. Hernandez*,
   No. 1:03-cr-01257 (RWS), 2005 WL 1242344 (S.D.N.Y. May 24, 2005) ........................ 43

*United States v. Husein*,
   478 F.3d 318 (6th Cir. 2007) ............................................................................ 11

*United States v. Martin*,
   520 F.3d 87 (1st Cir. 2008) .............................................................................. 11

*United States v. McCormick*,
   No. 3:15-cr-00009-1, 2017 WL 492506 (M.D. Tenn. Feb. 7, 2017) ................................. 22

*United States v. Meli, et al.*,
   19 Cr. 480 (RA) (S.D.N.Y. Sept. 24, 2021) ........................................................... 37

*United States v. Salvador*,
   No. 98 Cr. 484, 2006 WL 2034637 (S.D.N.Y. July 19, 2006) .......................................... 37

*United States v. Sanpedro*,
   352 F. App'x 482 (2d Cir. 2009) ........................................................................ 37

*United States v. Sharon Hatcher*,
   18 Cr. 454 (KPF) (S.D.N.Y. Apr. 19, 2021) .......................................................... 40

*United States v. Tiffany Days,*
   (19 Cr. 619 (CM) (S.D.N.Y. Apr. 29, 2021) ......................................................... 36

*United States v. Toohey,*
   132 Fed. Appx. 883 (2d Cir. 2005) ..................................................................... 33

*United States v. Torres*,
   No. 1 Cr. 1078, 2005 WL 2087818 (S.D.N.Y. Aug. 30, 2005) ........................................ 37

*United States v. Vigil*,
   476 F. Supp. 2d 1231 (D.N.M. 2007) .................................................................. 42

*United States v. Williams*,
   662 F. App'x 366 (6th Cir. 2016) ....................................................................... 43

**Statutes**

18 U.S.C. § 3553(a) ................................................................................... passim

USSG § 2M5.1 ........................................................................................ 34

## PRELIMINARY STATEMENT

Virgil Griffith has pleaded guilty to a conspiracy to violate U.S. sanctions laws.  He acknowledges that he engaged in serious criminal conduct, and he does not seek to excuse his actions in any way.  He also recognizes now how arrogant and misguided he was, and how dismissive he was of those who cared about him and tried to stop him from going to the DPRK, including his own parents.  He is deeply remorseful and accepts responsibility for the actions that bring him before this Court to be sentenced.  This is his first involvement in criminal activity, and it will be his last.

Put simply, this case involves a brilliant Caltech-trained scientist who developed a curiosity—bordering on obsession—with the DPRK, a regime that he believed to be a relic that would soon be swept into the dustbin of history.  In traveling to the DPRK, he viewed himself— albeit arrogantly and naively—as acting in the interest of peace.  As a result, he broke U.S. sanctions laws covering that country, the IEEPA, in ways that seem unfathomable in hindsight but, to his everlasting regret, made sense to him at the time.  He loves his country and never set out to do any harm.  It also bears pointing out that he did not gain financially from this crime. To the contrary, he spent his own money to travel to North Korea and was not compensated in any way for the presentation he gave.  Upon his return, he self-reported, repeatedly and voluntarily meeting with the State Department and FBI to discuss his trip, ███████████████ ███████████████████████████████████████

In his letter to the Court, Virgil acknowledges that he acted wrongly, accepts full responsibility for his crime, and is very regretful for his conduct.  In addition, the nearly 40 letters from family, friends, and others who have known Virgil provide the Court a complete (and positive) picture of him, revealing his true character and how he has learned a very tough lesson that will ensure that he never again takes actions like those that have put him before the

Court for sentencing.  To be sure, the information presented in this memorandum overwhelmingly evidences that Virgil is a good person who deserves a second chance.  Those who know him best—including all those who have written letters to the Court—attest to his core goodness and kind heart, and to their belief in him and desire to be there for him when he returns to society.

Virgil is now before the Court to be sentenced as a non-violent, first-time offender for a crime he admits he committed.  Based on the factors set forth in 18 U.S.C. § 3553(a), many compelling sentencing considerations exist that justify a sentence well below the parties' stipulated advisory Guidelines range of 63 to 78 months' imprisonment (and the Probation Office's 63-month recommendation).  These reasons include:

1. Virgil has already spent over 10 months in extremely harsh jail conditions as well as approximately 19 months under restrictive pretrial home confinement.

2. A compilation of sentences related to violations of the IEEPA and similar embargo-type cases make clear that the sentences given to individual defendants in cases involving these types of violations but with far worse facts are usually substantially below the Guidelines range.  The sentence here should take these cases into account so as to avoid unfair sentencing disparities.

3. Virgil has no prior criminal record. He has never had a prior arrest, much less a conviction, ███████████████████████████████████████████████████
████████████████████████████████████████████████████████████.

4. Virgil has learned his lesson.  He realizes that he is not as smart or as independent as he thought he was, and he knows what he did was wrong.  His friends and family are his anchors; they have remained with him and will provide the structure and accountability he needs to keep him on solid (and humble) ground.  This was a unique set of facts in which his innate curiosity and his desire for cooperation and peace, coupled with a naïve and conceited view of the ability of science and himself to bring the world toward peace, caused him to lose judgment and commit this crime.  This will not happen again.

Given the specific § 3553(a) sentencing factors in this case, the defense respectfully submits that a sentence of imprisonment of 24 months, with a fine and substantial community service, is "sufficient, but not greater than necessary" to meet all of the factors.

## DISCUSSION

### I.     The Presentence Report and the Guidelines Calculation

The final PSR was issued on December 27, 2021.  The PSR agrees with the parties' United States Sentencing Guidelines ("Guidelines") calculation of a total offense level of 26, resulting in a Guidelines range of 63-78 months' imprisonment, because Virgil has no prior criminal record (or even any contacts with the criminal justice system) and is in Criminal History Category I.  (PSR ¶ 4.)  The Probation Office recommended a sentence of 63 months.  (PSR Sentencing Recommendation at 2.)

### II.     Virgil's Personal History and Characteristics

Pursuant to 18 U.S.C. § 3553(a)(1), in arriving at a sentence that is "sufficient but not greater than necessary" to comply with the purposes of federal sentencing, the Court "should consider, among other factors, the nature and circumstances of the offense and *the history and characteristics of the defendant*."  (Emphasis added.)  An examination of Virgil's personal history and characteristics reveals that a significant downward variance is warranted.  This fact is evidenced by information provided to the Court within the letters of support from family members (Exhibit A), friends and former colleagues (Exhibit B), and importantly, Virgil himself (Exhibit C).

#### a.   Virgil's Upbringing, Academic Background, and Career

Virgil was born and raised in Tuscaloosa, Alabama.  (PSR ¶ 72.)  Virgil's parents are both physicians—his father Robert practices dermatology, and his mother Susan is a retired radiologist.  (*Id.*)  Virgil's sister, Joy, is veterinarian living in Maryland.  (*Id*. ¶ 73.)  The

3

Griffiths are a tight-knit, loving family who have supported Virgil throughout this ordeal.  The family is active in their local church community, as shown by the letters of support submitted by clergy and parishioners at Grace Church in Tuscaloosa.  (Ex. B at 1-4.)

Although Virgil would go on to have a sterling academic career, he faced serious obstacles in school at a young age.  ████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████

As many of his supporters will attest, one of Virgil's defining traits is his relentless, boundless curiosity.  Dr. Christof Koch, Virgil's doctoral advisor at Caltech, describes Virgil as "intensely curious," while high school friend Peter F. Burns Jr. calls him "an intellectual explorer and curious person."  (Ex. B at 5-6.)  Similarly, Virgil's longtime friend Eric Corley recalls "an incredibly intelligent person who was intensely curious about everything ranging from the profound to the mundane."  (*Id.* at 39-40.)  Virgil was able to overcome ████████████ to graduate from the University of Alabama in 2007, where he majored in Computer and Cognitive Science.  (PSR ¶ 88.)  Virgil continued his studies at Caltech—one of the most prestigious schools in the world—earning a doctorate in computation and neural systems in 2013.  (*Id.* ¶ 89.)

In 2017, after working as a research scientist for several organizations, including one tied to the Massachusetts Institute of Technology, Virgil accepted a position with the Ethereum Foundation, a non-profit organization founded by blockchain and cryptocurrency pioneer Vitalik Buterin that supports the Ethereum blockchain.  (PSR ¶ 91-94; Ex. B at 7-9.)  Ether, the native token on Ethereum, is second only to Bitcoin in market capitalization, and has helped revolutionize the world of smart contracts, decentralized applications, and much more.  In many

ways, Ethereum is more innovative than Bitcoin, and Virgil made significant and lasting contributions to its development.

Virgil and Buterin first became acquainted in 2013 and formed a strong friendship, sharing a mutual belief in the potential for blockchain technologies to positively change the world. (Ex. B at 7-9.) Buterin writes that Virgil is "someone who is very kind and who deeply values cooperation and peace. He impressed me the most with his eagerness to reach out and attempt to genuinely understand different people and cultures, always with the goal of trying to bring them together and find ways for everyone to benefit." (*Id.*) Virgil's core values of "seeking cooperation and peace" have contributed to "deep personal changes" in Buterin, who describes how Virgil has helped him "to foster an open-mindedness and an orientation toward cooperation that guide my actions to this day, in a way that was absent from my personality five years ago." (*Id.*)

These values of Virgil—peace, cooperation, selflessness—have positively impacted all those around him as the Court will read below.

### b. Testimonials From Virgil's Friends, Family, and Professional Peers

The letters attached as Exhibits A-B help paint a full picture of Virgil—a complex, beloved person who is defined by much more than the crime he committed. Exhibit A consists of letters from Virgil's parents and uncle. Virgil's parents have continued to support their son unconditionally during this tremendously difficult period, drawing strength from their faith. They will provide an excellent support system for Virgil once he is released.

The family letters offer candid yet tender insights into who Virgil really is. According to his father, Robert, "Virgil is the most remorseful I have ever seen." (Ex. A.) Robert is "confident that this episode in [Virgil's] life has produced a man who more fully

appreciates his need for community and outside influence to discover the wisest path forward."
(*Id.*)  Virgil's mother, Susan, also highlights her son's sincere contrition, writing that since
his arrest, she has "see[n] his attitude change, and he has expressed a desire to lead a more
quiet life."  (*Id.*)  Susan writes that Virgil has "become a genuinely kind and generous person"
who "is remorseful for his actions[.]"  (*Id.*)  And Virgil's uncle, Roger Day, a professional
musician who specializes in family and children's music, offers a tender glimpse into
Virgil's kind-hearted nature.  Day writes that, on a family trip to visit him in Pasadena,
Virgil "played the role of intrepid tour guide to perfection" and introduced Day's young son
to boba tea and other attractions on the Caltech campus.  As Day notes, "Virgil remains a
beloved member of our family."  (*Id.*)

Exhibit B encompasses a number of letters from Virgil's large circle of friends and
colleagues.  This includes pastors from his church, old school friends, former Ethereum
Foundation colleagues, and many others who cherish Virgil's kindness and willingness to help
others.

Virgil's close friend, Won "Antonia" Tong, offers a moving description of his
acceptance of guilt and commitment to learning from his mistake:

> Dr. Virgil Griffith voiced to me tremendous regret as well as a
> strong willingness to rectify the misconduct. Facing the aftermath
> of one's doing is often tough, and he was ready to get through that
> for a better future, as he repented his misdeeds. Since he's already
> proceeded to acquire a foreign language, read many useful
> literatures, and taught himself on international trade law in prison,
> I believe Dr. Virgil Griffith has every intention of fixing what he
> has torn apart. He's always been a kind gentleman who strives for
> personal growth, compassion, and serenity. I'm confident that Dr.
> Virgil Griffith will make the most of his home confinement and
> return to being a robust spectacular figure - a remarkable
> blockchain scientist in America.

(Ex. B at 10.)

6

Fred Schuckert, the Griffith family's former pastor, has also observed growth and maturity in Virgil since his arrest.  Pastor Schuckert writes:

> There have been three areas of character where I have seen considerable growth in Virgil. One area of growth is in humility. He has been deeply humbled by his serious error in judgement with his North Korea trip and by the severity of the corresponding consequences. Another area of growth I have seen in him is in thoughtfulness. Virgil genuinely expresses interest in my family and ministry. When we have met, he always he wants to know how things are going in my world. He has also shown real concern for people whom we both know are struggling in life. A third area of growth I have seen in Virgil is his openness to the differing viewpoints of others. He really wants to understand why someone believes what they believe.

(*Id.* at 3.)

While Virgil has experienced tremendous personal growth in the wake of his crime, he has always been a loving, kind friend.  Lauren Roberts, a psychiatric nurse practitioner in Alabama who met Virgil through a mutual friend, writes that "[w]hat initially struck me about Virgil is his inclusive, altruistic nature and inquisitive, visionary mind.  Virgil is the most generous, nonjudgmental human being I've ever encountered."  (*Id.* at 11-12.) Roberts believes she is "certain I could ask most anything of Virgil and he would gladly assist me."  (*Id.*)  Virgil's Chinese tutor, a University of Alabama PhD student named Huaiyue Zhang, also writes of Virgil's empathy and kindness, describing how Virgil has mentored her and "inspired me, enlightened me with great ideas, and encouraged me to stick to my goal and not to give up.  I can tell he is the kind of person who truly cares about people even when he himself is going through difficulty."  (*Id.* at 13.)  Henry Strickland, another supporter and friend who has known Virgil for 22 years, writes that what is "special about Virgil" is that he is "gentle, kind, and generous. He keeps his family and his network of friends in mind.  Sometimes he tells me of his plans of unique gifts for various people.  For one friend, he was commissioning an oil painting of that

friend's pet parrot.  He enjoys helping those who are younger or less experienced, like students we meet at conferences." (*Id.* at 14-16.)

Exhibit B is also comprised of letters from Virgil's former academic and professional colleagues.  These letters will show the court that Virgil is a brilliant scientist with a unique worldview who will, in the words of his peer David Bailey, "help make the world a better, freer place for all people." (*Id.* at 17.)  One of Virgil's former colleagues at the Ethereum Foundation, Nicholas Johnson, provides a succinct summary of his professional talents:

> Virgil possesses a rare combination of technical insight and ambition that has served the projects he has advocated for well, and he has a history of taking on 'moonshot' projects that seem far-fetched to most. The example of this that stands out to me was his successful efforts working with Muslim scholars to have Ethereum declared 'Halal.'

(*Id.* at 18.)  Virgil's "moonshot" outlook has led to great contributions in his field, and his colleagues and peers know that Virgil will continue to build great things once he is released from custody.  Computer programmer Dimitri Dimoulakis echoes this sentiment, respectfully asking the Court to "consider not only Virgil's future, but the overall benefit to humanity he has contributed both to myself and to countless others.  Imposing anything in excess of the lowest sentence permitted under the law is an overall loss for society." (*Id.* at 19-20.)  Similarly, Bailey, who now runs *Bitcoin* Magazine, writes that "Virgil has positively given so much to the world in his short professional career, and I want to see him be able to continue to help make the world a better, freer place for all people." (*Id.*)  Emily Tsay, a friend and former colleague of Virgil's at the Ethereum Foundation, also emphasizes his selflessness and commitment to helping others.  According to Tsay, Virgil "has done so much for me that has changed the trajectory of my life.  He is such a rare and exceptional friend because he has a combination of compassion, creativity, and generosity that he applies to all his friendships, and even

people he has just met!" (*Id.* at 21-22.) Tsay has been in contact with Virgil during his incarceration, and she relates that he has been "very reflective while in prison" and is "deeply remorseful for his actions." (*Id.*) Tsay looks forward to Virgil's release, since his "heart and creativity will no doubt be a net positive on people's lives and the world." (*Id.*)

Collectively, these letters leave no doubt that, despite the serious crime he has committed, Virgil has consistently enriched the lives of those around him, and these supporters have not forgotten or abandoned him. This support system will be there for Virgil when he emerges from this period in his life to start his life anew, and he is committed to repaying their faith in him.

### c. Virgil's Charity Work While on Pretrial Release

Consistent with Virgil's character, kindness to others is not limited to family and friends. Following his arrest, Virgil regularly attended church services with his family and has also helped run children's programming at the church. (*Id.* at 2.) While living in his parents' home pending trial, Virgil befriended a homeless man named Eugene Hayes, who was working at a Waffle House in Tuscaloosa at the time. Virgil selflessly helped Hayes in a variety of ways, from helping him complete his GED and barbering license to helping Hayes pay off several parking tickets. Thanks in no small part to Virgil's assistance, Hayes now has a stable job as a barber and a security guard. Here is what Hayes has to say in his moving handwritten letter to the Court (without any corrections):

> When I meet Virgil I was at the lowest point of my life. I was homeless and working off tips. I meet Virgil at the Waffle House I greeted him I said welcome to the Waffle House and continued as his server. What I didn't realize was that my whole life was about to change for the better. After talking to him for awhile Virgil took intrest in what stressed me out and those things made me want to give up in life. I remember Virgil asking me what are some goals you have in life. I remember telling him my goals don't matter I

can't reach them. Virgil almost didn't finish eating because he immediately was concerned. From that day Virgil stood by me a stranger who he knew nothing about. He coached me threw my mental problems and thoughts. When I called Virgil and explained to him bad ideas or going threw my head he showed me good in it. Virgil told me that my bad thoughts only make room for more bad and that being positive and staying focused on my goals take the bad thoughts away.

Virgil worked hard with me with the little space he had to give. Even when I made the same mistake he reacted with love never anger. He walked me through the steps of remaining stable. Virgil pushed me to get my education and it was a success "G.E.D." Now I'm liscense barber. He got me involve with his family loving church. We tracked down every ticket and blemish on my record then he help my gain back access to my licsense now I don't have to look over my shoulder when I drive witch made it possiable for me to be a better father to my two sons now my two boys have a weed free father and not only for me he does these things countless times. I have seen him in hero mode even if it was helping a homeless lady eat. Virgil sees the good in everyone expt spiders they make him jumpy. I'll never forget Virgil telling me "you know I could've just paid you out I and I said why did you go threw the storm and rain with me if it was that was that easy Virgil said "because me paying you out of debt only solves the problem temporary, but if I teach you the skill it will last a lifetime. I'll never forget that.

I will teach my son by that law so if I'm gone they will still stand but truley I can say I'm a better person to the world. I swear by my son's life and everything in me that Virgil showed me real friendship and love to be honest he saved my life. He also use to tell me I find joy in helping others never once have he showed me anything dffrent. Virgil also said "Eugene, do you realize you pulled 85% of yourself out of this" but no matter what Virgil is the real hero in me and my family life. Virgil went from friend to family and on that note about family. He's truley been better to me then blood he even housed me when I was to cold gave me clothes off his back socks so my feet could be war I really can keep going. But me, my family, and friends miss him dearly. Not only can we see his heart we felt the real love. Brave of you to step in my kind of community just to come help us. My prayers are strong and I know God see a rightous heart and I know Virgil stick out like a sore thumb. Thank you for listening Judge Castle.

(*Id.* at 23-25.)

While on pretrial release, Virgil also volunteered in a children's enrichment program at his family's church.  Grace Church Children's Ministry Director Shannon Gray writes:

> I was happy to see Virgil participate in the community and not just stay at home. He engaged with the kids really well and helped teach some of the science lessons we were working on. Virgil was helpful explaining concepts to the kids as well as connecting with them as people. I appreciated him taking the time and making the effort to be involved in our children's program.

(*Id.* at 4.)  The Senior Pastor at Grace Church, Ben Talmadge, also expressed gratitude for Virgil's service to the congregation.  Pastor Talmadge feels that Virgil "was making a sincere attempt to accept the punishment for what he did and abide by the restrictions placed upon him."  (*Id.* at 1-2.)  As part of this sincere attempt, Virgil regularly attended church services and "also included times of serving others in various ways, from helping underprivileged families with practical needs to offering advice on how I could incorporate effective use of technology into my sermon delivery."  (*Id.*)

The defense respectfully submits that Virgil's commitment to his family and communities, and the benefits that he would glean from being surrounded by same, supports the imposition of a mitigated sentence.  *See, e.g., United States v. Martin*, 520 F.3d 87, 93 (1st Cir. 2008) (affirming a 91-month variance down from the guideline range based in part on "the support that the defendant stood to receive from his family [and] personal qualities indicating his potential for rehabilitation . . . ."); *United States v. Husein*, 478 F.3d 318, 324 (6th Cir. 2007) (affirming sentence of one-day credited for time served and three years' supervised release, including 270 days of home confinement, despite an advisory Guidelines range of 37 to 46 months, where the court noted that defendant's "family is going to benefit more by your presence than society is going to benefit from your incarceration").

11











### g. Virgil's Remorse and How That Has Changed Him

Virgil's remorse and the fact that he is a changed and chastened man is readily apparent to those who know him.  The Court can see this first and foremost in his own letter as well, in



16

which he describes the "two plus years since [his] arrest" as "the most difficult of [his] entire life." (*See generally*, Ex. C.)  One of the things that so deeply changed Virgil was seeing the impact of his actions on his family members.  The genuine remorse and regret that his friends and family members have observed are echoed in his own letter.  For example, Virgil describes his eternal gratitude to his "amazing parents," and notes that "[o]ne of the hardest parts about all of this, is knowing how much I let them down and how much I have hurt them." (*Id.*)  And it is not only his parents whom he recognizes were victims of his actions, but also his sister and brother-in-law.  He describes how his actions "severely and understandably frayed" his relationship with his sister, acknowledging that while it is "incredibly painful," he admits that he deserves it.  (*Id.*)

Having fully grasped the significance of his crimes and understanding why he should not have rejected the admonitions of his friends and family, Virgil describes how "the foolishness and stupidity of my decision to travel to North Korea now astounds me." (*Id.*)  Based on the impact that the decision has had on his life, but more importantly on the lives of his family and friends, this is a genuine moment of introspection and understanding and of the wrongfulness of what he did.  He now recognizes that it was not only wrong but driven by his misplaced hubris, and having seen the consequences, Virgil admits that he was "so very wrong" and as a result is "profoundly embarrassed" of what he has done.  (*Id.*)

Virgil recognizes that his acceptance of responsibility in this case by pleading guilty is only the beginning of the healing process, but he is dedicated to continuing that process.  He rightly views this mistake and the consequences he has suffered as something that have caused him to reflect and evolve and that will make him more "cognizant of the ramifications of [his] actions" so as "to never repeat the mistakes [he] made." (*Id.*)











### III.    The Nature and Circumstances of the Offense

The defense respectfully submits that an examination of the nature and circumstances of Virgil's offense, as required by 18 U.S.C. § 3553(a)(1), indicates that a sentence well below the applicable Guidelines range of 63-78 months' imprisonment is warranted.

The law requires that, in fashioning an appropriate sentence, courts should "attempt[] to understand (as best one can) what set a defendant upon [an] illegal course." *United States v. Blake*, 89 F. Supp. 2d 328, 332 (E.D.N.Y. 2000). While this does not excuse Virgil's conduct as a moral matter, as a legal matter Section 3553(a) makes that context relevant in determining his sentence. *See, e.g., United States v. McCormick*, No. 3:15-cr-00009-1, 2017 WL 492506 at *10 (M.D. Tenn. Feb. 7, 2017) ("The context in which the offense took place indicate [defendant] was unusually influenced by a number of factors, including untreated mental health issues (depression, anxiety, and a 'maladaptive' desire to please) . . ., and other issues. While these circumstances do not excuse [defendant's] conduct, they do help to explain it").

To be sure, the crime Virgil has pleaded guilty to committing is a serious offense, and he accepts full responsibility for his participation it. In a nutshell, that crime is that Virgil conspired to provide services to North Korean persons without obtaining an OFAC license to do so, including by attending a conference in the DPRK and delivering a presentation on blockchain technology. (PSR ¶ 53). Virgil's presentation was titled "Blockchain and Peace," was based on a published article, and he intended to stay tethered to that subject matter, but his ego and belief that he was "the guy with all the answers" got in the way. While Virgil did not initially intend to provide any information at the conference concerning sanctions evasion, he recognizes that was the intent of others present in the conference, and that he aided and abetted their statements, by engaging in their presentations and offering comments, and clearly crossed that line. Other actions he took before and after the DPRK conference were also wrong. What he did was illegal, and he accepts responsibility for it. He makes no excuses.

Of course, the conference itself was the culmination of Virgil's unique and unfortunate curiosity and obsession with North Korea that is described in Paragraphs 16-29 of the PSR. To assist the Court in evaluating those events, the defense respectfully offers additional background and definitions regarding the blockchain, digital tokens, nodes, and other similar concepts, based on a declaration from one of the world's leading experts on blockchains and cryptocurrencies, Andreas Antonopoulos, which is attached as Exhibit E ("Andreas Decl."). (The defense believes it is misleading to refer to a "node" as simply "cryptocurrency infrastructure" and a blockchain as simply a "cryptocurrency network," as was done in the PSR. (PSR ¶ 18, n. 1.) With all appropriate respect to the Probation Office, the defense submits that it is important to unpack these terms to clarify the technology to make clear what Virgil did (and did not) discuss, and to distinguish this from the facts and circumstances in other sanctions cases.

A blockchain is a piece of software that provides an indelible ledger of the transactions that run on it; it is generally public and open.  (Ex. E, ¶¶ 4-5.)  It does not reside on one server or computer, however, but runs on computers (called nodes) all over the world.  While digital tokens are issued on a blockchain, can be a means of exchange on that blockchain, and can be required to effect transactions on it, the blockchain itself can be used like any piece of software to power all kinds of different applications, and such is Ethereum's vision.  Ethereum does not exist simply to create or exchange Ether, its native token, but was envisioned as the backbone of the next generation of computer applications.  Applications are being built on Ethereum and on other blockchains every day, even by governments.

With this background, a "node" is just a computer that replicates the blockchain and adds on to it.  (Ex. E, ¶ 6.)  It enhances the security of a blockchain to have nodes all over the world, particularly among disparate actors who do not have reason to collude in damaging the blockchain.  It also bears pointing out that Virgil did not proceed with the idea of an Ethereum node in the DPRK based upon legal advice.

As to the Tor node, that is actually a totally different thing and not a cryptocurrency node at all.  Tor is an Internet freedom project, and has received the majority of its funding and support from the U.S. State Department and the Department of Defense and was developed by the U.S. Naval Research Laboratory in the mid-1990s.[19]  The State Department had a long-standing interest in introducing Tor into nations and regimes that traditionally were not open to the West.  Indeed, prior to traveling to the DPRK, Virgil was aware that people involved with the Tor Project, including an employee of the Tor Project, had visited the DPRK in 2016 to talk

---

[19] https://www.torproject.org/about/sponsors/

about the Tor project.  Tor Project management knew about this trip, and other similar trips, such

as a follow up trip to Cuba, far in advance.  The Tor Project received funding (and continues to)

from the State Department, Radio Free Asia ("RFA"), and many other groups like the

Broadcasting Board of Governors (now called the U.S. Agency for Global Media), which

promotes internet and media freedom worldwide on behalf of the U.S. government.  The same

individual traveled with the head of RFA and several of the Governors to India, Thailand, and

Burma in 2012.  This individual had encouraged Virgil to do whatever was possible to help

topple the DPRK government, as well as to understand what real tyranny looks like in the world,

which helped give Virgil a false sense of confidence that, in so doing, he was not undermining

U.S. interests.  Virgil knew all of that at the time he suggested the Tor Project that it consider a

DPRK node.  A Tor node need not even be a computer but could run on someone's phone.  A

leader of the Tor Project rejected the idea that it would get involved in the DPRK, and that

subject too was dropped.

     For these reasons, the defense believes that the core of the offense conduct concerns the

conference.  Virgil clearly understands that he crossed a line and violated the U.S. sanctions laws

with respect to his words and conduct there.  Virgil has long been fascinated with the idea of

science as a tool of diplomacy, and he intended not to counsel any sanctions violation.  His

"Blockchain and Peace" lecture discussed the idea that "smart contracts" could be used to permit

accountability in treaty relationships, an idea that has been suggested at the U.N.  In other words,

smart contracts might permit governments who do not trust each other—like the DPRK and the

U.S.—to have a transparent contractual process by which the DPRK might disarm, thereby

satisfy the condition precedent to lifting sanctions, and the smart contract might verify such

disarmament so that U.S. sanctions could be lifted.  In that way, Virgil's own lecture was about

*complying with U.S. disarmament conditions* to end the sanctions regime, not evading them. (*See* PSR ¶ 38 ("Virgil described "using smart-property to disable nukes based upon fulfil[l]ed conditions.").)

Virgil recognizes that his engagement with CC-2 and others in their lectures and his remarks in response to their lectures crossed into cryptocurrency and sanctions evasion matters and violated the law.  Importantly, in comparing Virgil's offense to other sanctions and export control offenses, however, the conference discussions remained at the level of what the blockchain technology and cryptocurrency could do, focusing on "potential uses" of technology (*see* PSR ¶ 36) and things that "could be built" or "could be done."  (PSR ¶ 47.)  None of this discussion was at the highly technical level of how such applications are built, involving the detailed knowledge of cryptography and computer programming that it actually takes to create a blockchain.  Although Virgil obviously has an extremely technical background and advanced programming skills, he did not tell them how anyone actually programs a smart contract, much less sets up an entire blockchain and creates cryptocurrency.[20]

Notably, Virgil told the FBI that he did not believe, based on the conference, that the DPRK could build a viable cryptocurrency without China's assistance.[21]  The government apparently believes that conclusion is unsupported.  (*See* PSR ¶ 47.)  While Virgil now recognizes that his assessment may have been naïve, it was sincere, and it is the same thing he told friends upon his return.  The conference transcripts reflect that he did not receive the type of

---

[20] In no way is this discussion intended to imply that the special skill enhancement under the Guidelines—to which Virgil has stipulated and agreed—is not applicable.  It is.

[21] USAO_000246.

questions a programmer would ask if encountering roadblocks in programming an actual blockchain, and he did not provide information at that level.[22]

Again, the defense respectfully asks the Court to understand that Virgil is not seeking to excuse his crime but to explain that—in Virgil's own mind, based on his education and knowledge in this space, and at the time of the offense—he was providing only high-level general information, the type he and others regularly provided when speaking at conferences generally, not technical assistance.[23]  The DPRK clearly had far more advanced and technical expertise than was discussed at the conference, which is relevant when evaluating the nature and circumstances of the offense.  For example, a November 2017 *Vice* article reported that North Korean students were taking courses on cryptocurrency at Pyongyang University, indicating a growing engagement with bitcoin and cryptocurrency.  However, Federico Tenga, the Italian founder of the bitcoin startup Chainside who taught a cryptocurrency course at Pyonyang University in November 2017, returned from teaching the course skeptical of North Korea's

---

[22]  For example, and there are legion such examples, in an open discussion on Medium among two core Ethereum developers, the discussion involves numbers, programming language references, mathemathical concepts, etc. and is incomprehensible to a non-programmer. https://medium.com/ethereum-magicians/q-a-on-eth-2-0-ab1d5d3ac133 (*e.g.*, "Goes back to the idea of using merkel roots to include data, same conditions apply if 2.0 is finalising 1.0. Long term it depends on what happens with 1.0 (1.x, EWASM), if there is a WASM interpreter running in a shard then data will be more accessible").  The Ethereum core developer meetings are recorded and available on YouTube as are their agendas.  Again, these discussions are unlike the conference transcripts and at a high level of technicality.  See https://github.com/ethereum/pm/blob/master/AllCoreDevs-Meetings/Meeting%20128.md (I've opened up the proposal it's been mentioned during the previous call. it's the Geth the payloads, it's now a PR to the engine API spec. so, the Geth payload bodies function reflects the logic of the Geth blog bodies message of Eth protocol. This is actually the crux of this proposal.. . . . it's just exposed in almost the same or literally the same logic, in the, in the other part of the client in the other API.").

[23] Ex. E, ¶¶ 14-20.

cryptocurrency capabilities, saying that his students initially lacked an understanding of bitcoin's fundamentals.[24]

It is also important to highlight that Virgil made no money on this offense and did not seek to profit. As is well documented, he paid money to attend the conference and to travel the country. His travel to the DPRK was consistent with his curiosity about what he believed was an outdated and dying regime. In Virgil's naïve optimism, he believed that the regime would soon be relegated to the dustbin of history, and that seeing it would be akin to traveling to East Berlin before the Wall fell. Of the eight days he was in the country, only one was at the conference; the rest consisted of travel to well-established tourist sites.

Of course, the defense does not suggest that comparing the DPRK to East Berlin before the wall fell justifies his actions in any way. But this motivation does offer the Court insight into the significant difference between the sanctions violation in this case and that which exists in many other cases. Although admittedly illegal and improper, as the Court engages in the nuanced evaluation of the nature and circumstances of the offense, the defense respectfully submits that, as further discussed below, Virgil's conduct falls toward the lower end of the universe of sanctions offenses and weighs in favor of a downward variance pursuant to the sentencing considerations set forth in 18 U.S.C. § 3553(a).

### IV.     The Need to Avoid Unwarranted Sentencing Disparities (§ 3553(a)(6))

A below Guidelines sentence would not create any disparity with the sentences imposed on those convicted of similar crimes. To the contrary, imposing a lengthy sentence, let alone a Guidelines sentence, of incarceration on Virgil would create significant disparities in treatment

---

[24] https://www.vice.com/en/article/a37xya/north-koreas-bitcoin-crash-course-has-experts-worried

between similarly situated inmates.  Courts routinely review "case law submitted by defense counsel demonstrating that many similarly situated defendants had received sentences shorter than the guidelines range applicable here," and then impose sentences below the Guidelines range.  *Sarvestani v. United States,* Case No. 13 Cr. 214 (PGG), 2015 WL 7587359, at *6, n.3 (S.D.N.Y. Nov. 25, 2015).

Bearing these factors in mind, as the Court compares this crime in the instant case, and Virgil's participation in the conspiracy to other sanctions crimes that have been perpetrated in this and other districts, mitigating factors come to light and place the scheme Virgil was involved in toward the less serious end of the universe of sanctions offenses.

The defense attaches a spreadsheet as Exhibit F that captures the sentences imposed in sanctions and export-control related offenses over at least the last 10 years, demonstrating that the district courts routinely grant downward departures from the Guidelines range.  These cases establish that a significant number of defendants have received downward variances for similar offenses.  The following is a discussion of three of those cases found on the spreadsheet: *United States v. Banki,* Case No. 10 cr-00008 (S.D.N.Y. 2010), *United States v. Amirnazmi,*, Case No. 08-cr-00429, (E.D. Pa. 2010) *and Sarvestani*, 2015 WL 7587369.

In *Banki*, the defendant was convicted of multiple violations of IEEPA related to the transfer of a large amount of currency to Iran.  *United States v. Banki*, 685 F.3d 99, 102-03 (2d Cir. 2012).  Banki also obtained a personal financial benefit from this scheme, including a $2.4 million apartment in New York City.  *Id.* at 104. Virgil did not obtain any financial benefit from providing his "Blockchain and Peace" lecture and, as mentioned above, paid money to attend the conference in Pyongyang.  Moreover, Banki was convicted of five counts that included violating Iranian Transactions and Sanctions Regulations, conspiracy to violate the ITSR, and making

29

false statements to federal officials.  *Id.* at 102.  Virgil has pleaded guilty to one count of

conspiring to violate the IEEPA and voluntarily assisted law enforcement with their investigation

into his conduct.  Given that Banki faced a Guidelines range of 63-78 months and was sentenced

to only 30 months (*see id.* at 104), Virgil should similarly receive a significant downward

variance for his offense.

In *Sarvestani*, the defendant was involved in the export of satellite material to Iran in

violation of the sanctions regime.  *Sarvestani*, 2015 WL 7587369 at *1.  Sarvestani operated

multiple companies that procured U.S.-made goods for Iranian companies by transshipping the

goods through third countries to obscure the destination of the goods.  *Id.* at *3.  The district

court categorized the activity as "extremely serious criminal conduct," noting that "intentional

criminal conduct of this sort, committed by a highly sophisticated businessman, cannot be

condoned."  *Id.* at *5-6.  Alternately, Virgil did not engage in the transshipment of goods to

North Korea.  Although Sarvestani's plea agreement contained a Guidelines range of 57 to 71

months (*see id.* at *15), the district court decided to sentence Sarvestani to 30 months while

taking into consideration the case law submitted by the defense that demonstrated similarly

situated defendants receiving downward variances.  *Id.* at *6.

In *Amirnazmi*, the defendant, a dual citizen of the U.S. and Iran, was convicted of

multiple violations of the IEEPA with respect to the Iran sanctions regime.  *United States v.

Amirnazmi*, 645 F.3d 564, 570-71 (3d. Cir. 2011).  The defendant engaged in illegal business

transactions with the Government of Iran, including agreements to transfer a software program

developed to optimize the purchase of chemicals and chemical processes, with the intent to turn

Iran into a "chemical powerhouse."  *Id.* at 567-68.  Amirnazmi was found guilty of conspiracy to

violate the IEEPA, three violations of the IEEPA, and making false statements to federal

officials.  *Id.* at 571.  Much like Amiranazmi, Virgil alternately pleaded guilty to one count of conspiring to violate the IEEPA and voluntarily assisted law enforcement with their investigation into his conduct.  Given that Amirnazmi received 48 months down from 97-121 months (*see id.* at 571; Ex. F at 8), Virgil should also be granted a significant downward variance.

As outlined in the attached spreadsheet (Exhibit F), other recent IEEPA sentences were within the one to five year range, or even less.  *See, e.g., United States v. Zadeh* (the government and the PSR calculated a 46-57 month Guidelines range, but the district court imposed an 18-month sentence on an Iranian citizen for conspiring to purchase and ship products to Iran); *United States v. Sheikhzadeh*, (government requested a Guidelines range of 46-57 months, but the district court imposed a three month sentence on the defendant, and American citizen of Iranian descent, who financially benefited from Iran's Permanent Mission to the United Nations, proving hawala services to co-conspirators in the U.S. to facilitate investments in Iran); *United States v. Chen* (Guidelines range of 30-37 months, but the district court sentenced a Chinese national to 30 months for IEEPA violations that undermined America's security interests); *United States v. al-Baroudi* (government requested a Guidelines range of 46 to 57 months, but the district court imposed a 32 month sentence on the defendant, a Syrian national, for exporting U.S. tactical equipment to Syria for the purpose of supplying and arming Ahrar al-Sham and other insurgent groups whose goal was to overthrow the Assad government and install the Islamic state); *United States v. Parsa* (36 month sentence for six-year scheme in which the defendant conspired to obtain high-tech electronic components from American companies for transshipment to Iran and other countries); *United States v. Ouzhan Aydin* (30 month sentence for exporting munitions and money laundering for procuring aircraft parts for shipment from the U.S. to Iran); *United States v. Ali Soofi* (32 month sentence for Canadian-Iranian citizen for

conspiring to export military items from the United States to Iran and the Iranian Revolutionary Guard Corps).

Importantly, in many of the offenses reflected on the spreadsheet and the cases mentioned in the above paragraph, the defendants had a profit motive. But Virgil received no money in connection with his actions tied to North Korea. Further, in nearly every case on the spreadsheet, the defendants assisted in sending money to a banned country, or, more troublingly, in transporting actual nefarious and harmful equipment to America's enemies; whereas, Virgil did not. Defendants even received probation even where sending specialized carbon fiber used in nuclear engineering projects (*Chen*), restricted computer chips (*Wen*), construction equipment (*Mahmood*), laboratory reequipment (*Griffin*), ITAR-controlled wiring harnesses (*Trujillo*), ITAR-controlled connections for missiles guidance systems (*Telemi*). The defense has found no case in which a defendant was convicted of providing publicly known oral information, as opposed to money or specific banned items relating to weapons or computers, in violation of sanctions or export controls, but submits that providing such information should be deemed to be less damaging to national security than top secret information and physical items that can be used for weaponry.

Virgil's crime should be placed in parity with the cases in which defendants have been given probation. ████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████████



Therefore, the Court should sentence Virgil to a non-Guidelines sentence that is substantially below the Guidelines range to bring Virgil's sentence in line with similarly situated defendants. *See* 18 U.S.C. § 3553(a)(6) and *United States v. Toohey,* 132 Fed. Appx. 883, 884-87 (2d Cir. 2005).  More specifically, Virgil should be sentenced consistent with the sentences handed down in *Banki, Amirnazmi*, and *Sarvestani*, which support the sentence the defense respectfully seeks from the Court of 24 months' imprisonment along with a fine and substantial community service.

### V.       The Remaining 18 U.S.C. § 3553(a) Factors Support a 24-Month Sentence

In arriving at a sentence that is "sufficient but not greater than necessary" to comply with the purposes of federal sentencing, the Court also is required to consider a number of other factors not discussed above, namely, the need for the sentence imposed (a) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense, (b) to afford adequate deterrence to criminal conduct, and (c) to protect the public from further crimes of the defendant.  18 U.S.C. § 3553(a)(2)(A)-(C).

### a.   A 24-Month Sentence Is Sufficient to Recognize the Seriousness of the Offense and to Provide Just Punishment

The defense submits that a 24-month sentence, with a fine and community service, is sufficient in light of the factors of the seriousness of the offense and just punishment.

Virgil recognizes that his was a serious offense, and does not dispute the importance of the laws he violated.  Virgil sincerely believes in nuclear non-proliferation, and shares the U.S. national security goal of disarming the DPRK.  Again, in Virgil's backward mind at the time, he intended to assist with, rather than to undermine, that goal.  Virgil has long admired the Pugwash Council, an organization of scientists and leaders after a 1955 paper by Albert Einstein and Bertrand Russell that urged leaders of the world to "think in a new way," to renounce nuclear weapons, and "to find peaceful means for the settlement of all matters of dispute between them."[25]  The Pugwash Council ultimately received the Nobel Peace Prize.  With such influences, Virgil operated under a naïve and narcissistic view that his own efforts could be part of bringing about cooperation and peace, but realizes he was wrong to ignore the law, and that he got carried away.  He sincerely regrets his illegal conduct.

The Guidelines range appliable to this offense, however, is very high, because Virgil has received an enhancement under USSG § 2M5.1 based on evading national security controls. Without this enhancement, his sentencing range would have been a fraction of his current advisory Guidelines range.

The defense is not disputing the applicability of the enhancement, but notes that this same range would apply even if Virgil had shipped missile parts to the DPRK.  The same range applies to actions that present more of a clear and present danger to the United States than Virgil's

---

[25] *See* http://websites.umich.edu/~pugwash/Manifesto.html

offense, such as shipping weapon components or funding a terrorist organization.  Accordingly, the defense submits that the Guidelines range overstates the seriousness of Virgil's offense conduct and a downward departure is warranted.

For this and other reasons, Virgil believes that a below-Guidelines sentence is consistent with the imposition of a just punishment.  *See* Section 3553(a)(2)(A).  While Virgil's actions clearly broke the law, he does not deserve the same sentence as someone who, for example, intended to profit by selling missile parts to a hostile foreign nation.  Accordingly, a 63-month sentence would be much greater than necessary to justly punish this particular offense by this particular person.

### b.   Virgil's Pre-Sentence Confinement Eliminates the Need for a Long Sentence

Virgil's approximately 10 months of pre-sentence confinement, the vast majority of which were served at the Metropolitan Correctional Center ("MCC") and the Metropolitan Detention Center ("MDC"), warrants a downward variance.[26]  The time Virgil has served should be credited against the period of incarceration the Court imposes at a significant multiple of the actual time served due to the extremely harsh conditions (*e.g.,* he has not been permitted outdoors at the MCC or MDC since July 2021).  *See, e.g., United States v. Gonzalez*, No. 18 Cr. 669 (JPO) (S.D.N.Y. Apr. 2, 2021), Dkt. No. 250 at 17:17-18:5 (noting that defendant's pre-sentence confinement of 24 months in the MCC during harsh COVID protocols "is equivalent to having served three years.").

---

[26] The defense calculates that by the time Virgil is sentence he will have served 308 days incarcerated (42 days (November 28, 2019 – January 9, 2020) + 266 days (July 20, 2021 – April 12, 2022).)

Judges in this District have repeatedly recognized the horrific conditions at the MDC and MCC throughout the COVID-19 pandemic during sentencing deliberations.  For example, Judge Oetken acknowledged the "extraordinarily harsh" conditions that a defendant served at the MCC, most of which was during "lockdown conditions," and declared that "because it's been harsher than a usual period that it's more punitive, that it's essentially the equivalent of either time and a half or two times what would ordinarily be served," and, ultimately, that "having served 24 months [was] equivalent to having served three years."  *United States v. Gonzalez*, 18 Cr. 669 (JPO) (S.D.N.Y. Apr. 2, 2021).  And back in July 2020, Judge Paul Engelmeyer acknowledged the experience of a defendant who, like Virgil, endured lockdowns and contracting COVID-19 in detention: "I'm mindful that your experience in prison as a result of the pandemic, the preceding lockdown, the ensuing lockdown, and your own illness was frightful. Prison is supposed to be punishment, but it is not supposed to be trauma of that nature or close."  *United States v. Aracena de Jesus*, 20 Cr. 19 (PAE) (S.D.N.Y. July 1, 2020).[27]  Judge Engelmayer also stated, "Bottom line, your time in the MCC was way harder than anyone intended when you were detained following your arrest. Any mature system of justice, any thoughtful judge in imposing the reasonable sentence here would have to recognize the unexpected and regrettable ardors that you experienced since your arrest in December."  (*Id.*)[28]  Similarly, Judge McMahon, in *United States v. Tiffany Days*, lamented that she was only able to vary downward to the mandatory minimum based on the circumstance endured at MCC by Days, stating, "It is the finding of this Court that the conditions to which she was subjected [at the MCC] are disgusting, inhuman as anything I've heard about any Colombian prison, but more so because we're supposed to be

---

[27] Sent'g. Tr. at 36:14-18.

[28] Sent'g. Tr. at 37:6-11.

better than that."  (19 Cr. 619 (CM) (S.D.N.Y. Apr. 29, 2021)); Sent'g. Tr. at 19:17-20.)[29]  The

problems at the MCC and MDC even before the pandemic are equally well-known and have also

been grounds for downward variances in sentences.[30]

Since his arrest on November 28, 2019, Virgil has spent significant time at both facilities,

as well as on home confinement with restrictive conditions such that he was also not really free.

Following his arrest, Virgil transferred to the MCC in late December, and remained there until

his release on January 9, 2020.  Then he spent approximately 19 months on home confinement,

with strict conditions, at his parents' home in Tuscaloosa, Alabama.  Upon revocation of his

bond on July 20, 2021, he spent time at the MCC, which was in the process of closing down due

to its unfitness as a jail, and then following his plea in September, Virgil was moved to the

MDC, where he remains to this day.  By the time the Court sentences him on April 12, 2022, he

will have spent approximately 10 months incarcerated.

---

[29] As another example, in June 2021, Judge Abrams deemed the "traumatizing" and "unimaginably harsh" conditions at MDC during the COVID-19 pandemic a "very legitimate" factor when considering the defendant's sentence.  *United States v. Meli, et al.*, 19 Cr. 480 (RA) (S.D.N.Y. Sept. 24, 2021).

[30] *See, e.g., United States v. Sanpedro*, 352 F. App'x 482, 486 (2d Cir. 2009) (summary order) (noting that "[i]n imposing the sentence it did, the district court considered … [among other factors,] the harsh conditions of [the defendant's] confinement at Combita" prison in Colombia where he was detained before being extradited to the United States); *United States v. Salvador*, No. 98 Cr. 484, 2006 WL 2034637, at *4 (S.D.N.Y. July 19, 2006) (holding that defendant's pre-sentence conditions while "incarcerated in the Dominican Republic, awaiting extradition to the United States ... warrant a downward departure"); *United States v. Torres*, No. 1 Cr. 1078, 2005 WL 2087818, at *2 (S.D.N.Y. Aug. 30, 2005) ("depart[ing] downward, by 1 level, because of the harsh conditions of defendant's pretrial detention").  Examples of the conditions which merit variant sentences include a "lack of even minimal sanitary conditions and lack of food at times." *Salvador*, 2006 WL 2034637, at *4.  Other courts have determined that a lack of heating, hot water, and meaningful shelter during pre-sentence detention similarly justify a lower sentence. *Torres*, 2005 WL 2087818, at *2.

The conditions at MCC, where Virgil was held after his arrest and then again from his bail revocation through trial, were horrific. Those conditions, which are legendary in SDNY and had been the subject of judicial complaints for many years, were indeed so bad that the prison was closed while Virgil was there. For example, he never was permitted on the roof to get fresh air, rats infested the place and were in Virgil's cell at night, and he had no access to the library. Immediately before trial, Virgil heard an inmate screaming because he was being stabbed with multiple knives; to exit his cell to visit counsel, he had to step over the blood, which had not been cleaned up. He showed up late for his meeting with defense counsel, visibly pale and in distress.

As noted in the defense's January 14, 2022 letter requesting an adjournment of the sentence, which the Court granted, Virgil has also endured significant hardships during his time at MDC. (*See* Dkt. No. 188.) Due to nationwide gang violence and a recent COVID-19 outbreak in late 2021 and early 2022, Virgil and other inmates at MDC were kept in lockdown conditions for nearly 1.5 months, during which time Virgil contracted COVID-19 himself. Although he had been vaccinated while on release, he was not permitted to receive a booster shot. He was isolated during the time that he had COVID-19. Fortunately, he has since recovered.

During the lockdown there were significantly reduced food rations, and Virgil was often relying on peanut butter and jelly sandwiches (there was no food commissary or vending machines to supplement his meals). He also was unable to receive in-person visitors, including those from counsel, and his family have been unable to visit him at all. Virgil has had extremely limited out-of-cell and shower time, and experienced delayed access to necessary prescription

medications.[31] (*See, e.g.,* Dkt. No. 188.)  Virgil experienced first hand the horrific and unhealthy

sanitation and sewage problems that have factored so prominently in the articles critiquing the

MDC.  During his time at the MDC even outside of the lockdown, Virgil often has had to go

without showering for days at a time, has not had enough blankets to stay warm at night during

the winter, has been only served cold meals for long stretches of time.  In addition, he has not

had access to the library or been outside at the MDC to breathe fresh air once.

The grim conditions at MDC have recently drawn attention from members of Congress

and from judges.  In September 2021, various members of Congress submitted a letter to Bureau

of Prisons Director Michael Carvajal, in which they noted their concerns about how the

movement of detainees from the MCC to MDC, like Virgil has "taken a significant toll on staff,

---

[31] MDC's nightmarish conditions extend beyond the recent lockdown. *Insider* published an
article in September 2021 detailing attorneys' and prison experts' comments on the "disgusting"
conditions at MDC, such as poor heating and cooling systems, vermin infestations, sanitation and
sewage problems, and poorly trained, abusive personnel. (Jacob Shamsian, *Inside the Brooklyn
jail holding Ghislaine Maxwell and R. Kelly, where the toilets don't work and a judge said it's
'run by morons.'* Insider (Sep. 10, 2021, 5:45 PM), https://www.insider.com/brooklyn-federal-
jail-mdc-holding-ghislaine-maxwell-r-kelly-problems-2021-9.)  In October, when MDC inmates
were reportedly locked in their cells for 15 hours due to an electrical issue, the Federal Defenders
received reports of inmates lacking hot food, working toilets, and lights, as well as a dearth of
officers on units and inadequate medical treatment. One chilling account regards an inmate who
was instructed to administer his own psychiatric medication. (Noah Goldberg and John Annese,
*More problems at fed jail in Brooklyn; Inmates report no lights, water or hot food, few staffers*,
New York Daily News (Oct. 10, 2021, 5:20 PM), https://www.nydailynews.com/new-york/nyc-
crime/ny-water-electricity-conditions-mdc-brooklyn-20211010-27q6mnw6jre4llsko6jbww4m74-
story.html.)  Earlier in the pandemic, *Brooklyn Paper* published a scathing collection of inmates'
reports of inhumane conditions at MDC – many of which are eerily similar to those recently
experienced by Virgil and his fellow inmates – such as near-constant cell confinement, limited
showers, reduced access to legal calls, plumbing and ventilation issues, and significant concerns
from the medically vulnerable population. (Jessica Parks, *Detainees report inhumane conditions
at Brooklyn's Metropolitan Detention Center*, Brooklyn Paper (June 17, 2020),
https://www.brooklynpaper.com/detainees-report-inhumane-conditions-at-brooklyns-
metropolitan-detention-center/.) Nearly two years later, it's evident that MDC still has not
determined how to maintain livable conditions while keeping its population safe from COVID-
19.

raised security concerns, and heightened the already urgent medical care crisis at MDC."
*Federal Defenders of New York, Inc. v. Federal Bureau of Prisons, et al.*, 19 Cv. 660 (MKB)
(E.D.N.Y.) (Sept. 2, 2021).  Likewise, Judge McMahon in *Days* railed against MDC, saying that
it's "run by morons" and that "there is no excuse for [its] conditions."  19 Cr. 619 (Apr. 29,
2021).  Around the same time, Judge Failla acknowledged how extreme lockdown conditions at
MDC impeded a defendant's access to health-related "services that the Court envisioned her
receiving while incarcerated," which the Court "believe[d] to be critical to her physical and
mental health, and to her ability to reenter society as a productive and law-abiding citizen."
*United States v. Sharon Hatcher*, 18 Cr. 454 (KPF) (S.D.N.Y. Apr. 19, 2021) Dkt. No. 333 at 10-
11.

Overall, the conditions Virgil has endured first at the MCC and now at the MDC are
appalling, and much harsher than what a prisoner faces at a camp or minimum security facility,
or even a higher level prison.  Even at the country's highest security prison, ADX "Supermax" in
Colorado, prisoners get outside, fresh air one hour a day.[32]  Virgil has not breathed fresh air since
he went in July 2021.[33]

As for the approximately 19 months Virgil spent on home confinement, that bears serious
consideration in crafting the appropriate sentence too.  During his time on home confinement,
Virgil had to wear an ankle monitor, which is an unusually lengthy period of time.  In addition,
he was not permitted any computer or internet access.  In this modern age, this is more than just
a simple inconvenience.  Basically, the time he spent on home confinement cut him off from life

---

[32] https://www.themarshallproject.org/2016/01/08/my-life-in-the-supermax

[33] The exception being a draft through a leaky window for a few weeks during quarantine at the
MDC.

as he has known and enjoyed it. When taken all together, his circumstances on home confinement are custody-like in terms of removal from everyday society, and they lasted approximately 19 months.

In sum, the time Virgil has been incarcerated, approximately 10 months by his sentencing, should be credited against any period of incarceration at a multiple of the actual time served at a multiple, and the time spent on strict home confinement also provides additional grounds for a downward variance.

### c. A 24-Month Sentence is Sufficient for General and Specific Deterrence, to Promote Respect for the Law, and To Protect the Public (§ 3553(a)(2)(B and C))

A sentence of incarceration of no more than 24 months, with a fine and significant community service, is sufficient to provide general or specific deterrence, to provide respect for the law, and to protect the public.

To start, the very unique nature of the criminal conduct at issue in this sentencing lessens the need for general deterrence. *Cf. Garofalo v. Gravano*, 23 F. Supp. 2d 279, 282 (E.D.N.Y. 1998) ("General deterrence is similarly inapposite. Because his stature in organized crime is so unique, it would be fatuous to believe that the sentence imposed would encourage others to emulate his past"). Simply put, sanctions violations are not common. Even for those in the population who could be deterred, the punishment already meted out to Virgil—arrest by the FBI, home confinement with severe restrictions on communication with the outside world, a felony conviction, public humiliation, a reputation in tatters, a career in ruins, and time spent incarcerated—already provides significant deterrence. *United States v. Edwards*, 595 F.3d 1004, 1016 (9th Cir. 2010) (holding that § 3553 "does not require the goal of general deterrence be met through a period of incarceration," and upholding district court's determination that probation and restitution provided adequate deterrence, despite range of 27-33 months imprisonment). As

41

Professor Matt Blaze notes in his letter to the Court, "Even the lightest possible sentence would still achieve a very strong deterrent effect on those might find themselves in a position to commit similar crimes."  (Ex. B at 45-46.)

Moreover, the overwhelming consequences that Virgil has already suffered have provided have more than ensured general as well as specific deterrence.  Virgil has lost a job he cherished at the Ethereum Foundation, has been locked out of meaningful participation in his professional community since his arrest, and his reputation will forever be tarnished.  *See United States v. Adelson*, 441 F. Supp. 2d 506, 514 (S.D.N.Y. 2006) ("With his reputation ruined by his conviction, it was extremely unlikely that [the defendant] would ever involve himself in future misconduct").  Indeed, Virgil's downfall has been very public, more than most convicted felons.  His arrest was the focus of extensive national media coverage, including in the New York Times.[34]  This case will haunt him the rest of his life in a way that is uniquely harsh due to the media coverage, and his reputation has permanently suffered.  There is thus no need to impose an additional lengthy sentence of incarceration on Virgil to achieve specific deterrence.  *United States v. Vigil*, 476 F. Supp. 2d 1231, 1235 (D.N.M. 2007) (finding variance appropriate where defendant was collaterally punished by loss of his position and reputation, widespread media coverage, and emotional toll of two lengthy public trials).

In addition, there are other circumstances in this case which underscore that a lengthy sentence of imprisonment is not necessary to deter Virgil from engaging in similar conduct.  For example, he is a first-time offender, and courts have observed that first-time offenders like Virgil

---

[34] *See, e.g.,* https://www.nytimes.com/2019/12/02/nyregion/north-korea-virgil-griffin-cyptocurrency-arrest.html

42

are statistically less likely to reoffend.  *See, e.g., United States v. Williams*, 662 F. App'x 366,

377 (6th Cir. 2016) (affirming a below-Guidelines sentence because the sentencing court "was

motivated primarily by [the defendant's] lack of criminal history and her low risk of

recidivism").  And for offenders like Virgil who have never been imprisoned even a short term

of imprisonment can be "sufficient to impress upon [her] the seriousness of the offense and to

deter others under similar circumstances."  *United States v. Cull*, 446 F. Supp. 2d 961, 965 (E.D.

Wisc. 2006).  And offenders over the age of 40—which Virgil will be in less than a year—

"exhibit markedly lower rates of recidivism in comparison to younger defendants."  *United*

*States v. Hernandez*, No. 1:03-cr-01257 (RWS), 2005 WL 1242344, at *5 (S.D.N.Y. May 24,

2005).

 As to general deterrence, studies have shown that a longer prison sentence is unlikely to

have a specific deterrent effect.  "[T]here is little evidence of a specific deterrent effect arising

from the experience of imprisonment compared with the experience of noncustodial sanctions

such as probation.  Instead, the evidence suggests that reoffending is either unaffected or

increased."  Daniel S. Nagin, Deterrence in the Twenty-First Century, 42 CRIME & JUST. 199,

201 (2013).  A long prison sentence for Virgil—who, as set forth above, will continue to be a

productive member of society—is thus not necessary to adequately serve the goals of deterrence.

 Lastly, neither imprisonment nor other forms of custody are necessary to protect the

public from future crimes.  Virgil has learned to respect the law and has ███████████████

███████████████  Based on his lack of criminal history alone, Virgil poses the lowest

possible risk of recidivism.  More importantly, as the letters attest, Virgil has demonstrated

genuine remorse and has learned the most difficult of lessons from this case.  Virgil presents no

risk of reoffending and any form of custody is wholly unnecessary to protect the public.

## <u>CONCLUSION</u>

The defense respectfully submit that a careful consideration of all the sentencing factors a below Guidelines sentence of imprisonment of 24 months, with a fine and substantial community service, is sufficient to serve the goals of Section 3553(a).  Virgil acknowledges that he deserves punishment, but a sentence within the Guidelines range would overstate and over-punish the criminal conduct at issue in this case, particularly in light of the sentences others have received for much more egregious conduct.  Virgil still holds the potential to be extremely valuable to society as a family member, as a friend, as a brilliant scientific mind, and as a cautionary tale– and intends to work hard to be one upon release from prison.

Dated:  March 4, 2022

Respectfully Submitted,

*/s/ Brian E. Klein*

_____
Brian E. Klein
Keri Curtis Axel
Sam S. Meehan
Waymaker LLP

-and-

Sean S. Buckley
Amanda N. Tuminelli
Kobre & Kim LLP

*Attorneys for Virgil Griffith*

44