

**Waymaker LLP**
777 S. Figueroa Street, Suite 2850
Los Angeles, California 90017
T 424.652.7800

Author's Direct Dial No.
**(424) 652-7814**

Author's Email Address
**bklein@waymakerlaw.com**

**BY ECF**

April 6, 2022

Honorable P. Kevin Castel
United States District Judge
Daniel Patrick Moynihan United States Courthouse
500 Pearl Street
New York, New York 10007

**Re:    *United States v. Virgil Griffith*,**
**20 Cr. 15 (PKC)**

Dear Judge Castel:

    We write to the Court in advance of our client Virgil Griffith's April 12, 2022 sentencing to address a few of the issues raised in the government's 64-page sentencing memorandum. (*See* Gov't Memo.; Dkt. No. 192.) In light of the government's lengthy memorandum and the arguments it raises, we believe this letter will help save the Court and the parties time and resources at the hearing and assist the Court with crafting a sentencing that is "sufficient, but not greater than necessary" to meet all of the 18 U.S.C. § 3553(a) factors.

    As the Court is aware, the defense has respectfully requested a sentence of imprisonment of 24 months, with a fine and substantial community service. (Deft. Memo. (Dkt. No. 191) at 3.) The Probation Office recommended a sentence of 63 months' imprisonment with a $25,000 fine. (PSR Sentencing Recommendation at 2, 6.) The government seeks a sentence within the Guidelines range of 63 to 78 months' imprisonment plus a fine "towards the top of the Guidelines range" of $1 million. (Gov't Memo. at 2.)

    At the outset, although the government spent almost 40 pages discussing the offense conduct, its position fails to address many of the key points raised by the defense regarding Mr. Griffith's unique personal history and circumstances. For example, Mr. Griffith has already spent over 10 months in extremely harsh jail conditions as well as approximately 19 months under restrictive pretrial home confinement.

    The defense raises a limited number of points below and looks forward to addressing all of the government's points at the April 12 sentencing.



Honorable P. Kevin Castel
April 6, 2022
Page 2 of 5

- **The Court Should Reject the Government's Proposed High-End Fine**

The government's proposed fine "towards the top end of the Guidelines range" of $1 million is neither just, warranted by the circumstances of this case, nor consistent with past precedents.

A fine is rarely imposed in IEEPA cases even where the conviction has been for more economically significant or dangerous conduct than is presented in this case. *See, e.g.*, *United States v. Atilla*, 15 Cr. 867 (RMB) (Dkt. No. 518) (S.D.N.Y. May 16, 2018) (defendant convicted of multi-year scheme to help Iran launder billions of dollars-worth of oil proceeds and was not ordered to pay fine or restitution); *United States v. Amirnazmi*, 8 Cr. 429 (Dkt. No. 184-1) (E.D. Pa. 2010) (no fine and $17,277.37 in restitution); *United States v. Ihsan Elashyi*, 2 Cr. -52 (Dkt. Nos. 371, 373, 437, 484, 428) (N.D.T.X.) (no fine and no restitution ordered for defendants). And where a fine was imposed, it did not typically exceed even $100,000. *See, e.g.*, *Sarvestani v. United States*, 2015 WL 7587359 (S.D.N.Y. Nov. 25, 2015) ($100,000 fine and no restitution); *United States v. Sergey Boltutskiy*, 11 Cr. 553 (Dkt. No. 82) (E.D.P.A. Dec. 20, 2013) ($3,000 fine and no restitution).

A fine approaching anything close to what the government seeks – $1 million – would be particularly inappropriate and unjust for a number of reasons. First, Mr. Griffith did not receive (nor attempt to receive) any compensation or otherwise profit from the charged offense and there was no harm or loss to any victim. Second, while the defense advocated for the imposition of a "significant" fine in its sentencing submission, this was done in support of an argument for a sentence of not more than 24 months and based upon the Probation Office's recommendation of a $25,000 fine. (Further, by "significant" the defense was not implying anything more than high five figures, which would traditionally be very significant.) By contrast, the government is seeking a sentence within the 63 to 78 months recommended Guidelines range, as well as a fine near the top end of the Guidelines and the statutory maximum based upon the claim that Mr. Griffith could pay such a fine. Imposition of anywhere close to a $1 million fine under the facts and circumstances of his case hardly can be described as "sufficient but not greater than necessary" to achieve the legitimate objectives of sentencing and would create an unwarranted and significant sentencing disparity. *See* 18 U.S.C. § 3553(a).

In its sentencing submission, the government argues that cases such as *Banki*, *Amirnazmi*, and *Sarvestani* are not analogous to the case at hand, and points the Court instead to examples such as *Dhafir* and *Datta*. (Gov't Memo. at 63 ("Such cases include Rafil Dhafir, who was sentenced to 264 months for conspiring to launder several million dollars to Iraq, 3 Cr. 64 (NAM) (N.D.N.Y.); and Vikram Datta, who was sentenced to 235 months for conspiring to launder millions in drug proceeds, 11 Cr. 102 (LAK) (S.D.N.Y.).").) The defense does not agree that these are appropriate comparisons. As an initial matter, each case involved the laundering of millions of dollars in illicit funds, an issue that distinctly is not in play here. Even then, in Mr. Dhafir's case, a fine was waived, and he was ordered to pay $865,272 in restitution. In Mr. Datta's case, there was no fine and no restitution. Thus, the cases the government contends are most analogous support the imposition of no fine at all.



Honorable P. Kevin Castel
April 6, 2022
Page 3 of 5

To support its request for a fine at the top end of the Guidelines range of $1 million, the government speculates that Mr. Griffith has not fully disclosed his assets.  (Gov't Memo. at 50.)  It is unfair that the government has tied Mr. Griffith's hands in terms of accessing (and valuing) his cryptocurrency assets, and then unfairly seeks to impugn him when he cannot value them.  Mr. Griffith has neither had internet access, nor access to his cold wallet storage devices (which are like USB devices), in more than two years.  As the Court knows, cryptocurrency is highly volatile.  Immediately after Mr. Griffith's arrest, the government informed counsel for Mr. Griffith that any attempt to access his cold wallets in Singapore would be deemed obstruction.  Accordingly, the defense worked with counsel in Singapore to create a protocol where even Mr. Griffith's own counsel would not access Mr. Griffith's cold wallets while securing them.  *See* Attachment A.  Under that protocol, which was designed to satisfy the government's concerns and that it approved, the wallets were seized by a computer forensic examiner, itemized, sealed, and placed in a safe deposit box.  The government made no request for an accounting of any assets on the devices and, consistent with the protocol, no one accessed the data on the devices before securing them.  The government's suggestion that the "foreign safety-deposit box money" "should have been reported" (Gov't Memo. 51) is wholly improper, as the government never requested that and indeed, based on the obstruction threat, Mr. Griffith's counsel carefully avoided accessing them.  Accordingly, Mr. Griffith only could provide an estimate to the Probation Office, about which the Probation Office has expressed no concern.  In any event, Mr. Griffith in trying to comply with the government's own restrictions lacks access to any more specific information.

Finally, we urge the Court to keep in mind that Mr. Griffith has always made an average salary consistent with his jobs as an academic, researcher, and theoretician, and even such positions for which he is qualified may be hard to come by once he is released with a felony conviction.  The government's request is in effect for Mr. Griffith to forfeit his entire life savings for a crime in which he had no gain and there was no victim loss, while his ability to earn future income has been greatly diminished.

We believe that the weight of relevant caselaw and § 3553(a) factors support the conclusion that a much smaller fine, if any, is appropriate in this case, as the defense requested.

- ████████████████████████████████████████████████
  ██████████████ **Understands the Gravity of the Offense**

████████████████████████████     █████████████████
██████████████████████████████████████████████████████
██████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████



███████████████████████████████████████████████████████████████ ██
██████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████
████████████████████████████████████  As another example, the government inaccurately characterizes the phone and laptop Mr. Griffith took to the DPRK as "burner" devices to make them sound nefarious.  (*Id.*)  But the phrase "burner phone" is in the common parlance and using one is a well-established practice, not only by U.S. government officials but also by U.S. businesspeople when traveling to regimes such as China.[2]  The reality is that Mr. Griffith took "clean" devices (*i.e.,* new and with no content on them) to the DPRK because he did not want the DPRK to seize any of his personal or professional  (much of which was propriety and confidential) information, and did not do so out of a desire to keep any information about his travel to the DPRK from U.S. (or any other) authorities (indeed, he reported his DPRK trip both before and immediately after).  Further, Mr. Griffith took no steps to destroy the other devices upon his return, and Singapore authorities later seized them and turned them over to the prosecution team.

The government also claims that the defense "seeks to undermine the gravity of the offense."  (Gov't Memo. at 43.)  Not true.  Mr. Griffith has in no way sought to minimize his offense conduct.  And the defense in his sentencing position simply offered much needed context to the particular facts and circumstances of this case.  (See Deft. Memo. at 23-25.)  To that end, the defense has thoroughly explained in previous filings that the DPRK had extensive knowledge and use of cryptocurrency before Mr. Griffith's trip as U.S.-based prosecutions and enforcement actions prove.  (*See, e.g.,* Deft. Mot. to Compel at 18-19; Dkt. No. 62.)[3]  It is the government that

---

[1] ███████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████

[2]  According to Newsweek, the U.S. Olympic Committee advised U.S. athletes to take burner phones to the recent Winter Olympics in China.  https://www.newsweek.com/olympic-athletes-advised-take-burner-phone-china-required-app-has-security-flaws-1670557  This is a common and unremarkable practice.

[3] For example: (1) *United States v. Park Jin Hyok*, Case No. MJ-18-1479 (C.D. Cal.). Park is alleged to have been a programmer for a DPRK government-backed entity called "Chosun Expo" that was responsible for the 2014 Sony hack and the 2017 WannaCry 2.0 attack. The criminal complaint alleges that, in July 2017, nearly two years before Mr. Griffith's trip, North Korea took ransom payments from the WannaCry attack from Bitcoin wallets, which were then sent to a currency exchange and converted to Monero.; (2) *OFAC Sanctions on Lazarus Programmers*.  https://home.treasury.gov/news/press-releases/sm924.  In March 2020, OFAC sanctioned two Chinese nationals who purportedly work for Lazarus Group, an alleged cyber-crime syndicate backed by the government of the DPRK. The sanctions stemmed from an



fails to acknowledge these important facts.  The government's sentencing position makes it sound like Mr. Griffith alone taught the DPRK about cryptocurrency and this was a novel problem. (*See, e.g., id.* at 46-47.)  Nothing could be further from the truth, as the government's own prosecutions show.

***

For all of the above reasons, as well as those in Mr. Griffith's sentencing position, the defense respectfully submits that a sentence of imprisonment of 24 months, with a fine not more than $25,000 and substantial community service, is appropriate for Mr. Griffith.

Respectfully submitted,

Brian E. Klein
Keri Curtis Axel
Waymaker LLP

-and-

Sean S. Buckley
Amanda N. Tuminelli
Kobre & Kim LLP

*Attorneys for Virgil Griffith*

---

alleged Lazarus hack in 2018 (again, before Mr. Griffith's trip) in which about $91 million worth of cryptocurrency was stolen and laundered by the two programmers through Chinese banks.